UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PHILIP CHARVAT on behalf of himself and
all others similarly situated,

*v.*

ELIZABETH VALENTE, et al.,

      *Defendant.*

Case No.  12-cv-5746

**RULE 26(a)(2)(b) WRITTEN REPORT
OF JEFFREY A. HANSEN**



1

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

## EXPERT REPORT OF JEFFREY A. HANSEN

My name is Jeffrey A. Hansen. I am an adult over the age of 18, a resident of the state of California, and reside at 2625 Kings View Circle, Spring Valley, CA 91977. Unless indicated otherwise, I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them. I was asked to prepare this written expert report by Plaintiff's counsel in the above-captioned matter, in support of Plaintiff's Designation of Expert Witnesses Pursuant to Fed. R. Civ. P. 26(a)(2)(b). I have been retained in this case at a rate of $300 per hour, for all services rendered, and $380 per hour for depositions.

### *Experience and Credentials.*

I am the principal of Hansen Legal Technologies, Inc. My firm is in the business of handling information technology, including investigations and analysis of electronic data. I have served as an expert or consultant in more than 50 Telephone Consumer Protection Act, 47 U.S.C. § 227, ("TCPA") class action lawsuits, and as an expert or consultant in numerous other civil cases. With regard to my experience as an expert and consultant in legal matters, generally, I have frequently served as an expert witness and consultant to law firms in conducting computer forensic analysis. I have also assisted in electronic discovery issues. Specific to this case, my firm was retained to assist Plaintiff's counsel in evaluating and analyzing the telephone dialing system used by the defendant Elizabeth Valente, and the associated companies named in the lawsuit, including but not limited to the defendant Resort Marketing Group (collectively referred to as "RMG"), in placing telephone calls to Plaintiff and the other putative class members. I have also been retained to assist Plaintiff and their counsel in evaluating and analyzing electronic data related to outbound calls and other electronic data associated with computer systems and/or telephone dialing systems used by RMG in marketing on behalf of the defendants Carnival, Royal Caribbean and Norwegian Cruise Lines ("Cruise Defendants").

I have extensive experience with data warehousing, including data warehousing related to telemarketing and auto-dialers. I am familiar with the procedures involved in such practices, and I have personally engaged in data warehousing regarding the compilation of certain lists,

2

including demographic and target audience lists for telemarketing, and have personally repaired defective lists to eliminate improperly formatted and corrupted data. I also frequently act as a consultant to companies that engage in the use of autodialers, and I am familiar with their use and procedures, and the technical aspects of that business. In that capacity, I have assembled, configured, maintained, operated all aspects of autodialers, and interfaced with the telecommunications providers through whose networks the autodialers operate.

I have set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines, to outbound call centers capable of generating over one million calls per hour. When building these systems, I have used various software and hardware solutions for predictive and autodialers, both proprietary and open source, and customized those systems for their particular uses. I myself have used and maintained predictive and autodialers, and trained others to do the same. Similarly, I am familiar and have experience with, and know how to use databases containing cell block identifiers and ported number lists, both of which identify cellular type telephone numbers and are typically used in these industries.

Over the years, I have used various types of marketing lists, obtained from various sources, for telemarketing campaigns. I have purchased these lists from data brokers who were not the original source of the data, but who were essentially "middle-men." I have also purchased various "opt-in" lists, but never used them for the basis of "consent." These lists were compiled from visits to various websites and distributed among various data brokers and compiled by other middle men. I discovered very quickly the vendors of these lists had a different understanding of the word "opt-in" than I did. Their definition was "the leads are interested in a type of product because they visited a website." My definition of "opt in" was "consent to be called about a product or service." I also realized that it was impossible to verify how many of these leads were originally created, however, it was understood that they were compiled from various sources such as: spyware, landing pages, public information, web scraping, registrar of voters, etc., and then combined together.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

Over the last twenty-six (26) years, I have also had extensive experience in a broad range of other areas in the electronic and information technology fields and obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst. From the hardware perspective, I have extensive experience in troubleshooting and repairing at the component level, and building various systems for various purposes. I have designed, built and maintained computer networks in a variety of environments from commercial businesses to very large DoD networks. I have taught approximately 1,000 others the skills to become computer network engineers themselves. I have had extensive experience in dealing with security breaches and hardening computer networks against those breaches. I have handled many computer forensic and E-Discovery matters, including internal investigations in companies, working at the FBI sponsored Regional Computer Forensics Laboratory, and founding a computer forensics and E-Discovery firm over 7 years ago. I have also had extensive experience with the set-up and use of predictive and auto dialers. *See Exhibit A, Resume of Jeffrey A. Hansen.*

I have been called to testify in the following civil matters: *Craig Casey v. Valley Center Insurance Agency Inc.*, Case No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court); *Stemple v. QC Holdings, Inc.*, Case No. 12-CV-1997-CAB-WVG (S.D. Cal.); *Hahn v. Massage Envy Franchising,* Case No: 3:12-cv-00153-DMS-BGS (S.D. Cal.); *Abdeljalil v. General Electric Capital Corporation,* Case No: 12-cv-02078-JAH-MDD (S.D. Cal.); *Jasminda Webb v. Healthcare Revenue Recovery Group, LLC* Case No: C 13-0737 JD (N.D. Cal.); *Balschmiter v TD Auto Finance, LLC,* Case No: 2:13-cv-01186 (E.D. Wisc.); *Jordan Marks v Crunch San Diego, LLC,* Case No. 14-CV-0348-BAS (BLM) (S.D.Cal.); *Peter Olney v Job.com,* Case No: 1:12-cv-01724-LJO-SKO (E.D. Cal.); *Carlos Guarisma v ADCAHB Medical Coverages, Inc. and Blue Cross and Blue Shield of Florida, Inc.,* Case No: 1:13-cv-21016-JLK (S.D. Fla.); *Farid Mashiri v Ocwen Loan Servicing, LLC,* Case No: 3:12-cv-02838 (S.D. Cal.); *Monty J. Booth, Attorney at Law, P.S. v Appstack, Inc.,* Case No. 2:13-cv-01533-JLR (W.D. Wash.); *Rinky Dink, Inc. d/b/a Pet Stop v World Business Lenders, LLC,* Case No. 2:14-cv-00268-JCC (W.D.

4

Wash.); *Michael Reid and Dave Vacarro v. I.C. Sytems, Inc.,* Case No. 2:12-cv-02661-ROS (D. Ariz.); *Jeffrey Molar v NCO Financial Systems* Case No. 3:13-cv-00131-BAS-JLB (S.D. Cal.); *Latonya Simms v Simply Fashion Stores LTD, and ExactTarget, Inc.,* Case No. 1:14-CV-00737-WTL-DKL (D. Ind.); *Sueann Swaney v Regions Bank,* Case No. CV-13-RRA-0544-S (N.D. Ala.); *Hooker v SiriusXM,* Case No. 4:13-cv-00003 (AWA) (E.D. Va.); *Diana Mey v Frontier Communications,* Case No. 13-cv-01191-RNC (D. Conn.); *Rachel Johnson v Yahoo! Zenaida Calderin v Yahoo! Case* No. 14-cv-2028 14-cv-2753 (N.D. IL).

### Work and Analysis in this Case

I have been retained in this case to case to analyze a telemarketing dialer database (the "Dialer Database") produced in discovery by RMG. Specifically, I have been asked to assess and opine as to the number of pre-recorded messages transmitted to, and received by, consumers that promoted the goods and services of the Cruise Defendants, contained within particular campaigns within the Dialer Database, to identify the phone numbers of consumers so contacted, and to determine if such consumers were called on a residential or cellular telephone line.

In addition, I have been asked to specifically address some of the defenses raised by RMG and the Cruise Defendants as to the type of information that could be successfully gleaned from the Dialer Database. For example, RMG may claim that not all of the outbound calls made via the Dialer Database utilized a pre-recorded message. RMG may also claim that some outbound calls were made using a predictive dialer, with no pre-recorded voice and some calls were "hand dialed," presumably meaning an outbound telemarketing call made without the assistance of a computer. RMG may also contend that not all of the pre-recorded messages transmitted to consumers via the Dialer Database promoted the goods and services of the Cruise Defendants, or that this information may not be ascertained from the Dialer Database. To address these claims, I have been asked to identify only class members who were sent pre-recorded

messages promoting the goods or services of the Cruise Defendants, and to explain my process for doing so.

My understanding is that RMG has claimed in discovery that, on limited occasion, RMG would switch out the pre-recorded message used in a particular telemarketing campaign and change the substance of the pre-recorded message from promoting the goods or services of the Cruise Defendants, to some other goods or service unrelated to this case. RMG further claims that sometimes, the substance of the pre-recorded message would be changed in the middle of the same telemarketing campaign.[1] To address this expected claim, I have been asked to identify telemarketing campaigns which solely utilized pre-recorded messages that promoted the goods or services of the Cruise Defendants throughout the entirety of the individual telemarketing campaigns.

Further, I have been asked to evaluate the documents produced by RMG that it contends evidences the "prior express consent" of consumers to receive the pre-recorded telemarketing calls at issue in this case. RMG has produced over seventy million phone numbers it claims are "opt in" leads, many of which were purportedly purchased from a "middle-man" who, in turn, purchased the leads from another "middle-man" who, in turn, purchased the leads from yet another third party who can no longer be located. I understand that the defendants claim these "opt in" leads satisfy the TCPA's requirement that a consumer must provide their "prior express consent" to receive telemarketing calls delivered via pre-recorded message. As a professional familiar with the telemarketing industry and its best practices, I have been asked to opine as to reliability of defendant's "opt in data" in the context of this case.

---

[1] Jamie Smith, the RMG employee charged with administering and maintaining the Dialer Database admitted at deposition that he was aware of no evidence that the pre-recorded messages used in the telemarketing campaigns that included calls to Mr. Charvat were changed in the middle of the campaigns. See Exhibit B, Deposition of Jamie Smith at pg. 106-107.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

Finally, the defendants may claim that at least some of the telemarketing calls at issue were made to consumers who were prior customers of the defendants. Accordingly, the defendants are expected to argue that an Established Business Relationship ("EBR") exemption to the TCPA would apply to such consumers. Although my understanding is that, to date, the defendants have failed to produce any actual evidence that any of the class members had a valid EBR with any of the defendants, I have been asked to explain how such a limited sub-set of hypothetical consumers could be removed from the class list. However, as the defendants have not produced any actual EBR evidence, I have yet to perform this analysis.

### Methodology to Identify the Class

I utilized the following methodology to identify consumers who received pre-recorded messages from RMG promoting the goods or services of the Cruise Defendants. First, I was provided with the Dialer Database which consisted of two large PostgreSQL databases. The two databases contained records of pre-recorded calls made to 432,832,770 phone numbers. The Dialer Database was physically possessed by Ms. Valente and RMG, but was serviced and administered by Asteria Solutions Group, which also designed the dialing software used by the Dialer Database. RMG relied heavily upon Asteria to provide it with guidance as to the use of the dialing software and the Dialer Database. Given the important role played by Asteria in managing the Dialer Database, I contacted Asteria myself to make sure that I correctly interpreted the data contained on the Dialer Database. To that end, I consulted with Tim Ringenbach who provided me with the requisite information and relationship data to properly interpret the data and tables contained within the Dialer Database, and the proper meaning of disposition codes used by the Asteria software. I have worked with many dialing systems and software similar to the Asteria software used with the Dialer Database. I have also worked, in the past, with Asteria software in a context unrelated to this case. The relationship data provided

by Asteria was consistent with my experience as to the manner in which the Asteria software compiled information relating to telemarketing campaigns.

Next, using a SQL database, I matched the hundreds of millions of pre-recorded calls made using the Dialer Database to a Cell Block Identifier list identifying which numbers were assigned to wireless numbers. In this way, I was able to segregate cell phone numbers from landline numbers. I then used the Neustar ported number lists to identify numbers that were ported either from wireless to landline or landline to wireless. Neustar is the company that was retained by the Federal Communications Commission to maintain a database tracking telephone number assignments. If a residential number was ported to a wireless provider, it would appear in the Neustar database. Using the telephone and date columns in my queries, I was able to determine which numbers were called after being ported to wireless from landline. For the numbers ported to landline from wireless, I was also able to determine which numbers where called before being ported. The end result was, I identified numbers as a wireless number only if it was a wireless number at the time of the call.

I then examined the directory of pre-recorded messages contained in the audio directory used by the Dialer Database. Specific audio-files were all identified in the "sounds" table of the audio directory and stored in /var/lib/asterisk/sounds/ivrs/. The telemarketing records for each individual campaign within the Dialer Database confirmed whether or not a pre-recorded message was used as the records identified the specific sound file played during each call made by the Dialer.

Based on all the above information, and based upon my own personal knowledge as to how the Asteria system works, I joined the various tables contained within the Dialer Database that I needed to create a Call Detail Report for three of the pre-recorded telemarketing campaigns that included the residential phone number of Mr. Charvat. These reports detail:

- The phone number of the consumer called by RMG (Column A);
- The date of the call (Column B);

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

- Whether the call was answered by an answering machine or a person (Column C);

- The name assigned to the particular telemarketing campaign (Column D);

- The number assigned to the particular telemarketing campaign (Column E);
- The specific number assigned to the pre-recorded call within the Asteria sound directory (Column F).

The Call Detail Reports confirmed that Mr. Charvat was called by RMG via pre-recorded message on June 11, 2011, September 8, 2011 and June 20, 2012. Mr. Charvat made recordings of all three of these calls confirming that the substance of the pre-recorded messages promoted the goods or services of the Cruise Defendants and specifically utilized their trade names "Carnival," "Royal Caribbean" and "Norwegian" cruise lines.[2]  The pre-recorded call made to Mr. Charvat on June 11, 2011 was found within a telemarketing calling campaign entitled 0610 TS2 Mix B223.  The Dialer Database assigned this telemarketing Campaign ID #422.  The records also indicate that the number of the audio-recording made to Mr. Charvat was s28.wav. This exact recording was also used in all calls contained within the telemarketing campaign entitled 0610 TS2 Mix B223 and assigned Campaign ID#422.  I found no evidence whatsoever that would indicate that any of the telemarketing calls contained with 0610 TS2 Mix B223 and

---

[2] **June 11, 2011**
   Recording: Congratulations.  You've submitted an online contest entry form for Royal Caribbean Cruises, Carnival or Norwegian Cruise lines and were selected to receive a promotion. Press one now to speak to a cruise specialist, or press 2 to decline this promotion and be added to our do not call list.  Press one now.

   **September 8, 2011**
   Recording:  Hello.  You filled out an entry form for a Royal Caribbean, Carnival or Norwegian Cruise Line promotion and were selected today. Please press one to speak with a cruise specialist or press 2 to decline this offer and be added to our do not call list. Press one now.

   **June 20, 2012**
   Recording:  Congratulations, you filled out a contest entry form for a 4 or 5 day cruise with Carnival, Royal Caribbean or Norwegian cruise lines and you were selected. Press 1 now to speak to a travel service cruise agent or press 2 to decline this offer and be added to our do not call list. Press one now.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

assigned Campaign ID #422 were dialed by hand, or did not include a pre-recorded message. I found no evidence whatsoever that would indicate that any of the telemarketing calls contained within 0610 TS2 Mix B223 utilized a pre-recorded message different than the pre-recorded message recorded by Mr. Charvat. Indeed, the records indicate that all consumers in this campaigned received the pre-recorded message .s28.wav, the same message received by Mr. Charvat.

The pre-recorded call made to Mr. Charvat on September 8, 2011 was found within a telemarketing calling campaign entitled 0901 TS2 Eastern B223. The Dialer Database assigned this telemarketing Campaign ID #610. The records also indicate that the number of the audio-recording made to Mr. Charvat was s28.wav.[3] This exact recording was also used in all calls contained within the telemarketing campaign entitled 0901 TS2 Eastern B223 and assigned Campaign ID#610. I found no evidence whatsoever that would indicate that any of the telemarketing calls contained with 0901 TS2 Eastern B223 were dialed by hand, or did not include a pre-recorded message. I found no evidence whatsoever that would indicate that any of the telemarketing calls contained within 0901 TS2 Eastern B223 and assigned Campaign ID#610, utilized a pre-recorded message different than the pre-recorded message recorded by Mr. Charvat. Indeed, the records indicate that all consumers in this campaigned received the pre-recorded message .s28.wav, the same message received by Mr. Charvat.

The pre-recorded call made to Mr. Charvat on June 20, 2012 was found within a telemarketing calling campaign entitled 0620 TS2 Eastern B223. The Dialer Database assigned this telemarketing Campaign ID #1410. The records also indicate that the number of the audio-recording made to Mr. Charvat was s61.wav. This exact recording was also used in all calls contained within the telemarketing campaign entitled 0620 TS2 Eastern B223 and assigned

---

[3] I also note that when the Dialer Database was produced by RMG, the audio file s.28 was a recording that was a pre-recorded message that promoted the goods or services of the Cruise Defendants, further confirming that recipients of the IVR numbered s.28 all received a pre-recorded message promoting the goods or services of the Cruise Defendants, and that s28 was never "recorded over" changing the substance of the pre-record to something other than a promotion of the goods or services of the Cruise Defendants.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

Campaign ID#1410. I found no evidence whatsoever that would indicate that any of the telemarketing calls contained with 0620 TS2 Eastern B223 were dialed by hand, or did not include[4] a pre-recorded message. Indeed, the records indicate that all consumers in this campaigned received the pre-recorded message s61.wav, the same message received by Mr. Charvat. I found no evidence whatsoever that would indicate that any of the telemarketing calls contained within 0620 TS2 Eastern B223 and assigned Campaign ID#1410, utilized a pre-recorded message different than the pre-recorded message recorded by Mr. Charvat.[5]

After segregating the above three telemarketing campaigns from the Dialer Database, I then removed any call records that did not result in an audio file being played (such as any dispositions indicating a no answer or trunk error[6]). I did not remove from the list any calls with a disposition code of "HUMAN," "NORMAL" "TRANSFERED" or "MACHINE." All of these disposition codes indicate that the pre-recorded call was in fact successfully transmitted to and

---

[4] In discovery, RMG produced the audio file from the Dialer Database that was numbered s61.wav. Like the s61 pre-recorded call made to Mr. Charvat on June 20, 2012, the audio file s61.wav, as produced, also was a pre-recorded message that promoted the goods or services of the Cruise Defendants, further confirming that recipients of the IVR numbered s.61 all received a pre-recorded message promoting the goods or services of the Cruise Defendants, and that s61 was never "recorded over" changing the substance of the pre-record to something other than a promotion of the goods or services of the Cruise Defendants.

[5] It is not disputed that the telemarketing campaigns in which Mr. Charvat's name appeared utilized a pre-recorded message that promoted the goods or services of the Cruise Defendants. RMG admitted such in its Supplemental Response to Plaintiff's First Set of Interrogatories in which, in response to a Court Order of September 19, 2014 that ordered RMG to identify "all pre-recorded telemarketing calls initiated by RMG relating to Cruise Defendants" RMG responded **that "the only telephone calls contained within the Asteria database for which RMG can state with any degree of certainty would have referenced the Cruise Line Defendants in a pre-recorded message played during the telephone calls are those calls contained within Campaigns 422, 505, 610 and 1410."** See Exhibit C. Records produced by RMG further indicate that Campaign ID #422 was the campaign that included the call to Mr. Charvat on June 11, 2011, Campaign ID #610 refers to the campaign that included the call to Mr. Charvat on September 8, 2011, and Campaign ID #1410 refers to the campaign that included the call to Mr. Charvat on July 9, 2012. A copy of this discovery response is attached at Exhibit D.

[6] A "trunk error" is any error that would prevent a call from being placed through the public switched telephone network.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

received by the consumer. The specific campaigns that I identified applying the above methodology are listed below and constitute the preliminary list of class members in this case ("Preliminary Class List"):

| Consumer | Campaign Name | ID | Sound# | Date | # Land | # Cell | # Of Calls |
|----------|---------------|-----|--------|------|--------|--------|------------|
| Phil Charvat (614) 895-8940 | 0610 TS2 Mix B223 | 422 | s28 | 6/11/11 | 76,262 | 226,946 | 303,208 |
| Phil Charvat (614) 895-8940 | 0901 TS2 Eastern B223 | 610 | s28 | 9/8/11 | 52,683 | 141,732 | 194,415 |
| Phil Charvat (614) 895-8940 | 0620 TS2 Eastern B223 | 1410 | s61 | 7/9/2012 | 45,260 | 126,059 | 171,319 |
| | Total Number of Calls | | | | 174,205 | 494,737 | 668,942 |
| | Total Class Members | | | | 103,055 | 286,184 | 388,966[7] |

The end result of this analysis is a Preliminary Class List of consumers who all, beyond a reasonable degree of certainty, actually received pre-recorded telemarketing calls sent by RMG via the Dialer Database that promoted the goods and services of the Cruise Defendants. Further, each consumer contained on the Preliminary Class List received pre-recorded messages *identical* to the calls made to Mr. Charvat. Attached at Exhibit E is an excel spread-sheet that includes the telephone numbers of all class members, including the date they were called, the name of the telemarketing campaign in which they appear, the Campaign ID assigned to the campaign, the

---

[7] The total class members (388,966) does not equal the total # of land lines (103,055) plus the total number of cell lines (286,184) because s small number of class members (273) received telemarketing calls on their landlines that were then ported over to a cell line and then received another telemarketing call from RMG promoting the goods or services of the Cruise Defendants..

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

number of the pre-recorded message they received, and the specific disposition code confirming that the consumer, in fact, received the pre-recorded call at issue. The total number of class members contained on the Preliminary Class List who all received pre-recorded telemarketing calls from RMG promoting the goods and services of the Cruise Defendants, and which were identical to the calls made to Mr. Charvat is 388,966. I further broke down these class members to identify which received calls on a landline (103,055), and which received calls on a cell phone (286,184). Some of the consumers, similar to Mr. Charvat, received multiple pre-recorded calls from RMG promoting the goods or services of the Cruise Defendants. The total number of calls made to consumers listed on the Preliminary Class List was 668,942 pre-recorded calls, all of which were initiated by RMG, received by consumers, and which promoted by pre-recorded message the goods or services of the Cruise Defendants.

I would note that the Dialer Database includes evidence of millions of additional pre-recorded calls successfully made to consumers, both prior to and following the July 2012 filing of the original class complaint in this matter, which promoted the goods or services of the Cruise Defendants. In fact, the Dialer Database evidences telemarketing calls made by RMG through March of 2014, over a year after the filing of the class complaint. Many of the telemarketing campaigns that continued post-filing utilized a pre-recorded message similarly designated "s61" as the message used to call Mr. Charvat on July 9, 2012. That the calls made to these consumers also promoted the goods or services of the Cruise Defendants is further confirmed by sworn complaints obtained by class counsel from the Florida Department of Agriculture and Consumer Services. I have reviewed sworn complaints provided by Lynn Marie Yeats, Shari Balter, Thomas Thiel, Amy Beth Vanderberg, Jason Ohman, John Pell and David Hill.[8] I note that all of these complaints confirm that the substance of the pre-recorded telemarketing calls made to these consumer, on various dates after July of 2012, promoted the goods or services of the Cruise Defendants. All of these complaints provided the phone number of the consumer who received

_____

[8] Sworn complaints submitted by consumers to the Florida Department of Agriculture and Consumer Services are attached at Exhibit F.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

the call. I have confirmed that the phone numbers of these consumers were all contained in the Dialer Database and within telemarketing campaigns that used the pre-recorded message designated s61, the same number assigned to the pre-recorded call made to Mr. Charvat on July 9, 2012. I also note that the consumer complaints submitted to the Florida Department of Agriculture and Consumer Services listed the phone number that appeared on the consumers' Caller Identification ("CID") screen identifying the number of the calling entity. I compared these CID numbers to the numbers contained in the Dialer Database used by RMG to make out-bound pre-recorded telemarketing calls and confirmed that all of the CID numbers identified by these consumers matched numbers, in fact, were used by RMG to make outbound pre-recorded telemarketing calls.[9]

Finally, I reviewed the Freedom of Information Act response provided by the Federal Trade Commission as to telemarketing complaints submitted by consumers who complained of their receipt of pre-recorded telemarketing calls promoting the Cruise Defendants and made from Caller Identification Numbers admittedly used by RMG to promote the goods and services of the Cruise Defendants via pre-recorded message. Many of these complaints were received by the FTC *after* the filing of the class litigation, and continuing through March of 2014. RMG stopped telemarketing via pre-recorded message.[10]

---

[9] Attached at Exhibit G is a list of the phone numbers used by RMG to make telemarketing calls via the Dialer Database.

[10] Attached at Exhibits H-K are excerpted excel spread sheets evidencing pre-recorded telemarketing complaints submitted to the FTC and specifically in regard to telemarketing conducted for Carnival, Royal or NCL. Prior to the filing of this class action in July of 2012, 300 consumers complained to the FTC as to their receipt of pre-recorded messages promoting Carnival Cruise Lines and which identified the originating number of the telemarketing calls as a CID owned by RMG and contained in the Dialer Database. See Exhibit H. Following the filing of this class action in July of 2012, ninety consumers complained to the FTC as to their receipt of pre-recorded messages promoting Carnival Cruise Lines and which identified the originating number of the telemarketing calls as a CID owned by RMG and contained in the Dialer Database. See Exhibit I. The excerpts of the RCL and NCL complaints reflect both pre-filing and post-filing complaints associated with Travel Services CID. In total, 1,125 consumers complained to the FTC as to their receipt of pre-recorded messages promoting Royal Caribbean and which identified the originating number of the telemarketing calls as a CID owned by RMG and contained in the Dialer Database. See Exhibit J. In total, 270 consumers complained to the

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

The evidence derived from the Dialer Database demonstrates that even after the filing of this class action lawsuit in July of 2012, RMG continued to telemarket to consumers via the Dialer Database using a pre-recorded message that promoted the goods and services of the Cruise Defendants. For purposes of class certification, however, I limited my analysis to the campaigns that included calls to Mr. Charvat, as it is not disputed that all of the calls evidenced by the three telemarketing campaigns that included Mr. Charvat utilized pre-recorded messages that promoted the goods or services of the Cruise Defendants. In my expert opinion, however, beyond a degree of reasonable certainty, the true scope of RMG's pre-recorded telemarketing, conducted on behalf of the Cruise Defendants, far exceeds the telemarketing to consumers contained on the Preliminary Class List. I could easily expand the Preliminary Class List upon request.

### *Calls with an established business relationship*

For pre-recorded telemarketing calls made prior to October 16 of 2013, the TCPA exempts calls made where the "initiator" of the call has an "established business relationship" ("EBR") with the consumer who received the call. *See* 47 C.F.R. § 64.1200(a)(2)(iv) (no person or entity shall *initiate* a telephone solicitation to any residential line using a pre-recorded voice unless the call is made to any person with whom *the caller* has an established business relationship at the time of the call)(emphasis added).[11] The Federal Communications Commission also recently clarified that:

---

FTC as to their receipt of pre-recorded messages promoting Norwegian Cruise Lines and which identified the originating number of the telemarketing calls as a CID owned by RMG and contained in the Dialer Database. See Exhibit K.

[11] The term "established business relationship" is defined as a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party. See 47 C.F.R. § 64.1200(f)(3).

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

"a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, *and generally does not include persons or entities, such as third-party retailers,* that might merely have some role, however minor, in the causal chain that results in the making of a telephone call.

*See In the Matter of The Joint Petition Filed By Dish Network,* 28 FCC Rccd 6574 * 29-30 (April 17, 2013) (emphasis added).

In this case, it is not disputed that RMG was the "caller" who "initiated" the calls to class members. Accordingly, RMG may assert an EBR exemption. If it is determined that some calls included on the Preliminary Class List may have been made to consumers with a valid EBR with RMG, that was not terminated prior to the calls at issue, it would be a simple process to eliminate those numbers from the Preliminary Class List. If I were provided a list of such hypothetical consumers in a delimited text file (with both a delimiter and qualifier), I would have no difficulty excluding those consumers from the results of my analysis.[12]

### Analysis of "Opt-In" Data

The TCPA also exempts from its scope pre-recorded telemarketing calls made with a consumer's "prior express consent." *See* 47 U.S.C. §227(b)(1)(B) (residential phones); 47 U.S.C. 227(b)(1)(A) (cell phones). "Prior express consent" exists where a consumer has (a) clearly stated that the telemarketer may call, and (b) clearly expressed an understanding that the telemarketer's subsequent call will be made for the purpose of encouraging the purchase of goods or services. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 27 F.C.C.R. 1830 ¶ 7 (FCC 2012). The FCC's definition is consistent with the everyday meaning of the term "prior express consent" meaning "[c]onsent that is clearly and unmistakably stated. *See Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 955 (9th Cir. 2009).

In this case, I was provided with many thousands of data files containing over seventy million phone numbers that were produced in discovery by RMG in response to a request for all

---

[12] I note, however, that the EBR exemption to the TCPA applies only to residential phones and not to pre-recorded calls to cell phones.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

evidence as to "prior express consent." RMG called consumers using this data and claims that these consumers' provided RMG with their "prior express consent" to receive pre-recorded telemarketing calls promoting the goods or services of the Cruise Defendants. Specifically, RMG claims the data relied upon was of consumers who "opted in" to receive the telemarketing calls at issue. RMG claims that all of these consumers called went onto various websites, unaffiliated with either RMG or any of the Cruise Defendants, and claims these consumers expressed an interest in receiving telemarketing calls about "discount travel." RMG claims this data, alone, satisfies the TCPA's "prior express consent" requirement.

I have over 15 years of experience of working with "opt in" data in the telemarketing industry. I am familiar with the manner in which "opt in" data is compiled and how it can be manipulated. In order to assess the authenticity and reliability of "opt in" data, particularly where it is being offered to satisfy the TCPA's strict requirement of "prior express consent," a telemarketer must be able to determine if, in fact, the "opt in" data is legitimate. Most fundamental, the telemarketer must be able to verify that a consumer, in fact, visited a particular web site at a particular time and on a particular date and requested to be contacted by telephone to receive marketing calls *from a specific entity*. The end user of such data would also want to review the exact language contained on such web-site to confirm that the consumer, in fact, has asked to receive telemarketing calls from a particular caller.

The data relied upon by RMG to satisfy the TCPA's "prior express consent" requirement is not, in my opinion, "opt in" data at all. In my opinion, a consumer "opts in" to receive telemarketing calls when they expressly agree to receive calls from a specific entity. That is undeniably not the case here. Ms. Valente testified that the data used by RMG to make pre-recorded telemarketing calls promoting the goods or services of Carnival, Royal and Norwegian cruise lines consisted of consumers who purportedly expressed an interest in receiving calls generically about "discount travel."[13] RMG does not claim that the consumers, whose data was

---

[13]See Exhibit L, deposition of Elizabeth Valente at pg. 178 ("we purchased opt in leads of consumers who wanted to be called for discount travel.")

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

purchased from third party brokers and used to make the pre-recorded telemarketing calls at issue in this case, requested to receive telemarketing calls specifically from RMG or from any of the Cruise Defendants. In fact, Mr. Rader admitted under oath that such was not the case.[14] A legitimate "opt in" request to receive telemarketing calls, in my opinion, must identity the entity who now has permission to call. Generic requests for calls about "discount travel," even assuming the requests are authentic, are not specific enough to support a claim of "prior express consent," to contact a consumer via pre-recorded message, as they do not clearly and unmistakably evidence a consumer's consent to receive telemarketing calls from a specific calling party. In fact, Peter Lachnicht, the principal of Caldwell List, from whom RMG purchased millions of what it labels "opt in" leads, agreed at his deposition that a valid "opt in" lead is a lead in which a consumer explicitly requests to be called by a specific entity.[15] There is no dispute here that none of the consumers, whose data was purchased from brokers such as Caldwell List, specifically consented to receive telemarketing calls promoting the goods or services of the Cruise Defendants.

Not only, however, is the data relied upon by RMG not sufficiently specific, it is not reliable. The data produced in discovery by RMG is not data obtained directly from its original source. To the contrary, it is undisputed that RMG purchased the data they label "opt in" data from middlemen, who in turn purchased the data from other middlemen, and not from the data's original source. In this case, for example, RMG claims that it had "prior express consent" to call Mr. Charvat, and millions of other consumers, via pre-recorded message because it purchased their contact information from a data broker called Caldwell List. Peter Lachnicht, the 30(b)(6) designee of Caldwell List, testified in turn that the data sold to RMG was purchased from yet another broker named Tom Mongiovi.[16] Mr. Mongiovi, in turn, testified that he was also a

---

[14] See Exhibit M, Deposition of Jason Rader at pg. 56-57 (confirming that "opt in" leads used by RMG were consumers who wanted to receive calls about "travel" generally and not specifically telemarketing calls promoting the goods or services of the Cruise Defendants).
[15] See Exhibit N, Deposition of Peter Lachnicht at pg. 27.
[16] See Exhibit N, Deposition of Peter Lachnicht at pg. 36 (Caldwell List does not generate the lead information itself. It buys it from a third party and then re-sells the data).

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

middle-man and that the data he sold to Caldwell List was purchased from an individual named Steven Katz, who Mr. Mongiovi believes may now reside in Costa Rica.[17] Mr. Mongiovi also testified that to the best of his knowledge, Mr. Katz was simply yet another middle-man himself and there could be 100 intermediaries between Mr. Mongiovi and the original source of the data sold to RMG.[18] Neither Mr. Lachnicht nor Mr. Mongiovi could attest to the accuracy of the data sold to RMG.[19] Mr. Mongiovi further admitted that the data could easily have been manipulated by anyone in the chain of possession of the data.[20]

I finally note that the suspicion that the data purchased by RMG was fraudulent or manipulated is not based on mere speculation. Jason Rader, RMG's Vice President of Marketing recently testified that both he and Ms. Valente, in fact, suspected that the data RMG purchased from Caldwell List was fraudulent and had been manipulated.[21]

In my fifteen years working in the telemarketing industry, it has been my experience that the individuals who broker "opt in" data, such as Mr. Lachnicht and Mr. Mongiovi here, have no personal knowledge whatsoever as to how the data they are selling was, in fact, compiled and whether or not the data has been manipulated. From the data produced by Ms. Valente and RMG, and from the testimony of Mr. Lachnicht, Mr. Mongiovi and Mr. Rader, it is *impossible* to determine how the "opt-in" lists sold to RMG were compiled, who compiled them, when they were compiled, and whether consumers actually visited the "opt in" web sites at issue. As someone who ran call centers for more than fifteen years, I would have never used the data,

---

[17] See Exhibit O, deposition of Tom Mongiovi at pg.88-89.
[18] See Exhibit O, deposition of Tom Mongiovi at pg. 182 ("I did not create or compile the data sold to RMG, I purchased it from Katz").
[19] See Exhibit N, Lachnicht Depo at pg.61-62 (Lachnicht admits he does not know if the data sold to RMG was legitimate); Exhibit O, Mongiovi Depo at pg 183) (when asked if the data sold to RMG was authentic, Mongiovi responded "110% I cannot say.")
[20] See Exhibit O, Mongiovi Depo at pg 177,197- 198 (any of the middlemen in the chain from the original source could have manipulated the data).
[21] See Exhibit M, Deposition of Jason Rader at pg 171 (Valente suspected Caldwell List data had been changed to insert new web sites); at pg. 172 (Valente expressed suspicion to Rader that Caldwell List data was fraudulent); at pg. 178 (Valente "freaked out" because she thinks the Caldwell List data is "bogus"); at pg. 179 (Valente nervous that Caldwell List is "making stuff up").

19

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

relied upon here by the defendants, in support of a claim of "prior express consent," as the data is inherently suspect, unreliable and likely fraudulent. No responsible telemarketer would ever rely upon this data to satisfy the TCPA's strict requirement that a consumer must provide a telemarketer with their "prior express consent" to receive pre-recorded telemarketing calls. In my opinion, far beyond a reasonable degree of certainty, the "opt in" data relied upon by RMG to call consumers in this case is inherently flawed and unreliable, and cannot be used to satisfy the TCPA's prohibition against telemarketing via pre-recorded without a recipient's "prior express consent."

In my further opinion, the data purchased by RMG from brokers such as Caldwell List does not consist of consumers who asked to be called by anyone. Instead, this data appears to have been obtained via spyware. Spyware is software that is installed on a person's computer covertly. The spyware then gathers information about a consumers' internet searches (including the computer's IP address) and sends it to third parties without the consumer's knowledge or consent. Spyware is installed without the user's knowledge and its presence is hidden to avoid detection. In this case, RMG purchased data of over 78 million consumers from 6,000 web sites.[22] The sheer volume of the data purchased would make a responsible marketer highly suspicious that each of these consumers requested to receive telemarketing calls from anyone. Rather, it is more likely that this consumer data was obtain without an individual consumers knowledge or consent via spyware.

---

[22] I also note that the web domains, alone, used by Caldwell List would place any reasonable marketer on notice that the data being purchased was unlikely to have anything whatsoever to do with consumers interested in receiving telemarketing calls regarding a cruise. Caldwell List was purchasing data purportedly originally obtained from web sites with no relation whatsoever to the Cruise Defendants, or to "discount travel" for that matter. A small sampling of these web sites include: www.abc.com; www.ebay.com; www.netflix.com; www.disneylandreport.com; www.usmilitary.com; www.1000dictionaries.com; www.123-baby-names.com; www.heartdisease.com; www.321weather.com; www.3fatchicks.com; www.accidentalhedonist.com; www.fishingmonster.com; www.freemathhelp.com; www.icravebollywood.com; www.lordoftherings-essentials.com. The list of web sites used by Caldwell List is attached at Exhibit P.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

In fact, the evidence in this case indicates that once Ms. Valente was provided with the list of 6,000 "opt-in" web-sites used by Caldwell List, she instructed RMG's President, Richard Borst, to forward that list to a business associate named Jeff Henderson with a company called Fox Valley Technologies. Mr. Henderson was instructed to research and report back on the web sites used by Caldwell List. Mr. Henderson reported back to Mr. Borst on July 8, 2010, and warned Ms. Valente of his suspicion that the web sites used by Caldwell List likely obtained data using "tracking cookies and Adware which can capture and collect a user's web surfing blueprint" as well as "data mining techniques."[23] In other words, Ms. Valente was warned that the data she was purchasing was not, data of consumers who asked to be called, but whose data was surreptitiously gathered without their knowledge or consent.

Finally, it is my understanding that plaintiff's counsel recently issued discovery asking RMG to match their claimed consent evidence to the numbers listed on the Preliminary Class List. If RMG were to come forth with evidence of prior express consent that the Court somehow found sufficient to satisfy the TCPA, it would be a simple SQL statement to remove any of these hypothetical consumers from the Class List.

### Conclusion

In my expert opinion, and beyond a reasonable degree of certainty, I will testify at trial that:

1.     The Preliminary Class List consists of 388,966 consumers who received a total of 668,942 pre-recorded telemarketing calls from RMG.

2.     The consumers can all be identified by their phone number.

3.     Each of these consumers actually received a pre-recorded telemarketing call from RMG.

4.     Each of these consumers received identical pre-recorded messages to those received by Mr. Charvat.

---

[23] The 7/8/2010 analysis of Mr. Henderson as to the web sites purportedly used by Caldwell List to generate data is attached at Exhibit Q.

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN

5.      The pre-recorded messages received by all class members advertised the goods or services of the co-defendants, and used the trade names of Carnival Cruise Line, Royal Caribbean Cruise Line, and Norwegian Cruise Line.

6.      Any claimed Established Business Relationship TCPA exemption for any of these calls is speculative as no evidence, to date, has been produced matching the calls made to the consumers on the Preliminary Class List to any EBR evidence.  When and if EBR evidence is produced, that matches any of the numbers on the Preliminary Class List, consumers subject to such a defense can be removed from the Preliminary Class List.

7.      The data upon which RMG relies for its "prior express consent" defense is flawed and unreliable.  No responsible telemarketer would have relied on this data given Ms. Valente's documented suspicion that the data was manipulated or fraudulently obtained.  Finally, it is my opinion that the data relied upon by RMG to make pre-recorded telemarketing calls to class members was obtained via some type of spyware.

8.      Finally, when and if valid prior express consent evidence is ever produced, that matches any phone numbers listed on the Preliminary Class List, consumers subject to such a defense can be easily removed from the Preliminary Class List.

I declare that the foregoing is true and correct, subject to the laws of perjury of the United States. Executed in Spring Valley, CA on this 18th day of December, 2015.

I reserve the right to amend, modify or supplement the statements and opinions set forth herein as appropriate.

Jeffrey A. Hansen

*PHILIP CHARVAT v. ELIZABETH VALENTE*
WRITTEN REPORT OF JEFFREY A. HANSEN