## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Philip Charvat, on behalf of himself and others similarly situated, | ) ) ) | Case No. 1:12-cv-5746 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| Elizabeth Valente, Resort Marketing Group, Inc., Carnival Corporation & PLC, Royal Caribbean Cruises, Ltd., and NCL (Bahamas), Ltd., | ) ) ) ) | Hon. Judge Andrea R. Wood Hon. Mag. Judge Mary M. Rowland |
| Defendants. | ) ) | **JURY TRIAL DEMANDED** |

### THIRD AMENDED CLASS ACTION COMPLAINT

1.      Plaintiff Philip Charvat ("Mr. Charvat" or "Plaintiff") brings this putative class action against the defendants to secure redress for their violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

2.       Plaintiff is one of many call recipients, believed to number in the millions, who received illegal pre-recorded telemarketing calls promoting the cruise services of the defendants.

3.       The Plaintiff brings this action to enforce the consumer privacy provisions of the TCPA and achieve redress and compensation for affected consumers.  In a case such as this, where individual damages are set by statute at $500-$1,500 per violation, a class action is the best if not the only means of obtaining redress for the type of wide-scale, illegal telemarketing at issue, and is consistent both with the private right of action afforded by the TCPA, and the fairness and efficiency goals of Fed. R. Civ. P. 23.

### PARTIES

4.      Mr. Charvat is a resident of Columbus, Ohio.

5.      Defendant Elizabeth Valente is an individual who resides at 1 North River Lane,

Geneva, Illinois 60134.

6.     Defendant Resort Marketing Group, Inc. ("RMG") is a Nevada corporation with a principal place of business in Illinois located at 222 East State Street, Batavia, Illinois.

7.     At all times material to this complaint, Ms. Valente owned, controlled in fact, or was a corporate officer of RMG and other assorted corporate entities including TSN International, Inc., TSN Travel, Inc., Travel Services International and The Vacation Club, Inc., and personally directed their telemarketing practices. Collectively, Ms. Valente, RMG and the various corporate entities controlled by Ms. Valente are referred to herein as "Travel Services."

8.     At all times material to this complaint, Travel Services conducted the same business often from the same address, using the same equipment and same employees, and held themselves out to the public under the fictitious name "Travel Services."

9.     Carnival Corporation & PLC ("Carnival") is a Florida corporation that provides cruise services and is headquartered at 3655 NW 87th Ave. in Doral, FL 33178.

10.    Royal Caribbean Cruises, Ltd. ("Royal Caribbean") is a Florida corporation that provides cruise services and is headquartered at 1050 Caribbean Way in Miami, FL 33132.

11.    NCL (Bahamas), Ltd. ("Norwegian") is a Florida corporation that provides cruise services and is headquartered at 7665 Corporate Center Drive in Miami, FL 33126.

12.    Carnival, Royal Caribbean, and Norwegian are referred to collectively as the "Cruise Defendants."

## JURISDICTION AND VENUE

13.    The Court has federal question jurisdiction over the TCPA claims. *Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740 (2012).

14.    Venue is proper because one or more of the defendants reside in this District and

are subject to this Court's jurisdiction.

## THE TELEPHONE CONSUMER PROTECTION ACT

15.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" *Telephone Consumer Protection Act of 1991*, Pub. L. No. 102-243, 105 Stat. 2394 (1991), codified at 47 U.S.C. § 227 (TCPA).  The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*

16.     The TCPA's most severe restrictions address prerecorded telemarketing calls to residential and cellular telephone lines. In enacting the statute, Congress stated that banning these calls was "the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(10) and (12); *see also Mims*, 132 S. Ct. at 745.

17.     Accordingly, the TCPA prohibits persons from initiating telemarketing calls to residential telephone lines and cell phones using a prerecorded voice to deliver a message without the prior express consent of the called party. 47 U.S.C. § 227(b).

18.     For prerecorded telemarketing calls made to cellular telephones and landlines prior to October 16, 2013, the telemarketer must show they had a consumer's prior express consent to call via pre-recorded message.

19.     For prerecorded telemarketing calls made to cellular telephones and landlines on or after October 16, 2013, the telemarketer must show prior express consent through a signed writing (a) bearing the signature of the person providing consent; (b) that specifies the telephone number to which the person consenting is called; (c) clearly authorizes the company to call the person using an auto dialer or prerecorded message for telemarketing purposes; and (d) providing consent is not a condition of purchasing goods or services.  *See In re Rules & Regs.*

*Implementing the TCPA,* 27 FCC Rcd 1830, 1844 ¶ 33 (2012).

20.     For calls made on or after October 16, 2013, an established business relationship exemption is no longer applicable.

21.     On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of . . . section 227(b) . . . that are committed by third-party telemarketers."[1]

22.     More specifically, the *FCC 2013 Ruling* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls.  *FCC 2013 Ruling*, 28 FCC Rcd at 6586 ¶ 34.

23.     The FCC has rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.*at 6587 ¶ 36 n.107.

24.     Under the TCPA, a seller of a product or service may be vicariously liable for a third-party marketer's violations of Section 227(b), even if the seller did not physically dial the illegal call, and even if the seller did not directly control the marketer who did.  *Id.*

25.     A seller is liable under Section 227(b) when it has authorized a telemarketer to market its goods or services. *Id.* at 6586 ¶ 34.

26.     Additionally, a seller may be vicariously liable for a Section 227(b) violation under principles of apparent authority and ratification. *Id.* at 6587 ¶ 34.

27.     The FCC 2013 Ruling further clarifies the circumstances under which a

---

[1] *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, CG Docket No. 11-50, 28 FCC Rcd 6574, 6574 ¶ 1 (2013) ("*FCC 2013 Ruling*").

telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*Id.* at 6592 ¶ 46.

28.     The FCC 2013 Ruling further held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

29.     Ms. Valente is personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the Telephone Consumer Protection Act, which reads, *inter alia*,

> [T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person*.

47 U.S.C. § 217 (emphasis added).

## **FACTS**

### **The Illegal Telemarketing Campaign at Issue**

30.     At all times relevant to this Complaint, the Cruise Defendants authorized Travel Services to telemarket on their behalf and specifically using their trade names.

5

31.     The trade-marks and trade-names of the Cruise Defendants are among the most famous in the world.

32.     Travel Services began telemarketing via pre-recorded message on behalf of the Cruise Defendants in 2009, and used a third party to transmit those pre-recorded messages.

33.     Sometime thereafter, Travel Services purchased its own telemarketing computer equipment and moved its pre-recorded telemarketing practice in-house.

34.     To telemarket the cruise products of the Cruise Defendants, Travel Services purchased consumers' contact information from a third-party data broker called Caldwell Lists.

35.     Travel Services claims that the consumers whom it contacted via pre-recorded message promoting the Cruise Defendants "opted in" by visiting various websites, all of which were unaffiliated with Travel Services or with any of the Cruise Defendants.

36.     Travel Services is not in possession of any evidence relating to the actual visit of any of these consumers to any of these "opt in" websites.

37.     For example, Travel Services posits that Mr. Charvat's daughter, Allison, consented to receive pre-recorded messages promoting the Cruise Defendants at the Charvat home when she purportedly visited an unrelated website: www.123freetravel.com.

38.     The web page instructs a consumer to enter their phone number into a box in order to "claim a shopping spree."  A screen shot of the "consent" page of this website closest in time to the alleged consent by Allison Charvat is attached at Exhibit 1.

39.     Allison Charvat never visited this website, and the defendants have failed to provide any admissible or even credible evidence to the contrary.

40.     Even if she did visit this website, a bait and switch scheme to obtain consumers' phone numbers by fraudulently claiming they could receive a "travel spree" cannot suffice to

6

satisfy the TCPA's requirement that, before a defendant may send a pre-recorded telemarketing message to a consumer, whose number is residential or cell, it must first have the consumer's "prior express consent."

41.     The claim that Caldwell List providing Travel Services with "opt in" consent data authorized Travel Services to telemarket via pre-record is also not true.

42.     In response to subpoena, Caldwell List has admitted that the data it sold to Travel Services was, in actuality, purchased from yet another data broker called TDC Marketing, Inc. ("TDC").

43.     TDC has attested that the data it sold to Caldwell List, and which in turn was sold to Travel Services, was actually purchased from yet another third party, an individual named Jeffrey Katz who now lives in the Philippines.

44.     TDC further attested that the data sold to Travel Services was only intended to be used for e-mail or direct mail campaigns and ***not*** for a pre-recorded telemarketing campaign.

45.     Phone numbers purchased by Travel Services, in this manner, were organized into calling campaigns identified by a Campaign ID.

46.     The individual telemarketing campaign was then programmed into Travel Services' predictive dialer system that allowed Travel Services to make automated calls to consumers without human intervention.

47.     A pre-recorded message promoting the goods or services of the Cruise Defendants, by their individual trade names, was also loaded into the auto-dialer.

48.     The auto-dialer Travel Services used was asterisk-based, and was designed by a third-party vendor called Asteria. The Asteria dialer broadcasted the pre-recorded telemarketing calls to call recipients nationwide via internet based Voice Over Internet Protocol telephone

lines.

49.     The auto-dialer then ran from 9:00 a.m. to 9:00 p.m., during the week—and occasionally on Saturdays—contacting thousands of consumers a day with the identical prerecorded message promoting cruises offered by Carnival, Royal Caribbean, and Norwegian.

50.     Consumers who received the pre-recorded messages were informed that they had won a cruise and to "Press 1" for more information.

51.     Consumers who "Pressed 1" were then transferred to a call center operated by Travel Services.

52.     The auto-dialer database ("Dialer Database") that transmitted all of these calls was located at the Travel Services call center in Batavia, Illinois.

53.     Millions of records evidencing pre-recording telemarketing calls made by Travel Services for the Cruise Defendants are evidenced on the Dialer Database.

54.     The Travel Services' call center was staffed by up to twenty operators at a time.

55.     After a call recipient "pressed 1" in response to the voice broadcast message, they were informed that they had "won" or been "selected" to receive a free cruise.

56.     As attested under oath by the former President of Resort Marketing Group, Richard Borst, the claim that a call recipient had won a free cruise was a "ruse".

57.     In addition, although consumers were initially told the cruise was "free," they were eventually told that to reserve their cruise, they would have to pay "taxes" or "port fees."

58.     Travel Services, however, did not pay "taxes" or "port fees" to any government agency.  When a consumer failed to follow through on their reservation, Travel Services kept the monies it had told consumers were to pay for "taxes" or "port fees." Travel Services referred to revenue generated in this manner as "breakage."

59.     After a consumer indicated that they were interested in booking a cruise, and paid the fictitious "taxes" and "port fees," the consumer was then referred to the sales department at Carnival, Royal Caribbean, or Norwegian.

60.     The Cruise Defendants would then, in turn, compensate Travel Services for each referred customer.

61.     The intent of the pre-recorded telemarketing campaigns conducted by Travel Services was not to communicate with pre-existing customers of Travel Services or the Cruise Defendants, but instead was intended to find new customers for the Cruise Defendants, and new members of its self-described "travel club."

62.     New customers acquired by Travel Services for the Cruise Defendants were thereafter enrolled in Travel Services' "vacation club," and charged another fee that automatically renewed on an annual basis.

63.     This was yet another means by which Travel Services derived compensation from telemarketing conducted in the world famous trade names of the Cruise Defendants.

64.     The Cruise Defendants also paid monies directly to Travel Services to reimburse Travel Services for other forms of marketing conducted for the benefit of the Cruise Defendants.

65.     The Cruise Defendants were all closely familiar with Travel Services' telemarketing operation, as they all assigned representatives to visit Travel Services' physical location, including its telemarketing call center, to train Travel Services' personnel.

66.     These training sessions occurred many times prior to the filing of this lawsuit and continued thereafter until early 2014.

67.     Carnival, in particular, was closely involved in assisting Travel Services in its preparation of marketing plans, and reviewed and approved telemarketing scripts used by Travel Services when selling to consumers.

68.     Carnival's Business Development Director for N. Illinois and S.E. Wisconsin, Thomas Panici described Travel Services as one of his "biggest accounts."

69.     Mr. Panici also referred to Ms. Valente as a "loyal" "partner" of Carnival and her employees as a "team of soldiers I have trained."

70.     Mr. Panici, acting on Carnival's behalf, described consumers who complained of Travel Services' business practices as "nasty customers that are looking for something free."

71.     Carnival was also well aware that Travel Services was telemarketing via pre-recorded message, as Travel Services explicitly told Carnival that it was using "press 1" telemarketing, and because Carnival received multiple consumer complaints in the years prior to the filing of the original complaint in this lawsuit, informing it that Travel Services was engaged in pre-record telemarketing in violation of the law.

72.     Carnival itself confirmed that Travel Services was engaged in pre-record telemarketing, but accepted without question Travel Services' claim that all consumers contacted via pre-recorded message had "opted in" to receive the calls.

73.     Carnival never asked Travel Services for proof of such a claim or asked complaining consumers if they, in fact, had opted in to receive pre-recorded telemarketing calls.

74.     To the contrary, each time a consumer complained to Carnival about the allegedly illegal telemarketing practices of Travel Services, Mr. Panici and his superiors on Carnival's sales side, came to Travel Services' defense repeatedly noting the amount of customers referred to Carnival by Travel Services.

75.     At all times relevant to this lawsuit, all of the Cruise Defendants had the ability to supervise, monitor, and control the conduct of Travel Services, but consciously turned a "blind eye" to Travel Services' illegal conduct, while simultaneously accepting the benefits of Travel Services' illegal acts.

10

76. At all times relevant to this lawsuit, all of the Cruise Defendants had the authority to issue a cease and desist order to Travel Services revoking Travel Services' to market using their world famous trade names.

77. At all times relevant to this lawsuit, all of the Cruise Defendants had the authority to issue a cease and desist order to Travel Services revoking Travel Services' authority to telemarket on their behalf.

78. At no time did any of the Cruise Defendants issue such a cease and desist order to Travel Services.

79. At all times relevant to this lawsuit, the Cruise Defendants allowed Travel Services to telemarket using their trade names and to post their trade marks on Travel Services' websites.

80. By allowing Travel Services to telemarket using their trade name, and by allowing Travel Services to use their trade-marks, the Cruise Defendants purposefully led consumers to believe that Travel Services had the authority to act on the Cruise Defendants' behalf.

81. Carnival, in particular, even provided Travel Services with letters of recommendation that Travel Services then posted on its website and provided to skeptical consumers, affirming that Travel Services and Carnival were, in fact, "partners."

82. When Travel Services experienced problems with a creditor, Carnival similarly intervened and assured the creditor, via a letter, that Travel Services was a valued partner of Carnival.

83. In internal correspondence, Carnival repeatedly referred to Travel Services as a "partner" and celebrated the number of new customers acquired for Carnival by Travel Services, even offering to throw it a "big party" when it reached 1,200 new customers booked in a year.

11

**The Massive Scope of Illegal Telemarketing At Issue**

84.     Over the four years prior to the filing of this lawsuit, and extending until March of 2014—long after the filing of this lawsuit in July of 2012—millions of illegal pre-recorded telemarketing calls were initiated by Travel Services to consumers nationwide, promoting by trade name the cruise services of the Cruise Defendants.

85.     The scope of the illegal telemarketing campaign at issue in this case is confirmed by records contained with the Dialer Database.

86.     None of these consumers provided their "prior express consent" to receive pre-recorded telemarketing calls promoting the goods and services of the Cruise Defendants.

87.     The scope of the illegal telemarketing campaign at issue is also evidenced by records of consumer complaints obtained from the Federal Trade Commission in response to Freedom of Information Act requests.

88.     Specifically, in the years prior to the filing of this lawsuit, in July of 2012, many consumers complained to the FTC about pre-recorded telemarketing calls promoting Carnival.

89.     Hundreds of these complaints specifically identified the originating call as coming from a Caller Identification Number ("CID") assigned to Travel Services and contained within the Dialer Database.  An excerpted excel spread sheet detailing consumer complaints submitted to the FTC which specifically identified CID used by Travel Services and contained within the Dialer Database is attached at <u>Exhibit 2</u>.[2]

90.     FTC records similarly confirm that prior to the filing of this class action, over seven hundred consumers complained to the FTC of their receipt of robocalls promoting Royal Caribbean, and many consumers complained of their receipt of robocalls promoting Norwegian.

---

[2] The comments of consumers detailing their frustration with these telemarketing calls are set forth at Column AA.

The majority of these complaints specifically identified the originating call as coming from a Caller Identification Number assigned to Travel Services and contained within its database. An excerpted excel spread sheet detailing consumer complaints submitted to the FTC which specifically identified CID used by Travel Services and contained within the Dialer Database is attached at Exhibit 3 (Royal) and Exhibit 4 (Norwegian).[3]

91.     In March of 2011, the Federal Communications Commission issued a citation to Travel Services for telemarketing to consumers in violation of the TCPA. The FCC issued the citation after they had received voluminous complaints from consumers alleging that Travel Services was promoting the goods and services of the Cruise Defendants via pre-recorded message, in violation of the TCPA.[4]

92.     Most of these complaints specifically associated with the FCC citation to Travel Services identified the originating call as coming from a Caller Identification Number assigned to Travel Services and contained within the Dialer Database.

93.     Public records obtained from the Florida Department of Agriculture and Consumer Protection similarly confirm that, prior to the July 2012 filing of this class lawsuit, many consumers complained to the FDACP in regard to their receipt of robocalls promoting the goods and services of the Cruise Defendants. Many of these consumers specifically identified the originating call as coming from a Caller Identification Number assigned to Travel Services and contained within the Dialer Database. A Freedom of Information Act response from the FDACP excerpted to include only telemarketing complaints which specifically identified CID used by Travel Services and contained within the Dialer Database is attached at Exhibit 6.

---

[3] The comments of consumers detailing their frustration with these telemarketing calls are set forth at Column AA.

[4] The FCC Citation, and the consumer complaints upon which the Citation is based are attached at Exhibit 5.

94.     The complaints received from the FDACP specifically identify the complaining consumers, confirm that the consumers all received robocalls, and contain the date on which such robocalls were received.

95.     The calls made by Travel Services to these consumers, who specifically identified CID associated with Travel Services as originating the robocall, including Campaign ID, are further confirmed by evidence within the Dialer Database.

96.     Prior to the filing of this class lawsuit, Travel Services was sued by a consumer named Stewart Abramson who alleged that Travel Services had called him multiple times, via pre-recorded message, promoting the goods or services of the Cruise Defendants.

97.     The pre-recorded calls made by Travel Services to Mr. Abramson, including the Campaign IDs associated with these calls, are evidenced by records contained within the Dialer Database.

## The Calls to Mr. Charvat[5]

98.     On February 11, 2011, Mr. Charvat received a telephone call ("Call One") on his residential telephone line.

99.     Call One included a pre-recorded message that informed the Plaintiff that he had been "selected" to receive a cruise with Carnival, Royal Caribbean, or Norwegian Cruise Lines.

100.     After the pre-recorded message, Mr. Charvat was connected to an operator named "Sampson," who stated that he worked for a company called "Travel Services."

101.     In response to Mr. Charvat's request for a website to identify the entity calling, Sampson provided Mr. Charvat with a website identified as www.travelservicesus.info.

102.     The trade names and trade-marks of the Cruise Defendants were prominently

---

[5] Transcripts of the pre-recorded telemarketing calls made by Travel Services to Mr. Charvat are attached at Exhibit 7.

featured on the website.

103.     Travel Services made Call One to Mr. Charvat, and the call is evidenced in the Dialer Database as being associated with Campaign ID.

104.     On June 11, 2011, Mr. Charvat received a telephone call on his residential telephone line ("Call Two").

105.     Call Two was a pre-recorded message that informed Mr. Charvat that he had been "selected" to receive a cruise with Carnival, Royal Caribbean, or Norwegian Cruise Lines.

106.     Call Two was then transferred to a live representative who stated they worked for "Travel Services."

107.     When Mr. Charvat identified himself, Call Two was terminated.

108.     Travel Services made Call Two to Mr. Charvat, and the call is evidenced in the Dialer Database as being associated with Campaign ID.

109.     On September 8, 2011, the Plaintiff received a telephone call ("Call Three") on his residential telephone line.

110.     Call Three was a pre-recorded message that informed the plaintiff that he had been "selected" to receive a cruise with Carnival, Royal Caribbean, or Norwegian Cruise Lines.

111.     Call Three was connected to an individual named "Marie" who stated that she worked for "Travel Services."

112.     Marie informed Mr. Charvat that Travel Services was running a one day promotion for Royal Caribbean, Carnival, or Norwegian.

113.     After the Plaintiff requested specific information to identify "Travel Services," Marie provided the plaintiff with a web-site identified as www.travelservicesus.net.

114.     Call Three was made to Mr. Charvat by Travel Services and utilized a pre-

recorded message that sought to promote the Cruise Defendants by their individual trade names.

115.    Travel Services made Call Three to Mr. Charvat, and the call is evidenced in the Dialer Database as being associated with Campaign ID.

116.    On July 9, 2012, the Plaintiff received a telephone call on his residential telephone line ("Call Four").

117.    Call Four was a pre-recorded message that informed the plaintiff that he had been "selected" to receive a cruise with Carnival, Royal Caribbean, or Norwegian Cruise Lines.

118.    Call Four was connected to an individual named Joanna Harrison, a Travel Services operator.

119.    "Joanna Harrison" was a fictitious name.

120.    After Mr. Charvat requested specific information to identify "Travel Services," Ms. Harrison provided the plaintiff with a website identified as www.travelserviceonline.net.

121.    Travel Services made Call Four to Mr. Charvat, and the call is evidenced in the Dialer Database as being associated with Campaign ID.

122.    Neither Mr. Charvat, nor anyone in his household, at any time, had a business relationship with any of the Defendants and did not fill out any "contest entry form" as asserted in the pre-recorded message.

123.    Neither Mr. Charvat, nor anyone in his household, gave their written or oral consent to receive the pre-recorded message calls from the Defendants.

**Following the Filing of this Class Action, the Cruise Defendants Allowed Travel Services to Continue Telemarketing on their Behalf via Robocall and Attack Mr. Charvat**

124.    On July 23, 2012, Mr. Charvat initiated the original class filing against the Defendants. *See Docket Entry No. 1.*

125. An Amended Complaint was thereafter filed on September 25, 2012.

126. Attached to the Amended Complaint as exhibits were the actual recordings of the pre-recorded telemarketing calls made to Mr. Charvat, confirming that the calls promoted the goods and services by their trade name, were made via pre-recorded message, and ultimately were identified as being made by Travel Services. *See Docket Entry No. 23.*

127. Despite being on such notice that Travel Services was telemarketing via pre-recorded message using their world famous trade-names, the Cruise Defendants allowed Travel Services to continue to telemarket on their behalf and using their trade names for an additional nineteen months, until March of 2014.

128. During the period of time following the filing of this lawsuit, until approximately March of 2014, Travel Services called millions of consumers via robocall promoting the goods and services of the Cruise Defendants using their trade names and without consumers' consent.

129. Such calls are evidenced by the Dialer Database.

130. At the time this lawsuit was filed, and all times thereafter, the Cruise Defendants had the power and authority to issue a cease and desist command to Travel Services and to revoke Travel Services' authority to telemarket on behalf of the Cruise Defendants and to use their trade-names.

131. At no time did the Cruise Defendants take even these basic steps to protect the privacy rights of consumers nationwide. Instead, the Cruise Defendants placed profit over privacy and allowed Travel Services to continue its illegal telemarketing campaign through March of 2014, long after the original class action was filed.

132. Rather than take immediate action against Travel Services, the Cruise Defendants and Travel Services entered into a joint defense agreement.

17

133.    Instead of addressing the illegal actions of Travel Services, the Defendants all jointly choose to attack Mr. Charvat, the lead class representative.

134.    Specifically, the Defendants all alleged that by tape-recording the illegal telemarketing calls made to his home in Ohio, in accord with Ohio law, Mr. Charvat violated the Illinois Wire Tap Act and the purported privacy rights of Travel Services—the telemarketer who placed illegal calls to Mr. Charvat's home.

135.    Travel Services even filed a Counter-Claim against Mr. Charvat seeking damages from Mr. Charvat for his violation of Travel Services' purported right of privacy.[6]

136.    The Defendants also alleged that Mr. Charvat and his daughter had engaged in fraudulent conduct by "inviting" the illegal telemarketing calls at issue.

137.    By failing to immediately repudiate Travel Services illegal acts, the Cruise Defendants ratified Travel Services' illegal telemarketing.

138.    The Cruise Defendants all continued to pay Travel Services for referrals obtained via unlawful telemarketing in violation of the TCPA through 2014.

139.    By continuing to accept referrals from Travel Services, after explicitly being placed on actual notice that Travel Services was engaged in telemarketing in violation of the TCPA, the Cruise Defendants ratified Travel Services' illegal actions.

140.    Like the scope of Travel's Services illegal telemarketing campaign for the years prior to the filing of this class lawsuit, the scope of Travel Services' continued illegal telemarketing post-filing is similarly confirmed by complaint records obtained from state and federal law enforcement agencies.

---

[6] This Counter-claim was only withdrawn after Mr. Charvat fully briefed a Motion for Summary Judgment and after the Illinois Surveillance Act was declared unconstitutional by the Illinois Supreme Court. *See Docket Entry 169-171; 191.*

141.     Following the filing of this lawsuit, counsel for Mr. Charvat obtained FOIA responses from the FTC that confirmed that even post-filing, Travel Services continued to telemarket for the Cruise Defendants.  Attached at Exhibit 8 are complaints submitted by consumers to the FTC specifically relating to pre-recorded telemarketing complaints relating to Carnival, and which identify the telemarketing calls as originating from CID assigned to Travel Services.  Similar post-filing complaints are evidenced by the FTC responses relating to Royal and Norwegian attached at Exhibit 3 (Royal) and Exhibit 4 (Norwegian).

142.     In February of 2014, a consumer named Daniel Collins complained that his minor son had received a pre-recorded telemarketing calls from Travel Services promoting the goods and services of the Cruise Defendants.

143.     The pre-recorded telemarketing call to Mr. Collins is evidenced by documents contained within the Dialer Database, including its Campaign ID number.

## THE LEGAL BASIS OF THE CLAIMS

144.     The claims of the Plaintiff, and the class of persons he seeks to represent, arise pursuant to the provisions of the TCPA, a federal statute enacted to prohibit unreasonable invasions of privacy via certain telemarketing practices.

## CLASS ALLEGATIONS

145.     Plaintiff bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all other persons or entities similarly situated throughout the United States.

146.     The class of persons represented by the Plaintiff is defined as follows:

All persons within the United States to whose residential or cell phone lines pre-recorded telemarketing calls were initiated by Travel Services mentioning by trade name Carnival, Royal Caribbean and/or  Norwegian Cruise

Lines, in the four years prior to the filing of this lawsuit through March of 2014.[7]

147.    The class as defined above is limited to pre-recorded telemarketing calls initiated to residential or cell subscribed telephone lines.

148.    The class as defined above is identifiable by phone records contained with the Dialer Database owned by Travel Services.

149.    The class is subject to further temporal limitation by the Plaintiff through the development of discovery in this case.

150.    For consumers called prior to October 16, 2013, excluded from the class is any consumer who provided their prior express consent to receive pre-recorded telemarketing calls promoting the goods or services of the Cruise Defendants.

151.    For consumers called prior to October 16, 2013, excluded from the class is any consumers who was called via pre-recorded telemarketing call, on their residential telephone line, because of their prior established business relationship with Travel Services.

152.    For consumers called on or after October 16, 2013, excluded from the class is any consumer who provided their prior express consent, signed and in writing, consenting to receive pre-recorded or auto-dialer telemarketing calls promoting the goods and services of the Cruise Defendants on their residential or cell telephone lines.

153.    The Defendants bear the burden of proof to establish any exclusions.

154.    The potential class members  constitute a class so numerous that joinder of all class members is impracticable.

155.    The Plaintiff is a members of the class.

156.    The Plaintiff's claim is typical of the claims of the class, in that the plaintiff and

---

[7] This is the date on which Travel Services has represented it ceased making pre-recorded calls using the trade names of the Cruise Defendants.

all class members received virtually identical pre-recorded messages from Travel Services promoting the goods or services of the Cruise Defendants.

157.    The Plaintiff is an adequate representatives of the class because his interests do not conflict with the interests of the class, he will fairly and adequately protect the interests of the class, and he is represented by counsel skilled and experienced in class actions.

158.    The actions of the Defendants are generally applicable to the class as a whole and to the Plaintiff.

159.    There are questions of law and fact common to Plaintiff and to the proposed class, including but not limited to the following:

    a.  Whether the Defendants violated the TCPA by engaging in advertising by unsolicited prerecorded telemarketing calls to residential and cell telephone lines.

    b.  Whether Travel Services' prerecorded telemarketing calls to consumers throughout the United States promoted by trade name the goods or services of the Cruise Defendants.

    c.  Whether the unsolicited prerecorded telemarketing calls physically dialed by Travel Services were made "on behalf of" Carnival, Royal Caribbean, and Norwegian.

    d.  Whether the Plaintiff and the members of the class are entitled to statutory damages as a result of the Defendants' actions;

    e.  Whether an agency relationship existed between Travel Services and the Cruise Defendants;

    f.  Whether the Cruise Defendants had the ability to control the telemarketing practices of Travel Services;

    g.  Whether the Cruise Defendants provided Travel Services with their apparent authority to telemarket on their behalf; and

    h.  Whether the Cruise Defendants ratified Travel Services' illegal acts.

160.    Common questions of law and fact predominate over questions affecting only

individual members of the class, and a class action is the superior method for fair and efficient adjudication of the controversy.

161.    The identification of class members is ascertainable from the records contained within the Dialer Database.

162.    The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation, and because many are likely unaware that their rights have been violated.

163.    The Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

164.    The Plaintiff is capable of and willing to represent the other members of the class.

## CAUSES OF ACTION

## COUNT I – VIOLATION OF THE TCPA: 47 U.S.C. § 227(b): PRE-RECORDED MESSAGES

165.    The Plaintiff re-alleges and incorporates the foregoing allegations as if set forth fully herein.

166.    The TCPA makes it unlawful to initiate any telephone call to any residential or cell phone telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.

167.    The Plaintiff alleges the Defendants jointly engaged in telemarketing in violation of the TCPA's prohibition against telemarketing via pre-recorded message.

168.    The Plaintiff alleges that such violations of the TCPA were either willful or negligent.

169.    The Plaintiff and the class are entitled to have their rights, status, and legal

relations relating to the Defendants' use of telemarketing via pre-recorded message determined under the TCPA via class action.

### COUNT II -- INJUNCTIVE RELIEF TO BAR FUTURE TCPA VIOLATIONS

170.    The Plaintiff re-alleges and incorporates the foregoing allegations as if set forth fully herein.

171.    The TCPA expressly authorizes injunctive relief to prevent further violations of the TCPA.

172.    The Plaintiff, acting on behalf of the Class, respectfully petitions this Court to order all Defendants, including but not limited to their employees, agents, or other affiliates, to immediately cease engaging in unsolicited telemarketing in violation of the TCPA.

WHEREFORE, Plaintiff Philip Charvat respectfully requests that the Court enter judgment in his favor, and in favor of the class, providing the following relief:

a) As to Count I, statutory damages of $500 per violation, or up to $1,500 per violation if proven to be willful;

b) As to Count II, a permanent injunction prohibiting the Defendants, including but not limited to, their employees, agents, or other affiliates, to immediately cease engaging in unsolicited telemarketing in violation of the TCPA; and

c) Any other relief the Court finds just and proper.

### JURY DEMAND

The Plaintiff demands a trial by jury of all claims that can be so tried.


Dated:    April 1, 2016                              PHILIP CHARVAT, on behalf of
                                                     himself and others similarly situated


                                                     By:    /s/ Daniel J. Marovitch
                                                           One of Plaintiff's Attorneys

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
Telephone: (312) 729-5288
Facsimile: (312) 729-5289
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

Edward A. Broderick
BRODERICK LAW, P.C.
125 Summer St., Suite 1030
Boston, MA 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327
ted@broderick-law.com

Matthew P. McCue
LAW OFFICE OF MATTHEW P. MCCUE
1 South Ave., 3rd Floor
Natick, MA 07160
Telephone: (508) 655-1415
Facsimile: (508) 319-3077
mmccue@massattorneys.net

*Counsel for Plaintiff*