**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Philip Charvat, on behalf of himself and others similarly situated, | ) ) ) | Case No. 1:12-cv-05746 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| Elizabeth Valente, Resort Marketing Group, Inc., Carnival Corporation & PLC, Royal Caribbean Cruises, Ltd., and NCL (Bahamas), Ltd., | ) ) ) ) ) | Hon. Judge Andrea R. Wood Hon. Mag. Judge Mary M. Rowland |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**
**AND INCORPORATED MEMORANDUM IN SUPPORT**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................1

II.    APPLICABLE TELEMARKETING LAW ...........................................2

    A.    The TCPA's Strict Regulation of Telemarketing via Pre-Recorded Voice Message..................................................................................2

    B.    Responsibility for Compliance with the TCPA Extends to the Entity on Whose Behalf the Call Was Made. ...............................................5

III.   FACTS RELEVANT TO CLASS CERTIFICATION .............................7

    A.    RMG Telemarkets for the Cruise Defendants via Pre-Recorded Message.............7

    B.    RMG Purchases Consumer Data from Middle-Man Data Brokers .........................8

IV.   THE LITIGATION CLASS ...............................................................19

V.    LEGAL STANDARD FOR CLASS CERTIFICATION .......................20

    A.    The Class Representative Has Standing. ..............................................22

    B.    The Class Is Clearly Defined and Based on Objective Criteria............................22

    C.    The Class is Sufficiently Numerous Such that Joinder is Impractical...................24

    D.    The Plaintiff and Class Members Share Common Factual and Legal Issues..........................24

    E.    The Plaintiff's Claims are Typical of Claims of Class Members. .........................26

    F.    The Plaintiff Has Established That He Has No Conflicts with the Class, and that He and Class Counsel Will Adequately Represent Class Members. .........................................................................27

    G.    Common Issues Predominate and Warrant Class Certification............................28

        1.    Individual Issues Relating to Vicarious Liability Do Not Predominate. .............................................................................30

        2.    Individual Issues Relating to Consent Do Not Predominate. ...................31

    H.    A Class Action Is the Superior Method of Adjudicating this Matter. ...................37

    I.    Appointment of Counsel ...............................................................39

VI.   CONCLUSION ...............................................................................40

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdeljalil v. General Electric Capital Corp.*,
306 F.R.D. 303 (S.D. Cal. 2015) ...................................................................31, 38

*Agne v. Papa John's Int'l, Inc.*,
286 F.R.D. 559 (W.D. Wash. 2012) .........................................................20, 26, 38

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................21, 27, 28

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013)...........................................................................................29

*Andrews Farms v. Calcot, Ltd.*,
258 F.R.D. 640 (E.D. Cal. 2009) ..........................................................................31

*Bee, Denning, Inc. v. Capital Alliance Grp.*,
310 F.R.D. 614 (S.D. Cal. 2015) .....................................................................21, 38

*Birchmeier v. Caribbean Cruise Line, Inc.*,
302 F.R.D. 240 (N.D. Ill. 2014)..................................................................... *passim*

*Booth v. Appstack, Inc.*,
No. 13–1533, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015) ...........20, 30, 31, 38

*Brindisi v. Massanari*,
No. 00C6495, 2001 WL 1607485 (N.D.Ill. Dec. 14, 2001) ..................................33

*Butler v. Sears, Roebuck & Co.*,
702 F.3d 359 (7th Cir. 2012) ................................................................................28

*Butler v. Sears, Roebuck and Co.*,
727 F.3d 796 (7th Cir. 2013) ...........................................................................28, 29

*Campbell-Ewald Co. v. Gomez*,
136 S. Ct. 663 (2016)............................................................................................30

*Chapman v. First Index, Inc.*
796 F.3d 783 (7th Cir. 2015) ................................................................................20

*Chapman v. Wagener Equities, Inc.*,
No. 09-c-07299, 2014 WL 540250 (N.D. Ill. 2014)........................................21, 30

ii

*Chicago Teachers Union, Local 1 v. Board of Educ.*,
    307 F.R.D. 475 (N.D. Ill. 2015) ............................................................26

*Cicilline v. Jewel Food Stores, Inc.*,
    542 F. Supp. 2d 831 (N.D. Ill. 2008) ....................................................37

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
    No. 07-5953, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009) ..................25

*Gomez v. St. Vincent Health, Inc.*,
    649 F.3d 583 (7th Cir. 2011) ................................................................27

*Gulas v. Infocision Mgmt. Corp.*,
    599 S.E.2d 648 (W. Va. 2004) ..............................................................31

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) ................................................................................22

*Hawk Valley, Inc. v. Taylor*,
    301 F.R.D. 169 (E.D. Pa. 2014) ...........................................................30

*Hinman v. M and M Rental Center*,
    545 F. Supp. 2d 802 (N.D. Ill. 2008) ..............................................26, 37

*Holman v. Experian Info. Sols. Inc.*,
    No. 11-0180, 2012 WL 1496203 (N.D. Cal. Apr. 27, 2012) ................31

*Hooters of Augusta, Inc. v. Am. Glob. Ins. Co.*,
    272 F. Supp. 2d 1365 (S.D. Ga. 2003) ...................................................2

*Ikuseghan v. Multicare Health Sys.*,
    No. 14-5539, 2015 WL 4600818 (W.D. Wash. July 29, 2015) .......20, 38

*Ira Holtzman, C.P.A. v. Turza*,
    728 F.3d 682 (7th Cir. 2013) ....................................................21, 26, 38

*Kleen Products LLC v. Int'l Paper*,
    306 F.R.D. 585 (N.D. Ill. 2015) ......................................................21, 37

*Knutson v. Schwan's Home Serv., Inc.*,
    No. 12-0964, 2013 WL 4774763 (S.D. Cal. Sept. 5, 2013) ..................20

*Kohen v. Pacific Inv. Mgmt. Co.*,
    571 F.3d 672 (7th Cir. 2009) ................................................................21

*Kolinek v. Walgreen Co.*,
    No. 13-4806, 2014 WL 3056813 (N.D. Ill. July 7, 2014) ......................4

*Krakauer v. Dish Network L.L.C.*,
    311 F.R.D. 384 (M.D. N.C. 2015) ...................................................................20, 30

*Kristensen v. Credit Payment Servs.*,
    12 F. Supp. 3d 1292 (D. Nev. 2014) ...............................................................20, 30

*Lee v. Stonebridge Life Ins. Co.*,
    289 F.R.D. 292 (N.D. Cal. Feb. 12, 2013) .......................................................30, 38

*Manno v. Healthcare Revenue Recovery Grp., LLC*,
    289 F.R.D. 674 (S.D. Fla. 2013) ...........................................................................20

*Marcial v. Coronet Ins. Co.*,
    880 F.2d 954 (7th Cir. 1989) .................................................................................24

*Mendez v. C-Two Grp., Inc.*,
    No. 13-5914, 2015 WL 8477487 (N.D. Cal. Dec. 10, 2015)...........................30, 38

*Mey v. Honeywell Intern., Inc.*,
    No. 12-1721, 2013 WL 1337295 (S.D. W. Va. Mar. 29, 2013) ...............................2

*Mims v. Arrow Fin. Servs., LLC*,
    132 S. Ct. 740 (2012)..............................................................................................3

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) .................................................................22, 23, 39

*In re Nigeria Charter Flights Contract Litig.*,
    233 F.R.D. 297 (E.D.N.Y. 2006) ..........................................................................30

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) .................................................................................21

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ...............................................................................24

*Pruitt v. City of Chicago*,
    472 F.3d 925 (7th Cir. 2006) .................................................................................24

*Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*,
    281 F.R.D. 327 (E.D. Wis. 2012) ..........................................................................38

*Saf-T-Gard Int'l, Inc. v. Vanguard Energy Servs., LLC*,
    No. 12-3671, 2012 WL 6106714 (N.D. Ill. Dec. 6, 2012)......................................38

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ...................................................................................4

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,
No. 11-10271, 2012 WL 6589258 (D. Mass. Dec. 18, 2012)..................................38

*St. Clair v. Johnny's Oyster & Shrimp, Inc.*,
76 F. Supp. 2d 773 (S.D. Tex. 1999) ...................................................................33

*Stern v. DoCircle, Inc.*,
No. 12-2005, 2014 U.S. Dist. LEXIS 17949 (C.D. Cal. Jan. 29, 2014) ...........32, 38

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014) ..........................................................22, 24, 25, 28

*Toney v. Quality Res., Inc.*,
75 F. Supp. 3d 727 (N.D. Ill. 2014) ...............................................................4, 36

*United States v. Dish Network, L.L.C.*,
75 F. Supp. 3d 942 (C.D. Ill. 2014) ......................................................................6

*United States v. Jackson*,
208 F.3d 633 (7th Cir. 2000) ..............................................................................33

*Van Patten v. Vertical Fitness Group, LLC*,
No. 12-1614, 2013 U.S. Dist. LEXIS 189845 (S.D. Cal. Nov. 8, 2013) ...........32, 38

*Van Sweden Jewelers, Inc. v. 101 VT, Inc.*,
No. 10-253, 2012 WL 4127824 (W.D. Mich. Sept. 19, 2012) ...............................38

*W. Rim Inv. Advisors, Inc. v. Gulf Ins. Co.*,
269 F. Supp. 2d 836 (N.D. Tex. 2003) ...................................................................2

*Wal–Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011)........................................................................................25

*Whitaker v. Bennett Law, PLLC*,
No. 13-3145, 2014 WL 5454398 (S.D. Cal. Oct. 27, 2014) ..................................20

*Zeidel v. YM LLC USA*,
No. 13-6989, 2015 WL 1910456 (N.D. Ill. Apr. 27, 2015) .....................................4

*Zeno v. Ford Motor Co.*,
238 F.R.D. 173 (W.D. Pa. 2006) .........................................................................30

**Regulatory Cases**

*In re Joint Petition Filed By DISH Network, LLC et al. for Declaratory Ruling
Concerning the TCPA Rules*,
28 FCC Rcd 6574 (May 9, 2013)...........................................................................5

*In re Rules & Regs. Implementing the TCPA*,
   20 FCC Rcd 13664, (Aug. 17, 2005) .................................................................5

*In re Rules & Regs. Implementing the TCPA*,
   27 FCC Rcd 1830 (Feb. 15, 2012) ...................................................................34

*In re Rules & Regs. Implementing the TCPA*,
   7 FCC Rcd 2736 (April 17, 1992) ....................................................................18

*In re Rules & Regs. Implementing the TCPA*,
   17 FCC Rcd 17459 (2002) ..................................................................................3

**Statutes**

47 U.S.C. § 227 ........................................................................................................2

47 U.S.C. § 227(b)(1)(A) .........................................................................................4

47 U.S.C. § 227(b)(1)(B) .........................................................................................4

47 U.S.C. § 227(b)(3) .........................................................................................1, 26

Pub. L. No. 102-243, 105 Stat. 2394 ...................................................................2, 3

**Rules**

Fed. R. Civ. P. 1 ....................................................................................................37

Fed. R. Civ. P. 23 ................................................................................2, 22, 24, 30

Fed. R. Civ. P. 23(a) .............................................................................................21

Fed. R. Civ. P. 23(a)(2) ........................................................................................25

Fed. R. Civ. P. 23(a)(3) ........................................................................................26

Fed. R. Civ. P. 23(a)(4) ........................................................................................27

Fed. R. Civ. P. 23(b) .............................................................................................21

Fed. R. Civ. P. 23(b)(3) ................................................................................. *passim*

Fed. R. Civ. P. 23(g)(1) ........................................................................................39

**Other Authorities**

137 Cong. Rec. S16204-01 .....................................................................................4

*Fed. Practice & Proc.* § 1751 (3d ed. 2010) .........................................................22

## I.  __INTRODUCTION__

After almost four years of contentious litigation, this case is before the Court on plaintiff's motion for class certification. Philip Charvat ("Mr. Charvat") filed this class action in July of 2012, seeking to hold the defendants accountable for massive violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Mr. Charvat received several of the *millions*[1] of illegal pre-recorded telemarketing calls defendants Resort Marketing Group, Inc. and its principal, Elizabeth Valente (collectively, "RMG"), made promoting the products of defendants Carnival Corporation & PLC ("Carnival"), Royal Caribbean Cruises, Ltd. ("Royal"), and NCL (Bahamas) Ltd. ("Norwegian") (collectively referred to as the "Cruise Defendants").

Mr. Charvat seeks to certify a class of 388,966 putative class members who all received the exact same pre-recorded calls from RMG promoting the products of the Cruise Defendants, on the same dates on which Mr. Charvat received those exact same calls. These illegal telemarketing calls received by Mr. Charvat and class members were identical in a number of aspects: They used the same pre-recorded script, were sent through one voice broadcasting platform, were all found within the same telemarketing campaigns that included Mr. Charvat, and all similarly promoted the Cruise Defendants' goods and services. The damages sought by all class members are also identical. The scope of the conduct at issue is large, and the individual damages are too small to incentive individuals to sue.[2]

---

[1] Attached at __Exhibit 1__ is the expert report of Jeffrey Hansen ("Hansen Report at __").  Mr. Hansen's report found that the Dialer Database contained records of calls made to *432,832,770* telephone numbers.  *See* Ex 1, Hansen Report at pg. 7.

[2] The Telephone Consumer Protection Act provides for statutory damages of $500 per violation, and up to $1,500 per violation if the conduct is found willful or knowing. 47 U.S.C. § 227(b)(3).

Further, a common question of fact and law exists as to whether the Cruise Defendants are vicariously liable for telemarketing calls violative of the TCPA that were physically dialed by RMG. It is important to note at the outset that, at Judge Rowland's instruction, full discovery as to whether the Cruise Defendants are vicariously liable for the illegal actions of RMG was deferred until after this Court's ruling on class certification. For purposes of class certification, whether or not the Cruise Defendants are vicariously liable for the actions of RMG is a common question that supports class certification. Accordingly, the extensive evidence obtained to date by plaintiff's counsel as to the knowledge, direction, and control that the Cruise Defendants exercised over RMG's telemarketing practices is not set forth in detail herein.[3] This evidence will be presented in detail at trial. For the reasons set forth below, all elements of Rule 23 are satisfied, and this case should be certified to proceed to trial as a class action.

## II.     <u>APPLICABLE TELEMARKETING LAW</u>

### A. *The TCPA's Strict Regulation of Telemarketing via Pre-Recorded Voice Message*

In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Pub. L. No. 102-243, 105 Stat. 2394, at § 2(5) (1991) (codified at 47 U.S.C. § 227).[4] State laws alone were deemed insufficient to effectively address

---

[3] Some of the evidence that the plaintiff will present to the Court as to the vicarious liability of the Cruise Defendants for the illegal acts of RMG is summarized in Plaintiff's Third Amended Complaint (Dkt. 463 at ¶¶ 65-83; 124-143).

[4] The TCPA has long been recognized as a remedial statute that must be construed liberally in favor of consumers and against telemarketers, as the law requires. *See Mey v. Honeywell Intern., Inc.,* No. 12-1721, 2013 WL 1337295, at * 1 (S.D. W. Va. Mar. 29, 2013) ("The TCPA is a remedial statute and thus entitled to a broad construction."); *Hooters of Augusta, Inc. v. Am. Glob. Ins. Co.*, 272 F. Supp. 2d 1365, 1376 (S.D. Ga. 2003), *aff'd*, 157 F. App'x 201 (11th Cir. 2005) (concluding after reviewing the TCPA's extensive legislative history that the TCPA is a remedial statute); *W. Rim Inv. Advisors, Inc. v. Gulf Ins. Co.*, 269 F. Supp. 2d 836, 849 (N.D. Tex. 2003), *aff'd*, 96 F. App'x 960 (5th Cir. 2004) (TCPA is a remedial statute).

the widespread problem: "Congress believed that federal law was needed because 'telemarketers [could] evade [state-law] prohibitions through interstate operations.'" *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012) (quoting 105 Stat. 2394, at § 2(7)). Thus, through the TCPA, Congress outlawed telemarketing via unsolicited autodialed or prerecorded telephone calls, specifically finding that:

> [R]esidential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.
> . . .
> Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call[,] . . . is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

105 Stat. 2394, at §§ 2(10) and (12); *see also Mims*, 132 S. Ct. at 745. [5] The specific focus on pre-recorded message telemarketing was intentional, as Congress recognized that the use of such automated technology to telemarket to consumers was more intrusive to the privacy concerns of the called party.

> It is clear that automated telephone calls that deliver an artificial or prerecorded voice message are more of a nuisance and a greater invasion of privacy than calls placed by "live" persons. These automated calls cannot interact with the customer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party, fill an answering machine tape of a voice recording service, and do not disconnect the line even after the customer hangs up the telephone. For all these reasons, it is legitimate and consistent with the Constitution to impose greater restrictions on automated calls than on calls placed by lived persons.

*See In re Rules & Regs. Implementing the TCPA*, 7 FCC Rcd 2736, at ¶ 25 (Apr. 17, 1992).

---

[5] Senator Hollings of South Carolina, the primary sponsor of the TCPA, explained that "computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall". *See In re Rules & Regs. Implementing the TCPA,* 17 FCC Rcd 17459, at ¶ 90 (2002) (quoting 137 Cong. Rec. H10, 341 (Nov. 7, 1991)).

In order to prevail on a TCPA claim that alleges an unlawful pre-recorded call to a residential or cellular telephone line, a consumer need only establish they were called via pre-recorded message, and that the substance of the pre-recorded message was an unsolicited advertisement or telephone solicitation. Once these elements are established, the burden then switches to the defendant to prove an affirmative defense. The TCPA exempts from its scope pre-recorded telemarketing calls made with a consumer's "prior express consent." *See* 47 U.S.C. §227(b)(1)(B) (residential phones); 47 U.S.C. § 227(b)(1)(A) (cell phones). "Prior express consent" exists where a consumer has (a) clearly stated that the telemarketer may call, and (b) clearly expressed an understanding that the telemarketer's subsequent call will be made for the purpose of encouraging the purchase of goods or services. *In re Rules & Regs. Implementing the TCPA*, 27 FCC Rcd 1830 ¶ 7 (Feb. 15, 2012). The FCC's definition is consistent with the everyday meaning of the term "prior express consent," meaning "'[c]onsent that is clearly and unmistakably stated.'" *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 955 (9th Cir. 2009) (quoting Black's Law Dictionary 323 (8th ed. 2004)); 137 Cong. Rec. S16204-01, 1991 WL 229525 (consent to be expressly given to the particular entity making the call). Finally, "simply providing one's phone number does not constitute *carte blanche* consent to receive automated marketing messages of any kind; instead, consent is limited by the facts surrounding the consent[.]" *Zeidel v. YM LLC USA*, No. 13-6989, 2015 WL 1910456, at *3 (N.D. Ill. Apr. 27, 2015); *Kolinek v. Walgreen Co.*, No. 13-4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014) (under TCPA, consent for one purpose does not equate to consent for all purposes, and is limited to the specific context and purpose for which it is given); *Toney v. Quality Res., Inc.,* 75 F. Supp. 3d 727, 736 (N.D. Ill. 2014) (rejecting TCPA "prior express consent" defense in context where

4

consumer provided her phone number to confirm an order, but received a call from an agent of the same company for telemarketing purposes).

### B. Responsibility for Compliance with the TCPA Extends to the Entity on Whose Behalf the Call Was Made.

Ever since the TCPA was enacted, the FCC has repeatedly made clear that the TCPA's broad restrictions on various forms of "telephone solicitations" cannot be evaded simply by utilizing a third party to solicit business:

> We take this opportunity to reiterate that a company on whose behalf a *telephone solicitation* is made bears the responsibility for *any* violation of our telemarketing rules and calls placed by a third party on behalf of that company *are treated as if the company itself placed the call.*

*See In re Rules & Regs. Implementing the TCPA*, 20 FCC Rcd 13664, ¶ 7 (Aug. 17, 2005) (emphasis added). The logic behind such a rule is plain: Those who benefit from illegal telemarketing should not be able to push their dirty work to third parties and then hide behind those third parties in an effort to avoid liability.

Further confirming its longstanding recognition that entities on whose behalf illegal telemarketing calls are made will be held accountable for such calls, the FCC released a declaratory ruling on May 9, 2013, which explicitly reaffirmed that entities like the Cruise Defendants may be held liable under federal common law principles of agency for violations of the TCPA committed on their behalf by third-party telemarketers. *In re Joint Petition Filed By DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules,* 28 FCC Rcd 6574, ¶¶ 28, 33-34 (May 9, 2013) ("FCC Ruling"). Specifically, the FCC held that a "seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct."

5

FCC Ruling ¶ 46. The FCC further explained that a seller could be bound by the unauthorized conduct of a telemarketer if the seller is aware of ongoing illegal conduct and fails to terminate the telemarketer, or, in fact, promotes or celebrates the telemarketer. *Id.* at ¶ 34 n. 104, and ¶ 46.[6]

Specific to this case, in June of 2013, Judge Zagel determined that the FCC Ruling clearly applied to the conduct of RMG and the Cruise Defendants. *See* Dkt. 117, 141 (denying the Cruise Defendants' motion to dismiss, finding that the FCC Ruling makes clear that plaintiff's claims against the Cruise Defendants are cognizable under a vicarious liability theory). More recently, Judge Rowland expounded on the applicable agency analysis relevant to the liability of the Cruise Defendants:

> RMG's authority to act on behalf of any one of the Cruise Line Defendants will be a fact-intensive question and will be determined by its overall business relationship with each of the Cruise Line Defendants. Significantly, an agency relationship can be based on circumstantial evidence. *Opp*, 231 F.3d at 1064 ("Implied authority is actual authority that is implied by facts and circumstances and it may be proved by circumstantial evidence.") (citation omitted). So even if a Cruise Line Defendant did not give express authority to RMG to perform telemarketing activities prohibited by the TCPA, a factfinder could determine that RMG reasonably believed—through the Cruise Line's words or conduct during the course of their overall business relationship—that the Cruise Line consented to have the telemarketing performed on its behalf.

*See* Dkt. 356 at 5-6.

---

[6] Even DISH Network, LLC, the seller at issue in the FCC Ruling—and the entity recently found responsible for making millions of illegal telemarketing calls—admitted before the FCC that "if the principal knows that a retailer is repeatedly engaging in violative telemarketing when selling the principal's products or services, and the principal fails to take reasonable measures to address the unlawful conduct, depending on the facts, that also could be interpreted as directing the unlawful conduct." *See FCC Ruling* at ¶ 46 n. 138. *See United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942 (C.D. Ill. 2014), *opinion amended on reconsideration*, 80 F. Supp. 3d 914 (C.D. Ill. 2015), *and vacated in part*, 80 F. Supp. 3d 917 (C.D. Ill. 2015) (granting summary judgment against DISH for making millions of illegal telemarketing calls via third parties).

### III.    FACTS RELEVANT TO CLASS CERTIFICATION

RMG is an Illinois-based corporation controlled by its principal, defendant Elizabeth Valente ("Ms. Valente"). RMG has been described as a kind of "parent" corporation controlling other iterations of Ms. Valente's business, such as Travel Service Network, Inc., TSN Travel, Inc., TSN International, Inc., and TSN Marketing LLC.[7]

#### A. RMG Telemarkets for the Cruise Defendants via Pre-Recorded Message.

RMG began telemarketing via pre-recorded message on behalf of the Cruise Defendants in 2010.[8] To telemarket the products of the Cruise Defendants, RMG purchased consumers' contact information from third-party data brokers.[9] Those purchased telephone numbers were then loaded into RMG's auto-dialer computer[10] ("Dialer Database") and assigned a Campaign ID and a specific recording.[11] Pre-recorded calls made via the Dialer Database were then broadcast to call recipients nationwide.[12] The Dialer Database ran from 9:00 a.m. to 9:00 p.m. during the

---

[7] Exhibit 1, Hansen Report at Tab M, Deposition of Jason Rader at pages 9-18 (describing the various entities controlled by Ms. Valente, including RMG).

[8] Id. at Tab L, Deposition of Beth Valente at pg. 112.

[9] Id. at Tab L, Valente Deposition at pg, 133 (we purchased leads from Caldwell List and FlowMedia).

[10] An "auto dialer" is a computer that allows a telemarketer to make multiple calls at the same time. Using what is called a "predictive dialer" the computer only transfers calls to a live agent when the call is answered by a consumer. In this manner, the telemarketer does not have to hand dial the call and avoids the inconvenience of an unanswered call or a busy signal. RMG has admitted that the computer it used to make the telemarketing calls at issue was an "auto dialer." *See* Exhibit 1, Hansen Report at Tab L, Valente Depo at 91.

[11] Id. at Tab B, Deposition of Jamie Smith at 24-25; 86 (describing how a telemarketing campaign was carried out).

[12] **Exhibit 2**, Declaration of RMG President Richard Borst at ¶¶ 4-5.

week—and occasionally on Saturdays—contacting hundreds of thousands of consumers a day.[13]

The substance of the pre-recorded messages relevant here promoted the goods or services of the

Cruise Defendants.[14]

Consumers who received the pre-recorded messages promoting the goods or services of

the Cruise Defendants were often informed that they had filled out a "contest entry" form, via a

prerecorded message which then instructed consumers to "Press 1" for more information. This

was a ruse, as there was no "contest entry."[15] Consumers who "Pressed 1" were then transferred

to a call center operated by RMG in Batavia, Illinois, which was staffed by up to twenty operators

at a time. After a consumer indicated that they were interested in booking a cruise, the consumer

was then referred to RMG's sales department which closed the transaction, including sending out

the reservation form allowing the customer to book a cruise with Carnival, Royal Caribbean, or

Norwegian. The Cruise Defendants would then, in turn, compensate RMG for each referred

customer.[16]

### B. RMG Purchases Consumer Data from Middle-Man Data Brokers[17]

The defendants claim that the consumers who were contacted by RMG via pre-recorded

message promoting the goods or services of the Cruise Defendants had consented to receive such

calls when they purportedly visited various third-party websites on the internet. The defendants

do not claim that these consumers specifically consented to being called by RMG or any of the

---

[13] Id. at ¶¶ 8-9.

[14] Exhibit 2, Declaration of RMG President Richard Borst at ¶ 10.

[15] Id. at ¶ 22.

[16] Ex. 1, Hansen Report at Tab L, Valente Deposition at pg. 53 (describing the sales process); Valente Deposition at pg. 117 (we get paid on commission by Carnival, Royal or Norwegian).

[17] Ex. 1, Hansen Report at 17-21.

Cruise Defendants.[18]  Rather, the defendants' claim the consumers contacted had generically

expressed an interest in receiving information about "travel" when visiting these unaffiliated

third-party websites.  Data obtained during such online visits was then allegedly sold to third-

party data brokers, who then sold such data to unknown levels of additional data brokers, until it

was ultimately purchased by RMG.[19]

      For example, the defendants claim that Mr. Charvat's daughter, Allison, consented to

receive pre-recorded telemarketing calls from the defendants on a website called

www.123freetravel.com.[20]  Ms. Charvat has been deposed and has denied these allegations.[21]  In

purported support of this claim, RMG produced in discovery a 4,567-page spreadsheet

containing the names of hundreds of thousands of consumers whom RMG claims agreed to

receive pre-recorded telemarketing calls. Specifically as to Mr. Charvat, the spreadsheet contains

a single line of data that provides the name of Allison Charvat, the home phone number for Mr.

Charvat, the residential address for Mr. Charvat, a date (3/12/2010), and a website address,

---

[18] Ex. 1, Tab L, Valente Deposition at pg 179 (websites did not specifically mention names of
Valente's companies).  Ex 1, Tab M, Rader Deposition at pg. 56-57 (confirming that "opt in"
leads used by RMG were consumers who wanted to receive calls about "travel" generally and
not specifically telemarketing calls promoting the goods or services of the Cruise Defendants).

[19] Ex. 1, Tab L, Valente Deposition at pg. 147 (leads were for people interested in travel and
travel discounts); Valente Deposition at pg. 148 (we told the brokers we wanted leads who were
interested in travel so we would not waste time).

[20] Ex. 1, Tab L, Valente Deposition at pg. 185 (Charvat was called based on lead from
www.123freetravel.com).  *See also* **Exhibit 3**, RMG's Answers to First Set of Interrogatories at
#16 (same).

[21] *See* **Exhibit 4**, Deposition of Allison Charvat at pg. 139 (I never heard of this web site until I
learned of it from counsel).

www.123freetravel.com.[22]  Where this spreadsheet came from originally, who created it, and how many times it was modified before it arrived at RMG is unknown.[23]

RMG also produced images of the promotions and privacy pages from www.123freetravel.com that purportedly accurately represent this website at the time of Ms. Charvat's alleged visit on March 12, 2010.  The promotions page informs the consumer:



This promotion informs the consumer that they have "Won a Travel Shopping Spree Worth

---

[22] An excerpt of this Excel spreadsheet listing only the data relating to Mr. Charvat is attached hereto at **Exhibit 5**.  The Court may note that even on this single page of the spreadsheet, many consumers purportedly went to www.123freetravel.com and agreed to receive telemarketing calls from the defendants on March 12, 2010.  This remarkable fact is not limited to this single page. In fact, tens of thousands of consumers listed on the same spreadsheet in which Mr. Charvat's data was listed all purportedly went to this same website on the exact same date and agreed to receive telemarketing calls from apparently anyone in the world who purchased the contact data.

[23] RMG produced thousands of other spreadsheets containing the numbers of millions of other consumers who—it claims—provided RMG with their "prior express consent" to receive pre-recorded telemarketing calls.

$3,000 and asks the consumer to "enter your phone number below" to "claim your travel shopping spree."[24] Undisclosed to the consumer on this initial page—but purportedly disclosed elsewhere on another page of this website—was the catch: To obtain the "free" travel spree the consumer had "won," he or she had to pay $189 to join the 123FreeTravel Club.[25]

Nothing on these first two screen images relates all to telemarketing. To find anything relating to purported "consent" to receive telemarketing calls, a consumer visiting this website would have to click on the Privacy Page of www.123freetravel.com. Consumers who did so were informed that by "agreeing" to the terms of the privacy policy, a consumer thereby agrees to receive "telephonic … advertising solicitations from GenerationX-Solutions, Inc. and its business divisions."[26] Notably, however, the Privacy Policy of www.123freetravel.com only applies to consumers who "signed up" on the www.123freetravel.com website, who are "members" of the 123FreeTravel Club, and who "agreed" to its terms. Further, members of the 123FreeTravel Club who purportedly agreed to such terms only consented to receive "telephonic … advertising solicitations from GenerationX-Solutions, Inc. and its business divisions."

RMG has represented in discovery that it has produced all documents relating to Mr.

---

[24] The screen shot of the "Offer" page of www.123freetravel.com produced by RMG in discovery is attached at **Exhibit 6**. (TS5030-5032). Although Ms. Charvat purportedly visited this web site on March 12, 2010, the screen shots of this web site, in the top right corner, indicates that the images are apparently from January 29, 2011, and March 23, 2006. The third image of the purported "Offer" page is undated. (TS5032).

[25] The screen shot produced by RMG purportedly representing the terms and conditions page of www.123freetravel.com is attached at **Exhibit 7** (TS5034).

[26] The screen shot of the "Privacy Policy" page of www.123freetravel.com is attached at **Exhibit 8** (TS5033). The screen shot appears to represent how this "Privacy Policy" appeared as of sometime in 2006. Ms. Charvat purportedly visited this web-site on March 12, 2010. Ex. 6-8 are the only documents any of the defendants have offered to indicate what this web-site promoted and disclosed to consumers in support of their affirmative defense of prior express consent.

Charvat's purported "prior express consent" to receive pre-recorded telemarketing calls from RMG on behalf of the Cruise Defendants.[27] No evidence has been produced to indicate that Ms. Charvat ever "won a free travel spree" from www.123freetravel.com, or that she ever paid $189 and "signed up" to be a member of the www.123freetravel.com travel club, or that she "agreed" to the terms of the privacy page of this website. Finally, RMG and the Cruise Defendants have all admitted that they have no business affiliation whatsoever with GenerationX-Solutions or www.123freetravel.com.[28]

RMG did not directly purchase the contact information of Mr. Charvat, and other class members, from www.123freetravel.com or from any of the other websites it claims were the original source of its leads.[29] Instead, RMG purchased contact information for class members from a data broker called Caldwell List who, in turn, purchased the data from another data broker called TDC Marketing. TDC, in turn, admitted that the data sold to Caldwell List was purchased from yet another broker named Steven Katz. TDC further testified that there could be "one hundred intermediaries between Mr. Mongiovi and the original source of the data ultimately sold to RMG." Neither Caldwell List or TDC can attest to the accuracy of the data sold to RMG and admitted that the data could easily have been manipulated by anyone in the chain of possession

---

[27] *See* **Exhibit 9**, RMG's Response to Plaintiff's Fifth Request for Production of Documents at Request No. 1 (RMG has produced all documentation as to its prior express consent defense relating to Mr. Charvat).

[28] *See* Ex. 3, RMG Answers to First Set of Interrogatories at #19 (RMG denies any relationship with www.123freetravel.com); **Exhibit 10**, Carnival Answers to Interrogatories at #17 (same); **Exhibit 11**, Royal Answers to Interrogatories at #17 (same); **Exhibit 12**, Norwegian Answers to Interrogatories at #17 (same).

[29] *See* Ex. 1, Hansen Report at pg. 16-21. A list of many of the thousands of web-sites that was purportedly the original source of data sold to RMG by various data brokers is attached at Tab P to the Hansen Report.

of the data.[30]  The defendants never deposed Mr. Katz and made no effort to authentic any of the evidence upon which they rely upon for their affirmative defense of prior express consent.[31]

Further, evidence obtained from RMG during discovery demonstrates that the data relied upon by the defendants to call class members was likely fraudulently obtained.  First, on December 1, 2009, Jason Rader, the VP of Marketing for RMG, forwarded to Peter Lachnicht of Caldwell List a list of websites RMG had previously used to obtain consumer contact data.  Mr. Rader wanted to make sure that any data purchased by Caldwell List from RMG was not duplicative of data it had already purchased from other sources.[32]  Mr. Lachnicht, in turn, forwarded that list to Mr. Mongiovi of TDC and asked him to "look at these and let me know if it is the same source or not…"  Incredibly, Mr. Lachnicht then asked Mr. Mongiovi that if the lead sources were the same, whether ***"there was any way to make them look different."***  Mr. Lachnicht then admitted, ***"I'm such a sleaze-bag, I know!.."[33]***  When confronted at his deposition with this e-mail, Mr. Rader of RMG admitted that he found the e-mail "troubling"

---

[30] Ex 1, Hansen Report at 18, Tab N, Deposition of Peter Lachnicht of Caldwell List at pg. 36, 61-62 (Caldwell List does not generate the lead information itself.  It buys it from a third party and then re-sells the data) (Caldwell List does not know if the data sold to RMG was legitimate); Ex 1, Tab O, Deposition of Thomas Mongiovi of TDC Marketing at pg 182 ("I did not create or compile the data sold to RMG, I purchased it from Katz); Mongiovi Depo at pg 183 (when asked if the data sold to RMG was authentic Mongiovi responded "110% I cannot say"); Mongiovi Depo at pg 177,197- 198 (any of the middlemen in the chain from the original source could have manipulated the data); Mongiovi Depo at pg. 182-183 (noting it is "true" that he does not know if there were 100 intermediaries involved in the chain of custody of the data sold to RMG).

[31] The Court ordered deadline for the parties to complete all non-expert third party discovery related to the Defendants' affirmative defenses, was September 1, 2015.  (DE# 368).

[32] Ex. 1, at Tab M, Rader Deposition at pg. 185-187.

[33] The 12/1/2009 e-mail exchange between Mr. Lachnicht and Mr. Mongiovi is attached hereto at **Exhibit 13.**  This e-mail is discussed at pages 187-188 of the Rader Deposition, attached to the Hansen Report at Tab M.

13

because the brokers are "doing something wrong" as they are "making up" the source of data "being relied upon [by RMG] to make robo-calls.""[34]

Several years later, on March 8, 2011, the FCC issued a citation to RMG for engaging in prerecorded telemarketing in violation of the TCPA. Attached to the FCC's citation were consumer complaints, many of which disclosed that the substance of the telemarketing calls at issues promoted the goods and services of the Cruise Defendants via pre-recorded message.[35] Upon receipt of the citation, RMG forwarded a list of the complaining consumers' names and phone numbers and asked Caldwell List to produce the evidence of consumers' consent to receive prerecorded messages from RMG. Thereafter, Caldwell List responded with a list of consumers who matched the phone numbers contained in the consumer complaints submitted to the FCC. Nine out of the ten names of consumers who complained to the FCC *did not match* the names of the consumers on the data purchased from Caldwell List. In follow-up e-mail exchanges between RMG and Caldwell List, RMG accused Caldwell List of selling it fraudulent leads.[36] Thereafter, RMG demanded a refund. Caldwell List refused but, instead, offered to provide RMG with even more leads at a better price. RMG agreed and continued to use this data, data it believed was fraudulent, to send prerecorded telemarketing calls promoting the Cruise

---

[34] Id. at pages 187-188.

[35] Plaintiff's counsel submitted a Freedom of Information Act to the FCC seeking a copy of this citation and all underlying documentation. The response is attached at **Exhibit 14.**

[36] Attached at **Exhibit 15** (page 1) is a list of consumers who complained to the FCC including their names and phone numbers. Page 2 of this Exhibit is the corresponding match contained within data purchased from Caldwell List. The only consumer who complained to the FCC who matches the data of Caldwell List was Reaca Fieder (510) 318-1108.

Defendants *for three more years*, through March 2014.[37]  When deposed on these issues, Jason

Rader, RMG's Vice President of Marketing admitted that Ms. Valente suspected that the data

RMG purchased from Caldwell List was fraudulent and had been manipulated.[38]

### A. *The Massive Scope of Illegal Telemarketing Revealed through Discovery*[39]

Over the four years prior to the filing of this lawsuit, and extending until March of

2014—long after the filing of this lawsuit in July of 2012—millions of illegal pre-recorded

telemarketing calls were initiated by RMG to consumers nationwide, promoting by trade name

the cruise services of the Cruise Defendants.[40]  The scope of the illegal telemarketing campaign

at issue in this case is confirmed by records contained with the Dialer Database.[41] The scope is

also evidenced by records of consumer complaints obtained from the Federal Trade Commission

in response to Freedom of Information Act requests.[42]  Specifically, in the years prior to the

filing of this lawsuit, hundreds of consumers complained to the FTC about pre-recorded

telemarketing calls promoting the goods and services of the Cruise Defendants originating from

Caller Identification Numbers ("CID") assigned to RMG and contained within the Dialer

---

[37] A string of e-mails organized chronologically between RMG and Caldwell List from March through July 2011, discussing the suspected fraudulent nature of the RMG leads is attached at **Exhibit 16.**

[38]  *See* Ex. 1, Hansen Report, at 19, citing to Tab M, Deposition of Jason Rader at pg 171 (Valente suspected Caldwell List data had been changed to insert new web sites); at pg. 172 (Valente expressed suspicion to Rader that Caldwell List data was fraudulent); at pg. 178 (Valente "freaked out" because she thought the Caldwell List data was "bogus"); at pg. 179 (Valente nervous that Caldwell List is "making stuff up").

[39] The scope of the illegal telemarketing at issue in this case is also set forth in detail in the Third Amended Complaint (DE# 463) *at ¶¶ 84-97; 124-131.*

[40] Ex. 1, Hansen Report at pg. 13-15.

[41] Id. at 7-13.

[42] Id. at 14.

Database.[43]  Such complaints that explicitly tied to CID's used by RMG continued to be received at the FTC *after* the filing of the class litigation, and continuing through March of 2014.[44]  At no time before or after the filing of the instant class action did the Cruise Defendants issue a cease and desist command to RMG, revoke RMG's authority to telemarket on behalf of the Cruise Defendants and to use their trade names, or discipline RMG in any manner whatsoever.  *See* Third Amended Complaint (DE# 463) at ¶¶ 76-78.  As a result, RMG continued to telemarket on behalf of the Cruise Defendants via pre-recorded message long after the filing of the class complaint, and the Cruise Defendants continued to pay RMG for its services.[45]

---

[43] Id. at 15.

[44] Id. at 15.  Attached to the Hansen Report, at Tabs H-K are, excerpted Excel spreadsheets evidencing pre-recorded telemarketing complaints submitted to the FTC and specifically in regard to telemarketing conducted for Carnival, Royal or NCL.  Prior to the filing of this class action in July of 2012, 300 consumers complained to the FTC as to their receipt of pre-recorded messages promoting Carnival Cruise Lines and which identified the originating number of the telemarketing calls as a CID owned by RMG and contained in the Dialer Database.  See Hansen Report at Tab H.  Following the filing of this class action in July of 2012, ninety consumers complained to the FTC as to their receipt of pre-recorded messages promoting Carnival Cruise Lines and which identified the originating number of the telemarketing calls as a CID owned by RMG and contained in the Dialer Database.  See Hansen Report at Tab I.  The excerpts of the RCL and NCL complaints reflect both pre-filing and post-filing complaints associated with RMG's CID.  In total, 1,125 consumers complained to the FTC as to their receipt of pre-recorded messages promoting Royal Caribbean and which identified the originating number of the telemarketing calls as a CID owned by RMG and contained in the Dialer Database. See Hansen Report at Tab J.  In total, 270 consumers complained to the FTC as to their receipt of pre-recorded messages promoting Norwegian Cruise Lines and which identified the originating number of the telemarketing calls as a CID owned by RMG and contained in the Dialer Database.  See Hansen Report at Tab K.

[45] *See* Ex. 1, Tab L, Valente Deposition at pg. 175 (we continued to telemarket via pre-recorded message post filing and continued to use the leads in our database).

**B.  *The Calls to Mr. Charvat and The Methodology to Identify the Class***

RMG sent pre-recorded telemarketing calls to Mr. Charvat's residential telephone line on June 11, 2011, September 8, 2011 and July 9, 2012.  RMG has admitted to making these calls.[46] These calls promoted the goods or services of the Cruise Defendants' via pre-recorded message.[47]  The methodology to identify the class in this case is set forth in detail in the Hansen Report, attached hereto at Ex. 1, pages 7-11.  To identify class members, Mr. Hansen first examined the Dialer Database and confirmed it had been used to make hundreds of millions of pre-recorded calls to consumers throughout the United States.  Mr. Hansen then isolated in the database three of the calling campaigns that included Mr. Charvat's phone number, and for which Mr. Charvat had recorded the actual pre-recorded call made to his home confirming that the call promoted the goods or services of the Cruise Defendants via pre-recorded message. Mr. Hansen then identified those consumers contained within these three telemarketing campaigns who received the pre-recorded messages. Based on all the above information, and based upon his

---

[46] *See* **Exhibit 17**, RMG Response to Plaintiff's First Request for Admissions at #10-14 (RMG admits to sending pre-recorded calls to Mr. Charvat on these dates).

[47] The actual recordings of these calls is included on the CD attached at **Exhibit 18**.

**June 11, 2011**
Recording: Congratulations.  You've submitted an online contest entry form for Royal Caribbean, Carnival or NCL cruise and were selected to receive a promotion. Press one now to speak to a cruise specialist, or press 2 to decline this promotion and be added to our do not call list.  Press one now.

**September 8, 2011**
Recording: Hello.  You filled out an entry form for a Royal Caribbean, Carnival or Norwegian Cruise Line promotion and were selected today. Please press one to speak to a cruise specialist or press 2 to decline this offer and be added to our do not call list. Press one now.

**July 9, 2012**
Recording:  Congratulations, you filled out a contest entry form for a 4 or 5 day cruise with Carnival, Royal Caribbean or Norwegian cruise lines and you were selected.  Press 1 now to speak to a travel service cruise agent or press 2 to decline this offer and be added to our do not call list. Press one now.

personal knowledge as to how the dialing system used by RMG worked, Mr. Hansen joined the various tables contained within the Dialer Database and created a Call Detail Report for those three pre-recorded telemarketing campaigns that included the residential phone number of Mr. Charvat. These reports detail:

- The phone number of the consumer called by RMG (Column A);

- The date of the call (Column B);

- Whether the call was answered by an answering machine or a person (Column C);

- The name assigned to the particular telemarketing campaign (Column D).

The Call Detail Reports confirmed that Mr. Charvat was called by RMG via pre-recorded message on June 11, 2011, September 8, 2011 and July 9, 2012. Mr. Charvat's recordings of these calls confirmed that the substance of the pre-recorded messages promoted the goods or services of the Cruise Defendants and specifically utilized their trade names "Carnival" "Royal Caribbean" and "Norwegian."

After segregating the above three telemarketing campaigns from the Dialer Database, Mr. Hansen then removed any call records that did not result in an audio file being played. He did not remove from the list any calls with a disposition code of "HUMAN," "NORMAL" "TRANSFERED" OR "MACHINE" as all of these disposition codes indicate that the pre-recorded call was in fact successfully transmitted to and received by the consumer. The specific campaigns identified by Mr. Hansen, applying the above methodology, are listed below and constitute the list of class members in this case ("Class List"):

| Consumer | Campaign Name | ID | Date | Land | Cell | Total Calls |
|---|---|---|---|---|---|---|
| Phil Charvat<br><br>(614) 895-8940 | 0610 TS2 Mix B223 | 422 | 6/11/11 | 76,262 | 226,946 | 303,208 |

| Phil Charvat (614) 895-8940 | 0901 TS2 Eastern B223 | 610 | 9/8/11 | 52,683 | 141,732 | 194,415 |
|---|---|---|---|---|---|---|
| Phil Charvat (614) 895-8940 | 0620 TS2 Eastern B223 | 1410 | 7/9/2012 | 45,260 | 126,059 | 171,319 |
| | *Total Calls* | | | *174,205* | *494,737* | *668,942* |
| | *Total Class Members* | | | *103,055* | *286,184* | *388,966[48]* |

The end result of this analysis is a list of consumers who all actually received pre-recorded telemarketing calls sent by RMG via the Dialer Database that promoted the goods and services of the Cruise Defendants. Further, each consumer contained on the Class List received pre-recorded messages **identical** to the calls made to Mr. Charvat. Attached to the Hansen Report at Tab E is an Excel spreadsheet that includes the telephone numbers of all class members, including the date they were called, the name of the telemarketing campaign in which they appear, the Campaign ID assigned to the campaign, and the specific disposition code confirming that the consumer, in fact, received the pre-recorded call at issue.

## IV.    THE LITIGATION CLASS

Under Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff Philip Charvat respectfully moves for certification of the following class:[49]

---

[48] The total class members (388,966) does not equal the total number of land lines (103,055) plus the total number of cell lines (286,184) because a small number of class members (273) received telemarketing calls on their landlines that were then ported over to a cell line and then received another telemarketing call from RMG promoting the goods or services of the Cruise Defendants.

All persons within the United States who received pre-recorded telemarketing calls that were initiated by RMG seeking to sell the goods or services of the Cruise Defendants and whose phone number is contained on the Class List.[50]

## V.   LEGAL STANDARD FOR CLASS CERTIFICATION

"In the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions." *Bee, Denning, Inc. v. Capital Alliance Grp.*, 310 F.R.D. 614, 630 (S.D. Cal. 2015) (certifying two classes under the TCPA).  Accordingly, courts routinely certify TCPA claims.[51]  In fact, the Seventh Circuit held that "[c]lass certification is *normal* in litigation under § 227 (TCPA), because the main questions,

---

[49] The following definition greatly narrows the size of the class to avoid potential predominance and manageability issues given the vast scope of the telemarketing at issue.  *See Chapman v. First Index, Inc.* 796 F.3d 783, 785 (7th Cir. 2015) (recognizing that obligation to define class falls on the judge's shoulders and does not require an amendment to the complaint).

[50] The members of the class are all consumers who appear in the exact same telemarketing campaign logs as Mr. Charvat and who received the exact same pre-recorded message as Mr. Charvat promoting the goods and services of the Cruise Defendants.

[51] *See Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 400 (M.D. N.C. 2015) (certifying class of individuals who received telemarketing calls promoting Dish despite being registered on the National Do Not Call Registry); *Booth v. Appstack, Inc.,* No. 13–1533, 2015 WL 1466247, at *16–17 (W.D. Wash. Mar. 30, 2015) (certifying class of individuals to whom automated calls were placed to cellular telephones); *Ikuseghan v. Multicare Health Sys.*, No. 14-5539, 2015 WL 4600818, at *6 (W.D. Wash. July 29, 2015) (finding commonality satisfied where TCPA claims were predicated on the use of an automated dialing system to make calls on behalf of defendant); *Whitaker v. Bennett Law, PLLC*, No. 13-3145, 2014 WL 5454398, at *7 (S.D. Cal. Oct. 27, 2014) (certifying class of individuals to whom automated calls were placed to cellular telephones); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 256 (N.D. Ill. 2014) (certifying two litigation classes for automated calls made to either a cellphone or landline that advertised free cruises in exchange for participation in various surveys); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014) (certifying nationwide class of individuals who allegedly received text messages in violation of the TCPA); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 693 (S.D. Fla. 2013) (certifying a litigation class comprised of all Florida residents who received an automated telephone call on their cellphone); *Knutson v. Schwan's Home Serv., Inc.*, No. 12-0964, 2013 WL 4774763, *11 (S.D. Cal. Sept. 5, 2013) (certifying class of persons who received autodialed calls with a prerecorded message on their cell phones); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 572 (W.D. Wash. 2012) (certifying class of cell phone owners who received text messages promoting the defendant's pizza products).

such as whether a given [communication] is an advertisement, are common to all recipients." *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013) (emphasis added); *see also Chapman v. Wagener Equities, Inc.*, No. 09-7299, 2014 WL 540250, at *15 n. 11 (N.D. Ill. 2014) ("*Chapman I*"), *leave to appeal denied*, 747 F.3d 489 (7th Cir. 2014) ("*Chapman II*") (Posner, J.) ("The defendants simply ignore the many cases decided during and since 2011 in which TCPA classes have been certified, as well as the Seventh Circuit's observation in *Turza* that class certification is the norm in TCPA cases.") These holdings are consistent with the Supreme Court's observation that the class certification requirements are "readily met" in consumer protection cases where, as here, common factual questions necessarily center upon the defendant's course of conduct. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Class certification is proper if the plaintiff satisfies the requirements of Fed. R. Civ. P. 23(a) and one of the subsections of Fed. R. Civ. P. 23(b). As a threshold requirement, however, the plaintiff must demonstrate that: (1) the representative plaintiff has standing; and (2) the proposed class is ascertainable. *See, e.g. Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009) ("[A]s long as one member of a certified class has a plausible claim to have suffered damages, the requirement of standing is satisfied."); *Birchmeier,* 302 F.R.D. at 245 (citing *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012)); *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006) (ascertainability).

Second, a proposed class must meet all of the requirements of Rule 23(a), which are "(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *Kleen Products LLC v. Int'l Paper,* 306 F.R.D. 585, 589 (N.D. Ill. 2015) (citing *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012)). Finally, the proposed class must qualify as one of the types described in Rule 23(b). *Id.* In this case, Plaintiff seeks certification under Rule

21

23(b)(3), which "requires the court to find that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014) (quoting the Rule) (internal quotation marks omitted).

The purpose of Rule 23 is to provide for the efficient administration of justice, as the class action mechanism allows large numbers of claims involving the same core issues to proceed in the aggregate, providing a path to relief where otherwise there would be none. "Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); Wright, *et al.*, 7A *Fed. Practice & Proc.* § 1751 (3d ed. 2010).

### A. The Class Representative Has Standing.

It is undisputed that RMG initiated at least three pre-rerecorded telemarketing calls to Mr. Charvat that promoted the goods or services of the Cruise Defendants using their trade names. It is undisputed that Mr. Charvat received these calls. Mr. Charvat alleges that these pre-recorded telemarketing calls violated his right of privacy as protected by the TCPA, which provides for statutory damages to the call recipient. As such, Mr. Charvat has properly alleged: (1) an injury-in-fact (the invasion of privacy caused by the unwanted calls); (2) stemming from Defendants' unlawful conduct (the automated calls in violation of the TCPA); and (3) that the injury may be redressed (via the statutory TCPA damages). Mr. Charvat thus has standing to represent the proposed class.

### B. The Class Is Clearly Defined and Based on Objective Criteria.

"Rule 23 requires that a class be defined, and experience has led courts to require that classes be defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). In a detailed and thorough opinion on the topic, the Seventh

22

Circuit recently explained that ascertainability is only focused on the class definition itself, explicitly rejecting the application of a "heightened" or "stringent" version of ascertainability in which some courts consider administrative feasibility. *Id.* The Court explained that a proposed class may fail to meet the ascertainability requirement in three ways. First, classes "defined too vaguely fail to satisfy the 'clear definition' component." *Id.* In other words, "class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* at 660. Second, the ascertainability requirement will not be satisfied where classes "are defined by subjective criteria, such as by a person's state of mind…." *Id.* "Third, classes that are defined in terms of success on the merits—so-called 'fail-safe classes'—also are not properly defined. . . . The key to avoiding this problem is to define the class so that membership does not depend on the liability of the defendant." *Id.*

In accord with the Seventh Circuit's ascertainability guidance from *Mullins*, and as detailed in the expert report of Jeffrey Hansen, the members of the class in this case are easily ascertainable. In fact, they've been identified. First, as the phone numbers of each class member are listed on the Class List (Hansen Report at Tab E), the plaintiff has adequately identified a particular group who will make up the class. Second, the Class List specifies that this particular group was harmed "during a particular time frame" and "in a particular location" as it identifies the dates upon which each class member received an illegal telemarketing call, and identifies the specific phone number that received the illegal call. Third, the Class List explains how each class member was injured "in a particular way," as each class member received an identical illegal telemarketing call in violation of their right of privacy as protected by the TCPA. As the consumers on the Class List represent "a particular group, harmed during a particular time frame, in a particular location, in a particular way," the class definition is not vague, and the class is

23

readily ascertainable. In addition, all three of these elements are entirely objective criteria—an individual either received a call from RMG or he or she did not; the call occurred during the relevant time period or it did not; and the person is on the Class List or they are not. Finally, the definition does not depend on, or presuppose, any liability for these calls on the part of the Cruise Defendants, and thus it is not a "fail safe" class. As such, Plaintiff's proposed class is ascertainable.

### C. The Class is Sufficiently Numerous Such that Joinder is Impractical.

A plaintiff does not need to "specify the exact number of persons in the class…but cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity." *Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir. 1989) (internal citations omitted). The Seventh Circuit has implied that even a class of forty may be sufficient to warrant class certification. *See Pruitt v. City of Chicago*, 472 F.3d 925, 926 (7th Cir. 2006) (noting that "[s]ometimes 'even' 40 plaintiffs would be unmanageable"). Numerosity is determined prior to any consideration of whether a particular class member has a valid claim. *See Parko v. Shell Oil Co.,* 739 F.3d 1083, 1084 (7th Cir. 2014) ("How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.") (emphasis in original). There can be no doubt, then, that in this case, the numerosity requirement of Rule 23 is satisfied. As detailed in the Hansen Report, RMG made 668,942 pre-recorded telemarketing calls to 388,966 consumers on the Class List. *See* Exhibit 1, Hansen Report at pg. 12.

### D. The Plaintiff and Class Members Share Common Factual and Legal Issues.

"One of the requirements for a class action in federal court is the existence of questions of law or fact common to the class." *Suchanek,* 764 F.3d at 755 (quoting the rule) (internal quotation marks omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Id.* at 756

(citing *Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th Cir. 2010)). "The Supreme Court has explained that 'for purposes of Rule 23(a)(2) even a single common question will do.'" *Id.* at 755 (quoting *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)).

A class plaintiff must show that the matter "is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. Because by definition large automated calling programs are carried out on a mass basis, a proposed TCPA class often contains common issues of law and fact. *See G.M. Sign, Inc. v. Finish Thompson, Inc*., No. 07-5953, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009).

The same is true here. Every class member's claim arises from the same common nucleus of operative facts, *i.e.,* RMG made identical pre-recorded telemarketing calls to the consumers whose phone numbers are contained on the Class List. All of the pre-recorded messages sent to and received by consumers listed on the Class List promoted the goods or services of the Cruise Defendants using their trade names. Similarly, every Class Member has an interest in the same overarching question of law, *i.e.,* whether the calls made by RMG violated the TCPA, and whether the Cruise Defendants are vicariously liable for such calls. More specifically, the class-wide adjudication of this action would implicate these additional common issues of law and fact:

- Did RMG place the calls under the Cruise Defendants' actual authority—express or inferred?

- Did RMG place the calls under the Cruise Defendants' implied authority?

- Did the Cruise Defendants ratify RMG's illegal conduct by accepting the benefit of its illegally-generated business and failing to exercise its authority to end the violations, even after this lawsuit was filed?

- Does the data purchased by RMG from Caldwell List and used to make pre-recorded call to consumers satisfy the TCPA's "prior express consent" requirement?

25

■ If there were violations of the TCPA by RMG and the Cruise Defendants, were those violations knowing or willful such that treble damages are appropriate under 47 U.S.C. § 227(b)(3)?

These questions are dispositive, apply equally to all class members and, importantly, can be answered using common proof and uniform legal analysis. Further, the uniformity of the applicable law — the federal TCPA — distinguishes this case from putative nationwide class actions requiring application of multiple states' laws. The commonality requirement is therefore met. As the Seventh Circuit held, "[c]lass certification is normal in litigation under § 227, because the main questions…are common to all recipients." *Turza*, 728 F.3d at 684. The class definition ensures that all Class members have identical claims; both factually and legally. Fed. R. Civ. P. 23(b)(3); *Agne*, 286 F.R.D. at 566.

### E. The Plaintiff's Claims are Typical of Claims of Class Members.

"'[T]ypicality' reflects the Rule 23(a)(3) requirement that 'the claims or defenses of the representative parties [be] typical of the claims or defense of the class.'" *Chicago Teachers Union, Local 1 v. Board of Educ.,* 307 F.R.D. 475, 480-81 (N.D. Ill. 2015). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on the same legal theory." *Id.* (quoting *Oshana,* 472 F.3d at 514). Put another way, where the defendant engages "in a standardized course of conduct vis-a-vis the class members, and plaintiffs' alleged injury arises out of that conduct," typicality is "generally met." *Hinman v. M and M Rental Center,* 545 F. Supp. 2d 802, 806-07 (N.D. Ill. 2008) (citing, *e.g.*, *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)). "This requirement 'directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large.'" *Birchmeier,* 302 F.R.D. at 251 (quoting *Muro v. Target Corp.,* 580 F.3d 485, 492 (7th Cir. 2009)).

26

Here, the standardized course of conduct consists of (1) RMG purchasing lists of consumer data from data brokers separated by an unknown number from the data's original source; (2) RMG making pre-recorded calls to those consumers; (3) promoting the Cruise Defendants goods or services on those calls. All of these actions are evidenced within the Dialer Database and through other discovery obtained from RMG. Mr. Charvat had his data sold to RMG by Caldwell List, received a pre-recorded call from RMG, via the Dialer Database, that promoted the goods or services of the Cruise Defendants, and is included on the proposed Class List. The class only includes those consumers who were included in the same telemarketing campaigns, as evidenced by the Class List, and who received the same pre-recorded telemarketing message. Mr. Charvat's claims thus flow from the same exact conduct that produced the calls for all the other members of the proposed class, and are therefore typical of those of the class.

### F. The Plaintiff Has Established That He Has No Conflicts with the Class, and that He and Class Counsel Will Adequately Represent Class Members.

"Rule 23(a)(4) requires that the named plaintiffs and class counsel 'will fairly and adequately protect the interests of the class.'" *Birchmeier,* 302 F.R.D. at 252 (quoting the Rule). In an adequacy analysis, the Court considers "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). While the Supreme Court has noted that adequacy and typicality analysis "tend [ ] to merge," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20 (1997), courts have rejected proposed class representatives due to "conflicts of interest" or "serious credibility problems." *Birchmeier,* 302 F.R.D. at 252 (internal quotation marks and citations omitted).

Here, Mr. Charvat has no conflicting interests with class members. In fact, by investigating, documenting, filing, and prosecuting the claim, including producing hundreds of pages of documents, being subjected to a seven-hour deposition during which counsel for one of the defendants accused his daughter of being a "liar," and by overcoming a frivolous counterclaim asserting that he violated RMG's privacy rights by tape-recording the illegal calls at issue in accord with Ohio law, Mr. Charvat has demonstrated a desire and ability to protect class members' interests and a firm commitment to see this case through to hold the defendants jointly accountable for their massive violation of telemarketing law. There is nothing to suggest that Mr. Charvat has any interest antagonistic to the vigorous pursuit of the class claims against the defendants. In fact, his ability to overcome years of attacks on his character and family demonstrate his resolve to represent the interests of the class, and make him an ideal class representative. Similarly, Mr. Charvat's counsel are competent to represent the class, having previously been appointed lead counsel in many TCPA class actions.[52]

### G. Common Issues Predominate and Warrant Class Certification.

Predominance is "readily met" in certain consumer cases. *Amchem*, 521 U.S. at 625. The touchstone for predominance analysis in the Seventh Circuit is efficiency. *Butler v. Sears, Roebuck & Co.,* 702 F.3d 359, 362 (7th Cir. 2012) ("*Butler I*"), *vac'd on other grounds* 133 S. Ct. 2768 (2013), *judgment reinstated*, 727 F.3d 796 (7th Cir. 2013) ("*Butler II*"), *cert. denied* 134 S. Ct. 1277 (2014). "[T]he requirement of predominance is not satisfied if 'individual questions ... overwhelm questions common to the class.'" *Butler II,* 727 F.3d at 801 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1196 (2013)). On the flip side, it is not the case that *every* issue must be common to *every* class member, as "a rule requiring 100% commonality would eviscerate consumer-fraud class actions." *Suchanek,* 764 F.3d at 759.

---

[52] The affidavits of class counsel are attached at **Exhibit 19**.

"[P]redominance is [not] determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Butler II*, 727 F.3d at 801. An issue is 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke'. *Id.* (quoting *Dukes*, 131 S. Ct. at 2551). Here, it cannot credibly be disputed that RMG sent pre-recorded telemarketing calls to millions of consumers nationwide promoting the Cruise Defendants. Given the above summation of defendants' consent claims, there can be no credible claim here that consumers provided their "prior express consent" to receive the pre-recorded calls at issue. What remains to be resolved then at trial is the common question as to whether the Cruise Defendants are vicariously liable for the pre-recorded telemarketing performed by RMG.

In addition, as the Supreme Court has held, while Rule 23(b)(3) requires a showing that questions common to the class predominate, it does not require proof that those questions will be answered, on the merits, in favor *of* the class. *Amgen*, 133 S. Ct. at 1191. "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Id.* Whether or not this case is ultimately decided in favor of the class, its resolution will be determined by answering questions common to all class members.

TCPA claims, by their nature, involve large numbers of consumers who received identical calls; a small number of defendants; and a common course of conduct that affected each person in the same way. As detailed above, and in the expert report of Mr. Hansen, the class members in this case received pre-recorded calls identical to the calls received by Mr. Charvat, and were included in the exact same telemarketing campaigns that included the calls to Mr. Charvat. These calls were all initiated by RMG using identical computer and

29

telecommunications technology.  The calls of all class members are evidenced by common

evidence found within the Dialer Database.  All class members actually received the pre-

recorded messages.  All class members seek the exact same statutory damages.  As common

questions of fact and law predominate over all others, class certification is appropriate.

### 1. *Individual Issues Relating to Vicarious Liability Do Not Predominate.*[53]

"[U]nder federal common-law principles of agency, there is vicarious liability for TCPA

violations." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016) (citing *FCC Ruling*).  To

achieve Rule 23's efficiencies, courts frequently certify TCPA class cases involving vicarious

liability allegations and adjudicate these claims in a single proceeding.  *Lee v. Stonebridge Life

Ins. Co.*, 289 F.R.D. 292, 294 (N.D. Cal. Feb. 12, 2013) (certifying TCPA vicarious liability

class action); *Kristensen*, 12 F. Supp. 3d at 1302 (same); *Hawk Valley, Inc. v. Taylor*, 301 F.R.D.

169, 188 (E.D. Pa. 2014) (same); *Mendez v. C-Two Grp., Inc.*, No. 13-5914, 2015 WL 8477487,

at *7 (N.D. Cal. Dec. 10, 2015) (common question of "whether Defendants are vicariously liable

for [third-party telemarketer's] conduct" satisfied predominance); *see also Chapman I*, 2014 WL

540250, at *11 (certifying class involving common issue of "whether defendants are vicariously

liable for the TCPA violations of [third-party telemarketer]); *Krakauer* 311 F.R.D. at 394, 400

(certifying Do Not Call class action and recognizing vicarious liability as a common issue to be

resolved at trial); *Booth*, 2015 WL 1466247, at *8 (certifying TCPA class where common issue

was whether defendant's could be held vicariously liable for allegedly illegal calls). [54]

---

[53] The parties all agreed to defer discovery relating to vicarious liability until after the ruling on
class certification.

[54] *See also In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 304 (E.D.N.Y. 2006)
(holding that existence of an agency relationship can be determined using common evidence of
principal's representations to third parties, and certifying class); *Zeno v. Ford Motor Co.*, 238
F.R.D. 173, 193-94 (W.D. Pa. 2006) (certifying class where existence of an agency relationship

Here, consistent with such cases, common evidence regarding vicarious liability supports class certification.  Post certification, the Court or jury will decide the common question as to whether or not the Cruise Defendants are vicariously liable for RMG's.  The evidence supporting and opposing that claim—and its ultimate resolution—cannot and will not vary as between class members.  That is the very definition of a common issue.

## 2. *Individual Issues Relating to Consent Do Not Predominate.*

Frequently in TCPA cases, defendants attempt to show that class members provided "prior express consent" to receive telemarketing calls, and that determining the validity of such consent requires consumer by consumer factual "mini-trials."  Surely, the defendants will jointly claim that proving consent in this case will give rise to a deluge of fact issues that should preclude class certification, and will ask this Court to essentially miss the forest for the trees.[55]  In this case, however, the plaintiff intends to attack the defendants consent defenses using common proof.  *See Abdeljalil v. General Electric Capital Corp.*, 306 F.R.D. 303, 311 (S.D. Cal. 2015) (granting class certification in a TCPA case over defendant's consent based predominance objections noting that consent defenses were subject to attack via common proof); *Booth.*, 2015 WL 1466247, at *12 (indicating that the court need not resolve issues relating to consent at the

could be determined by interpreting standard form agreements and a common course of conduct); *see also Holman v. Experian Info. Sols. Inc.*, No. 11-0180, 2012 WL 1496203, at *9 (N.D. Cal. Apr. 27, 2012) (certifying Fair Credit Reporting Act class where question of whether credit reporting agency could be held liable for subscriber's violation "turns on the interactions between [the agency] and [the subscriber]"); *Andrews Farms v. Calcot, Ltd.*, 258 F.R.D. 640, 652 (E.D. Cal. 2009), *order clarified on reconsideration,* 268 F.R.D. 380 (E.D. Cal. 2010) (certifying as a common issue the question of fiduciary duty or agency relationship).

[55] A common tactic. "Defendants attempting to avoid class certification will, almost exclusively, overwhelm a [trial] judge with the differences between each class member's case [,]" *Gulas v. Infocision Mgmt. Corp.*, 599 S.E.2d 648, 653 (W. Va. 2004). "It is akin to a judge being asked to look at a forest of oak trees and being told the difference between each tree: each tree has a different height, a different color, a different number of leaves, a unique number of branches, a wide variation in the number and size of tree rings, and so on." *Id.*

class certification stage and plaintiff need only prove that consent, or the lack thereof, can be resolved on evidence and theories applicable to the entire class); *Stern v. DoCircle, Inc.,* No. 12-2005, 2014 U.S. Dist. LEXIS 17949, at *20 (C.D. Cal. Jan. 29, 2014) (granting TCPA class certification and noting that consent defenses do not defeat predominance where consent will be proved or disproved on evidence and theories applicable to the entire class)*; Van Patten v. Vertical Fitness Group, LLC,* No. 12-1614, 2013 U.S. Dist. LEXIS 189845, at *16-18 (S.D. Cal. Nov. 8, 2013) (granting TCPA class certification and explaining that where consent defenses are subject to common proof individual issues do not predominate over common ones).

First, as detailed at length *infra*, the only consent defense applicable to the overwhelming majority of class members purportedly arises from RMG's purchase of class members' contact information through unknown levels of third-party data brokers, who purportedly originally obtained it from thousands of different websites,[56] wholly unaffiliated with defendants.[57] As to the admissibility of information found online, the Seventh Circuit has long aptly recognized:

> The fact that the Internet service providers may be able to retrieve information that its customers posted or email that its customers sent does not turn that material into a business record of the Internet service provider. "Any evidence procured off the Internet is adequate for almost nothing, even under the most liberal

---

[56]   As noted in the Hansen Report attached at Exhibit 1, at fn 22, the web domains, alone, that were the purported original source of consumer consent data would place any reasonable marketer on notice that the data being purchased was unlikely to have anything whatsoever to do with consumers interested in receiving telemarketing calls regarding a cruise.  A small sampling of these web sites include: www.abc.com; www.ebay.com; www.netflix.com; www.disneylandreport.com; www.usmilitary.com; www.1000dictionaries.com; www.123-baby-names.com; www.heartdisease.com; www.321weather.com; www.3fatchicks.com; www.accidentalhedonist.com; www.fishingmonster.com; www.freemathhelp.com; www.icravebollywood.com; www.lordoftherings-essentials.com.  The list of web sites used by Caldwell List is attached to Ex. 1, Hansen Report at Tab P.

[57] The defendants expert has determined that the purported "consent" of 386,264 (99.31%) class members is based on Internet derived lead data obtained.

> interpretations of the hearsay exception rules." *St. Clair v. Johnny's Oyster & Shrimp, Inc.*, 76 F. Supp. 2d 773, 775 (S.D. Texas 1999).

*United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000). *See also Brindisi v. Massanari,* No. 00-6495, 2001 WL 1607485, at *3 (N.D. Ill. Dec. 14, 2001) (Kennelly, J.) ("The Seventh Circuit has noted that evidence pulled off the web without any kind if authentication is 'adequate for nothing'"), *reversed on other grounds*, *Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003).

Stripped to its core, defendants' consent defense essentially is that unauthenticated data found somewhere on the internet, that was then passed from broker to broker to broker before ultimately being purchased by RMG, can suffice to satisfy the TCPA's strict requirement that a telemarketer first obtain a consumer's "prior express consent" before sending that consumer pre-recorded telemarketing calls.  The defendants rely on this data as evidence of their affirmative defense of consent, but have made no effort whatsoever in the past 3 ½ years to authenticate it, and the time to do so has now expired.  The defendants, essentially, ask this Court to accept as true the same type of unauthenticated "voodoo information taken from the Internet" which courts, including the Seventh Circuit, have cautioned against accepting.  *St. Clair*, 76 F. Supp. 2d at 75 (cited with approval in *Jackson*, 208 F.3d at 637).  Accordingly, the purported generic "opt-in" data relied upon by the defendants as evidence of class members' "prior express consent" to receive pre-recorded telemarketing calls from RMG on behalf of the Cruise Defendants fails as a matter of law based on common proof.[58]

---

[58] Just weeks ago, Judge Rowland ruled that the type of "consent" evidence submitted by the defendants was so unreliable, unauthentic and speculative it could not even be used as a basis to pursue additional discovery from Mr. Charvat.  *See DE# 470 Order on Defendants' Motion to Compel Inspection of Plaintiff's Computing System* (after extensively reviewing the evidence in this case as to leads purchased by RMG from lead brokers, Court finds the consent data submitted by the defendants speculative and unauthenticated Court declines to Order Mr. Charvat to provide the defendants with access to his computer system).

Not only, however, is defendants' "voodoo" consent evidence unauthentic, unreliable and inadmissible, it is also likely fraudulent. In fact, as detailed *infra*, RMG knew the data it was purchasing from Caldwell List was fraudulent, and despite such knowledge, continued to send pre-recorded telemarketing calls to consumers using such data even after this class action was filed, through March of 2014. The defendants' prior express consent defense will fail based on common proof for these reasons.

Moreover, even if the consumer data purchased by RMG from third data brokers was authentic, reliable, not fraudulent and otherwise admissible, it ***still*** cannot, as a matter of law, satisfy the TCPA's strict requirement that a telemarketer must have a consumer's "prior express consent" to telemarket via pre-recorded voice. RMG has admitted that it did ***not*** obtain these phone numbers directly from consumers who requested that RMG call them with telemarketing offers relating to the Cruise Defendants.[59] "Prior express consent" exists where a consumer has (a) clearly stated that the ***telemarketer*** may call, and (b) clearly expressed an understanding that the telemarketer's subsequent call will be made for the purpose of encouraging the purchase of goods or services. *In re Rules & Regs. Implementing the TCPA*, 27 FCC Rcd 1830 ¶ 7 (Feb. 15, 2012) (emphasis added); *see also* 137 Cong. Rec. S16204-01, 1991 WL 229525 (consent to be expressly given to the particular entity making the call). The ***"telemarketer"*** in this case is RMG. It is undisputed that not a single class member consented to receive a telemarketing call specifically from RMG. For this reason, the defendants' "prior express consent" defense will fail based on common proof.

---

[59] Ex. 1, Tab L, Valente Deposition at pg 179 (websites did not specifically mention names of Valente's companies). Ex 1, Tab L, Rader Deposition at pg. 56-57 (confirming that "opt in" leads used by RMG were consumers who wanted to receive calls about "travel" generally and not specifically telemarketing calls promoting the goods or services of the Cruise Defendants).

Further, RMG claims that Mr. Charvat and thousands of other class members,[60] provided it with their "prior express consent" to receive pre-recorded telemarketing calls from RMG on behalf of the Cruise Defendants, by visiting the website www.123freetravel.com.  However, as detailed above at pages 8-11, even if the images of this website as produced by RMG are admissible and accurately depict this website as of the date  of Ms. Charvat's purported visit in March of 2010, the **context** in which a consumer would have provided their phone number to this website was to claim a "free" "travel spree" the consumer had apparently been "pre-selected" to receive. [61]  To obtain their "free" "travel spree," a consumer had to pay $189 to become a member of the 123FreeTravel Club.  The context, however, in which a consumer was asked to provide their phone number was to claim a "free" "travel spree."  Nowhere on the offer page of www.123freetravel.com was a consumer expressly informed that by entering his or her phone number in the designated box, they would be providing "prior express consent" to receive pre-recorded telemarketing calls from anyone, let alone from defendants.  This type of internet scam, as a matter of law, cannot satisfy the TCPA's strict requirement that before a telemarketer sends a consumer a pre-recorded message, it must first obtain his or her "prior express consent."

The defendants will no doubt point to the Privacy Policy of this website in support of their claim of "prior express consent," and will note that the Privacy Policy includes language relating to the sale and use of consumer data for "telephonic … advertising solicitations."[62]

---

[60] The defendants' expert has determined that 61,548 class members (16% of the proposed class) purportedly consented to receive pre-recorded telemarketing calls from RMG on behalf of the Cruise Defendants via www.123freetravel.com.

[61] See purported screenshots of the promotion page of www.123freetravel.com, **Exhibit 6**. (TS5030-5032).

[62] The screen shot of the "Privacy Policy" page of www.123freetravel.com is attached at **Exhibit 7** (TS5033).

Even if it assumed, however, that this Privacy Policy is accurate, and admissible, the terms of the

Privacy Policy itself limits its scope to consumers who are "members" of the 123FreeTravel

Club and "have signed up on the http://www.123freetravel.com) web site." To become a

"member" of 123FreeTravelClub, a consumer had to pay $189. The defendants have failed to

produce any evidence that Allison or Phil Charvat, or any class member, paid monies to join the

123FreeTravel Club or otherwise "signed up" to become a "member." Further, the terms of the

Privacy Policy required consumers to "agree" to its terms. The defendants have failed to

produce any evidence that any class member "agreed" to the terms of the Privacy Policy of this

website. Finally, by its own terms, the Privacy Policy of www.123freetravel.com informed club

members who had explicitly agreed to its terms that they were only consenting to receive

"telephonic" "solicitations" from GenerationX-Solutions (the owner of www.123freetravel.com)

and its "business divisions."[63] **All** of the defendants have denied any business relationship

whatsoever with www.123freetravel.com or GenerationX-Solutions, let alone functioning as a

division of its business.[64]

     For all of these reasons, and under these circumstances, any contention that data obtained

from www.123freetravel.com represents consumers who provided their "prior express consent"

---

[63] *See Toney v. Quality Res., Inc.,* 75 F. Supp. 3d 727, 738 (N.D. Ill. 2014) (Court expresses skepticism that web site Privacy Policy can satisfy TCPA's "prior express consent" requirement where defendant failed to introduce any evidence to indicate the consumer agreed to or even saw its terms and where the defendant failed to demonstrate that the version of the policy submitted by the defendants was the version in effect at the time the consumer was called).

[64] *See* Ex. 3, RMG Answers to First Set of Interrogatories at #19 (RMG denies any relationship with www.123freetravel.com); **Exhibit 9**, Carnival Answers to Interrogatories at #17 (denies any relationship with www.123freetravel.com of GenerationX); **Exhibit 10**, Royal Answers to Interrogatories at #17 (denies any relationship with www.123freetravel.com of GenerationX); **Exhibit 11**, Norwegian Answers to Interrogatories at #17 (denies any relationship with www.123freetravel.com of GenerationX).

to receive pre-recorded telemarketing calls from RMG on behalf of the Cruise Defendants will fail as a matter of law, based on common proof applicable to all members of the class. Given the undisputed evidence in this case, individualized issues relating to "prior express consent" will not predominate over the common questions of law and fact that make this case ideal for resolution on a class-wide basis.[65]

### H. A Class Action Is the Superior Method of Adjudicating this Matter.

The second prong of the analysis under Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); Fed. R. Civ. P. 1 (noting that the Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding"). "Class certification is usually considered a superior method of adjudicating claims involving standardized conduct, even if there are individual issues that exist among class members (for example, on questions such as damages)...." *Cicilline v. Jewel Food Stores, Inc.,* 542 F. Supp. 2d 831, 838 (N.D. Ill. 2008). Where there is a "breadth and importance of the common issues" in the case, "'the superiority requirement . . . poses no serious obstacle to class certification.'" *Kleen Products,* 306 F.R.D. at 606 (quoting *Messner*, 669 F.3d at 814 n.5).

Unsurprisingly, courts routinely find class actions to be the superior method of adjudicating claims in the TCPA context. *See, e.g. Hinman,* 545 F. Supp. 2d at 807 ("It also appears that resolution of the issues on a class-wide basis, rather than in thousands of individual lawsuits (which in fact may never be brought because of their relatively small individual value),

---

[65] Plaintiff intends to move for partial summary judgment as to the defendants' affirmative defense that consumers provided RMG with their "prior express consent" to receive pre-recorded telemarketing calls from RMG on behalf of the Cruise Defendants by visiting various websites including, but not limited to, www.123freetravel.com.

would be an efficient use of both judicial and party resources."); *Reliable Money Order, Inc. v. McKnight Sales Co.,* 281 F.R.D. 327, 339 (E.D. Wis. 2012) ("Providing evidence of the defendant's alleged violation of the TCPA, as it relates to this specific class, would be duplicated in each individual lawsuit if the action were not allowed to proceed as a class. This runs counter to the objective of class actions to provide efficiency for the parties and the courts."), *aff'd,* 704 F.3d. 489 (7th Cir. 2013). As one federal court recently found while certifying a TCPA case:

> Jurists and commentators have long debated the merits of the modern class action and the public policies behind Rule 23… It is the view of this Court that the instant case highlights one of the strongest justifications for the class action device: its regulatory function… A statute such as the TCPA, which provides for a relatively small recovery for individual violations but is designed to deter conduct directed against a large number of individuals, can be effectively enforced only if consumers have available a mechanism that makes it economically feasible to bring their claims. Without the prospect of a class action suit, corporations balancing the costs and benefits of violating the TCPA are unlikely to be deterred because individual claims will not impose the level of liability that would outweigh the potential benefits of violating the statute.

*Bee, Denning, Inc.*, 310 F.R.D. at 630. Nationwide trial courts have scrutinized and approved the use of the class action vehicle to combat illegal telemarketing.[66] In 2013, the Seventh Circuit itself noted that class certification of TCPA claims is "normal" because the main questions that arise in TCPA class actions are "common to all recipients." *Turza*, 728 F.3d at 684.[67]

---

[66] *See e.g., Mendez v. C-Two Grp., Inc.*, 2015 WL 8477487, at *7-8; *Ikuseghan,* 2015 WL 4600818, at *7-8; *Abdeljalil,* 306 F.R.D. at 311; *Booth*, 2015 WL 1466247, at *17; *Stern,* 2014 U.S. Dist. LEXIS 17949, at *20; *Lee*, 289 F.R.D. at 295; *Van Patten,* 2013 U.S. Dist. LEXIS 189845, at *16-18; *Saf-T-Gard Int'l, Inc. v. Vanguard Energy Servs., LLC*, No. 12-3671, 2012 WL 6106714, at *6 (N.D. Ill. Dec. 6, 2012); Agne, 286 F.R.D. at 571-72; *Van Sweden Jewelers, Inc. v. 101 VT, Inc.*, No. 10-253, 2012 WL 4127824, at *8-9 (W.D. Mich. Sept. 19, 2012); *Sparkle Hill, Inc. v. Interstate Mat Corp.*, No. 11-10271, 2012 WL 6589258, at *4-5 (D. Mass. Dec. 18, 2012); Reliable Money Order, Inc., 281 F.R.D. at 339.
[67] A TCPA class certification decision remarkably similar to this case that also involved telemarketing by a marketing entity via pre-recorded message on behalf of a cruise line is *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 (N.D. Ill. 2014).

Moreover, this case does not present any of the manageability problems that impact the superiority determination. In particular, providing notice to class members—which occasionally proves an obstacle to class certification under the TCPA—can be easily accomplished in this case because Plaintiff will be able to generate an accurate list of class members using the records obtained in discovery. *See Mullins*, 795 F.3d at 667 (holding that questions related to the accuracy and usability of proposed class lists should be analyzed in the context of the superiority requirement). The database maintained by RMG and produced in discovery contains a listing of every phone call made to every consumer on the Class List. As such, the Plaintiff already possesses a list of class members, and should the Court certify the proposed class, notice could quickly and efficiently be sent to class members using that list. Thus, the proposed class meets the superiority requirement of Rule 23(b)(3).

### I. *Appointment of Counsel*

Lastly, plaintiff requests that his counsel be appointed as Co-Lead Class Counsel for this action. Fed. R. Civ. P. 23(g)(1) provides that "a court that certifies a class must appoint class counsel" and instructs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class." The attorneys for the plaintiffs are "qualified, experienced, and generally able to conduct the proposed litigation." All attorneys for the class are experienced class action practitioners. Counsel from these firms are fully versed with the intricacies of class actions in general and TCPA class actions in particular. A number of these cases have already been resolved, achieving excellent results for class members. *See* **Exhibit 19**, Counsel Declarations.

## VI.     <u>CONCLUSION</u>

This case meets the requirements for class certification.  The proposed class is defined by specific, objective, and verifiable criteria. It includes hundreds of thousands of people. The phone number of each class member is contained on the Class List and was found on the Dialer Database.  The claims asserted are based on misconduct that is *per se* illegal. The members of the class were all called in the same exact telemarketing campaigns. Each class member received the exact same pre-recorded message promoting the goods or services of the Cruise Defendants. All class members seek the exact same statutory damages.  All of the primary issues of law and fact in the action are common to the class, and predominate over any individual issues.  The defenses asserted by the defendants will, similarly, raise common questions of fact and law capable of resolution based on common proof.  This is, quite simply, the sort of controversy for which the vehicle of class adjudication was designed.  For all of these reasons, the Motion for Class Certification should be granted.

Respectfully submitted,

Dated: May 16, 2016       PHILIP CHARVAT, on behalf of himself
and others similarly situated


By: /s/ Daniel J. Marovitch

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
Phone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

Matthew P. McCue (*pro hac vice*)
THE LAW OFFICE OF MATTHEW P. MCCUE
1 South Ave., Third Floor
Natick, MA 01760
(508) 655-1415
mmccue@massattorneys.net

Edward A. Broderick (*pro hac vice*)
BRODERICK & PARONICH, P.C.
99 High St., Suite 304
Boston, MA 02110
(617) 738-7080
ted@broderick-law.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I have this 16th day of May, 2016, caused a copy of the foregoing

document to be served via ECF on all counsel of record, as well as on defendants RMG and

Elizabeth Valente at bvalente@tsncorporate.com, the e-mail at which Ms. Valente agreed to

accept service of documents relating to this case. Exhibit 18, consisting of three audio files, will

be e-mailed separately.

    .

           /s/ Daniel J. Marovitch