**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Philip Charvat, on behalf of himself and others similarly situated, | ) ) | |
| | ) | No. 12 cv 5746 |
| Plaintiff, | ) | |
| | ) | The Honorable Andrea Wood |
| v. | ) | |
| | ) | Magistrate Judge Mary Rowland |
| Elizabeth Valente, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**THE JOINT RESPONSE OF CARNIVAL CORPORATION & PLC,
NCL (BAHAMAS) LTD., AND ROYAL CARIBBEAN CRUISES, LTD.
TO PHILIP CHARVAT'S MOTION FOR CLASS CERTIFICATION**

Catherine J. MacIvor (Florida Bar# 932711)
Jeffrey E. Foreman (ARDC #6193309)
Daniela Ferro (Florida Bar#111479)
FOREMAN FRIEDMAN, PA
One Biscayne Tower, Suite 2300
2 South Biscayne Boulevard
Miami, FL  33131
*Attorneys for Royal Caribbean Cruises, Ltd. and NCL (Bahamas), Ltd.*

Jeffrey S. Becker (ARDC #6282492)
Darren B. Watts (ARDC #6197441)
Lena Shapiro (ARDC #6321499)
SWANSON, MARTIN & BELL, LLP
330 N. Wabash Avenue, Suite 3300
Chicago, Illinois 60611
*Attorneys for Carnival Corporation & PLC*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

I.  CRITICAL FACTS OMITTED FROM PLAINTIFF'S MOTION......................................3

   A.  THE CRUISE LINES' RELATIONSHIP WITH TRAVEL AGENCIES
      IS AT ARM'S LENGTH WITH INDEPENDENT COMPANIES ....................................................4

   B.  RESORT MARKETING GROUP PLACED PRERECORDED TELEMARKETING CALLS
      FOR ITS OWN BENEFIT AND WITHOUT AUTHORIZATION OF THE CRUISE LINES ...............4

      i.  RMG Acquired An Autodialer and Did Not Tell the Cruise Lines ..........................7

      ii.  RMG Used the Autodialer to Grow *its* Membership
         Unbeknownst to the Cruise Lines ...........................................................................8

   C.  PHILIP CHARVAT IS A SERIAL PLAINTIFF WHO
      INVITES TELEMARKETING CALLS FOR HIS OWN BENEFIT ...............................................11

   D.  RESORT MARKETING GROUP'S PRERECORDED CALLS TO PLAINTIFF ...............................13

   E.  PLAINTIFF'S CLASS ACTION IS ENTIRELY PREMISED ON
      HIS EXPERT'S UNQUALIFIED AND UNRELIABLE OPINIONS.............................................15

II.  AS A SERIAL LITIGANT, PLAINTIFF
    DOES NOT HAVE STANDING UNDER *SPOKEO* ........................................................20

III.  PLAINTIFF FAILS TO MEET HIS BURDEN UNDER RULE 23 ....................................23

   A.  PLAINTIFF'S PROPOSED CLASS OF OUTDATED, INVALID AND
      DISCONNECTED TELEPHONE NUMBERS IS VAGUE AND NOT ASCERTAINABLE ................24

      i.  A Survey of the Proposed Class Reveals A High
         Volume of Telephone Numbers Are Invalid or Not
         Associated with Those Who Received Calls from RMG ..........................................26

      ii.  Plaintiff's Proposed Class Fails to Exclude Individuals
         Who Consented to Be Contacted, or Who Had a Business
         Relationship with Any of the Defendants................................................................27

   B.  PLAINTIFF IS A SERIAL LITIGANT WHO INVITES TCPA VIOLATIONS
      AND IS THEREFORE AN INADEQUATE CLASS REPRESENTATIVE .........................................29

C.  PLAINTIFF'S CLAIM IS NOT TYPICAL OF THOSE OF THE PUTATIVE CLASS ........................29

    i.  Plaintiff Received No Prerecorded Calls on a Cell Phone.........................................29

    ii.  Plaintiff Did Not Detrimentally Rely on the
       Cruise Lines' Silence or RMG's Apparent Authority ...............................................30

    iii.  Plaintiff's Ratification Claim is Not Typical of His Proposed
        Class Because the Cruise Lines Retained No Benefit from His Calls......................30

D.  PLAINTIFF IMPROPERLY RELIED ON HIS EXPERT'S UNQUALIFIED AND
    UNRELIABLE OPINION AS THE BASIS FOR ESTABLISHING NUMEROSITY ..........................34

E.  PLAINTIFF FAILS TO SUFFICIENTLY ESTABLISH THE EXISTENCE
    OF COMMON ISSUES FOR CERTIFICATION AND TRIAL ......................................................32

F.  INDIVIDUAL ISSUES IN THIS CASE PREDOMINATE OVER COMMON ISSUES .......................34

    i.  Whether Each Call Initiated by RMG Played a Prerecorded
       Message that Referenced the Cruise Lines is an Individual Issue ...........................36

    ii.  Prior Express Consent is an Individual Issue...........................................................38

        a.  Plaintiff's Summary of "Prior Express Consent" is Artificially Narrow............40

        b.  The Variety of Consent Obtained from Numerous Sources
           Requires Numerous Individual Inquiries and Mini-Trials..................................42

           1.  The Wide Variety of RMG's Sources
              Of Consent Requires Individual Inquiries ....................................................43

           2.  The Variety of the Cruise Lines' Sources
              Of Consent Require Individual Inquires .......................................................44

    iii.  Plaintiff's Ratification Theory Creates Individual Issues..........................................46

    iv.  Plaintiff's Apparent Authority Theory Creates Individual Issues .............................53

    v.  Whether the Cruise Lines Had an Established Business
       Relationship with Putative Class Members is an Individual Issue ...........................55

G.  GIVEN THE MANY UNIQUE AND COMPLICATED ISSUES THAT
    ARISE OUT OF PLAINTIFF'S ATTEMPT TO CERTIFY A CLASS
    OF OUTDATED TELEPHONE NUMBERS, THE CLASS MECHANISM
    IS NOT A SUPERIOR METHOD OF RESOLUTION FOR THIS CASE ..........................................56

      i.   Plaintiff Has Failed to Propose a Trial Plan.................................................................58

     ii.   A Class Action is Not Superior When Consumers
         Receive *De Minimis* Recovery.......................................................................................59

## TABLE OF EXHIBITS[1]

Exhibit 1** ............................................................. Rule 26(a)(2)(b) Report of Margaret Daley

Exhibit 2**............................................ Declaration and Supplemental Report of Margaret Daley

Exhibit 3* ...................................................................................... Deposition of Richard Borst

Exhibit 4* ........................................................................................ Deposition of Jamie Smith

Exhibit 5*......................................................................................... Deposition of Jason Rader

Exhibit 6* ..................................................................................... Deposition of Benny Aguilera

Exhibit 7............................................................................... Declaration of Elizabeth Valente

Exhibit 8*............................................................................... Deposition of Elizabeth Valente

Exhibit 9*.................................................................................... Deposition of Tom Mongiovi

Exhibit 10 ....................................... E-Mail Correspondence Concerning RMG-Generated Leads

Exhibit 11 ................................................. E-Mail Correspondence and RMG Landing Page Leads

Exhibit 12 .................................................................... RMG Website Landing Pages

Exhibit 13..................................................... E-Mail Correspondence and Attached Paper Leads

Exhibit 14 .............................. E-Mail Correspondence Reflecting RMG E-Mail and Show Leads

Exhibit 15 ....................................... E-Mail Correspondence Concerning Use of Caller ID Leads

Exhibit 16 .............................. E-Mail Correspondence Concerning Cruise and Land Promotions

Exhibit 17 ....................................................Audio Recording for Cruise Promotion without NCL

Exhibit 18 ......................Live Agent Script for Las Vegas Promotion and Accompanying E-Mail

Exhibit 19 .......................... Live Agent Script for Disney Promotion and Accompanying E-Mail

Exhibit 20 .......................................................... Live Agent Script for Condominium Promotion

Exhibit 21 ............................................... Prerecorded Message Offering Land or Cruise Vacation

---

[1]  * Denotes depositions and declarations that have been filed without some or all accompanying exhibits due to volume and to avoid duplication.  All such exhibits have been produced and designated separately in this Response, or are available to the Court or any party upon request.

** To avoid duplication, the Expert Report of Margaret Daley and the Declaration of Margaret Daley, which are attached to this Response as Exhibits 1 and 2, are attached without their voluminous exhibits, which exhibits shall be fully included in the Cruise Lines' contemporaneously-filed *Daubert* Motion, and which are fully incorporated into this Response by reference.

Exhibit 22 ............................................. Email Correspondence Concerning Purpose of Promotion

Exhibit 23 ..................................................................................... Live Agent Script

Exhibit 24 ....................................................................................Verification Script

Exhibit 25 ........................................... Invoice to RMG for Purchase of Do Not Call Subscription

Exhibit 26 ........................................... Invoice to RMG for Purchase of Asteria Dialer

Exhibit 27 .................................. E-Mail Correspondence Concerning Receipt of Duplicate Leads

Exhibit 28 ........................................ E-Mail Correspondence Concerning RMG Scrubbing DNC

Exhibit 29 ............................................................... Carnival Travel Agency Policies

Exhibit 30 ................................................................. RCL Travel Agent Guidelines

Exhibit 31 ................................................................. NCL Travel Agency Guidelines

Exhibit 32* ................................................................... Deposition of Philip Charvat

Exhibit 33 .................................... Emails Concerning RMG Use of DNC Scrubbing Application

Exhibit 34 .......................................................... List of Plaintiff's TCPA Litigation History

Exhibit 35 ........................ 9/16/2011 Order Requiring Plaintiff to Place Phones on DNC Registry

Exhibit 36 .................................................................... Declaration of Anthony Pascale

Exhibit 37* .................................................................. Deposition of Anthony Pascale

Exhibit 38 ........................................ Prerecorded Message Offering Member Renewal Promotion

Exhibit 39 ................................. Prerecorded Message Offering Dining Card and Travel Discount

Exhibit 40 ............................................. Prerecorded Message Offering Upgrade on Membership

Exhibit 41 ................................. Recording of February 1, 2011 Call Between RMG and Plaintiff

Exhibit 42 ........................................ Recording of June 1, 2011 Call Between RMG and Plaintiff

Exhibit 43 .............................. Recording of September 8, 2011 Call Between RMG and Plaintiff

Exhibit 44 ........................................ Recording of July 9, 2012 Call Between RMG and Plaintiff

Exhibit 45 ...................................... Transcriptions of the Four Calls Between RMG and Plaintiff

Exhibit 46 ................................. E-Mail Correspondence Among RMG Concerning Script to Use

Exhibit 47* .................................................................. Deposition of Telicia Compton

Exhibit 48* .................................................................. Deposition of Jeffrey Hansen

Exhibit 49* .................................................................. Declaration of Jerry Samargia

Exhibit 50 ............................................................. Supplemental Declaration of Jerry Samargia

Exhibit 51* .................................................................. Deposition of Jerry Samargia

v

Exhibit 52 ...................... Terms and Conditions to Websites for Orbitz, Travelocity and Expedia

Exhibit 53 ................................................................................. Transcript from 6/28/14 Hearing

Exhibit 54 ........................................................ E-mail Correspondence Between RMG and NCL

Exhibit 55 .......... E-mail Correspondence Showing RMG Not Disclosing Current Scripts to CCL

Exhibit 56 ........................................................................Correspondence Concerning by A. Dow

Exhibit 57 ........................................................................ Correspondence Concerning A. Carter

Exhibit 58 ...................................................... Second Amended Complaint in *Smith v. State Farm*

Exhibit 59 ................................................................. Certification Brief in *Smith v. State Farm*

Exhibit 60 ....................................................................... Opposition Brief in *Smith v. State Farm*

Exhibit 61 ........................................................................ 8/11/14 Order in *Smith v. State Farm*

Exhibit 62 ...................................................... Samples from Cruise Line Past Guest / EBR Search

Exhibit 63 ...................................................... U.S. Chamber; *The Juggernaut of TCPA Litigation*

Exhibit 64 ...............................................6/21/2013 Order in *Desai v. ADT Security Services, Inc.*

Exhibit 65 ........................................................................... CCL Cruise Ticket Contract

Exhibit 66 ........................................................................... RCL Cruise Ticket Contract

Exhibit 67 ........................................................................... NCL Cruise Ticket Contract

Exhibit 68 ............................................. Prerecorded Message Offering Land Vacation Promotion

Exhibit 69 ............................................. Prerecorded Message Offering Land Vacation Promotion

Exhibit 70 .................................. Prerecorded Message Offering Free Gas and Dinner Promotion

Exhibit 71 ...................................... Prerecorded Message Offering Best Buy Gift Card Promotion

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

*Abdeljalil v. GE Capital Corp.,*
    30 F.R.D. 303 (S.D. Cal. 2015) ...................................................................... 45

*Alabama Bluebird Body Co.,*
    573 F.2d 309 (5th Cir. 1978) ......................................................................... 36

*Am. Honda Motor. Co., Inc. v. Allen,*
    600 F. 3d 813 (7th Cir. 2010) ......................................................................... 2

*Ames v. Celebrity Cruises, Inc.,*
    1998 U.S. Dist. Lexis 11559 (S.D.N.Y. 1998) ................................................... 4

*Baird v. Sabre, Inc.,*
995 F. Supp. 2d 1100 (C.D. Cal. Jan. 28, 2014) .................................................... 41

*Balschmiter v. TD Auto Fin., LLC,*
    303 F.R.D. 508 (E.D. Wis. 2014) ...........................................................24, 34

*Barrett v. ADT Corp.,*
    2016 U.S. Dist. LEXIS 28767 (S.D. Ohio March 7, 2016) ...........................27, 60

*Blair v. CBE Group, Inc.,*
    309 F.R.D. 621 (S.D. Cal. 2015) .................................................................... 39

*Booth v. Apstack,*
    2015 U.S. Dist. LEXIS 40779 (W.D. Wash., March 29, 2015) ............................ 45

*Bridgeview Health Care Ctr. Ltd. v. Clark,*
    2013 U.S. Dist. LEXIS 118470 (N.D. Ill. Aug. 21, 2013) ...........................53, 57

*Buonomo v. Optimum Outcomes, Inc.,*
    301 F.R.D. 292 (N.D. Ill. 2014) .................................................................... 40

*Cabrera v. Gov't Emples. Ins. Co.,*
    2015 U.S. Dist. LEXIS 16663 (S.D. Fla. Jan. 15, 2015)..................................... 30

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ................................................................................... 23

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) ...................................................................27, 28

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ................................................................................. 23

*Connelly v. Hilton Grand Vacations Co., LLC*,
   294 F.R.D. 574 (S.D. Cal. 2013) .................................................38, 39, 43, 45

*Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours & Co.*,
   1994 U.S. Dist. LEXIS 17918 (S.D. Fla. June 9, 1994) ................................ 35

*Das v. Royal Jordanian Airlines*,
   766 F. Supp. 169 (S.D.N.Y. 1991) ................................................................. 4

*Davies v. W.W. Grainger, Inc.*,
   2014 U.S. Dist. LEXIS 87582 (N.D. Ill. June 27, 2014) ................................ 28

*Desai v. ADT*,
   No. 11 C 1925, 2012 U.S. Dist. LEXIS 68807 (N.D. Ill. May 11, 2012) ...................... 1, 60

*Douglas v. Steele*,
   816 P.2d 586 (Okla. Ct. App. 1991) ............................................................... 4

*Evanston Bank v. Conticommodity Servs.*,
   623 F. Supp. 1014 (N.D. Ill. 1985) .............................................................. 47

*Fitzhenry v. ADT Corp.*,
   2014 U.S. Dist. LEXIS 166243 (S.D. Fla. Nov. 3, 2014) .....................37, 55, 60

*G.M. Sign, Inc. v. Brink's Mfg. Co.*,
   2011 U.S. Dist. LEXIS 7084 (N.D. Ill. Jan. 25, 2011) ................................... 39

*Gannon v. Network Tel. Servs. Inc.*,
   2013 U.S. Dist. LEXIS 81250 (C.D. Cal. Jun. 5, 2013) ................................. 39

*Gene & Gene v. BioPay, LLC*,
   541 F.3d 318 (5th Cir. 2008) ..............................................1, 38, 40, 44, 45

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ....................................................................................... 24

*Gunnells v. Healthplan Servs.*,
   348 F.3d 417 (4th Cir. 2003) ........................................................................ 39

*Harken Fin. Servs. v. Broadridge Fin. Solutions, Inc.,*
  2009 U.S. Dist. LEXIS 100641 (N.D. Ill. Oct. 29, 2009) ................................................. 54

*Harper v. Sheriff of Cook Co.,*
  581 F.3d 511 (7th Cir. 2009) ......................................................................................... 24

*In re Paxil Litig.,*
  212 FRD 539 (C.D. Cal. 2003) ...................................................................................... 58

*In re Pubs Champaign,*
  618 F.2d 432 (7th Cir. 1980) ......................................................................................... 47

*In re Telectronics Pacing Sys.,*
  168 F.R.D. 203 (S.D. Ohio 1996) .................................................................................. 58

*Jamie S. v. Milwaukee Pub. Schools,*
  668 F.3d 481 (7th Cir. 2012) ......................................................................................... 23

*Jamison v. First Credit Servs.,*
  290 F.R.D. 92 (N.D. Ill. 2013) ............................................................................ 24, 39, 40

*Johnson v. Hondo, Inc.,*
  125 F.3d 408 (7th Cir. 1997) ......................................................................................... 46

*Kenro, Inc. v. Fax Daily,*
  962 F. Supp. 1162 (S.D. Ind. 1997) .............................................................................. 39

*Kohn v. Pacific Inv. Mgmt. Co.,*
  571 F.3d 672 (7th Cir. 2009) ......................................................................................... 23

*Kolinek v. Walgreen Co.,*
  2014 U.S. Dist. LEXIS 91554 (N.D. Ill. July 7, 2014) ................................................... 41

*Kristensen v. Credit Payment Servs.,*
  12 F. Supp. 3d 1292 (D. Nev. 2014) ............................................................................. 40

*Leyse v. Bank of Am. Nat'l Ass'n,*
  804 F.3d 316 (3d Cir. 2015) .......................................................................................... 22

*Marcial v. Coronet Ins., Co.,*
  880 F.2d 954 (7th Cir. 1989) ......................................................................................... 31

*Messner v. Northshore Univ. HealthSystem,*
  669 F.3d 802 (7th Cir. 2012) ......................................................................................... 24

*Mullins v. Direct Digital, LLC,*
    795 F.3d 654 (7th Cir. 2015) .............................................................25, 57, 58

*Muro v. Target Corp.,*
    580 F.3d 485 (7th Cir. 2009) ............................................................ 29

*N. Assur. Co. of Am. v. Summers,*
    17 F3d. 956 (7th Cir. 1994) ............................................................. 53

*Nagel v. ADM Investor Servs. Inc.,*
    65 F. Supp. 2d 740 (N.D. Ill. 1999) ...................................................54, 55

*Neece v. John Hancock Mut. Life Ins. Co.,*
    1990 U.S. App. LEXIS 16644 (7th Cir. 1990) ........................................47, 49

*Olney v. Job.com,*
    2014 U.S. Dist. LEXIS 60843 (E.D. Cal. May 1, 2014) ................................ 41

*Opp v. Wheaton Van Lines, Inc.,*
    231 F.3d 1060 (7th Cir. 2000) .......................................................... 14

*Oshana v. Coca-Cola Co.,*
    472 F.3d 506 (7th Cir. 2006) ...........................................................23, 24

*Patten v. Vertical Fitness Group, LLC,*
    2013 U.S. Dist. LEXIS 189845 (S.D. Cal. Nov. 8, 2013) ............................... 45

*People v. Melongo,*
    2014 IL 117852 (March 20, 2014) ...................................................... 28

*Pheasant Run, Inc. v. Xerox Corp.,*
    1986 U.S. Dist. LEXIS 30340 (N.D. Ill. Jan.16, 1986) ................................. 4

*Quality Mgmt. & Consulting Servs. v. SAR Orland Food Inc.,*
    2013 U.S. Dist. LEXIS 155727 (N.D. Ill. Oct. 30, 2013) ..............................29, 47

*Sacred Heart Health Systems, Inc. v. Humana Healthcare Servs., Inc.,*
    601 F.3d 1159 (11th Cir. 2010) ......................................................... 48

*Sartin v. EKF Diagnostics, Inc.,*
    2016 U.S. Dist. LEXIS 86777 (E.D. La. July 5, 2016) ................................. 22

*Shamblin v. Obama,*
    2015 U.S. Dist. LEXIS 54849 (M.D. Fla., April 27, 2015) .............................. 39

*Sherman v. Yahoo! Inc.,*
  2015 WL 5604400 (S.D. Cal. Sept. 23, 2015) .........................................................25, 59

*Siding & Insulation Co. v. Alco Vending, Inc.,*
  2014 U.S. Dist. LEXIS 183593 (N.D. Ohio Feb. 6, 2014) ................................ 48

*Simer v. Rios,*
  661 F.2d 655 (7th Cir. 1981) ..................................................................................23, 24

*Smith v. Microsoft,*
  297 F.R.D. 464 (S.D. Cal. 2014) ................................................................................ 26

*Smith v. State Farm Mut. Auto. Ins. Co.,*
  30 F. Supp. 3d 765 (N.D. Ill. 2014) .........................................................................47, 50

*Soppet v. Enhanced Recovery Co., LLC,*
  679 F.3d 637 (7th Cir. 2012) ...................................................................................... 26

*Southwell v. Mortgage Investors Corp. of Ohio,*
  2014 U.S. Dist. LEXIS 112362 (W. D. Wash. Aug. 12, 2014) ......................... 39

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.,*
  376 F.3d 664 (7th Cir. 2004) ...................................................................................... 54

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540, 1543 (May 16, 2016) ...........................................................3, 20, 21, 22

*Stern v. DoCircle, Inc.,*
  2014 U.S. Dist. LEXIS 17949 (C.D. Cal. Jan. 29, 2014) ...................................34, 40, 45, 58

*Stoops v. Wells Fargo Bank, N.A.,*
  2016 U.S. Dist. LEXIS 82380 (W.D. Penn. June 24, 2016).....................................21, 22

*Szabo v. Bridgeport Machines, Inc.,*
  249 F.3d 672 (7th Cir. 2001) ...................................................................................... 47

*Tel. Sci. Corp. v. Asset Recovery Solutions, LLC,*
  2016 U.S. Dist. LEXIS 104234 (N.D. Ill. August 8, 2016) ................................ 21

*Toney v. Quality Res., Inc.,*
  75 F. Supp. 3d 727 (N.D. Ill. 2014) .......................................................................... 47

*Valentino v. Carter Wallace, Inc.,*
  97 F.3d 1227 (9th Cir. 1996) ...................................................................................... 58

*Versteeg v. Bennett, Deloney & Noyes, P.C.,*
 271 F.R.D. 668 (D. Wyo. 2011) ................................................................ 39

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.,*
 274 F.R.D. 229 (S.D. Ill. 2011) .................................................. 29, 30, 39, 44

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011) ................................................................ 23, 24, 32, 33

*Young v. Nationwide Mutual Ins. Co.,*
 693 F.3d 532 (6th Cir. 2012) .................................................................. 25

*Zinser v. Accufix Research Inst., Inc.*,

 253 F.3d 1180 (9th Cir. 2001) ................................................................ 58

**STATUTES AND REGULATIONS**                                               **Page(s)**

47 U.S.C. § 227 ................................................................ 12, 29, 30, 40, 58

Federal Rule of Civil Procedure 23 ..............................................................*passim*

Illinois Eavesdropping Act,
 *720 ILCS 5/14-2* .................................................................................. 28

*In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 12-21 ...........21, 40

**MISCELLANEOUS AUTHORITY**                                                **Page(s)**

Adonis Hoffman*, Sorry, Wrong Number, Now Pay Up, WALL S. J., June 15, 2015* ............. 59

Becca J. Wahlquist, *The Juggernaut of TCPA Litigation: The Problems with Uncapped Statutory Damages*, U.S. Chamber Institute for Legal Reform, Oct. 2013 .......................... 59

Restatement (Third) of Agency § 4.01(1) (2006) ) .........................................47, 53

Lewis Carroll, *Alice In Wonderland*, 157 (1946) ................................................. 3

Defendants, Carnival Corporation & PLC ("CCL"), NCL (Bahamas) Ltd. ("NCL"), and Royal Caribbean Cruises, Ltd. ("RCL") (collectively the "Cruise Lines"), hereby file their Joint Response in Opposition to Philip Charvat's Motion for Class Certification (the "Motion") pursuant to Federal Rule of Civil Procedure 23(c)(1). In support of this Response, the Cruise Lines attach and incorporate herein the Expert Report of Margaret Daley [**Exhibit 1**], and the Declaration of Margaret Daley [**Exhibit 2**], and respectfully request this to Court deny Plaintiff's Motion for Class Certification for all of the reasons set forth herein.

## **INTRODUCTION**

Although Philip Charvat ("Plaintiff") is a serial TCPA plaintiff who has filed over 100 other TCPA actions,[2] and has litigated this case under a strategy of leaving "no stone unturned," his Motion is remarkably bereft of substantiated record facts. Instead, it posits a factual fiction based on untrue and unreliable evidence to support a threadbare vicarious liability claim against the three largest and most competitive cruise lines in the world.[3] [DE 492 at 8.] In furtherance of this fiction, Plaintiff suggests these three competitors entered into an agency relationship with one small travel agency to make prerecorded calls for the Cruise Lines with the expectation it would

---

[2] The fact Plaintiff has filed over 100 other TCPA actions has prompted another federal court to refer to his practices and operation as an "enterprise." *See e.g., Desai v. ADT*, No. 11 C 1925, 2012 U.S. Dist. LEXIS 68807, at *6-12 (N.D. Ill. May 11, 2012) (referencing Plaintiff's 99 cases as of that time, and concluding that "[t]*his seems to have become a bit of an enterprise for Mr. Charvat, . . .*" (emphasis added).

[3] Among the untrue and unreliable evidence Plaintiff submitted to this Court is the declaration of Richard Borst ("Borst"), a former officer and employee of defendant travel agency, RMG, which Borst recanted during his deposition because it was rife with false and misleading statements (drafted by Plaintiff's counsel) concerning the Cruise Lines' business relationship with RMG, as well as the their purported knowledge about RMG's robocalling activities. [DE 492 at 7-8, fn 14-15.] For this reason, the Cruise Lines have contemporaneously filed a Motion to Strike the Borst Declaration with this Response. Borst was the first, but not the last, witness to recant during a deposition a declaration prepared by the Plaintiff's counsel. Thomas Mongiovi's ("Mongiovi") declaration, again prepared by Plaintiff's counsel, claimed that opt-in leads were actually not to be used for telephone contact. However, when confronted by contemporaneous emails at his deposition, Mongiovi corrected his testimony and further stated that in his 20 years of business, no one else has ever complained about opt-in leads sold. [*See* Deposition of Thomas Mongiovi, attached as **Exhibit 9**, at 48-49, 101, 108-09, 111, 218-19.]

receive compensation for every customer it referred to them. *Id.* The overwhelming evidence in this case, however, proves the exact opposite. Resort Marketing Group ("RMG") was a small, independent travel agency that booked a variety of travel packages for *its* clients, like any of more than 100,000 travel agencies in this country. It operated a membership-based vacation club, and all its marketing, including robocalls, were designed to increase membership in its club. Plaintiff, of course, omitted from his Motion any reference to the fact RMG offered consumers a variety of free vacation packages during its calls to incentivize them to join its club. Plaintiff also fails to disclose that RMG acquired consumers' consent to be contacted from a variety of different sources.

At its core, the Motion relies on an unqualified expert, Jeffrey A. Hansen ("Hansen") as the sole support for the "class" that Plaintiff is proposing this Court certify.[4] As explained in greater detail in the Cruise Lines' accompanying *Daubert* Motion, Hansen's methodology in analyzing RMG's database is built on faulty assumptions about the forensic reliability of the tables and logs in that database, and his opinions are unverified, unreliable and consist of legal conclusions and *ipse dixit*. Against this backdrop, Plaintiff asks this Court to certify a class that is comprised of a list of outdated, invalid and disconnected phone numbers that are a half decade old, and which have never been linked to a single actual person (the "List"). As explained below in Section III, the courts have made clear they cannot properly certify a class consisting of a list of phone numbers without consideration of any plan to connect each number with actual people. From there, the problems with Plaintiff's proposed class expand exponentially and compel denial of his Motion.

---

[4] Contemporaneous with this Response, the Cruise Lines filed a Joint Motion to Exclude the Report, Opinions and Testimony of Plaintiff's Expert, Jeffrey A. Hansen (the "*Daubert* Motion"), and expressly incorporate their *Daubert* Motion and its arguments into this Response. The *Daubert* Motion was filed with this Response because the district court "must make a conclusive ruling on any challenge to an expert's qualifications or submissions before it may rule on a motion for class certification" where, as here, "an expert's report or testimony is critical to class certification," *Am. Honda Motor. Co., Inc. v. Allen,* 600 F. 3d 813, 815-16 (7th Cir. 2010).

This Response addresses numerous deficiencies in Plaintiff's quest to certify his List, beginning with Plaintiff's lack of Article III standing as discussed in the Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1543 (May 16, 2016), and continuing with his failure to satisfy each requirement under Rule 23. These shortcomings are, in large part, a result of his strained theory of vicarious liability against each of the three separately owned and operated Cruise Lines, which is based on unsubstantiated factual and legal arguments, makes no market sense, and which triggers a substantial number of individual inquiries that predominate over any purportedly common issues. It is Plaintiff's burden to meet all of Rule 23's requirements *and* to propose a generalized method of proof and uniform legal analysis as to all common issues. He has not done so. Instead, he brushes over these essential requirements and asks this Court to accept unfounded assumptions, ignore highly relevant facts and to certify the proposed class now while waiting until later to determine whether common issues can be tried via a generalized method of proof. Or in the words of Lewis Carroll, Plaintiff urges this Court for a "[s]entence first – verdict afterwards."[5] For each of the following reasons, his Motion should be denied.

## I. CRITICAL FACTS OMITTED FROM PLAINTIFF'S MOTION

The record evidence undeniably demonstrates that class certification is inappropriate in this particular case. Because Plaintiff's slanted version of the facts (as told through his many pleadings and motions) has been repeatedly presented to this Court, it is important to consider the following complete record with respect to the following four critical factual issues in this case: (1) the Cruise Lines' business relationship with travel agencies, (2) RMG's telemarketing practices, (3) Plaintiff's telemarketing enterprise, and (4) an explanation of why Hansen's opinions are unreliable and cannot be used as a basis to certify the Plaintiff's List.

---

[5] LEWIS CARROLL, ALICE IN WONDERLAND, 157 (Puffin Books 1946).

## A. THE CRUISE LINES' RELATIONSHIP WITH TRAVEL AGENCIES IS AT ARM'S LENGTH WITH INDEPENDENT COMPANIES

In the travel industry, the Cruise Lines are referred to as "travel vendors," and interact with travel agencies ranging from large corporations, like Expedia, to much smaller travel agencies, like RMG. These agencies arrange all types of domestic and international travel. Smaller agencies also book vacation packages for their customers and obtain commissions for this booked travel. Plaintiff claims the Cruise Lines compensated RMG for each "referred" customer. [DE 492 at 8.] But this is misleading, because Plaintiff cites testimony that merely describes a commission paid by travel vendors for booking cruises, not for referring robocalled customers. *Id*. From the Cruise Lines' perspective, RMG was one of the thousands of small travel agencies that booked client travel to a greater or lesser degree with each of the Cruise Lines. This arm's length relationship is reflected in well-settled law that has long held that travel agents are the *agents of their customers and not the travel vendor*. *See Pheasant Run, Inc. v. Xerox Corp.*, 1986 U.S. Dist. LEXIS 30340, *21 (N.D. Ill. Jan.16, 1986)*("a travel agent is presumed to be the agent of the traveler").[6]

## B. RESORT MARKETING GROUP PLACED PRERECORDED TELEMARKETING CALLS FOR ITS OWN BENEFIT AND WITHOUT AUTHORIZATION OF THE CRUISE LINES

Since at least 1996, RMG was a full-service "membership based travel company" that booked all forms of leisure travel for its customers, including air travel, land travel, timeshares, car rentals, and travel with many different cruise lines. [*See* Deposition of Richard Borst, attached

---

[6] *See also Ames v. Celebrity Cruises, Inc.*, 1998 U.S. Dist. Lexis 11559 (S.D.N.Y. 1998) ("it is settled law that travel agents are to be construed as agents of ticket purchasers, and passengers are accordingly charged with constructive knowledge of ticket terms and conditions while the tickets are in their agents' possession."); *Das v. Royal Jordanian Airlines*, 766 F. Supp. 169, 171 (S.D.N.Y. 1991); *Douglas v. Steele*, 816 P.2d 586, 589 (Okla. Ct. App. 1991) (travel agent was not an agent of the company whose travel packages she sold to her customers, but rather was an agent of the customers). The Cruise Lines iterate this well-established principle of law in their ticket contracts with each guest who sails. [*See* CCL Contract, attached as **Exhibit 65**, ¶ 3, RCL Contract, attached as **Exhibit 66**, ¶ 14, and NCL Contract, attached as **Exhibit 67**, ¶ 12.] Plaintiff's strained vicarious liability theory is contrary to this well-settled law.

as **Exhibit 3**, at 24-26; Deposition of Jamie Smith, attached as **Exhibit 4**, at 5.] The services RMG provided were similar to what any travel agency would provide, but because RMG was a *membership-based* travel agency, it provided these services only to its members. [Ex. 3 at 25-26.] Simply put, RMG's business model was based entirely on "acquiring members and then traveling the members." [*See* Deposition of Jason Rader, attached as **Exhibit 5**, at 24.] RMG also provided unique services and benefits to its members, including wholesale access to condominium rentals, price match guarantees and travel rebates. [Ex. 3 at 25, 28-29.]

In order to educate consumers on the value of purchasing vacation club memberships, RMG organized face-to-face presentations similar to time-share demonstrations. [Ex. 3 at 31-34; Deposition of Benny Aguilera, attached as **Exhibit 6**, at 10-11; Declaration of Elizabeth Valente, attached as **Exhibit 7**, ¶ 10.] Beginning in 2007, RMG started contacting consumers by telephone to schedule appointments. [Ex. 6 at 11.] In doing so, it only called consumers who *agreed and consented* to be contacted through a variety of different sources, including:

    (i)    RMG's own website landing pages;
    (ii)   paper leads received from shows and conventions;
    (iii)  contests run by RMG through which it collected information;
    (iv)  referrals from other RMG vacation club members;
    (v)   consumers who called RMG and left a message on its answering machine;
    (vi)  leads generated through RMG's email campaigns, and
    (vii) online leads purchased from various vendors containing information regarding consumers who were interested in travel opportunities and promotional offers.

[*See. e.g.,* Ex. 4 at 36; Ex. 5 at 35-36, 56-57, 299-307, 312-330; Ex. 7, ¶ 11-13; Deposition of Elizabeth Valente, attached as **Exhibit 8**, at 47-48, 171.][7] RMG merged all consent and contact

---

[7] RMG's contemporaneous business records from before this Lawsuit was filed also reflect RMG's receipt of consent documents from various sources. *See* Ex. 5 at 302 and **Exhibit 10** (email showing RMG's use of its email campaigns and landing pages to generate leads); Ex. 5 at 308 and **Exhibit 11** (email attaching leads from RMG landing pages); **Exhibit 12** (sample of RMG landing pages); **Exhibit 13** (emails and leads reflecting RMG's use of paper leads); **Exhibit 14** (emails reflecting RMG's use of email and show leads); **Exhibit 15** (emails reflecting RMG's use of phone numbers received from consumers that contacted RMG).

information it received into a single database for use in calling consumers. [Ex. 4 at 101.]

In 2009, RMG hired third-party vendors to make these calls on its behalf. [Ex. 5 at 235-36, 397.] These vendors scrubbed the phone numbers RMG provided to them for Do Not Call ("DNC") compliance, and then placed calls using autodialers. [Ex. 5 at 298.] The vendors then transferred calls to RMG's representatives, who attempted to schedule face-to-face presentations. [Ex. 6 at 14.] RMG also started giving free trial memberships to consumers by phone in 2009. [Ex. 6 at 12-14.] To incentivize prospective members to join its club, RMG offered a variety of promotional vacations, including free trips to Las Vegas, Disney, or Myrtle Beach [Ex. 5 at 34, 330-31, 337-38; Ex. 6 at 134-35, 141; Ex. 8 at 98-99], or free vacations on one of several competing cruise lines. [Ex. 7, ¶ 17; Ex. 4 at 6-7.] RMG would also frequently offer consumers the option to choose between *either* a land vacation *or* a cruise vacation. [Ex. 5 at 346-47; **Exhibit 16**.] Sometimes it offered travel on certain Cruise Lines and not others. [*See e.g.,* message offering cruise on RCL and CCL, but *not* NCL, attached as **Exhibit 17**.] Evidence of these varied promotions is contained in RMG's historical records, including for example, scripts and recordings RMG used when offering consumers trips to Las Vegas [**Exhibit 18**]; Disney theme parks [**Exhibit 19**], condominium stays [**Exhibit 20**], and combined cruise/land travel offers [**Exhibit 21**].[8]

The decision as to what gift RMG offered consumers was entirely up to RMG's Manager, Elizabeth Valente, who made that decision based on what offer she thought appealed to the most consumers to join RMG's vacation club on any given day and time. [Ex. 6 at 22-23, 63-64; Ex. 7, ¶ 17-18.] Regardless of the gift, the one consistent offer RMG presented during every call was a trial membership in its club, since the entire purpose behind RMG's telemarketing was to grow its membership. [Ex. 3 at 35; Ex. 5 at 332-33; Ex. 6 at 37, 134, 148; Ex. 7, ¶ 25-26; Ex. 8 at 54.] The

---

[8] Examples of additional incentives and offers are demonstrated by recordings attached hereto as Exhibits 38, 39, 40, 68, 69, 70 and 71.

sworn testimony of RMG's current and former employees on this subject is corroborated by RMG's internal business records, created years before Plaintiff commenced litigation.[9]

### i.  RMG Acquired An Autodialer and Did Not Inform the Cruise Lines

From 2009 through 2010, RMG continued contacting consumers via third-party telemarketing vendors in an effort to grow its membership base. [Ex. 5 at 233-36.] It continued generating leads through its own websites and e-mail campaigns, as well as through trade shows, and several third-party vendors, including Executive Leads, Bullseye, Dynamic Interactive Group, Vince Deluca, Caldwell List and Flow Media, among others. [Ex. 5 at 263-65.] In late 2010, RMG purchased autodialing equipment to make calls internally. [Ex. 5 at 233-34; Ex. 4 at 12-13.] It licensed software from Asteria Solutions Group ("Asteria") to make these calls [**Exhibit 25**], and it purchased an annual subscription to the National DNC Registry. [Ex. 5 at 349-50; **Exhibit 26**.] RMG was ready to make autodialed calls by early 2011. [Ex. 4 at 19-20.] It realized that many phone numbers it loaded into its dialer were on multiple lead lists and caused duplicate numbers to be loaded into the system. [Ex. 5 at 289; **Exhibit 27**.] Consequently, RMG hired a company to create an application that allowed it to scrub and remove (1) duplicate phone numbers; (2) phone numbers on its internal DNC list and (3) phone numbers on the National DNC Registry. [Ex. 4 at 32-34; Ex. 5 at 291-92.][10] RMG then ran all lead lists it received from its many sources through the scrubbing application, stored the remaining phone numbers in large "batches" of numbers, and loaded those batches into the dialer directly from the application. [Ex. 4 at 108-09, 157-58.]

From early 2011 until March of 2013, RMG used its autodialer for a variety of purposes,

---

[9] *See, e.g.* **Exhibit 22** (email recognizing "also whole goal is giving away old cruise voucher or 3/2 [condo stay] and making member"); **Exhibit 23** (general script stating that RMG is giving away cruise as promotion) and **Exhibit 24** (verification script stating "we hope you will continue to use our travel club").

[10] In discovery, RMG produced its scrubbing application in its native format. Attached as **Exhibit 28** is correspondence that evidences the fact RMG indeed used this scrubbing application to filter out duplicate numbers, as well as numbers on internal and national DNC lists.

including making calls for non-profit organizations, for charity, setting appointments for face-to-face presentations, solicitations to join its vacation club, for business-to-business promotions and to contact its members. [Ex. 4 at 14; Ex. 5 at 60-61, 260-61.] About half the calls RMG made with its autodialer were robocalls (i.e. by prerecorded message) and the other half were predictive calls (i.e. no use of prerecorded messages). [Ex. 6 at 142-43; Ex. 8 at p. 91.]

RMG **never** informed the Cruise Lines it purchased its own autodialer, or that it supplemented its own leads with leads from third-party vendors. [Ex. 5 at 265; Ex. 8 at 231.] RMG never informed the Cruise Lines (or any travel vendor for that matter) that it mentioned their products, services or trade names to consumers in prerecorded messages. [Ex. 5 at 346, 365-66.] It never once sent the Cruise Lines copies of scripts or recordings of any prerecorded message used in its telemarketing campaigns. *Id.* This is because RMG was subject to travel agency policies and rules imposed upon it by all three Cruise Lines, which (1) required RMG to be fully knowledgeable and compliant with all applicable laws, including the TCPA, and (2) expressly prohibited RMG from sending outbound prerecorded telephone messages promoting the Cruise Lines.[11] There is *absolutely no* evidence of any oral or written agreement between the Cruise Lines and RMG that authorized RMG to robocall on the Cruise Lines' behalf. There also is no evidence or testimony that RMG referred its autodialed customers to the Cruise Lines in exchange for any pecuniary benefit or otherwise. Rather, all of the evidence points to the opposite. [Ex. 3 at 75-76; Ex. 6 at 31, 133-35; Ex. 7, ¶¶ 25, 29, 33, 37, 39-56; Ex. 8 at 75-76.]

### ii. RMG Used the Autodialer to Grow *its* Membership Unbeknownst to the Cruise Lines

After RMG scrubbed and merged its customer leads into a single list, it loaded that list into

---

[11] *See* CCL's Policies, attached as **Exhibits 29**, § III(B); RCL's Policies, attached as **Exhibit 30**, § 7.1; NCL's Policies **Exhibit 31**; DE 492-11 at 13-15, Resp. #1; DE 492-12 at 13, Resp. #1; DE 492-13 at 16, Resp. #1.

its autodialer and set up a campaign[12] to contact each number on the list. [Ex. 4 at 24, 156-57.] If someone answered the phone, the call was transferred to a live RMG representative (if the call is predictive) or a prerecorded message was played (if the call was a robocall), the substance of which varied depending on the travel incentive RMG offered at the time of the call. [Ex. 6 at 19-20, 34-35.] As discussed above, RMG offered a variety of different travel incentives, and it frequently changed the incentive offered *during the course of an ongoing campaign*.[13] [Ex. 4 at 105-06, 138-39; Ex. 5 at 340-41; Ex. 7, ¶ 17; Ex. 8 at 168.]

If a consumer received a robocall, the message played would conclude by asking the consumer to "Press 1" to speak with a live representative or "Press 2" to be put on RMG's DNC list. [Ex. 5 at 334-35; Ex. 8 at 53-54.] If the consumer opted to be put on the DNC list, he or she would "Press 2," and his or her phone number would be pulled out of the dialer system, loaded into RMG's scrubbing application and flagged so it was not called by the dialer again. [Ex. 4 at 93-94.][14] If instead a consumer elected to speak with a representative, he or she was transferred to a live RMG employee,[15] who read a written script that identified the offer to the consumer and explained that it was being presented as a promotion:

> We are giving these cruises away as a promotional means. The name of our travel agency is Travel Services US. We are a full service travel agency with over 24+ years networking experience with all major cruise lines, hotels, resorts and rental car companies. We simply want you to know about us in hopes that you will book your future vacations through us.

---

[12] In this context, a "campaign" is a set of rules that identify the schedule and length of the call process, the phone numbers the dialer will call, and which of the various prerecorded messages to be played during the call, if any. [Ex. 4 at 24.]

[13] As explained in detail below in Section I(E), Asteria's autodialer is designed to function as "a dynamic, highly flexible system that allowed telemarketers to immediately implement changes to telemarketing campaigns while in progress." [Ex. 1 at 16 and fn. 38.]

[14] Evidence RMG consistently used and maintained its internal DNC list is attached hereto as **Exhibit 33**.

[15] Plaintiff suggests in conclusory fashion that RMG "referred" interested consumers to the Cruise Lines' sales departments. [*See* Third Amended Complaint, [DE463] ¶¶ 59-60 and 138-139.] This is simply not true and inconsistent with every piece of evidence elicited in this matter.

[Ex. 21.][16] RMG thereafter offered the consumer a trial membership in its vacation club, as well as free travel gift. [Ex. 8 at 53-54.] It asked the consumer to pay a non-refundable deposit that would be used to pay taxes associated with the travel when it was booked. [Ex. 5 at 334-35; Ex. 8 at 53-54; Ex. 7, ¶ 21-22.] If the consumer elected to accept RMG's offer, she would be transferred to RMG's verification department, where a representative reviewed the offer by reading a confirmation script before accepting the consumer's deposit. [Ex. 5 at 334-35; Ex. 8 at 53-54.]

Upon completion of these calls, ***no consumer had ever booked a vacation***, on a cruise or otherwise. [Ex. 6 at 144-45; Ex. 7, ¶ 23.] Rather, RMG mailed consumers an introductory package that provided information about the vacation club, and a reservation form the consumers were required to complete and return to RMG within 18 months to redeem the promotional travel. [Ex. 5 at 335; Ex. 6 at 144-45; Ex. 8 at 54.] If a consumer did not timely redeem the promotion, his or her deposit was forfeited. [Ex. 8 at 158-59.] However, RMG would typically offer to travel the consumer in hopes that he or she would become a member of its club. [Ex. 5 at 41.] According to RMG, a large amount of travel offers were ultimately forfeited, which RMG referred to as "breakage." [Ex. 8 at 65.]

When consumers returned their reservation forms, RMG contacted them and assisted in booking their vacation with various travel vendors in the same way it would for any other customer. It bears noting that RMG paid for the cost of this promotional travel from of its revenues and treated that cost as an internal marketing expense. [Ex. 5 at 79-80; Ex. 7, ¶ 23; Ex. 8 at 55.] Consumers who had been offered this promotion often requested to book a different trip than the one they originally discussed with RMG (i.e. they would request to go on a trip to Las Vegas rather

---

[16] This is consistent with the testimony of every single current and former employee of RMG, each of whom testified that the entire purpose of RMG's telemarketing endeavors was to promote its own vacation club. [*See* Ex. 3 at 35; Ex. 4 at 89-90; Ex. 5 at 29-30, 98, 332-335; Ex. 6 at 134; Ex. 8 at 54.]

take a cruise, or vice versa), or sometimes they requested to upgrade their vacation. [Ex. 5 at 335-37; Ex. 8 at 61-62.] RMG regularly accommodated these requests and only charged consumers the difference between the price of the original gift and their selected vacation. [Ex. 5 at 336.]

### C. PHILIP CHARVAT IS A SERIAL PLAINTIFF WHO INVITES TELEMARKETING CALLS FOR HIS OWN BENEFIT

Plaintiff is, by every definition of the term, a serial TCPA litigant who operates a TCPA litigation "enterprise." [Ex. 2, ¶¶ 28-39.] He has filed over 100 TCPA lawsuits over the past twenty years, and is so proud of his involvement in this cottage industry that he often signs e-mails with the number "7" to denote that he filed the seventh TCPA lawsuit ever in the United States. [*See* Deposition of Philip Charvat, attached as **Exhibit 32**, at 79, 115; **Exhibit 34**.] To support his TCPA enterprise, Plaintiff set up an operation in his home to tape record every incoming call received on his two residential phone lines. [Ex. 32 at 223, 229-30.] He also created a book to log evidence of calls to be used in litigation, and asked his wife and two daughters to participate in logging them. [*Id.* at 221-26, 362.] He stores this information in a TCPA library and then sends demands to the companies he records, or may forego a demand and immediately file a TCPA lawsuit. [*Id.* at 339.]

Plaintiff is also a paid subscriber and contributor to various TCPA listservs and forums. [Ex. 32 at 98-99; Ex. 2, ¶¶ 28-39.] He has spent over 4,000 hours studying the TCPA [Ex. 32 at 420], has educated audiences on TCPA issues at continuing legal education courses [*Id.* at 142] and has secured a paralegal's certificate to assist him in his ongoing TPCA litigation enterprise.[17] He unquestionably treats his TCPA litigation as a business enterprise, and he actually *testified that he believes the purpose and intent of the statute is to allow for serial filers of TCPA claims to supplement their income*. [Ex. 32 at 431-32.] Thus, when Plaintiff receives calls, he rarely asks

---

[17] Plaintiff also testified that he pays around $135 per year to be a member of a TCPA forum that is intended to act as "one-stop shopping" for TCPA law. [Ex. 32 at 99.]

telemarketers to stop calling him despite the fact he knows they would be required to place his phone number on their internal DNC list upon request. [Ex. 32 at 369-70.]

Rather than take steps to *stop* telemarketers from calling him, Plaintiff deliberately *refused* to place his telephone numbers on the National DNC Registry until he was eventually ordered to do so by an Ohio state court during the pendency of a motion for sanctions filed against him:

> Charvat is hereby permanently ordered to place all telephone numbers that he directly or indirectly owns, uses or maintains, and/or that his spouse owns, uses, or maintains, as a "residential telephone subscriber" within the meaning of 47 U.S.C. § 227, *et seq.*, on the National Do Not Call Registry maintained by the Federal Trade Commission, on any comparable registry maintained under Ohio law, and on any successor procedure or mechanism to disclose report to telephone solicitors that calls should not be placed to his telephone numbers.

[**Exhibit 35**; *see also* Ex. 32 at 187-88.]

From limited discovery the Cruise Lines obtained from Plaintiff, the money he receives from his TCPA enterprise is significant, and has substantially supplemented his household income.[18] Plaintiff admits he has received more than $100,000 in revenue from his TCPA business. [Ex. 32 at 179.] In fact, he recently received $30,000 as the named plaintiff in a recently-settled lawsuit filed against ADT by the same litigation team that represents him in this case. *Id.*

To facilitate his enterprise, it is valuable for Plaintiff to have his contact information appear on multiple lead lists. In this case, the Cruise Lines discovered that Plaintiff's contact information was included on leads from www.123freetravel.com, which were produced not only by RMG, but also by SMA Communications ("SMAC"), a ***disinterested third-party*** that received this lead ***directly from the company that originally generated it***—Generation-X.[19] [Declaration of Anthony

---

[18] The Cruise Lines have been unable to discover the full extent to which Plaintiff has benefitted from his endeavors. RCL sought discovery concerning this information, including for example, Plaintiff's annual tax records [DE 214], but that discovery was denied. [DE 227.]

[19] Plaintiff asserts that no defendant took any steps to authenticate the leads that RMG received from Caldwell List. [DE 492 at 13.] This argument is false. The Cruise Lines tried to locate the source of leads generated from www.123freetravel.com, but that source, Generation-X, had gone through bankruptcy prior

Pascale, attached as **Exhibit 36**, ¶¶ 17-21; Deposition of Anthony Pascale, attached as **Exhibit 37**, at 115-17.] SMAC also produced a ***second travel-related lead*** showing Plaintiff submitted his telephone number through one of its websites—www.travel250states.com—during the pendency of this lawsuit. [Ex. 36, ¶¶ 13-15.] This lead contains note only Plaintiff's phone number, but also the name and address of his *neighbor*. [Ex. 36, ¶ 29.] SMAC's owner testified that this combination of information is evidence that an actual person uploaded the information onto its website, and that it is "statistically impossible" for spyware to collect such information, as Hansen claims. [Ex. 37 at 134-35.][20] It is further evidence that Plaintiff submits his information on various websites to invite telemarketing calls so that he may file TCPA lawsuits for monetary gain. [Ex. 37 at 49-50.]

### D. Resort Marketing Group's Prerecorded Calls to Plaintiff

In his Motion, Plaintiff references three prerecorded telephone calls he received from RMG. Consistent with his typical practice, he recorded and logged each of these calls. [DE 492 at 17.][21] The recordings demonstrate that each call began by playing *different* prerecorded messages, none of which was identical to another. *Id.* During each message, Plaintiff was given the option to "Press 1" to speak with an RMG representative, or to "Press 2" to be placed on RMG's internal DNC list. [Ex. 41-44.] In all three calls, Plaintiff "Pressed 1" and was transferred to a live RMG

to commencement of this Lawsuit. With respect to Jeff Katz, the vendor from whom TDC Marketing had acquired the lead data, Mongiovi testified that Katz had retired and moved to either Costa Rica or the Philippines. [Ex. 9 at 88.] In addition, the Daley Report illustrates further attempts through expert analysis to examine and evaluate the *totality* of the leads RMG had used. [Ex. 1 at 36-44.]

[20] For this reason, the Cruise Lines requested an inspection of Plaintiff's computing systems to acquire direct evidence that Plaintiff places opt-in lead information on various websites to facilitate his receipt of telemarketing solicitations. [DE 482-1.] That issue is pending before this Court and is another example of how Plaintiff's atypical use of the TCPA resulted in allocation of a substantial amount of time and attention to matters that do not concern the absent proposed class plaintiffs. [DE 482.]

[21] Plaintiff actually alleges he received four calls, which took place on February 11, 2011 (Call One); June 11, 2011 (Call Two); September 8, 2011 (Call Three) and July 9, 2012 (Call Four), respectively. [DE 463, ¶¶ 98-123.] Recordings of these calls are being produced in conjunction with this Response as **Exhibits 41**, **42**, **43** and **44**, respectively. The Cruise Lines also attach written transcripts of these recordings, which were transcribed (albeit inaccurately) by Plaintiff's counsel. [*See* **Exhibit 45**.]

representative. *Id.* Each conversation between RMG and Plaintiff varied in substance despite the fact RMG required its employees to read a specific written script when speaking with customers. [**Exhibit 46**.] One RMG representative, for example, informed Plaintiff she was offering him a "one day only promotion *from Travel Services*," which is "based out of Scottsdale, Arizona" that has "been in travel for 25 years." [Ex. 43.] Another RMG representative, however, told Plaintiff that RMG has "been hired by [the Cruise Lines] to help them fill up empty cabins."[22] [Ex. 44.] This representative later admitted during her deposition that she "got off script" when she told Plaintiff the Cruise Lines hired RMG to fill empty cabins. [*See* Deposition of Telicia Compton, attached as **Exhibit 47**, at 69-70.] She also testified that she and her co-workers would "ad lib a lot when we're on the phone and we get off script a lot." [Ex. 47 at 69-72.] Thus, the calls recorded by Plaintiff show that each consumer was given different information depending on which message they heard, which live representative they spoke with, and what was "ad libbed" during the call.[23]

Plaintiff never requested that his telephone number be placed on RMG's internal DNC list. [Ex. 32 at 346-47.] Rather during one call, he concealed his true identity and used the fake name "Bill Sherrill" to keep RMG on the phone so he could gather information for this litigation. [Ex. 43; Ex. 32 at 424-25.] When asked why he did not request to be put on RMG's DNC list, he cavalierly responded "[b]ecause I don't have to." [Ex. 32 at 423-24.] He never completed a transaction with RMG. Rather, one call was disconnected, and on the other calls, he told each representative he had to research the offer or speak with his wife. Thus, Plaintiff never joined RMG's vacation club, never paid money to RMG, and never vacationed on any of the Cruise Lines.

---

[22] No script produced by RMG states that RMG was hired by the Cruise Lines.

[23] The law is clear that statements made by RMG or its employees do not create an agency relationship with the Cruise Lines. *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) ("[O]nly the words or conduct of the alleged principal, not the alleged agent, establish the [actual or apparent] authority of an agent.").

### E. PLAINTIFF'S CLASS ACTION IS ENTIRELY PREMISED ON HIS EXPERT'S UNQUALIFIED AND UNRELIABLE OPINIONS

Plaintiff's Motion seeks to certify a proposed class that consists of a spreadsheet of outdated, invalid and disconnected *telephone numbers* that do not identify the owners of these numbers at the time each call was made:

> All persons within the United States who received prerecorded telemarketing calls that were initiated by RMG seeking to sell the goods or services of the Cruise Defendants and whose phone number is contained on the Class List.

[DE 492 at 20; 492-1 at 21.] [24] Inherent in this definition is Plaintiff's concession that he cannot seek damages for telemarketing calls in which the prerecorded messages played by RMG never mentioned each of the Cruise Lines' trade names. Indeed, it would be nonsensical for Plaintiff to ask this Court to hold the Cruise Lines vicariously liable for phone calls in which RMG offered consumers travel incentives featuring promotions *other than* cruise vacations on their ships.

Plaintiff's Motion relies exclusively on Hansen's Report to identify which of RMG's calls played messages referencing the Cruise Lines' trade names. [DE 492 at 17-19.] As established in detail in the Cruise Lines' *Daubert* Motion, Hansen is an unqualified expert witness, and the proposed class is based on his untested presumption that RMG's database records "identified the specific sound file played during each call made by the Dialer." [*See Daubert* Motion; DE 492-1 at 8.] This conclusion was premised on Hansen's incorrect belief that RMG's dialer database identified specific files in its "sounds" table that were written to the database at the time each call was placed. [DE 492-1 at 8-9; *see* Deposition of Jeffrey Hansen, attached as **Exhibit 48**, at 281, 375.] According to Hansen, this allowed him to join together database tables and connect each telephone call with the *specific* sound file played during that call. [DE 492-1 at 8-9] Hansen then

---

[24] Hansen's Report simply concludes that "[t]he consumers [on the List] can all be identified by their phone numbers," but offers no method or plan as to how to do that. Given that 73% of these numbers are for cell phones, this has proven to be extremely problematic. [DE-492-1 at 21; Ex. 2, ¶¶ 62-73.]

erroneously presumed that all calls made by RMG during a given campaign must have played the same prerecorded message. With respect to Campaign 422, for example, Hansen concluded:

> The records also indicate that the number of the audio-recording made to Mr. Charvat was s28.wav. This exact recording was also used in all calls contained within the telemarketing campaign entitled 0610 TS2 Mix B223 and assigned Campaign ID#422.

[DE 492-1 at 9.][25] Hansen's understanding of how the dialer collects data is completely wrong, which led to his faulty premise that the sound file used on a particular phone call was written to the database at the time the call was placed. This error in methodology is dramatically illustrated than by the fact that Sound 28—the sound Hansen opines was played during both Campaigns 422 and 610—was not created until *April 12, 2012*, almost a year after Campaign 422 had concluded (on June 16, 2011) and more than six months after Campaign 610 had concluded (on September 9, 2011). [*See* Ex. 1 at 33 and fn. 87.][26]

In evaluating Hansen's Report, the Cruise Lines' expert—Margaret Daley ("Daley") of the Berkley Research Group—spoke with Asteria database designer, Tim Ringenbach[27] ("Ringenbach"), who confirmed that RMG used versions of the Asteria dialer that were limited in how it collected and stored information. [Ex. 1, p. 10-11.][28] With respect to sound files played

---

[25] Hansen reached the same conclusion with respect to recordings purportedly used in Campaigns 610 and 1410. [*See* DE 492-1 at 10-11.]

[26] As discussed *supra*, Hansen eventually admitted that Sound 28 was not the "exact recording" used on these campaigns. [Ex. 48 at 259.] He also admitted that he never even listened to Plaintiff's recordings prior to his deposition. [Ex. 48 at 245.]

[27] Hansen noted: "Given the important role played by Asteria in managing the Dialer Database, I contacted Asteria myself to make sure I correctly interpreted the data…" and referred to Ringenbach. This statement in Hansen's report is misleading because it was Plaintiff's counsel who spoke to Ringenbach and provided that information to Hansen. Hansen had one email exchange with Ringenbach. [DE 492-1 at 7; Ex. 48 at 55-60, 368-369]. Given Hansen's acknowledgement as to the important role played by Asteria, it is truly remarkable that he failed to confirm any of his presumptions about the forensic capability of the database or his findings with Ringenbach.

[28] Ringenbach of Asteria confirmed: "The Asteria database consists of different tables. What we'll call "instructional" tables are written to by user activity in the Asteria interface, and they contain instructions

during particular calls or campaigns, the dialer did ***not*** store this information in its log files. Rather, due to the dialer's limited functionality, the database only identifies the sound file queued up to be played during a dialplan on the ***day each of its backups were created***.[29] As a result, there is no way to identify which sound was played during a particular call or campaign:

> No forensic trail exists that leads to the identity of the prior prerecorded message. Without such a trail, it is impossible to determine what prerecorded message was played in the past, and hence what travel package was offered. For example, this would allow one version of "Sound 1" to describe a vacation stay in Orlando, while the next version of "Sound 1" could describe a cruise travel package.
>
> \*       \*       \*
>
> Because of the substantial edits made to these tables combined with the fact that the Database backups do not log each of these edits,[30] it is only possible to identify the audio file that was queued to be played ***at the precise time and date that the Database backups were made***." As was confirmed by Mr. Ringenbach: "The Dialplan_State_Param table[31] only shows the active assigned sound at the precise time the database backup was made, not a historical record of what had been assigned in the past."

[Ex. 1 at 17, 20-21 and fn. 49.] This outcome is unsurprising, as both Hansen and Daley agree the "Asteria Database was not designed to permanently record all activity." [*Id.* at 13 and fn. 26.] Hansen and Daley also agree that the database backups "do not contain a forensic trail or audit log that records the changes made to calling Campaigns, Dialplans, or Sounds." [Ex. 1 at 13.] Thus, "once a user makes changes to a Dialplan or Campaign, the prior instructions are deleted and

---

for the system. . . "Logging" tables are written to by the dialer as calls are made, and contain data about activity that has been performed." [Ex. 1 at 11, fn. 18.]

[29] In this regard, the two Database Backups produced by RMG in this case were exported from its server on May 5, 2012 and March 8, 2014. [Ex. 1 at 15.] Thus, the only information that can be extracted from these backups is identification of the sound files that were set to be played on those dates, and not the dates of the campaigns, which had all concluded months, and in many cases years, earlier.

[30] "The number of times the Sounds, and thus the prerecorded messages played, were swapped in Dialplan 11 are unknown." [Ex. 1 at 20.]

[31] According to Daley, the "Asteria Database stores information about the Dialplans in several separate tables. The Dialplan name and the date of its creation are stored in a table called "Dialplans." A list of the actions to be taken in a call (such as start, transfer to an agent, and hangup) are stored in a table called "Dialplan_State." The specific values assigned to actions, such as what prerecorded sound to play during a call, are stored in the "Dialplan_State_Param" table. [Ex. 1 at 18]

overwritten." [Ex. 1 at 13.] This was confirmed by Ringenbach in written correspondence to *Hansen*, in which Ringenbach stated: "**Unfortunately, there's not an audit table associated with it, so you can't really see that things have changed**." [*Id.* at 13.] Hansen ignored this information and prepared his Report to reach the exact opposite conclusion.

Daley further explained how the Database Backups prove that RMG "*deleted* and *changed*" Dialplan instructions hundreds, if not thousands, of times using the Asteria software interface,[32] which wiped out all previously existing instructions. [Ex. 1 at 18-20 (emphasis in original)]. As a result, she concluded:

> My conclusion is that because prior instructions contained in the Sound and Dialplan tables had been deleted or modified during the course of ongoing campaigns, there are no records in the Database backups or other information produced in this case that identify the nature [or] substance of the prerecorded messages played to consumers. . .
>
> Since the Database backups only identify the Sound number and thus the audio file to be played *next*, and they are not an historic record of the prerecorded messages *previously* played, it is not possible to tell which calls to the purported class used prerecorded messages that mentioned the defendant cruise lines and which did not.

[Ex. 1 at 23-24.]

Ringenbach confirmed that the last dialplan instructions "cannot be used to deduce what Sound numbers, and thus what prerecorded messages, were played in the past." [Ex. 1 at 24.] Hansen never realized that in creating his proposed List, "the tables he relied upon were not log tables and instead only included reference to the last audio file played in a dialplan before the system was backed up." [Ex. 1 at 28.] During his deposition, Hansen conceded that he had failed

---

[32] Daley notes that there were 939 individual edits to the Dialpan_State-Param table alone, and that many more deletions were made to the Dialplan_State table, which were not logged by the dialer. [Ex. 1 at 20.] These edits to the instructional tables wiped out all previously existing instructions thereby making it impossible to determine what instructions, and therefore what sounds, were associated with a campaign at the time it was run. [Ex. 1 at 18-20.] Thus, Hansen's core presumption is wrong.

to confirm whether information in the database concerning sound files represented the message that was actually played during a specific call, or whether it was limited to identification of the sound file queued up on a dialplan as of the date each backup was created:

> Q: (By Mr. Becker): Is it fair to say that, in the report that you provided to us today, you did not provide us with any information to indicate that there is historical data identifying what audio file was associated with the specific dial plan at any time prior to the date of the backup? You make no reference to such analysis in your report, do you?
>
> A. (By Hansen): I didn't look specifically for that.

[Ex. 48 at 360.]

As illustrated in Section I(E), above, RMG used the Asteria dialer in precisely the way it was designed to function: as "a dynamic, highly flexible system that allowed telemarketers to . . . swap recordings in and out of specific campaigns as often as needed." [Ex. 1 at 16, and fn. 38.] RMG offered a variety of travel incentives during its telephone calls and frequently changed the incentives offered during the course of ongoing campaigns, as confirmed by Jamie Smith of RMG:

> Q. (By Mr. Burke): So if we had a recording of the initial recording of an IVR from Campaign 1410, would it be reasonable to understand that the initial part of the IVR, the initial recording, was played for every call that answered?
>
> A. (By Mr. Smith): No.
>
> Q. Why not?
>
> A. Because, as often happened, they could stop the campaign right in the middle of it and offer another incentive if that particular incentive was not working. They could actually stop it for any number of reasons and then change out the recording for whatever reason the sales manager wanted.

[Ex. 4 at 105-06, 138-39; *see also* Section I(B).] Mr. Smith further testified:

> A. (By Mr. Smith): You could also change from offering the cruise incentive, if that wasn't—it that wasn't doing what the manager wanted it to do, you could change that to a land-based incentive, any of the incentives. A promotion—promotional incentive.
>
> Q. Do you have a recollection of changing any campaigns from a cruise incentive to something else in the middle of the campaign?
>
> A. Yes.

Q.    Okay.  When did that happen?

A.    I don't recall an exact date.  *It happened all the time*.

[Ex. 4 at 142 (emphasis added).] Thus, as explained below and in the accompanying *Daubert* Motion, Hansen's unqualified and unreliable opinions cannot be used as the basis for certification.

## II.    AS A SERIAL TCPA LITIGANT, PLAINTIFF DOES NOT HAVE STANDING UNDER *SPOKEO*

As a serial TCPA litigant who has filed more than 100 TCPA lawsuits over the past twenty (20) years, and who conducts his enterprise as a business to generate his living, Plaintiff does not have standing to bring this Lawsuit because he has not suffered a real injury-in-fact that is concrete and particularized, as required by the United States Supreme Court in *Spokeo*, 136 S. Ct. at 1543.

Plaintiff attempted, but failed, to establish standing by simply stating in his Motion that because he received calls at his home that allegedly violated the TCPA and invaded his right to privacy, he had Article III standing. [DE 492 at 22.] In *Spokeo*, however, the Supreme Court held that a plaintiff who seeks to invoke federal jurisdiction bears the burden of establishing that she has suffered an "injury in fact," which requires more than proof of a statutorily created right. *Id.* at 1549. To proceed under Article III of the Constitution, a plaintiff must also show she suffered "an invasion of a legally protected interest" that is "concrete and particularized." *Id.* For an injury to be particularized, "it must affect the plaintiff in a personal and individual way." *Id.* at 1548. For an injury to be "concrete," it must be "'real' and 'not abstract.'" *Id.* at 1556. The Court explained that a plaintiff will not automatically satisfy the "concrete and particularized" injury-in-fact requirement whenever a statute grants her a right and purports to authorize a lawsuit to vindicate that right. *Id.* at 1549. Rather, the Supreme Court held that "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.*

A district court in Pennsylvania recently followed this constitutional test and held that, under *Spokeo,* another serial TCPA plaintiff did not have standing to proceed with her TCPA lawsuit. *See Stoops v. Wells Fargo Bank, N.A.*, 2016 U.S. Dist. LEXIS 82380, *29 (W.D. Penn. June 24, 2016). The *Stoops* plaintiff purchased thirty five (35) cell phones with prepaid minutes to invite eleven TCPA lawsuits. She maintained those phones, took them with her when she traveled, and like Plaintiff, tracked them with a written call log. *Id.* at *2. In addressing these facts, the *Stoops* court turned to the purpose of the TCPA, noting that "[i]n enacting the TCPA, Congress's intent 'was to protect consumers from the nuisance, invasion of privacy, cost and inconvenience that autodialed and prerecorded calls generate.'" *Id.* at *28 (*quoting In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. at 7979-80). The court concluded that because Stoops was a serial litigant who used the TCPA as a business tool to generate substantial income through serial litigation, the calls did not constitute the type of "nuisance, invasion of privacy, cost, and inconvenience" from which Congress intended to protect consumers. *Id.* at *34.

Most recently, the Honorable Judge St. Eve applied *Spokeo,* and followed *Stoops* in dismissing a TCPA lawsuit based on a lack of Article III standing. *Tel. Sci. Corp. v. Asset Recovery Solutions, LLC*, 2016 U.S. Dist. LEXIS 104234 (N.D. Ill. August 8, 2016) ("*TSC*"). Judge St. Eve held that the plaintiff used technology it created to gather information about robocalls it received, and then used the TCPA for business purposes to sue the defendant, which resulted in its failure "to allege an interest with which the TCPA is concerned." *Id.* at *48-49. In dismissing the case, Judge St. Eve *rejected* the plaintiff's contention that it "simply embraced its role of 'private attorney general,'" and distinguished several cases decided before *Spokeo* (including this Court's June 24, 2015 ruling [DE 369]) because none of those cases considered "whether a 'professional

plaintiff' falls within the [TCPA's] zone of interests." *Id.* at 46-47.[33]

The rationale in *Spokeo, Stoops* and *TSC* are applicable to Plaintiff, whose day-to-day operation of generating an unnaturally high volume of telemarketing calls to his residence, and then recording them to facilitate his TCPA business, are even more compelling than the facts in *Stoops* and *TSC*. As set forth in Section I(C), Plaintiff submitted his contact information on various websites to facilitate his receipt of telemarketing calls so he may file TCPA lawsuits for monetary gain. [Exhibit 36, ¶¶ 12-39.] To that end, he has filed *ten times more* than the eleven lawsuits the *Stoops* court considered in denying her standing. His two decades of facilitating, tracking and recording telephone calls is a far more sophisticated, dedicated, and time consuming operation than that of Stoops. He tracks and maintains a written log of every incoming telemarketing call he receives and recruited family to help. He has dedicated over 4,000 hours of time to study the TCPA and obtained a paralegal's degree to facilitate his business.  [Ex. 32 at 27, 307.] To keep calls coming, he rarely informs telemarketers to stop calling him, and following his refusal to place his phone numbers on the National DNC Registry, he was ordered to do so. [Ex. 35.]

In enacting the TCPA, it was not Congress' intent to provide Plaintiff with a means to make his living from voluminous TCPA lawsuits that he acted positively to facilitate. In that respect, there is little question that Plaintiff's interests in privacy and against nuisance, costs, and inconvenience were not violated when he received calls from RMG. *See Stoops*, 2016 U.S. Dist. LEXIS at *34 ("As her testimony establishes, Plaintiff's privacy interests were not violated when she received calls from Defendant"); *see also Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 323 (3d Cir. 2015) ("[s]omeone with a generalized interest in punishing telemarketers, for example,

---

[33] *See also Sartin v. EKF Diagnostics, Inc.,* 2016 U.S. Dist. LEXIS 86777 *8 (E.D. La. July 5, 2016)(dismissing TCPA complaint because threadbare allegations of a TCPA violation failed to demonstrate injury in fact sufficient to establish Article III standing).

would not qualify on that basis alone"). Consequently, Plaintiff has not suffered a concrete, injury-in-fact, and therefore he does not have Article III standing to pursue this litigation. *See Kohn v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 676 (7th Cir. 2009).

### III.   PLAINTIFF FAILS TO MEET HIS BURDEN UNDER RULE 23

In filing his Motion, Plaintiff is asking that this case be treated as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (U.S. 2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). "In order to satisfy a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members" *Id.* (internal citations omitted). Before the Court can address Rule 23 issues, Plaintiff must satisfy the implied prerequisite that he has standing and that the class be sufficiently defined so as to be ascertainable. *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006); *Simer v. Rios,* 661 F.2d 655, 682 (7th Cir. 1981).

*If* Plaintiff has standing (which he does not) <u>and</u> *if* the class is sufficiently defined (which it is not), the Court is obligated to conduct a rigorous analysis of each requirement set forth in Rule 23. *Jamie S. v. Milwaukee Pub. Schools*, 668 F.3d 481, 493 (7th Cir. 2012) (holding that class certification is appropriate only if, after a rigorous analysis, the trial court is satisfied that the requirements of Rule 23 have been met). Rule 23 does not set forth a mere pleading standard. *Dukes,* 564 U.S. at 350. Rather, a party seeking certification "must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact," typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)(citing *Dukes,* 564 U.S. at 350). *If* Plaintiff meets this initial burden, he must also satisfy through *evidentiary* proof at least one of the provisions of Rule 23(b). *Id.*;

*Oshana,* 472 F.3d at 513; *Jamison*, 290 F.R.D. at 102 (quoting Fed. R. Civ. P. 23(b)(3)). Failure to meet any one of the Rule's requirements precludes class certification. *Harper v. Sheriff of Cook Co.,* 581 F.3d 511, 513 (7th Cir. 2009) (citation omitted). Plaintiff must meet these burdens by the "preponderance of the evidence" standard. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012).

In assessing Plaintiff's submissions, this Court must probe beyond the pleadings to determine whether alleged common issues can be tried on a classwide basis, which requires an inquiry into the merits of the claim. *Dukes,* 564 U.S. at 351 n. 6. While the Court has discretion in deciding whether to certify a class, that discretion must be exercised within the framework of Rule 23. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100 (1981).

### A. Plaintiff's Proposed Class of Outdated, Invalid and Disconnected Telephone Numbers is Vague and Not Ascertainable

Plaintiff contends that he "adequately identified a particular group who will make up the class" because "***phone numbers of each class member*** are listed on the Class List." [DE 492 at 23 (emphasis added).] This List, however, is comprised of 388,966 telephone numbers that Hansen determined were called by RMG half a decade ago. A proposed class based solely on these dated telephone numbers cannot properly be certified because it is too vague under Rule 23. In that respect, courts have made clear that Plaintiff must be able to specify ***who*** the members are, and cannot reference mere numbers on a list. *Balschmiter v. TD Auto Fin., LLC*, 303 F.R.D. 508 (E.D. Wis. 2014) (explaining that a plaintiff must identify and provide notice "to the class members as individuals, not merely numbers on a list").

The law on this point is clear. It is axiomatic that before a proposed class can be certified, an actual "class" must exist. *Simer v. Rios,* 661 F.2d at 669. "Rule 23 requires that a class be defined, and experience has led courts to require that classes be defined clearly and based on

objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). In *Mullins*, the Seventh Circuit made clear that when a proposed class is defined too vaguely, it fails to "satisfy the 'clear definition' component." *Id.* at 659-60 (*citing Young v. Nationwide Mutual Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) ("There can be no class action if the proposed class is amorphous or imprecise"). It also emphasized that "vagueness is a problem because a court needs to be able to identify **who** will receive notice, **who** will share in any recovery, and **who** will be bound by a judgment." *Id.* at 660 (emphasis added).

Plaintiff utterly fails to identify **who** may be in his proposed class. His List of phone numbers is not equivalent to a class of actual people. Based on Hansen's summary opinion that "[t]he consumers can all be identified by their phone number," Plaintiff will likely assert that if the Court will simply certify his proposed class, he can use the phone numbers on the List to identify account holders for each number. [DE 492-1 at 21, #2.] That is problematic because an independent survey reaffirms that a significant percentage of the actual people who had owned those numbers at the time of the calls a half decade ago cannot be ascertained.[34] Second, 73% of the numbers on the List are for cell phones, and there are substantial issues with identifying people who owned cell phone numbers a half decade ago. [Ex. 2, ¶¶ 62-73.] Plaintiff has not offered a proposal on how that could be done, and any plan he may have proposed would rely on a reverse lookup procedure, which itself would be wholly insufficient. *See Sherman v. Yahoo! Inc.*, 2015 WL 5604400, at *6-7 (S.D. Cal. Sept. 23, 2015)(mere proposals to subpoena carriers and use reverse lookups were ruled inadequate to carry plaintiff's burden).

---

[34] This issue also impacts the superiority analysis under *Mullins* because it makes the class unmanageable given difficulty that exists in identifying the actual people connected to the numbers on the List. 73% of the numbers on the List are associated with cell phones, and Plaintiff has completely failed to propose any method of how he plans to identify people who owned cell phone numbers a half decade ago. [Ex. 2, ¶¶ 62-73.] Plaintiff has not offered a plan on how he will do this, and any plan he may propose would be untimely and wholly insufficient. [*See* Section III(G)(i).]

### i. A Survey of the Proposed Class Reveals A High Volume of Telephone Numbers Are Invalid or Not Associated with Those Who Received the Calls from RMG

The ascertainability problem with Plaintiff's proposed class is not mere conjecture. As noted above, an independent survey by New Partners Inc. ("New Partners") reveals that almost **one-third** of the numbers on the List are either invalid, or are ***not*** associated with the person who owned the number in 2011 and 2012.[35] New Partners attempted to contact a sampling of 93,343 phone numbers contained on the List. Out of that sampling of 93,343 telephone numbers, a total of 26,871 numbers (or 28.8%), were "found to be invalid or disconnected." [**Exhibit 49**, ¶ 18.] In addition, 23% of the individuals who answered New Partners' telephone call during the survey indicated that, back in 2011 and 2012, they did not own the telephone number on which New Partners contacted them. [*Id*. at ¶ 19.] Daley relied upon the details of this survey to corroborate her expert opinion that the proposed class cannot be ascertained or certified. In summary, almost **one-third** of the telephone numbers in this survey population are not associated with a person who could qualify as a member of Plaintiff's proposed class. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012)(holding that standing to bring a TCPA claim resides in the "the person subscribing to the called number *at the time the call is made*"); *see also Smith v. Microsoft*, 297 F.R.D. 464, 473 (S.D. Cal. 2014) (noting that many members of the proposed class have changed their numbers due to the years that have passed during the campaigns and litigation).

### ii. Plaintiff's Proposed Class Fails to Exclude Individuals Who Consented to Be Contacted, or Who Had a Business Relationship with Any of the Defendants

Another reason Plaintiff's class definition cannot be ascertained without discovery on substantial individual issues is because it does not properly exclude consumers who gave their

---

[35] The New Partners survey was conducted under the direction and supervision of its CEO, Jerry Samargia and relied on in Daley's expert report. [*See* Ex. 1 at Exhibit W.] A copy of Mr. Samargia's Declaration, Supplemental Declaration and deposition transcript are attached as **Exhibits 49**, **50** and **51**, respectively.

26

prior express consent to be contacted by RMG or the Cruise Lines, or consumers who had preexisting business relationships with RMG or the Cruise Lines. *See Barrett v. ADT Corp.,* 2016 U.S. Dist. LEXIS 28767 (S.D. Ohio March 7, 2016). In *Barrett*, the court denied as overbroad a class definition proposed by the *same attorneys* who represent Plaintiff in the present case because the definition they proposed did not "limit the class to consumers who did not give prior express consent to be contacted." *Id*. at *24. As discussed in Section III(F)(ii), these questions raise substantial individual issues which would require countless mini-trials to resolve. *Id.* at *23 (a plaintiff cannot ask a court to ascertain which calls are not actionable under the TCPA through extensive, individual fact-finding). For these reasons, the proposed class fails the ascertainability requirement, and the Motion should be denied accordingly.

### B. PLAINTIFF IS A SERIAL LITIGANT WHO INVITES TCPA VIOLATIONS AND IS THEREFORE AN INADEQUATE CLASS REPRESENTATIVE

Contrary to the conclusory assertion in Plaintiff's Motion as to his adequacy [DE 492 at 28], his conduct presents unique and individual issues and defenses, which detract attention from the class as a whole and warrant denial of his Motion. The Seventh Circuit has ruled that a named plaintiff who "is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 726 (7th Cir. 2011) ("[t]he only question we can consider is whether, however meritorious the suit itself may be, the claim of the class representative may be subject to a defense [while] other class members may not be subject to the same defense, or perhaps to any defense").

Plaintiff brazenly contends that the purpose of the TCPA is to allow him to supplement his income through his TCPA enterprise [Ex. 32 at 431-32], but his frequent use of the TCPA for financial benefit also subjects him to a unique standing defense under *Spokeo*. [*See* Section II.] His practice of recording virtually every call he receives also subjected him to a counterclaim by RMG

based on a violation of the Illinois Eavesdropping Act, 720 ILCS 5/14-2 (the "Act"). [DE 123.][36]

The "presence of **even an arguable defense** peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation [because] the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer.'" *CE Design,* 637 F.3d at 726 (emphasis added).

The fact that Plaintiff treats his TCPA litigation as a business combined with the question of whether he places information on websites to invite telemarketing calls may rightly lead the jury to focus on his credibility, or on issues unique to Plaintiff rather than claims of absent class members. At a minimum, the presence of Plaintiff's contact information on two travel-related lead lists produced by non-party SMAC demonstrates that Plaintiff has expressly consented to receive travel-related calls. [Ex. 36, ¶ 39.] Plaintiff's effort to oppose the Cruise Lines' discovery requests concerning this issue only serves to underscore that there exists significant factual issues that must be resolved separately as to Plaintiff if this case should proceed as a class action. It is therefore "likely that too much time and attention will be spent on rebutting substantial individual defenses to the detriment of the absent class plaintiffs." *Davies v. W.W. Grainger, Inc.*, 2014 U.S. Dist. LEXIS 87582, *10 (N.D. Ill. June 27, 2014). A jury may also reasonably conclude that Plaintiff

---

[36] When RMG filed its eavesdropping counterclaim in May of 2013, the Act required the consent of all parties to a conversation to consent to having their conversation recorded. 720 ILCS 5/14-2(a)(2). While that claim was pending, however, the Illinois Supreme Court declared the Act unconstitutionally overbroad because it prohibited the open recording of public conversations in violation of the First Amendment. *See, e.g., People v. Melongo*, 2014 IL 117852 (March 20, 2014). It was for this reason RMG voluntarily withdrew its counterclaim, which the Court allowed it to do without prejudice. [DE 193.] In December of 2014, the Illinois legislature passed a new version of the Act, which removed the unconstitutional restraints, but left intact the prohibition against the all-party consent requirements for private conversations such as those at issue in this lawsuit. *See* PA 98-1142. Thus, Plaintiff's conduct is still illegal under the modified statute, and he remains prohibited from surreptitiously recording private conversations with Illinois citizens.[36] For this reason as well, the parties have devoted a great deal of attention to rebutting arguments that do not affect the entire putative class.

seeks a windfall to supplement his income, which it may hold against the class even though a large percentage of the class may never have recorded a call, never refused to be placed on a DNC registry, never lied about their identity when speaking with a telemarketer, and never filed a single TCPA lawsuit. Accordingly, Plaintiff has failed to establish his adequacy.

## C. PLAINTIFF'S CLAIM IS NOT TYPICAL OF THOSE HELD BY THE PUTATIVE CLASS

Plaintiff contends his claim is typical of those held by the putative class because his contact information was sold to RMG by Caldwell List, which resulted in RMG making a prerecorded call that purportedly promoted the goods or services of the Cruise Lines. [DE 492 at 27.] Plaintiff's claims, however, are actually atypical of those he asserts on behalf of his proposed class. This alone warrants denial of his Motion. *Muro v. Target Corp.,* 580 F.3d 485, 492 (7th Cir. 2009) (holding that a named plaintiff's claims must share "the same essential characteristics as the claims of the class at large"); *Quality Mgmt. & Consulting Servs. v. SAR Orland Food Inc.*, 2013 U.S. Dist. LEXIS 155727 (N.D. Ill. Oct. 30 2013) ("[t]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation").

### i. **Plaintiff Received No Prerecorded Calls on a Cell Phone**

Plaintiff *does not own a working cell phone*, which is not typical of approximately 73% of his proposed class, since RMG did not contact Plaintiff on a cell phone in alleged violation of Section 227(b)(1)(A)(iii) of the TCPA. [Ex. 32 at 14, 310-11.] As such, his claims are atypical of three fourths of his proposed class. *See Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229 (S.D. Ill. 2011). In *Vigus*, the named plaintiff received several prerecorded calls on his residential telephone line, but sought to represent a class of individuals who the defendant called on either (1) a residential telephone line or (2) a cellular telephone service. *Vigus* 274 F.R.D. at

29

232. The court rejected the plaintiff's attempt to represent individuals contacted on cell phones based on a lack of typicality:

> To the extent Vigus seeks to certify owners of cell phone numbers called by the Casino who might have a cause of action for violation of 47 U.S.C. § 227(b)(1)(A)(iii), the TCPA's provision relating to cell phones, his claim is not typical of those putative class members because they rely on different legal theories and different defenses. As noted above, Vigus does not have a cause of action under 47 U.S.C. § 227(b)(1)(A)(iii) for the Casino's call made to his residential line.

*Vigus,* 274 F.R.D. at 236. The Court further held: "The relevant inquiry is not whether any member of the putative class might have a claim under the provisions of the TCPA relating to calls made to cell phone numbers but whether [*the plaintiff*] himself has such a claim. If he does not, he does not have standing to sue under the TCPA's cell phone provisions." *Id.* at 233; *see also Cabrera v. Gov't Emples. Ins. Co.*, 2015 U.S. Dist. LEXIS 16663 (S.D. Fla. Jan. 15, 2015) (holding that plaintiff could not pursue claims on behalf of persons who received calls on their residential lines because he did not have a residential line and did not suffer the same injury as that subgroup).

### ii. Plaintiff Did Not Detrimentally Rely on the Cruise Lines' Silence or RMG's Apparent Authority

As discussed in Sections III(F)(iii) and (iv), Plaintiff may only assert apparent authority and ratification claims against the Cruise Lines if he justifiably and detrimentally relied on some statement, conduct or silence of the Cruise Lines. Plaintiff makes no such claim in his pleading or Motion. Thus, to the extent he seeks to certify his class against the Cruise Lines based on an apparent authority or ratification theory, his claims are atypical of his proposed class.[37]

### iii. Plaintiff's Ratification Claim is Not Typical of His Proposed Class Because the Cruise Lines Retained No Benefit from His Calls

Plaintiff may only assert a ratification claim against the Cruise Lines if he can present

---

[37] The lack of Plaintiff's justifiable and detrimental reliance also makes him an inadequate class representative with respect to both his ratification and apparent authority claims. [*See* Section III(B).]

evidence the Cruise Lines received and retained a benefit from prerecorded calls RMG made to his residence. The retention of a benefit derived from allegedly improper conduct is an essential characteristic of any ratification claim. *See* Section III(F)(iii). In this regard, Plaintiff has not demonstrated that the Cruise Lines received or retained any benefit from calls RMG made to his residence. He did not become a member of RMG's vacation club, did not accept or redeem a cruise on any Cruise Lines, and is unlikely to cruise in the future. [Ex. 32 at 420.] Thus, Plaintiff's claim is atypical of any class of telephone numbers associated with actual people who might assert a ratification claim against the Cruise Lines.[38] For this reason as well, Plaintiff's Motion to certify his vicarious liability claim against the Cruise Lines should be denied.

### D. PLAINTIFF IMPROPERLY RELIED ON HIS EXPERT'S UNQUALIFIED AND UNRELIABLE OPINION AS THE BASIS FOR ESTABLISHING NUMEROSITY

In order to establish numerosity, the putative class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiff "cannot rely on conclusory allegations that joinder is impracticable or on speculation as to the size of the class." *See Marcial v. Coronet Ins., Co.,* 880 F.2d 954, 957 (7th Cir. 1989). He claims to meet this requirement by identifying 688,942 prerecorded calls placed to 388,966 phone numbers, which he concludes makes joinder impracticable. [DE 492 at 24; 492-1 at 12.] However, as discussed in Section I(E), this proposed List is based on Hansen's unqualified and highly unreliable opinion that recordings played during these 688,942 calls were "all identical" to recordings played during the 3 calls recorded by Plaintiff. *Id.* There is no way to forensically make this determination because the dialer used by RMG was not equipped to function for that purpose and did not log that information. [*See* Section I(E).] Given that a designer of the dialer confirmed this fact, a class of telephone

---

[38] The lack of a retained benefit by the Cruise Lines in connection with calls received by Plaintiff also makes him an inadequate class representative with respect to his ratification claim.

numbers based on data extracted from the Asteria database is sheer speculation. *Id.*

Plaintiff also relies on Hansen's opinion that because all of RMG's leads were obtained from third parties, they are unreliable. [DE 492 at 13-14; 492-1 at 16-21.] As illustrated in Section I(B) this legal conclusion is incorrect, as RMG acquired leads from a variety of sources. Plaintiff's opinion that "all leads are bad" is also inconsistent with relevant case law [*see* Section III(F)(ii)(a)], and is based entirely on Hansen's "experience" of volunteering his time to assist with robocalls in an office with no employees for one friend. [*See Daubert* Motion.] Hansen offered nothing but speculation and *ipse dixit.* Plaintiff therefore fails to provide any reliable evidence of a class that excludes persons who consented to be contacted by RMG. He therefore fails to demonstrate that the proposed class is so numerous that joinder is impracticable.

### E. PLAINTIFF FAILS TO SUFFICIENTLY ESTABLISH THE EXISTENCE OF COMMON ISSUES FOR CERTIFICATION AND TRIAL

Plaintiff summarily contends that issues in this case "apply equally to all class members and, importantly, can be answered using common proof and uniform legal analysis." [DE 492 at 26.] However, Plaintiff submits no explanation as to how the five common questions he identified may be proven through a generalized method of proof and uniform legal analysis. *Id.* He therefore falls far short of satisfying his Rule 23(a)(2) burden of offering "significant proof" that the putative class has been harmed by a common and generalized course of conduct such that determination of the allegedly common issues with common answers will resolve "an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 564 U.S. at 350-53.

The Supreme Court held that Rule 23's commonality language "is easy to misread, since any 'competently crafted class complaint literally raises common 'questions.''" *Id.* at 564 U.S. at 349. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to

drive the resolution of the litigation." *Dukes* 564 U.S. at 350 (quoting Nagareda, Richard A., *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L. Rev. 97, 132 (April, 2009)). Plaintiff misreads (and therefore misapplies) Rule 23's commonality requirement by identifying five purportedly common questions, but then fails to identify any classwide proof or explain how such proof will generate common answers to these questions "in one stroke." [DE 492 at 25-26.]

Plaintiff submits only one lead source to be considered as a common question and ignores record evidence that RMG obtained leads through a variety of sources. For example, Plaintiff asks: "Does the data purchased by RMG from Caldwell List and used to make prerecorded call [*sic*] to consumers satisfy the TCPA's 'prior express consent' requirement?" [DE 492 at 25, bullet 4.] This ignores all of RMG's other sources of consent, since, as discussed in Sections I(B) and III(F), members of the proposed class provided consent in a variety of different ways and contexts, including through its own websites and e-mail campaigns, such that the issue of "prior express consent" cannot be addressed by looking at only **_one_** of many lead vendors from which RMG purchased contact information. For this reason, Plaintiff failed to provide the Court with a manner of resolving "prior express consent" in "one stroke." *Dukes,* 564 U.S. at 350-53.

Lack of common proof also impacts Plaintiff's claim that the Cruise Lines should be held vicariously liable for RMG's robocalls. [DE 492 at 7-8.] This is because in resolving a TCPA claim against the Cruise Lines, the crux of the inquiry is whether RMG placed each call as an agent of the Cruise Lines. Three of Plaintiff's purportedly common questions are directed to this issue: (1) did the Cruise Lines actually authorize RMG to place robocalls to the putative class; (2) did RMG make these calls with the implied authority of the Cruise Lines and (3) did the Cruise Lines ratify RMG's allegedly illegal conduct? [DE 492 at 25.] As for these agency issues, Plaintiff concedes vicarious liability cannot attach to the Cruise Lines for phone calls where RMG did not

seek to sell their products or services. [DE 492 at 20.] Vicarious liability therefore cannot be considered a common issue unless Plaintiff can propose a generalized method of proof by which he can establish that each prerecorded message received by the proposed class mentioned the Cruise Lines. This he cannot do because RMG offered a variety of different vacation packages to the consumers it contacted, and it frequently changed incentives offered during the course of an ongoing campaign. [*See* Section I(B)(ii).] Thus, some calls RMG placed offered consumers a cruise vacation and others did not. Plaintiff has identified no way to distinguish between these calls, and his reliance on Hansen's opinion that all prerecorded messages played during RMG's campaigns were identical is completely unreliable and *erroneous*. [*See* Section I(E).] The same is true with respect to Plaintiff's ratification and apparent authority claims, which are further discussed in Section III(F). Plaintiff presents nothing more than sheer speculation as to how issues of vicarious liability may be resolved on a classwide basis. His Motion should therefore be denied.

### F.  INDIVIDUAL ISSUES IN THIS CASE PREDOMINATE OVER THE COMMON ISSUES

By every possible measure, this is a unique case in which Plaintiff seeks to hold three separate cruise lines vicariously liable for calls they neither placed nor authorized. While Plaintiff suggests that courts "routinely certify TCPA claims" [DE 492 at 20], that broad assertion fails to acknowledge that "***TCPA cases are neither uniformly suitable or unsuitable for class action treatment***. Whether the predominance requirement is satisfied depends on the unique issues and evidence presented in the case." *Stern v. DoCircle, Inc.*, 2014 U.S. Dist. LEXIS 17949 (C.D. Cal. Jan. 29, 2014) (emphasis added). "If the litigation will not be ***greatly simplified*** by resolution of a common issue, 'the complications, the unwieldiness, the delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring.'" *Balschmiter*, 303 F.R.D. at 516 (internal citations omitted).

Unique issues and evidence relating to vicarious liability, prior consent and established business relationships require consideration of individual proof for more than 375,000 phone numbers on the List, which have never been matched to actual people. *If* Plaintiff meets all the Rule 23(a) requirements, and is able to identify an ascertainable class, this Court will still be required to engage in a multitude of individual inquires to determine whether the facts establish that *any* of the three Cruise Lines may be liable for an alleged TCPA violation, including:

(i)     whether each telemarketing call allegedly initiated by RMG actually played a prerecorded message that referenced RCL, CCL or NCL,[39] as opposed to one of the many other incentives offered by RMG;

(ii)    whether each proposed class member who received a call from RMG had previously provided his or her consent to receive such a travel-related call, including consent to RMG, consent to any of the three Cruise Lines, or consent on a travel-related website;

(iii)   whether each proposed class member had a prior business relationship with either RMG, or any of the three Cruise Lines;

(iv)    whether each proposed class member can establish the facts necessary to find any of the Cruise Lines ratified RMG's act of making the prerecorded call on behalf of each of the Cruise Lines; and

(v)     whether each proposed class member can establish the facts necessary to find any of the Cruise Lines are vicariously liable for the call because he or she believed that RMG had the apparent authority to make the prerecorded call on behalf of each of the Cruise Lines.

As explained below, the predominance of these unique facts and issues preclude Plaintiff from satisfying **his burden** of establishing "some credible basis for claiming that the questions susceptible to generalized proof on a class-wide basis—the common questions—predominate over questions subject to only individualized proof." *Dahlgren's Nursery, Inc. v. E.I. du Pont de Nemours & Co.,* 1994 U.S. Dist. LEXIS 17918, *28-29 (S.D. Fla. June 9, 1994) (citations omitted).

---

[39] There are some prerecorded messages referencing CCL and RCL, but not NCL, which will require a highly individual inquiry to determine who heard what message relating to which Cruise Line. [*See e.g.,* Ex. 17.]

If the effect of class certification is to bring in hundreds of possible claimants "whose presence will in actuality require a multitude of mini-trials (a procedure which will be time consuming and costly), then the justification for class certification is absent." *Id.* at *28-29 (citing *Alabama Bluebird Body Co.,* 573 F.2d 309, 328 (5th Cir. 1978)). Each of these lines of necessary inquiry mandate that the Court deny Plaintiff's Motion.

### i. Whether Each Call Initiated by RMG Played a Prerecorded Message that Referenced the Cruise Lines is an Individual Issue

Plaintiff cannot employ a generalized method of proof to determine which of more than 668,000 telemarketing calls played a recording that mentioned each cruise line. This is because RMG telemarketed for the sole purpose of increasing membership in *its* vacation club, and discounted cruises were one of many different incentives it offered during the course of a campaign to accomplish this objective. [*See* Section I(B)(ii).] Plaintiff *ignores evidence* that shows many proposed class numbers received prerecorded messages that offered land vacation incentives, while others received messages offering cruises aboard several competing cruise lines. This is illustrated in a July 12, 2011 e-mail exchange between Jamie Smith and Jason Rader:

> Jamie Smith:  Jason, I have heard different things on T3.  Please give me an overview of what you are selling in there starting tomorrow.  ***I heard cruises but I also heard condos.  Which is it as all of the recordings need to match what you are selling.***  - Jamie

> Jason Rader:  ***both – they will be selling both condos and cruises***

[Ex. 16.]  This email exchange took place between the first and second call Plaintiff received from RMG, and demonstrates RMG's varied use of travel incentives. The variation in incentives RMG offered is also corroborated by data collected during New Partners' double-blind survey, in which **fifty-five percent (55%)** of interview respondents who remember whether they did or did not

receive a prerecorded call offering them a free cruise in 2011-2012 said they did *__not__* receive such a call, whereas only forty-five percent (45%) said they did. [Ex. 1 at 47; Ex. 49, ¶ 21.]

Quite simply, Plaintiff cannot maintain a class action against the Cruise Lines emanating from calls that offered discounted trips to Las Vegas or Myrtle Beach as frequently as they offered discounted cruise vacations. It is impossible to determine what incentive was offered during each of these calls because RMG used a version of the Asteria dialer that did *not* have the capability of storing data that identified the specific prerecorded message played during each particular call or campaign. [Ex. 1 at 10-14; Section I(E).] Thus, there are no tables in the database that log edits made to sounds as calls are placed.[40] [Ex. 1 at 14.] As a result, there is no way to identify which sound was played during a particular call or campaign, and class certification is entirely improper. *See Fitzhenry v. ADT Corp.*, 2014 U.S. Dist. LEXIS 166243 (S.D. Fla. Nov. 3, 2014) ("Defendants argue, and the Court agrees, that the fact that the calls to the proposed class members were different makes this case less suitable for class certification than cases involving calls where the same prerecorded message was delivered").

Plaintiff provides no method to distinguish between cruise calls and non-cruise calls. Instead, he relies on Hansen's erroneous conclusion that because Plaintiff recorded 3 telephone calls that referenced the Cruise Lines, *all* 668,939 calls on the List (which were placed on 17 different days spanning over a one-year period) must have played identical[41] messages that also mentioned the Cruise Lines. [DE 492 at 17-18.] As set forth in Section I(E) and the *Daubert*

---

[40] Hansen eventually conceded this fact in his deposition. [Ex. 48 at 151-52.]

[41] Hansen *admits* these recordings are themselves *not identical*. In Footnote 3 of his Report, he indicates that the audio recording contained within the dialer directory and titled .s28 is in fact not the same recording Plaintiff captured from Campaign 422 or 610. [DE 492-1 at 10.] He concedes that a file may be recorded over, but then concludes without any support, that since all three recordings mention the Cruise Lines, then .s28 "was never 'recorded over' changing the substance of the prerecorded to something other than a promotion of the goods or services of the Cruise Defendants." [*Id.* at 10, fn. 3.]

Motion, however, this conclusion was based on Hansen's flawed and unverified understanding of how the Asteria database stores information.[42] [Ex. 1 at 17, 20-21 and fn. 49.] Given the reality of RMG's business, as illustrated through undisputed and unrebutted testimony, contemporaneous business records, independent survey research, and expert analysis, Plaintiff seeks to certify a class based on the assumption that all calls were identical, but which are actually muddled with phone calls that do not mention the Cruise Lines, and which do not in any way "seek to sell the goods or services of the Cruise Defendants." [DE 492 at 20.] Plaintiff's complete failure to provide a method by which to remove these calls from his List requires denial of his Motion.

### ii.    Prior Express Consent is an Individual Issue

Although TCPA cases are not "'per se' unsuitable for class resolution, class certification is warranted only when the 'unique facts' of a particular case indicate that individual adjudication of the pivotal element of prior express consent is unnecessary." *Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574 (S.D. Cal. 2013) (quoting *Gene & Gene v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008). Plaintiff's Motion omitted substantial consent evidence because he knows that the many ways in which consumers provided consent trigger extensive individual inquiries, thus precluding class certification. The record in this case falls squarely within a long line of TCPA cases holding that if there are numerous disparate ways in which consumers provided

---

[42] Hansen attempts to support his opinion by referencing allegedly "sworn" consumer complaints, which he claims are evidence that RMG made calls that "promoted the goods and services of the Cruise Lines." [DE 492-1 at 13 and Ex. F.] These complaints actually *undermine* Hansen's contention that every call played an "identical" prerecorded message, since they reflect differing messages received by each consumer. The Yeats, Hill, Thiel, and Vandenburg complaints, for example, say only that they were offered a cruise without referencing the names of *any* cruise line, whereas the Balter complaint only identified NCL. *Id.* The Ohman and Pell complaints do not even suggest that they were offered cruises, stating instead that they were offered a "travel trip" and "vacation," respectively. *Id.* The variation in the substance of these complaints further demonstrates the individual nature of this issue. It should also be noted that none of the calls underlying these complaints are part of Plaintiff's proposed List, and, contrary to Hansen's claim, nothing contained in Exhibit F of Hansen's Report indicates these complaints are sworn. *Id.*

consent, then class certification must be denied because individual issues predominate.[43]

In a last ditch effort to avoid the factual record, and numerous cases denying class certification in similar circumstances, Plaintiff argues that the existence of prior consent is an affirmative defense that must be proven by defendants at trial. [DE 492 at 4.] This assertion, however, is *irrelevant at the class certification stage* because it is Plaintiff's burden to establish common issues and a generalized method of proof as to both claims **_and_** defenses. Courts have long recognized that "like other considerations, affirmative defenses must be factored into the calculus of whether common issues predominate." *Gunnells v. Healthplan Servs., 348 F.3d 417*, 438 (4th Cir. 2003) (citing *Wal-Mart Stores, Inc. v. Visa USA Inc*., 280 F.3d 124, 138 (2d Cir. 2001)). Thus, it remains **_Plaintiff's burden_** at the class certification phase to "prove that consent, or a lack thereof, can be resolved 'on evidence and theories applicable to the entire class.'"

---

[43] *See e.g., G.M. Sign, Inc. v. Brink's Mfg. Co.*, 2011 U.S. Dist. LEXIS 7084, *8 (N.D. Ill. Jan. 25, 2011) (St. Eve, J.)(individual issues of consent predominated over common issues because defendant set forth specific evidence showing large amount of the putative class consented to receive faxes); *Jamison*, 290 F.R.D. at 107 (Kendall, J.) (holding that mini-trials must be conducted to determine which consumers provided consent); *Gene & Gene,* 541 F.3d at 326-29 (holding that individual issue of prior express invitation or permission "prevented plaintiff from "advanc[ing] any viable theory employing generalized proof concerning the lack of consent with respect to the class...[which] leads to the conclusion that myriad mini-trials cannot be avoided"); *Vigus*, 274 F.R.D. at 237 ("call list [was] not a list of homogeneously unconsenting recipients [thereby] "burden[ing] the Court and the litigants with the arduous task of sifting through each putative class member's claim to determine its merits on a case-by-case basis"); *Southwell v. Mortgage Investors Corp. of Ohio*, 2014 U.S. Dist. LEXIS 112362 (W. D. Wash. Aug. 12, 2014)("Defendant presents evidence that it obtained consent from consumers from multiple sources: several webpages, responses to mailings, spontaneous calls seeking information, or prior business relationships"); *Gannon v. Network Tel. Servs. Inc*., 2013 U.S. Dist. LEXIS 81250, *8 (C.D. Cal. Jun. 5, 2013) (holding predominance not satisfied where consent issues required individual inquiries into class members' disparate interactions with defendant); *Connelly*, 294 F.R.D. at 578 ("the differing circumstances under which putative class members provided their cell phone numbers to [the defendant] are, at the very least, relevant to a determination of prior express consent"); *Versteeg v. Bennett, Deloney & Noyes, P.C.,* 271 F.R.D. 668, 674 (D. Wyo. 2011)(because "the TCPA claims will require extensive individual fact inquiries into whether each individual gave 'express consent' by providing their wireless number to the creditor during the transaction that resulted in the debt owed...individual inquiries [] predominate over the class action"); *Shamblin v. Obama*, 2015 U.S. Dist. LEXIS 54849 (M.D. Fla., April 27, 2015)("the consent issue in this case presents individual fact inquiries precluding class certification"); *Blair v. CBE Group, Inc.*, 309 F.R.D. 621 (S.D. Cal. 2015)(same); *Kenro, Inc. v. Fax Daily*, 962 F. Supp. 1162, 1169 (S.D. Ind. 1997)(same).

*Kristenson*, 12 F. Supp. 3d at 1307 (*quoting Stern,* 2014 U.S. Dist. LEXIS 17949 at *8).

Because consent is a significant issue in this case, Plaintiff "***must advance a viable theory employing generalized proof*** to establish liability with respect to the class involved," and this Court "must <u>*only*</u> certify class actions filed under the TCPA when such a theory has been advanced." *Gene & Gene*, 541 F.3d at 329 (emphasis added). If instead a defendant "'sets forth specific evidence showing that a significant percentage of the putative class consented to receiving calls . . . courts have found that issues of individualized consent predominate over any common questions of law or fact." *Buonomo v. Optimum Outcomes, Inc.,* 301 F.R.D. 292 (N.D. Ill. 2014) (quoting *Jamison*, 290 F.R.D. at 106-07). As set forth below, Plaintiff has failed to meet his burden.

### a. Plaintiff's Summary of "Prior Express Consent" is Artificially Narrow

Not every prerecorded telemarketing call violates the TCPA. Rather, a violation occurs only where a call is placed without the recipient's prior consent. 47 U.S.C. § 227, *et seq*. Plaintiff asks this Court to employ an unreasonably restrictive and narrow interpretation of what constitutes "prior express consent" contrary to that applied in this District. [DE 492 at 4, 8-15.] The TCPA itself does not define prior express consent.  In 1992, however, the FCC entered an order which recognized:

> Persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached.

*In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 8752, ¶ 31 (Oct. 16, 1992) (the "1992 FCC Order").

Courts in this District have interpreted the 1992 FCC Order to conclude that the scope of a consumer's prior consent is dependent on the "context and purpose" for which that consent was

given: "to the extent the FCC's orders establish a rule, it is that the scope of a consumer's consent depends on *its context and the purpose* for which it is given. Consent for one purpose does not equate to consent for all purposes." *Kolinek v. Walgreen Co*., 2014 U.S. Dist. LEXIS 91554 (N.D. Ill. July 7, 2014) (J. Kennelly). Judge Kennelly did not hold, as Plaintiff suggests, that the only party who may contact a consumer is the party to whom consent was originally given. Rather, the "context and purpose" of a consumer's consent defines the parameters for the consent given. *Id*.

The primary inquiry in considering whether a consumer provided consent is why he provided his telephone number, not to whom was the number provided. An individual "may **indirectly** provide a third party with express consent to be called under the TCPA." *Olney v. Job.com*, 2014 U.S. Dist. LEXIS 60843, *20 (E.D. Cal. May 1, 2014)(emphasis added). In *Olney*, an individual provided his number to a company to be contacted about "employment opportunities" and was thereafter contacted by an unrelated company about an educational opportunity that might lead to employment. *Id*. The court held that the TCPA "does not require a call to be made 'for the exact purpose for which the number was provided,' but it undoubtedly requires that the call bear some relation to the product or service for which the number was provided." *Id*. at *22. The court determined that the consumer could provide an unrelated third-party with prior express consent to contact him depending on the context and purpose for which his telephone number was provided. *Id.*; *see also Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100 (C.D. Cal. Jan. 28, 2014) (holding a consumer who provided his telephone number to an airline for travel purposes also consented to flight notification messages from a third-party). *Id*. at *6.

Despite this line of authority, Plaintiff asks this Court to apply an unreasonably restrictive interpretation of the prior express doctrine. [DE 492 at 4.] He suggests instead that consent may only be provided to a specifically identified entity and asks this Court to reject as inherently

invalid any consent document acquired by RMG from third-party vendors regardless of the context in which the consent was given. *Id.* This artificial interpretation of the prior express consent doctrine is contrary to well-established precedent and should be rejected.

### b. The Variety of Consent Obtained From Numerous Sources Requires Numerous Individual Inquiries and Mini-Trials

As demonstrated above, the record evidence establishes that tens of thousands of potential class members provided prior express consent directly to RMG, to one or more of the Cruise Lines, or to one of many other travel-related sources. Plaintiff abjectly fails to provide this Court with any generalized method for analyzing these varied lines of consent acquired from the putative telephone number class because he cannot. Rather, Plaintiff spends an inordinate amount of time explaining why he believes that some online leads RMG purchased from a ***single*** vendor out of many—Caldwell List—should be rejected as uniformly fraudulent.[44] [DE 492 at 8-15.]  This is nothing more than a "single bad apple" effort by Plaintiff to taint all the leads and sources of the telephone numbers contained in RMG's database.

In doing so, Plaintiff ignores the fact that individuals provided consent to be contacted in a variety of different ways and contexts, such that this issue cannot be addressed by oversimplified rhetoric that "all leads are bad."[45] Rather, RMG validly secured consent from consumers who, for

---

[44] The only leads identified by Plaintiff in support of this purported "common issue" were the Caldwell leads, which Plaintiff attempts to characterize as generally fraudulent based on *one* e-mail between Caldwell and TDC Marketing's owner, Tom Mongiovi, who testified that he and Peter Lachnicht were "kidding around" in that email. [DE 492 at 13-14; Ex. 9 at 180-81.] But even if they were not and had swapped information to make the leads look new, this does not make the original lead any less valid. RMG's Jason Rader, who was responsible for the leads, testified that RMG was never concerned with the authenticity of the data *originally* received from Caldwell; rather its concern was that Caldwell started *duplicating* leads so it could sell this information to RMG *again*.  [Ex. 5 at 288-94.] Rader, Mongiovi, and Anthony Pascale all testified that if such conduct occurred, it would not impact the authenticity or validity of the original lead. [Ex. 5 at 293-94; Ex. 9 at 202-03; Ex. 37 at 129-131.]

[45] RMG acquired leads from more than a half dozen different vendors over the course of several years. [*See* Section I(B).] The contact information in these leads were generated from hundreds of different websites, which each have their own terms and conditions and privacy policies that have been modified and altered

42

example, provided a telephone number to receive free gifts or travel-related communications. Given the number of websites through which consumer consent was sourced (including the travel website linked to Plaintiff—www.123freetravel.com),[46] the only way to analyze the context and purpose for which each of the over 375,000 telephone numbers on the List were provided would be to analyze each website's terms, conditions and privacy policies.

### 1. The Wide Variety of RMG's Sources of Consent Require Individual Inquires

As summarized above, RMG obtained consumer consent through a "variety of factually different scenarios, such that consent must be dealt with on an individualized basis." *Connelly*, 294 F.R.D. at 577. The undisputed evidence shows that RMG received telephone numbers from individuals who:

(i) submitted information in response to RMG's e-mail solicitations;
(ii) signed up for travel information through one of RMG's websites;
(iii) submitted information in connection with a contests run by RMG;
(iv) submitted information online through one of a variety of internet websites;
(v) completed physical paper forms while attending trade shows, travel conventions or the theatre;
(vi) contacted RMG by telephone to inquire about travel;
(vii) were referred to RMG by an existing vacation club member, or
(viii) were already members of RMG's travel and vacation club.

[Ex. 4 at 36; Ex. 5 at 35-36, 312-19; Ex. 7, ¶ 11-13.] The various methods by which RMG obtained consent differ substantially from one another, and, as a result, each consumer's experience varies

---

[46] over the years. The only way to assess the validity of each consumers consent would be to inspect the hundreds or thousands of privacy policies associated with each website to determine the "context and purpose" for which each consumer provided his or her telephone number.

[46] As set forth in Section I(C), the Cruise Lines located a company that acquired leads directly from Generation-X, and that company, SMAC, produced another lead from www.123freetravel.com, which also included Plaintiff's contact information. This second lead containing the same contact information concerning Plaintiff, was sourced through the same travel-related website, was in the possession of an independent third-party, and corroborates the Cruise Lines' belief that Plaintiff submitted his information and consent through www.123freetravel.com before RMG called him.

drastically. The aggregation of data from these many interactions cannot be summarily described as "a list of homogeneously unconsenting recipients." *See Vigus*, 274 F.R.D. at 237. Rather, RMG gathered these leads "over time and from a variety of sources." *Gene and Gene*, 541 F.3d at 328. Accordingly, a trial on the merits will degenerate into a series of mini-trials regarding the various circumstances under which each of more than 375,000 class members consented to be contacted.

Daley's analysis of RMG's lead database also confirmed that more than 57% of the telephone numbers on Plaintiff's List are found on more than one lead source, and almost 15% of the telephone numbers were received from *more than four independent sources*. [Ex. 1 at 38-39.] However, due to the manner in which this data was generated, stored and aggregated over the years, Daley could not run an analysis to determine the precise source from which each class member's leads had actually originated without conducting a manual review of the hundreds of thousands of lead files. *Id.* Consequently, Daley concluded:

> I conclude that the majority of the telephone numbers in the proposed Preliminary Class List have *multiple* possible sources, with no direct link between those sources and the moment when the telephone number was actually dialed. Because of these numerous sources for the majority of the telephone numbers, the question of whether the original lead generation accurately and properly captured that consumer's consent becomes a question to be addressed individually to each separate possible source of each telephone number set forth on Hansen's Preliminary Class List.

[Exhibit 1 at 37.] Therefore, the individual issues of consent are extrapolated exponentially such that the case cannot be certified as a class action.

### 2. The Variety of the Cruise Lines' Sources Of Consent Require Individual Inquiries

The Cruise Lines also independently secured prior consent from many members of the proposed class. Each of the Cruise Lines searched their internal databases and found thousands of phone numbers from the proposed List associated with people who previously provided their number to the Cruise Lines and consented to be contacted by them. In addition, many consumers

44

book vacations through travel agents and online travel websites like Expedia, Orbitz, Priceline and Travelocity. These agencies frequently have their own terms, conditions and privacy policies that govern reservations they make for their customers, and which obtain express consent to be contacted by travel vendors featured on their website. [*See, e.g.* **Exhibit 52**.] In the New Partners survey, 496 putative class members (more than 13% of those questioned) said they purchased travel online using websites like Travelocity, Expedia or Priceline before they received the calls at issue in this case. [Ex. 49, ¶ 24(a).] This was corroborated by Daley, who identified over 5,000 telephone numbers on the proposed List from which one source of the lead is identified as Orbitz, Travelocity, Priceline or Expedia. [Ex. 2, ¶ 74.] The only way to conduct an analysis to determine whether each of these individuals is subject to a valid consent defense, or whether additional class members are subject to the same defense, is on an individual basis.

Plaintiff relies on cases that are easily distinguishable from the present matter because they each involve defendants who obtained telephone numbers under ***uniform*** circumstances.[47] In this case, however, RMG obtained the putative class members' telephone numbers "'from a variety of sources over a period of time.'" *Connelly*, 294 F.R.D. at 578 (*quoting Gene & Gene*, 541 F. 3d at 329). Thus, specific inquiry into each class member's experiences, and careful review of the terms, conditions and privacy policies on each website, must be conducted on an individual basis, which makes the issue of consent a highly individual inquiry not susceptible to classwide proof.

---

[47] The four cases Plaintiff cites in his Motion fall in this category. [*See* DE 492 at 31-32.] In one case, a telemarketing vendor admittedly pulled all its leads from public sources, like phone books. *Booth v. Apstack*, 2015 U.S. Dist. LEXIS 40779, *31 (W.D. Wash., March 29, 2015). In another case, the evidence showed that a gym obtained consent from all class members through the same gym application form. *Patten v. Vertical Fitness Group, LLC*, 2013 U.S. Dist. LEXIS 189845, *17 (S.D. Cal. Nov. 8, 2013). In the third case, neither party presented evidence to suggest consent was individualized. *Stern v*, 2014 U.S. Dist. LEXIS 17949 at *7. And in the fourth case, the Court ruled that the issue of consent was common without discussing how consent was procured. *Abdeljalil v. GE Capital Corp.*, 30 F.R.D. 303, 311 (S.D. Cal. 2015).

### iii. **Plaintiff's Ratification Theory Creates Individual Issues**

Plaintiff proposes no common method of proof to support a classwide determination that any of the three Cruise Lines ratified the 668,000 phone calls placed by RMG. Rather, Plaintiff merely states that "courts frequently certify TCPA class actions involving vicarious liability allegations and adjudicate these cases in a single proceeding." [DE 492 at 20.] From there, Plaintiff summarily asserts that "common evidence regarding vicarious liability supports certification." [DE 492 at 30-31.] However, Plaintiff provides no support for this conclusion. Thus, his Motion fails to identify any generalized method of proving the fundamental elements of his ratification claim. In fact, the overwhelming record evidence demonstrates that no generalized method presently exists, or will ever exist.[48]

Well-established precedent on ratification precludes this case from being certified as a class action based on this theory of vicarious liability. First, it is blackletter law that in order for Plaintiff to properly invoke a ratification theory of liability against each of the Cruise Lines, he must first establish that a principle-agent relationship exists between each Cruise Line and RMG. *See Johnson v. Hondo, Inc.*, 125 F.3d 408, 420 (7th Cir. 1997)("ratification has no applicability" where the agent does not purport to act on behalf of the principal). If Plaintiff can establish an actual

---

[48] To avoid these individual issues, Plaintiff suggests that the "parties all agreed to defer discovery relating to vicarious liability until after the ruling on class certification." [DE 492 at 30, fn. 53.] This is untrue. While the Cruise Lines suggested deferring vicarious liability discovery until after class certification, Plaintiff refused unless they agreed to stipulate that vicarious liability was a common issue for class certification, to which they could not agree. Plaintiff then embarked upon a year of costly electronic discovery. While the parties are not foreclosed from conducting further discovery on vicarious liability, Judge Rowland made clear that any discovery pertaining to vicarious liability that may impact class certification must be conducted **before** Plaintiff filed his Motion. [*See* DE 206; **Exhibit 53** at 19-20 ("I don't want . . . any of you to be in the midst of class certification briefing and saying to Judge Wood this vicarious liability discovery is really significant right now and then she's got to put the brakes on briefing and you have to do 90 days of discovery, that's what you're here to do")]. The fact Plaintiff claims vicarious liability issues will be dealt with "later," and the absence of any proposed method of classwide proof on this issue after he sought extensive and expensive ESI discovery, speaks volumes.

principle/agent relationship (which he cannot),[49] then ratification is "the affirmance of a prior unauthorized act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1)(2006). This black letter law is measured by the perception of the third party—that is, the proposed class members.[50]

But Plaintiff does not allege that the Cruise Lines expressly ratified the acts of RMG. Thus, to the extent he seeks to establish his ratification claims against the Cruise Lines based on their alleged failure to repudiate RMG's unauthorized conduct, he must show that each Cruise Line, as RMG's principal, (1) had "full knowledge" of all material facts; (2) acted in a manner inconsistent with a repudiation of the agent's conduct, and (3) retained a benefit from the unauthorized transaction. Restatement (Third) of Agency §§ 4.01(1); 4.01 cmt. b; 4.01 cmt. d; 4.01(2).[51] Further, "one who claims ratification must show not only that the principal failed to object, but that he was actually misled by that silence into doing that which he would not have done except for the silence." *Evanston Bank v. Conticommodity Servs.*, 623 F. Supp. 1014, 1037 (N.D. Ill. 1985) (citing *In re Pubs Champaign,* 618 F.2d 432 (7th Cir. 1980)).

This case is governed by Seventh Circuit precedent, which holds that it is inappropriate to certify a class where there is no common proof of an alleged ratification. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 674, 677-78 (7th Cir. 2001)(reversing certification based on no

---

[49] The Cruise Lines will be filing a Motion for Summary judgment with respect to Plaintiff's claim that an actual agency relationship existed pursuant to which RMG was expressly authorized to place any prerecorded telemarketing calls on behalf of the Cruise Lines.

[50] *See e.g., Neece v. John Hancock Mut. Life Ins. Co.*, 1990 U.S. App. LEXIS 16644, *15 (7th Cir. Sept. 20, 1990) (implied ratification only available to an innocent third party who relied on the transaction to his detriment); *Evanston Bank.*, 623 F. Supp. at 1034-35 ("whether ratification has occurred is a complex, fact-intensive inquiry" which requires proof that a third party relied on the conduct of the agent to his detriment).

[51] *See also Neece*, 1990 U.S. App. LEXIS at *17; *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 779 (N.D. Ill. 2014); *Toney v. Quality Res., Inc.,* 75 F. Supp. 3d 727, 745-46 (N.D. Ill. 2014).

common proof of ratification).[52] In that regard, Plaintiff has failed to identify any alleged classwide proof that any of the Cruise Lines had "full knowledge of all material facts" concerning RMG's telemarketing endeavors. *See Siding & Insulation Co. v. Alco Vending, Inc.,* 2014 U.S. Dist. LEXIS 183593, \*29 (N.D. Ohio Feb. 6, 2014) (rejecting ratification claim because defendant did not have knowledge of all material facts surrounding the campaign at the time of alleged ratification). Rather, the record in this case about what the Cruise Lines knew and when they knew it relative to RMG's conduct is nonexistent.[53] RMG conveyed to the Cruise Lines what it wanted them to hear, and hid facts from them. [Ex. 5 at 229; Ex. 7 ¶¶ 29, 33, 36-56; **Exhibit 54**; **Exhibit 55**.] For example, RMG never told the Cruise Lines that (1) it had purchased an autodialer, (2) it had bought leads from third-parties, (3) it used prerecorded messages that reference the Cruise Lines' trade names or (4) it received a citation from the FCC or any other governmental agency. [Ex. 5 at 243, 265, 361-62.] This case cannot be properly certified as a class action because each member of the proposed class will be subject to very different facts and circumstances depending on when RMG called them and what material information it withheld from the Cruise Lines at that particular point in time. This fact alone makes ratification an individual issue.

Further, there is no classwide proof to establish the Cruise Lines assented to any of RMG's

---

[52] *See also Sacred Heart Health Systems, Inc. v. Humana Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010) (same).

[53] Plaintiff references a series of consumer complaints his attorneys received from the Federal Trade Commission ("FTC") in response to FOIA requests they issued, which he says is evidence of the "massive scope" of RMG's telemarketing campaign. [DE 492 at 15-16 and fn. 44.] Plaintiff does not state that the Cruise Lines had any knowledge, let alone "full knowledge" of these complaints. They did not. Moreover, Plaintiff and Hansen greatly inflate the number of complaints that actually pertain to calls that reference one or more of the Cruise Lines. For example, Hansen claims that 270 consumers complained to the FTC about NCL, when in fact there were only *27* complaints pertaining to calls that mention NCL prior to the filing of the complaint and only *9* after it was filed. Such misleading "evidence" is intended to do nothing other than mislead the Court to believe the Cruise Lines knew about the purportedly "massive scope" of RMG's robocalls before and after the lawsuit was filed and took no action to stop these calls, when no such evidence exists.

668,000 alleged TCPA violations. Rather, proof of assent by the Cruise Lines inherently triggers individual inquiries relating to their interactions with RMG. For example, on the rare occasion where a consumer contacted CCL about issues with RMG, which were unrelated to prerecorded calls, CCL addressed the issue with RMG, which frequently resulted in RMG *refunding* the consumer's deposit. [**Exhibit 56**.][54] Certainly such conduct is more akin to repudiation than ratification, and no vicarious liability will attach to the Cruise Lines in connection with calls where they affirmatively repudiate RMG's conduct in a way that results in a consumer being reimbursed his or her deposit. While no guest ever complained directly to RCL or NCL about any prerecorded calls, RCL and NCL likewise handled any other complaints about RMG in a similar manner.

There is also no classwide proof to establish that any owners of the 388,966 telephone numbers were actually misled by the Cruise Lines such that it caused them to do that which they would not otherwise have done but for the Cruise Lines' acts or omissions. *Neece*, 1990 U.S. App. LEXIS at *20 ("ratification is available only to an innocent third party who has relied upon the transaction to his detriment"). A determination of whether each class member believed that RMG was in fact contacting them on behalf of the Cruise Lines is certainly an individual issue, and the record evidence elicited to date shows that not all consumers contacted by RMG were misled in such a manner. [*See* **Exhibit 57** at 2.][55]

---

[54] For example, one consumer who complained to CCL (not about robocalls, but about RMG's description of its offer to the guest) in Exhibit 56 references his "*Carnival credit card*," he received only after completing an application that would have included language providing his express consent for Carnival to contact him. As it happens, this individual is a longtime Carnival customer and had traveled with Carnival multiple times before receiving this call from RMG, which makes him subject to a number of affirmative defenses. These same affirmative defenses would also be available to both RCL and NCL, depending upon the individual.

[55] In correspondence to CCL, a guest complained that RMG was not being clear in its offer (the complaint did not concern robocalling), and confirmed: "I really don't know what is going on here. I do know that *none of this is at any fault of Carnival* but I wanted someone to be aware of the deception that was going on using the Carnival name. Like I said, *I am aware Carnival is not at fault nor has any obligations to honor or even respond to this matter*."

49

Finally, there is no classwide proof to establish that any Cruise Line retained a benefit from each of the 668,000 robocalls placed by RMG. Rather, as discussed above, RMG offered a variety of travel incentives, *other than* cruises, to consumers during its campaigns. [*See* Section I(B)(ii).] The Cruise Lines could never retain any benefit from calls that did not offer cruise vacations, and there is no generalized method of proving which calls offered such an incentive and which did not. Moreover, as reflected in Section I(B)(ii), *none* of the telephone calls at issue in this case concluded with a sale to the Cruise Lines, a referral to the Cruise Lines or even a communication with the Cruise Lines. On the contrary, most solicitations concluded with a consumer rejecting RMG's offer and disconnecting the call.[56] Even calls where RMG successfully completed a transaction resulted in the consumer receiving a package in the mail that required him or her to return a travel voucher within 18 months in order to redeem the travel incentive. [Ex. 5 at 335; Ex. 6 at 144-45; Ex. 8 at 54.] There is a "large amount of breakage" associated with RMG's solicitations, which means most consumers never redeem their travel offer. [Ex. 8 at 65.] RMG also frequently allowed consumers to change the vacation they redeemed from cruise to land and vice versa. [Ex. 5 at 335-37; Ex. 8 at 61-62.] Thus, assuming it was possible to identify and isolate phone calls where RMG offered consumers a cruise incentive, it is still impossible to determine which calls resulted in RMG booking a vacation on one of the Cruise Lines. Absent such evidence, there is no classwide proof of any benefit that could be retained by the Cruise Lines.

It should be noted that Plaintiff's counsel have a similar class action pending in this District before the Honorable Judge St. Eve, captioned *Smith v. State Farm Mutual Automobile Insurance*

---

[56] Should Plaintiff attempt to argue in his Reply that the Cruise Lines ratified RMG's conduct by generally accepting money for cruises booked by RMG over time, this contention is without merit because (1) it does not take into account that RMG booked vacations for its existing members all the time, and therefore not every booking was the result of a prerecorded call and (2) this does not change the fact that the Cruise Lines must receive an actual benefit for each call within the putative class, and if no benefit was derived from a particular call, then that call cannot form the substantive basis for a ratification claim.

*Company*, 1:13-cv-02018. In *Smith*, plaintiffs alleged that State Farm should be vicariously liable for robocalls made by a third-party vendor, which were directly transferred to State Farm insurance agents. [**Exhibit 58**, ¶¶ 31-37.] The vendor (Variable) called telephone numbers found in the White Pages, screened consumers by asking a "series of personal and demographic questions essential to developing an insurance quote," and then "matched the caller with an insurance agent who had contracted with Variable to purchase leads matching the demographics gathered." [**Exhibit 59** at 8.] Variable worked with "various insurance agents," including State Farm, Nationwide and Farmers' Insurance. [**Exhibit 60** at 1.] However, it would only transfer a lead to one agency at a time. [Ex. 59 at 8.] Thus, when Variable initially placed a robocall, *it was unclear which agency would benefit from that call*, since Variable could ultimately transfer the call to any one of the agencies, or to none at all (if the consumer disconnected the call or failed Variable's screening process). When Variable did transfer a call to State Farm, the agent gathered additional information from the consumer, entered it directly into State Farm's computer system, and issued a quote directly to the consumer for auto and homeowner's insurance. [Ex. 58, ¶¶ 32-37.]

On August 11, 2014, Judge St. Eve dismissed the plaintiff's ratification claims against Nationwide and Farmers because those defendants did not obtain any benefit from the calls that allegedly violated the TCPA. [*See* **Exhibit 61**, Aug. 11, 2014 Min. Entry, at 20-21.]  In pursuing their claim against State Farm, the *Smith* plaintiffs thereafter sought to certify a class of individuals "who received automated telephone calls on their cellular telephones, *and whose lead information was transferred to agents of State Farm*." [Ex. 59 at 17 (emphasis added).] Counsel in *Smith* made sure to point out that consumers "whose lead was *not provided to State Farm* are *excluded* from the Class and Subclass."  [Ex. 59 at 3 (emphasis added).] In fact, counsel went one step further and excluded from the class a "large number of leads [that] may have been distributed to multiple

51

agents" rather than just to a State Farm agent. [Ex. 59 at 8, fn. 4.] The reason for this is obvious—State Farm cannot benefit from any robocall that Variable transferred to a competing insurance company, nor would it benefit from any call that did not result in its receipt of a consumer lead.

The *Smith* plaintiffs' recognition that State Farm could not retain any benefit associated with calls that were not transferred to its agents speaks volumes. It calls into question why counsel believes Plaintiff should be permitted in the present case to proceed with a ratification theory on a classwide basis when he has made no attempt to exclude from his class those calls where the Cruise Lines neither received nor retained any benefit whatsoever.

A brief comparison of the allegations in Plaintiff's most recent complaint filed in this case and his pending Motion confirm that he now recognizes his allegations cannot stand. For example, in his Third Amended Complaint, Plaintiff alleged facts strikingly similar to *State Farm* (but for which he did not have any factual basis or good faith to allege):

> After a consumer indicated that they were interested in booking a cruise, and paid the fictitious "taxes" and "port fees," the consumer was then ***referred to the sales department at Carnival, Royal Caribbean, or Norwegian***.

[DE 463, ¶¶ 59-60 (emphasis added).] In his pending Motion, Plaintiff recognized that his allegations had no factual basis, so he altered his argument to assert as follows:

> After a consumer indicated that they were interested in booking a cruise, the consumer was then ***transferred to RMG's sales department*** which closed the transaction, including sending out the reservation form allowing the customer to book a cruise with Carnival, Royal Caribbean, or Norwegian.

[DE 492 at 8 (emphasis added).]  This change recognizes that RMG never booked any trips during its robocalls, and it never put its customers in direct contact with the Cruise Lines. Only on the rare occasion where a consumer joined RMG's club and returned the travel certificate contained

in its welcome package would RMG then book travel for that consumer.[57] To determine which customers actually completed the entire process, and to then pinpoint the type of vacation the consumer selected, would require an individual assessment as to each transaction between RMG and over 375,000 proposed class members (to the extent they can be identified). Plaintiff's failure to offer a generalized method of proof as to these issues precludes certification of any class action.

### iv.   <u>Plaintiff's Apparent Authority Theory Creates Individual Issues</u>

Plaintiff also fails to identify any evidence to prove the existence of a claim of "apparent authority" on a classwide basis arising from the 668,000 robocalls allegedly placed by RMG. [*See* DE 492 at 30-31.] That is because the record in this case makes clear that such evidence does not exist—rather, call recipients directly questioned the authority of RMG, as highlighted below. But in addition, Plaintiff's claim of apparent authority reaffirms that the present case cannot be properly certified as a class action because the very elements of such a claim present additional individual issues. "Apparent authority holds a principal accountable for the results of third party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Restatement (Third) of Agency § 2.03 cmt. c (2006).[58] In fact, the Seventh Circuit reaffirmed that two of the three elements of a claim of apparent authority require Plaintiff to establish individual issues with respect to each call recipient's beliefs and reliance:

> (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority.

---

[57] RMG would then pay the cost of the cruise (or other vacation) on its customer's behalf and internally treat this payment as a marketing expense. [Ex. 8 at 55.]

[58] *See also Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 U.S. Dist. LEXIS 118470, *8 (N.D. Ill. Aug. 21, 2013) (quoting *N. Assur. Co. of Am. v. Summers*, 17 F3d. 956, 962 (7th Cir. 1994))("Apparent authority is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal").

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 673 (7th Cir. 2004). In a word, this claim mandates proof of individual issues relative to whether each Cruise Line had any direct communications or actions with each of the call recipients. *Harken Fin. Servs. v. Broadridge Fin. Solutions, Inc.*, 2009 U.S. Dist. LEXIS 100641, * 14 (N.D. Ill. Oct. 29, 2009) (internal citations omitted) (the "existence of a principal/agent relationship and the creation of apparent authority depend crucially on the words or actions of the principal to state a claim sufficient as a matter of law"). The statements and actions of RMG alone are insufficient. *Id.* ("Statements or manifestations made by the agent are not sufficient to create an apparent agency relationship").

Under the law governing apparent authority, this case cannot be certified due to the presence of individual issues as to the belief of each proposed class member. The Honorable Frank Easterbrook reached this exact conclusion under similar facts. *See e.g., Nagel v. ADM Investor Servs. Inc.*, 65 F. Supp. 2d 740, 746 (N.D. Ill. 1999)(denying class certification where claims turned on "person-specific" interactions between putative class members and defendants: "[w]ho said what to whom and when, and who relied on which statements, are not things that can be resolved with respect to . . . a class") (Easterbrook, J.). Denial of certification on the same basis is required in this case because Plaintiff absolutely failed to identify *any* generalized method of proving the elements of apparent authority on a classwide basis. In fact, the record reaffirms that in most instances (including those involving Plaintiff himself), there was no direct communication between the Cruise Lines and any of the proposed class members, and the only interaction they had was with RMG *as their agent*. [*See* Section I(B).] Their communications with RMG also differed from call-to-call because there was no single recording played to every call recipient, and RMG representatives regularly deviated from any prepared script. [*See* Section I(D).] The evidence of record shows that this case lacks a sufficient method of proof for apparent authority,

and factual disparities and individual issues predominate. *Nagel*, 65 F. Supp. 2d at 746.

> **v.    Whether the Cruise Lines Have an Established Business
> Relationship with Putative Class Members is an Individual Issue**

Under the TCPA that was in effect at the time Plaintiff received his calls, the prohibition against prerecorded calls did not apply to calls made to any person with whom the caller had an established business relationship at the time the call is made. 47 C.F.R. § 64.1200(a)(2)(iv). *Fitzhenry*, 2014 U.S. Dist. LEXIS at 166243 (denying certification proposed by Plaintiff's counsel in this case in part because individual issues concerning established business relationship exist). The Cruise Lines searched their internal databases to determine whether any telephone numbers contained on Hansen's proposed List existed in their systems, and in February of 2016, they produced lists containing thousands of corresponding telephone numbers for past guests.[59]

These individual issues are confirmed by the Survey conducted by New Partners. As part of its process, New Partners' first removed from the survey population all telephone numbers that the Cruise Lines identified in their databases as being associated with guests who traveled with one or more of the Cruise Lines prior to January 1, 2015, which should have removed any of the Cruise Lines prior guests from the survey population. [Ex. 49, ¶ 10.] The survey results, however, uncovered an additional 425 putative class members who had taken a cruise before receiving the prerecorded calls at issue in this case. [Ex. 49, ¶ 24(d).][60] This equates to more than 11% of putative

---

[59] See, *e.g.* CCL28872, RCL206323 and NCL76203, portions of which are attached hereto as **Exhibit 62**.

[60] Judge Rowland ordered the Cruise Lines to compare over 600,000 telephone numbers on Plaintiff's proposed List to the Cruise Lines' databases within a thirty (30) day period of time. Such analyses had never been undertaken before. Thus, the completeness of this type of search is entirely unclear because it failed to take into account, for example, written in-person customer consent that was obtained at trade shows, among other methods of acquiring consent. Further, since consumers often change their residential and/or cellular telephone numbers, it is impossible to assess with any degree of certainty whether an established business relationship existed between a consumer and the Cruise Lines without manually verifying the accuracy of the information. It is therefore no surprise that additional customers of the Cruise Lines were found in the proposed List despite the Cruise Lines' attempt to identify all of them.

class members who answered this question.[61] Thus, the Cruise Lines may have a valid established business relationship defense as to a significant percentage of the putative class, which can only be identified on an individual basis.

### G. GIVEN MANY UNIQUE AND COMPLICATED ISSUES THAT ARISE OUT OF PLAINTIFF'S ATTEMPT TO CERTIFY A CLASS OF OUTDATED TELEPHONE NUMBERS, THE CLASS MECHANISM IS NOT A SUPERIOR METHOD OF RESOLUTION FOR THIS CASE

Plaintiff seeks to establish the "superiority" requirement of Rule 23(b)(3) through conclusory assertions that the class mechanism is a "superior" way to adjudicate this unique controversy because (1) a class is generally certified as to "standardized conduct," (2) the consumers who received calls from RMG are unlikely to file individual claims, and (3) TCPA lawsuits like this one are routinely certified as class actions. [DE 492 at 37.] These assertions fail to demonstrate that a class action is superior to other available methods for the fair and efficient adjudication of *this* controversy, as required by Rule 23(b)(3).

Plaintiff's first argument is that class certification is appropriate under the unique facts of this case because the conduct at issue is "standardized." [DE 492 at 37]. Very little about this case is "standard." As best demonstrated above, given the unique facts of this case, numerous individual inquiries are necessary to determine whether any member of the proposed class can be identified as an actual person, whether each telephone number actually received a call from RMG that referenced the Cruise Lines rather than one of many other travel incentives, and if so, whether the telephone number was associated with a person who had provided consent to receive the call or had a prior business relationship with any of the Defendants.

---

[61] In its survey, New Partners asked this question to the 3,787 survey respondents who indicated that they had been called on their residential telephone line, and that this was their residential telephone line in 2011-2012. [Ex. 49, ¶ 22-23.]

Even if Plaintiff had provided a basis for concluding that these issues were all "standardized," and he has not, he fails to demonstrate how he can establish the elements of vicarious liability for each alleged class member under any agency theory. Most TCPA vicarious liability cases arise when one company makes robocalls to residential or cell phones pursuant to an oral or written contract, or at least with the knowledge and assent of a company seeking to have the robocalls made. *See e.g. Bridgeview Health Care Ctr. Ltd. v. Clark,* 2011 WL 4585028, *6 (N.D. Ill. Sept. 30, 2011)("[i]t is undisputed that Defendant *hired* B2B to send unsolicited facsimile advertisements on Defendants behalf"). Unlike most cases, however, Plaintiff seeks to certify a class of prerecorded calls made by RMG, a fully independent travel agency, to promote its own business interests by marketing various travel products and services as promotional inducements to join its club, which is how *RMG* made money. None of the Cruise Lines contracted with or authorized RMG to telemarket, let alone to make prerecorded telemarketing calls, on their behalf. [Ex. 7 ¶¶ 29, 33, 37, 39-42, 46, 49-52, 56]. In fact, the Cruise Lines produced various contracts and written policies that explicitly prohibit Plaintiff from using prerecorded messages that promote their respective products. The individual inquiries arising out of this unique set of facts do not lead to efficiencies or economies of time, effort and expense. *Mullins*, 795 F.3d at 667.

Plaintiff's second argument is that individual TCPA claims are unlikely to be filed. This argument, however, is a legal conclusion frequently used by plaintiffs to justify their request to certify TCPA claims as class actions. Plaintiff presents no evidence that individual consumers have been deterred from pursuing their own claims arising out of calls made by RMG. Plaintiff is, of course, well aware that two consumers other than him had complained to RMG about its alleged calls and subsequently settled their claims with RMG on an individual basis. Plaintiff is himself also evidence of the fact that consumers have a reasonable monetary incentive to pursue their

claims on an individual basis, as Plaintiff has filed over 100 individual TCPA claims (and likely settled many more through pre-suit demand letters).

Plaintiff's third and final argument is that TCPA lawsuits are routinely certified. As explained in Section III(F), however, this broad assertion fails to recognize that "TCPA cases are neither uniformly suitable or unsuitable for class action treatment" and the appropriateness of certification "depends on the unique issues and evidence presented in the case." *Stern*, 2014 U.S. Dist. LEXIS at *19. Indeed, TCPA class certifications are routinely *__denied__* under facts similar to those presented in this case, and Plaintiff should not be permitted to claim with a broad brush that TCPA cases are "all alike."

### i. Plaintiff Has Failed to Propose a Trial Plan

To satisfy the manageability requirement of Rule 23(b)(3), Plaintiff "bears the burden of demonstrating a suitable and realistic plan for trial of the class claims." *See Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir. 2001).[62] As discussed above, Plaintiff failed to propose *any* trial plan or a generalized method of proof for "common issues",[63] and that alone requires denial of class certification. This is particularly true with respect to Plaintiff's failure to provide any explanation as to how he intends to identify his proposed class. His proposed class is merely a list of phone numbers, which in many cases do not belong to the person who owned that

---

[62] *See also Valentino v. Carter Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996) (reversing certification where "[t]here has been no showing by Plaintiffs of how the class trial could be conducted"); *In re Telectronics Pacing Sys.*, 168 F.R.D. 203, 221 (S.D. Ohio 1996); *In re Paxil Litig.,* 212 FRD 539, 548 (C.D. Cal. 2003); accord *Wachtel v. Guardian Life Ins. Co.,* 453 F.3d 179, 186 (3d Cir. 2006)(courts should require the "full and clear articulation of the litigation's contours at the time of class certification").

[63] This is particularly true with respect to Plaintiff's failure to explain how he intends to identify the proposed class. As emphasized above, the List is merely a list of phone numbers, which often do not belong to the person who owned that number over a half of a decade ago. [DE 492-1 at 12.] As the Seventh Circuit made clear in *Mullins*, Plaintiff must provide a trial plan that demonstrates by a preponderance of the evidence that the owners of the telephone numbers can be identified in a way that makes this case manageable, administratively feasible and superior as a class action. This he has failed to do.

number over a half a decade ago. Plaintiff must provide a trial plan[64] that demonstrates by a preponderance of the evidence that the owners of the phone numbers contained on the List can ever be identified in a way that makes this case manageable, administratively        feasible and superior.

### ii.  A Class Action is Not Superior When Consumers Receive *De Minimis* Recovery

The TCPA was originally intended to make it easier for consumers to recover damages from automated telemarketing calls by going into small claims courts in their home states so that they could file *individual* lawsuits *without an attorney*. [*See* Becca J. Wahlquist, *The Juggernaut of TCPA Litigation: The Problems with Uncapped Statutory Damages, U.S. Chamber Institute for Legal Reform*, Oct. 2013, attached as **Exhibit 63**, at 8.] The TCPA's sponsor, Ernest Hollings, confirmed this intent on the Senate floor.[65] "Especially in certain 'hotbeds' of TCPA litigation (such as . . . . [the] Northern District of Illinois) plaintiffs' firms race each other to bring TCPA class action lawsuits against not only the entity making calls, but any 'deep pocket' company they can argue could be vicariously liable." [*Id.* at 6.] This race to the courthouse to sue deep pockets has resulted in a windfall for serial TCPA plaintiffs and the TCPA plaintiffs' bar. For example, "in 2014, the average consumer received $4.12 from a TCPA class-action settlement. Plaintiffs' lawyers received an average of $2.4 million." Adonis Hoffman, *Sorry, Wrong Number, Now Pay Up*, WALL S. J., June 15, 2015.[66] In a recent class action lawsuit settled by Plaintiff and his counsel

---

[64] Any plan he may now propose would be untimely and likely rely on a reverse lookup procedure, which itself is wholly insufficient. *See Sherman v. Yahoo! Inc.*, 2015 WL 5604400, at *6-7 (S.D. Cal. Sept. 23, 2015)(mere proposals to subpoena carriers and use reverse lookups were ruled inadequate to carry plaintiff's burden). The List is therefore unmanageable. *Id.*

[65] "Small claims court or a similar court would allow the consumer to appear before the court without an attorney. The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer. However, it would defeat the purpose of the bill if the attorneys' costs to the consumers of bringing an action were greater than the potential damages. I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this bill." [*See* Ex. 63 at 8 (quoting 137 Cong. Rec. 20821-30822 (1991)).]

[66] Available at: http://www.wsj.com/articles/sorry-wrong-number-now-pay-up-1434409610

(the same attorneys of record in the present case), Plaintiff received $30,000, and his counsel collectively received $5,090,895.99. [*See* Order in *Desai v. ADT Security Services, Inc.,* Case No. 1:11-cv-1925 (N.D. Ill.),[67] attached as **Exhibit 64**.] Such litigation comes at a societal cost to *all consumers* who shoulder the brunt of increased prices due to excessive TCPA litigation. At the very least, a benefit of a $4 average recovery for class members should be weighed against the overall detriment to consumers from the cost of increased prices, particularly where, as here, the proposed class would be inefficient, unfair and unwarranted. Plaintiff has failed to meet his burden under Rule 23(b).

WHEREFORE, the Cruise Lines respectfully request this Court enter an order denying Plaintiff's Motion for Class Certification, and any additional relief this Court deems appropriate.

Respectfully Submitted,

| | |
|---|---|
| Catherine J. MacIvor (Florida Bar# 932711)<br>Jeffrey E. Foreman (ARDC #6193309)<br>Daniela Ferro (Florida Bar # 111479)<br>FOREMAN FRIEDMAN, PA<br>One Biscayne Tower, Suite 2300<br>2 South Biscayne Boulevard<br>Miami, FL 33131<br>*Attorneys for Royal Caribbean Cruises, Ltd. and NCL (Bahamas), Ltd.*<br>By: /s/ *Catherine J. MacIvor*<br>     Catherine J. MacIvor | Jeffrey S. Becker (ARDC #6282492)<br>Darren B. Watts (ARDC #6197441)<br>Lena Shapiro (ARDC #6321499)<br>SWANSON, MARTIN & BELL, LLP<br>330 N. Wabash Avenue, Suite 3300<br>Chicago, Illinois 60611<br>Tel: 312-321-9100<br>*Attorneys for Carnival Corporation & PLC*<br><br>By: /s/ *Jeffrey S. Becker*<br>     Jeffrey S. Becker |

---

[67] Additionally, the lawyers in this case, who also represented the Plaintiff in the *Desai* case, ended up suing ADT two additional times *after* reaching the above-referenced class action settlement. In the *Fitzhenry* case, the individual claim was dropped after a nationwide class was denied and it was resurrected in *Barrett,* where the class was limited to Ohio, only to be denied again. *Fitzhenry,* 2014 U.S. Dist. LEXIS at 166243 (class certification denied); *Barrett,* 2016 U.S. Dist. LEXIS at 28767 (class certification denied).

## <u>CERTIFICATE OF SERVICE</u>

 I, Jeffrey S. Becker, Esq., do hereby certify that on this 31st day of August, 2016, I cause a copy of the forgoing Joint Response to Plaintiff's Motion for Class Certification to be served to all counsel of record via ECF, and to Elizabeth Valente, as agreed, at the e-mail address of bvalente@tsncorporate.com.

## SERVICE LIST

*Charvat v. Travel Services, et al., Case No.* 12-cv-5746

**Attorney for Plaintiff**
Alexander H. Burke
Burke Law Offices, LLC
155 N. Michigan Avenue, Suite 9020
Chicago, IL 60601
312-729-5288
FAX: 312-729-5289
ABurke@BurkeLawLLC.com

Matthew P. McCue
Law Offices of Matthew P. McCue
1 South Ave., Third Floor
Natick, MA 01760
508-655-1415
FAX: 508-644-1415
mmccue@massattorneys.net

Edward A. Broderick
Broderick Law, P.C.
125 Summer Street, Suite 1030
Boston, MA 02110

**Travel Services and Beth Valente**
Elizabeth Valente
TSN/RMG
bvalente@tsncorporate.com
By e-mail service as agreed.