# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Philip Charvat on behalf of himself and others similarly situated, | ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:12-cv-5746 |
| v. | ) ) | Honorable Judge Andrea Wood |
| Elizabeth Valente, Resort Marketing Group, Inc., Travel Service Network, Inc., TSN Travel, Inc., TSN International, Inc., TSN Marketing LLC, Carnival Corporation & PLC, Royal Caribbean Cruises, Ltd., NCL (Bahamas) Ltd., | ) ) ) ) ) ) ) | Magistrate Judge Mary Rowland |
| *Defendants.* | ) ) | |

## CARNIVAL CORPORATION & PLC, NCL (BAHAMAS) LTD. AND ROYAL CARIBBEAN CRUISES, LTD. JOINT MOTION TO STRIKE REPORT OF PLAINTIFF'S EXPERT, JEFFREY HANSEN, AND TO EXCLUDE HIS OPINIONS AND TESTIMONY PURSUANT TO FEDERAL RULES 702, 703, 403 AND *DAUBERT*

Catherine J. MacIvor (Florida Bar # 932711)
Jeffrey E. Foreman (ARDC #6193309)
Daniela Ferro (Florida Bar #111479)
FOREMAN FRIEDMAN, PA
One Biscayne Tower, Suite 2300
2 South Biscayne Boulevard
Miami, FL 33131
*Attorneys for Royal Caribbean Cruises, Ltd. and NCL (Bahamas), Ltd.*

Jeffrey S. Becker (ARDC #6282492)
Darren B. Watts (ARDC #6197441)
Lena Shapiro (ARDC #6321499)
SWANSON, MARTIN & BELL, LLP
330 N. Wabash Avenue, Suite 3300
Chicago, Illinois 60611
*Attorneys for Carnival Corporation & PLC*

## TABLE OF CONTENTS

I.  INTRODUCTION AND HANSEN'S PROFFERED OPINIONS........................................1

II. RULE 702 AND *DAUBERT* STANDARD GOVERNING
HANSEN'S REPORT AND OPINIONS ..............................................................................2

III. HANSEN IS COMPLETELY UNQUALIFIED TO RENDER THE
PROFFERED OPINIONS AND HAS OVERSTATED AND
MISREPRESENTED HIS EXPERIENCE...........................................................................4

    A.  HANSEN'S EMPLOYMENT, BACKGROUND AND EXPERIENCE
    FAIL TO PROVIDE THE REQUISITE QUALIFICATIONS IN DATA
    ANALYSIS, *AND* HE MISREPRESENTS HIS CREDENTIALS ................................5

        i.  Hansen's Employment History is Unrelated to Data Analysis...........................6

        ii. Hansen Misrepresented His Data Analysis Qualifications and
        Experience...........................................................................................................8

    B.  HANSEN'S EMPLOYMENT IS ALSO UNRELATED TO TELEMARKETING, AND
    HE MISREPRESENTED WHAT LITTLE TELEMARKETING EXPERIENCE HE HAS ..................10

    C.  HANSEN'S CANNOT BE QUALIFIED AS AN EXPERT BASED ON HIS
    PRIOR "EXPERIENCE" WHICH HE HAS ALSO MISREPRESENTED .......................................12

IV.  HANSEN'S METHODOLOGY IN CREATING HIS PROPOSED
CLASS LIST IS FLAWED, UNTESTED AND UNRELIABLE .........................................14

    A.  HANSEN NEVER CONFIRMED HIS ASSUMPTIONS WITH THE
    DATABASE DESIGNER, AND NEVER DISCOVERED THAT HIS
    OPINION CONCERNING THE DATABASE WAS WRONG .....................................15

    B.  HANSEN NEVER CONSIDERED EVIDENCE CONCERNING
    RMG'S USE OF THE ASTERIA DIALER .............................................................17

    C.  HANSEN NEVER LISTENED TO OR CONSIDERED ANY RECORDINGS ...................19

V.  HANSEN'S "OPT-IN" DATA AND "CONSENT" METHODOLOGY
AND OPINIONS WERE NOT RESEARCHED OR TESTED, AND
ARE SPECULATIVE, UNRELIABLE ..............................................................................21

VI. HANSEN'S REPORT AND OPINION SHOULD ALSO BE
STRICKEN BECAUSE THEY ARE REPLETE WITH HIS
UNQUALIFIED LEGAL OPINIONS ABOUT THE TCPA...............................................24

## TABLE OF EXHIBITS[1]

Exhibit 1 ................................................................................. Jeffrey Hansen Curriculum Vitae

Exhibit 2 ........................................................... Supplemental Report of Jeffrey Hansen

Exhibit 3* .................................................................................. Deposition of Jeffrey Hansen

Exhibit 4 ............................................ Declaration and Supplemental Report of Margaret A. Daley

Exhibit 5 ................................................................................. Exemplar Job Postings

Exhibit 6** ................................... Deposition of Jeffrey Hansen in *Lee v. Global\*Tel Link Corp.*

Exhibit 7**........................................... Report of Jeffrey Hansen in Lee v. Global\*Tel Link Corp.

Exhibit 8 ........................................................................... Report of Margaret A. Daley

Exhibit 9*.................................................................................. Deposition of Benny Aguilera

Exhibit 10* ...................................................................... Deposition of Jason Rader

Exhibit 11* ........................................................................ Deposition of Elizabeth Valente

Exhibit 12* ....................................................................... Deposition of Jamie Smith

Exhibit 13.................................................................. Declaration of Elizabeth Valente

Exhibit 14 ................................ E-Mail Correspondence Concerning Cruise and Land Promotions

Exhibit 15 ............................................................................ Hansen Timesheets

Exhibit 16 ................................................................. Audio Recording of "Sound 28"

Exhibit 17 ................................................................Audio Recording of "sound" 61"

---

[1] * Denotes Depositions that have been filed without their accompanying exhibits due to volume and to avoid duplication. All other exhibits are available to be produced upon request.

** Denotes a document filed under seal.

## TABLE OF AUTHORITIES

**CASES**

*Aguilar v. Int'l Longshoremen's Union Local # 10,*
  966 F.2d 443 (9th Cir. 1992) ........................................................................ 25

*Alice Lee, et al., v. Global Tel*Link Corporation,*
  Case No. 2:15-cv-02495-ODW-PLA (C.D. Calif.) ......................................6, 12, 13

*American Honda Motor Co. v. Allen,*
  600 F.3d 813 (7th Cir. 2010) .................................................................................2

*Ansick v. Hillenbrand Indus., Inc.,*
  933 F. Supp. 773 (S.D. Ind. 1996) ....................................................................5, 6

*Balschmiter v. TD Auto Fin. LLC,*
  303 F.R.D. 508 (E.D. Wis. 2014) ......................................................................3, 13

*Bammerlin v. Navistar Int'l Transp. Corp.,*
  30 F.3d 898 (7th Cir. 1994) ........................................................................... 25

*Banta Props., Inc. v. Arch Specialty Ins. Co.,*
  2011 U.S. Dist. LEXIS 152928 (S.D. Fla. 2011)...................................................14

*Bogosian v. Mercedes-Benz of N. Am., Inc.,*
  104 F.3d 472 (1st Cir. 1997)....................................................................................7

*Braun v. Lorillard Inc.,*
  84 F.3d 230 (7th Cir. 1996) ...................................................................................5

*Cage v. City of Chicago,*
  979 F. Supp. 2d 787 (N.D. Ill. 2013) ...................................................................14

*Coal. For a Level Playing Field v. Autozone, Inc.,*
  82 F. App'x 240 (2d Cir. 2003) ..............................................................................5

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426, (2013)............................................................................................3

*Contreras v. Sec'y of HHS,*
  121 Fed. Cl. 230 (Fed. Cl. 2015) ...........................................................................5

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)........................................................................... *passim*

*Elock v. Kmart Corp.,*
   233 F.3d 734 (3d Cir. 2000)..................................................................................7

*General Electric Co. v. Joiner,*
   522 U.S. 136 (1997).................................................................................14, 24

*Haley v. Kolbe & Kolbe Millwork Co.,*
   2016 U.S. Dist. LEXIS 39771 (W.D. Wis. Mar. 25, 2016)........................................3

*Hamilton v. Negi,*
   2012 WL 1067857 (E.D. La. March 15, 2012).......................................................4

*Hangarter v. Provident Life & Accident Ins. Co.,*
   373 F.3d 998 (9th Cir. 2004) ...........................................................................25

*Henderson v. United Student Aid Finds, Inc.,*
   Case No. 3:13-cv-JLS-BLM (S.D. Cal.)..............................................................13

*In re Aluminum Phosphide Antitrust Litig.,*
   893 F. Supp 1497 (D. Kan. 1995)......................................................................13

*In re Paoli R.R. Yard PCB Litig.,*
   35 F.3d 717 (3d Cir. 1994)...............................................................................14

*In re Unisys Sav. Plan. Litig.,*
   173 F.3d 145 (3d Cir. 1999)...............................................................................4

*In re Vioxx Prods.,*
   489 F. Supp. 2d 587 (E.D. La. 2007)...................................................................5

*Kumho Tire co., Ltd. v. Carmichael,*
   526 U.S. 137 (1999).........................................................................1, 4, 5, 14

*Marks v. Crunch,*
   Case No. 14-cv-00348 (S.D. Cal.)......................................................................13

*Messner v. Northshore Univ. Healthsystem,*
   669 F.3d 802 (7th Cir. 2012) ..........................................................................2, 3

*Molnar v. NCO Financial Systems, Inc.,*
   No. 13-cv-00131 (S.D. Cal.)............................................................................13

*Nationwide Transp. Fin. v. Cass Info. Sys.,*
   523 F.3d 1051 (9th Cir. 2008) ........................................................................25

*Navarro v. Fuji Heavy Indus.,*
   117 F.3d 1027 (7th Cir. 1997) ............................................................................23

*Richmond Steel Inc. v. Puerto Rican Am. Ins. Co.,*
   954 F.2d 19 (1st Cir. 1992)...................................................................................5

*Strauss v. CBE Group., Inc.,*
   2016 U.S. Dist. LEXIS 65587 (S.D. Fla. March 23, 2016) ....................................13

*Swaney v. Regions Bank,*
   Case No. 13-cv-0544 (N.D. Ala.) .........................................................................13

*Thomas J. Kline, Inc. v. Lorillard, Inc.,*
   878 F.2d 791 (4th Cir. 1989) .................................................................................7

*Tyus v. Urban Search Mgmt.,*
   102 F.3d 256 (7th Cir. 1996) .................................................................................3

*United States v. Mamah,*
   332 F.3d 475 (7th Cir. 2003) ...............................................................................24

*United States v. S. Ind. Gas & Elec. Co.,*
   55 Env't Rep. Cas. (BNA) 1597 (S.D. Ind. Oct. 24, 2002)............................... 25

*U.S. v. Ozuna,* 561 F.3d 728,
   (7th Cir. 2009)......................................................................................................4

*Victory Records, Inc. v. Virgin Records Am., Inc.,*
   08 C 3977, 2011 WL 382743 (N.D. Ill. 2011)......................................................19

*Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.,*
   521 F.3d 790 (7th Cir. 2008) ...............................................................................24

*Wilson v. City of Chicago,*
   6 F.3d 1233 (7th Cir 1993) ....................................................................................4

*Yazell v. Foremost Ins. Co.,*
   2005 WL 2899326 (Ky. Ct. App. May 10 2006).....................................................8

**STATUTES AND RULES**

47 U.S.C. § 227.............................................................................................................1, 22

Federal Rule of Evidence 702.........................................................................................2, 3, 17

**OTHER SOURCES**

Saks, "Prevalence and Impact of Ethical Problems in Forensic Science,"
    34 J. Forensic Sci. 772 (1989) ...................................................................................5

Defendants, NCL (Bahamas) Ltd. ("NCL"), Royal Caribbean Cruise, Ltd. ("RCL") and Carnival Corporation & PLC ("Carnival") (collectively "Cruise Lines"), respectfully request this Court to strike the Supplemental Written Report ("Report"), and exclude the opinions and testimony of Plaintiff's data analysis and telemarketing expert, Jeffrey Hansen ("Hansen"), pursuant to Federal Rules of Evidence 702, 703, and 403. Pursuant to the standard in this Circuit, the Cruise Lines respectfully ask this Court to rule on this motion to strike before addressing Plaintiff's class certification[2] motion ("Motion") because he is unqualified to render such opinions, which are replete with improper legal opinions, and his methodology is so manifestly unreliable as to render them excludable in their entirety under *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999).

## I.  INTRODUCTION AND HANSEN'S PROFFERED OPINIONS

Plaintiff brought this putative class action against an independent travel agency, Resort Marketing Group ("RMG"), and the Cruise Lines for telephone calls RMG purportedly made to residential and cellular telephones in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). Plaintiff claims that RMG made three automated, pre-recorded calls to his home in order to "promote" the goods and services of the Cruise Lines, which were allegedly identical to calls made to a list created by Hansen of outdated, invalid and disconnected telephone numbers that Plaintiff has requested this Court certify ("List"). [DE 492 p. 1, 7-8, 13, 15-20, 23-24, 29-30, 56; 492-1]. Plaintiff's vicarious liability claim seeks more than $300 million in damages on behalf of this List of half decade old telephone numbers, which neither Plaintiff nor Hansen have connected to any particular individual. Hansen's List and related opinions form the basis for

---

[2] This *Daubert* Motion has been filed concurrently with the Cruise Lines' Response in Opposition to Plaintiff's Motion for Class Certification, which is expressly adopted and incorporated herein.

Plaintiff's Motion, including the Rule 23 requirements of numerosity, commonality, typicality and predominance requirements. [DE 492 at 1, 7-8, 12-13, 15-19, 24-27, 29-30].

Based on *Plaintiff's lawyer's discussion* with a development engineer for Asteria, Tim Ringenbach ("Ringenbach"), one email exchange with Ringenbach, and his own "experience,"[3] Hansen created the List. [Hansen Report attached as **Exhibit 2** at 12, 21-22; Hansen Deposition attached as **Exhibit 3** at 55-60, 368-369; DE 492 at 1, 7, 17-20, 23, 25-26, 29.] Plaintiff's Motion relied on Hansen's erroneous opinion that the 668,942 calls made by RMG to the proposed list of 388,966 telephone numbers promoted each of the Cruise Lines during *every* call to *each telephone number* and were *identical* to the three calls received and recorded by the Plaintiff. *Id.* In addition, Hansen made a legal conclusion, based solely on his telemarketing "experience," that no responsible telemarketer would have relied on the opt-in lead data purchased from third-parties and, thus, Defendants' prior express consent ("Consent") defense is invalid. [Ex. 2 at 16-21.]

## II.     RULE 702 AND DAUBERT STANDARD GOVERNING HANSEN'S REPORT AND OPINIONS

Plaintiff bears the burden of establishing by a preponderance of the evidence that Hansen is "qualified" as an "expert" as to both data analysis and telemarketing. *Daubert*, 509 U.S. 592, n. 10; Fed. R. Evid. 702. He must also establish that his Report and proffered testimony are reliable under the requirements set forth in Rule 702, *Daubert* and its progeny. *Id.* The Seventh Circuit has ruled that where, as here, an expert's opinion is "critical" to the Motion, the court *must* make a conclusive ruling on any challenge to his opinions *before* ruling on class certification. *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 812-13 (7th Cir. 2012)(quoting *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010)). An expert's opinion and testimony is "critical" if it is "important to an issue decisive for the motion for class certification." *Messner,*

---

[3] Hansen's curriculum vitae is attached as **Exhibit 1**.

669 F.3d at 812 (the "*Messner* standard").[4] A ruling on expert testimony must be made "without regard to whether the district court ultimately grants or denies [the class certification] motion." *Id.* at 813. Since Plaintiff's Motion attached and adopted Hansen's Report, this Court must fulfill its essential role as a "gate keeper" and apply the *Messner* Standard at the class certification stage to "ensure that it is dealing with an expert, not just a hired gun." *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 267 (7th Cir. 1996).

Because "[t]he class action is an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," Plaintiff "must affirmatively demonstrate his compliance" with Rule 23 to come within the exception. *Comcast Corp. v. Behrend,* 133 S. Ct 1426, 1432 (2013). Plaintiff must satisfy through *evidentiary proof* each Rule 23 requirement by a preponderance of the evidence. *Id.* at 1432; *Messner,* 669 F.3d at 811. Such evidence _must_ be admissible, which means that expert opinion offered in support of class certification must comply with Rule 702. *Daubert,* 509 U.S. at 589.

Federal Rule of Evidence 702 requires that expert testimony must satisfy four requirements in order to be admissible. First, the expert must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Even if the expert is qualified, the testimony will only be admitted if: (1) it is based upon sufficient facts or data; (2) it is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the

---

[4] Consequently, courts in this Circuit have applied the *Messner* Standard to class certification motions that have been brought in other TCPA class actions. *See e.g., Balschmiter v. TD Auto Fin. LLC,* 303 F.R.D. 508, 522 (E.D. Wis. 2014) (denying class certification in a TCPA case after analyzing the expert's submission and the elements under Rule 23); *Haley v. Kolbe & Kolbe Millwork Co.,* 2016 U.S. Dist. LEXIS 39771, *21 (W.D. Wis. Mar. 25, 2016) (denying class certification and finding that expert's opinions were "unreliable and unhelpful to a trier of fact and therefore inadmissible. Without those opinions, plaintiffs cannot meet their burden of demonstrating that common questions of fact predominate or that they have a viable method of showing class-wide injury with common proof.").

case." *Id.; see also U.S. v. Ozuna*, 561 F.3d 728, 736 (7th Cir. 2009) (citing *Daubert*, 509 U.S. at 595)("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."). Even if testimony is relevant and reliable, it must nevertheless still "fit" the facts of the case and assist the trier of fact. *Daubert*, 509 U.S. 591.

The goal of these requirements is "to make certain that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom *the same level of intellectual rigor that characterizes the practice of an expert in the field*." *Kumho Tire*, 526 U.S. at 152 (emphasis added). In exercising its discretion to admit or exclude expert testimony, the court must guard against "expertise that is *fausse* and science that is junky." *Kumho Tire*, 526 U.S. at 159 (Scalia J., concurring). The Plaintiff has completely failed to meet this burden.

## III. HANSEN IS COMPLETELY UNQUALIFIED TO RENDER THE PROFFERED OPINIONS AND HAS OVERSTATED AND MISREPRESENTED HIS BACKGROUND AND EXPERIENCE

In his CV and his Report, which was made under *penalty of perjury*, Hansen claims to have credentials, qualifications and experience that supposedly establish his expertise in data analysis and telemarketing, which have been, at best, exaggerated and which are not reflected in his current or past employment positions. [Ex. 1; Ex. 2 at 2-5, 17, 19, 22.] Even if his experience is considered as generously[5] as possible, his prior employment and other experience cannot withstand the rigors of Rule 702 and *Daubert*. Courts have routinely excluded "expert" opinions not only where, as here, the witness fails to have the requisite education, skills and training, but also when experts like Hansen misrepresent their background and qualifications.[6]

---

[5] Despite Rule 702's liberality concerning a proposed expert's qualifications, the Seventh Circuit has cautioned, "the consequence of . . . liberality is not, or at least should not be, a free-for-all." *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir 1993). Liberality requires judges to exercise *increased* caution in evaluating expert credentials. *Id.* at 1238-39 ("The elimination of formal barriers to expert testimony has merely shifted to the trial judge the responsibility for keeping 'junk science' out of the courtroom.")

[6] *See Hamilton v. Negi*, 2012 WL 1067857, *2-5 (E.D. La. March 15, 2012)(excluding expert based on misrepresentations about her qualifications); *In re Unisys Sav. Plan. Litig.*, 173 F.3d 145, 156 (3d Cir. 1999)

4

### A. Hansen's Employment, Background and Experience Fail to Provide the Requisite Qualifications in Data Analysis, *and* He Misrepresents His Credentials

Hansen's actual employment history fails to demonstrate the qualifications necessary to render any opinions in this case relating to his analysis of RMG's dialer database and he has engaged in a pattern of exaggerating[7] his credentials in his CV and Report.[8] This is not just a credibility question, it goes to the very heart of whether he is qualified to render opinions in this case. *See Contreras v. Sec'y of HHS,* 121 Fed. Cl. 230, 240 (Fed. Cl. 2015) ("courts typically consider an expert's misrepresentations as to his qualifications to be serious transgressions.") Hansen, therefore, cannot ensure that he "employs [] the same level of intellectual rigor that characterizes the ***practice of the expert in the relevant field***" because (1) he *fails to meet the minimum requirements for hire in the data analysis field* and (2) his only experience for the last 12 years consists of a full-time job as a cable technician and a side-job serving as a plaintiff's expert witness.[9] *See Kumho Tire,* 526 U.S. at 152 (emphasis added).

---

(affirming exclusion of expert testimony for several reasons, including because court found expert "not to be credible because he had made statements about his credentials that were inconsistent with his deposition testimony"); *In re Vioxx Prods.,* 489 F. Supp. 2d 587, 594 (E.D. La. 2007) (granting motion for new trial because expert "misrepresented his certification status" at trial where expert doctor, "a central witness in [the] case," represented that he was board certified, when in fact his certification expired).

[7] For example, Hansen's Report and CV claim that he has handled many computer forensic and eDiscovery cases while "*working* at the FBI sponsored Regional Computer Forensic ("RCFL"), which is a training and support center for law enforcement agencies [Ex. 1 at 2; Ex. 2 at 4; [Ex. 4 at ¶¶53-58](emphasis added). He never "*worked*" at the RCFL, or any law enforcement agency, and at his deposition, he admitted he was only as an unpaid "volunteer." [Ex. 3 at 92:13-93:22; Ex. 4 at ¶¶53-58].

[8] ". . . if people are willing to lie about something [credentials] on which it is so easy to be caught, how common and how damaging to the fact-finding process are misrepresentations about the substance of forensic science: fabrication of findings, exaggeration of findings, withholding of exculpatory findings, and other knowing attempts to create in the fact finder an impression that is not supported by evidence?" Saks, "Prevalence and Impact of Ethical Problems in Forensic Science," 34 J. Forensic Sci. 772, 789 (1989).

[9] *See Coal. For a Level Playing Field v. Autozone, Inc.,* 82 F. App'x 240, 243 (2d Cir. 2003)(noting that "there was ample basis for the [trial] court to conclude that Kuralt, an owner and manager of a small bookstore chain, lacked the requisite training and experience in the automotive parts industry to qualify as an expert"); *Braun v. Lorillard Inc.,* 84 F.3d 230, 235 (7th Cir. 1996)(noting that "[m]odern science is highly specialized"); *Richmond Steel Inc. v. Puerto Rican Am. Ins. Co.,* 954 F.2d 19, 22 (1st Cir. 1992)(excluding testimony of a certified public accountant who had not "dealt with a construction enterprise comparable in size, magnitude, and number of projects" for 10 years); *Ansick v. Hillenbrand*

### i. Hansen 's Employment History is Unrelated to Data Analysis

In a case where Hansen bases his opinions on his "experience," he is remarkably unqualified to render opinions on data analysis. He has never been employed by a hardware or software company as a data analyst or data warehousing specialist, and he does not have the requisite background and skills required to obtain an *entry level job in that field.* [*See* Declaration and Supplemental Report of Margaret A. Daley attached as **Exhibit 4**, ¶¶59-61; exemplar job postings, attached as **Exhibit 5**.] Hansen has never authored any technology publications, he has had no technology-related continuing education in 10 years, he does not belong to any relevant industry trade groups, and he has received no industry awards. [Ex. 1; Ex 4, ¶¶ 18, 20-21, 59-61.] His experience falls far short of establishing his expertise for his opinions in this case. *Id.*

Rather, since 2004, Hansen has been employed by naval contractors to assist with connecting fiber optic cables to vessels when they are in port. [Ex. 3 at 81:23-82:9, 83:25-84:9; Ex. 4, ¶ 21.] Between 2000 and 2004, he worked as an instructor at Laptop Training Solutions ("LTS"), which was sued for fraud for selling technical certification courses run by unqualified instructors. [Ex. 1 at 2; Ex. 4, ¶¶ 49-50.] Prior to LTS, Hansen worked as an electronics technician in the private sector and in the Navy where he repaired, maintained and tested electronic equipment. [Ex. 1 at 3.] Before that, he was a radio, television and VCR repairman. *Id. None* of this actual employment experience involved data analysis of telemarketing databases. Lastly, Hansen's business serving as an expert witness for plaintiffs' attorneys in TCPA cases[10] is a side job he runs out of his home, and also performs out of his van at piers while waiting for vessels.

---

*Indus., Inc.,* 933 F. Supp. 773, 780 (S.D. Ind. 1996)(excluding the testimony of an experienced horsewoman who offered to testify about the "behavioral propensities of horses that are blind in one eye.").

[10] ███████████████████ [*See* Hansen Deposition in *Lee v. Global Tel\*Link Corp.,* Case No. 2:15-cv-02495-ODW-PLA (C.D. Calif) attached as **Exhibit 6** at 95:20-22.]

[Ex. 1; Ex 4, ¶ 18, 41-43; Ex. 6 at 94:2-96:6.] His expert sideline may include some telemarketing database analysis, but "[i]t would be absurd to conclude that one can become an expert simply by accumulating experience in testifying."[11]

Hansen's education is limited to graduating from high school; he never enrolled in any college, university or trade school. [Ex. 1 at 1; Ex. 3 at 89:11-90:1.] While an expert is not required to have a college education in the field about which he opines, employers _hiring_ professionals in the data analysis field require at least a college degree. [Ex. 4, ¶¶ 59-61; Ex. 5.] On top of an undergraduate degree, employers also often require a master's degree or years of experience in the field. [Ex. 5.] Hansen says he has read books, taken computer-related courses and studied on the internet to read source code, and he considers himself fluent in Structured Query Language ("SQL"),[12] the programming language upon which his opinion in this case is premised. [Ex. 3 at 125-27.] While Hansen supposedly trained himself in SQL and "taught" the MS SQL program at LTS, LTS was sued for fraud for selling technical certification courses with unqualified instructors. [_Id.;_ Ex. 4, ¶¶ 49-52; _see infra._] ████████████████████████

████. [Ex. 4, ¶¶ 21, 46-47; Ex. 6 at 32.]

In this case, Hansen is not opining on connecting fiber optic cables to vessels in port, which is what he has been primarily employed to do for more than a decade. Rather, he claims to be an expert in the analysis of structured data, which is not substantiated at all by his actual employment

---

[11] _Thomas J. Kline, Inc. v. Lorillard, Inc.,_ 878 F.2d 791, 800 (4th Cir. 1989; see also _Elock v. Kmart Corp.,_ 233 F.3d 734, 744 n. 5 (3d Cir. 2000)(noting that "mere fact that [witness] was previously admitted as an expert witness qualified to give testimony on vocal rehabilitation is irrelevant to the determination whether he is qualified to give such testimony in this case"); _See Bogosian v. Mercedes-Benz of N. Am., Inc.,_ 104 F.3d 472, 477 (1st Cir. 1997)(rejecting opinion of witness who had testified as an expert 126 times); _Hardin v. Ski Venture, Inc.,_ 50 F.3d 1291, 1296 (4th Cir. 1995).

[12] SQL is a special-purpose programming language designed for managing data held in relational databases management system. The scope of SQL includes data insert, query, update and delete, schema creation and modification, and data access control. [Ex. 4, fn. 72.]

experience, apart perhaps from any experience he may have gained from his prolific expert retention by plaintiffs' counsel in TCPA cases. Hansen is, therefore, unqualified to provide any opinions arising out of his analysis of RMG's dialer database.

### ii. Hansen Misrepresented His Data Analysis Qualifications and Experience

Hansen's Report claims that "[o]ver the last twenty-six (26) years, [he has] had extensive experience in a broad range of other areas in the electronic and information technology fields." [Ex. 2 at 4.] This statement suggests that since *1990*, Hansen has had "information technology" experience, which is simply *not* true. *Id.* As discussed above, he was a television, VCR and CD player repairman 26 years ago and graduated from high school in *1991*. [Ex. 1 p. 3; Ex. 4, ¶¶ 18, 52-54.]

In an effort to bolster his "extensive experience" in the "information technology" field, Hansen has also listed a number of Microsoft and other certifications in his CV and Report, but he omits that these are ███████████████████████████████████████████████ ████████████████████████████████.[13] [Ex. 1 at 2-3; Ex. 2 at 4; Ex. 4, ¶¶46-48 and (Ex. 15 to the Declaration); Ex. 6 at 37:1-6; 39:20-25; 40:13-22; 46: 9-25; 48:7-49:25; 50:3-50:5.] He obtained all of them while he was at LTS, *see infra,* and he has not taken a single technical course in 10 years. [Ex. 4, ¶¶46-48]. *See Yazell v. Foremost Ins. Co.,* 2005 WL 2899326, *3 (Ky. Ct. App. May 10 2006)(affirming exclusion of testimony from a witness who "was formerly a licensed insurance adjustor in Kentucky, but at the time of the deposition his license had expired and he had been operating a window cleaning business for almost four years"). Hansen's CV also reflects that he was certified by the State of California and Oregon to teach

---

[13] MCP 4.0, A+, Network +, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security +, CIW Security Analyst. [Ex 1 at 3; Ex. 2 at 4]. His Linux certification has no application to this case. [Ex. 1 at 3; Ex. 2 at 4; Ex. 4, ¶¶ 40-41.]

computer installation and repair, but there is no state-wide agency that certifies teachers in private

schools in either California or Oregon. [Ex. 1 at 3; Ex. 4, ¶ 48.] ████████████████

████████████████████████████████████████████████████████

██████████████████. [Ex. 4, ¶ 48; Ex. 6 at 51:6-53:20.]

      Hansen also listed on his CV his role as "Director of Training/IT Director" for LTS. [Ex.

1 at 2.] However, he had no technical certifications for the first two years of his employment with

LTS and, as a consequence, he was an uncertified instructor for *2 years*. [Ex 4, ¶¶46-50.] The

California Bureau for Private Postsecondary and Vocational Education granted LTS a temporary

license, which was revoked a year later for, among other things, failing to adequately train

students.[14] [Ex. 4, ¶49.] ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. [Ex. 4, ¶¶49-52; Ex. 6 75:11-18; 76:10-77:13.] ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. [Ex. 4 at ¶52; Ex. 6 at 69:13-17]. ████

████████. [Ex. 6 at 73:1-74:16.] ████████████████████████████

████████████████████████████████████████████████████████

████. [Ex. 4 ¶¶49-52; Ex. 6 at 68:18-69:1; 70:13-72:15; 73:1-74:16; 77:19-79:7;79:25-80:4;

81:22-83:17; 84:25- 85:15.] ████████████████████████████

████████████████████████████████████████. [Ex. 4, ¶51.]



---

[14] Incredibly, Hansen's opinions that RMG obtained leads that were gained through spyware are based solely on "training" he received at LTS. *See* supra. [Ex. 3 at 455:2-455:21; 456:12-20].

Notwithstanding ████████████████████, he stated in his Report that he "taught approximately 1,000 others the skills to be computer engineers" and ████████ on his CV to claim he provided a "hands on training environment" and instruction in various certification courses, "resulting in hundreds of certified students." [Ex. 1 at 2; Ex. 2 at 4.] Students primarily enrolled at LTS to obtain Microsoft certifications, but as set forth above, ████████████████ ██████████████████████████████████████ [Ex. 4 at ¶52; Ex. 6 at 73:3-74:16.] ████████████████████████████████████████████ ████████. [Ex. 6 at 72:1-74:16.]

### B. Hansen's Employment is Also Unrelated to Telemarketing, and He Misrepresented What Little Telemarketing Experience He Has

According to Hansen's Report, he "frequently act[s] as a consultant to *companies* that engage in the use of autodialers." [Ex. 2 pp. 2-3.] He also claims to have "set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines to outbound call centers capable of generating over one million calls per hour." [Ex. B p. 3.] Hansen's CV reveals his experience in telemarketing, including automated dialer systems, did not begin until at least 2000. [Ex. 1; Ex. 4, ¶¶ 22-40.] His CV claims that, since 2000, he has provided telemarketing support to various "*companies*" through his company – PNS724. [Ex. 1 at 2; Ex. 3 at 75:19-76:18; Ex. 4, ¶¶22-40.] These statements are, *at best, gross exaggerations*. [Ex. 4 at ¶¶22-40]. The truth is that, other than five campaigns he claims to have run out of his house,[15] the *only* telemarketing experience Hansen has arises out of his periodic, *unpaid* work at *one company*, HomeyTel.[16] [Ex 3 at 396:18-397:8 399:5-25; Ex. 4, ¶¶ 22-40.] He

---

[15] Hansen testified that he set up the home autodialer "for friends … when they're running for political office" and while he claims to have 50-100 friends who ran for office, he can only remember the name of one who he assisted via his home autodialer. [Ex. 6 at 120-23.]

[16] HomeyTel has no employees and its "call center" consisted of some computer equipment stored under a desk. [Ex. 4, ¶¶ 22-40]. Video of TV news footage of HomeyTel's office shows exposed wires, computers

has not "designed" a call center for *any* other company. *Id.*

Hansen claims to have 15 years of experience in the telemarketing industry, which means that as early as *2001*, or *while he was still employed at LTS*, Hansen was also working with HomeyTel. [Ex. 1 at 2; Ex. 3 75:19-76:21; 78:6-18] *Again* that is just not true. The owner and operator of HomeyTel was in and out of prison between 2000 and 2006, and HomeyTel was not even formed until 2006. [Ex. 1; Ex. 4, ¶¶ 24-29.] Putting aside the misrepresentations as to the length of his telemarketing experience, Hansen's voluntary opt-in lead "experience" with HomeyTel resulted in numerous complaints and lawsuits arising out of the leads that Hansen helped to procure. [Ex. 1 at 1; Ex. 3 at 99:6-100:12; 78:12-18; 98:17-99:5; Ex. 4, ¶¶ 30-40.] Hansen has had no professional experience in setting up, configuring or maintaining dialer systems for a call center that conducts telemarketing with call agents and customer service representatives. [Ex. 4, ¶¶ 21-23, 26, 33-34, 38.] As for his volunteer experience at HomeyTel, Hansen looked at Asteria's telemarketing equipment, but Homeytel never used it. [Ex. 3 at 100:14-103:12.]

With respect to Hansen's opinions concerning Consent and established business relationship ("EBR"), he is not a paralegal, he has no legal training and he does not consider himself an expert on the TCPA's Consent and EBR standards, but opined about them anyway. [Ex. 3 at 389:12-392:16; 395:20-23.] When pressed on these opinions during his deposition, Hansen conceded that his testimony concerning Consent was merely his *personal opinion* regarding what he considered to be "best practices," and was not intended to be a legal conclusion concerning what the statutes or regulations require for there to be legally valid Consent. [Ex. 3 at 408-409 (". . .that is not my role.").] But that is exactly what he did in his Report. [Ex. 2 at 6, 16-17.]

---

and telephone lines jammed into one office. *Id.* When Hansen claims in his expert report that he has "set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines to outbound call centers capable of generating over 1 million calls per hour," what he is referring to is the equipment underneath the desk in HomeyTel's single office. *Id.*

11

Notwithstanding his complete lack of experience in the type telemarketing that RMG conducted in this case, Hansen again based his conclusions about RMG's telemarketing, Consent[17] and EBR on his *personal experience* as a "telemarketer." [Ex. 2 at 17-20; Ex. 3 at 406-09, 415-16.] He is, by every possible measure, completely unqualified to render any opinion pertaining to the TCPA or the legality of RMG's telemarketing endeavors, and his opinions should be stricken.

### C. Hansen Cannot Be Qualified as an Expert Based on His Prior "Expert Experience," Which He Also Misrepresented

While Hansen claims to have vast experience as an "expert" in TCPA cases, in reality, his work is actually just moonlighting he performs in his off hours out from his home, or sometimes out of his van while working at his full-time job.[18] [Ex. 6 at 94-95, 137-38, 165; Ex. 4, ¶¶ 41-45.] There is also a question as to precisely how much expert witness experience Hansen actually has, given that he has presented conflicting information in prior expert reports he submitted in various lawsuits. For example, in his Report filed in this case (dated February 10, 2016), Hansen claims he was as an expert in more than 50 TCPA class action lawsuits. [Ex. 2 at 2.] Five months later, in another report filed in *Alice Lee, et al., v. Global Tel\*Link Corporation,* Case No. 2:15-cv-02495-ODW-PLA (C.D. Calif.) dated July 5, 2016 ("GTL Report"), ██████████████████████ ██████████████████████████████. [*See* GTL Report attached as **Exhibit 7** at 2; *see also* Ex. 4, ¶¶ 41-45,] for similar representations in another case.] This means Hansen served as an expert or consultant in *100 new TCPA class action cases in only five months*. These figures are mindboggling, and are either a result of Hansen's sloppy and misleading testimony, or

---

[17] Hansen also opined, based solely on his own *ipse dixit*, that RMG obtained leads through spyware. He offered that opinion because he claims to have "26 years" of experience in spyware, but this is yet another misrepresentation because he had not even graduated from high school 26 years ago. [Ex. 1 p. 4; Ex. 3 at 454]. When pressed at his deposition, he admitted he based this "spyware" opinion on his experience at LTS. [Ex. 3 at 454-455.] The numerous problems with LTS are set forth *supra*.

[18] Hansen admitted that he was literally on the clock for HP while he was sitting in his van and billing TCPA clients for his expert services. [Ex. 6 at 95:7-96:16.]

show that he is exactly the type of "hired gun" courts have repeatedly excluded.[19]

There is also evidence from the record in the matter of *Marks v. Crunch*, Case No. 14-cv-00348 (S.D. Cal.), that Hansen may have inflated the number of TCPA cases in which he has actually served as an expert. [Ex. 4, ¶44.] In that case, Hansen testified that he had worked on multiple text messages cases, but refused to produce copies of his prior expert reports. *Id.* The defendant, Crunch, challenged Hansen's credentials, and the court ordered Hansen to produce his prior reports. In subsequent court filings, "Hansen admitted that he had not actually provided an expert report in at least 24 of the 50 'TCPA Class Actions' listed on the Crunch CV." *Id.* In fact, Hansen *had never submitted a report or declaration in a prior text messaging case. Id.* The case was dismissed after the *Crunch* court granted defendant's summary judgment motion, which mooted the motion to exclude Hansen.[20]

In sum, in all but *one* instance, and that was to defend his own robocalling endeavors for HomeyTel, Hansen has been an expert witness for plaintiff's attorneys in TCPA lawsuits. [Ex. 3 at 461-62.] He has no relevant training or experience that would qualify him as an expert in the field of telemarketing or data analytics, and the information he does provide is full of conflicting information and troubling misrepresentations. As such, Plaintiff cannot meet his burden of

---

[19] *See e.g., In re Aluminum Phosphide Antitrust Litig.,* 893 F. Supp 1497, 1500 & n. 5 (D. Kan. 1995)(disparaging a witness as "an expert for hire" and noting that "he has devoted his career to partisan adjudicatory purposes").

[20] Despite his purported extensive history as a testifying expert, Hansen cannot identify a single case where he was qualified as an expert and his testimony was adopted by a court. Rather, his work was recently rejected by the court in *Strauss v. CBE Group., Inc.,* 2016 U.S. Dist. LEXIS 65587, at **5-7 (S.D. Fla. March 23, 2016). In several other cases, Hansen submitted reports or declarations that are remarkably similar to that submitted in this case, and he has have been repeatedly challenged. *See Molnar v. NCO Financial Systems, Inc.,* No. 13-cv-00131 (S.D. Cal.); *Balschmitter v. TD Auto Finance LLC,* 303 F.R.D. 508 (E.D. Wis. 2014) and *Swaney v. Regions Bank,* Case No. 13-cv-0544 (N.D. Ala.). These cases were settled before any ruling on the defendants' motion to exclude Hansen. *See also Lee v. Global Tel*Link Corp.,* Case No. 2:15-cv-02495-ODW-PLA (C.D. Cal.); *Henderson v. United Student Aid Finds, Inc.,* Case No. 3:13-cv-JLS-BLM (S.D. Cal.). These motions to exclude Hansen are pending.

establishing by a preponderance of the evidence that Hansen is qualified to render any opinions in the fields of data analysis or telemarketing.

## IV.  HANSEN'S METHODOLOGY IN CREATING HIS PROPOSED CLASS LIST IS FLAWED, UNTESTED AND UNRELIABLE

*If* an expert meets the qualifications prong of Rule 702, the Court must nevertheless strike his opinions where: (1) they are based on insufficient facts or data; (2) they are derived from unreliable principles and methods or (3) the expert has unreliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *see also Kumho Tire,* 526 U.S. at 149-50; *Daubert,* 509 U.S. at 591-95; *Banta Props., Inc. v. Arch Specialty Ins. Co.,* 2011 U.S. Dist. LEXIS 152928, *11-12 (S.D. Fla. 2011) (holding that when experts fail to use reliable data that has been tested and verified and when experts use poor methodology, courts exclude their opinions). Hansen's analysis of the dialer database used by RMG is premised on a flawed and unreliable methodology, untested assumptions, and consideration of an inappropriately limited set of data.[21]

Hansen's proposed Class List is premised entirely on his assumption that the prerecorded messages Plaintiff heard during three calls he received from RMG are identical to those played during each of more than 668,000 other calls contained on the proposed Class List. [Ex. 2 at 12, 21-22.] Thus, to create his proposed List, Hansen attempted to forensically link "sound" files in the dialer database with each call made by RMG's dialer. In doing so, Hansen concluded that the dialer database identified specific audio files in its "sounds" table that were written to the database

---

[21] In fulfilling its gatekeeper's role, this Court must assess not only Hansen's methodology but also the reliability of his application of that methodology to the facts of the case. *See* Fed. R. Evid. 702(c)-(d); *GE v. Joiner,* 522 U.S. 136, 146 (1997). In considering the reliability of an expert's method used to reach his conclusions, the court must undertake an independent analysis of *each step* in the logic that leads to the expert's conclusions. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir. 1994). If the analysis is deemed unreliable at *any step,* the expert's entire opinion must be excluded. *See Cage v. City of Chicago,* 979 F. Supp. 2d 787, 808 (N.D. Ill. 2013) (emphasis added) ("any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology).

at the time each call was placed. [Ex. 2 at 8-9; Ex. 3 at 281, 375.] According to Hansen, this

allowed him to join together database tables and connect each phone call with *the specific sound

file* played during that call. [Ex. 2 at 8-9.] This led to his erroneous conclusion that all calls made

during a given campaign must have played the exact same prerecorded message. For example,

with respect to Campaign 422, (one of the three campaigns during which Plaintiff received a call),

Hansen concluded:

> The records also indicate that the number of the audio-recording made to Mr.
> Charvat was s28.wav. This exact recording was also used in all calls contained
> within the telemarketing campaign entitled 0610 TS2 Mix B223 and assigned
> Campaign ID#422.

[DE 492-1 at 9.][22] Hansen's understanding of how data is collected by the dialer is completely

wrong, which led to the faulty premise that the sound file used on a particular telephone call was

written to the database at the time the call was placed. This error in Hansen's methodology is due

in large part to the fact that he (1) never confirmed his assumptions with the designer of the

database, (2) ignored material evidence concerning the way in which RMG used the dialer to offer

a variety of travel incentives during the course of its campaigns, and (3) failed to listen to any of

the recordings produced by Plaintiff or RMG in this case. As a result, his methodology is entirely

unreliable and, therefore, his Report should be stricken and his opinions excluded.

### A. Hansen Never Confirmed His Assumptions with the Database Designer and Never Discovered that His Opinion Concerning the Database Was Wrong

While Hansen assumed the Asteria dialer operated in a certain way, he never tested his

theories or sought to review or confirm them with anyone, including one of the Asteria database

designers, Ringenbach, who was made available to him. [Ex. 3 at 368-69.] Hansen never spoke

---

[22] Hansen reached the same conclusion with respect to recordings purportedly used in Campaigns 610 and 1410. [*See* Ex. 2 at 10-11.]

with Ringenbach; rather, he left that task to Plaintiff's lawyers. Had Hansen done so, he would

have learned the dialer did *not* store any information that could be used to identify the sound files

played during particular calls or campaigns. [*See* Report of Margaret A. Daley ("Daley Report")

attached as **Exhibit 8**, at 10-11, fn. 18.][23] Ringenbach has explained that the tables Hansen joined,

and upon which he based his opinions, *cannot* be used to deduce what prerecorded messages were

played to call recipients during particular calls:

> Because the logging tables do not capture sounds played, there is no table in the
> Asteria database that directly shows which sound was played in any individual call.

[Ex. 8 at 11, fn. 18, 24.] Instead, the database only identifies the sound file queued up to be played

on the *day each of RMG's backups were created*.[24] As a result, there is no way to identify which

sound was played during a particular call or campaign. [Ex. 8 at 17, 20-21 and fn. 49.]

 A simple discussion with Ringenbach would have alerted Hansen to the fact that his

methodology was premised on the false assumption that Asteria's dialer documented what

recording was played during each call. Hansen admitted during his deposition, however, they he

never actually spoke with Ringenbach because Hansen left that task to Plaintiff's counsel. [Ex. 3

at 368-69.] Thus, Hansen never received nor considered any of the information Ringenbach could

have provided to him, and as a result, based his entire opinion on a faulty and untested assumption,

which renders his methodology completely unreliable. [Ex. 2 at 8-9; Ex, 3 at 117, 281, 375.]

---

[23] Ringenbach of Asteria confirmed: "The Asteria database consists of different tables. What we'll call "instructional" tables are written to by user activity in the Asteria interface, and they contain instructions for the system. . . "Logging" tables are written to by the dialer as calls are made, and contain data about activity that has been performed." [Ex. 8 at 11, fn. 18.]

[24] In this regard, the two Database Backups produced by RMG in this case were exported from its server on May 5, 2012 and March 8, 2014. [Ex. 8 at 15.] Thus, the only information that can be extracted from these backups is identification of the sound files that were set to be played on those dates, and not the dates of the campaigns, which had all concluded months, and in many cases years, earlier.

**B. Hansen Never Considered Evidence Concerning RMG's Use of the Asteria Dialer**

Hansen also ignored material evidence relating to RMG's use the Asteria dialer. The undisputed record evidence demonstrates that RMG used the Asteria dialer in precisely the way it was designed to function: as "a dynamic, highly flexible system that allowed telemarketers to immediately implement changes to telemarketing campaigns while in progress. . . a user could replace and swap recordings in and out of specific campaigns as often as needed." [Ex. 8 at 16, and fn. 38.] In that regard, RMG offered consumers a variety of different travel incentives during its telephone calls, including trips to destinations like Las Vegas, Disney, or Myrtle Beach, and vacations on one of several competing cruise lines, and it would often offer consumers the option to choose between *either* a land vacation *or* a cruise vacation during the same call. [*See* Deposition of Benny Aguilera attached as **Exhibit 9**, at 141; Deposition of Jason Rader attached as **Exhibit 10**, at 205; Deposition of Beth Valente attached as **Exhibit 11**, at 98-99; Deposition of Jamie Smith attached as **Exhibit 12**, at 6-7; Declaration of Beth Valente attached as **Exhibit 13**, ¶17; e-mail correspondence, attached as **Exhibit 14**.] RMG also frequently changed the incentives offered *during the course of an ongoing campaign*. [Ex. 10 at 275-276; Ex. 11 at 168; Ex. 12 at 105-06, 138-39; Ex.13, ¶17.]

The record evidence concerning RMG's use of the dialer is found in multiple scripts, recordings and e-mails produced over the course of discovery in this matter, and it is discussed by several witnesses during their depositions. Hansen, however, did not consider, ask for or review any of these documents or recordings. [Ex. 3 at 51.] Plaintiff's counsel never even provided Hansen with this evidence. [Ex. 3 at 55 and Dep. Ex. 2.] He also never reviewed the deposition transcripts of four RMG representatives—Beth Valente, Richard Borst, Jason Rader and Benny Aguilera—

17

who each provided testimony concerning RMG's use of the Asteria dialer.[25] According to Hansen, even if he had reviewed these depositions, "[i]f it wasn't in my report, I didn't consider it relevant." [Ex. 3 at 51.] This notable concession speaks volumes, given that Hansen never referenced any testimony or documents relevant to the way RMG used the dialer, or its routine practice in changing the recordings and incentives offered during pending campaigns "*all the time*." [Ex. 12 at 142 (emphasis added).] This evidence is absolutely relevant to the present dispute and unquestionably impacts the reliability of Hansen's methodology and opinions.

The record evidence shows that RMG "*deleted* and *changed*" dialplan instructions hundreds, if not thousands, of times using the Asteria software interface,[26] which wiped out all previously existing instructions. [Ex. 8 at 18-20 (emphasis in original)]. RMG made these modifications so frequently that 99.99% of the records contained in the dialer database were affected. [Ex. 8 at 21.] In the one email exchange between Ringenbach and Hansen, Ringenbach confirmed that once a user makes changes to a Dialplan or Campaign, the prior instructions are deleted and overwritten: "**Unfortunately, there's not an audit table associated with it, so you can't really see that things have changed.**" [Ex. 8 at 13.] This information demonstrates how completely wrong Hansen's underlying assumptions are. With respect to this central opinion by Hansen, *he admitted in his deposition* that if his understanding was incorrect about what the

---

[25] Hansen's failure to read these witnesses' testimony is evident from his timesheets, attached hereto as **Exhibit 15**, which fairly and accurately reflect all the time he spent reviewing transcripts in this case. [Ex. 3 at 52-54; Ex. 15 at 2.] He spent 5 ½ hours reviewing three witnesses' depositions—Jamie Smith, Tom Mongiovi and Peter Lachnicht (the latter two are not even RMG employees). He did not review any other deposition transcripts, and does not recall receiving or reviewing any deposition *exhibits*. [*Id.* p. 48-50.] Hansen did not even receive the deposition transcript for Richard Borst. [*Id.* at 52.]

[26] There were 939 individual edits to the Dialpan_State-Param table alone, and many more deletions were made to the Dialplan_State table, which were no logged by the dialer. [Ex. 8 at 20.] These edits wiped out all previously existing instructions thereby making it impossible to determine what instructions, and therefore what sounds, were associated with a campaign at the time it was run. [Ex. 8 at 18-20.]

database showed relative to whether a specific sound was played during a campaign, then the end result of his Report and his conclusions were also wrong:

> Q. And all I am asking you is to agree that if your understanding of what these tables show and how they relate to each other is wrong that could make your analysis and your opinions wrong too, right?
>
> A. All right.
>
> Q. Do you agree with that?
>
> A. Yeah.
>
> Q. So, for example, if your understanding of whether or not a specific sound was played during a campaign, that understanding was incorrect, your conclusions regarding that campaign could be incorrect too, right?
>
> A. *Well, if my conclusions were incorrect, then, yes, the end results could be incorrect.*

[Ex. 3 at 141; 261-62 (emphasis added).] Hansen's sworn admission about the consequences of his flawed, untested, and unverified methodology mandate that his Report, conclusions and testimony are unreliable and should be stricken under Rule 702. *See, e.g. Victory Records, Inc. v. Virgin Records Am., Inc.*, 08 C 3977, 2011 WL 382743, at *2 (N.D. Ill. 2011) (holding that expert's assumptions and projections must rest on an adequate basis, and further holding that assumptions based on speculation are inadmissible).

### C. Hansen Never Listened to or Considered Any Recordings

Hansen prepared, signed and submitted his Report, and sat for his deposition without ever listening to any of the prerecorded messages that were the subject of that Report. It is unfathomable to think an expert opining on the dissemination of prerecorded messages would provide an opinion in this matter without actually listening to any of the relevant recordings produced by the parties. This, however, is exactly what Hansen did. Prior to his deposition, he had never heard the recordings Plaintiff made of his phone calls with RMG,[27] nor did he listen to any of the hundreds

---

[27] Hansen testified that he never received these recordings, and instead relied on his review of written transcripts of the recordings provided to him by Plaintiff's counsel. [Ex. 3 at 224-27.]

of prerecorded messages RMG produced in this case. [Ex. 3 at 247, 224-227.]

Despite never having listened to any of the recordings produced in the case, Hansen opined that the prerecorded messages Plaintiff heard were "identical" to those played to each telephone number identified on his proposed List. [Ex. 2 at 12] Specifically, he states RMG played "Sound 28" at the beginning of every call it made during Campaigns 422 and 610, including the two calls received by Plaintiff. [Ex. 2 at 9.] He also opines that RMG played "Sound 61" at the beginning of every call it made during Campaign 1410, including the call Plaintiff received. [Ex. 2 at 10-11.]

By not listening to the recordings, however, Hansen never realized that the actual version of Sound 28 contained in RMG's database[28] is *not identical* to the messages Plaintiff recorded during Campaigns 422 or 610. [Ex. 3 at 244, 248-249, 258-259.] In fact, the message Plaintiff recorded during Campaign 422 is *different* from the recording he captured during Campaign 610. Thus, the evidence produced by Hansen's own client invalidates his opinion that all recordings in the database identified as "Sound 28" must be the "identical" played to Plaintiff. Ex. 2 at 12, 21-22. This error in Hansen's methodology is further illustrated by the fact that Sound 28—the sound he opines was played during both Campaign 422 and Campaign 610—was not created until *April 12, 2012*, a year after Campaign 422 had concluded and more than six months after Campaign 610 concluded. [Ex. 8 at 33 and fn. 87.][29]

The same is true with respect to "Sound 61," which Hansen claims was played during every call made during Campaign 1410. The version of Sound 61 contained in RMG's database[30] is different from the message recorded by Plaintiff during Campaign 1410. [Ex. 8 at 34.] These

---

[28] A copy of this recording is being produced on a DVD contemporaneous with this briefing as **Exhibit 16**.

[29] As discussed *supra*, Hansen eventually admitted that Sound 28 was not the "exact recording" used on these campaigns. [Ex. 3 at 259.] He also admitted that he never even listened to Plaintiff's recordings prior to his deposition. [Ex. 3. at 246-47.]

[30] A copy of this recording is being produced on a DVD contemporaneous with this briefing as **Exhibit 17**.

differences between the recordings contradicts Hansen's conclusion that "no evidence whatsoever [] would indicate that any of the telemarketing calls … utilized a pre-recorded message different than the pre-recorded messages recorded by Mr. Charvat." [Ex. 3 at 260-261; Ex. 8 at 10-11].

Upon listening to the different recordings during his deposition, Hansen admitted that "[t]here w[ere] some subtle differences between the two." [Ex. 3 at 259.] Given these differences, *Hansen conceded that he cannot provide an opinion as to which specific sound files were associated with the recordings played to Plaintiff or his putative class*. [Ex. 3 at 353-54.] By his own concession, Hansen's method of determining which recordings were played and to whom is speculative and unreliable and cannot be used as the basis for class certification, much less proof at trial. The recordings produced in this case (and ignored by Hansen) prove that just because two sound files have the same name, this does not mean that they are the "exact recording."[31]

## V.  HANSEN'S "OPT-IN" DATA AND "CONSENT" METHODOLOGY AND OPINIONS WERE NOT RESEARCHED OR TESTED, AND ARE SPECULATIVE, UNRELIABLE *IPSE DIXIT*

Hansen posits that RMG's "opt-in" data is inauthentic or unreliable. [Ex. 2 at 17.] In forming this opinion, Hansen relied on his purported "experience" to assert that consent could not have been provided because the lead lists were not purchased from the original source, and that he is suspicious as to whether certain websites collected the consumer consent data in question. [Ex. 2 at 17-18, 20; Ex. 3 at 429; *see also generally* Ex. 2 (Hansen's Report fails to cite any Database information).] Hansen makes these broad assertions in an effort to jettison the countless individual inquiries that must be conducted into the many different sources through which RMG had acquired each phone number on his proposed List, and the consent provided pursuant to the privacy policies

---

[31] Of course, as detailed in Section IV(A), the reason the calls identified in Hansen's proposed List had the same sound file name (either Sound 28 or Sound 61, depending on the campaign) was because Hansen had combined tables that only reflected the sound file associated with the dialplan used on these campaigns (Dialplan 11) on the dates that that dialer databases were backed up.

and consent provisions for every one of those possible sources.[32] The Cruise Lines have addressed these individual issues in detail in Section III(F) of their Response to Plaintiff's Motion, and they expressly incorporate that treatment here by reference. But for purposes of this *Daubert* Motion, Hansen's glaring failure to research any of his assertions concerning RMG's lead lists, or to test a single alleged class number against its source or sources, render all of his assertions on this subject inadmissible as nothing more than his speculative *ipse dixit*.

Hansen's superficial conclusions about all of RMG's "opt-in" data as being inauthentic or unreliable are not supported by any investigation of the actual lead lists. Hansen did not analyze the source for a single telephone number included in his proposed Class list. [Ex. 8 at 43.] For example, he did not analyze any of the 3,000 unique websites associated with the consent sources for any of the lead lists in RMG's database. *Id.* He also did not analyze any of the consent provisions and privacy policies on any of these websites. *Id.* Consequently, Hansen did not analyze the terms of any of the privacy policies or consent provisions related to the source or sources for a single class member in relation to 47 U.S.C. § 227 (b)(1)(B). [Ex. 8 at 36-37, 43.] In fact, Hansen did not even conduct any research or analysis of the lead lists themselves to understand how many different sources were associated with each phone number on the proposed Class List:

> Q. (By Becker) Okay. Did you review all the websites that were listed on those different lead lists?
>
> A. (By Hansen) There's just so many different websites.

---

[32] As the Cruise Lines have emphasized in their Response to class certification, RMG acquired its leads from more than a half dozen different vendors over the course of several years. [Response at Section I(B).] The contact information in these leads were generated from hundreds of different websites, and each website had its own terms and conditions and privacy policies. These facts will require an assessment of each source or sources for an individual phone number in the RMG Database to determine what privacy policy or policies and "context and purpose" the consumer consented to in providing his or her telephone number. This also does not account for the paper leads, email leads and website leads RMG had acquired directly and merged with the leads purchased from third-party vendors.

> Q. . . . Did you look to see how many of the calls that were made, the phone numbers on your preliminary class list, are also in lead lists provided by RMG?
>
> A. **I didn't make the comparison.**
>
> Q. Okay. Do you have any idea how many of those phone numbers are found on more than one lead list?
>
> A. It wouldn't surprise me if they were, **but I didn't make that comparison.**
>
> Q. Did you ever determine how many lead lists Phil Charvat appeared on?
>
> A. **No, I didn't -- I didn't look for that.**

[Ex. 3 at 422 (emphasis added).][33]

In this admission, Hansen effectively confirms that the individual questions arising from these sources coming from "so many different websites" renders this case inappropriate for class certification. Moreover, Hansen's admission confirms that his broad assertions about all of RMG's "opt-in" data being inauthentic or unreliable is nothing more than his pure speculation. *See e.g., Navarro v. Fuji Heavy Indus.*, 117 F.3d 1027, 1031 (7th Cir. 1997) ("The [expert's] affidavit contains no support for this conclusion, and a conclusion without any support is not one based on expert knowledge and entitled to the dignity of evidence."). When Hansen was asked at his deposition why he failed to take any of these elemental testing steps as part of his methodology, he justified has abject failure on "sheer volume," as follows:

> Q: (By Becker) Explain the methodology employed by you in determining whether the leads in the case are flawed, fraudulent, and unreliable?
>
> A. (By Hansen) **The sheer volume.**

[Ex. 3 at 428 (emphasis added).]

---

[33] Approximately 51 million phone numbers for which lead lists exist are associated with more than one (1) source and approximately 12 million phone numbers are associated with more than four (4) sources. [Ex. 8 at 40.] Due to multiple possible consent sources, Hansen would need to determine all possible sources for each proposed class member, contact each source, determine whether the proposed class member provided consent and then review the consent to determine whether it was sufficient. *Id.* at 41. However, Hansen did not make a single inquiry in this regard. [Ex. 2 at 403-404; *see generally* Ex. 3.]

Hansen's failure to review any of the source data contained within RMG's lead database is a compelling example of his repeated invocation of speculation, *ipse dixit* and a flawed, unreliable methodology at every level in this case. *See e.g., General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *see also Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.,* 521 F.3d 790, 791–92 (7th Cir. 2008) ("an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process"); *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003) ("[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support"). His Report and conclusions should be stricken.

## VI. HANSEN'S REPORT AND OPINION SHOULD ALSO BE STRICKEN BECAUSE THEY ARE REPLETE WITH HIS UNQUALIFIED LEGAL OPINIONS ABOUT THE TCPA

Hansen has filled his Report with (i) inadmissible legal opinions and conclusions about the TCPA and related FCC regulations or reports, (ii) the legal conclusion that RMG "*promoted* the goods and services of Cruise Defendants," [34] (iii) his own opinion as to the legal standard for the "prior express consent" defense under the TCPA, and (iv) his opinion as to the legal standard for the "established business relationship" ("EBR") defense under the TCPA.[35] *See e.g.,* DE 492-1 at 11, and 15-17. Hansen is not a lawyer, has no legal training, has not authored any articles on the TCPA, and admitted that he has no understanding about the TCPA statute, related rules or regulations. [Ex. 3 at 395-96.] By offering Hansen's opinions on the TCPA, Plaintiff is

---

[34] In his 22-page Report, Hansen made this legal conclusion a total of *__36__ times.* [See Ex. 2 at 2, 5 (twice), 6 (three), 7, 9, 10 (three), 11 (four), 12 (six), 13, 14 (five), 15 (three), 17 (twice), 18 (twice) and 22.]

[35] By way of just one example, on page 16 of his Report, Hansen seeks to provide this Court with a long narrative interpreting the TCPA, the FCC regulations and reports governing "Opt-In" data and "prior express consent," and a citation to a Ninth Circuit decision interpreting the law. [*See* DE 492-1 at 16.] This one of many examples where Hansen seeks to provide an "expert" report on the ultimate legal questions in this case, for which he has absolutely no education, training or background to provide.

using his expert to address the central legal issues that have been raised by in this Lawsuit. Courts have routinely stricken the reports and opinions of experts who provide opinions that are legal conclusions.[36] Plaintiff cannot establish by a preponderance of the evidence that Hansen's Report and opinions should be admitted under Rule 702, as they are filled with legal conclusions on the ultimate questions in this case. Consequently, his Report and opinions should be excluded, and Hansen should be summarily barred from admission in this case.

WHEREFORE, for the foregoing reasons, the Cruise Lines respectfully request this Court enter an Order striking the Report, opinions and testimony of Hansen, and bar them in connection with class certification and at trial, and for all other relief that the Court deems just and proper.

Respectfully Submitted,

| | |
|---|---|
| Catherine J. MacIvor (Florida Bar # 932711) | Jeffrey S. Becker (ARDC #6282492) |
| Jeffrey E. Foreman (ARDC # 6193309) | Darren B. Watts (ARDC #6197441) |
| Daniela Ferro (Florida Bar # 111479) | Lena Shapiro (ARDC #6321499) |
| FOREMAN FRIEDMAN, PA | SWANSON, MARTIN & BELL, LLP |
| One Biscayne Tower, Suite 2300 | 330 N. Wabash Avenue, Suite 3300 |
| 2 South Biscayne Boulevard | Chicago, Illinois 60611 |
| Miami, FL 33131 | Tel: 312-321-9100 |
| *Attorneys for Royal Caribbean Cruises, Ltd. and NCL (Bahamas), Ltd.* | *Attorneys for Carnival Corporation & PLC* |
| By: /s/ Catherine J. MacIvor | By: /s/ Jeffrey S. Becker |
| Catherine J. MacIvor | Jeffrey S. Becker |

---

[36] *See, e.g., Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 900 (7th Cir. 1994) (excluding expert testimony regarding compliance with Federal Motor Vehicle Safety Standards); *Nationwide Transp. Fin. v. Cass Info. Sys.,* 523 F.3d 1051, 1059-60 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her *legal conclusion,* i.e., an opinion on an ultimate issue of law.") (quoting *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1016 (9th Cir. 2004)); *Aguilar v. Int'l Longshoremen's Union Local # 10,* 966 F.2d 443, 447 (9th Cir. 1992) (upholding district court's exclusion of expert legal opinion as "utterly unhelpful"); *United States v. S. Ind. Gas & Elec. Co.,* 55 Env't Rep. Cas. (BNA) 1597 (S.D. Ind. Oct. 24, 2002)).

## CERTIFICATE OF SERVICE

I, Jeffrey S. Becker, Esq., do hereby certify that on this 31st day of August, 2016, I cause a copy of the forgoing Motion to Strike Report of Plaintiff's Expert, Jeffrey Hansen, and to Exclude His Opinions and Testimony, to be served to all counsel of record via ECF, and to Elizabeth Valente, as agreed, at the e-mail address of bvalente@tsncorporate.com.

Case: 1:12-cv-05746 Document #: 521 Filed: 08/31/16 Page 34 of 34 PageID #:17311

## SERVICE LIST

*Charvat v. Travel Services, et al., Case No.* 12-cv-5746

**Attorney for Plaintiff**
Alexander H. Burke
Burke Law Offices, LLC
155 N. Michigan Avenue, Suite 9020
Chicago, IL  60601
312-729-5288
FAX: 312-729-5289
ABurke@BurkeLawLLC.com

Matthew P. McCue
Law Offices of Matthew P. McCue
1 South Ave., Third Floor
Natick, MA  01760
508-655-1415
FAX:  508-644-1415
mmccue@massattorneys.net

Edward A. Broderick
Broderick Law, P.C.
125 Summer Street, Suite 1030
Boston, MA  02110

**Travel Services and Beth Valente**
Elizabeth Valente
TSN/RMG
bvalente@tsncorporate.com
By e-mail service as agreed.

27