**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Philip Charvat on behalf of himself and others | ) | |
| similarly situated, | ) | |
|     Plaintiff, | ) | Case No. 1:12-cv-5746 |
| | ) | |
| v. | ) | Judge Wood |
| | ) | Mag. Judge Rowland |
| Elizabeth Valente, Resort Marketing Group, Inc., | ) | |
| Carnival Corporation & PLC, Royal Caribbean | ) | |
| Cruises, Ltd., NCL (Bahamas) Ltd. | ) | |
|     Defendants. | ) | |

**PLAINTIFF'S REPLY TO DEFENDANTS'
<u>OPPOSITION TO MOTION FOR CLASS CERTIFICATION</u>**

# **TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION ....................................................................................1

II.   ARGUMENT.........................................................................................3

    A.    Defendants' Self-Serving Recitation Of The Merits Of This Case Is Hotly Disputed And Will Be Resolved At Trial ...............................................3

    B.    Mr. Charvat Is An Ideal Class Representative.................................4

        1.    The Claim That Mr. Charvat "Invites" Telemarketing Calls Is Without Merit..........................................................................6

            a.    The Lead Data Relied Upon By The Cruise Defendants Is Fraudulent ...........................................................7

    C.    The Cruise Defendants' Challenge To The Expert Methodology Of Jeffrey Hansen Is Meritless And Does Not Warrant The Denial Of Class Certification .......................................................................10

    D.    Mr. Charvat Has Constitutional Standing To Represent The Class.................14

    E.    The Class Is Objectively Ascertainable In Satisfaction Of Rule 23 ...............15

    F.    Mr. Charvat's Claims Are Typical Of The Class Claims In Satisfaction Of Rule 23 ...................................................................................17

    G.    Individual Issues Relating To Consent Can Be Resolved Using Common Proof........................................................................................17

    H.    Individual Issues Do Not Predominate And Will Be Litigated Using Common Proof..........................................................................22

    I.    The Cruise Defendants Are Liable Under A Theory Of Actual Agency ........23

        1.    The Cruise Defendants Are Liable Under A Theory Of Apparent Authority .......................................................................24

        2.    The Cruise Defendants Are Liable Under A Theory Of Ratification ..25

    J.    Whether Class Members Have An EBR With The Defendants Will Be Litigated Using Common Proof..................................................27

    K.    The Resolution Of This Dispute Via Class Action Is Superior To Individual Claims.......................................................................28

II.   CONCLUSION....................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abante Rooter and Plumbing, Inc. v. Birch Communications, Inc.*,
2016 U.S. Dist. LEXIS 8526 (N.D GA. Jan. 7, 2016)............................................................14

*Abdeljalil v. Gen. Elec. Capital Corp.*,
2015 WL 1346850 (S.D. Cal. Mar. 26, 2015) .......................................................................17

*Aguilar v. Wawona Frozen Foods*,
2016 U.S. Dist. LEXIS 51171 (E.D. Cal 2016).....................................................................29

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013)............................................................................................................4

*Aranda v. Caribbean Cruise Line, Inc.*,
2016 U.S. Dist. LEXIS 111828 (N.D. Ill. Aug. 23, 2016)................................................2, 15

*Aranda v. Caribbean Cruise Line, Inc.*,
2016 U.S. Dist. LEXIS 51704 (N.D. Ill. Apr. 18, 2016) .........................................................2

*Baird v, Sabre, Inc.*,
995 F. Supp. 2d 1100 (C.D.Cal. 2014) ..................................................................................22

*Birchmeier v. Caribbean Cruise Line, Inc.*,
302 F.R.D. 240 (N.D. Ill. 2014)...............................................................................2, 3, 17, 30

*Booth v. Appstack, Inc.*,
2016 U.S. Dist. LEXIS 68886 (W.D. Wash. May 25, 2016)..................................................15

*In re Caribbean Cruise Line, Inc.*,
2014 U.S. App. LEXIS 25084 (7th Cir. Ill. Oct. 10, 2014) .....................................................2

*CE Design v. King Architechtural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011) ...................................................................................................6

*Chamberlain v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) .................................................................................................29

*Chapman v. Wagener Equities, Inc.*,
747 F.3d 489 (7th Cir. Ill. 2014)...........................................................................................28

*Charvat and Desai v. ADT Security Services, Inc.*,
No. 11-1925 (N.D. Ill.) ............................................................................................................4

ii

*Charvat, et. al. v. Monitronics International Inc., et. al.*,
  1:13-md-02493-JPB-MJA (Dkt. No. 420) (N.D. W. Va. May 29, 2015)..............................6

*Charvat v. AEP Energy, Inc.*,
  1:14-cv-03121 (N.D. Ill 2015) ............................................................................4

*Charvat v. Crawford*,
  155 Ohio App. 3d 161 (Ohio Ct. App. 2003) ...........................................................5

*Charvat v. Echostar Satellite, LLC*,
  630 F.3d 459 (6th Cir. 2010) ..............................................................................5

*Charvat v. Elizabeth Valente, et. al.*
  2015 U.S.Dist. LEXIS 73942 (ND Ill. June 8, 2015) ...............................................23

*Charvat v. Farmers Ins. Columbus, Inc.*,
  178 Ohio App. 3d 118 (Ohio Ct. App. 2008) ...........................................................5

*State ex. rel. Charvat v. Frye*,
  114 Ohio St. 3d 76 (Ohio 2007)...........................................................................5

*Charvat v. GVN Mich., Inc.*,
  561 F.3d 623 (6th Cir. 2009) ..............................................................................5

*Charvat v. National Guardian Life Insurance Company*,
  No. 3:15-cv-00043 (W.D.Wis. 2016) (Peterson, J) ..................................................4

*Charvat v. NMP, LLC*,
  656 F.3d 440 (6th Cir. 2011) ..............................................................................5

*Charvat v. Ryan*,
  116 Ohio St. 3d 394 (Ohio 2007)..........................................................................5

*Charvat v. Elizabeth Valente, et. al.*
  110 F. Supp. 3d 894 (N.D. Ill. 2015) ....................................................................5

*Fitzhenry v. Career Educ. Corp.*,
  2016 U.S. Dist. LEXIS 26244 (N.D. Ill. Mar. 1, 2016).............................................15

*Mey v. Got Warranty, Inc.*,
  No. 15-101 (N.D. W. Va. June 30, 2016) ..............................................................15

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) .......................................................................13, 17

*Murray v. GMAC Mortgage Corp.*,
  434 F.3d 948 (7th Cir. 2006) ..............................................................................5

iii

*Owens Ins. Co. v. European Auto Works, Inc.*,
    695 F.3d 814 (8th Cir. 2012) ...................................................................................15

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) ...................................................................................17

*Satterfield v. Simon & Schuster*,
    569 F.3d 946 (9th Cir. 2009) ...................................................................................23

*Stoops v. Wells Fargo Bank, NA.*,
    No. 15-83, 2016 U.S. Dist. LEXIS 82380 (W.D. Pa. June 24, 2016)................................14, 15

*Telephone Science Corporation v. Asset Recovery Solutions, LLC*,
    2016 U.S. Dist. LEXIS 104234 (N.D. Ill. Aug. 8, 2016)...................................14, 15

*Woods v. City of Chicago*,
    234 F.3d 979 (7th Cir. 2000) ...................................................................................19

**Regulatory Cases**

*In the Matter of The Joint Petition Filed By Dish Network*,
    28 FCC Rccd 6574 (Apr. 17, 2013)...........................................................................28

*In re Rules & Regs. Implementing the TCPA*,
    27 FCC Rcd 1830 (2012).........................................................................................22

*In the Matter of Rules and Regulations Implementing the Telephone Consumer
    Protection Act of 1991*,
    FCC 03-153, -- FCC Rcd. --, 2003 WL 2157853, 2003 FCC LEXIS 3673
    (July 3, 2003) .....................................................................................................20, 21

**Statutes**

47 U.S.C. § 227 .........................................................................................................15

47 U.S.C. § 227(a)(4).................................................................................................28

Ohio Rev. Code § 2933.52..........................................................................................1

**Rules**

Fed. R. Civ. P. 23 ......................................................................................... *passim*

Fed. R. Civ. P. 23(b)(3)................................................................................................4

Fed. R. Evid. 803(6)...................................................................................................19

Fed. R. Evid. 901(b)...................................................................................................19

**Regulations**

47 C.F.R. § 64.1200(a)(2)(iv) ................................................................................................27

47 C.F.R. § 64.1200(f)(4) ......................................................................................................29

**Other Authorities**

Rest. (Third) of Agency ...............................................................................24, 25, 26

## I.     __INTRODUCTION__

In opposition to Plaintiff's Motion for Class Certification (Dkt. No. 492), the Cruise Defendants[1] have submitted a trial brief that asserts myriad merits arguments as to why the Cruise Defendants should, in their view, prevail at trial. *See* (Dkt. No. 520) ("Opp. Brief at __".) The Cruise Defendants' purported merits arguments have nothing to do with class certification. The class Mr. Charvat seeks to certify consists of 388,966 putative class members who received 668,942 illegal pre-recorded telemarketing calls from the defendant Resort Marketing Group "RMG") promoting the products of the Cruise Defendants. The phone numbers of the class members appear in three telemarketing campaigns that included calls to Mr. Charvat.[2] That each of the proposed class members received pre-recorded messages is confirmed by an admission by the telemarketer in the case --RMG-- as well as by the fact that Mr. Charvat recorded the illegal pre-rerecorded calls at issue and the scripted recorded message promoted the goods or services of the Cruise Defendants.[3] The illegal telemarketing calls received by Mr. Charvat and class members were identical in all important aspects: they used the same pre-recorded message; were sent through the same voice broadcasting software, and were all found in the dialer database maintained by RMG and produced in discovery. The damages sought by all class members are statutory and identical, as such, no individual inquiries as to damages is required. The scope of the conduct at issue is large, and the individual damages are too small to incentivize individuals to sue. The central issue in this litigation- whether the Cruise Defendants are vicariously liable for the actions of RMG- presents common questions of law and fact that favor certification of the

---

[1] The defendants are all defending this case cooperatively via a joint defense agreement.

[2] The class case consists of consumers whose phone numbers were found in Campaigns 422, 505 and 610, the same campaigns that included the calls to Mr. Charvat (the "Charvat Campaigns").

[3] Plaintiff resides in Ohio. Under Ohio law he may record any telephone call in which he is a party without the consent or notice to the other parties [*See:* Ohio Rev. Code § 2933.52]

class. For all of these reasons, Mr. Charvat has satisfied the requirements of Rule 23 and this matter should proceed to trial as a certified class.

The Court should also note at the outset, the overwhelming similarities between this case and another TCPA class action against a cruise line, *Birchmeier v. Caribbean Cruise Line, Inc.*, Case No. 12-C-4069, which is proceeding in this District before Judge Kennelly ("*Birchmeier*"). Identical to this case, *Birchmeier* features a class of consumers seeking redress under the TCPA due to their receipt of prerecorded telemarketing calls promoting the goods and services of the defendant, Caribbean Cruise Line. Like the Cruise Defendants here, Caribbean Cruise Line also claimed that the telemarketing calls were physically made by an independent third party over which it did not exercise control. Many of the same defenses raised by the Cruise Defendants here were raised as purported barriers to class certification and were carefully considered and rejected by Judge Kennelly. *See Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250-251 (N.D. Ill. 2014) (rejecting various defenses to class certification and citing vicarious liability as a common question supporting certification), petition for rehearing denied, *In re Caribbean Cruise Line, Inc.*, 2014 U.S. App. LEXIS 25084 (7th Cir. Ill. Oct. 10, 2014) and *Aranda*[4] *v. Caribbean Cruise Line, Inc.*, 2016 U.S. Dist. LEXIS 51704 ** 27-40 (N.D. Ill. Apr. 18, 2016) (court denies defendant's motion for summary judgment recognizing vicarious liability theories are fact intensive and should be resolved at trial); and *Aranda v. Caribbean Cruise Line, Inc.*, 2016 U.S. Dist. LEXIS 111828, *19-20 (N.D. Ill. Aug. 23, 2016) (motion to decertify the class denied on grounds relating to *Spokeo*). As Judge Kennelly held when certifying the class in *Birchmeier*:

> In this case, plaintiffs have alleged that defendants chose to violate the TCPA on a very large scale by targeting a million or more people with inappropriate calls.

---

[4] Featuring a new plaintiff, this is the same lawsuit as *Birchmeier.*

Individual litigation of the claims of each individual would not be a superior or efficient way to resolve the claims.

*Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. at 255. Just like *Birchmeier*, this lawsuit features cruise lines hiring a third party telemarketing outfit that engaged in pre-recorded telemarketing on massive scale to consumers nation-wide. As recognized by Judge Kennelly in *Birchmeier*, the most efficient manner to resolve such a matter is through the class action vehicle.

## II.     ARGUMENT

### A.     Defendants' Self-Serving Recitation Of The Merits Of This Case Is Hotly Disputed And Will Be Resolved At Trial

The Cruise Defendants' brief begins with an allegation that Mr. Charvat has omitted "critical facts" from his class certification submission and that his evidence of vicarious liability is "threadbare." Opp. Brief at 1-3.[5] Mr. Charvat's Memorandum of Law in Support of Motion for Class Certification (Dkt. No. 492) ("Plaintiff's Class Memo at __"), of course, focused on the only relevant issue before the Court: whether this case should be certified to proceed as a class. Although Mr. Charvat looks forward to presenting the merits of this case to a jury at trial, the time to debate the merits is not now. The Supreme Court has cautioned that although the class certification analysis is to be rigorous per *Wal-Mart Stores, Inc. v. Dukes*,

> Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. See id., at ___, n. 6, 131 S. Ct. 2541, 180 L. Ed. 2d 374, at 391(a district court has no "authority to conduct a preliminary inquiry into the merits of a suit" at class certification unless it is necessary "to determine the propriety of certification" (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974))); Advisory

---

[5] The parties to this litigation all agreed with Judge Rowland's recommendation that merits discovery as to the plaintiff's vicarious liability claims would wait until after the Court ruled on class certification. *See* (Dkt. No. 391) ("The parties and the Court agree that merits discovery will be required post-class certification…").

> Committee's 2003 Note on subd. (c)(1) of Fed. Rule Civ. Proc. 23, 28 U.S.C.
> App., p. 144 ("[A]n evaluation of the probable outcome on the merits is not
> properly part of the certification decision.")

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-1195 (2013). The Court

further stressed that "the focus of Rule 23(b)(3) is on the predominance of common *questions.*"

*Id.*, 133 S.Ct. at 1195.

The Cruise Defendants, however, have taken a different tack. In their opposition, they

have submitted sixty (60) pages of briefing along with seventy-two (72) exhibits. The Cruise

Defendants do not even begin to discuss whether Mr. Charvat has satisfied Rule 23 until page

twenty three (23) of their opposition. Mr. Charvat's reply to the Cruise Defendants' opposition

will continue to focus on why this case should be certified as a class and allowed to proceed to

trial on the merits.[6]

## B.    Mr. Charvat Is An Ideal Class Representative[7]

Throughout their Opp. Brief, but specifically at pages 11-13, and 19-20, the Cruise

Defendants attack Mr. Charvat claiming he is a "serial litigant" who "invites" telemarketing calls

---

[6] If the Court, however, believes it is appropriate to assess the merits of Mr. Charvat's factual
claims, ample evidentiary support is already before the Court. *See* Plaintiff's Joint Motion for
Reconsideration of Judge Rowland's Order Granting In Part Plaintiff's Motion to Compel (Dkt.
No. 315); Plaintiff's Motion to Amend to File Third Amended Complaint (Dkt. No. 308);
Plaintiff's Reply to Cruise Defendants' Opposition to Motion to Amend (Dkt. No. 353); Third
Amended Complaint, and its attachments (Dkt. No. 463). Mr. Charvat explained in these
submissions, with reference to record evidence, that each of the Cruise Defendants authorized
RMG to market on their behalf using their trade names and, in fact, reimbursed RMG for
marketing expenses. These submissions also document the fact that for eighteen months after the
class litigation was filed, RMG continued to telemarket via prerecorded message for the Cruise
Defendants and the Cruise Defendants did nothing. Instead, they continued to reap the benefits
of RMG's illegal acts.

[7] On three prior occasions, Mr. Charvat was appointed by courts in the Seventh Circuit as class
representative in TCPA class actions. *See Charvat and Desai v. ADT Security Services, Inc.,* No.
11-1925 (Dkt. No. 243) (N.D. Ill.) (Bucklo, J.)*; Charvat v. AEP Energy, Inc.,* 1:14-cv-03121
(Dkt. No. 41) (N.D. Ill) (Zagel, J.)*.); Charvat v. National Guardian Life Insurance Company*, No.
3:15-cv-00043 (Dkt. No. 70) (W.D.Wis.) (Peterson, J)*.*

and is, therefore, an inadequate class representative.[8] Since the outset of this case, Mr. Charvat

has made no secret of the fact that he is a telemarketing activist and is responsible for many

important appellate telemarketing decisions recognizing and clarifying the broad protections

afforded consumers under the TCPA.[9] In 2007, for example, the Ohio Supreme Court recognized

Mr. Charvat's wide success as a TCPA litigant stating:

> Although … Charvat has filed numerous lawsuits under the TCPA in recent years,
> there is no evidence that any of these cases have been frivolous.  In fact, the
> evidence establishes that Charvat has been successful in all but one of nearly 60
> lawsuits filed in the Franklin County Municipal and Common Pleas Courts.

*See State ex. rel. Charvat v. Frye,* 114 Ohio St. 3d 76, 80 (Ohio 2007). The Cruise Defendants

fail to explain why Mr. Charvat's experience with TCPA litigation disqualifies him from serving

as the class representative. Activists such as Mr. Charvat, who are well educated and experienced

in litigation, are ideal class plaintiffs.  *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 955

(7th Cir. 2006) (recognizing "repeat litigants" as uniquely competent class representatives).[10]

---

[8] The Cruise Defendants attack on Mr. Charvat is nothing new. Long ago, this Court assessed and rejected the claim that Mr. Charvat's prior TCPA experience disqualified him from serving as a class representative. *See Charvat v. Travel Servs.*, 110 F. Supp. 3d 894, 898 (N.D. Ill. 2015). To discourage Mr. Charvat from pursuing this case, the defendants also have asserted a frivolous "wiretap" counterclaim against Mr. Charvat, have falsely accused Mr. Charvat of perpetrating a "fraud on the court" by "inviting" telemarketing calls, and have accused his daughter, Allison, of being a "liar." The Cruise Defendants have also now launched an assault, not only on the expert opinion of Mr. Charvat's expert, Jeff Hansen, but on his character as well.

[9] *See Charvat v. Echostar Satellite, LLC,* 630 F.3d 459, 461 (6th Cir. 2010) ("Philip Charvat has not been shy in taking on the role of a private attorney general under the Telephone Consumer Protection Act" and collecting cases); *Charvat v. NMP, LLC,* 656 F.3d 440 (6th Cir. 2011); *Charvat v. GVN Mich.*, *Inc*., 561 F.3d 623 (6th Cir. 2009); *Charvat v. Farmers Ins. Columbus, Inc.,* 178 Ohio App. 3d 118, (Ohio Ct. App. 2008); *Charvat v. Ryan,* 116 Ohio St. 3d 394 (Ohio 2007); *Charvat v. Crawford,* 155 Ohio App. 3d 161, 2003 Ohio 5891, 799 N.E.2d 661 (Ohio Ct. App. 2003).

[10] The Cruise Defendants also claim that the income derived by Mr. Charvat from his TCPA advocacy over the past twenty years should disqualify him serving as a class representative. Again, this Court previously considered and rejected this exact argument. *See Charvat v. Travel Servs.*, 110 F. Supp. 3d 894, 898 (N.D. Ill. 2015). Further, it is worth nothing that Mr. Charvat has repeatedly refused to place his own financial over the interests of other class members. *See*

"For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." *CE Design v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011). As explained below, the Cruise Defendants have not offered a single shred of admissible, authentic or reliable evidence to challenge Mr. Charvat's adequacy as a class representative.

      **1.**       **The Claim That Mr. Charvat "Invites" Telemarketing Calls Is Without Merit**

      In addition to labeling Mr. Charvat as a "serial litigant," the Cruise Defendants accuse Mr. Charvat of "inviting" telemarketing calls by "planting" his contact information on the Internet. Opp. Brief at 11-13. These desperate allegations do not withstand close scrutiny.[11]

---

*e.g., Charvat, et. al. v. Monitronics International Inc., et. al.,* 1:13-md-02493-JPB-MJA (Dkt. No. 420) (N.D. W. Va. May 29, 2015) (offers of judgment of $50,000 made to Mr. Charvat individually rejected as no offer made to other members of the class).

[11] At page 12 of its Opp. Brief, and in purported "support" of its allegation that Mr. Charvat "invites" telemarketing calls, the Cruise Defendants assert that a Ohio state judge "ordered" Mr. Charvat to place his home telephone number on the National Do Not Call Registry. At his deposition, Mr. Charvat explained that he initiated a lawsuit against the Columbus Dispatch, a newspaper in Columbus, Ohio which continued to telemarket to him despite his repeated requests that such calls cease, and despite two prior TCPA suits over earlier calls. In that lawsuit, Mr. Charvat alleged that the Dispatch was liable for multiple violations of the TCPA. Unfortunately, Mr. Charvat's counsel was unable to continue the case due to a health emergency. Without counsel, Mr. Charvat decided to dismiss the case against the Dispatch. Counsel for the Dispatch, however, filed a sanctions motion against Mr. Charvat claiming his damages theory was frivolous. Mr. Charvat disagreed with this assertion, but to resolve the sanctions issue, Mr. Charvat voluntarily agreed to place his residential number on the Do Not Call Registry in exchange for the dismissal of the sanctions threat. Counsel for the Dispatch insisted that the terms of the settlement be reduced to an Order. Mr. Charvat agreed and the Order, referred to by the Cruise Defendants, was entered. Mr. Charvat, thereafter, placed his residential numbers on the Do Not Call Registry. *See* __Exhibit 1,__ Deposition of Phil Charvat at pg. 186-190, 363-366. The insinuation from counsel that a Court found wrongdoing on behalf of Mr. Charvat, given the above context, is demonstrably false and, in no way supports the Cruise Defendants' allegation that Mr. Charvat "invites" telemarketing calls or is otherwise inadequate to represent the class.

        a.        **The Lead Data Relied Upon By The Cruise Defendants Is Fraudulent**

In support of their allegation that Mr. Charvat "invites" telemarketing calls, the Cruise Defendants have referenced a lead that contained Mr. Charvat's contact information, that was produced by RMG in discovery, and which was purportedly originally obtained from a web site called www.123freetravel.com.[12] For the first four years of this litigation, it was never disputed that this was *the* lead relied upon by RMG to call Mr. Charvat via pre-recorded message.[13] In his initial memorandum, Mr. Charvat set forth the many reasons why this lead was inadmissible, unreliable, fraudulent and in no way evidenced Mr. Charvat's alleged consent to receive telemarketing calls from RMG.[14] In their Opp. Brief, the Cruise Defendants make no effort to address the authenticity, reliability or sufficiency of this lead.

Instead, after Mr. Charvat demonstrated that the lead from www.123freetravel.com was likely fraudulent, the Cruise Defendants again changed course. They then had their expert, Margaret Daley, search through all of the many millions of leads purchased by RMG from various data brokers for more data relating to Mr. Charvat. Ms. Daley then found three additional leads that contained Mr. Charvat's contact information all of which were purportedly obtained from a web site called www.enews.com. Ms. Daley then argued in her expert report that it was possible, despite the testimony of RMG to the contrary, that Mr. Charvat consented to receive telemarketing calls from RMG, by providing his contact information to www.enews.com.[15]

Apparently in an effort to authenticate the leads from www.enews.com and detailed in the Daley Report, the Cruise Defendants then contacted SMA Communications, the entity that

---

[12] See Report of Margaret Daley, at Ex 1, pg. 42 to the Opp. Brief ("Daley Report)
[13] *See* Plaintiff's Class Cert Memo at Ex 1, Tab L, Deposition of Elizabeth Valente at pg. 185) (Charvat was called based on lead from www.123freetravel.com).
[14] Class Cert. Memo, at pages 9-15.
[15] See Daley Report, Ex 1 to Opp. Brief, at pg. 42.

owned www.enews.com. The Cruise Defendants then spoke with Anthony Pascale,[16] one of the

owners of SMA Communications, and asked Mr. Pascale to search the SMA database for any

leads relating to Mr. Charvat. Mr. Pascale did so and discovered a number of leads that

purportedly matched Mr. Charvat's contact information and detailed these leads in an affidavit

that has been submitted to this Court (the "Pascale Declaration").[17] Curiously, however, the

Pascale Declaration made no reference to the leads from www.enews.com, the leads referred to

in the Daley Report and offered by the Cruise Defendants as purported evidence that Mr. Charvat

"invites" telemarketing calls to his home and consented to receive pre-recorded telemarketing

calls from RMG on behalf of the Cruise Defendants.[18]

At his recent deposition,[19] Mr. Pascale admitted that although SMA was still in the

possession of all leads directly obtained from www.enews.com via consumer's visits to web-sites

going back ten years, and that he searched the SMA database for all leads relating to Mr.

Charvat, Mr. Pascale did not discover any leads relating to Mr. Charvat and obtained from

www.enews.com.[20] When asked to explain how leads from www.enews.com and allegedly

---

[16] *See* Deposition of Anthony Pascale, Opp. Brief at Exhibit 37, pg. 87, lines 1-8. Mr. Pascale admitted at his deposition that he is a convicted felon who served twenty months in jail relating to a two million dollar insurance fraud. *Id.* at 28-29.

[17] The authenticity and relevance of these leads was addressed and rebutted at length in Mr. Charvat in his Opposition to the Cruise Defendants Motion to Compel Inspection of Computer Systems (Dkt. No. 455). In a thorough and well-reasoned decision, Judge Rowland examined these leads and rejected the Cruise Defendants' claim that these leads somehow supported the allegation that Mr. Charvat "invites" telemarketing calls to his home. *See Order on Cruise Lines Defendant's Motion to Compel* (Dkt. No. 470) (rejecting defendants argument noting the leads relied upon were purchased from third parties and were not reliable, and further recognizing that unauthenticated data, of the sort relied upon by the defendants, and purportedly discovered on the Internet is speculative).

[18] Ms. Daley's chart, that appears at p. 42 of the Daley Report, is attached at ***Exhibit 2.***

[19] Mr. Pascale was deposed after the Plaintiff's Motion for Class Certification was filed. It was only at this deposition did Mr. Charvat's counsel learn that the leads from www.enews.com were fraudulent.

[20] *Id.* at. 89, lines 3-8.

relating to Mr. Charvat, could have ended up in RMG's possession, and prominently featured at page 42 of the Daley Report, Mr. Pascale testified that, in his opinion, the leads in the RMG database relating to Mr. Charvat and www.enews.com, *were fraudulent and had been manufactured by disreputable lead brokers.*[21]

Although the Cruise Defendants were the ones who initially contacted Mr. Pascale, asked him to search SMA's database for data relating to Mr. Charvat, and used the results of that search to attack Mr. Charvat, Mr. Pascale testified that he was *never told* by defense counsel that their consent defense was based, in large part, on leads relating to Mr. Charvat that purportedly originated at www.enews.com. Mr. Pascale further testified that if he had been made so aware, he would have disclosed in his declaration that leads relating to Mr. Charvat's alleged visits to www.enews.com did not exist.[22]

Accordingly, Mr. Charvat has now affirmatively demonstrated that (1) www.123freetravel.com is a scam; (2) the lead from this web-site has not been authenticated, (3) the lead is likely fraudulent, and (4) the lead does not constitute Mr. Charvat's prior express consent to receive pre-recorded telemarketing calls from RMG on behalf of the Cruise Defendants. *See* Plaintiff's Class Cert. Memo at 9-15. Similarly, it is now *undisputed* that the leads from www.enews.com[23] are also fraudulent and in no way demonstrate that Mr. Charvat somehow "invited" the calls at issue as alleged, or that Mr. Charvat consented to receive the telemarketing calls at issue. Mr. Charvat is a dedicated telemarketing activist and an experienced TCPA litigant. He will be an ideal class representative. That he has endured such a ceaseless

---

[21] *Id.* at. 93-94 ("Somebody that was between where the lead was purchased had to have played games or entered false information on that record").

[22] *Id.* at. 90-93. The Declaration of Mr. Pascale was attached to the Opp. Brief at Exhibit 37.

[23] Despite the fact that the Cruise Defendants now know that these leads are fraudulent, no effort has been made to withdraw or revise the Daley Report in regards to its representations as to the leads from www.enews.com.

attack on his character (and that of his family), in his efforts to represent the class, and to hold the Cruise Defendants accountable for their misconduct, is irrefutable proof that he is an adequate class representative.

**C.      The Cruise Defendants' Challenge To The Expert Methodology Of Jeffrey Hansen Is Meritless And Does Not Warrant The Denial Of Class Certification**

The Cruise Defendants claim that the class should not be certified because the opinion of Mr. Charvat's telemarketing expert, Jeff Hansen, is unreliable, and fails to account for the "possibility" that class members received pre-recorded messages that promoted something other than the Cruise Defendants. Opp. Brief at 15. Mr. Hansen's ultimate opinion, however, that each consumer included in the Charvat Campaigns received a pre-recorded telemarketing call from RMG promoting the Cruise Defendants, is well supported by the evidence.

In discovery, Mr. Charvat asked RMG to identify what individual telemarketing campaigns contained in the Dialer Database promoted the goods or services of the Cruise Defendants. Initially, RMG resisted this request and refused to answer. After Judge Rowland ordered RMG to identify "all pre-recorded telemarketing calls initiated by RMG relating to Cruise Defendants," RMG admitted that:

> the only telephone calls contained within the Asteria database for which RMG can state with any degree of certainty would have referenced the Cruise Line Defendants in a pre-recorded message played during the telephone calls are those calls contained within Campaigns 422, 505, 610 and 1410.[24]

RMG explained that it was able to confirm that the Charvat Campaigns promoted the Cruise Defendants via pre-recorded message because Mr. Charvat recorded the calls.[25] As a result,

---

[24] It is not disputed that Campaigns 422, 505 and 610 are the "Charvat Campaigns."  Mr. Charvat only recently discovered his recording for Campaign 1410 and reserves the right to add this campaign to the class post certification.

[25] *See **Exhibit 3**,* RMG's Supplemental Response to Plaintiff's First Set of Interrogatories at pg. 2-3 (RMG admits that the Charvat Campaigns all promoted the goods or services of the Cruise Defendants via pre-recorded message).

RMG has *admitted* that the putative class members were sent pre-recorded messages that promoted the goods and services of the Cruise Defendants.[26] Accordingly, the Cruise Defendants claim that it was *possible* that RMG might have stopped the Charvat Campaigns and switched the recording from promoting the Cruise Defendants to something else is without merit and, under no circumstances can support a basis to prevent this matter from proceeding to trial as a certified class.

In their attack on Mr. Hansen's opinion, the Cruise Defendants focus on a section of the Hansen Report in which he examined the particular numbers assigned to the recordings used in the RMG telemarketing campaigns that included calls to Mr. Charvat. Mr. Hansen noted that these campaigns indicated that recordings labeled s28 or s61 were used in the Charvat

---

[26] The fiction that RMG, more often than not, stopped its telemarketing campaigns mid-stream and changed the substance of the promotion, is belied by the facts. RMG's former President, Richard Borst testified at his deposition that the only goods or services ever promoted by RMG via pre-recorded message were the goods or services of the Cruise Defendants. *See* Opp. Brief at Ex. 3, Deposition of Richard Borst at pg. 108 (only aware of pre-records being used to promote cruise packages); RMG's Vice President of Marketing, Jason Rader, identified at his deposition a "chronology" of pre-recorded messages" used by RMG during the time frame from May of 2010 to April of 2013. The chronology evidences the fact that, during this period of time, RMG *only* promoted the goods or services of the Cruise Defendants. *See* Class Cert. Memo at Ex 1, Tab M, Deposition of Jason Rader, at pg. 31. A copy of the chronology is attached at ***Exhibit 4.*** Further, RMG's IT Manager, Jamie Smith, the individual charged with physically initiating RMG's telemarketing campaigns testified that although it was possible to interrupt a campaign and to switch out a recording, such was not a frequent occurrence. *See* Class Cert. Memo at Ex 1, Tab B, Deposition of Jamie Smith at pg. 97. Mr. Smith also testified he was not aware of any evidence to indicate that the recordings used in the Charvat Campaigns were ever switched mid-campaign. *Id.* at 106-107. Finally, in support of her claim that RMG "regularly" stopped the campaigns mid-stream and switched recordings, Ms. Daley, at pg. 17, fn 41, of the Daley Report, cites to the Declaration of Ms. Valente. Ms. Valente, attested, however, that RMG changed the recordings and switched the promotion, however, only "several times a month." *See* Opp. Brief at Ex. 7, Declaration of Elizabeth Valente at pg. 3, ¶18. Ms. Daley, however, noted in her report that between October of 2010 and March of 2014, RMG initiated 2,477 telemarketing campaigns, which, on average comes to ***fifty-eight telemarketing campaigns a month***. *See* Opp. Brief at Ex. 1, Daley Report at pg. 21. Obviously, even assuming RMG stopped individual telemarketing campaigns "several" times a month and switched the pre-recorded message from a promotion for the Cruise Defendants to something else, such was the exception and not the rule.

11

Campaigns. He then located these numbered recordings in the audio directory of the Dialer Database, and noted that the substance of the recordings promoted the goods or services of the Cruise Defendants. Because all of the consumers in the Charvat Campaigns received a pre-recorded message labeled either s28 of s61, such supported Mr. Hansen's conclusion that all the consumers in the Charvat Campaigns received the same pre-recorded message as Mr. Charvat. *See* Report of Jeffrey Hansen, Ex. 1 to Class Cert. Memo. at pg 9-12.

The Cruise Defendants, however, contend that Mr. Hansen erred when he assumed that the Dialer Database accurately historically identified which numbered recording was played during a particular campaign. In her report, Ms. Daley explains that the historical database in the RMG Dialer Database was "purged" by RMG on May 5, 2012.[27] Apparently due to this "purge" RMG rendered it impossible to forensically determine, from the evidence in the Dialer Database alone, the exact pre-recorded message assigned to a particular campaign. The Cruise Defendants then reason that because it is impossible to "forensically" prove which recording was used in which campaign, Mr. Charvat cannot prove that all class members received pre-recorded messages promoting the Cruise Defendants and, accordingly, class certification should be denied. This claim fails for two reasons.

First, although it may arguably not be possible to "forensically" prove which recording was used with the Charvat Campaigns, due to RMG's "purge" of its records, the Cruise Defendants ignore the fact that Mr. Hansen's opinion, that all class members received pre-recorded telemarketing calls identical to Mr. Charvat, ***did not*** solely rely upon the number assigned to the recording by the RMG Dialer Database. Mr. Hansen primarily relied on the fact that Mr. Charvat recorded the calls and that these recordings undeniably evidence the promotion

---

[27] *See* Opp. Brief at Ex 1, at pg. 15.

by RMG via pre-recorded message, of the goods or services of the Cruise Defendants. The methodology relied upon by Mr. Hansen is set forth in detail in Plaintiff's Class Cert Memo at 17-19. Nowhere in that explanation does Mr. Charvat contend that Mr. Hansen identified the class by relying on the number (s28 or s61) assigned to a particular recording found in the Dialer Database. Rather, Mr. Hansen identified the class because they were included in Charvat Campaigns, and the substance of the recording used in the Charvat Campaigns was evidenced by the recordings made by Mr. Charvat.

Second, the Cruise Defendants should not benefit from the fact that their telemarketing agent, RMG, conveniently "purged" its records making it difficult or impossible to "forensically" determine which pre-recorded message was utilized in individual telemarketing campaigns. *See Mullins v. Direct Digital, LLC,* 795 F.3d 654 (7th Cir. 2015) (recognizing that a defendant facing class certification should not benefit from their failure to maintain records to identify the class). It would be particularly inequitable for the defendants to benefit from RMG's "purge" in this regard where the FCC Citation explicitly placed RMG on notice that its telemarketing was in violation of the TCPA in March of 2011. It also would be inequitable for Carnival, in particular, from benefit from RMG's "purge" of its data when Carnival new, for years prior to the purge that RMG was telemarketing via pre-recorded message, using Carnival's famous trade name, in violation of the TCPA.

In sum, Mr. Hansen has opined that all of the consumers in the Charvat Campaigns received pre-recorded messages from RMG promoting the Cruise Defendants. His opinion is supported by ample evidence. RMG has admitted that the Charvat Campaigns promoted the Cruise Defendants, the evidence overwhelmingly supports the conclusion that the Charvat Campaigns promoted the Cruise Defendants, and the defendants' creative claim that RMG

"might" have stopped the Charvat Campaigns mid-stream and switched out the recording is mere speculation utterly inappropriate for resolution at the class certification stage.

**D.     Mr. Charvat Has Constitutional Standing To Represent The Class**

At page 20 of its Opp. Brief, the Cruise Defendants argue that class certification should be denied because Mr. Charvat purportedly did not suffer an "injury in fact" due to his receipt of illegal pre-recorded telemarketing calls and, as such, does not have constitutional standing to represent the class as a result of the Supreme Court's recent decision in *Spokeo v. Robins*. The Cruise Lines' attempt to apply the decision in *Spokeo* to the TCPA is a tactic that other courts have referred to as a "Hail Mary pass." *See Abante Rooter and Plumbing, Inc. v. Birch Communications, Inc.,* 2016 U.S. Dist. LEXIS 8526 *8 (N.D GA. Jan. 7, 2016).

*Spokeo*, however, concerned a violation of the Fair Credit Reporting Act and not the TCPA. The Cruise Lines offer no support whatsoever for their contention that an allegation of receipt of illegal telemarketing calls in violation of the TCPA does not constitute an "injury in fact" for Article III standing purposes by someone who has not purchased their telephone for the *sole purpose* of receiving call.[28] That is because there is no support for this position. *See Fitzhenry v. Career Educ. Corp.,* 2016 U.S. Dist. LEXIS 26244 * 12 (N.D. Ill. Mar. 1, 2016) (noting that defendants standing argument against an experienced TCPA litigant is premised on

---

[28]  The two cases cited by the Cruise Defendants, *Stoops v. Wells Fargo Bank, NA.*, No. 15-83, 2016 U.S. Dist. LEXIS 82380 (W.D. Pa. June 24, 2016), and *Telephone Science Corporation v. Asset Recovery Solutions, LLC,* 2016 U.S. Dist. LEXIS 104234 (N.D. Ill. Aug. 8, 2016), are easily distinguishable. In *Stoops*, the plaintiff filed an individual TCPA lawsuit seeking to recover for calls made to thirty five (35) cell phones she obtained solely for the purpose of attracting telemarketing calls that she described as a TCPA "business." The phones at issue in *Stoops* were not the plaintiff's residential or cell phone used for personal business. Similarly, in *Telephone Science*, the plaintiff was a corporation created solely to attract telemarketing calls. In dismissing this case, Judge St. Eve found that a corporation created solely to attract telemarketing calls was not the type of plaintiff that fell within the "zone of interests" that Congress sought to protect in enacting the TCPA. *Id.* at 46-48. Here, there is no dispute that the calls made to Mr. Charvat were made to his residential telephone, a number that he and his family have used for personal matters for over twenty-five years.

the presumption that TCPA violations present no concrete injuries to those who receive unwanted telemarketing communications, a position for which defendant "provides no authority for this assertion"). Here, Mr. Charvat has alleged that he, and putative class members, received illegal telemarketing calls from RMG that invaded their right to privacy, the exact harm that Congress sought to prevent in enacting the TCPA. *See* 47 U.S.C. § 227 (Congressional Findings); *see also Owens Ins. Co. v. European Auto Works, Inc.*, 695 F.3d 814, 819-20 (8th Cir. 2012) ("[T]he ordinary meaning of the term 'right of privacy' easily includes violations of the type of privacy interest protected by the TCPA."). Just recently, Judge Kennelly denied a defendants request that he de-certify a TCPA class on the basis that the plaintiff did not sustain sufficient injury in act. *See Aranda v. Caribbean Cruise Line, Inc.*, 2016 U.S. Dist. LEXIS 111828, *19-20 (N.D. Ill. Aug. 23, 2016) (plaintiff had a right to be free from unsolicited telemarketing calls, just as a homeowner has a right to be free from trespass). *See also Booth v. Appstack, Inc.*, 2016 U.S. Dist. LEXIS 68886 *15-17 (W.D. Wash. May 25, 2016) (rejecting claim that a TCPA plaintiff has not sustained a sufficient injury in fact to have standing to enforce the TCPA); *Mey v. Got Warranty, Inc.*, No. 15-101, DE#128 at 5-17 (N.D. W. Va. June 30, 2016) (denying motion to dismiss TCPA class action after finding that unwanted phone calls cause concrete harm" sufficient to confer Article III standing).

As the telemarketing calls at issue were undisputedly made to Mr. Charvat's residential telephone line in violation of his right to privacy, Mr. Charvat has constitutional standing to represent the putative class.

**E.    The Class Is Objectively Ascertainable In Satisfaction Of Rule 23**

The Cruise Defendants claim at page 24 of their Opp. Brief that the class cannot be certified because the class is not ascertainable. In support, the Cruise Defendants' contend that Mr. Charvat seeks to certify a class of phone numbers. They then reason that since an unknown

number of phone numbers of class members have since been disconnected or re-assigned over the past four years, the class should not be certified. Essentially, the Cruise Defendants reason that since they successfully delayed the certification of this case for four years, they should now be rewarded because the phone numbers of some class members may have been disconnected or re-assigned. This argument fails for two reasons.

First, as the Cruise Defendants are well aware, the leads produced by RMG in discovery did not just identify the phone numbers of the class members, but the leads also identified their name and address.[29] Accordingly, the claim that Mr. Charvat's identification of the class is based solely on phone numbers is demonstrably false. To the extent this data needs to be updated to reflect the current address of class members, such is a simple administrative process regularly conducted by claims administrators post certification.

Second, even if all Mr. Charvat had to identify the class was phone numbers, the class would still satisfy any applicable ascertainability challenge.[30] "A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having the right to recover based on the description." *Abdeljalil v. Gen. Elec. Capital Corp.*, 2015 WL 1346850, at *2 (S.D.

---

[29] At Exhibit 5 to his Motion for Class Certification, Mr. Charvat attached a sample of the lead data relied upon by RMG to call consumers. As evidenced by this example, RMG is in the possession of the names and addresses of consumers it called via pre-recorded message, in addition to their phone numbers.

[30] To the extent that notice by United States mail to the addresses in the lead lists were not practicable, the Seventh Circuit has directed that courts use "alternative means such as notice through third parties, paid advertising, and/or posting in places frequented by class members." Moreover, the law of our Circuit is that "[g]iven the significant harm caused by immunizing corporate misconduct [such as reckless poor recordkeeping] a district judge has discretion to allow class members to identify themselves with their own testimony and to establish mechanisms to test those affidavits as needed." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 665 (7th Cir. 2015); see also *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 997 (8th Cir. 2016) (reversing denial of certification in TCPA case, holding that a list of telephone numbers to which faxes were sent is sufficiently ascertainable under Rule 23).

Cal. Mar. 26, 2015) (certifying a TCPA class of phone numbers); *Birchmeier* 302 F.R.D. at 250

(N.D. Ill. 2014) (rejecting a claim that phone numbers were insufficient basis to identify class).[31]

**F.      Mr. Charvat's Claims Are Typical Of The Class Claims In Satisfaction Of Rule 23**

The Cruise Defendants contend that certification should be denied in this case because

Mr. Charvat, who received illegal pre-recorded telemarketing calls on his residential phone, does

not purportedly have "standing" to represent consumers who received the same pre-recorded

calls on their cell phones. *See Opp. Brief at 25.* This argument warrants little discussion as this

exact claim was previously made by the Cruise Defendants and rejected by this Court in its

recent Order granting Mr. Charvat's Motion to File a Third Amended Complaint. *See*

*Memorandum and Order at 6-7* (Dkt. No. 454) (March 17, 2016) (Wood, J.) (rejecting claim that

Mr. Charvat did not have standing to represent consumers who received pre-recorded

telemarketing calls on their cell phones).

**G.      Individual Issues Relating To Consent Can Be Resolved Using Common Proof**

At page 43 of its Opp. Brief, the Cruise Defendants contend that issues relating to

whether consumers granted RMG their prior express consent to receive pre-recorded messages

from RMG on behalf of the Cruise Defendants creates individual issues rendering this matter

inappropriate for resolution via class action. In support, the Cruise Defendants contend that

consumers granted their prior express consent to RMG in a variety of ways, including, (a) in

---

[31] In an effort to manufacture facts to challenge class certification, the Cruise Defendants
conducted a "survey." Without telling the Court or counsel to Mr. Charvat, the Cruise
Defendants hired a third party, called 90,000 class members, and asked them questions as to the
merits of this case. Notably, the Cruise Defendants did not explain to the class members what the
calls were about, that they related to pending litigation, and that the consumer's rights were at
issue. The Cruise Defendants then noted how many numbers were disconnected or had been
reassigned. Opp. Brief at 26; Def. Ex. 49. Putting aside the appropriateness of this tactic, *Mullins*
and its progeny eviscerate these arguments by clarifying that names and addresses need not be
known to certify, and that poor recordkeeping should not permit systematic violations to occur
with impunity.

response to a consumer's e-mail solicitation, (b) in response to a consumer's inquiry to a RMG web site, (c) in response to a contest run by RMG, (d) via a trade show interaction, (e) via a telephone inquiry, and (f) via a referral from a club member. The Cruise Defendants then cite to cases that have denied class certification where the plaintiff was unable to prove a lack of consent using common proof.

The factual premise upon which this argument is based, however, that RMG obtained consent from consumers in a variety of ways, is demonstrably false. The class in this case is limited to the Charvat Campaigns, which are the three telemarketing campaigns that included pre-recorded calls to Mr. Charvat and other putative class members. In her expert report, Ms. Daley examined the consent defense relating to the members of the class and admitted that ***over 99% of class members*** were contacted by RMG because their data was purchased from lead brokers.[32] Although RMG may have obtained phone numbers used for telemarketing campaigns not relevant to this case from a wide variety of sources, as to the proposed class who appear in the Charvat Campaigns, the only basis for "prior express consent" offered by RMG and the Cruise Defendants are the leads purchased by RMG from third party data brokers.

Further, as to the lead data actually used by RMG to call class members, Mr. Charvat does intend to prove, via common proof, that these leads cannot, as a matter of law, carry the Cruise Defendants' burden of proving "prior express consent." First, the Cruise Defendants have failed to make any effort to authenticate any of the lead data upon which they rely.[33] RMG, admittedly purchased the lead data from a network of data brokers, unknown in number, and

---

[32] *See* Opp. Brief at Ex. 1, Daley Report at pg. 40 (identifying percent of proposed class with who match to "lead lists sources" at 99.31%).

[33] At pg. 44 of its Opp. Brief the Cruise Defendants claim that some class members consented to receive pre-recorded calls from RMG via travel websites like Expedia, Orbitz, Priceline and Travelocity. The Cruise Defendants never made any effort, however, to authenticate these leads.

relied upon those brokers to sell it authentic data. RMG cannot attest to the authenticity or reliability of the data. Only the original source of this data can attest to its authenticity.[34] The time, however, for the Cruise Defendants to authenticate this data has now closed.[35] As the leads offered by the Cruise Defendants as purported proof class members' "prior express consent" to receive pre-recorded telemarketing calls from RMG are inadmissible, the Cruise Defendants defense fails based on common proof. Second, not only have the Cruise Defendants failed to establish that the lead data relied upon by RMG was authentic, reliable and admissible, but Mr. Charvat has affirmatively demonstrated that these leads are fraudulent and that RMG knew the leads it was relying upon to call consumers ere fraudulent.[36]

Finally, in order to telemarket to class members by pre-recorded message, RMG must have first obtained consumers' "prior express consent." "Prior express consent" exists where a consumer has (a) clearly stated that the telemarketer may call, and (b) clearly expressed an understanding that the telemarketer's subsequent call will be made for the purpose of

---

[34] *See* Fed. R. Evid. 901(b) (a party may authenticate a matter through the testimony of a witness who has knowledge that the matter is what its proponents claim it to be). To be authentic as a business record under Fed. R. Evid. 803(6), a document must have sufficient trustworthiness to be considered reliable. *See Woods v. City of Chicago,* 234 F.3d 979, 988 (7th Cir. 2000). To demonstrate such trustworthiness and reliability, a party must offer testimony of a person who can speak from personal knowledge about the record and be qualified to introduce the record as evidence at trial. *Id.*

[35] Third party discovery relating to defendants affirmative defenses closed on September 1, 2015. *(Dkt. No. 368).*

[36] The Cruise Defendants claim that to assess their consent defenses, the Court will have to examine "thousands" of web sites. Opp Brief at pg 42, fn 45. The Cruise Defendants own expert witness, however, has admitted that the contact data for 61,548 class members were obtained from www.123freetravel.com. *See* Opp. Brief at Ex. 1, Daley Report at pg. 43. The data for another 21,980 class members was obtained from a web site called www.simplyforfree.com. *See* Daley Report at Exhibit U, Website Analysis. Accordingly, even if the leads relied upon by the Cruise Defendants were authentic, admissible and not fraudulent, the Court could assess the validity of the defendants' "prior express consent" defenses as to 83,528 class members with reference to *two* web sites.

encouraging the purchase of goods or services. *In the Matter of Rules and Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 27 F.C.C.R. 1830 ¶ 7 (FCC

2012). A telemarketer who claims it had consent to send a pre-recorded message to a particular

consumer bears the burden of proof, and must maintain records that prove such a claim. The

FCC has cautioned that a telemarketer claiming consent "must be prepared to provide clear and

convincing evidence of the existence of such a relationship." *In the Matter of Rules and*

*Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 03-153 at

¶112, -- FCC Rcd. --, 2003 WL 2157853, 2003 FCC LEXIS 3673 (July 3, 2003) (emphasis

added). The FCC has also noted:

> In the event a complaint is filed, the burden of proof [as to whether prior express
> consent was obtained] rests on the sender to demonstrate that permission was
> given. We strongly suggest that senders take steps to promptly document that
> they received such permission.

Id. at ¶46. Most recently, in February of 2012, the Federal Communications Commission

reiterated that, specifically in the context of pre-record message telemarketing:

> Finally, should any question about the consent arise, the seller will bear the burden
> of demonstrating that a clear and conspicuous disclosure was provided and that
> unambiguous consent was obtained.

*See* In the Matter of Rules and Regulations Implementing the Telephone Consumer

Protection Act of 1991, 27 FCC Rcd 1830 at ¶112; 2012 FCC LEXIS 794 (Feb. 12, 2012).

The Cruise Defendants claim the above recitation of the law as to prior express consent is

"too narrow." Opp. Brief at pg. 40. In support, the Cruise Defendants cite to a selective provision

of a 1992 FCC Order in which the FCC recognized:

> Persons who knowingly release their phone numbers have in effect given their
> invitation or permission to be called at the number which they have given, absent
> instructions to the contrary. Hence, telemarketers will not violate our rules by
> calling a number which was provided as one at which the called party wises to be
> reached.

Opp. Brief at 40, citing *In re Rules & Regs. Implementing Tel. Consumer Prot. Act of 1991*, 7

F.C.C.R. 8752, ¶ 31 (Oct. 16, 1992) (the "1992 FCC Order"). .

Accordingly, the Cruise Defendants apparently reason that once a consumer gives

***anyone*** their phone number, that number can be bought and sold and passed between an

unknown number of intermediaries, and used by any telemarketer to call that consumer for any

reason whatsoever. Under the Cruise Defendants' view of the law, even a phone number

obtained on a scam web-site like www.123freetravel.com, can be sold to data brokers and

telemarketers without limit. When a consumer complains, the telemarketer can point to the

original lead obtained from a web-site with no affiliation whatsoever with the telemarketer, or

with the goods being sold, as purported proof of that consumer's "prior express consent" to

receive pre-recorded telemarketing calls. Of course, this is not the law. Omitted from the Cruise

Defendants' recitation of the FCC's position in this regard is the comment found in the

paragraph immediately preceding the quoted excerpt, in which the FCC clarifies that:

> "any telephone subscriber who releases his or her telephone number has, in effect,
> given prior express consent ***to be called by the entity to which the number was
> released.***"[37]

1992 FCC Order, ¶ 30.

Here, of course, there is no allegation that consumers provided their prior express consent

to RMG, the entity that made the calls at issue. In fact, RMG has admitted that the leads it

---

[37] In fact, even *Baird v. Sabre*, a case relied upon by the Cruise Defendants in support of their
interpretation of "prior express consent" has explicitly recognized that "myriad federal courts
have relied on the 1992 FCC Order to conclude that plaintiffs who ***provided a business*** with their
telephone number and then received a text message ***from the business*** had no claim under the
act." *See Baird v, Sabre, Inc.,* 995 F. Supp. 2d 1100, 1102-03 (C.D.Cal. 2014)(collecting cases).
S*ee In re Rules & Regs. Implementing the TCPA* ("*FCC 2012 Order*"), 27 FCC Rcd 1830 ¶ 7
(2012) ("prior express consent" requires that the consumer "clearly stated that *the telemarketer*
may call") (emphasis added).

purchased from third data brokers did not evidence consumers' requests to be called by RMG or by any of the Cruise Defendants.[38]

The Cruise Defendants' contention that establishing prior express consent will create individual inquires and mini trials fails both factually and as a matter of law. Mr. Charvat will offer common proof at trial that will demonstrate that 1) the lead data upon which all of the defendants rely is inadmissible; 2) the lead data upon which all of the defendants rely is fraudulent, and 3) even if these leads were admissible and authentic, they cannot serve as a basis for "prior express consent" because none of the leads at issue were provided directly to RMG, none of the leads relied upon even by the defendants even make reference to RMG or to any of the Cruise Defendants, and none of the leads relied upon evidence a consumer's "clearly and unmistakably stated" consent to receive telemarketing calls from RMG. *See Satterfield v. Simon & Schuster,* 569 F.3d 946, 966 (9th Cir. 2009). Mr. Charvat's challenges to the Cruise Defendants' consent claims each will be based on common proof that will succeed or fail in an identical fashion for all class members.

**H. Individual Issues Do Not Predominate And Will Be Litigated Using Common Proof**

At pages 46-54 of their Opposition Brief, the Cruise Defendants lay out their trial arguments as to why they are not vicariously liable for the actions of RMG under agency theories of ratification or apparent agency. Of course, whether the Cruise Defendants are vicariously liable for the actions of RMG is a merits issue appropriate for resolution at summary judgment

---

[38] At his deposition, Mr. Rader, RMG's Vice President for Marketing, testified that the leads RMG used to call class members were for consumers who expressed an interest in discount travel and did not specifically request to be called by any of the Cruise Defendants. *See* Class Cert. Memo at Ex 1, Tab M at pg. 56-57. Ms. Valente also testified that she could point to no specific web-site from which lead data purportedly originated from which consumers consented to receive pre-recorded telemarketing calls *from RMG*. *See* Class Cert. Memo at Ex 1, Tab L, Deposition of Elizabeth Valente at pg. 150.

and trial.[39]  Even at this stage of the litigation, however, and without the benefits of full merits

discovery as to vicarious liability, Mr. Charvat has ample evidence of the Cruise Defendants'

liability, under a variety of different theories, all susceptible to class-wide proof.

I.      **The Cruise Defendants Are Liable Under A Theory Of Actual Agency** [40]

That a defendant may not accept the benefits of illegal telemarketing and avoid its

consequences was made clear by the FCC in May of 2013, when it issued its long awaited order

regarding the vicarious liability of Dish Network for alleged telemarketing practices of various Dish

authorized dealers. *See In re DISH Network, LLC*, 28 FCC Rcd 6574 (F.C.C. 2013) ("FCC Ruling

at __").  The FCC declared that entities may be held vicariously liable under broad federal common

law principles of agency for violations of the TCPA committed by third-party telemarketers. The

FCC specifically held:

> [W]e see no reason that a seller should not be liable under [sections 227(b) and
> 227(c) of the TCPA] for calls made by a third party telemarketer when it has
> authorized that telemarketer to market its goods or services. In that circumstance, the
> seller has the ability, through its authorization, to oversee the conduct of its
> telemarketers, even if that power to supervise is unexercised.

FCC Ruling at ¶ 47. The FCC went on to conclude that where a third party is authorized to market

on behalf of a seller, and where the seller has the ability to oversee the conduct of its telemarketer,

the seller may be vicariously liable if the telemarketer acts in violation of the TCPA.  *Id.*  Finally,

the FCC has also made clear that where a principal authorizes a third party to market on its

behalf, it cannot turn a "blind eye" to the conduct of its agent. *See* FCC Ruling at ¶ 47 (a seller

---

[39] It is particularly inappropriate to expound at length as to the merits of Mr. Charvat's vicarious liability claims where the parties agreed to defer full merits discovery until after class certification. *See (DE# 391).*

[40] In a Memorandum and Order dated June 8, 2015, Judge Rowland thoughtfully and accurately summarized the law relating to Mr. Charvat's various theories of vicarious liability as to the Cruise Defendants.  *See Charvat v. Elizabeth Valente, et al.,* 2015 U.S.Dist. LEXIS 73942 (ND Ill. June 8, 2015) (Rowland, J.*)* "

who authorizes another to market on its behalf, has the ability, through its authorization, to oversee the conduct of its telemarketers, *even if that power to supervise is unexercised*).

These exact circumstances are present in this case and as alleged in the Third Amended Complaint (DE# 463). As detailed therein, all of the Cruise Defendants authorized RMG to telemarket on their behalf and, in fact, reimbursed RMG for marketing expenses. Indeed, it is not disputed that RMG continued to telemarket on behalf of the Cruise Defendants for eighteen months after this class action lawsuit was filed. At no time did any of the Cruise Defendants, take any action against RMG.

### 1. The Cruise Defendants Are Liable Under A Theory Of Apparent Authority

Apparent agency is present when a seller cloaks its telemarketer with the appearance of being its agent, even if "behind the scenes" no agency relationship exists. Rest. (Third) of Agency § 7.03(2)(b).

> A principal is subject to vicarious liability for a tort committed by an agent in dealing or communication with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission.

Restatement (Third) of Agency § 7.08. Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations. Restatement (Third) of Agency § 2.03.

Accordingly, where a third party is authorized to telemarket on behalf of the principal; where the third party freely uses the logo and trade name of the principal; where the third party has access to the principal's computer databases and confidential pricing information; where the principal has authority to review telemarketing scripts; where the principal has the authority to

supervise the telemarketing at issue and fails to do so, are all factors that a court may consider in assessing an apparent agency theory of TCPA liability.

Applied to the facts uncovered to date, and as alleged through the Third Amended Complaint, all of these elements are present and support a finding of apparent agency. All of the Cruise Defendants allowed RMG to market on their behalf using their trade names. The Cruise Defendants even reimbursed RMG, for its marketing costs, helped train RMG's personnel and were all familiar with RMG's telemarketing operation. Carnival, in particular, provided RMG with access to a password protected web site so RMG could book consumers directly into Carnival's booking engine. Carnival also reviewed and approved the telemarketing scripts used by RMG and had the authority, power and control to review all marketing content used by RMG. All of these facts are based on common proof and will support a finding of apparent agency by a jury in regard to the relationship between RMG and each of the Cruise Defendants.

### 2.     The Cruise Defendants Are Liable Under A Theory Of Ratification

Finally, in the context of the TCPA, the FCC has also recognized that a "seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits." FCC Ruling ¶ 34 & n. 104 (citing Rest. (Third) of Agency § 4.01, cmt. d). Applying this principle specifically in the telemarketing context, the FCC explained that "ratification may occur through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences." *Id.* For this reason, a seller may be bound by the unauthorized conduct of a telemarketer if the seller "*is aware of ongoing conduct encompassing numerous acts by [the telemarketer]*" and the seller "*fail[s] to terminate*," or, in some circumstances, "*promot[es] or celebrat[es] the telemarketer*." (*Id.*)

Ratification does not require an agency relationship or actual authority. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect *as if done by an*

*agent acting with actual authority.*" *Id.* § 4.01(1). No agency relationship is necessary for a principal to be liable under a ratification theory. *Id.* cmt. B. One cannot avoid ratification liability by claiming ignorance. Willful ignorance in the face of ample notice of the need to investigate repeated allegations of illegal telemarketing, coupled with accepting the benefits of that illegal conduct, is more than enough to create a material issue of fact on vicarious liability. As the Restatement explains, "Ratification is the consequence of a choice freely made by the principal. The principal may choose to ratify the action of an agent *or other actor* without knowing material facts. *A factfinder may conclude that a principal has made such a choice when the principal is shown to have had knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation*." Rest. (Third) of Agency § 4.06, cmt. d (emphasis added).

That is exactly the circumstance here. For years prior to the filing of the class complaint, Carnival, for example, knew that RMG was engaged in illegal telemarketing via pre-recorded message and turned a "blind eye." Further, all of the Cruise Defendants knew, at least as of the time of the filing of the Class Complaint, that RMG was engaged in illegal telemarketing via pre-recorded message. In response, the Cruise Defendants did nothing. Instead, and although they had the power to supervise and discipline RMG, they continued to pay RMG for new referrals thereby accepting the benefits of RMG continued illegal telemarketing. After the Class Complaint was initially filed in July of 2012, the defendants all entered into a joint defense agreement pursuant to which the defendants coordinated their defense to this case, coordinated their joint attack on the class plaintiff, all during which the illegal conduct was allowed to continue unabated for an additional eighteen months. This conduct all supports a theory of liability premised on ratification and based on common proof.

**J.      Whether Class Members Have An EBR With The Defendants Will Be Litigated Using Common Proof**

The Cruise Defendants argue at page 55 of their Opposition Brief that the TCPA's prohibition against prerecorded calls does not apply to calls made to any person with whom the caller had an established business relationship ("EBR") at the time the call was made. *See* 47 C.F.R. § 64.1200(a)(2)(iv). Mr. Charvat does not dispute that an EBR affirmative defense may apply in this case as to RMG. That is why he requested in discovery, and Judge Rowland ordered, the Cruise Defendants and RMG to identify those class members with whom they claimed an EBR. In response, the defendants disclosed that only two hundred and twenty six (226) class members had an EBR with RMG at the time of the telemarketing calls at issue.[41] Given the size of the class, assessing the applicability of RMG's EBR defense as to 226 class members is a relatively simple, matter the resolution of which will not predominate over class common issues. If this case is certified, Mr. Charvat's counsel will examine RMG's claim of EBR and if it appears to have merit, these consumers can be removed from the class. *See Chapman v. Wagener Equities, Inc.,* 747 F.3d 489, 492 (7th Cir. Ill. 2014) (Posner, J.) (whether an individual consumer has a valid claim is the issue to be determined after the class is certified).

As to the Cruise Defendants, Ms. Daley also identified 9,507 class members who purportedly had an EBR with one of the Cruise Defendants at the time they were called by RMG. Mr. Charvat, however, does not agree that the Cruise Defendants are entitled to claim an EBR defense in this case. The EBR exemption is limited and applies only to the "caller" who "initiates" a telemarketing call. *See* 47 U.S.C. § 227(a)(4) (defining "telephone solicitation" and recognizing the limitation of the EBR exemption to the caller who initiates the call). In this case, RMG and not the Cruise Defendants initiated the calls at issue.  Accordingly, the EBR

---

[41] See Daley Report, Ex 1 to Opp. Brief, at pg. 34.

exemption applies only to RMG and not to the Cruise Defendants. Any doubt in this regard was clarified by FCC which has recognized that:

> "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call, *and generally does not include persons or entities, such as third-party retailers,* that might merely have some role, however minor, in the causal chain that results in the making of a telephone call.

See *In the Matter of The Joint Petition Filed By Dish Network,* 28 FCC Rcd 6574 * 29-30 (Apr. 17, 2013) (emphasis added). As the Cruise Defendants did not "initiate" the calls at issue, they cannot claim an EBR exemption. Finally, the Court need not resolve this discrete legal question at this stage of the litigation. Whether the Cruise Defendants are entitled to assert an EBR defense is a common question that actually supports class certification and resolution at a later date.[42]

## K.     The Resolution Of This Dispute Via Class Action Is Superior To Individual Claims[43]

At page 56 of its Opp. Brief, the Cruise Defendants express their preference that the instant dispute be resolved by consumers in small claims court one claim at a time. Of course, the Cruise Defendants would prefer that this dispute be resolved in such a fashion. That way, the

---

[42] At a minimum, the Cruise Defendants claim that over 9,000 class members should be excluded because of an EBR is exaggerated. In her report, Ms. Daley noted that that close to 5,000 class members explicitly asked the Cruise Defendants to STOP CALLING. *See* Opp. Brief at Ex. 1, Daley Report at pg. 45 (table documenting class members Do Not Call requests to the Cruise Defendants). A Do Not Call request terminates an EBR exemption to the TCPA. 47 C.F.R. § 64.1200(f)(4) (2006) (§64.1200(f)(5) in the current regs). Incredibly, Carnival, still asserts EBR claims as to 1,870 class members despite the fact, due to poor record keeping, it cannot tell if the DNC requests made prior to or after the pre-recorded calls at issue. *See* Opp. Brief at Ex. 1, Daley Report at pg. 45, footnote 121.

[43] At page 58 of their Opp. Brief, the Cruise Defendants claim that class certification should be denied because Mr. Charvat has failed to propose a trial plan. The Federal Rules, however, do not require the submission of a trial plan as a condition of class certification. See *Aguilar v. Wawona Frozen Foods*, 2016 U.S. Dist. LEXIS 51171, *3 (E.D. Cal 2016); *Chamberlain v. Ford Motor Co.*, 402 F.3d 952, 961, n.4 (9th Cir. 2005) ("We decline Ford's suggestion that the district court's failure to adopt a trial plan… was an abuse of discretion."). The Court could anticipate that Mr. Charvat could promptly submit a detailed trial plan within sixty days of the Court's ruling on class certification.

Cruise Defendants will never be held to account for their massive collective violations of telemarketing law. The Cruise Defendants also claim that resolving this case via class action is not superior due to the large potential damages at stake. The Cruise Defendants, however, are a poor candidate for sympathy considering the factual background and circumstances around this litigation. The size of the damages in this case was solely due to the fact that the Cruise Defendants authorized RMG to telemarket on their behalf, failed to supervise RMG, took no action when they knew that RMG was violating the law and, in fact, allowed RMG to continue to telemarket on their behalf for *eighteen months after this class action was filed*. Having ignored RMG's illegal conduct for years, while simultaneously accepting and benefitting from such illegal conduct, the Cruise Defendants are hardly in a position to now claim that it is not fair to hold them to account for their actions. *See Birchmeier* 302 F.R.D. at 256 (N.D. Ill. 2014) (court rejects defendant's plea of ruinous potential damages is not a basis upon which the Court would deny class certification).

### III.     CONCLUSION

As Mr. Charvat has satisfied all of the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Court should certify this case as a class and allow it to proceed to trial. After four long years of litigation, it is time to hold the defendants to account for their massive collective violation of the law and of the privacy rights of class members.

Respectfully submitted,

Dated: September 28, 2016

PHILIP CHARVAT, on behalf of
himself and others similarly situated,


By: /s/ Alexander H. Burke

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
Telephone: (312) 729-5288
Facsimile: (312) 729-5289
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

Edward A. Broderick
BRODERICK LAW, P.C.
99 High St., Suite 304
Boston, MA 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327
ted@broderick-law.com

Matthew P. McCue
LAW OFFICE OF MATTHEW P. MCCUE
1 South Ave., 3rd Floor
Natick, MA 07160
Telephone: (508) 655-1415
Facsimile: (508) 319-3077
mmccue@massattorneys.net

*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2016, I electronically filed the foregoing with the

Clerk of the Court, using the CM/ECF system, which will send a notice of electronic filing to all

counsel of record.

/s/ Alexander H. Burke