**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Philip Charvat, on behalf of himself and others similarly situated, | ) ) | Case No. 1:12-cv-05746 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Elizabeth Valente, et al., | ) | Hon. Judge Andrea R. Wood |
| | ) | Hon. Mag. Judge Mary M. Rowland |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE CRUISE LINES'
MOTION TO STRIKE AND EXCLUDE PLAINTIFF'S EXPERT**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  BACKGROUND ...................................................................................................2

II.  LEGAL STANDARD...........................................................................................8

III.  ARGUMENT ......................................................................................................10

    A.  Mr. Hansen's substantial, relevant experience qualifies him as an expert. ...........10

    B.  Mr. Hansen's findings result from the proper application of reliable principles
          and methods to sufficient facts and data. ...............................................................13

         1.  Robodial Call List Analysis .....................................................................13

         2.  Analysis of RMG's "Opt-in" Leads and Consent.....................................21

         3.  Cell Phone/Landline Analysis...................................................................23

    C.  Mr. Hansen did not misrepresent his qualifications.................................................23

         1.  Daley's "supplemental" report fails to comply with Rule 26(b)(2)...........24

         2.  Defendants' attacks on Mr. Hansen's experience are baseless.................25

         3.  Defendants' ad hominin attacks on Hansen and others are irrelevant to
            Hansen's qualifications as an expert.........................................................29

IV.  CONCLUSION...................................................................................................32

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bell v. PNC Bank, Nat. Ass'n,*
  800 F.3d 360 (7th Cir. 2015) ................................................. 31

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993)........................................................... 10

*Elcok v. Kmart Corp.,*
  233 F.3d 734 (3rd Cir. 2000) ............................................... 30

*Hartman v. EBSCO Indus., Inc.,*
  758 F.3d 810 (7th Cir. 2014) ................................................. 9

*Holmes v. Godinez,*
  311 F.R.D. 177 (N.D. Ill. 2015)............................................ 10

*Jones v. Lincoln Elec. Co.,*
  188 F.3d 709 (7th Cir. 1999) ............................................... 28

*Meganathan v. Signal Int'l L.L.C.,*
  No. 13-497, 2015 WL 11109846 (E.D. Tex. June 26, 2015)................... 30

*Mims v. Arrow Fin. Servs., LLC,*
  132 S. Ct. 740 (2012).......................................................... 3

*Mullins v. Direct Digital, LLC,*
  795 F.3d 654 (7th Cir. Ill. 2015)........................................... 14

*Nimely v. City of New York,*
  414 F.3d 381 (2d Cir. 2005).................................................. 29

*Rink v. Cheminova,*
  400 F.3d 1286 (11th Cir. 2005) ............................................. 30

*Sherman v. Yahoo! Inc.,*
  No. 13-41 (S.D. Cal. Feb. 20, 2015) (DE 113) .......................... 28

*Smith v. Ford Motor Co.,*
  215 F.3d 713 (7th Cir. 2000) ..................................... 9, 10, 29

*United States v. Offill,*
  666 F.3d 168 (4th Cir. 2011) ................................................. 9

*United States v. Williams,*
  No. 06-00079, 2009 WL 424583 (D. Haw. Feb. 20, 2009).................... 30

*White v. State Farm Fire & Cas. Co.,*
  No. 07-1871, 2010 WL 760612 (W.D. La. Mar. 2, 2010)..................... 31

*Xanadu Mar. Trust v. Meyer,*
  21 F. Supp. 2d 1104 (N.D. Cal. 1998) ..................................... 25

**Statutes**

47 U.S.C. § 227(b)(1)(A) ................................................................................... 3, 21

47 U.S.C. § 227(b)(1)(B) ................................................................................... 3, 21

Cal. Bus. & Prof. Code § 606 ................................................................................. 25

Pub. L. No. 102-243, at § 2 (1991) ........................................................................... 3

**Rules**

Fed. R. Civ. P. 11 ..................................................................................................... 25

Fed. R. Evid. 702 ........................................................................................... 9, 10, 30

Fed. R. Evid. 703 ................................................................................................. 9, 10

**Regulations**

47 C.F.R. § 64.1200(a)(2) (2008) .............................................................................. 3

47 C.F.R. § 64.1200(a)(1)(iii) (2008) ........................................................................ 3

This case challenges the propriety of more than 600,000 telemarketing calls made by Resort Marketing Group ("RMG") and promoting the goods and services of Carnival, Norwegian, and Royal Caribbean cruise lines ("Cruise Defendants") via prerecorded message, a form of telemarketing strictly regulated by the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

Plaintiff has proffered Jeffrey Hansen as an expert witness to testify as to the number and quality of calls that were part of RMG's prerecorded Cruise Defendant telemarketing campaigns that included calls to Mr. Charvat ("Charvat Campaigns"), including whether the calls were made to cell or landline telephones, and the validity of the online "evidence" Defendants proffered in support of their contention that they had consent to make the calls at issue.

These subjects are of the type that expert testimony will assist the trier of fact. Submission of testimony regarding what hundreds of thousands of rows of call data means, how the online lead generation process works, and cross-checking data against lists of cell phone number are each precisely the type of testimony that answers questions about this case; testimony that lay witnesses cannot provide.

Moreover, Mr. Hansen is well-qualified to provide the proffered testimony. He has over 16 years of first-hand experience maintaining and operating a variety of automatic telephone dialing systems in telemarketing and other contexts, and he has extensive experience conducting data analysis, including specifically as to autodialers and the SQL databases in which the robocall data at issue in this case was produced. Mr. Hansen's specialized expertise and experience make him uniquely qualified to testify in this case.

The Cruise Lines' *Daubert* motion is riddled with tabloid-quality innuendo, must of which is "supported" by a supplemental declaration from the Cruise Defendants' expert, who is

now being proffered as an "expert" as to Mr. Hansen's life experiences. Indeed, throughout this litigation, the Cruise Lines have resorted to unfounded *ad hominem* attacks to distract the Court from the weakness of their position.[1]

This motion brings more of the same. Rather than focusing on the substance of Plaintiff's expert's methodology, they try to smear Mr. Hansen's character and integrity. These assertions have no basis in reality, nor are they relevant to whether this Court should exclude Mr. Hansen's opinion. The "facts" submitted about Mr. Hansen rely on conjecture made by Defendants' opinion witness about what might have happened. This goes far beyond appropriate advocacy, and demonstrates a pernicious failure by defense counsel to appropriately vet the basis for their offensive contentions about Plaintiff, members of his family, his expert, his expert's friends and business associates, and seemingly anyone else supporting views contrary to their position.

The Cruise Defendants' *Daubert* motion should be denied.

## I.    BACKGROUND

Plaintiff Philip Charvat seeks redress on behalf of himself and a class of consumers whom RMG illegally called in an attempt to sell the goods or services of Carnival Corporation & PLC ("Carnival"), Royal Caribbean Cruises, Ltd. ("Royal Caribbean"), and NCL (Bahamas), Ltd. ("Norwegian") (collectively, "Cruise Defendants"), in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227.

---

[1]     Cruise Defendants have called Plaintiff's daughter a liar, derogatively referred to Mr. Charvat as a serial litigant, and in the absence of any credible evidence, deemed self-serving statements an ex-con made after looking up Mr. Charvat on the internet a sufficiently reliable basis for arguing that Plaintiff somehow "tricks" companies into violating the TCPA—though even *that* individual later testified that the lead data Defendants say represents Plaintiff's consent to be called was fabricated. DE 512-1, Pascale Dep. at 94. And despite this suit's basis in unwanted phone calls, Defendants surreptitiously conducted a telephone "survey" of 90,000 class members from whom they hid its purpose and adversarial nature, and now seek to use such consumers' spur-of-the-moment recollections of a telemarketing call from years ago as substantive "evidence" to defeat certification.

Congress enacted the TCPA in 1991, in response to voluminous consumer complaints about unwanted, computerized calls to private homes and other abuses of telephone technology. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). Congress recognized that, while many states had enacted their own laws against invasive telemarketing practices, federal legislation was needed because telemarketers, by operating interstate, were escaping these state-law prohibitions. *Mims*, 132 S. Ct. at 745. In line with Congress' specific finding that "[b]anning such automated or prerecorded telephone calls … is the only effective means of protecting telephone consumers from this nuisance and privacy invasion," Pub. L. No. 102-243, at § 2(12) (1991), the TCPA and its implementing regulations broadly prohibit prerecorded telemarketing calls made without the called party's "prior express consent," and empower consumers to stop these unwanted calls through an injunction and statutory damages. 47 U.S.C. §§ 227(b)(1)(A), (1)(B), (3); 47 C.F.R. §§ 64.1200(a)(1)(iii), (a)(2) (2008).

In this case, Defendant RMG began using prerecorded telemarketing messages to solicit the purchase of Cruise Defendants' cruises in 2010.[2] RMG's prerecorded messages informed the called party that he or she had won a cruise, and instructed the consumer to press a number on their phone for further information, at which point an RMG representative would attempt to get them to make a booking for which Cruise Defendants would pay RMG a commission.[3] RMG used an Asteria "Omega" dialer to make these prerecorded telemarketing calls for the Cruise Defendants.[4] Described as "more than an auto dialer" by the RMG employee who managed it,

---

[2]      DE 521-2 at 433 (Hansen Rep. Ex. L, Valente Dep. at 112:1-5).

[3]      DE 428-3 (Borst Decl. ¶¶ 6-7, 10, 22). This included payment of "port fees" or "taxes" RMG charged the consumer but ended up keeping for itself if the consumer failed to follow through on their reservation. DE 521-2 at 420, 434 (Valente Dep. at 59:9-65:5, 117:6-10).

[4]      DE 521-2 at 413 (Valente Dep. at 33:7-9), and 33-34 (Smith Dep. at 12:13-15, 14:10-15).

Defendant's Asteria dialer also had the capacity to dial predictively at different rates to keep a certain number of representatives on the phone.[5]

RMG's prerecorded telemarketing calls were not made as a result of the called party providing his or her phone number to RMG or Cruise Defendants, or even with the consumer giving permission to *anyone* for RMG or Cruise Defendants to call his or her phone.[6] Rather, they were made using phone numbers and other consumer data ("leads") that RMG ***purchased*** from third-party data brokers including Caldwell Lists who, in turn, purchased the data from another broker, TDC Marketing who, in turn, purchased the data from additional third-party, Steven Katz, who himself purchased the data from additional unknown levels of third parties.[7] Although they did not authenticate the lead data or pursue discovery down the chain beyond TDC Marketing, Defendants contend that this data was initially created when the consumer provided his or her information to one of thousands of unrelated, third-party websites[8]—each of varying degrees of legitimacy—which then sold the consumer's data to a data broker or other third party and, ultimately, to RMG. TDC Marketing's Rule 30(b)(6) deponent testified that there

---

[5]   DE 521-2 at 34 (Smith Dep. at 14:21-15:11).
[6]   Indeed, RMG's owner and Rule 30(b)(6) deponent, Elizabeth Valente, testified that the leads her company purchased were only generically for "consumers who wanted to be called for discount travel." DE 521-2 at 450 (Valente Dep. at 178); *see also* DE 521-2 at 517 (Rader Dep. at 56-57 (confirming that "opt in" leads used by RMG were consumers who wanted to receive calls about "travel" generally and not specifically telemarketing calls promoting the goods or services of the Cruise Defendants)).
[7]   DE 521-2 at 673 and 680 (Lachnicht Dep. at 36, 61-62 (Caldwell List does not generate the lead information itself. It buys it from a third party and then re-sells the data) (Caldwell List does not know if the data sold to RMG was legitimate)); DE 521-2 at 797-98 and 802 (Mongiovi Dep. at 182 ("I did not create or compile the data sold to RMG, I purchased it from Katz); 183 (when asked if the data sold to RMG was authentic Mongiovi responded "110% I cannot say"); 177, 197-198 (any of the middlemen in the chain from the original source could have manipulated the data)).
[8]   DE 521-2 at 845-914 (RMG e-mail listing purported website lead sources).

4

could be 100 intermediaries between a data compiler and the original source of the data,[9] any of which could have altered the data (to the extent it wasn't fabricated at the outset).[10]

Indeed, in 2010, a consultant warned RMG that many of the websites associated with Caldwell Lists' leads likely obtained consumer contact information using "tracking cookies and adware which can capture and collect a user's web surfing blueprint," as well as "data mining techniques," rather than from the consumer directly.[11] Nonetheless, RMG continued to make calls using leads procured through Caldwell Lists, including for years after receiving a citation from the FCC regarding unwanted telemarketing calls and *itself* confronting Caldwell Lists about its belief that the leads were fraudulent.[12] As Judge Rowland has noted, evidence in this case indicates that "data compilers freely sell leads to each other without regard to their provenance or accuracy."[13] This is true; in fact, the principal of SMA Communications, LLC—which owns the ENewsOffers.com website through which three leads in RMG's database associated with Plaintiff Charvat purportedly derived[14]—admitted that he could find no evidence of such leads in his business' records, and that RMG's data for Plaintiff had to have been fabricated.[15]

Plaintiff retained his expert, Jeffrey Hansen, to analyze RMG's data for the calls at issue, in addition to the reliability of RMG's lead data and the applicability of any established business

---

[9]    DE 521-2 at 798 and 802 (Mongiovi Dep. at 182–83, 197–98).

[10]   Indeed, that same individual and the owner of Caldwell Lists themselves discussed altering the lead data. DE 470 at 2 n. 4 ("*If [the data is from the same website,] is there anyway [sic] to make them look different? I'm such a sleaze bag, I know! :)*") (emphasis added).

[11]   DE 521-2 at 918-20 (Hansen Rep. Ex. Q).

[12]   DE 463-5, 3d Am. Compl., Ex. 5 (FCC citation); *see also* DE 455-11 (containing string of e-mails organized chronologically between RMG and Caldwell List from March through July 2011, discussing the suspected fraudulent nature of the RMG leads).

[13]   DE 470 at 2 (citing examples).

[14]   DE 521-6 at 47 (Daley Orig. Rep. at 42).

[15]   DE 512-1, Pascale Dep. at 87-1-94:21 ("Somebody that was between where the lead was purchased had to have played games or entered false information on that record … before the sale of the record.").

relationship between Defendants and the persons called to this case.[16] To that end, he was provided with RMG's Dialer Database, consisting of records of approximately 432,832,770 calls across two backups made in 2012 and 2014, respectively.[17] Mr. Hansen processed the data, including by comparing it to a Cell Block Identifier list in order to identify wireless numbers, and then further comparing the data to ported numbers lists through Neustar—which maintains a national database of telephone number assignments through the FCC—to ensure that the data accurately captured instances in which a landline had been ported to a cell phone, or vice versa, and thus whether the number was assigned to a cell phone or landline when called.

Plaintiff Charvat made recordings of three of the calls he received from RMG, dated June 11, 2011, September 8, 2011, and July 9, 2012. By running a search through the data to identify the calls to Plaintiff Charvat, Mr. Hansen identified three campaigns (out of thousands) that were associated with these three calls: "0610 TS2 Mix B223" and "0901 TS2 Eastern B223" (each associated with a "Sound" labelled "28"), and "0620 TS2 Eastern B223" (associated with "Sound" labelled "61"). Mr. Hansen reviewed the correlating Sound 28 and 61 audio files in an "IVR Directory" produced by RMG relating to its calls, which revealed that *both* audio files consisted of a prerecorded message promoting cruises on behalf of Cruise Defendants—just like Plaintiff Charvat's own recordings of the calls he received.[18] By running a Boolean search for

---

[16]    Exhibit 1, Hansen Rep. at 6-8.

[17]    Exhibit 1, Hansen Rep. at 7; Exhibit 2, Hansen Dep. at 165:18-24.

[18]    Audio recordings are attached as Exhibit 7. The s28.wav file produced by RMG—and associated with its 2012 database backup—plays the following message:

> Hello and congratulations. You filled out a contest entry form for a Carnival, Norwegian Cruise Line, or Royal Caribbean cruise, and you were selected. Press 1 now to be transferred to a Travel Services cruise agent, or press 2 to be added to our Do Not Call List. Press 1 now.

Similarly, the s61.wav file—which is associated with its 2014 database backup—plays the following:

> Congratulations. You filled out a contest entry form for a Carnival, NCL, or Royal Caribbean cruise, and you were selected today. Press 1 now to claim your cruise and speak to a booking agent, or press 2 to decline this offer and be added to our Do Not Call List. Press 1 now.

records with the same Campaign Name, Campaign ID, and Sound as these three calls to Plaintiff, Mr. Hansen was able to identify and join the call log and sound data for all calls from the same campaigns in which Plaintiff was called. He then removed any call records that did not result in an audio file being played—i.e., where the call disposition indicated anything other than "HUMAN," "TRANSFERRED," or "MACHINE,"—to create a Class List comprising 668,942 total calls to 388,966 individual class members, each of whom received an analogous prerecorded call from RMG telemarketing Cruise Defendant cruises. Because of his earlier analysis, Mr. Hansen was able to further break the Class List down to consumers associated with 103,055 cell phone numbers and 286,184 landlines.[20] This narrow class represents just a fraction of the *millions* of prerecorded Cruise Defendant telemarketing calls RMG made through thousands of other campaigns, both before and after this suit was filed.[21]

Mr. Hansen was also able to confirm that, to the extent Defendants identify consumers with whom they had a valid established business relationship—pursuant to the TCPA's exemption for such calls to landlines made prior to October 16, 2013—the rows of data associated with such persons can simply be removed from the Class List.[22] Any consumers for whom Defendants are able to establish had actually consented for them or RMG to call their phone can, similarly, be easily removed from the Class List.[23]

Mr. Hansen also reviewed the lead data RMG used to make its calls to Plaintiff and the other class members, consisting of many thousands of data files containing over 70 million

---

[20]     Exhibit 1, Hansen Rep. at 14. A small number of class members (273) received telemarketing calls on their landlines that were then ported over to a cell line, and then received another telemarketing call from RMG, resulting in the difference in the number of class members and the number of associated unique phone numbers. *Id.* at 12.
[21]     Exhibit 1, Hansen Rep. at 13-15.
[22]     Exhibit 1, Hansen Rep. at 15-16.
[23]     Exhibit 1, Hansen Rep. at 21-22.

consumer phone numbers RMG purchased through third-party data brokers.[24] After reviewing the lead data and associated website sources, and considering not only his own experience within the telemarketing industry, testimony from RMG's principal and employees, testimony from two tiers of data brokers from which RMG obtained its leads, and other documentary evidence regarding the nature of Defendants' lead data, Mr. Hansen concluded that the generic lead data RMG used to call Plaintiff and the class was flawed, unreliable, and did not represent the associated consumer's agreement to be called by Defendants.[25] No responsible telemarketer would have relied on this data, especially given RMG's own suspicion that the data had been manipulated or fraudulently obtained.[26] Indeed, given the sheer amount of data—over 70 million records purportedly derived from 6,000 various websites, many of whom plainly have nothing to do with Defendants or even travel generally, and which RMG's own consultant determined likely obtained leads using "tracking cookies and Adware which can capture and collect a user's web surfing blueprint" as well as "data mining techniques"—Mr. Hansen agreed that data RMG used to make the calls at issue had likely been obtained by using some type of spyware.[27]

Given Mr. Hansen's vast experience with telemarketing, automatic telephone dialing systems, and data analysis, Plaintiff disagrees that his findings are unreliable or will be unhelpful for the trier of fact. Respectfully, Defendants' motion should be denied.

## II.   <u>LEGAL STANDARD</u>

"The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the

---

[24]     <u>Exhibit 1</u>, Hansen Rep. at 16.
[25]     <u>Exhibit 1</u>, Hansen Rep. at 16-22.
[26]     <u>Exhibit 1</u>, Hansen Rep. at 22; *see, e.g.,* DE 455-11 at 5 ("Beth [Valente] believes and I am starting to as well- that they take random IP addresses and just add them to records and that their might be duplicates with different peoples names?").
[27]     <u>Exhibit 1</u>, Hansen Rep. at 20-22.

testimony would have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). Rule 702 of the Federal Rules of Evidence states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

More specifically, Rule 703 of the Federal Rules of Evidence reads:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Rule 702 allows expert testimony "on scientific matters, technical matters, or matters involving other specialized knowledge so long as the testimony will *assist the trier of fact* to understand the evidence or to determine a fact in issue." *United States v. Offill,* 666 F.3d 168, 175 (4th Cir. 2011) (emphasis in original) (internal quotation marks omitted). "[T]he court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Additionally, "[u]nlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including

9

those that are not based on firsthand knowledge or observation." *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993) (citing Fed. R. Evid. 702, 703).

## III.   <u>ARGUMENT</u>

Despite Defendants' improper and irrelevant attempts to smear Plaintiff's expert's reputation, Jeffrey Hansen is an IT, e-discovery, and computer forensics professional with decades of real-world experience. His expert analysis has been utilized in dozens of TCPA cases, and he has particularized experience with autodialers, and even used the same *brand* of dialer as Defendant RMG in this case. Defendants do not dispute that he is proficient in the SQL database language in which RMG's data was produced and analyzed in this case. Because Mr. Hansen properly applied reliable methods to reach his conclusions offered in this action, which will assist the trier of fact, Defendant's motion should be denied.

### A.   **Mr. Hansen's substantial, relevant experience qualifies him as an expert.**

Mr. Hansen has relevant experience and specialized knowledge that will assist the trier of fact in understanding the dialer data produced by RMG in this action, how it can be used to establish a certifiable class, and the validity of the "opt-in" lead data RMG purchased to obtain consumers' phone numbers to call.

"[A]n expert witness may be qualified by 'knowledge, skill, experience, training, or education.'" *Holmes v. Godinez*, 311 F.R.D. 177, 210 (N.D. Ill. 2015) (quoting Fed. R. Evid. 702). "There is no requirement that an expert hold any particular credentials to give expert opinion testimony." *Holmes*, 311 F.R.D. at 210. Rather, "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith*, 215 F.3d at 718.

Mr. Hansen has substantial, particularized experience relevant to this matter, including both as to data analysis and dialer-based calling and telemarketing. His business, Hansen Legal Technologies, Inc., has focused for the past three years on the analysis of data and autodialing equipment in litigation.[28] Before that, Mr. Hansen co-owned Hansen & Levey Forensics from 2007 to 2013, which provided similar computer forensics and e-discovery services.[29] Since 2000, he has also owned a company, Pns724, through which he has maintained a telemarketing call center client's dialers, data, and do-not-call and telemarketing lists for more than a decade, along with providing complete IT solutions for hundreds of businesses and individuals.[30]

Mr. Hansen has "set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines, to outbound call centers capable of generating over one million calls per hour[,]" and apart from using predictive and autodialers himself, he has trained others.[31] In fact, he has prior experience with the particular *brand* of dialer used to make the calls at issue in this case.[32] In contrast, Defendants' opinion witness Peggy Daley had **zero** experience with autodialers or telemarketing before this case.[33]

Beyond having managed dialers in the context of telemarketing, Mr. Hansen has substantial experience in processing and analyzing data, both generally and in connection with autodialers. Mr. Hansen is fluent in Structured Query Language ("SQL"), a programming

[28]    Exhibit 2, Hansen Dep. at 66:14-16; 67:19-68:6.
[29]    Exhibit 1, Hansen Rep. at 4 and C.V. at 1-2. [Mr. Hansen's C.V. was attached as Exhibit A to his report. This is included with Exhibit 1 to this motion, but due to the voluminous size of his report, the other exhibits are cited as filed attached to Defendants' motion.]
[30]    Exhibit 2, Hansen Dep. at 75:20-77:6; Exhibit 1, Hansen Rep., C.V. at 2.
[31]    Exhibit 1, Hansen Rep. at 3.
[32]    Exhibit 1, Hansen Rep. at 7 ("I have worked with many dialing systems and software similar to the Asteria software used with the Dialer Database. I have also worked, in the past, with Asteria software in a context unrelated to this case."); Exhibit 2, Hansen Dep. at 60:9-15; 102:2-15 (noting he made hundreds of thousands of calls via an Asteria dialer).
[33]    Ms. Daley testified that her only other experience with an autodialer was in *Johnson v. Navient Solutions, Inc.*, No. 15-716 (S.D. Ind.), in which she had been retained just over "the last month or two" before her April 6, 2016 deposition in this case. Exhibit 3, Daley Dep. at 14:16-15:20. A review of that case's electronic docket reveals that a "wrong number" TCPA class was certified. *Johnson* DE 122.

language used to communicate with databases, and which he used to analyze the data presented in this matter through the PostgreSQL and MySQL database engines. Not only has Mr. Hansen continually used SQL for more than a decade, but he in fact instructed others on SQL, as well.[34] He has used his specialized skills and knowledge to provide consulting or expert services in dozens of TCPA matters, and has been consistently upheld as a qualified expert by other courts.[35]

This specialized knowledge and experience will assist the trier of fact in understanding the evidence at issue. Defendant RMG in this case produced two large PostgreSQL telemarketing dialer databases containing records of its calls to over 430 million phone numbers.[36] Mr. Hansen—who, unlike Defendants' proffered expert—has substantial experience in both the operation of automatic telephone dialing systems and the analysis of associated data—was particularly capable of processing and analyzing this data in the context of TCPA class litigation, breaking the data down to (1) identify a Class List of 389,239 consumers who received a total of 668,942 prerecorded telemarketing calls from RMG for the Cruise Defendants' goods or services, and (2) confirm that any consumer in the Class List for whom a valid "prior express consent" or established business relationship defense does apply can be easily excluded. Through his experience in himself having vetted and purchased lead lists for use in autodialing, Mr.

---

[34]     Exhibit 2, Hansen Dep. at 127:1-25-128:2.

[35]     *See, e.g., Booth v. Appstack, Inc.*, No. 13-1533, 2016 WL 3030256, at *12 (W.D. Wash. May 25, 2016) (relying on Hansen's analysis similar to this case to conclude "conclude[] that the TCPA Class has demonstrated that Appstack made 601,207 calls to cell phones"); *Whitaker v. Bennett Law, PLLC*, No. 13-3145, 2014 WL 5454398, at *4 (S.D. Cal. Oct. 27, 2014) (granting class certification in TCPA action, citing Hansen declaration in noting that plaintiff "has shown a reasonable basis to believe that a class actually exists, and that the class could be specifically determined via discoverable access to [defendant's] technologies and data"); *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, No. 13-1556, 2014 WL 3894345, at *1 (S.D. Cal. July 2, 2014) (relying on Hansen declaration in compelling production of defendant's call data in TCPA action, including in reference to fact that data could be "compared to commercially available cell block identifiers").

[36]     Exhibit 1, Hansen Rep. at 7; Exhibit 2, Hansen Dep. at 165:18-24.

Hansen's determination that the lead data RMG used in its telemarketing was flawed and unreliable, such that no responsible telemarketer would have relied on it, is also relevant to the Court's understanding and determination of the extent to which this data RMG purchased through multiple levels of unknown third-parties is reliable and serves to truly evidence the consumer's prior express consent to be called. Hansen Rep. at 16-22. Thus, because Mr. Hansen has substantial specialized knowledge and experience with autodialers and data analysis that will assist the trier of fact in this action, he qualifies as an expert.

### B. Mr. Hansen's findings result from the proper application of reliable principles and methods to sufficient facts and data.

Because Mr. Hansen properly applied reliable principles and methods to analyze RMG's call and lead data in this action, his opinions as an expert should be considered.

#### 1. *Robodial Call List Analysis*

At base, this Court has been presented with two conflicting expert opinions. On the one hand, Mr. Hansen has concluded that it is most likely that the calls RMG made to class members included prerecorded telemarketing messages for Cruise Defendants. He supports this conclusion through review of defendants' data, corroborated by Plaintiff's recordings of RMG's calls to his phone, consumer complaints and an FCC citation about Cruise Line calls during the class period in relation to the same caller ID number used to call Plaintiff, RMG's former president's declaration affirming the calls' purpose, the testimony of RMG's representatives confirming the frequent use of its calls using cruises as an incentive, RMG's discovery responses confirming that prerecorded messages referencing Cruise Defendants were played in relation to these campaigns, and evidence that millions of other calls RMG made through thousands of *other* campaigns similarly included prerecorded cruise messages. All of this, in addition to the fact that the only prerecorded messages contained in RMG's Interactive Voice Response ("IVR")

13

Directory which the Dialer Database attributes to the three campaigns in which Plaintiff Charvat was called included, yet again, an analogous message promoting Cruise Defendants. The evidence is overwhelming.

On the other hand, Defendants' proffered expert, Ms. Daley, contends that Mr. Hansen's conclusion is unreasonable because the audio files for these campaigns *could have* been changed play a non-Cruise Line message. Ms. Daley relies upon non-descript testimony from RMG employees that this occurred (and overlooking evidence that, to the extent this was the case, it was minimal and/or done purposefully as a litigation tactic against class certification),[37] and overstating the unsurprising conclusion that the three campaigns' dialing plan changed in some undeterminable way over the course of the several-year class period. Ms. Daley's conclusions on these points are undisputed: it might be theoretically *possible* that Travel Services might have substituted some non-Cruise Line robocall in place of its Cruise Line calls for some period. But aside from the theoretical possibility that this might have happened, there exists no contemporaneously-created evidence of such.

Mr. Hansen's methodology on this point was reliable. Defendants' first argument—that Mr. Hansen improperly assumed that all of the calls to the class were identical without first confirming his assumptions with Asteria, considering certain evidence regarding RMG's use of its dialer, or listening to the recordings—misstates both Mr. Hansen's methodology and his findings.

---

[37]      *See* <u>Exhibit 4</u>, 0787274 (e-mail from more than a year into the litigation stating, "Like I emphasized the other day, the new case that just came down helps us if we can find out how diverse our calling was in these respects," with a response from Valente that it was "very diverse," albeit only because "sometimes we would start as a cruise and if they were afraid of water - we would move them to a condo package - we did not keep track of when that happened"), and 0801637 (Valente e-mail stating more than a year into this litigation, "I am also thinking I might have you run the dialer [sic] with a hotel or condo Vegas - message once a day – so we can say we are doing both"). A defendant's failure to maintain records identifying the class, especially when done with ill intent, does not foreclose certification. *Mullins v. Direct Digital, LLC,* 795 F.3d 654 (7th Cir. Ill. 2015).

First, Defendants' characterization of Mr. Hansen's opinion is incorrect. Mr. Hansen does not dispute that the specific audio recordings played to the class changed over time; indeed, Plaintiff himself recorded calls from RMG with slight variances of the same message. Rather, what matters—and what Mr. Hansen was able to determine to a reasonable degree of certainty in the fields of data analysis and telemarketing—is that the calls to Plaintiff and the class were (1) prerecorded, and (2) made for the purpose of attempting to sell the goods or services of Cruise Defendants. Every single call to Plaintiff played a variance of the same prerecorded message suggesting he had won a cruise for Cruise Defendants, the two audio files identified in the Dialer Database associated with the campaigns tied to three calls for which Plaintiff had a recording (and dozens of others) play a variance of the same prerecorded message suggesting the consumer had won a cruise for Cruise Defendants, hundreds of consumer complaints about the same caller ID number RMG used to call Plaintiff identified calls soliciting Cruise Defendant cruises, RMG's former president confirmed the purpose behind the calls, and RMG's own discovery responses confirm that these campaigns "would have referenced the Cruise Line Defendants in a pre-recorded message played during the telephone calls."[38] The overwhelming bulk of evidence establishes that the calls made to Plaintiff and the class played prerecorded telemarketing messages for Cruise Defendants. Variances in phrasing—for example, referencing a "booking agent" instead of a "Travel Services cruise agent" as the person to whom the caller will be transferred after "pressing 1"—are immaterial, and do not change the fact that these were all prerecorded telemarketing calls for Cruise Defendants.

Second, although he had hands-on experience working with an Asteria dialer (in addition to other dialers) before having been hired to testify here, Mr. Hansen *did* consult with Asteria, which built RMG's dialer to ensure that the data was properly interpreted and analyzed. He

---

[38]    DE 521-2 at 100-101 (RMG Supp. Resp. to Interrog. No. 4).

obtained table keys that associated the Dialer Database's tables with corresponding column headings. Mr. Hansen conferred with Tim Ringenbach—the same Asteria representative with whom Defendants' expert consulted—to double-check his understanding of the data. Plaintiff's counsel conferred with Mr. Ringenbach about the Dialer Database, as well, relaying the results of such communication to Mr. Hansen. And unlike Defendants' expert, Mr. Hansen had previously used an Asteria dialer to make hundreds of thousands of calls, and has substantial experience working with dialer data generally; as such, he had much more relevant, first-hand knowledge to work from than Ms. Daley from the outset.

Third, Mr. Hansen *did* consider all relevant evidence regarding RMG's use of its dialer. Defendants' motion chides Mr. Hansen for not having reviewed the depositions transcripts of Elizabeth Valente and other RMG representatives—which ignores his report and testimony, including that he was *present* by phone at Jamie Smith's deposition[39]—and then argues that because Valente and her associates purportedly offered a variety of incentives other than cruises and "frequently changed the incentives offered during the course of an ongoing campaign," Mr. Hansen's opinion that the calls to Plaintiff and the class were prerecorded telemarketing calls for Cruise Defendants is flawed. But as Defendants themselves go on to admit, no evidence identifying when or what changes were purportedly made exists.[40] In truth, Ms. Valente testified that she didn't even know what a Campaign ID was and had only "a very general idea of what the campaigns were,"[41] and the RMG employee who primarily managed the dialer, Jamie Smith, was unable to identify anything suggesting that any of the campaigns relevant to this action had

---

[39]  Exhibit 1, Hansen Rep. at Ex. B (Smith deposition), Ex. L (Valente deposition), Ex. M (Rader deposition); Exhibit 2, Hansen Dep. at 466:2-3.
[40]  DE 526, Defs.' Mot. at 25.
[41]  DE 521-2 at 428 (Valente Dep. at 92).

been stopped or altered for any reason.[42] The audio files within RMG's IVR Directory contain dozens of prerecorded messages referencing Cruise Defendants.[43]

And finally, Defendants' contention that Mr. Hansen's opinion is unreliable because he never listened to any of the prerecorded messages at issue is demonstrably false because, as Mr. Hansen testified and stated in his report, he *did* listen to all of the IVR Directory recordings.[44] As Mr. Hansen's report confirms, the two "sound" files from RMG's IVR Directory applicable to the three campaigns in which Plaintiff was called, s28 and s61, both contain a prerecorded message promoting the goods or services (i.e., cruises) of the Cruise Defendants—*just like the calls Plaintiff Charvat recorded for such campaigns*, and just like dozens of other prerecorded messages in RMG's IVR Directory.[45] It is entirely irrelevant that, over the course of several years, slight variances or improvements were made to the particular audio recording played in the three campaigns in which Plaintiff and the class were called; the point is that the underlying message itself did not change: *__All__* of the applicable recordings involve analogous prerecorded messages promoting Cruise Defendants' cruises, regardless of whether one starts off saying "hello and congratulations" while another begins with "congratulations."

Ms. Daley assumes too much, both overstating the amount of change to the dial plans across RMG's thousands of campaigns,[46] and going out of her way to assume not only that any

---

42      DE 521-2 at 57 (Smith Dep. at 106:2-107:10).
43      *See, e.g.,* Exhibit 7.
44      Exhibit 1, Hansen Rep. at 10 n. 3 and 11 n. 4; Exhibit 2, Hansen Dep. at 226:5-21 (indicating that he had transcripts of the three calls to Plaintiff for which Mr. Charvat made recordings, testifying that "I do have the sound files that were played," and clarifying, when defense counsel was asking whether he was aware of recordings *specific* to a particular call to a consumer other than Plaintiff, that defense counsel was "asking the question leaving out any recordings in the IVR directory that was produced").
45      *See* Exhibit 1, Hansen Rep. at 10 n. 3 and 11 n. 4; *compare* Footnote 18 (s28 and s61), *supra, with* Hansen Rep. at 9 n. 2 (Plaintiff's recordings of the calls he received), ***all similarly suggesting the consumer had won a cruise for Cruise Defendants***. Audio recordings are available at Exhibit 7.
46      Ms. Daley suggests that there were over 900 edits to 22 of the 29 dial plans in the Dialer Database over the 2-year period between backups  (of which only one is relevant to the calls at issue), but this appears to discount the fact that the change to one function (e.g., "answering machine detect")

17

modification must have been to the "sound" played as opposed to any other possible function, but that any change to the "sound" tied to a dial plan must also represent a change to the substance of the message to *anything* other than a cruise solicitation. Nothing in the Dialer Database supports Ms. Daley's assumptions. Her reliance on differences between the various dial plans in the two Dialer Database backups to attempt to "prove" that sound files were changed over time is irrelevant: It doesn't matter that a "sound" tied to a dial plan for a campaign was changed because there is no way to tell what those changes were, or if they were changes to the "sound" at all. And Ms. Daley's position isn't helped in either case by the fact that RMG's IVR Directory is filled with dozens of Cruise Defendant-related "sound" recordings, with a striking paucity of other call types. In the absence of actual proof to the contrary, one must logically accept the overwhelming bulk of the evidence establishing that these three campaigns involved prerecorded Cruise Defendant calls.

Ms. Daley herself admits that, since RMG's Dialer Database only provides a snapshot of each dial plan at the date of the backup, "the dialplan tables only show the most recent set of instructions input by the users. They do not contain any record of past activity."[47] She incorrectly assumes that any edit to Dial Plan 11 relevant to the class' campaigns *must* have been a change to the "sound" function, as opposed to, say "amd" (answering machine detect). And she guesses that because only the "sound" integer appears to have changed across the two backups, all changes must have been to "sound"—overlooking the fact that some functions, including the "amd" function determining whether the dialer will detect an answering machine, are simple on/off commands that could easily be switched back and forth repeatedly and still end in the

---

corresponding to a single dial plan state (e.g., "47") will force a change in the row count for the other functions tied to that dial plan state (e.g., "sound", "hangup on answering machine detect", etc.), such that there were likely exponentially fewer edits than she believes.

[47]     DE 521-4 at 6 (Daley Supp. Rep. at 4).

18

same result at the date of each backup. A singular reliance on the fact that "things changed" in the dial plan over time, and that Ms. Valente and her associate say they changed the message sometimes on an unidentified, limited basis, ignores the overwhelmingly weight of the evidence that RMG's calls to Plaintiff and the class played prerecords soliciting Defendants' cruises.

Mr. Hansen conducted a thorough analysis of RMG's call data, which was produced through two large backup[48] PostgreSQL databases containing records of over 430 million calls.[49] He joined these two tables in PostgreSQL, and then imported the data into MySQL, a similar SQL-based database management system.[50] While much of the data was self-evident or could be ascertained through Mr. Hansen's past experience—e.g., a table named "call log" would contain call log information—he also consulted with Tim Ringenbach of Asteria Solutions Group to ensure that the data was correctly interpreted. Hansen Dep. at 131:14-134:10. Mr. Hansen then compared the phone numbers contained in RMG's dialer database with a Cell Block Identifier list, in order to segregate cell phone numbers from landline numbers.[51] Because it was possible that some numbers might have been ported from landline to cell phone, or vice versa, Mr. Hansen also compared the data with the Neustar ported number lists to determine which numbers were called after being ported.[52] In this way, Mr. Hansen was able to identify which numbers were assigned to a cellular telephone service at the time RMG called it.[53]

---

[48]     One database is a backup dated May 5, 2012, while the other is dated March 8, 2014. Exhibit 2, Hansen Dep. at 129; DE 521-6 at 20 (Daley Orig. Rep. at 15).

[49]     Exhibit 1, Hansen Rep.at 7-8; Exhibit 2, Hansen Dep. at 165:18-24.

[50]     Exhibit 2, Hansen Dep. at 128, 130-131 (indicating that data would not have been affected in any way as a result of analyzing it in MySQL, because the data was "exported … from Postgres in a format that is intended for the exchange of data between databases").

[51]     Exhibit 1, Hansen Rep. at 9.

[52]     The FCC has retained Neustar to maintain a database tracking telephone number assignments. Exhibit 1, Hansen Rep. at 9.

[53]     Exhibit 1, Hansen Rep. at 9.

Plaintiff Charvat recorded three of the calls he received from RMG on behalf of Cruise Defendants.[54] To further isolate relevant data of calls to persons who received similar prerecorded Cruise Defendant telemarketing calls, Mr. Hansen ran a query for calls to Mr. Charvat and other consumers obtained through public records requests complaining about the prerecorded cruise calls at issue in this case, using records for which Mr. Charvat had an associated call recording to narrow the relevant campaigns down to just three out of more than a thousand campaigns identified in the Dialer Database, each associated with its own Campaign ID: 422, 610, and 1410. He also reviewed a directory produced by RMG of the prerecorded messages used in relation to its calls, which associates a designated "sound"—e.g., "28" or "61"—with a particular audio file.[55] By running a Boolean query for all records containing the same campaign name, campaign ID, and associated sound file as those in the records associated with the three calls for which Plaintiff had a call recording, Mr. Hansen was able to isolate and join the call log and associated sound data for all calls for these three campaigns—thereby creating a Class List containing the number called, call date, call disposition, (e.g., "machine" or "human,"), and associated campaign sound file name (e.g., "422 s28.wav"), for all calls in each of the three campaigns in which Plaintiff Charvat was called.[56]

Based on his experience with telemarketing and dialer campaigns, review of transcripts of the depositions of, among others, RMG's owner Elizabeth Valente and its dialer manager Jamie Smith, numerous consumer complaints all similarly concerning prerecorded telemarketing calls for Cruise Defendants by RMG, and the audio files and data, Mr. Charvat was able to conclude to a degree of scientific certainty that each of the numbers identified in the Class List received, like Plaintiff, a prerecorded telemarketing call advertising Cruise Defendants' goods or

---

[54]    Exhibit 1, Hansen Rep. at 9 n. 2.
[55]    Exhibit 1, Hansen Rep. at 8.
[56]    DE 521-3 at 562; Exhibit 1, Hansen Rep. at 8-13.

services. Based RMG's two "s28" and "s61" audio files attributable to the calls to the consumers

identified in the Class List

### 2. *Analysis of RMG's "Opt-in" Leads and Consent*

Because Mr. Hansen's experience in the telemarketing industry and specialized

knowledge as an IT professional will assist the trier of fact in evaluating the validity of the lead

data RMG purchased for use in its calling campaigns, Defendant's motion should be denied.

A defendant may avoid liability under the TCPA if it can prove that it made an otherwise

prohibited call with the called party's "prior express consent." 47 U.S.C. § 227(b)(1)(A),

(b)(1)(B). In this case, there is no dispute that RMG obtained the phone numbers it called from

data it purchased through unknown levels of third-party data brokers.[57] Although unable to

determine how this data ultimately reached RMG—in the end, working through three levels of

intermediary data brokers before giving up—Defendants contend that this data was ultimately

created when the consumer submitted his or her information to one of thousands of unrelated,

third-party websites. Defendants contend this data represents the consumer's consent to be called

based on "privacy policies and consent provisions for every one of those possible sources."[58]

Mr. Hansen's findings prove otherwise; not only is RMG's lead data flawed and

unreliable, but it was likely obtained via spyware or similar means.[59] To reach this conclusion,

Mr. Hansen was provided with and reviewed RMG's lead data, which was produced through

thousands of data files containing over 70 million numbers.[60] He also considered deposition

testimony from RMG representatives indicating that leads were not intended to be specific to

RMG or Cruise Defendants, but only to consumers "who wanted to be called for discount

---

[57]  DE 521-6, Daley Rep. at 40 (over 99% of class member phone numbers match to data in RMG's "opt-in" lead lists).

[58]  DE 526, Defs.' Mot. at 29.

[59]  Exhibit 1, Hansen Rep. at 22.

[60]  Exhibit 1, Hansen Rep. at 16.

travel"[61]—and noted that, beyond the extreme volume of data, any reasonable telemarketer would have realized that a significant portion of the websites from which these leads purportedly came (e.g., LordOfTheRings-Essentials.com) have nothing to do with that purpose.[62]

Mr. Hansen also reviewed deposition testimony from RMG's own lead broker, Peter Lachnicht of Caldwell Lists, as well as his sub-broker, Tom Mongiovi of TDC Marketing, who confirmed that they were not the original source of the data sold to RMG, and could make no representation about its validity.[63] There was also ample evidence Mr. Hansen considered, from both testimony and internal RMG e-mails, which indicated that RMG *itself* believed the lead data it purchased to be fraudulent.[64] Indeed, a consultant warned RMG back in 2010 that website from which its leads were purportedly sourced likely obtained the data through "tracking cookies and Adware" as well as "data mining techniques."[65] With this investigation and his own knowledge and experience in the telemarketing industry, Mr. Hansen agrees.[66]

Mr. Hansen's conclusion that the lead data submitted . In fact, when Plaintiff's counsel asked Ms. Daley if she was going to testify about the validity of RMG's lead data, she notably demurred.[67]

---

[61]     DE 521-2 at 450 (Valente Dep. at 178), and 517 (Rader Dep. at 56-57 (confirming that "opt in" leads used by RMG were consumers who wanted to receive calls about "travel" generally)).

[62]     Exhibit 1, Hansen Rep. at 20 n. 22; DE 521-2 at 845-921 (RMG e-mail listing purported website lead sources).

[63]     Exhibit 1, Hansen Rep. at 18-19.

[64]     Exhibit 1, Hansen Rep. at 19; *see, e.g.,* DE 521-2 at 546 (Rader Dep. at 171-72 (Valente suspected Caldwell List data had been changed to insert new websites, and expressed suspicion to Rader that Caldwell List data was fraudulent)), and 548 (Rader Dep. at 178-79 (Valente "freaked out" because she thinks the Caldwell List data is "bogus," and was nervous that Caldwell List was "making stuff up")).

[65]     Exhibit 1, Hansen Rep. at 21; DE 521-2 at 918-21.

[66]     Exhibit 1, Hansen Rep. at 20-22.

[67]     Exhibit 3, Daley Dep. at 224:2-4 ("I am not here to testify about the validity of the consents that are, purport to be contained within the lead lists.").

### 3.    Cell Phone/Landline Analysis

Daley admits that she is not a telemarketing expert,[68] and she identifies no basis for claiming that she is an expert in determining whether a phone number is assigned to a cell phone. Defendants therefore cannot use the newfound opinion in her untimely "supplemental" report that "cellular telephone reverse lookup processes are unreliable" as a valid means of opposing class certification or excluding Hansen—i.e., someone who actually has first-hand experience identifying cell phones from lists of numbers. Even as a lay testimony, Daley's presentation of hearsay information from third-sources is unreliable, and not her "personal knowledge." Courts and the FCC have repeatedly confirmed the use of wireless and ported number lists as a valid means of confirming whether a number is assigned to a cell phone, and Daley's improper assertions to the contrary should be disregarded.[69]

### C.    Mr. Hansen did not misrepresent his qualifications.

The bulk of Defendants' motion serves as a hit piece on Mr. Hansen's reputation, not as a substantive argument regarding the viability of his methodology. Using a "supplemental" report submitted for the first time with their motion, Defendants and their opinion witness, Margaret A. "Peggy" Daley, make repeated false accusations denigrating Mr. Hansen's integrity and

---

[68]    **Exhibit 3**, Daley Dep. at 102-103 ("I'm not being offered as a telemarketing expert.").

[69]    *See Booth v. Appstack, Inc.*, No. 13-1533, 2016 WL 3030256, at *12 and n. 13 (W.D. Wash. May 25, 2016) (concluding that "Plaintiffs sufficiently confirmed and demonstrated that the recipient devices were indeed cellular devices" in case in which Mr. Hansen used similar method to determine which numbers from class list were assigned to cell phones at time of call, noting that any discrepancy "can be adequately addressed at the claims stage"); *Malta v. Fed. Home Loan Mortgage Corp.*, No. 10-1290, 2013 WL 444619, at *6 (S.D. Cal. Feb. 5, 2013) (citing approvingly process for identifying calls to cell phones using "compar[isons] to the known cell phone lists (including ported number lists)"); *Thrasher v. CMRE Fin. Servs., Inc.*, No. 14-1540, 2015 WL 1138469, at *2 (S.D. Cal. Mar. 13, 2015) (compelling production of call data, finding that "CMRE can produce the record as it is kept (in a searchable format), and Plaintiff's expert will 'scrub' the list by comparing the outbound dial list to a list of known cell block identifiers and will be able to quickly determine how many of the numbers called are cell phone numbers"); *In re Rules & Regs. Implementing the TCPA*, CG Docket No. 02-278 at ¶ 72 ("We generally agree … that there are solutions in the marketplace to better inform callers of reassigned wireless numbers[.]").

reputation—from grasping, negative inferences about his professional experience, to attacking former business associates who have nothing to do with this case. Such matter has no bearing on Mr. Hansen's standing as an expert, and instead demonstrates untenable bias on the part of Ms. Daley, who has started to create a cottage industry for herself by soliciting firms whose opponents have retained Mr. Hansen's services.[70] Because Defendants' and Ms. Daley's offensive accusations are not only false and irrelevant, but fail to meet procedural compliance in any regard, they should be disregarded by this Court.

### 1. Daley's "supplemental" report fails to comply with Rule 26(b)(2).

Defendants' expert report was due on February 19, 2016.[71] On February 20, 2016, Cruise Defendants produced Peggy Daley's Rule 26(a)(2)(B) report, indicating that she had been retained "to review the data produced in this case, which purports to document the telephone calls made by RMG, as well as RMG's opt-in leads database and the cruise line defendants' customer data."[72] Plaintiff's counsel deposed Ms. Daley on that basis on April 6, 2016. Yet now, as an exhibit to their class certification response brief, Defendants submit for the first time a *new* report from Ms. Daley, opining "as a professional investigator and Certified Fraud Examiner that Mr. Hansen has exaggerated his credentials and presents misleading statements regarding his professional qualifications."[73] Ms. Daley was neither timely disclosed under Rule 26(a)(2), nor was the supplemental report timely produced such that Plaintiff was able to cross-examine her on her "findings." These reasons alone warrant this Court rejecting the report's assertions.

---

[70]     Exhibit 5, *Lee v. Global Tel*Link Corp.*, No. 15-2495 (C.D. Cal.), Daley Dep. at 59 (Aug. 12, 2016) (admitting that her staff has emailed defense counsel in other TCPA cases advertising that Daley "has done a good job in discrediting [Hansen's] work").
[71]     DE 431.
[72]     DE 521-6 at 12 (Daley Orig. Rep. at 7).
[73]     DE 521-4 at 9 (Daley Supp. Rep. at 7).

### 2.    Defendants' attacks on Mr. Hansen's experience are baseless.

The failure of Peggy Daley's shoddy online research to verify every facet of the past 26 years of Mr. Hansen's professional life does not make him a liar. Nor does couching Ms. Daley as a newly-designated "private investigation" expert grant Defendants license to make specious accusations. Indeed, "it is a grave breach of professional ethics ... to present expert testimony knowing or suspecting it to be false and misleading in the absence of full disclosure of the manner in which the test was conducted."[74] Mr. Hansen did not misstate his qualifications, and the Court should reject any assertion otherwise.

Defendants repeatedly use negative inferences to suggest that, because *they* couldn't verify Mr. Hansen's sworn statements about his own life, he must be lying. But beyond the obvious conflict of interest, Ms. Daley's willingness to assert anything to support her position regardless of its truth has been proven.[75] For example, among similar contentions in another pending action, *Lee v. Global Tel*Link Corp.*, No. 15-2495 (C.D. Cal.), Daley suggested that Hansen misrepresented having worked at the FBI-sponsored San Diego Regional Computer Forensics Lab ("RCFL") in 2006 because he "struggled to remember" his director's name at his deposition and "[r]esearchers working at my direction have attempted to identify and locate this individual, but no person matching this description has been identified."[76] After being confronted at her own deposition with evidence that a **simple Google search** would have returned numerous

---

[74]    *Xanadu Mar. Trust v. Meyer*, 21 F. Supp. 2d 1104, 1106 (N.D. Cal. 1998) (citing Cal. Bus. & Prof. Code § 6068(d)); *see also* Fed. R. Civ. P. 11(b) (by submitting a written motion, an attorney certifies that, inter alia, "it is not being presented for any improper purpose, such as to harass, [and that] ... the factual contentions have evidentiary support").

[75]    *E.g.,* Exhibit 5, Daley *Lee* Dep. at 219 (admitting that, despite representing that Hansen was "misleading" the court, she did not know for a fact that hundreds of Hansen's students *didn't* obtain certifications; rather, her conclusions against him are based on Daley being "suspicious").

[76]    *Lee v. Global Tel*Link Corp.*, No. 15-2495 (C.D. Cal.) (DE 85 ¶ 111).

first-page results for this person,[77] she contacted the individual and confirmed that he "recalled a volunteer program and recalled the name Jeffrey Hansen."[78] Unbelievably, Daley here has not only attached an affidavit to her supplemental report referencing her co-worker's communication with a *different* RCFL employee who apparently couldn't remember Hansen from ten years ago, but affirmatively attempts to diminish the director's confirmation of remembering Hansen on the basis that he couldn't find out anything further "to confirm whether Mr. Hansen's statements were accurate."[80]

Cruise Defendants continue this false narrative that Hansen didn't volunteer at the RCFL, submitting a subpoena response from the Department of Justice indicating that it could find no record of Hansen's time there.[81] But the unsurprising fact that the government doesn't have a record of someone volunteering at one of its labs a decade ago doesn't change the reality that Hansen *did* work there, or that Daley's blind reliance on third-party researchers to "verify" his report was disproven by first-page results of a Google search.[82] This is exactly the kind of faulty logic and lack of candor that permeates Defendants' motion, among the following:

- No Misrepresentations. Defendants recklessly claim that Hansen "misrepresented" his qualifications, but do not identify *any* instance where this really happened.[83]

- Hansen's Data Analysis Experience. Defendants claim that Hansen's employment history is unrelated to data analysis, and argue that this makes him an improper opinion witness. However, Mr. Hansen has used SQL database language (utilized by both sides' experts to

---

[77]    Despite attesting to the conclusions in her reports under penalty of perjury, it is apparent that Daley doesn't do her own research. Exhibit 5, Daley *Lee* Dep. at 233-34 (when Daley was presented with this evidence, she admitted, "**I'm not sure what happened when the staff did the search**").

[78]    *Lee v. Global Tel*Link Corp.*, No. 15-2495 (C.D. Cal.) (DE 94-1 ¶ 5).

[80]    DE 521-4, Daley Supp. Rep. ¶¶ 57-58 and Ex. 19, Skertic Aff. ¶¶ 3-8.

[81]    Defendants falsely claim that Hansen misrepresented his time at the RCFL because he only worked there as a volunteer, and not an employee. This itself misrepresents Hansen's testimony, which clearly acknowledged that he worked at the RCFL as a volunteer for most of 2006, providing his services in exchange for the experience. Exhibit 2, Hansen Dep. at 92:13-93:22.

[82]    If this is the quality of evidence which Daley finds acceptable, it raises serious concerns about her qualifications to provide *any* expert opinion in this action.

[83]    Exhibit 2, Hansen Dep. at 95-98.

analyze the data in this case) in his work since 2000, and taught this language to others as an instructor at Laptop Training Solutions ("LTS").[84] He has used SQL consistently in the two iterations of his own e-discovery and computer forensics business since 2007, including on numerous occasions in relation to the analysis of dialer data.[86]

- Telemarketing Experience. Defendants argue that Hansen has insufficient telemarketing experience to qualify as an expert.

  o **Asteria Dialer**. Cruise Lines argue that Hansen only "looked" at an Asteria dialer, when in fact he used it to make hundreds of thousands of calls.[87]

  o **Multiple Telemarketing Assignments**. Cruise Lines claim Hansen only worked for one telemarketer, HomeyTel, despite his unrefuted and truthful testimony that he also provided assistance to other telemarketers.[88] Hansen not only set up and maintained a call center using different types of dialers, he also maintained call lists and Do Not Call lists "used to place hundreds of millions of calls over a five year period."[89] The Court, of course, should take Mr. Hansen's sworn testimony at face-value instead of relying on Daley's conclusions that Hansen's operations were minimal, based upon specious internet and public record searches.[90] Hansen was there then; Daley was not. Moreover, Defense counsel had the opportunity to cross-examine Hansen further on these issues, but decided for whatever reason, not to do so.

  o **Correct Testimony Regarding Politics**. They falsely claim that he inflated having conducted dialing campaigns for 50-100 friends who ran for political office, despite that Hansen's testimony really said he robodialed for a few people, but that he knows lots of political people.[91]

  o **Improper Mis-Association**. They reference campaigns in which Hansen had limited or no involvement to suggest that Hansen himself was involved in activities that resulted in consumer complaints.[92]

  o **Guilt by Association**. And they submit irrelevant, unflattering information obtained from public records or online about the owner of HomeyTel in an improper attempt to discredit Hansen by association.

---

[84]    Exhibit 2, Hansen Dep. at 126-128.

[86]    Exhibit 1, Hansen Rep. at 2-3 (discussing data warehousing experience), C.V. at 1-2; DE 522, Hansen *Lee* Dep. at 211-13.

[87]    Exhibit 2, Hansen Dep. at 102.

[88]    Exhibit 2, Hansen Dep. at 98-99. They also misrepresent the *length* of his work with HomeyTel, which included years of relevant work before its owner formally incorporated. DE 526 at 18.

[89]    Exhibit 1, Hansen Rep., C.V. at 2.

[90]    Exhibit 2, Hansen Dep. at 69 ("Over the last 15 years, I've handled every aspect of auto-dialers."), 79 ("And, of course, there was multiple redoing those. As he grew, the dialers were changed, the computers were changed to something more efficient."), 104 (explaining that he's worked with "numerous auto-dialers," including products from TelData, Net-Dot Solutions, Asteria, VICIdial, and others); *see also* DE 522, Hansen *Lee* Dep. at 120 and 179:4-13.

[91]    DE 522, Hansen *Lee* Dep. at 122-23.

[92]    *E.g.,* Exhibit 2, Hansen Dep. at 392-394 (indicating that he only compiled the dial lists for some campaigns, but didn't make the audio recording played).

- <u>Teaching Experience</u>. Defendants mix and match aspects of Hansen's work at LTS to give the impression that he overstated his teaching experience there, stating "Hansen admitted … that only 12 students were ever trained." This is false. As Hansen's C.V. and report explain, he instructed roughly 1,000 students in *numerous* computing areas, "including Microsoft Certified Systems Engineer (NT4.0, Win2000 MCSE, 2003 MCSE), Cisco (CCNA), A+, N+, Linux+, I-Net+, Security+, MOUS and Web Page Design (HTML, Javascript, DHTML, Flash 4, Flash 5, Fireworks3, Photoshop 5) resulting in hundreds of certified students."[93] He also specifically taught students about spyware.[94] That a smaller number of students obtained one particular certification is not inconsistent.

- <u>Formal Degree is Not Necessary</u>. Entirely ignoring Mr. Hansen's vast real-world experience and the fact that he has *successfully run his own computer forensics and e-discovery business for the greater part of a decade*, Defendants use Daley's own supposition and "exemplar job postings" she found online to suggest that because Hansen was not formally educated beyond high school, he is un-hirable in his field and thus unqualified—an argument a court in another TCPA case involving Hansen unequivocally rejected as "**gratuitously derogatory**," noting that "geniuses of all kinds have boasted no college degree." [95] A formal degree is not necessary for a Fed.R.Civ.P. 26(a)(2) to pass *Daubert* muster. *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 724 (7th Cir. 1999) (acknowledging that "Rule 702 provides that a witness can be qualified as an expert without formal training or education by virtue of his or her experience").

- <u>Number of Years' Experience</u>. Defendants quote a reference in Mr. Hansen's report discussing his 26 years of experience in the "electronic and information technology fields," and then immediately ignore the "electronic" part of the quotation to claim that Hansen lies about having 26 years of *IT* experience because in 1990 he was working as a television/VCR tech. Hansen's declaration on this point was true: he has been working in "electronic and information technology fields" for 26 years.[96]

- <u>Technological Experience in the Navy</u>. They minimize Hansen's years of service as a sailor and employee of a U.S. Navy contractor, which was not limited to merely "connecting fiber optic cables to vessels in port," but in fact involved a wide range of IT networking and computer issues which more than qualified him to set up and maintain automatic telephone dialing systems in the private sector, from forensic-type work, work identifying and addressing security threats, and network troubleshooting and management for large-scale Department of Defense networks, for which he currently maintains a secret-level security clearance.[97]

- <u>No Publications</u>. Defendants argue that he "has never authored any technology publications" and "does not belong to any relevant industry trade groups" or "received …

---

[93]  <u>Exhibit 1</u>, Hansen Rep., C.V. at 2.
[94]  <u>Exhibit 2</u>, Hansen Dep. at 455:10-459:11.
[95]  <u>Exhibit 6</u>, *Sherman v. Yahoo! Inc.*, No. 13-41 (S.D. Cal. Feb. 20, 2015) (DE 113 at p. 10 n. 14).
[96]  <u>Exhibit 1</u>, Hansen Rep., C.V. at 1-3.
[97]  <u>Exhibit 1</u>, Hansen Rep., C.V. at 2-3.

industry awards," but fail to explain how or to what extent these are required in Hansen's field.[98] Given Hansen's extensive experience and the straightforward basis for his conclusions, they simply are not necessary here. *Smith*, 215 F.3d at 720.

- <u>Hansen's Certifications</u>. They similarly claim that certifications on Hansen's C.V. are old, entry-level, or expired, but do not establish why the inclusion in his C.V. of certifications Hansen obtained early on in his career warrants exclusion, and do not identify any certifications or continuing education he is purportedly required to have or renew.

- <u>Worked Two Jobs</u>. Defendants suggest it is incredulous that anyone could *possibly* work two jobs (describing Hansen's own business as a "side job"), and falsely suggest that Hansen is working substantively "out of his van"—misrepresenting testimony from an unrelated case in which Hansen indicated that he will take advantage of downtime in his contracting job to read transcripts or other case materials.[99]

### 3. Defendants' *ad hominin* attacks on Hansen and others are irrelevant to Hansen's qualifications as an expert.

Where credibility is an issue for the trier of fact, Defendants untimely conjecture that Hansen misstates his experience, or their attempt to find "dirt" on him and his acquaintances, cannot serve as a valid basis for exclusion.

Determining the weight and credibility of a witness's testimony belongs to the jury, and thus "expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005). In weighing the admissibility of expert evidence, "the district court functions as a 'gatekeeper' whose role is to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *Smith*, 215 F.3d at 718 (citation omitted). A proffered opinion that is

---

[98]  Publication must not be that important, given that Daley's C.V. identifies only thirteen articles over the past 17 years, including such in-depth work as a "10 steps" list for an online lawyer magazine (http://www.insidecounsel.com/2014/09/02/10-steps-to-protecting-your-trade-secrets-from-the) and a 13-question Q&A response about her employer (http://www.metrocorpcounsel.com/articles/10235/duff-phelps-integrating-e-discovery-and-investigations-expertise). DE 521-6 at 57-8 (Daley Orig. Rep. Ex. A).

[99]  DE 522, *Lee v. Global Tel*Link Corp.*, No. 15-2495 (C.D. Cal. July 18, 2016) (Hansen Dep. at 95).

irrelevant—i.e., that would not "help the trier of fact to understand the evidence or to determine a fact in issue"—is thus inadmissible. Fed. R. Evid. 702(a).

Here, Daley spends a considerable amount of her supplemental report contending not only that Hansen misstates his experience, but asserting extraneous unflattering "facts" as an apparent way to embarrass Mr. Hansen or discredit him through association. This includes, for example, implying that Hansen somehow acted improperly in being employed by LTS over a decade ago because it was sued and went bankrupt, discussing Hansen's friend's unsuccessful bid for election as a judge, suggesting that this unrelated third party improperly "gave the impression to motorists that [he] was already a sitting judge running for re-election[,]" and "allegedly made similarly misleading claims in other media that embellished his credentials[,]" and discussing complaints about Hansen's client's telemarketing, and this individual's arrest history and public dispute with an elected official. Daley includes a lighthearted post on Hansen's Facebook page without the underlying context, about which she could not possibly be aware, to attempt to portray Hansen in an unflattering, biased light. None of these or similar assertions have any bearing on Hansen's experience or qualifications as an expert, and they purport to attack Hansen's integrity. This is not the proper scope of an expert report, which, in this case, attempts to take over the trier or fact's role of weighing the witness's credibility.[100]

---

[100]    *See Rink v. Cheminova*, 400 F.3d 1286, 1293, n.7 (11th Cir. 2005) ("[A] district court cannot exclude an expert because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness."); *Elcok v. Kmart Corp.*, 233 F.3d 734, 751 n.8 (3rd Cir. 2000); (ruling that an expert witness's "general credibility" "could neither be considered by the District Court when performing its Rule 702 analysis, nor by this Court in reviewing that analysis[;] … the District Court should not consider Copemann's likely credibility as a witness when assessing the reliability of his methods"); *United States v. Williams*, No. 06-00079, 2009 WL 424583, at *11 (D. Haw. Feb. 20, 2009) ("The parties must bear in mind that the principle of *Daubert* and *Kumho* is not for a court to make credibility determinations or to assess an expert's conclusions."); *Hausman v. Holland Am. Line-USA*, No. 13-937, 2015 WL 9839747, at *3 (W.D. Wash. Aug. 21, 2015) (denying motion to exclude expert testimony because of "credibility issues" and allegedly "inaccurate[] claims [about] a biomechanical engineering background"); *Meganathan v. Signal Int'l L.L.C.*, No. 13-497, 2015 WL 11109846, at *11 (E.D. Tex. June 26, 2015) ("Whether the school where she obtained her Ph.D. in clinical psychology is

And even as lay testimony, because Daley's specious conjecture is pulled from numerous third-party sources about which she has no personal knowledge, it is inadmissible in either case. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 371 (7th Cir. 2015) ("[E]vidence given by affidavit could suffice to resolve disputes before deciding whether to certify a class[,] ... [the] affidavit must be based on personal knowledge.") (emphasis added).

In short, Defendants use of suggestive language and false inferences to smear Hansen's reputation and character is improper and should be disregarded. They tried a similar tactic before—basing a request for invasive discovery on the scurrilous affidavit of an ex-con who, despite having no relation to Plaintiff or this case, conducted an "investigation" into Mr. Charvat on the internet. Just as Judge Rowland denied that motion,[101] the Court should similarly reject Defendants' latest unfounded mudslinging here.

As a network and IT professional, Mr. Hansen has extensive experience with computers and information technology. He has conducted numerous technology-based forensic examinations, provided complete IT solutions for hundreds of businesses, including network design, configuration, forensics, and data recovery, and has taught others about numerous network and computing issues, including spyware. Mr. Hansen conducted a years' worth of volunteer work building forensics machines and installing and configuring systems for the FBI-sponsored San Diego Regional Computer Forensics Laboratory and, aside from his own business, he also works for Hewlett-Packard maintaining fiber-optic networks for the U.S. Navy,

---

accredited by the American Psychological Association, or whether her license to be a family counselor in California is still valid, does not impact whether she is qualified as an expert on trafficking. To the extent that Signal believes that these alleged misstatements affect the weight the jury should ascribe to her testimony, it can raise such issues on cross-examination."); *White v. State Farm Fire & Cas. Co.*, No. 07-1871, 2010 WL 760612, at *6 (W.D. La. Mar. 2, 2010) ("[T]he Court will not exclude Mr. Norman's testimony based on State Farm's allegations that he embellished, exaggerated or misrepresented his credentials and/or qualifications.").

[101]   DE 470.

with a secret-level security clearance. His work as an IT professional and computer forensics professional has also provided him with specialized insight into the telemarketing and lead generation industry—including more than a *decade* of experience setting up and maintaining an outbound call center using a variety of dialers, in addition to purchasing lead data and ensuring DNC compliance. In short, he is very experienced in not only telemarketing, but all manners of issues affecting telephone and computer networks generally.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff Philip Charvat respectfully requests that the Court deny Cruise Defendants' motion to strike Jeffrey Hansen's expert report and exclude his opinions and testimony.

Dated: September 28, 2016                                    PHILIP CHARVAT, on behalf of
                                                                              himself and others similarly situated,


                                                                              By:  /s/ Alexander H. Burke_____


Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
Telephone: (312) 729-5288
Facsimile: (312) 729-5289
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

Edward A. Broderick
BRODERICK LAW, P.C.

32

125 Summer St., Suite 1030
Boston, MA 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327
ted@broderick-law.com

Matthew P. McCue
LAW OFFICE OF MATTHEW P. MCCUE
1 South Ave., 3rd Floor
Natick, MA 07160
Telephone: (508) 655-1415
Facsimile: (508) 319-3077
mmccue@massattorneys.net

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2016, I electronically filed the foregoing with the

Clerk of the Court, using the CM/ECF system, which will send a notice of electronic filing to all

counsel of record.

/s/ Alexander H. Burke