# UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

PHILIP CHARVAT on behalf of himself and all others similarly situated,

*v.*

ELIZABETH VALENTE, et al.,

     *Defendant.*

Case No. 12-cv-5746

**DECLARATION AND SUPPLEMENTAL REPORT OF MARGARET A. DALEY**

Case: 1:12-cv-05746 Document #: 523-4 Filed: 08/29/16 Page 3 of 768 PageID #:18824

I, Margaret Daley, Esquire, declare and state under penalty of perjury as follows:

1.     I was retained by Carnival Corporation & PLC, Royal Caribbean Cruise Ltd. and NCL (Bahamas) Ltd. to review and analyze the report of Jeffrey Hansen ("Hansen") who is the expert retained by the Plaintiff who provided certain telemarketing and data analysis opinions regarding the proposed class in this matter. I was present at his deposition, had my deposition taken, and have reviewed Hansen's supplemental report. I now provide this declaration after having reviewed the Plaintiff's Motion for Class Certification, in relation to the Cruise Lines Rule 702 and *Daubert* Motion and to clarify a question that occurred during my deposition. For the sake of brevity, I adopt the qualifications set forth in detail in my report dated February 19, 2016 on pages 4-7.

2.     The documents that I am relying on in connection to the Cruise Lines Rule 702 and *Daubert* motion are as follows:

Written Report of Jeffrey Hansen

Deposition of Jeffrey Hansen

Lee v. Global Tel*Link Corp., 2:15cv2495 (C.D. Calif., filed April 3, 2015), Deposition of Jeffrey Hansen

"Laptop Training School Closes With No Warning," 10 News.com

California Secretary of State Business Entity Record for HomeyTel

U.S.v. Braun, Defendant-Appellant, No. 94-3847, Decided: July 13, 1995

Warrant Recommended, Re. Braun, No. 93-00133-01-CR-W-9-5 (W.D. Mo. filed Sept. 8, 1993), Sept. 18, 2000

Re. Braun 93-cr-00133 Disposition, Braun v. Bloodworth, 4:02cv00789 (W.D. Mo. Filed Aug. 16, 2002), Complaint and Docket

State v. Braun, 273 P.3d 801 (Kan. Ct. App. 2012)

"Text of Conrad Braun's phone calls to Kansans"

"Californian behind calls against Morrison"

Consumer complaints against HomeyTel

Action News (https://www.youtube.com/watch?v=U8xeWipGm64)

Sapan v. Homeytel, Inc., Conrad Braun, *et al*., Case No. 30-2011-0087692 (San Diego Cnty. Sup. Ct., March 15, 2011), Declaration of Attorney Christopher J. Reichman in Support of Default Judgment

http://www.salespider.com/b-359389576/thugz-network-solutions

http://homeownerscircle.com/company-359389576/thugz-network-solutions

https://www.consumer.ftc.gov/articles/0131-credit-card-interest-rate-reduction-scams

http://www.eastcountymagazine.org/ken-gosselin

http://www.kpbs.org/news/2014/apr/03/san-diego-judicial-candidate-accused-puffing-crede/

<u>Henderson v. United Student Aid Funds, Inc.</u>, 3:13cv01845 (S.D. Calif., filed Aug. 8, 2013), Declaration of Jeffrey Hansen, ECF 142-45

<u>Marks v Crunch San Diego</u>, No. 14-cv-00348 (S.D. Cal. filed Feb. 14, 2014), Declaration of Justin A. Barton In Support Of Crunch San Diego, LLC's Motion To Exclude Opinions And Testimony Of Jeffrey Hansen, ECF 37-2

Elmasri and Navathe, *Fundamentals of Database Systems*, Addison-Wesley Computing

https://certification.comptia.org/continuing-education/

https://www.microsoft.com/en-us/learning/mcsa-certification.aspx

http://www.bppe.ca.gov/about_us/history.shtml

<u>Russell, et al., v. DAT, Inc. dba Laptop Training Solutions</u>, GIC804272 (San Diego Sup. Ct., filed Jan. 23, 2003)

Laptop Training Solutions Bankruptcy Petition, U.S. Bankruptcy Court S. D. Calif. Case no. 04-08579-7

http://web.archive.org/web/20030216221358/http://64.167.168.13/NEWLTS/web/slmfaq.htm#18

https://www.facebook.com/jeff.hansen.583234

National Consumer Law Center Report (June 2005),

https://www.rcfl.gov/about

Affidavit of Mark Skertic

Berkeley Research Group Job Postings

    3.    The documents that I am relying on to supplement my opinions relating to the recently filed motion for class certification are:

Email from Leslie Sherman at LexisNexis.com, April 14, 2016

18th Mobile Wireless Competition Report, published by the Federal Communications Commission (https://www.fcc.gov/document/18th-mobile-wireless-competition-report)

<u>Sherman v. Yahoo</u>, 3:13cv00041 (S.D. Calif., filed Jan. 8, 2013), ECF No. 191

AT&T First Quarter 2016 Earnings – Investor Briefing (accessed at https://www.att.com/Investor/Earnings/1q16/ib_final_1q16.pdf)

AT&T Inc. 2013 Annual Report (accessed at https://www.att.com/Investor/ATT_Annual/2013/downloads/ar2013_annual_report.pdf)

http://thehackernews.com/2016/03/prepaidp-burner-phone.html

2012 North American Wireless Survey

Email from Josh Eidell at Experian Data Quality, May 3, 2016

Email from Holly Paulus at Nexxa Group, May 4, 2016

LexisNexis End User Agreement

Lexis Nexis reverse lookup result

Lexis Nexis reverse lookup test results

4.     The documents that I am relying on to clarify a question asked during my deposition are:

Email exchange with Tim Ringenbach, April 26, 2016-April 27, 2016

**RMG Call Agent Shift Changes Do Not Account For The Edits Observed Within The Asteria Database's Dialplan Tables**

5.     In my deposition, I was asked whether RMG would have had to change aspects of their dialplans when changing which customer service agents were assigned to handle calls, such as shift changes in staffing.[1]  At the time, I testified that I did not think that shift changes or other changes to the customer service staff would change the dialplans.  I have subsequently conducted additional analysis of the database design and conferred again with Asteria database engineer Tim Ringenbach. Mr. Ringenbach confirmed that changes to the customer service staff had ***no effect*** on these tables and cannot explain any of the observed changes to the Dialplan_State or Dialplan_State_Param tables.

6.     The Asteria database contains numerous tables that interact with one another to track certain information about the dialplans used in RMG's calling campaigns.  The various dialplan tables are "instructional" tables that record settings and parameters input by the user to instruct the system how to behave next, whereas other tables in the database are "log" tables that

---

[1] Deposition of Margaret Daley at 106:7-16.

record information automatically as calls are placed. RMG's Asteria system did not contain audit tables to track changes to the database. Therefore the dialplan tables only show the most recent set of instructions input by the users. They do not contain any record of past activity.

7.      In my Report, I identified that one of the dialplan tables, the Dialplan_State_Param table, had been changed at least 939 times—and only the most recent set of instructions was retained. The fact that Dialplan 11 was used in 94.7% of all calls placed[2] means it is reasonable to conclude to a degree of scientific certainty that many, if not most, of the changes observed in this table represent changes to Dialplan 11. Furthermore, the changes to Dialplan 11 were predominantly if not exclusively concerned with changing the pre-recorded IVR message played on calls. This makes it impossible to determine after the fact what recording was heard by any putative class member.

8.      From my analysis of the database design I observed that the system is *in theory* capable of capturing information about the specific customer service staffing assignments, but the way the Travel Services Asteria database was configured, no such data was in fact ever stored in the database. As a consequence of this configuration, any edits that are reflected in the Dialplan_State or Dialplan_State_Param tables contained in the database backups are not a result of shift changes or other employee assignments. Instead, the observed edits to the Dialplan_State and Dialplan_State_Param tables are a result of other changes to the Dialplans such as changes to the Sounds played. The fact that no customer service agent information was stored is easy to confirm by a review of the dialplan tables and certain other tables, such as "queue" tables.

9.      For example, shown below are the rows from the Dialplan_State table showing the states assigned to Dialplan 11 (the dialplan used on all of the calls placed to Mr. Charvat, and in all of the calls to the proposed class):

|  | id<br>integer | dialplan_id<br>integer | action<br>integer | state<br>integer | name<br>character varying(100) | hitcount<br>integer |
|---|---|---|---|---|---|---|
| 1 | 47 | 11 | 1 | 1 | Start | 0 |
| 2 | 48 | 11 | 3 | 2 | Hangup | 0 |
| 3 | 50 | 11 | 10 | 5 | Transfer DNC | 0 |
| 4 | 51 | 11 | 10 | 7 | Transfer to TS2 queue | 0 |

10.     The output above shows that row 49 has been deleted from this table, but the remaining states are found on rows 47, 48, 50, and 51. These same rows are identical in both of

---

2

| Database Backup | Number of Calls | Calls Placed Using Dialplan 11 | Percentage Of Total Calls |
|---|---|---|---|
| 1 | 214,824,995 | 192,442,807 | 89.58% |
| 2 | 212,020,422 | 212,008,516 | 99.99% |

Case: 1:12-cv-05746 Document #: 523-4 Filed: 08/23/16 Page 6 of 768 PageID #:16828

the database backups, which represent snapshots of the state of the Asteria database on May 5, 2012 and March 8, 2014. This indicates to me that, aside from the deletion of state 49, no other change has been made to these states between when the two database backups were made.

11.    Set forth below are the relevant rows from the Dialplan_State_Param table, from Database Backup 1 as taken on May 5, 2012:

| | id integer | dpstate_id integer | name character varying(20) | value text |
|---|---|---|---|---|
| 1 | 258 | 49 | next state | 2 |
| 2 | 259 | 49 | sound | 6 |
| 3 | 260 | 50 | next state | 2 |
| 4 | 261 | 50 | extension id | 4 |
| 5 | 264 | 51 | next state | 2 |
| 6 | 265 | 51 | extension id | 3 |
| 7 | 722 | 47 | sound | 28 |
| 8 | 723 | 47 | replays | 0 |
| 9 | 724 | 47 | fail state | 2 |
| 10 | 725 | 47 | amd | 1 |
| 11 | 726 | 47 | amd hangup on amd | 1 |
| 12 | 727 | 47 | bad sound | : |
| 13 | 728 | 47 | waitfordigit timeout | 10500 |

12.    The same parameters appear differently in Database Backup 2, taken on March 8, 2014:

| | id integer | dpstate_id integer | name character varying(20) | value text |
|---|---|---|---|---|
| 1 | 258 | 49 | next state | 2 |
| 2 | 259 | 49 | sound | 6 |
| 3 | 260 | 50 | next state | 2 |
| 4 | 261 | 50 | extension id | 4 |
| 5 | 264 | 51 | next state | 2 |
| 6 | 265 | 51 | extension id | 3 |
| 7 | 1262 | 47 | sound | 61 |
| 8 | 1263 | 47 | replays | 0 |
| 9 | 1264 | 47 | fail state | 2 |
| 10 | 1265 | 47 | amd | 1 |
| 11 | 1266 | 47 | amd hangup on amd | 1 |
| 12 | 1267 | 47 | bad sound | : |
| 13 | 1268 | 47 | waitfordigit timeout | 10500 |

13.    The important detail in these two outputs can be seen in the rows related to the parameters for state 47. This particular state is the "start" parameter for Dialplan 11, and which

is therefore directly related to the assignment of the pre-recorded IVR message to the dialplan. This parameter is different between the two backups. Not only has the sound assignment changed from Sound 28 to Sound 61, but the specific row numbers associated with this sound assignment has changed from Row 722 in Database Backup 1 to Row 1262 in Database Backup 2. Crucially, however, the *other* parameters associated with the other states of Dialplan 11 (states 48, 50, and 51) not only stayed the same between the two Database backups, but their row numbers also stayed the same, serving as evidence that these states were not edited during that time. The only parameters for Dialplan 11 that were changed in those two years were the parameters associated with state 47, which includes the assignment of the pre-recorded IVR message.

14.     This indicates that any changes to the customer services agents assigned to handle calls (such as a shift change) could not and do not account for the edits found in this table. Any such changes to staffing, if it was documented in the database at all, would have appeared in different tables. In terms of how the database is designed, the Queue_Log and Queue_Devices tables would be the location of any such information. I examined these tables and found that the Queue_Devices table is unused and empty of data in both Database Backups. I also found that the Queue_Log table does not contain the data identifying individual agents and their activity. An excerpt from that table is below as an illustration of how some of the columns are empty or filled with only default, non-descriptive data such as "NONE":

| | id [PK] serial | qtime timestamp with time zone | asterisk_id text | queue_uniqueid text | qname text | agent text | action text | info1 text | info2 text | info3 text | info4 text |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 2012-05-06 15:41:00-05 | NONE | | NONE | NONE | QUEUESTART | '' | '' | '' | '' |
| 2 | 2 | 2012-05-06 15:45:01-05 | NONE | | NONE | NONE | CONFIGRELOAD | '' | '' | '' | '' |
| 3 | 3 | 2012-05-06 15:50:01-05 | NONE | | NONE | NONE | CONFIGRELOAD | '' | '' | '' | '' |
| 4 | 4 | 2012-05-06 15:55:01-05 | NONE | | NONE | NONE | CONFIGRELOAD | '' | '' | '' | '' |
| 5 | 5 | 2012-05-06 16:00:01-05 | NONE | | NONE | NONE | CONFIGRELOAD | '' | '' | '' | '' |
| 6 | 6 | 2012-05-06 16:05:01-05 | NONE | | NONE | NONE | CONFIGRELOAD | '' | '' | '' | '' |
| 7 | 7 | 2012-05-06 16:10:01-05 | NONE | | NONE | NONE | CONFIGRELOAD | '' | '' | '' | '' |
| 8 | 8 | 2012-05-06 16:15:01-05 | NONE | | NONE | NONE | CONFIGRELOAD | '' | '' | '' | '' |
| 9 | 9 | 2012-05-06 16:20:01-05 | NONE | | NONE | NONE | CONFIGRELOAD | '' | '' | '' | '' |
| 10 | 10 | 2012-05-04 16:33:48-05 | NONE | | NONE | NONE | QUEUESTART | '' | '' | '' | '' |

15.     I communicated these observations to Mr. Ringenbach, who confirmed that due to the specific configuration of RMG's version of the Asteria database, it did not collect *any data* about shift changes or individual agents, and so there is in fact nothing in the database backups relating to shift changes.

16.     Mr. Ringenbach said, "I'm not surprised that there's not any queue information. Many custom[er]s [sic] forward the calls to an external system. Even if they're using our system for the queues, we would have recommended that they have a separate server for the queues (for performance reasons), which would have its own database."[3]

17.     During my conversation with Mr. Ringenbach I also verified that the act of changing a sound recording assigned to a Dialplan *does not* require the user to pause the calling

---

[3] See Exhibit 1.

campaign. Mr. Ringenbach confirmed the system is designed to be flexible and allow users to make these kinds of changes quickly should they choose to do so.

### Plaintiff's expert Jeffrey Hansen has overstated and misrepresented his professional experience and technical credentials

18. As discussed above, I was present at Mr. Hansen's deposition in this case and I have also been an opposing expert in two other cases with him.[4] I personally undertook a comprehensive background investigation into the professional experience and credentials Mr. Hansen claims in his expert reports and on his *curriculum vitae.* Based upon the facts unearthed in my investigation, it is my opinion as a professional investigator and Certified Fraud Examiner that Mr. Hansen has exaggerated his credentials and presents misleading statements regarding his professional qualifications.

19. In both his expert reports and *curriculum vitae*, Mr. Hansen claims a set of credentials, qualifications, and experience that purportedly establish his ability to offer expert opinions in matters relating to data analysis, automatic dialer systems and in TCPA matters in general. Specifically, he claims to:

    1) "*frequently*" "act as a consultant to *companies* that engage in the use of autodialers" and that he has set up and maintained "*all aspects* of predictive dialers and autodialers;"[5] (Emphasis added)
    2) have taught "1000 students" to be computer engineers;[6]
    3) be a seasoned expert witness who has served in "more than 50" TCPA class action lawsuits;[7]
    4) have "worked" at the FBI Regional Computer Forensic Laboratory;[8] and
    5) hold multiple technical certifications, including the MSCE.[9]

20. As detailed below, these claims appear to be exaggerated and misleading. Furthermore, what experience he does have was gained through associations with convicted felons and fraudsters and companies that have apparently exploited the very consumers plaintiff purports to represent.

███████████████████████████████████████████████████████████

---

[4] Due to confidentiality designations in those cases, I have been careful to only rely on materials provided to me in this case that were obtained by the Cruise Lines' counsel. Please see list in paragraph 2 *supra.*
[5] Written Report of Jeffrey Hansen, p. 3.
[6] *Id.*, p. 4.
[7] *Id.*, p. 2.
[8] *Id.*, p. 4.
[9] *Id.*, p. 4.
[10] Exhibit 2, at 89:4-94:18.
[11] Deposition of Jeffrey Hansen at 89:11-90:1.

███████████████████████████████████████████████ He has public speaking on any related technology or telemarketing subjects. He has received no industry awards or recognition. His full time job for the last ten years is to install fiber optic cables to Naval ships coming in to port in order to provide the vessel with internet connectivity.[14] His "expert" work is performed in his off hours and weekends.[15] His most significant professional credentials, outside of his prolific expert witness work on behalf of plaintiff's class action counsel, was working as the Director of Training for a for-profit computer training school which was shut down by the state of California for defrauding students,[16] and setting up the dialers for a robocalling company run by a convicted felon which has been sued on multiple occasions for violating the TCPA.[17]

### Mr. Hansen's Lack of Experience and Qualifications in Telemarketing

22.     Hansen graduated from high school in 1991 and never attended college.[18] ███████████████████████████████████████████████████████████████ nalysis, telephony or automatic dialers.

23.     From 2000 to 2004, he worked at Laptop Training Solutions as an instructor. This period of Mr. Hansen's biography is discussed more fully below in paragraphs 42 to 45.  Since 2004, Mr. Hansen has been employed with a succession of naval contractors to assist with fiber optic internet connectivity to ships docking in San Diego.[21]  This fulltime position, which Mr. Hansen has held continuously for twelve years, also does not involve data analysis, telephony or automatic dialers.

### *Mr. Hansen's Experience Setting Up Predictive Dialers and Autodialers*

24.     In his reports, Mr. Hansen claims that he "*frequently* act[s] as a consultant to *companies* that engage in the use of autodialers."[22] (Emphasis added)  Despite his use of the plural form in this sentence, he admitted when pressed that he has only been a paid consultant for one call center, HomeyTel, Inc.[23]

---

[12] Exhibit 2 at 33:5-13.
[13] *Id.* at 97:6-12.
[14] Deposition of Jeffrey Hansen at 81:23-82:9.
[15] *Id.* at 88:25-89:9.
[16] Exhibit 3.
[17] Deposition of Jeffrey Hansen at 98:17-22 and 99:6-100:12.
[18] *Id.* at 89:11-90:1.
[19] Exhibit 2 at 89:4-12.
[20] *Id.* at 89:21-90:13.
[21] Deposition of Jeffrey Hansen at 81:24-82:9.
[22] Written Report of Jeffrey Hansen, p. 3.
[23] Deposition of Jeffrey Hansen at 98:17-22.  Mr. Hansen has also claimed to have provided unpaid assistance to unnamed customers of HomeyTel's.
          A: Well, from time to time [HomeyTel] has had other friends and colleagues that also did
             telemarketing that I would give some limited help to.
          Q. You never got paid for?
          A. No.

25.     HomeyTel is the sole proprietorship of one Conrad Braun.[24]  Conrad Braun is a repeatedly incarcerated felon with a colorful history of violence, threats, and fraud.[25] Mr. Hansen first met Mr. Braun in 2000[26] when Mr. Braun was released from prison for his 1994 convictions on five counts of wire fraud, and five counts of interstate transfer of monies taken by fraud.[27]  Mr. Braun was re-arrested within three months for violations of that supervised release, and was returned to prison.

26.     Mr. Hansen testified that he set-up, configured, and maintained the dialers used by Conrad Braun and HomeyTel,[28] and that this constitutes the *entirety* of his professional experience with call centers:

> Q.     And then you did telemarketing work with HomeyTel, right?
> A.     Yes.
> Q.     Any other business or company that you work with?
> A.     No.
> Q.     Okay. What was the first call center you had primary responsibility for designing and setting up?
> A.     That would be HomeyTel's.
> Q.     Is that the last call center that you had primary responsibility for designing and setting up?
> A.     Well, that one went through many complete redesigns and buildings, but --
> Q.     But no other -- you have not designed a call center for any other company besides HomeyTel?
> A.     Right.
> Q.     Okay. So it's your first and last?
> A.     Right.[29]

[30]     Voice broadcasting consists of broadcasting recorded messages when a call connects and does not include direct connection to customer service agents.  HomeyTel does not have a federal tax ID number and therefore cannot legally have any employees.[31]  Mr. Hansen's experience with HomeyTel, therefore, does not

---

*Id.* at 98:25-99:5.

[24] *See* Exhibit 4.

[25] Braun has a YouTube channel where he claims he blackmailed the President of the United States and other public officials (while referring to himself as "the Bumblebee"). See https://www.youtube.com/watch?v=iVVi4Xu9xHM, https://www.youtube.com/watch?v=G-4QzRJfu80 and https://www.youtube.com/watch?v=58gGTqy0oCY.

[26] Deposition of Jeffrey Hansen at 78:12-18.

[27] *See* Exhibits 5 and 6.

[28] Deposition of Jeffrey Hansen at 78:20-79:6.

[29] *Id.* at 399:5-25.

[30] Exhibit 2 at 118:2-11.

[31] Exhibit 7, p. 9, par. 48.

qualify as professional experience with setting up, configuring, or maintaining dialer systems for a call center that conducts telemarketing with customer service representatives and call agents.

27. Although Mr. Hansen's work for HomeyTel and Conrad Braun is the sole professional consulting experience upon which he bases his claims of expertise in telemarketing and dialer technology, he also admitted he provided his services for free since 2008:

> A.   Who do they pay? They don't pay me. I don't charge them.
> Q.   You don't charge them. You don't charge HomeyTel?
> A.   Right.
> Q.   So you have been working for HomeyTel since 2008 for free?
> A.   For the most part.
> Q.   What does that mean "for the most part"?
> A.   Yeah. Since 2008, yes, because the last check that I received from them was at least ten years ago.[32]
> Q.   So you have been working for free for eight years for HomeyTel?
> A.   Yeah.[33]

28. Mr. Hansen's testimony regarding the chronology of these events is striking. As discussed above, Mr. Hansen has testified that he first met Mr. Braun in 2000, was responsible for setting up Mr. Braun's dialers, and that any work he has performed for Mr. Braun and HomeyTel since 2008 has been unpaid. This is apparently the support for Mr. Hansen's claim of "fifteen years working in the telemarketing industry" and of being "someone who ran call centers for more than fifteen years."[34] What is omitted from this sequence of events is the fact that between 2000 and 2006, Mr. Braun was in and out of prison on various convictions and therefore was not capable of conducting calling campaigns for most of this time.[35] By his own admission, between 1991 and 2006 Mr. Braun spent eleven of those years behind bars in various correctional facilities.[36]

29. Public records show that HomeyTel was established in 2006, not earlier.[37] While it may be the case that fifteen years elapsed on the calendar between the time that Mr. Hansen first set up some kind of dialer for Mr. Braun and the time that he submitted his reports in the instant matter, his professional experience with HomeyTel and Mr. Braun is largely concentrated in the two year period between when Mr. Braun was released from prison in 2006 and when Mr. Hansen reported he was last paid by Braun in 2008. Furthermore, it is precisely in that tight corridor of time from 2006 to 2008 that Mr. Hansen first started working as a telemarketing "expert" in TCPA matters. ██████████████████████████████████████████████████████████████████████

---

[32] This statement is ambiguous, as "ten years ago" from the date of the deposition would have been in 2006, the year of HomeyTel's creation.
[33] Deposition of Jeffrey Hansen at 79:19-80:4-9.
[34] Written Report of Jeffrey Hansen, p. 19.
[35] See Exhibits 5, 6, 8 and 9.
[36] Exhibit 10.
[37] Exhibit 4.
[38] Exhibit 2 at 109:1-193:22.

30.

In his report and testimony, Mr. Hansen presents himself as an expert on what a "responsible telemarketer" would do with respect to the selection and use of lead lists[39], and an expert on the appropriate definition of "consent."[40] In light of this stance, it is therefore instructive to observe Mr. Hansen's actual behavior in terms of the calling campaigns with which he has been associated.

31.    Mr. Hansen claims to be an expert in data analysis and telemarketing and has rendered a sweeping opinion in this matter that, in order to be compliant with the TCPA, "opt in" lead lists must contain express consent from the consumer to be called by a *specific entity*:

> I have over 15 years of experience of working with "opt in" data in the telemarketing industry . . . In order to assess the authenticity and reliability of "opt in" data, particularly where it is being offered to satisfy the TCPA's strict requirement of "prior express consent," a telemarketer must be able to determine if, in fact, the "opt in" data is legitimate. Most fundamental, the telemarketer must be able to verify that a consumer, in fact, visited a particular web site at a particular time and on a particular date and requested to be contacted by telephone to receive marketing calls *from a specific entity*.[41]

Mr. Hansen further claims that he would personally *never* use lead lists that did not provide express consent from the consumer to receive a call from the specific company making the call:

> As someone who ran call centers for more than fifteen years, I would have never used the data relied upon here by the defendants, in support of a claim of "prior express consent," as the data is inherently suspect, unreliable and likely fraudulent. No responsible telemarketer would ever rely upon this data to satisfy the TCPA's strict requirement that a consumer must provide a telemarketer with their "prior express consent" to receive pre-recorded telemarketing calls.

32.    Mr. Hansen's statements are however belied by his actions while working with Mr. Braun at Homeytel where he participated in calling campaigns with robocalls that attacked public officials and sold potentially fraudulent debt relief services. There is nothing to indicate that these call recipients ever consented to receive these calls. For example, Mr. Hansen testified that he compiled the lists of telephone numbers that Mr. Braun used for a particularly notorious 2006 calling campaign.[42] After being recently released from prison relating to a blackmail conviction,[43] Mr. Braun initiated a voice-broadcast robocall campaign to hundreds of thousands of Kansas citizens using a pre-recorded message that personally attacked Kansas Attorney General-elect Paul Morrison, who Mr. Braun believed was responsible for his convictions.[44] This calling campaign resulted in numerous TCPA complaints and widespread media coverage.[45]

---

[39] Written Report of Jeffrey Hansen, p. 19-20
[40] Deposition of Jeffrey Hansen at 405:17-406:23.
[41] Written Report of Jeffrey Hansen, p. 17
[42] Deposition of Jeffrey Hansen at 393:1-394:12.
[43] *See* Exhibit 9.
[44] *See* Exhibit 11. See footnote 25.
[45] *See* Exhibit 12.

33.     A TV news story about the Paul Morrison robocalls featured video footage of HomeyTel's call center, which, as described and shown in the footage, consists of a "small office jammed with exposed telephone wires, high power modems, and a bank of computers using 60 telephone lines."[46]  Images of the "call center" from the TV news report are below:






34.     When Mr. Hansen claims in his expert report that he has "set up and maintained all aspects of predictive dialers and autodialers from predictive dialers operating with just three telephone lines to outbound call centers capable of generating over 1 million calls per hour,"[47] he is referring to the HomeyTel "call center" which is depicted above.  My research uncovered no other locations for HomeyTel's business.

35.     Another HomeyTel calling campaign known to involve Mr. Hansen involved a series of robocalls made to consumers without their consent that was conducted in 2010.  This calling campaign resulted in lawsuits alleging that the calls were part of a fraudulent scheme to peddle debt relief, insurance, and other financial products to consumers. Pleadings in that lawsuit,

---

[46] https://www.youtube.com/watch?v=U8xeWipGm64, Attached as Exhibit 13.
[47] Written Report of Jeffrey Hansen, p. 3.

Sapan v. HomeyTel, Conrad Braun, *et al.*, state that the calls followed nearly identical scripts to sell various financial products such as insurance and credit card debt relief. For example one call featured a female voice saying "Hello this is Andrea with HomeyTel business news" and then referenced a fictitious "bank stress test act" before selling debt relief services. Another call from "David" stated it was from "TaxReliefNews" and used the same script. The pleadings also alleged that the calls placed by HomeyTel falsified the caller ID number presented to the call recipients. The number identified as the caller ID of the call's origin was not a working number.[48]

36.     Inspection of the web page cited in the call's message, TaxReliefNews.com, revealed that the page had been commissioned by HomeyTel and was hosted on the domain http://pam.thethugz.com/HomeyTel/ taxreliefnews.[49] Online records indicate that Mr. Hansen is the registrar of the "Thugz.com" domain.[50] Mr. Hansen also testified that he "handled all the lists" used by HomeyTel to populate its dialers' calling campaigns.[51]

37.     Robocalling campaigns on behalf of credit card debt and bank loan reduction services have a checkered history. There are so many documented cases of companies offering these services defrauding impoverished people that the FTC has a page on its website devoted to warning consumers away from these services. In fact the FTC advises consumers to ***never*** respond to these solicitations:

> The Federal Trade Commission (FTC), the nation's consumer protection agency, says consumers who get these interest rate reduction robocalls should listen to them with extreme skepticism, and delete them as many are scams.[52]

38.     ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████[55] Mr. Hansen testified in the instant matter that he only ran "a handful" of such political campaigns, and the *only* one he remembered was the last one, in 2012, for Ken Gosselin.[56] When pressed, Mr. Hansen suggested that he may only have run one other political campaign other than Mr. Gosselin's, but he did not recall the name or when it occurred.███████████████████████████

████████████[58]

---

[48] Exhibit 7, p. 3 ¶¶ 9-10.

[49] *See* Exhibit 7.

[50] http://www.salespider.com/b-359389576/thugz-network-solutions and http://homeownerscircle.com/company-359389576/thugz-network-solutions

[51] Deposition of Jeffrey Hansen at 412:10-12.

[52] https://www.consumer ftc.gov/articles/0131-credit-card-interest-rate-reduction-scams

[53] Exhibit 2 at 179:4-23.

[54] *Id.* at 121:9-14.

[55] *Id.* at 122:24-123:11.

[56] Deposition of Jeffrey Hansen at 397:13-25.

[57] *Id.* at 398:1-7.

[58] Exhibit 2 at 122:20-23.

39.     Although Mr. Hansen testified that this campaign took place in 2012, in fact Ken Gosselin's failed bid to be elected judge in San Diego took place in 2014.  Mr. Gosselin's campaign was marked by accusations of fraudulent misrepresentation.  The Gosselin campaign posted billboards that read "for Judge Gosselin Law Enforcement's Choice," however the "for" was printed in such tiny letters as to be essentially invisible.  This gave the impression to motorists that Gosselin was already a sitting judge running for re-election.  As reported in the San Diego media, the law forbids judicial candidates from calling themselves judges. [59]



The Gosselin campaign allegedly made similarly misleading claims in other media that embellished his credentials.  KPBS.org reported that the Gosselin campaign website stated he was Harvard Law School trained, when in fact he earned his law degree from La Verne University.  After the opposing candidate Brad Weinreb filed court papers to seek a court order barring the false ballot statements, the Gosselin campaign updated the website to read that he was a "Harvard Law School-trained mediator" because he received a certificate from a mediation workshop held at Harvard in 1999.  Mr. Gosselin also claimed in his candidate statement that as a judge *pro tem* he has presided over thousands of criminal and civil cases assigned by the Superior Court, when his opponents claimed court papers showed his actual judicial experience was limited to small-claims and traffic cases. Mr. Gosselin also allegedly claimed in his ballot designation worksheet that he is a constitutional law attorney, when his own website noted his practice focused on real estate cases.[60]  The text of the pre-recorded message played in the robocalls made by Mr. Hansen on Mr. Gosselin's behalf has not been identified in publicly accessible materials, so it is unclear whether the robocalls made by Mr. Hansen repeated any of the misleading campaign claims.

40.     In his deposition, Mr. Hansen was unable to identify *any other instances* of using his personal dialer for robocalling other than his work for Ken Gosselin's campaign:

> Q.   Before [the Gosselin campaign], when was the last one you ran before that?
> A.   I don't recall before that.
> Q.   So you ran five campaigns. The last one was in 2012. When was the first one?
> A.   I am not sure. I think there was one other one, but I can't place which one it was.
> Q.   How many year time span do you think you did these five campaigns?
> A.   It would have gone through the political seasons. So every two years there is a political season.

---

[59] http://www.eastcountymagazine.org/ken-gosselin
[60] http://www.kpbs.org/news/2014/apr/03/san-diego-judicial-candidate-accused-puffing-crede/

> Q.    But did you do four in the last political season and then one in 2012 --
> A.    No.
> Q.    -- or did you do two, two, two?
> A.    It might have been a total of two.  The one that stands out in my mind is Ken Gosselin.
> Q.    And so you think it might have been a total of two political seasons?
> A.    It might have been two. It might have been -- you know, *I can only recall the one at the moment*. (Emphasis added)[61]

Mr. Hansen also testified that his work for Conrad Braun and Ken Gosselin comprise the *entirety* of his telemarketing experience:

> Q.    But again, the depth of your experience in this industry, is limited to what you have done with HomeyTel as well as the few campaigns you did on your own?
> A.    Yes.[62]

### Mr. Hansen's Experience as an "Expert" Witness in "More Than 150 TCPA Class Action Lawsuits"

41.    In his reports, Mr. Hansen claims that he has "served as an expert or consultant in more than 50 TCPA class action lawsuits."[63]  This supplemental report was signed by Mr. Hansen on February 10, 2016.  Just a few months later, when Mr. Hansen filed his declaration on May 4, 2016 in the matter of <u>Henderson v. United Student Aid Funds, Inc.</u>, 3:13cv01845 (S.D. Calif., filed Aug. 8, 2013), he now claims to have "served as an expert or consultant in more than 150 TCPA class action lawsuits."[64]  In his deposition in another TCPA matter, Mr. Hansen testified regarding this extraordinarily prolific output as a plaintiff's TCPA expert:



A:

Q:
A:

42.    [66]  According to his deposition testimony in

---

[61] Deposition of Jeffrey Hansen at 398:1-23.
[62] *Id.* at 412:13-17.
[63] Written Report of Jeffrey Hansen, p. 2.
[64] <u>Henderson v. United Student Aid Funds, Inc.</u>, 3:13cv01845 (S.D. Calif., filed Aug. 8, 2013), Declaration of Jeffrey Hansen, ECF 142-45, p. 2.
[65] Exhibit 2 at 168:4-20.
[66] *Id.* at 96:7-9.

the instant matter, Mr. Hansen works a full 40-hour workweek with HP Enterprise Solutions connecting fiber optic cable for naval ships.[67] ████████████████

████████████████████████████████████████████████████████████

43.     Forensic analysis is a complex undertaking. This is particularly true in TCPA matters which typically involve the analysis of complex data warehouse systems which use relational databases that store tens of millions of individual call records. Understanding the system's design, unique configuration, operational history and audit history is critical to accurately assessing the nature of the system itself and thus the validity of the data contained within it. Reliable analytical results come from careful attention to detail.

44.     Mr. Hansen's testimony in <u>Marks v. Crunch San Diego</u>, No. 14-cv-00348 (S.D. Cal. filed Feb. 14, 2014) suggests that he may be inflating the number of TCPA cases where he has actually served as an expert. Defendant Crunch challenged Hansen's credentials as an expert witness, and in the resulting court filings Hansen admitted that he had not actually provided an expert report in at least 24 of the 50 "TCPA Class Actions" listed on the Crunch CV.  Furthermore, Mr. Hansen claimed in his deposition in that case that he had worked on *multiple* text messages cases.  After Mr. Hansen refused to produce copies of his expert reports he was ordered to do so by the court.  It was later disclosed after this production that contrary to his testimony, he had in fact *never* provided a report or declaration in a text messaging case.[70]

45.     If Mr. Hansen has indeed worked on 100 TCPA cases in the last two years this would constitute an extraordinary level of expert witness work, particularly for a solo practitioner with a completely unrelated full time job. If the number of cases presented on his expert report are presumed to be true there are red flags that Mr. Hansen may be running an expert report "mill." These red flags are:

1) The extraordinarily high volume of cases and expert reports produced by Mr. Hansen in his off hours;
2) The suspiciously high number of hours he claims to be working each week on a regular basis;
3) The exaggerated credentials he claims on his expert reports and *curriculum vitae* (see below); and
4) His publicly articulated bias against defendants in TCPA Matters.[71]

---

[67] Deposition of Jeffrey Hansen at 81:23-84:16.
[68] *Id*. at 88:25-89:9.
[69] Exhibit 2 at 97:3-14.
[70] The case was dismissed after the judge granted the defendant's motion for summary judgment leaving moot the defendant's motion to exclude Hansen's testimony.   Exhibit 14, p. 2-3 paragraphs 5-6.
[71] For example, Mr. Hansen uses his public Facebook page to advertise his expert witness work.  It contains posts from July 14 and July 21, 2016 in which he writes "I don't always drink beer, but when I do, it's after dealing with defense attorneys."

**Mr. Hansen's Experience and Qualifications as a Data Analyst**

*Mr. Hansen's Technical Certifications*

46.      All of Mr. Hansen's technical certifications listed in his CV were obtained between 2002 and 2006. These certifications are variously expired, retired, irrelevant, and/or non-existent. With few exceptions, they largely represent entry-level credentials for experience with now-obsolete technologies. For example. Mr. Hansen obtained the Microsoft Certified Solutions Administrator ("MCSA") and Microsoft Certified Systems Engineer ("MCSE") certificates in 2002.  Microsoft offers the MCSA and MCSE certificates in a variety of software domains including SQL Server.[72]   However, Mr. Hansen did not obtain either certificate in the SQL domains, but rather in the Windows Server 2003 and Windows 2000 Server operating systems.[73] These are extremely dated, and have been discontinued in most corporate environments as they are no longer supported by Microsoft. A summary of Mr. Hansen's certifications is set forth in Exhibit 15.

47.      To the extent any of these certifications are still technically valid, despite his failure to conduct any of the continuing education expected by the credentialing organizations, it is because he obtained them *so long ago* that the requirements for continuing education were not yet in place.[74]   Mr. Hansen's *curriculum vitae* makes it clear he has not taken a single formal continuing education course since 2006, *ten years ago*. Continuing education is particularly important in technology-related professions as software programs and computer hardware change



---

[72] Structured Query Language, or "SQL," is the industry-stanadrd programming language used to communicate with relational databases.  The language is a comprehensive standard covering data definitions, queries, and updates, specifying security and authorization, defining integrity constraints, and specifying transaction controls.  *See* Elmasri and Navathe, *Fundamentals of Database Systems*, Addison-Wesley Computing, Chapter 8.

[73] *See* Exhibit 15, also https://www.microsoft.com/en-us/learning/mcsa-certification.aspx

[74] https://certification.comptia.org/continuing-education/comptia-continuing-education-program-faq#certrenewalprocess1; also see: https://certification.comptia.org/continuing-education/how-to-renew/ce-renewal-cycle, and https://www.microsoft.com/en-us/learning/retired-certifications.aspx.

rapidly, making prior expertise quickly out of date. To give concrete examples, the last time Mr. Hansen took *any* professional education or training, Twitter had just launched, the first smartphone (the iPhone) was a year away from being introduced and Facebook was still limited to students.

48.     Mr. Hansen also claims to be a "Certified Instructor in California and Oregon by Bureau for Private Postsecondary and Vocational Education." This is misleading as there is no one state agency that certifies teachers in private schools in both California and Oregon. This statement *appears* to be a reference to a now defunct California governmental institution that regulated private postsecondary educational institutions that provided educational services in California. My investigation indicates that this body did not certify individual teachers and it ceased to function in 2007.[75] Further, Mr. Hansen is not qualified to be a public school teacher as he has no college degree. If he did obtain some kind of trade school teaching certification while at LTS it is likely expired since he left that position 12 years ago when the school went bankrupt and ceased operating. ███████████████████████████████████████████

███████████████████████

### *Mr. Hansen's Experience Teaching "1000 Students" to be Computer Engineers*

49.     Mr. Hansen was employed from 2000 to 2004 by Laptop Training Solutions ("LTS") as "Director of Training." LTS' license to operate was revoked by the California Bureau for Private Postsecondary and Vocational Education a year later for, among other things, failing to adequately train students. A consumer class action fraud case was filed against LTS in 2003.[77] In September 2004, LTS closed, and filed for Chapter 7 Bankruptcy on October 1, 2004. The company's filing lists over $5.2 million in liabilities. Many of these creditors appear to be the school's students.[78]

50.     One of the complaints alleged against LTS was that it provided "uncertified instructors."[79] None of Mr. Hansen's certifications were conferred prior to 2002, meaning that he taught classes at LTS for two years without holding any certifications.[80]

51.



[75] http://www.bppe.ca.gov/about_us/history.shtml
[76] Exhibit 2 at 52:15-53:2.
[77] Exhibit 16.
[78] *See* Exhibit 17.
[79] Exhibit 3.
[80] *See* Exhibit 15.
[81] Exhibit 2 at 87:6-11.
[82] *Id.* at 83:7-11.

[REDACTED] [85] It should be noted that LTS' website encouraged prospective students to fund their tuition by taking out personal loans either through private banking relationships or through Sallie Mae.[86] [REDACTED]

52. [REDACTED] plaintiff class action counsel Douglas Campion who filed the claim against LTS alleging that the staff was under-qualified, students were not receiving adequate education, and the company refused to refund tuition.[88] [REDACTED] In a press release cited by the Consumer Law Center, Mr. Campion stated as follows:

> Doug Campion, the attorney handling Henley's class action suit against LTS, called the case "***one of the most egregious frauds I've ever seen***." According to Campion, a former LTS trainer revealed that of the 800-1,000 students enrolled in LTS, ***only 12 students ever passed*** the Microsoft Certification exam for which the course was meant to train students. (Emphasis added)[89]

[REDACTED]

### Mr. Hansen's Experience at the FBI Regional Computer Forensic Laboratory

53. Mr. Hansen's expert reports claim that he has handled "many computer forensic and eDiscovery matters" while "working at the FBI sponsored Regional Computer Forensic ("RCFL").[91] The RCFL is a training and support center for law enforcement agencies. RCFL Examiners are drawn from federal, state, and local law enforcement agencies and they are responsible for seizing and collecting digital evidence at a crime scene, conducting an impartial examination of submitted computer evidence and testifying as required.[92]

---

[83] Exhibit 2 at 71:3-5 and 72:12-15.
[84] *Id.* at 81:11-82:14-17.
[85] *Id.* at 78:2-6, 78:16-24, and 79:25-80:8.
[86] http://web.archive.org/web/20030216221358/http://64.167.168.13/NEWLTS/web/slmfaq.htm#18
[87] Exhibit 2 at 65:18-22.
[88] Exhibit 16 p. 3-5, ¶ 4-8.
[89] Exhibit 18.
[90] Exhibit 2 at 170:6-15.
[91] Written Report of Jeffrey Hansen, p. 4.
[92] *See* https://www.rcfl.gov/about

54. Mr. Hansen was never employed by the FBI and he has never been employed by any law enforcement agency as a forensic technologist. When asked about this at his deposition, Mr. Hansen admitted he was only a volunteer.[93] He claims that "[t]hey utilized me for quite a few different things there," including setting up a "mobile laboratory" and "provid[ing] support in *basically all the areas*." (Emphasis added)[94] Mr. Hansen also testified that he volunteered at the RCFL for "almost the entire year" of 2006.[95]

55. ████████████████████████████████████████████

████████████████████████████████████████████

THE WITNESS: ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

56. In matters involving computer forensic analysis, the collection, transport and storage of data are meticulously documented and all persons involved in this process must sign chain of custody forms. Each person in the chain of custody may at some point be called upon to testify about the handling of the evidence. Furthermore, anyone conducting any analysis of the data would also be subject to requests that they testify as to their findings. The fact that Mr. Hansen was shielded from these activities at the RCFL lab means that he could not have the person responsible for collecting or preserving any of the data, transporting any of the data, or analyzing any of the data. These are the main services provided by the RCFL lab. It therefore appears that his activities would have been limited to hardware and software installation and maintenance. This would not qualify as being involved in "all aspects" of the RCFL's work.

57. ████████████████████████████████████████

investigators contacted Jeffrey H. Cable by telephone on July 25, 2016. Mr. Cable confirmed that he was a retired San Diego Police Officer and he previously worked at the San Diego RCFL. He did not recall ever working with an individual named Jeffrey Hansen.[98]

58. I also spoke with Randall Bolelli, who Mr. Hansen identified in his deposition in the Global Tel*Link matter as the director of the San Diego RCFL in 2006. I explained to Mr. Bolelli that Mr. Hansen had made certain claims in deposition about volunteering at the RCFL and asked if Mr. Bolelli could confirm any of it. Although Mr. Bolelli recalled a volunteer program and recalled the name Jeffrey Hansen, he stated he could not recall any information to

---

[93] Deposition of Jeffrey Hansen at 92:13-21.
[94] *Id.* at 92:24-93:5.
[95] *Id.* at 93:14-19.
[96] Exhibit 2 at 103:11-20.
[97] *Id.* at 245:21-246:20 and 254:23-25.
[98] *See* Exhibit 19.

say whether the statements made by Mr. Hansen were accurate or not, and he stated he would review some records before responding further. He asked for Mr. Hansen's date of birth and a picture, which I provided to him. Thereafter, on August 16, 2016, Mr. Bolelli contacted me, but he did not confirm whether Mr. Hansen's statements were accurate. Instead, he stated the matter had been referred to Chief Division Counsel for review and response and directed all further questions or inquiries to Chief Division Counsel. I then contacted the Chief Division Counsel, who told me they would not respond absent a subpoena. I understand a subpoena has been issued in this matter, but the response has not yet been submitted.

### *Mr. Hansen's Qualifications as a Data Analytics "Expert"*

59. My firm, Berkeley Research Group, currently has job openings for "Senior Associates" in Data Analytics and Technology Consulting. These positions are entry-level openings for support staff for testifying experts in these fields. The complete job postings are set forth as Exhibit 20 to this declaration, and I observe that Mr. Hansen's stated credentials as presented in his *curriculum vitae* and his testimony do not meet the minimum requirements expected by my firm of applicants for junior level support staff in these fields.

60. For example, an applicant for the Senior Associate – Data Analytics position is expected to have a "Bachelor's degree or its equivalent in Business Administration, Finance or Information Technology (with a preference for concentrations that combine business and analytics), *or relevant coursework.*" The qualified applicant for BRG's Senior Associate – Technology Consulting position is also expected to hold current certifications such as EnCE, CCE, ACE, or CFE.

61. Mr. Hansen does not have a college degree and never took any college level courses. ███████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████ [99] Other courses, such as electrical theory and training in electronics, may be relevant to his employment with HP Enterprise Systems maintaining the fiber optic network on naval vessels but is not the equivalent of in-depth secondary school instruction in "Business Administration, Finance or Information Technology (with a preference for concentrations that combine business and analytics)." Mr. Hansen says he has a handful of technical certifications, none of which are recent or supported by continuing education ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

### There is No Automatable Method to Reliably Identify the Names and Addresses of Proposed Class Claimants

62. The call records contained in the Asteria database only list the telephone numbers dialed by RMG's systems, not the names and addresses of the recipients of those calls. Plaintiff

---

[99] Exhibit 2 at 27:1-22, 28:1-4, and 31:5-7.
[100] *Id.* at 29:16-20 and 31:14-15.

has set forth no methodology by which to identify those names and addresses. In fact, no reliable methodology exists.

### Cellular Telephone Reverse Lookup Processes are Unreliable

63.     According to Mr. Hansen's analysis, the proposed class consists of 388,966 unique phone numbers, of which 286,184 (73%) are cellular telephone numbers.[101]

64.     I have been in the private investigations business since 1997 and have conducted thousands of background checks in the last 18 years. I am very familiar with the data provided by data processors and am experienced in the use of cellular telephone reverse lookup services. I can state with a reasonable degree of certainty from my professional experience that cellular telephone reverse lookup services are not considered highly reliable in the investigations industry because they are not obtained from reliable public sources of information. In my experience these lookup services typically have a 50/50 chance of accurately identifying the *current subscriber* of a cellular telephone number. These database services are significantly less reliable in identifying *historical* owners.

65.     Identifying the ownership of a cellular telephone number is by its very nature difficult. Unlike landlines, no national directory of cellular telephone owners is published by any organization and cellular providers do not make the information readily available. Data brokers that provide reverse lookup services compile the information from a diverse and proprietary set of data sources such as lead lists from lead generation websites, the accuracy of which varies widely. LexisNexis does not even identify its sources of cellular telephone ownership data, by which to evaluate its reliability.[102]

66.     In contrast, other data provided by brokers like LexisNexis, such as real estate ownership and business records, are sourced from reliable public records, including recorded deeds and secretary of state records. The accuracy of *that* data is not, however, at issue here, and the reputation of LexisNexis and other data brokers in adequately aggregating this type of data should not be applied to their cellular telephone number lookup services, which are drawn from an entirely different and less reliable type of data. These reverse lookup services do not enjoy a reputation for accuracy in the investigations industry. In fact, these reports are viewed with significant skepticism by professional investigators. The identifications provided by them are considered a potential *lead* to but not the definitive answer to the identity of a telephone owner.

67.     According to a 2015 FCC report, there is an average monthly "churn" rate of 1.44-1.85%.[103]  This means, on average, a cellular telephone number will change hands within 6-7 years. It is therefore likely that a substantial number of the phone numbers at issue in this case changed hands during the time period covered by the class definition. Data brokers' historical records are unreliable at best and often non-existent as to if and when a number changes hands.[104]

---

[101] Mr. Hansen Revised Report, p. 12.

[102] Exhibit 21.

[103] See the 18th Mobile Wireless Competition Report, published by the Federal Communications Commission, accessed at https://www.fcc.gov/document/18th-mobile-wireless-competition-report.

[104] In the case of Sherman v. Yahoo, the court denied class certification in a matter involving a proposal to use a cellular telephone reverse number lookup process to identify class claimants.  In the order denying class

68.     AT&T, one of the largest wireless carriers with a current subscriber base of over 130 million,[105] reported in 2013 that "[a]bout 90% of our postpaid smartphone subscribers are on FamilyTalk® plans (family plans), Mobile Share plans or business plans,"[106] whereby the actual end *users* of a phone number are different from the *subscriber*. According to AT&T, another 7% of their wireless subscribers are on a prepaid plan,[107] for which the wireless carrier often maintains little or no documentation of the user's identity.[108]  All told, the vast majority of the subscriber base, for one of the leading wireless carriers, consist of accounts for which the provider may not have any reliable record of the user's identity at all. While comprehensive information about the cellular telephone market is not readily available, a 2012 study by PriceWaterhouseCooper regarding the cellular market timeframe at issue in this case, reported that family plans account for 40% of the overall cellular market and that prepaid plans account for another approximately 30%.[109]

69.     Many data brokers do not even offer historical cellular phone number ownership records. For example, Experian, a leading international data broker, recently reported to BRG that Experian does not maintain or sell historical data on cellular telephone numbers ownership:

> **We don't have any historical ownership data on the phones** so we would not be able to accommodate [this] request for historical assignments. (Emphasis added)[110]

In addition, Nexxa, another prominent database vendor, also denies that it can provide historical cellular telephone ownership identification. When contacted, a Nexxa representative responded that "**we currently do not have access to the historical cell phone owner data**. That data resides directly with the carriers." (Emphasis added).[111]

70.     Data brokers who sell cellular telephone data warn their customers that the information is not reliable. LexisNexis for example provides the following disclaimer with respect to telephone lookup services:

> Important: The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is

---

certification, Judge Gonzalo Curiel agreed with defendant Yahoo!'s argument that "reverse lookup systems are fraught with difficulties and are unlikely to provide accurate contact information two years later."  Sherman v. Yahoo, 3:13cv00041 (S.D. Calif., filed Jan. 8, 2013), ECF No. 191.

[105] Q1 2016 AT&T Earnings – Investor Briefing, p. 13 accessed at https://www.att.com/Investor/Earnings/1q16/ib_final_1q16.pdf.

[106] AT&T Inc. 2013 Annual Report, p. 17, accessed at https://www.att.com/Investor/ATT_Annual/2013/downloads/ar2013_annual_report.pdf.

[107] *Id.*

[108] The anonymous nature of prepaid plans have been questioned by legislators concerned about their use by terrorists and other criminals. California is currently considering a proposed bill, dubbed the "Closing the Pre-Paid Mobile Device Security Gap Act of 2016," or HR 4886, which will require retailers to ask prepaid device buyers for their proper identification. *See* http://thehackernews.com/2016/03/prepaidp-burner-phone.html.

[109] Exhibit 22, p. 55 and 65 (percentage of family plans calculated as 58% of the postpaid market, identified itself as being 70% of the market).

[110] Exhibit 23.

[111] Exhibit 24.

generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified.[112]

71.     I know from personal experience on prior casework that LexisNexis does not expect any better than a 60-70% "hit rate" of finding *any* name and address to associate with a given cellular telephone number.

72.     The unreliable nature of LexisNexis' cellular telephone reverse lookup service is demonstrated by other misidentifications. For example, LexisNexis Cellular Phone Number Plus lookup service identifies *only* the name "William Wartson" for a cellular telephone number that I used as a professional wireless contact number during the time frame at issue in this dispute. The number was owned by my prior employer Duff & Phelps and my use of the number ended in April 2015.[113] The failure of LexisNexis to correctly identify this number with my name is indicative of the fundamental problem with using these unreliable cellular number lookup services to identify *historical users* of any given phone number.

73.     I recently conducted my own reliability testing of LexisNexis' reverse lookup service, using a list of 167 cellular telephone numbers for which I already knew the correct current *user*'s name. These numbers encompassed a range of phone service types including individually owned single user plans, family plans, and employer-owned plans.[114] Only 68 of these test numbers returned the correct name of the user, representing an accuracy rate of only 41%.[115] This result is consistent, although somewhat lower, than my professional experience which indicates that these reverse lookup services have a 50/50 accuracy rate in identifying current owners.

### Sources of Opt-In Consent

74.     In my report dated February 19, 2016, I presented my analysis of the unique websites attributed as the sources of opt-in consent for the proposed class claimants, as found on the lead lists produced by RMG. I conducted additional analysis to identify how often Orbitz, Priceline, Travelocity and/or Expedia are attributed as a source of opt-in consent within the lead lists. Orbitz, Priceline, Travelocity and/or Expedia are attributed as a source of opt-in consent for at least 5,748 unique phone numbers from the proposed class.[116]

---

[112] Exhibit 25. In addition, LexisNexis' license agreement further warns the user regarding the accuracy of the data:
> **"Section 3 - Not Legal Advice:** Content is not intended to and does not constitute legal advice and no attorney-client relationship is formed, nor is anything submitted to this Web Site treated as confidential. The accuracy, completeness, adequacy or currency of the Content is not warranted or guaranteed. Your use of Content on this Web Site or materials linked from this Web Site is at your own risk."

[113] Exhibit 26.
[114] I do not know if any pre-paid plans were included in the data set, but I did not take any steps to exclude them.
[115] Exhibit 27.
[116] As I explained in my report dated February 19, 2016, the inconsistent formatting and structure of the various lead lists prohibits comprehensive automatic searching of their contents. I identified websites within the lead lists by use of the same pattern-matching search used in my prior analysis, but this method is incomplete. A manual search across the millions of rows of data in the 8,247 lead lists would be required to comprehensively identify all instances of these websites.

| | |
|---|---|
| Total Unique Phone Numbers Associated Only With the Orbitz Website | 1,194 |
| Total Unique Phone Numbers Associated Only With the Priceline Website | 1,713 |
| Total Unique Phone Numbers Associated Only With the Expedia Website | 1,652 |
| Total Unique Phone Numbers Associated Only With the Travelocity Website | 1,110 |

I declare under penalty of perjury that the foregoing supplemental report is true and correct.

Executed on August 31, 2016.

Margaret A. Daley