## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Phillip Charvat, on behalf of himself and others similarly situated, | ) | |
| Plaintiff, | ) | Case No. 1:12-cv-5746 |
| | ) | |
| v. | ) | |
| | ) | |
| Elizabeth Valente, Resort Marketing | ) | |
| Group, Inc., Carnival Corporation & | ) | Hon. Judge Andrea R. Wood |
| PLC, Royal Caribbean Cruises, Ltd., | ) | Hon. Mag. Judge Mary M. Rowland |
| and NCL (Bahamas), Ltd., | ) | |
| Defendants | ) | **JURY TRIAL DEMANDED** |

### OBJECTIONS OF EVAN E. SHELTON AND TIMOTHY JOHNSON
### TO THE PROPOSED CLASS ACTION SETTLEMENT AND REQUEST TO BE HEARD

In this District, where a putative Telephone Consumer Protection Class Action ("TCPA") class action has potential manageability issues and is confronted with the defense of prior express consent, it is typical for the Court to certify a settlement class that will result in a payout equal to about one nice restaurant meal per claimant. In this case, claimants—after seeing headlines leading them to believe they would receive up to $900 per phone line—stand to receive less than the price of a pumpkin spice latte at Starbucks. Because the proposed payment per claimant is unacceptably low, putative settlement class members Evan E. Shelton and Timothy Johnson (the "Ohio objectors") object.

## I. INTRODUCTION.

When news of the proposed settlement in this case broke, the American public saw the headline that "Carnival Cruise" had agreed to pay up to $900 per claimant. *See, e.g.*, Natalie Dreier, *How to Collect Your $900 for Cruise Line Robo Calls*, AJC.com (Aug. 16, 2017 10:18 A.M.), http://www.ajc.com/news/national/how-collect-your-900-for-cruise-line-robo-

[ 1 ]

calls/emLjENHEfOL8ZlyykCrtVK/; Scott J. Croteau, *You can claim $900 if this free cruise robocall contacted you*, MASSLIVE.COM (Aug. 16, 2017, 11:01 AM), http://www.masslive.com/news/index.ssf/2017/08/did_a_robocall_offering_you_a.html; Alex Hider, *Have you been promised a free cruise over a robocall? You could be entitled to $900*, ABC NEWS (Aug. 15, 2017 12:45 PM), http://www.10news.com/news/national/have-you-been-promised-a-free-cruise-over-a-robocall-you-could-be-entitled-to-900. Yet if the proposed settlement is approved, the total payout per claimant is likely to be just a few dollars, leading to widespread disappointment.

The maximum amount for the proposed settlement is $12.5 million. After class counsel are paid their third and are reimbursed for their $211,193.05 in out-of-pocket costs, and after the requested $50,000 incentive award for Mr. Charvat is granted, only $8,072,140.28 will be left.[1] To date, over two million claims have been filed. If two million of these are valid, then the payout per claimant will be about $4.03. And even if a little less than half are valid, the payout will only be around $8 per claimant. Such a drastic reduction—providing claimants with a settlement that, for many, won't adequately compensate them for the time they will have spent on this case after filling out claim forms and cashing their settlement checks—will not provide effectual relief to the class, and will instead simply reinforce negative public stereotypes about the usefulness of class actions. To avoid this unfortunate result, the Ohio objectors thus respectfully ask this Court to reject the proposed settlement.

---

[1] This objection is not intended to call into question class counsels' fees or the requested incentive award for the lead plaintiff. This case has been exceedingly hard fought, and class counsel has performed admirably. As for Mr. Charvat, counsel for the Ohio objectors wishes to thank him for his service. Mr. Charvat is a hero in Ohio for bringing so many TCPA suits against telemarketers, discouraging them from placing calls to Ohio numbers. His career as a TCPA litigator has led to the establishment of key Ohio telemarketing jurisprudence, and it is worth paying him a significant incentive award to encourage him to continue developing favorable TCPA caselaw.

## II.  STATEMENT OF FACTS.

The history of this case is laid out in detail in plaintiffs' counsels' Motion for Attorneys' Fees and Costs, Doc. 579, at PageID #22628–32, and there is no need to recount those details here.  The personal experiences of the Ohio objectors, however, merit discussion.

Objector Evan Shelton, an elementary school teacher from Blacklick, Ohio, remembers with distaste the numerous calls he received promoting Carnival Cruise.  (Exhibit A, Declaration of Evan E. Shelton at ¶¶ 2–3.)  He would receive calls on his cell phone while at work, and—because he is a father—he would simply answer them, wondering if some emergency had befallen his children.  (*Id.* at ¶ 3.)  Yet when he answered the calls, he would be greeted by a robocall about a cruise, which he found "infuriating."  (*Id.*)  The robocalls followed him home from work, too, infesting his household landline.  (*Id.* at ¶¶ 2, 4–5.)

One day, Mr. Shelton's wife learned through social media about the proposed settlement. (*Id.* at ¶ 4.)  She saw the potential $900 payout, and she was so excited that she invested the time to check her family members' cell phone numbers and the household landline in the settlement database.  (*Id.* at ¶ 5.)  Two family numbers—Mr. Shelton's and the landline—were in the database, so Mr. Shelton and his wife again invested time filling out the claim forms, thinking they were going to receive $1800.  (*Id.* at ¶ 6.)

Later, Mr. Shelton was bitterly disappointed to learn that he would not be getting anything near this amount.  (*Id.* at ¶¶ 7–12.)  Although it is impossible to know exactly how much each class member will receive at this point, Mr. Shelton will not be content if he receives only a few dollars for the pain and suffering he believes that Carnival Cruise caused him.  (*Id.* at ¶ 9.)  In fact, he does not view the potential payout in this settlement as adequately compensating him for the time his family will have spent learning about the claim, filling out claim forms, and

cashing any future settlement checks he might receive. (*Id.* at ¶ 9.) As he puts it, if he wanted a few extra dollars, he "would just rummage through [his] car for spare change." (*Id.* at ¶ 8.)

Mr. Shelton describes this potential settlement as "worthless" to him, and he desires that the defendants pay more so that they face stiffer consequences for their alleged actions. (*Id.* at ¶¶ 10, 12.) His personal desire is that the settlement "send a message" to telemarketers that "Americans are sick of their calls." (*Id.* at ¶ 12.) Mr. Shelton did not know that he could object to the settlement until he learned about settlement objections from his attorney. (*Id.* at ¶ 11).

Objector Timothy Johnson, an employee in the automotive industry, remembers "getting at least four or five calls" on behalf of Carnival Cruise. (Exhibit B, Declaration of Timothy Johnson at ¶¶ 2, 7.) He received some of the calls at work, and this annoyed him. (*Id.* at ¶ 2.) When he received the settlement notification postcard in the mail, he thought getting $900 for those calls would be adequate compensation, so he filled out a claim form. (*Id.* at ¶ 4.) He was excited enough that he told others, including some coworkers, that he was going to receive $900. (*Id.* at ¶5.) By a stroke of luck, Mr. Johnson happened to tell the undersigned's spouse, Laura Hilton, about the $900 that he believed he was going to receive—and then later learned the bad news from Mrs. Hilton that the settlement was not going to result in a $900 payout for Mr. Johnson after all. (*Id.* at ¶ 7.) Had it not been for this fortuitous occurrence, Mr. Johnson wouldn't have learned that he wasn't going to receive the $900 in time to object. (*Id.*)

Mr. Johnson describes a settlement of a "few dollars" as "terrible." (*Id.* at ¶ 8.) He feels that he was deceived, and he wishes that class counsel would fight to get him more money. (*Id.*) He is disappointed to be receiving only a few dollars, and states that his attitude towards this proposed settlement is that "maybe we'll have better luck in the next class action that rolls around." (*Id.* at ¶ 9.)

[ 4 ]

## III.  ARGUMENT.

"In deciding whether to preliminarily approve a settlement, courts must consider: (1) the strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length and expense of continued litigation; (3) the amount of opposition to settlement among [a]ffected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed." *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010).  Here, on balance, this five-factor test weighs in favor of rejecting the settlement.

   A.  *The Strength of Plaintiffs' Case Compared to the Settlement Terms.*

The first factor—which looks to the strength of the plaintiffs' case compared to the expected benefits to class members—is the "most important." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citing *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)).[2]  The Court begins by "quantifying the net expected value of continued litigation to the class." *Synfuel Techs.*, 463 F.3d at 653.  The Court must "estimate the range of possible outcomes and ascribe a probability to each point on the range." *Id.*  Although "a high degree of precision cannot be expected in valuing a litigation, the court should nevertheless insist that the parties present evidence that would enable possible outcomes to be estimated, so that the court can at least come up with a ballpark valuation." *Id.*

The Court then compares the evidence of these possible outcomes to the "terms of the proposed settlement." *In re AT & T*, 270 F.R.D. at 346.  Importantly, the Seventh Circuit has instructed the Court to reject a settlement that does not provide plaintiffs with "effectual relief."

---

[2] Internal quotation marks, alteration marks, and citations are omitted unless otherwise apparent.

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) (courts must reject settlements where relief to class members is "meaningless").

Here, according to the settlement website, "over two million claims" have been filed. Charvat v. Resort Marketing Group, Inc. et al., *October 6, 2017 Update*, https://www.rmgtcpasettlement.com/Home.aspx. It is likely that most of these claims are valid, given that the settlement website does not permit users to file a claim unless they enter a phone number listed in the defendants' "dialer database." *Cf. Tarlecki v. Bebe Stores, Inc.*, No. C05-01777MHP, 2009 WL 1364340, at *3 n.5 (N.D. Cal. May 14, 2009) (where 2,104 claimants took any action at all with respect to a proposed settlement fund, 2,017 of them submitted valid claims). Further, the class—after ample opportunity for discovery—has alleged that "millions" of calls were placed by defendants. (Doc. 463, PageID #10742, ¶ 84.) If there were even just one million valid claims, and each of those claims won $1,500 under the TCPA, then the potential amount the class could recover would be $1.5 billion.

But even this "high end" estimate is conservative. The settlement agreement contemplated that individuals might have received three or more calls. (Doc. 569–1, PageID #22444.) Mr. Shelton and Mr. Johnson, for instance, both remember receiving more than three calls. If all two million claims are valid, and each claimant received *just* three calls, the total amount recoverable is $9 billion. This estimate does not even account for class members who failed to file claim forms, and it also does not account for the possibility that some individuals—like Mr. Shelton and Mr. Johnson—may have received more than three calls. Thus, even $9 billion is a conservative estimate for the higher end of the range. Realistically, then, the true maximum amount the plaintiffs can recover is probably whatever amount would bankrupt all defendants. Given that Carnival Corporation & PLC reported nearly $39 billion in assets in

[ 6 ]

2016, *see* Exhibit C, there is certainly the potential for plaintiffs to win truly significant compensation in this case.

Meanwhile, a logical (and conservative) "middle range" for this suit is $500 million. Suppose that the Court does not award triple damages, a little less than half of the current claimants have valid claims, and each of those claimants received only one call. One million valid claims multiplied by $500 per claim is $500 million—far more than the $12.5 million that the defendants have offered.

Lastly, the "low range" for this suit could be zero dollars, or, alternatively, an order from the Court refusing to certify the class. In the latter case, some of those class members who have received multiple calls will probably choose to continue the litigation on behalf of themselves— meaning that at least some class members will likely receive significant compensation in the form of settlements or individual judgments. And if the class were to lose the case entirely and receive zero dollars, that would not be much worse for any individual class member than receiving about four or eight dollars. As Mr. Shelton stated, if he wanted a few extra dollars, he would be better off looking for change in his car than filling out a settlement claim form.

Given the high potential value for the claims, a settlement for $12.5 million is inadequate. If the "middle range" is around $500 million, a settlement of around $100 million—or 20% of the middle-range value—would be more reasonable. Even $50 million, or 10% of the middle-range value, might be acceptable. But $12.5 million is only 2.5% of $500 million. It is hard to imagine a circumstance in which any reasonable plaintiff would settle for such a small percentage of the "middle range" of a suit.

Furthermore, a settlement of $12.5 million yields only "ineffectual relief" to class members. As Mr. Shelton points out, he and his family spent more time trying to get money out

of the settlement (by looking up information and filing claims forms) than the ultimate pay-out for them will be worth if the settlement is approved. And Mr. Johnson thinks that a few dollars is a "terrible" deal, and he views such an outcome as essentially equivalent to a loss for plaintiffs. Thus, under Seventh Circuit law, the Court reject the settlement.

B. *The Likely Complexity, Length and Expense of Continued Litigation.*

After having weighed the "most important" first factor, and ensured that the plaintiffs will be provided "effectual relief" under the settlement agreement, the Court proceeds to weigh the second through fifth factors. With respect to the second factor—"the likely complexity, length and expense of continued litigation"—courts in TCPA cases have looked to the "complexity and expense inherent in a class action jury trial, the possibility that plaintiffs might face problems recovering a potential judgment, and the likelihood of a potentially lengthy appellate review process." *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 818854, at *3 (N.D. Ill. Mar. 2, 2017).

Here, the second consideration—the possibility that plaintiffs may face problems recovering a potential judgment—weighs in favor of continuing the litigation. As mentioned above, defendant Carnival Corporation & PLC has almost $39 billion in assets. Simply put, there is room in defendants' pocketbook for an amount far north of $12.5 million.

Meanwhile, the first and third considerations—which tend to weigh in favor of settlement in *every* case—are less pronounced here than in other cases. First, this is a TCPA case, and many issues are likely to be capable of resolution at summary judgment. The Third Amended Complaint, in fact, reads more like a motion for summary judgment than a true complaint—it cites case law, argues for and against both parties' positions, and argues the strength of the Plaintiffs' claims on the evidence. Doc. 463, ¶¶ 15–29, ¶¶ 35–83, ¶¶ 85–97, ¶ 103, ¶ 121, ¶ 126,

¶¶ 128–29, ¶ 141 (expounding on legal arguments, complete with citations, in detail and citing to copious amounts of evidence).  If the Court granted summary judgment on even some issues—such as vicarious liability—the complexity of the case could be substantially reduced.

As for the appellate review process, the extensive legal theories set out in the Third Amended Complaint have already been supported by ample citations to authority.  While there are always risks and expenses in any litigation, the prospect of some future appeal should not be enough to cause plaintiffs to settle for an amount that does not provide them effectual relief.

### C. The Amount of Opposition to the Settlement Among the Parties.

With respect to the third factor, "the amount of opposition to settlement among [a]ffected parties," courts in this District have traditionally compared the number of objectors against the total number of members of the class.  *See, e.g.*, *In re Sw. Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013).  A mechanical approach based merely on the numbers might not be appropriate here, however.  First, few class members would opt out of a settlement that they believe will result in a $900 payout per phone line.  Both Ohio objectors readily filed claim forms because they thought that they were going to receive this amount.  In considering the number of class members who opted out, the Ohio objectors respectfully urge the Court to consider that some class members thought that they would receive significantly more than what will be their *pro rata* share if the Court approves the settlement.

Second, if number of objectors is low, the Ohio objectors ask the Court to consider that many of those who did file claim forms are likely still unaware that they will not be receiving

[ 9 ]

$900 per phone line.  For instance, Mr. Johnson was oblivious to the drastic reduction in the amount per claimant until shortly before the objection deadline.

Others did not know that they could object to the settlement—for instance, Mr. Shelton was unaware that he could object until this week.  This is understandable, given that in the media, to the extent that there was any coverage of the reduction in the potential amount per claimant, it was defeatist.  *See* Scott Berson*, Millions joined a lawsuit against 'free cruise' spam callers. Then came the bad news*, Miami Herald (Oct. 16, 2017 11:34 A.M.), http://www.miamiherald.com/news/nation-world/national/article179091301.html.  Mr. Berson's article in the *Miami Herald*, for instance, suggests to the public that there is nothing anyone can do—that too many people applied for the settlement was simply "bad news."

Lastly, the process to opt out of or object to this settlement or object was unnecessarily cumbersome.  As argued by objector Mr. Custy, any lack of objectors or "opt out" plaintiffs should be discounted.  *See* Doc. 604.

D.  *The Opinions of Counsel.*

With respect to the fourth factor, the opinions of counsel, the Court may consider both the opinions of class counsel as well as those of the objectors.  *Handschu v. Special Servs. Div.*, 605 F. Supp. 1384, 1405 n.20 (S.D.N.Y. 1985), *aff'd*, 787 F.2d 828 (2d Cir. 1986).  The Court should not "abdicat[e] its own responsibility," but rather should do its "own research."  *Id.*

The Ohio objectors urge the Court to consider the opinions of counsel for other objectors, as well as the opinion of their own attorney.  Although the attorney for objectors is still at an early stage of his career, he does have both class action and TCPA experience at highly-rated firms.  (Exhibit D, Declaration of Jonathan Hilton ("Hilton Decl.") at ¶¶ 2–3.)  Further, as

[ 10 ]

explained below, counsel for the Ohio objectors bases his opinion that the settlement amount should be higher on the opinions of judges of this District.  (Hilton Decl. at ¶ 4.)

First, in *Kolinek v. Walgreen Co.*, the Honorable Judge Matthew F. Kennelly opined that thirty dollars per claimant falls "on the lower of the scale" in a similar case.  311 F.R.D. 483, 493 (N.D. Ill. 2015).  In *Kolinek*, plaintiffs brought TCPA claims that could entitle them to $500 or $1500 per call, just as in this case.  *Id.* at 487.  The parties had not engaged in "full-scale formal discovery" or summary judgment motion practice, and the class had not been certified.  *Id.* at 494, 502.  And as in this case, any potentially certified class for trial would have had manageability issues, and if the plaintiffs had taken the case to trial, they "would be faced with rebutting … defenses that … class members provided prior express consent to receive … calls." *Id.* at 494.  If under these circumstances, the court believed that thirty dollars per class member was on the low end of the spectrum, then surely a few dollars per class member is unacceptable.

Second, in the case *In re Capital One Tel. Consumer Prot. Act Litig.*, the Honorable Judge James F. Holderman opined that $34.60 was "on the lower end of the scale" in TCPA actions.  80 F. Supp. 3d 781, 789 (N.D. Ill. 2015).  In *Capital One*, plaintiffs "would have the burden to effectively rebut Capital One's chief defense that the class members' consented to be contacted on their cell phones," and there was good reason to believe that, based on the law, plaintiffs would not win at the summary judgment stage.  *Id.* at 790.  "[M]anageability concerns" plagued the class, which had not yet been certified, and the FCC stood poised to revise its definition of an auto-dialer and thus effectively extinguish the plaintiffs' claims.  *Id.* at 791.  If $34.60 is at the "lower end" of the scale in such a case, then it stands to reason that a settlement resulting in just a fraction of this amount is too low.

   *E. The Stage of the Proceedings and the Amount of Discovery Completed.*

   Regarding the fifth factor, "the stage of the proceedings and the amount of discovery

completed," the basic principle is that defendants who choose to settle early should be allowed to

settle for less. *See, e.g.*, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 588 (N.D. Ill. 2011)

(defendants were permitted to settle for a relatively low amount where the parties had engaged

primarily in informal discovery and the complaint had not yet survived a motion to dismiss).

Defendants should be incentived to settle early, because early settlements allow class members to

receive their payments quickly, and the expense of prolonged litigation can be avoided.

   Unlike *Schulte*, where the parties had merely engaged in informal discovery and a motion

to dismiss the complaint was still pending, the defendants in this case are by no means settling

early. The defendants are attempting to settle the case after extensive discovery has already

taken place—discovery that has significantly bolstered plaintiffs' evidentiary position. Doc. 579,

PageID #22631–32 (explaining that "[d]iscovery in this case was particularly hard-fought"; that

there is "an ample evidentiary record, ensuring effective argument"; and that there have been

over thirty discovery hearings). And unlike in *Schulte*, here, this Court has already indicated that

the claims in the Third Amended Complaint are plausible. *Charvat v. Travel Servs.*, No. 12-CV-

05746, 2016 WL 1073048, at \*3 (N.D. Ill. Mar. 17, 2016) (permitting plaintiffs to file the Third

Amended Complaint). Thus, letting the defendants off the hook at this stage for only $12.5

million, after the parties have already engaged in extensive discovery and litigation—and class

members have already waited for years on a potential recovery—would not be fair to the class

members.

## IV.  CONCLUSION.

As shown above, the five-factor testweighs in favor of rejecting the settlement:

- The first and most important factor, the strength of the plaintiffs' claims measured against their potential recovery, weighs decisively in favor of rejecting the settlement.

- The second factor, at best, weighs only slightly in favor of settlement—as it does in nearly every case.

- The third factor, the amount of opposition to the settlement, is not presently known and may be difficult to accurately assess.

- The fourth factor, the opinions of counsel, weighs in favor of rejecting the settlement, once the relevant case law in this District is considered; and

- The fifth factor, the stage of the proceedings and the amount of discovery that has taken place, weighs in favor of rejecting the settlement.

Further, even if the Court believes that the second through fifth factors weigh in favor of settlement, the Court should still reject the settlement agreement because it does not provide "effectual relief" to class members, as required by the Seventh Circuit.  Thus, the Ohio objectors respectfully urge the Court to reject the settlement.

## V.  REQUEST TO BE HEARD.

Jonathan Hilton, as counsel for the Ohio objectors, requests ten minutes of time for oral argument on the proposed settlement at the Final Approval Hearing.  Additionally, objector Evan Shelton is tentatively planning to appear at the Court's Final Hearing, and requests five minutes' time to testify.  If circumstances arise such that he is not able to attend the hearing in person, he requests permission to testify by telephone.  His personal details are in his declaration.  *See* Exhibit A.

[ 13 ]

Dated: November 3, 2017

By: /s/ Jonathan Hilton, *on behalf of the Ohio objectors*

Jonathan Hilton (0095742)
20 South Third Street, Suite 210, PMB 197196
Columbus, OH 43215
(614) 992-2277
jonathanhiltonlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2017, I caused the foregoing to be electronically

filed with the Clerk of the United States District Court for the Northern District of Illinois using

the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jonathan Hilton

Jonathan Hilton (0095742)
20 South Third Street, Suite 210, PMB 197196
Columbus, OH 43215
(614) 992-2277
jonathanhiltonlaw@gmail.com
