```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   PHILIP CHARVAT, on behalf of    )  Docket No. 12 C 5746
     himself and others similarly    )
 4   situated,                       )
                                     )
 5                  Plaintiffs,      )  Chicago, Illinois
                                     )  March 5, 2018
 6             v.                    )  1:13 p.m.
                                     )
 7   ELIZABETH VALENTE, RESORT       )
     MARKETING GROUP, INC., TRAVEL   )
 8   SERVICE NETWORK, INC., TSN      )
     TRAVEL, INC., TSN INTERNATIONAL,)
 9   INC., TSN MARKETING, LLC,       )
     CARNIVAL CORPORATION & PLC,     )
10   ROYAL CARIBBEAN CRUISES, LTD.,  )
     NCL (Bahamas) LTD.,             )
11                                   )
                    Defendants.      )
12
               TRANSCRIPT OF PROCEEDINGS - Motion Hearing
13               BEFORE THE HONORABLE ANDREA R. WOOD

14   APPEARANCES (via conference call):

15
     For the Plaintiffs:   LAW OFFICE OF MATTHEW P. McCUE, by
16                         MR. MATTHEW P. McCUE
                           1 South Avenue
17                         3rd Floor
                           Natick, MA 07160
18

19                         BURKE LAW OFFICES, LLC by
                           MR. ALEXANDER H. BURKE
20                         155 North Michigan Avenue
                           Suite 9020
21                         Chicago, IL 60601

22
     For Objector Evan E. Shelton:
23

24                         MR. JONATHAN HILTON
                           20 South Third Street
25                         Suite 210
                           Columbus, oh 43215
```

1    APPEARANCES (Continued, via conference call):

2

3    For Defendant Royal Caribbean Cruises, Ltd., and Norwegian
     Cruise Lines:

4

5                              FOREMAN FRIEDMAN, PA, by
                               MS. CATHERINE J. MACIVOR
6                              2 South Biscayne Road
                               Suite 2300
7                              Miami, FL 33131

     ALSO PRESENT (via conference call:)
8
                               MR. PHIL COOPER,
9                              Kurtzman Carson Consultants

10

     APPEARANCES (In Person):
11

12   For Defendant Carnival Corporation & PLC:

13

                               SWANSON MARTIN & BELL, LLP, by
14                             MR. JEFFREY S. BECKER
                               MR. DARREN B. WATTS
15                             330 North Wabash Avenue
                               Suite 3300
16                             Chicago, IL 60611

17

18

19

20   Court Reporter:          LISA H. BREITER, CSR, RMR, CRR
                               Official Court Reporter
21                             219 S. Dearborn Street, Room 1854B
                               Chicago, Illinois 60604
22                             (312) 818-6683
                               lisa_breiter@ilnd.uscourts.gov
23

24

25

1          THE CLERK:  All rise.

2       (Call to order.)

3          THE COURT:  Call the case, And I think the microphones

4    at the counsel table are turned on.  So those people that are

5    here can sit at the counsel table instead of the podium.  I'm

6    guessing the folks on the phone are seated.  It's only fair.

7    Call case and appearances.

8          THE CLERK:  Case 12 CV 7546, Charvat vs. Travel

9    Services.

10          MR. BECKER:  Good afternoon, your honor.  Jeff Becker

11    and Darren Watts on behalf of Carnival Corporation.

12          MS. MACIVOR:  Catherine Macivor on behalf of Royal

13    Caribbean Cruises Limited and income about ham mom the.

14          MR. McCUE:  Matthew McCue for the plaintiff.

15          MR. BURKE:  Alex Burke for the plaintiff.

16          MR. HILTON:  Jonathan Hilton for Objector Shelton.

17          MR. COOPER:  This is Phil Cooper from KCC.

18          THE COURT:  okay.  Thank you for joining us,

19    Mr. Cooper I appreciate it, especially on short notice.  Is

20    that everyone?

21          MR. BECKER:  It is, Judge.

22          THE COURT:  So I have a list of questions.  Perhaps I

23    should start by asking the parties whether you thought about

24    this situation any further over the weekend and have any

25    proposals or changes to your proposal that you want to put on

1    the table from the outset.

2         Otherwise, I will start asking questions based on what

3    was presented to me last week.

4         MR. MC CUE:  Sure, your Honor.  This is Matthew McCue.

5    I think the only thing that we did not get into detail with you

6    last week was in response to KCC's concerns about costs.  And

7    I'll remind you it's somewhat unknown what the ultimate cost

8    would be because that's dependent upon how many consumers

9    provide verification documents.

10        What the parties have discussed and the cruise lines

11   agreed is that they would make paralegals available at the law

12   firms of Ms. Macivor and Mr. Becker, available to essentially

13   do the backroom work of compiling, organizing the verification

14   documents.

15        Especially if they are willing to put more money into

16   this case to deal with this issue versus push those costs over

17   to KCC, which was a concern of ours.  And to be clear, they

18   would only be organizing and compiling the documents.  They

19   would not be unilaterally making decisions about adequacy of

20   responses, that it would only be made jointly.  So that was the

21   only issue I wanted to bring to your attention.

22        There's a second point in that the order we submitted,

23   I think it gives KCC 10 days to make the -- send out the

24   e-mail, and they informed me today they need 17 days to do

25   that.  So regardless of which option we ultimately decide to

1    employ, they will need a little more time to get that e-mail

2    out.  But that will not affect the ultimate time frame of how

3    much time we need to do this.

4         With that said, really the issue for today is to

5    discuss these two options.  And you had asked Mr. Cooper for

6    guidance specifically in regards to their suggestion.

7         THE COURT:  Okay.  So before I move to my questions on

8    the proposals, Mr. McCue, so if I understand you correctly, the

9    arrangement that the parties have been discussing would shift

10   the cost to the law firms administrating this extra step.

11        Is that going to be reflected in a request for fees of

12   anybody?

13        MR. BECKER:  No, Judge.  So this is mostly going to be

14   on our former firm, Ms. Macivor's firms I would think.  The

15   idea was rather than have this be a burden or an expense taken

16   on by the administrator, which would be the burden of the

17   settlement fund, it would be additional funds our clients would

18   pay outside of the settlement fund to have more money to stay

19   with the class.  We're not filing any sort of petition for

20   fees.

21        THE COURT:  And plaintiffs' law firms are not going to

22   be involved in sharing in any of this burden?

23        MR. BECKER:  In that regard, Mr. McCue, to the extent

24   that there's a challenge, would have to weigh in on that.  But

25   I can't speak for him as to whether he would ask for the fees.

1    I would like to think the answer's no but I'll leave that to

2    him to respond to.

3            THE COURT:  Mr. McCue, is that plan going to result in

4    a greater fee request from plaintiff's counsel?

5            MR. MC CUE:  It will not, your Honor.  We're going to

6    petition for a common fund percentage of the funds.  So

7    regardless of the number of hours we've spent to date or we'll

8    spend in the future, our request will be the same.

9            THE COURT:  Okay.  That's good to know.  Let me start

10   by directing a question to the lawyers about the proposed

11   settlement itself.  I want to go back.

12           And in preparation for this hearing, I took another

13   look at the preliminary approval order and the notice that went

14   out to potential class members, and I was reminded that the

15   class definition in this case includes users of phone lines.

16           And in considering the issue of multiple people

17   submitting for multiple lines and at what point it looks fishy,

18   it was unclear to me how the parties' status report and the

19   affidavit that was submitted by the administrator accounts for

20   the fact that somebody can submit a claim if they are a user of

21   a phone line, but not the quote owner or subscriber.  Is that

22   something that the parties have thought about?

23           MR. McCUE:  From the plaintiffs' perspective --

24           THE COURT:  For the folks who are at the phone, I know

25   it's a little tedious, but because we do have a court reporter,

1    I'm going to need you to ask you to state your name before you

2    start talking even if you're pretty sure that we'll recognize

3    you by your voice, okay?

4            MR. McCUE:  Sure.  Matthew McCue speaking, your Honor.

5    My memory of the agreement -- and, please, Cathy and Jeff,

6    correct me if I'm wrong -- is that the standing to file a claim

7    is with the owner, user or subscriber to a phone line.

8            And my memory is that if we had multiple claims filed

9    for the same number that there was a process that we could look

10   at to see who filed a claim first or basically administratively

11   figure out who would have priority.  But I do not think that

12   only users could file a claim.  The standing was broader than

13   that.

14           THE COURT:  Yeah, and I'm actually concerned the other

15   way, that the parties' concern about, you know, verifying that

16   people are the proper owner of a line by uploading their bills

17   and things of that nature seems to not address at all the fact

18   that you may have thousands of people who submitted through the

19   online portal based on the fact that they are users of the

20   line, who wouldn't have any documentation at hand to show that

21   they were the user of a line, and there might be multiple

22   people who use a line.

23           So, you know, maybe it's a -- I don't know -- a common

24   phone at a college dorm that might have 20 people on that floor

25   who are using it.

1    MR. McCUE:  Your Honor, Matthew McCue again for the

2    plaintiff.  You know, some of these issues just go back to the

3    fact that this is a unique situation, and we're trying our best

4    to figure out what's the best way to proceed.

5    But in terms of that specific problem, the way I had

6    envisioned the verification requirement would that it would be

7    very broad.  It wouldn't just be a phone bill.  It would

8    literally be any type of documentation that could show that

9    that person used that line.

10    So, you know, an application for something that has

11    the phone number listed on the application, a business card.

12    You know, literally it could be very broad to deal with that

13    situation, that yes, not everybody's going to have a phone

14    bill.

15    And I think if we -- if we have an interpretation of

16    what type of verification documents is satisfactory that's very

17    broad, I think we can deal with that specific problem.

18    MR. BECKER:  This is Mr. Becker, and I agree with

19    everything Mr. McCue just spoke about.  If there's a common --

20    you know, the verification issue aside for a moment, if there

21    are multiple people using one phone number, as the settlement

22    was approved preliminarily, only one person would be able to

23    actually receive a claim under that anyway.  And it would be

24    the first person that filed the settlement agreement preventing

25    20 people from filing the same phone number, so to speak.

1          With respect to the verification issue, I think it

2     does make sense also, your Honor, to consider putting --

3          THE COURT:  Is that in the preliminary approval order?

4          MR. BECKER:  Yeah, yeah.

5          THE COURT:  Which paragraph?

6          MR. BECKER:  I don't have it in front of me.  I'll

7     have to pull it up.  But if someone on the phone has it in

8     front of them, there was a protocol for that.

9          THE COURT:  Does anybody on the phone know where I can

10    find in the preliminary approval order that if multiple users

11    submit for the same line, then there's a process for

12    determining which of those users actually gets to collect?

13         MS. MACIVOR:  I am looking, your Honor, as we speak.

14    This is Catherine Macivor.

15         MR. HILTON:  Jonathan Hilton.  I think it might be

16    Section 2.49.  That would be page 17.  It says, "The settlement

17    class member may submit multiple claims only if they have

18    multiple phone numbers listed."

19         THE COURT:  So that's in the settlement agreement; is

20    that correct?  You're saying it's in paragraph 2.69?

21         MR. HILTON:  I was actually thinking 2.49 in the

22    settlement agreement, but --

23         THE COURT:  Okay.

24         MR. HILTON:  -- I may have jumped the gun.

25         THE COURT:  So what I'm wondering is if there was

1    something that somebody submitting a claim would see such as
2    either the notice that went out or perhaps the preliminary
3    approval order, which I think people would be more likely to
4    look at than to somehow get access to the docket and look at
5    the settlement agreement itself, that tells them that that's
6    how users will be treated.  There's something --
7            MR. HILTON:  Your Honor, sorry.  Jonathan Hilton
8    again, sorry.
9            MR. McCUE:  Your Honor, just very briefly --
10           THE COURT:  Who is speaking?
11           MR. McCUE:  Matthew McCue is speaking.  Just reminded
12   the Court that under the -- in the website portal as well, when
13   someone affirmed and certified, they said that -- the check box
14   says, "I affirm I am the owner, user or subscriber of the
15   line."
16           So I think that helps inform people that it is broader
17   in terms of who we're talking about here.
18           THE COURT:  Yes, but I'm specifically asking about the
19   point of if there are multiple users of a line that submit
20   claims, is there anything in the notice or the portal that
21   tells them not all of the users will be able to collect?
22           MR. COOPER:  This is Phil Cooper from KCC.
23           In terms of our NIS (phonetic), the answer would be
24   that we did have the court documents posted on the website that
25   would provide that information pursuant to whatever paragraph

1    the parties are referring to.  So that documentation was

2    available readily at the web portal.  They didn't need to go to

3    the docket to fetch it.

4         MR. HILTON:  Your Honor, Jonathan Hilton again.  The

5    section in the settlement was Section 9.1.  It says that if

6    multiple claims are submitted for one particular number, the

7    first claimant to submit his or her claim form will be

8    recognized as the valid claim for that particular phone number.

9    So first in time.

10        MR. BECKER:  And I don't have the preliminary order in

11   front of me.  I know that a majority of the settlement

12   agreement protocol was incorporated into the order as well.

13   And then all those documents were made available to anyone who

14   went to the portal.

15        I mean, again, the people that are going to the portal

16   aren't receiving the actual notice.  They're watching the news,

17   going to the website, filling out their information.  And all

18   the information we're talking about is available for them to

19   review.

20        The preliminary order, the settlement agreement, the

21   notices are all online for them when they submit their

22   information.  But that is the correct provision that you

23   referred to just now.

24        THE COURT:  Okay.  So going back to the situation

25   where somebody is a user of a line, only one person submits a

1    claim for that line, the parties seem to be fairly confident

2    that anybody that's a user of a line is going to have some

3    piece of documentation that they can upload.  I suppose I'm

4    skeptical of that.  So far we've had the example of a business

5    card being used.

6         MS. MACIVOR:  Your Honor, may I address that, your

7    Honor's concern on that?

8         THE COURT:  Go ahead, Ms. Macivor.

9         MS. MACIVOR:  This is Catherine Macivor.

10        THE COURT:  Okay.

11        MS. MACIVOR:  I've done these before, verifications

12   where -- and I've actually been a member of a settlement where

13   I had to provide such proof.  And basically what was accepted

14   and how I at least envisioned it is if someone was a user,

15   let's use your Honor's example of someone at a college, all

16   they would have to do is get something from the college saying

17   this is the phone number that was used during the person's, you

18   know, residence at Boston University.

19        So it didn't have to be a business card.  It didn't

20   have to be something formal.  A letter -- like I myself

21   provided a note from someone whose phone I used.  So that's

22   what I was thinking of, and I think that type of thing can be

23   easily addressed.  But that's what I was thinking of.  Feel

24   free to chime in, anyone else, of the other lawyers.

25        MR. BECKER:  I think most of the users that we're

1    probably going to be talking about aren't going to fall in the

2    example of a common dorm room phone number.  It would likely be

3    someone that lives in a house and uses that phone number that

4    submitted the claim.

5         And my daughter submits it instead of me, and she's a

6    user of that line.  And she'll have substantially more access

7    to the actual evidence she would need than, say, 20 people on a

8    dorm room floor.  With respect to that issue --

9         THE COURT:  In that situation, Mr. Becker, does your

10   daughter have to ask you to submit some verification that you

11   are, in fact, the owner?

12        MR. BECKER:  No.  She would be able to submit

13   documents.  She could ask me for a phone bill that shows that

14   this is the phone number actually associated with that address

15   and she had access to receive that.

16        That would show, as a user, documentation's been

17   presented that shows this is connected with that phone number

18   as opposed to someone who randomly sat on the computer, put in

19   a phone number and can't receive that information at all.

20        Similarly, if you go to a phone bill -- or I'm sorry,

21   I think they've talked about a phone book type record online

22   that shows that phone number with that address is something

23   that's associated with that home, that would work as well.

24        There's -- there are a number of different ways to

25   receive the information that probably would be sufficient.  I

1    think the idea here is -- and I think we can put in to the

2    notices sent out -- the broad array of information that would

3    be available to them.

4              It isn't intended to filter them out.  It's intended

5    to say there's some level of additional corroboration they

6    provided that shows that they're associated with that phone

7    number.  The dorm room phone number issue, I think there's a

8    multitude of ways to go about that as well, but it won't

9    probably fall within the larger spectrum of those who submit.

10             THE COURT:  And people who are submitting based on a

11   work phone or an employer's phone, then they would have to get

12   some sort of documentation from their employer to show that

13   they actually use that phone number?

14             Say somebody's given a cell phone as part of their

15   job, and it's -- you know, it's their assigned cell phone.

16   They used it for a while while they were working, and then they

17   quit that job, so they give the phone back.  Now that person

18   has to go back to their former employer and get some sort of a

19   bill from their employer to show that they were a user of that

20   phone?

21             MR. McCUE:  Your Honor, this is Matthew McCue

22   speaking.  I mean, that's one way to do it, but, you know, what

23   I would like to see, you know, from my perspective is to make

24   it as easy as possible for people to provide verification.

25             So, I -- you know, we're talking here about ideas

1    about how to deal with this.  But from my perspective, I would

2    like it to have -- be less burdensome for consumers doing that.

3    A letter explaining that this was my cell phone number from X

4    to Y and was my work number and I don't own it anymore, I mean,

5    I personally think that that would be fine.

6            THE COURT:  You would accept that?

7            MR. McCUE:  I would, but I haven't discussed this with

8    defense counsel.  But, you know, the importance to me is that

9    the consumer respond with an explanation, a verification, but

10   it be as less burdensome as possible so that people who have

11   valid claims can do this very easily.

12           MR. BECKER:  I don't disagree with Mr. McCue.  I think

13   that the idea here is not to create a substantial burden for

14   individuals.  That would alleviate the issue that you raised of

15   somebody that was in a dorm.

16           I mean, if, we, as the cruise lines, or the

17   administrator want to do further verification, if we don't want

18   to accept it as it's written, we can incur that additional work

19   to do so.

20           But if someone's going to send a letter saying I

21   worked at this place and this was the number that I had,

22   putting aside whether -- I think that probably could be

23   sufficient.

24           THE COURT:  How do you know that person isn't making

25   it up?  Because these are people that you're already suspecting

1    of engaging in fraud.

2             MR. BECKER:  Right.

3             THE COURT:  So how -- how would you know that this is

4    not somebody who is going to make -- just write a letter

5    saying, yep, that was my work form.  My work --

6             MR. McCUE:  Your Honor, this is Matthew McCue

7    speaking.  And you're right, and this is why we're here.

8             You know, and I also would remind the Court that we're

9    not -- we're not saying that certain claims are definitely

10   fraudulent.  We're saying that there's a, you know, suspicion

11   that there's a need for follow-up verification.  There's a

12   suspicion of fraud.

13            As an example, someone writes in and says, you know,

14   hey, this was my cell phone from my employer.  You know, if the

15   cruise lines want to object to that, you know, I would

16   personally say let's look into it further, let's, you know --

17   let's call the employer, you know, does Joe Jones work there.

18   We can do follow-up, you know --

19            MR. BECKER:  That's --

20            MR. McCUE:  -- more inquiry.

21            But I doubt, your Honor, that there's going to be much

22   fighting about this.  The important thing is that consumers are

23   responding and verifying their connection to these numbers.

24   That, to me, is the real goal.

25            MS. MACIVOR:  Catherine Macivor, your Honor.  I think

1   another thing that could easily be done is if that arose -- and

2   I think it would be unusual -- you can always go to the

3   database.  And if there are 20 people claiming something from

4   work number, I think that that would come out upon the letter,

5   and that would be rather easy to verify.  And then that might

6   be subject to a challenge.  But I don't think we're going to

7   get a lot of those.

8           The whole point of this is to just, you know, weed out

9   the people who were, as your Honor said the other day, game the

10  system and not to exclude bonafide claims.

11          MR. BECKER:  Part of the reason I think that Mr. McCue

12  had suggested -- and we agree -- that we begin the filtering

13  process from everyone in the notice class from one call up is

14  because the other group of individuals who had received actual

15  notice had been vetted and verified and by KCC.

16          And so to your point, the individuals who we're

17  talking about right now have literally only submitted

18  information through the portal saying this is my phone number,

19  here's my address.  If they begin the process of actually

20  giving us a letter explaining how their relationship to that

21  address was or the phone bill, what not, most of those claims

22  that come back, a substantial majority of them likely are going

23  to be on their face perfectly fine.

24          If there are certain ones that we have issues with,

25  the protocol would have us provide those to Mr. McCue, attempt

1    to address those with him go, back to the administrator on the

2    limited number that remain, to have those verified similar to

3    the way the actual notice ones have been.

4         I think the thought here would be once we go through

5    this process, a small population of the remaining claims that

6    come back here would actually need to be verified further.  We

7    didn't do that on, you know, 60 million on the front end or two

8    and a half million on the front end, but it makes sense to, you

9    know, go through the further steps as we proceed.

10        THE COURT:  Remind me again why it is that there is

11   such a large number of people in the database that we don't

12   know whether or not for sure were actually called as part of

13   Mr. Charvat's campaign?

14        MR. McCUE:  Yes, your Honor.  Let me just back up on

15   that issue.  The database we have is from Travel Services which

16   was a marketing entity.

17        We -- Mr. Charvat was called a number of times.  So we

18   knew from the campaigns that he was located in, which of those

19   campaigns were cruise calls.  So was that -- those were

20   isolated, and those folks got direct notice.

21        That left a very large database of other phone

22   numbers.  But the contention was that travel services was

23   calling for condos as well as cruises.  So then the issue was,

24   well, how do you know which is which?  The cruise -- so as part

25   of the settlement, we -- plaintiffs insisted that people be

1    given a right to participate in the settlement even if they

2    weren't in the Charvat -- the exact same Charvat campaigns, and

3    that's why we set up the portal requiring people to attest that

4    not only is it their number, that they recall getting cruise

5    defendant-related calls.

6           THE COURT:  So in theory, it's possible that everyone

7    who submitted a claim except for the 50,608 people who were

8    direct notice claimants received a condo call and not a cruise

9    call, in theory.

10          MR. BECKER:  And part of our compromise in this case

11   was to not challenge every single call based upon the substance

12   of the recording they did or didn't receive towards our

13   marketing group, that's correct.

14          It would be too expensive and a much more different

15   analysis if we were trying to challenge an individuals at a

16   station that they got a cruise-related call.  So we agreed to

17   make everybody that received a call part of the overall class

18   and did not challenge that on that basis.

19          MR. McCUE:  And, your Honor, that was a hotly

20   contested issue.  From our perspective, the opposite is true,

21   that it's much more likely that the vast majority of these

22   calls were cruise calls.

23          But it was a disputed issue in trying to settle this

24   case on a broader basis than just the Charvat campaigns led us

25   to the idea of doing the portal and requiring people to attest

1    under pains and penalties that they recalled getting a fake

2    cruise call.

3              THE COURT:  Okay.  Going back to the additional

4    resources required for the two approaches that are on the

5    table, the one that's being advocated for by KCC and the other,

6    which I understand to be supported by both the plaintiff side

7    and the defense side.

8              To start, is that latter statement correct, that the

9    plaintiff's proposal, the one that Mr. McCue defended in Court

10   last week, is supported by defense counsel as well?

11             MR. BECKER:  It is.

12             MS. MACIVOR:  Catherine Macivor.  Yes, your Honor.

13             THE COURT:  Okay.  So, Mr. Cooper, this is where I was

14   hoping to get some information from you.  I'd like to get an

15   idea of the relative merits of these two approaches in terms of

16   the additional resources that are going to be required.

17             Have you prepared any information along those lines?

18             MR. COOPER:  Your Honor, this is Phil Cooper from KCC.

19   I don't know specifically what level of information you're

20   looking for.  We don't have anything formally.  That is, we

21   don't have the process in place, and that will be required to

22   refine the numbers further.

23             But I can certainly speak to, you know, the reasoning

24   behind that was in our declaration and our position if that

25   would suit the Court.

1          THE COURT:  Let's start there.  Why does KCC only want

2     to focus on people who submitted or I guess lines for which

3     three or more claims were submitted?

4          MR. BECKER:  Can I just speak for one moment before we

5     go there just to clarify?  I don't think it's lines for which

6     three or more claims were submitted, and I would like Mr. McCue

7     or Phil Cooper to clarify this.

8          I think the issue is claims where there are

9     multiple -- more than a certain number of claims submitted by

10    the same address or same IP address.  So it's not that 15

11    people put in the same phone number.  It's that one person may

12    have put in for 15 phone numbers.

13         THE COURT:  Okay.  And is that -- are we on the same

14    page with respect to that then, that in terms of the

15    potentially fraudulent claims, the focus is on the person or I

16    guess IP address, which is another question I'm going to have

17    probably for Mr. Cooper in a minute, not on multiple claims per

18    line?

19         MR. McCUE:  Matthew McCue speaking.  Your Honor, that

20    is correct.  And, your Honor, I would like to correct what I

21    believe was my factual misstatement.  KCC is recommending a

22    check at more than three, and I believe I said it was three, so

23    that's my --

24         THE COURT:  So it would actually have to be four?

25         MR. McCUE:  Correct.

1          THE COURT:  Okay.  So Mr. Cooper, why is it that KCC

2     is making that recommendation?

3          MR. COOPER:  This is Phil Cooper.  Well, basically our

4     general assessment is that anything at three or below falls

5     under the purview of being likely to be within a household or

6     it's possible to be within a household.

7          It's not unreasonable for a household to have three

8     different numbers that are being claimed when you think about

9     the population based upon just anecdotal general information.

10          However, when we look at the groupings of four plus,

11     we see a much broader range.  We see much more compounded

12     instances of the same IP address filing against multiple

13     numbers.  We see more commonality in the addresses where the

14     addresses are being manipulated to appear as if they are

15     different addresses rather than being actual unique people.

16          So, for example, adding apartment numbers to the end

17     of a street address that's a residential, whereas another

18     address, a farmhouse with somehow 16 claims with Apartment 2B

19     when it's clearly a one-floor farmhouse.

20          So we see this.  This is sort of the defining line.

21     And early discussions that looked at that as a threshold.  The

22     parties discussed different levels of I guess groupings.  We

23     had a number of claims that will be submitted on the entity,

24     and we've looked at it from the perspective of an actual IP

25     address commonality and address variation commonality.

1    One of the reasons why we've specifically asked to

2    have about a week on top of the time we're producing actually

3    to submit e-mails options (unintelligible) contrast --

4    THE COURT:  I'm sorry, Mr. Cooper, could you slow down

5    just a little bit and then go back to the beginning of your

6    last statement.  We're losing you.

7    MR. COOPER:  Sure, no problem.

8    What I said last is that one of the reasons that in

9    our timeline we'd asked to have the extra time added is to

10   allow for us to adjudicate false positives that might be in

11   that group to make sure we -- we looked through it.

12   And if there are any instances where, for example, the

13   IP address was recycled and just happened to be used again but

14   for clearly different people, we aren't including them

15   erroneously.

16   And so we have different groups, and there won't be

17   overlap between the duplicates or the multiple submissions of

18   IP address and the populations that have multiple submissions

19   against, A, what we call an entity because it could be various

20   factors relating to the address and name that are common

21   (unintelligible) those groups.  And the overlap between those

22   two populations is not 100 percent.

23   THE COURT:  So Mr. Cooper, are you able to determine

24   whether IP addresses are associated with public computer

25   terminals, for example?

1          MR. COOPER:  No.

2          THE COURT:  Okay.

3          MR. COOPER:  We are not.

4          THE COURT:  So there's no way that you could do any

5    sort of a threshold screen to make sure that an IP address with

6    50 claimants associated with it is not, you know, multiple

7    users at the public library who are spreading the word as they

8    are entering their information into the portals.

9          MR. COOPER:  Not per se, but that is a part of our

10   analysis is that we look at whether or not the addresses being

11   used in accompaniment with the IP address have common factors

12   that lead them to be indicating a fraud.

13         So when we do our review -- if we see 10 claims that

14   have very different addresses, all from the same IP address, we

15   would not necessarily be inclined to identify that as fraud.

16   That would be a situation where we may say that this appears to

17   be a situation of people using a recycled IP address or a

18   public library address.

19         But if we look and we see something like an example I

20   was giving earlier, where the address has been enumerated.

21   It's all in the same city, but there are clearly different

22   variations on the same address made to look different.  They're

23   submitted in rapid succession from an IP address and there's 20

24   of them, then it may be indicative of a situation we want to

25   remediate.

1        And we aren't denying those people, but we're asking

2   them in the proposed solution at least to provide some evidence

3   that they have the right to claim.  So I think that that is

4   ultimately the line of what the parties and the Court have been

5   asking is how can we attempt to weed out fraudulent submissions

6   without denying valid claims?

7        THE COURT:  And why not just go ahead and require

8   verification for all of the indirect notice claimants as the

9   parties are suggesting?

10       MR. COOPER:  Well, we have no objective indication

11  that the claims that are filing for are one, two or even three

12  numbers are fraudulent.  It's very common to see that, you

13  know, we would be getting these types of claims.

14       This volume is not disproportionate to what you might

15  see in a standard TCPA class action if you had an indirect

16  notice list.  But obviously that wasn't the case here.  It

17  wasn't a typical class and it's not a typical case.

18       However, there's not anything that would directly tell

19  us that someone filed simply because they're an indirect notice

20  recipient is a fraudulent claim or we would have inherited

21  identifying them as such because they did go through the

22  portal.  They did provide an in-class phone number that was

23  part of the data, and they did certify, well, they wouldn't

24  have a claim on file.

25       THE COURT:  And in terms of the additional time that

1    it would take to review the verification documents for only the

2    group who had four or more claims as opposed to doing it for

3    everybody who submitted an indirect notice claim, how much

4    longer would it take?

5            MR. COOPER:  Your Honor, we -- I mean, it depends on

6    the route that's taken here, I think, whether or not the

7    defendant or counsel for the defendant and the parties are

8    reviewing the documentation or KCC is adjudicating.

9            But also it's going to be highly contingent upon the

10   volume of responses and the method of response as well.  If

11   people choose to mail all their materials in, that's a longer

12   physical process than if they choose to go online and submit

13   using the claim number we've given them clearly identifying

14   who's submitting the proof, what the proof is.

15           If we end up sending it to more people, the odds are

16   that the volume of response is going to be larger.  It's just

17   sort of a unified numbers game when it comes to how long it

18   will take.  It's going to depend entirely on the volume of the

19   responses and the complexity of those responses.

20           THE COURT:  As I understand it --

21           THE REPORTER:  May I please ask Mr. Cooper to slow

22   down.

23           THE COURT:  So Mr. Cooper, just for future reference,

24   our court reporter here in court has asked me to ask you again

25   to try to speak a little bit more slowly so that she can get a

1      record of all this, okay?

2                  MR. COOPER:  Sure.

3                  THE COURT:  Good.  Who was about to speak up?

4      Somebody on the phone.

5                  MR. COOPER:  Then, I'm sorry, I just wanted to clarify

6      that we would expect the volume of proof and the volume of

7      responses to be much higher if we were to send to all of the

8      indirect notice filers.

9                  Because it's more likely that people that are

10     legitimate claimants filing for only one number, which is

11     obviously the largest population at hand, that they would be

12     able to find proof and then would be forced to submit it

13     requiring more volume of review than if it was a smaller

14     population.

15                 THE COURT:  As I understand it, I guess it would be

16     KCC.  KCC has not yet undertaken deduping the claims, so

17     finding the duplicative claims yet.  Why not?  Why not do that

18     before trying to deal with this fraud issue?

19                 MR. COOPER:  Your Honor, this is Phil Cooper again.

20     We have reviewed preliminarily those numbers, but there's still

21     more to do, and part of that is because of this threshold

22     issue.

23                 Because if, for example, five people claimed the same

24     phone number across claims and each of those five people also

25     filed two other claims and one of them filed three or four

1    other claims, then that person or those people may shift in or

2    out of one of these threshold groups if we were to do their

3    duplicate submission first.  But in reality, that probably

4    should be taken into consideration because it was a submission

5    attempt that exceeded a certain number.

6        The basic summary, the duplicate claims would be

7    removed before we do any final adjudication.  But in terms of

8    understanding how many claims an individual entity submitted,

9    that information is still pertinent.  We still want to make

10   sure that's being accounted for.

11       MS. MACIVOR:  Your Honor, from the --

12       THE COURT:  Go ahead, Ms. Macivor.

13       MS. MACIVOR:  Yeah, Ms. Macivor here.  So from our

14   perspective, when we were discussing this initially, we felt it

15   was important to identify and eliminate the fraudulent claims

16   first before that was done, and that was important.

17       So that's what we were discussing with the settlement

18   administrator, and that's why we were asked whether we wanted

19   that done.  And I didn't want a number on that because it's

20   more important to weed out the fraudulent claims first.

21       MR. BECKER:  I think also adding to that, Judge, when

22   the discussion became does it make sense to cut the clean line

23   at the notice class, the whole -- I believe -- and correct me

24   if I'm wrong -- the concept of needing to deduplicate, do a lot

25   of this analysis would cost a lot more money on KCC's part to

1    pull out IP numbers and look at the duplications, it becomes a
2    non-issue.
3          Because if you're sending notice out to everybody,
4    regardless of whether the IP address was there or the phone
5    numbers were from the same unit, they're all going to be asked
6    to submit information at that point.
7          And when that information comes in, it's
8    administratively filtered and reviewed by the parties, it makes
9    it unnecessary right now, I believe, for the expense to be
10   incurred, this issue of IP addresses and everything else.
11   Everyone's going to be asked to submit something, so why incur
12   that cost right now?
13         THE COURT:  Has anyone, either the attorneys or the
14   administrator done any sort of rough calculation to get an idea
15   of what the rate of claim exclusion as a result of this process
16   would have to be in order to take this from being a pro rata
17   case for class members to being a non pro rata case?
18         Right, so the number of claimants impacts whether or
19   not the class members are getting their distribution on a pro
20   rata basis or whether they're getting the original, I guess,
21   $300 per call.
22         So I guess my first question is if this were limited
23   to the direct notice people, who were the 50,000 odd people,
24   would they still get a pro rata distribution?
25         MR. BECKER:  Yes.

```
 1              THE COURT:  Okay.  So we're not in a situation where
 2      the degree to which people are excluded crosses that line.
 3              MR. BECKER:  I believe that's correct, Judge.
 4              THE COURT:  Okay.  Mr. Becker believes that's correct.
 5      Do the others on the phone believe that's correct?
 6              MR. McCUE:  Yes, your Honor.
 7              MS. MACIVOR:  Yes, your Honor.  Ms. Macivor here.
 8              MR. COOPER:  Yes.  This is Phil Cooper.  We also agree
 9      at KCC.
10              THE COURT:  Okay.  Would it -- and I suppose there's
11      no real way to kind of quantify the correlation at this point
12      between the percentage of excluded claims and the impact it has
13      on the recovery for individual class members.  Let me --
14              MR. McCUE:  Your Honor?
15              THE COURT:  Yes.
16              MR. McCUE:  This is Matthew McCue, plaintiff, your
17      Honor.
18              THE COURT:  Go ahead.
19              MR. McCUE:  You're sharing the same struggle I am,
20      frankly, in terms of, number one, it's our goal to eradicate
21      fraud in the process.  It's the hope that if we take out fraud,
22      the individual take of each valid claim will go up.
23              And the risk of -- the risk is that you spend money by
24      taking out the fraud, and trying to balance the two is really
25      the struggle that I frankly brought this motion to your
```

1   attention to get your guidance on.

2          It's my belief that taking out the fraud will increase

3   the claim -- the claim number of valid claims, but there is an

4   element of uncertainty here because we just don't know what's

5   going to happen.

6          THE COURT:  In terms of the logistics, to shift gears

7   for a moment, you've been talking about having people upload

8   verification through the portal.

9          Is there a way logistically that you could do this

10  where people can take a photograph of their phone bill with

11  their phone and then maybe text it someplace or otherwise send

12  it to the administrator since a lot of people don't have access

13  to scanners or, you know, actual PCs as opposed to their phone?

14         I assume there's some sort of a text like a phone

15  number or an e-mail address where things could be sent so that

16  somebody could just take a photo of their documentation and

17  send it.

18         MR. McCUE:  Yes, your Honor.  This morning my daughter

19  sent me by text her New York state driver's license and I saved

20  it as a pdf and send it to my accountant.  I think there's a

21  way to do that that's fairly simple.  But Phil Cooper would be

22  best to address that.

23         THE COURT:  I'm certain it's technologically possible

24  because I take photos of things and send it around.  But I

25  don't know that there's been any e-mail address or phone number

 1   set up for this purpose thus far.

 2         MR. BECKER:  There were claims that came in --

 3   Mr. Cooper can clarify.  Actually Mr. Cooper can't clarify.  I

 4   believe there was an ability to submit claims by e-mail.  I'm

 5   not sure.

 6         THE COURT:  Mr. Cooper, can people submit their

 7   verification under your scenario by text or e-mail to KCC?

 8         MR. COOPER:  This is Phil Cooper.  Your Honor, the way

 9   that this process is envisioned, there is an e-mail address

10   that's listed on the outbound notice.  It's not currently in

11   place, but it will be in place.

12         So that is a practical solution.  It certainly isn't

13   the most efficient way to process, but it's not problematic for

14   us to do, and it's not uncommon to have people e-mailing

15   something like a picture.  So yes, the answer is that could be

16   done.

17         MR. BECKER:  And to that end, the way that I envision

18   this working obviously with the guidance of KCC would be that

19   an individual could take a screenshot showing their phone

20   number on their phone, a bill, a business card, whatever else

21   we decide in the broad panoply of options that could be sent by

22   e-mail or through the portal that will end up in a common place

23   where we could then on a rolling basis begin going through them

24   approve, approve, approve or flag one, if it needs further

25   analysis, either through the parties' mutual agreement to

1    approve it or through KCC.  And that would give us the most

2    effective, time efficient way to go about it as they come in

3    and approve on a rolling basis.

4            THE COURT:  Okay.  So I do think that that option goes

5    partway towards alleviating my concern about discouraging

6    legitimate claimants from participating in this verification

7    process because it's just a hassle.  You have to locate

8    something.

9            You have to scan it.  You have to, you know, send it

10   off.  If you can just send it from your phone, at least it's a

11   little bit more convenient for just the way people live their

12   lives now.

13           The other practical concern that I have had is the

14   concern that people receiving this request for additional

15   information will be wary of providing it because things like

16   phone bills tend to have other personal information on them

17   other than just here's my name, here's the phone number.

18           So it has their call log, for example, of other people

19   that they're calling, which people might consider to be, you

20   know, personal that they don't want to share.  You know, their

21   account number for their -- for their service they might be

22   hesitant to share.

23           As it was, I know that the court received several

24   inquiries when notice went out in this case regarding whether

25   or not this was a real thing or a scam and should people really

1    be sending their personal information to this portal.

2         I imagine counsel and the administrator received

3    similar inquiries, but we certainly received a not

4    insubstantial amount.  Not 6 million, but a fair number.

5         So I would imagine some people might be hesitant to

6    provide the verification.  I would suggest perhaps including in

7    the notice some sort of statement that any additional personal

8    information that's submitted in response or any personal

9    information submitted by a settlement class member may only be

10   used for purposes of administering the settlement or for

11   purposes of this action, something that makes it clear that by

12   order of the Court, the parties would not be able to use this

13   for any other purpose, especially since presumably you're

14   dealing with people who think that the defendants are those

15   annoying telemarketers who call them all the time and are using

16   their personal information as is, if you assume that's the

17   people we're dealing with.

18        So I think two things need to happen logistically to

19   eliminate some of the concerns that I have.  One is the notice

20   be revised to include some sort of formal statement to that

21   effect, that the parties and the settlement administrator are

22   prohibited by Court order from using the personal information

23   submitted in connection with the claim for any purpose

24   unrelated to the -- I would say administration of the

25   settlement.  But I don't know if counsel would consider that

1    too narrow in the case that this thing fell through.  But I

2    think that would be the one that would probably be the most

3    fair warning.

4         And then second, I think allowing or making it clear

5    that people don't have to go back to the online portal in order

6    to upload verification information, but can send it as long as

7    they have, I guess, their claim number, that they can send it

8    by e-mail or text, a photograph of the documentation to the

9    administrator.

10        I think that would alleviate some of my concerns about

11   legitimate claimants being unnecessarily discouraged here.

12        MR. McCUE:  I agree, your Honor.  That's Matthew

13   McCue.  I agree with all those suggestions.

14        THE COURT:  With that said, it is difficult for me

15   otherwise to find a compelling reason here to not go with the

16   approach that the parties are supporting of asking for

17   verification for all of the indirect notice claims.  I

18   appreciate that.

19        That's going to result in a large number of people

20   that don't have any indicia of fraud at this point having to go

21   through these extra steps, but at least the burden will be the

22   same for all of the people in that category.  And frankly, I'm

23   not sure, given the number of claimants here, that it's really

24   fair to assume that you're going to catch more fraud by

25   focusing on the people who have four or more claims as opposed

1   to the people who are savvier fraudsters who just came up with

2   a better way of submitting claims.

3           Especially since the notice that went out tells people

4   that submitting three or more claims would be considered an

5   indicia of fraud, a lot of people are clever enough to read

6   that and figure out, one, now they know wait a minute, fraud,

7   this is something I hadn't really thought about I could do and

8   just come up with a workaround.

9           So it strikes me as a more fair approach to simply

10  have this apply to everybody, and I haven't yet heard a

11  compelling resource or cost argument from KCC as to why this is

12  going to, you know, impact the overall settlement and perhaps,

13  you know, put this into the category of something that the

14  parties didn't anticipate when they negotiated the settlement

15  such that we started questioning the settlement itself.

16          The timeline.  So the parties submitted a proposed

17  revised timeline along with the status report that I believe

18  assumes I adopted their approach and not the administrator's.

19  Is that fair to say?

20          MR. McCUE:  That's correct, your Honor.  The draft

21  order we submitted did -- of course, we could have changed it

22  if you wanted us to, but that's how we set up the order subject

23  to those general -- the one-sixth that I brought to your

24  attention that KCC needs 17 days to get the e-mail out, not 10

25  days.

1          And then you had raised, your Honor -- and I agree --

2   that having the final approval hearing on the Friday after the

3   4th of July is not good.  So that would be changed as well.

4          THE COURT:  The preliminary approval order and I think

5   the notice explains the challenge procedure and how it works.

6          Is this additional procedure going to conflict with

7   what people have already been told is the process for the

8   parties to challenge claims?

9          MS. MACIVOR:  No, your Honor.  This is Catherine

10   Macivor.  We're planning on following the same one.

11          MR. McCUE:  Your Honor, would it be helpful -- this is

12   Matthew McCue speaking.  Would it be helpful to the Court if we

13   submitted a revised order that reflected some of the

14   discussions that we had today?

15          THE COURT:  Yes, as well as I'd like to see a revised

16   notice to make sure it has that other language in it about the

17   parties being limited in their use of the information.

18          MR. McCUE:  Okay.

19          MR. HILTON:  Your Honor, this is Jonathan Hilton for

20   Evan Shelton, if I may.  I just wanted to say that assuming

21   that we -- that the Court does decide to send notice of all of

22   the indirect claimants to have them submit additional

23   documentation, I would just ask that the parties and the Court

24   consider the propriety of sending a reminder e-mail, just have

25   one additional round of reminder e-mails go out in case

1    somebody misses the first initial e-mail where it goes to spam

2    or a person just forgets so that we can keep as many legitimate

3    claims as possible.

4            THE COURT:  I think that's fair.  I think a reminder

5    e-mail would make sense.  We'll need to build that into the

6    timeline to be reflected in the order.

7            One other thought is I don't know --

8            MS. MACIVOR:  That would be an additional cost,

9    though.

10           THE COURT:  It's an additional --

11           MR. BURKE:  This is Alex -- this is Alex Burke.  I

12   think she'll have an idea of what it costs to send out an

13   e-mail notice, and my understanding is it's like $50,000.

14           MS. MACIVOR:  Yeah, I recall the estimate being

15   56,000.  So that would push -- with both notices, it would push

16   it over 100,000.

17           THE COURT:  Why does it cost 50,000 to send a reminder

18   e-mail?  Isn't it just a matter of sending pretty much the

19   prior e-mail with a header that says "as a reminder"?  Explain

20   to me why that's an overly simplistic view.

21           MR. COOPER:  Your Honor, this is Phil Cooper at KCC.

22   The e-mail campaigns have a unified pricing, so that's

23   basically the answer why.  It's like sending a postcard.  It's

24   just a different rate than doing so.  So if you send 50,000

25   e-mails two times, you pay for the price of sending 100,000

1    e-mails.

2         THE COURT:  That is because that's KCC's negotiated

3    rate as --

4         MR. COOPER:  Yeah, that is just the rate that it costs

5    for sending out the e-mails priced that way.

6         MR. BECKER:  Is there any cost savings associated with

7    once you've done it the first time and compiled those e-mail

8    addresses and knowing you're going to do it again, is there any

9    way to save on that?

10        MR. COOPER:  It's very minimal.  The savings are

11   entirely just upon the spec of writing up the notice here,

12   developing a language.  You save a few hours of the development

13   time and that's it.  It's not -- there's no savings on the

14   unitized rates.

15        THE COURT:  Is that because the cost to KCC of doing

16   it is the same, or is it because that's just your billing

17   practice?

18        MR. COOPER:  The cost is the same to us regardless of

19   whether or not we've done the campaign -- the campaign of the

20   same people before.  We don't give any different pricing.

21        THE COURT:  Because I'm thinking if this were a

22   campaign where you were sending out postcards, of course, you

23   would have to pay for the paper and the postage costs

24   regardless of whether you had done it before.

25        But for e-mail, the cost is sort of the actual I guess

1    cost of the process here is less, I would think.  And if the is

2    that's just what your rates are and that's what you've

3    negotiated, that's a fair answer.

4              MR. COOPER:  I mean --

5              THE COURT:  I would accept it.  I don't know.  You

6    might be able to work around it.  But if your answer is just

7    that's what we charge, then that's fine.  But I guess I'm

8    wondering if the expense goes down.

9              MR. COOPER:  The expense does not change based upon

10    the number of campaigns.  Unfortunately, that's just the

11    pricing system that's in place.

12              I mean, I can certainly inquire more about what

13    options are available, but that's not a department that I'm

14    directly involved in.  So I can't speak to it with any

15    authority.

16              THE COURT:  Okay.  Hearing that it would cost $50,000

17    to do a reminder e-mail, what do the parties think about that?

18              MR. BECKER:  I think that we don't want to eat away at

19    additional money that comes into the fund for class members by

20    spending $50,000 to send another e-mail if that's going to be a

21    substantial amount of money that could go to the class instead.

22              I think it's going to be a weighing of the two issues,

23    your Honor.  I think it might be helpful to talk to KCC to see

24    if there's a way to save on that, but we obviously don't want

25    to, you know, waste additional funds if it's not a necessary

1    step to be taken.

2          THE COURT:  How much is KCC getting paid as class

3    administrator?

4          MR. BECKER:  I don't have the estimate in front of me.

5          MR. McCUE:  You're Honor, it's -- we don't have a

6    final bill because, of course, it depends upon --

7          THE COURT:  I understand.

8          MR. McCUE:  I'm sorry, your Honor, this is Matthew

9    McCue.

10          It's expensive.  It's probably $3 million.  From the

11    plaintiff's perspective, your Honor, I think it's a commonsense

12    suggestion, and I think it would be helpful to encourage valid

13    claimants to submit.  And I think we should figure out a way to

14    pay for it.

15          THE COURT:  I tend to agree, and I would like the

16    parties to talk to KCC about this.  I don't know, but I've had

17    other settlements where KCC has sought to be a settlement

18    administrator.

19          But certainly in considering whether to approve

20    settlements with an administrator which I think is not willing

21    to be flexible on something like this, I might have to make a

22    mental note.  This strikes me as an amount of money that

23    perhaps the parties and the administrator can talk about so it

24    has a minimal impact.

25          That said, I appreciate that KCC has taken on a huge

1  undertaking.  I've already said that I'm inclined to adopt an
2  approach that's going to require more of their time and effort
3  and make it a harder job for them.  So I'm certainly aware of
4  that and sensitive to that.
5          However, I think they're also getting paid a lot.  So
6  there should be a way that the parties and KCC can work this
7  out so it has minimal impact on the class.  But I do think a
8  reminder e-mail should be built into the process.
9          We need to talk about another date for the final
10  approval hearing in light of where we are on the new schedule.
11  So we're going to be into I guess the end of June in order to
12  get all of the final summary documents relating to the
13  settlement.  It looks like June 25th is one of the last dates
14  that we're looking at.
15          For the reasons articulated by our objector, I agree
16  that July 6th is not a great day for this.  I don't want to
17  further discourage anybody by putting it on a date that will
18  make them or their lawyers have a harder time getting here.
19  Frankly, I suspect I may not be sitting on July 6th to hear
20  this.
21          Unfortunately, I do have jury trials scheduled at this
22  point for the week of July 9th and the week of July 15th.  And
23  I would like to make sure I set this for a date where I can set
24  aside a fairly significant amount of time to fully hear any
25  objections on this.

1          Is there any reason that it would be prejudicial to

2    any of the interested parties if the final approval hearing

3    were pushed to the week of July 23rd?

4          MR. McCUE:  Fine for plaintiff, your Honor.

5          MS. MACIVOR:  No, your Honor.  Catherine Macivor.

6          MR. BECKER:  That works for Carnival.

7          THE COURT:  Okay.

8          MR. HILTON:  Jonathan Hilton for Objector Shelton.

9    That's fine.

10         THE COURT:  Okay.  Based upon the parties' experiences

11   with these things, is there a day of the week that works --

12   tends to work better in terms of making sure that people are

13   able to show up if they want to show up?

14         MR. BECKER:  I believe that traveling counsel, it's

15   typically better if it's a Tuesday, Wednesday or Thursday.

16   Matt, Cathy, would you agree?

17         MR. McCUE:  Yeah, I would agree.

18         MS. MACIVOR:  I would agree, Catherine Macivor.

19         THE COURT:  I think we previously set it for an 11:00

20   o'clock time perhaps?  Let me look at the order and see what I

21   can do.

22         Yes, we previously set it for an 11:00 o'clock time.

23   Let's see.  I would be able to do it on the 24th, 25th, 26th, I

24   believe.  That's a Tuesday, Wednesday and Thursday of that week

25   of July 23rd.  It looks like I can do it at 11:00 o'clock on

1    any of those days.

2           Hopefully this is not a hearing that would take more

3    than a couple of hours.  I think we probably have about three

4    objectors who have -- that I'm aware of who have indicated a

5    desire to come and be involved in the hearing.  There may be

6    others.  So for scheduling for the revised proposed order that

7    the parties are working on, let's go with a new fairness

8    hearing date of July 24th at 11:00 a.m.

9           MR. McCUE:  That works, your Honor.

10          THE COURT:  Okay.  So what I need from the parties is

11   a revised order as well as a revised form of notice that's

12   going to be sent out, and the parties may need to talk a little

13   bit about that.

14          Would I be able to likely get that from the parties in

15   the next 24 hours or so --

16          MR. McCUE:  Yes, your Honor.

17          THE COURT:  -- so that we can get this

18   (unintelligible)?  I am going to -- officially going to grant

19   the request for the follow-up documentation.  This will go to

20   all of the indirect notice claimants, and this should provide

21   for the items that I mentioned on the record as well as the

22   reminder e-mail, and the parties are going to try to work out a

23   way so that it doesn't eat into the settlement fund.

24          The last sort of substantive issue, this was something

25   I had mentioned in passing when the parties were here last

1   week, which is the possibility that this additional process

2   might lead to additional objections.

3           In looking at the order, the order certainly lays out

4   a challenge procedure.  This isn't really a challenge

5   procedure.  This is something in addition, sort of a midway

6   step between the initial submission and actually providing for

7   challenges.

8           Is there any -- anyone, including Mr. Hilton, who

9   wants to argue for why some additional opportunity for

10  settlement class members to object should be allowed in light

11  of this additional procedure?

12          MR. McCUE:  Your Honor, Matthew McCue.  From the

13  plaintiff's perspective, I do think it's reasonable to allow

14  people to object to what we're proposing.

15          THE COURT:  Okay.

16          MR. HILTON:  Your Honor, this is Jonathan Hilton.  I

17  also agree.  If we're going to require additional documentation

18  for what could potentially be a very large payout, I think it

19  makes sense to allow people an additional opportunity to

20  object.

21          MR. BECKER:  I would think it's important.  However,

22  if we're going to go down that road and cognizant of the fact

23  that there is counsel present and objected heartily at the last

24  hearing, if we're going to go down that road, the objection

25  substance should be limited to what's actually taking place

1    here.

2    We shouldn't look at this as a way to reopen

3    objections that could have been posed timely prior to this.

4    THE COURT:  So here's my concern about that, which is

5    that we now have a public statement that's going to be sent to

6    people where the Court and the parties are acknowledging that

7    the settlement administrator believes there's an indicia of

8    substantial fraud in connection with the claims process.

9    As a legitimate settlement class member, that might be

10    something that I want to complain about or amend my prior

11    objection to complain about or just in general weigh in on as

12    some new information that's out there that I didn't know before

13    that may provide a basis for me to challenge the settlement.

14    Any thoughts from the parties on that?

15    MR. McCUE:  I think that's fair, your Honor.

16    THE COURT:  Is there going to be a timeline built into

17    the order for that to happen?  Is this going to happen within

18    the same 30-day window that they have to submit their

19    verification, and within that same window, if they have any

20    additional basis for an objection, they would have to submit it

21    within that same time frame?

22    MR. McCUE:  That would be my sense, your Honor.

23    That's what we typically do with objections in claims is we run

24    them the time frame to run at the same time.  So I would

25    envision that as well.

1      MR. BECKER:  Tying them together would be consistent

2  with what we did earlier in this case to tie the claim to the

3  objection period.

4      THE COURT:  I would not be opposed, I don't think, to

5  the parties indicating in some way that -- well, one, you

6  should definitely tell people if you objected previously, you

7  don't have to object again so that you don't have multiple

8  people submitting the same objection.

9      I don't know if there is an easy way to limit

10 objections to concerns arising out of the more recent

11 developments, the new process and the notice of it that's going

12 out.  That may be too fine of a detail to try to -- to try to

13 work into this.

14     From what I can tell, the majority of the objections

15 fall into three basic categories.  The lawyers are getting paid

16 too much, the representative class member's getting paid too

17 much, and there was a bait and switch here.  You told me I was

18 going to get $900 and now I'm getting four.

19     I think those are -- those are at least the objections

20 that I've seen for the most part.  I don't know if the parties

21 think otherwise or there are other types of objections.

22     MR. BECKER:  Very minimal other objections not of the

23 same substance that you're talking about.  Those are the three

24 primary objections you're seeing across the spectrum.

25     THE COURT:  And frankly, I could see how again

1   receiving notice that the class administrator believes there's

2   indicia of substantial fraud could support any of those three

3   objections and may want to be cited by objectors as an

4   additional reason why class plaintiff's getting paid too much,

5   lawyers are getting paid too much, and it's unfair that their

6   recovery is being reduced.

7          So I think I've talked myself into not limiting --

8   trying to put an artificial limit on the type of objection that

9   they can raise.

10          MR. BECKER:  For purposes of providing any putative

11   class member with, you know, the fairest way to address the

12   issues to the Court, I would agree.

13          THE COURT:  Any others on the phone want to weigh in

14   on that issue?

15          MR. McCUE:  Matthew McCue, your Honor, and all I would

16   point out is the objections about we're not getting paid

17   enough.  That's exactly why we're here is we're trying to

18   eliminate as much fraud from this process as possible to make

19   sure that people who have valid claims get as much as they can.

20          THE COURT:  Yes, I understand that.  I'm not sure that

21   the people who are getting this e-mail will appreciate that, at

22   least not at first glance.

23          Okay.  But let us -- they should have notice that they

24   can supplement objections, file new objections, no need to

25   repeat any objection that's already been submitted.

1     MR. BECKER:  Very good, Judge.  So we'll speak with

2   KCC, and we'll revert to your e-mail address, I believe the

3   chambers e-mail address, the updated notice and the updated

4   process timeline.

5     THE COURT:  Okay.  So let's -- if we're able to do

6   that within the next 24 hours -- if the parties are delayed

7   beyond that, just call chambers and let us know.

8     As I think the parties can tell from how I've

9   approached this, I'd rather you take a little bit of extra time

10  to make sure that you've thought everything through and gotten

11  on the same page rather than to rush through it, especially

12  since we're moving the final approval hearing anyway.  So I'd

13  rather try to address concerns on the front end, if we can.

14    MR. BECKER:  Very good, Judge.

15    THE COURT:  Anything else for today?  Anything from

16  anyone on the phone?

17    MR. McCUE:  That's it, your Honor.  Thank you for your

18  time.

19    THE COURT:  Okay.  And thank you to Mr. Cooper for

20  joining us and answering my questions, including my pointed

21  questions about how much you and your employer are getting

22  paid.

23    I can let you know I'm in no way disparaging the work

24  that you've done.  I hope that was clear.  I know it's a tough

25  job, and this is an unusual settlement to administrator.

 1          MR. COOPER:  Of course, your Honor.  We appreciate

 2   that very much.

 3          THE COURT:  Okay.  Mr. Becker.

 4          MR. BECKER:  Thank you, Judge.

 5          THE COURT:  Okay.  I think we are adjourned.  I'll

 6   look for your order.

 7          MR. COOPER:  Thank you, your Honor.

 8          MS. MACIVOR:  Thank you, your Honor.

 9          MR. McCUE:  Thank you, your Honor.

10          MR. HILTON:  Thank you.

11      (Concluded at 2:28 p.m.)

12                  * * * * * * * * *

13              C E R T I F I C A T E

14      I certify that the foregoing is a correct transcript of the

15   record of proceedings in the above-entitled matter.

16

17   /s/ LISA H. BREITER_____      *April 20,* 2018
     LISA H. BREITER, CSR, RMR, CRR
18   Official Court Reporter

19

20

21

22

23

24

25