```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    PHILIP CHARVAT, on behalf of    )
      himself and others similarly    )
 4    situated,                       )
                                      )
 5                    Plaintiffs,     )
                                      )
 6           -vs-                     )   No. 12 C 5746
                                      )
 7    TRAVEL SERVICES, et al.,        )   Chicago, Illinois
                                      )   October 30, 2018
 8                    Defendants.     )   10:00 a.m.

 9                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE ANDREA R. WOOD
10

11    APPEARANCES:

12    For the Plaintiffs:    LAW OFFICE OF MATTHEW MCCUE
                             1 South Avenue, Suite 3
13                           Natick, Massachusetts
                             BY:  MR. MATTHEW McCUE
14

15                           BURKE LAW OFFICES, LLC
                             155 North Michigan Avenue
16                           Chicago, Illinois  60601
                             BY:  MR. ALEXANDER HOLMES BURKE
17                                MR. DANIEL J. MAROVITCH

18
      For Defendant Carnival:  SWANSON, MARTIN & BELL, LLP
19                             330 North Wabash Ave.
                               Chicago, Illinois  60611
20                             BY:  MR. JEFFREY SCOTT BECKER
                                    MR. DARREN BRETT WATTS
21

22
                     COLETTE M. KUEMMETH, CSR, RMR, FCRR
23                        OFFICIAL COURT REPORTER
                          219 South Dearborn Street
24                              Room 1928
                          Chicago, Illinois  60604
25                            (312) 554-8931
```

```
1    APPEARANCES:   (Continued)

2    For Defendant Royal
     Caribbean and
3    Norwegian Cruise Lines:   FOREMAN FRIEDMAN, PA
                               2 South Biscayne Blvd., Suite 2300
4                              Miami, Florida  33131
                               BY:  MS. CATHERINE J. MacIVOR
5                                   MR. JEFFREY ERIC FOREMAN

6
     ALSO PRESENT:
7
     For Objectors Shelton
8    and Johnson:              MR. JONATHAN HILTON, ESQ.
                               20 South Third Street, Suite 210
9                              Columbus, Ohio  43215

10

11   For Objector Dunlap:      MR. ALLEN McDONALD
                               249 North Peters Road
12                             Knoxville, Tennessee  37923

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1            (Proceedings heard in open court: )
2            THE COURT:  So we're going to call this matter, and
3    then I will get appearances from each side.
4            Enjoli?
5            THE CLERK:  Calling case 12 CV 5646, Charvat versus
6    Travel Services.
7            THE COURT:  Looks like plaintiffs' counsel is at
8    this table.
9            MR. McCUE:  Matthew McCue for the plaintiff, Phil
10   Charvat, who is also in court with us today, your Honor --
11           THE COURT:  Good morning, Mr. Charvat.
12           MR. McCUE:  -- and also for the class.
13           MR. BURKE:  Good morning.  Alex Burke for the
14   plaintiff and the class.
15           MR. MAROVICH:  Dan Marovich for plaintiff and the
16   class.
17           MR. BURKE:  Also with us is Rob Dewitt from KCC.
18           THE COURT:  Ah.  Okay.  Good morning, Mr. Dewitt.
19           MR. DEWITT:  Good morning.
20           THE COURT:  Okay.  And so then we must have defense
21   counsel at the other table.
22           MS. MacIVOR:  Catherine MacIvor on behalf of Royal
23   Caribbean Cruises, Limited, and NCL Bahamas, Limited, and I'm
24   here with my partner, Jeff Foreman.
25           THE COURT:  Good morning.
```

1          MR. BECKER:  Your Honor, Jeffrey Becker and Darren

2     Watts on behalf of Carnival Corporation PLC.

3          THE COURT:  Okay.  And then I believe we have

4     individuals participating by phone.  We were not able to

5     establish the connection for the video conference with

6     Mr. Cooper, but my understanding is Mr. Cooper is on the

7     phone, is that correct?

8          MR. COOPER:  Yes, your Honor.  Phil Cooper is

9     dialed in.

10         THE COURT:  Okay.  He's here on behalf of KCC.

11         And then we have counsel for Mr. Cooper on the

12    phone as well?

13         MS. BRYAN:  Yes, hi.  This Sarah Bryan.  I'm

14    corporate counsel for KCC.

15         THE COURT:  Okay.  And I believe that's all for the

16    parties and the claims administrator, is that correct?

17         MR. McCUE:  That is correct.

18         MR. BECKER:  Correct, your Honor.

19         THE COURT:  Good.  When we get to the portion in

20    the hearing where I will ask to hear from any objectors, then

21    I will go through the list we put together of the people who

22    are here and who have asked for an opportunity to address the

23    Court.

24         As a note, particularly to those individuals who

25    may not have been in front of me before, I do read all the

1   materials that people submit, including the objections.  I

2   will acknowledge that given the volume of material for

3   today's hearing I may not be quite as facile in knowing

4   exactly where things are in the docket in the record here, so

5   I may ask about that, but you can rest assured that if you

6   put something in writing and put it in the docket, it will be

7   read and fully considered in connection with any ruling in

8   this matter, and you may take that into account in planning

9   your comments as well.

10          So as we all know, we're here for the hearing

11  regarding the final approval of the proposed class settlement

12  in the action Charvat versus Travel Services, which is case

13  No. 12 CV 5746, and in particular to consider the proposed

14  settlement agreement between the plaintiff, Mr. Charvat, and

15  defendants, Resort Marketing Group, its principal, Elizabeth

16  Valenti, and the cruise line defendants, Carnival Corporation

17  and PLC Royal Caribbean Cruises, Limited, and NCL Bahamas,

18  Limited.

19          I think what I would like to do is in a moment I'll

20  ask somebody, probably from plaintiffs' side, to maybe come

21  to the podium and provide sort of a summary of the settlement

22  and the settlement terms so that we have established sort of

23  our baseline here.

24          I will undoubtedly -- well, I know that I have

25  questions for the parties, but I think what I would like to

1    hear first from the parties on is whatever presentation that

2    you've prepared in order to establish -- help me in

3    establishing the criteria for approval of the settlement, and

4    then we can ask questions.

5          So if it's a situation where questions may be

6    directed to both sides and have multiple counsel responding,

7    I'm amenable to having you do it from the table as long as

8    everybody is sure to speak into a microphone and to do your

9    best not to speak over each other.  Because I need you to

10   speak into the microphone, I'm going to suspend the normal

11   practice of having you stand to address the Court.  I think

12   it's a little easier to speak into the microphone if you're

13   seated.  So don't worry about having to do that.

14         So let me start, I don't know who on behalf of

15   plaintiff would like to make a presentation on behalf of

16   approval of the proposed settlement.  Would that be

17   Mr. McCue, Mr. Burke?

18         MR. McCUE:  That would be myself, your Honor.  If

19   you don't mind, I'm more comfortable at the podium if that's

20   okay.

21         THE COURT:  Yes.  For this portion I think it's

22   appropriate to do it from the podium.

23         MR. McCUE:  Your Honor, the fact that this case

24   starts with a 12 itself is telling.  It's been around for

25   quite a while, and we appreciate all the work you've done and

1  the work Judge Rowland has done on this case.

2          I want to acknowledge Mr. Charvat, who is here from

3  Columbus, your Honor.  He is our lead class plaintiff.  He

4  has done an exceptional job on this case.  As we've detailed

5  in our filings, there were a lot of obstacles for him

6  personally in this case.  No. 1, he was sued by the

7  telemarketer, RMG, who claimed that by tape recording the

8  calls he violated Illinois law.  So putting himself

9  financially at risk in this case.  Keep in mind that he tape

10 recorded the calls in compliance with Ohio law, where the

11 telemarketer called him, so it's quite a novel argument.

12         In any event, they put him at risk personally in

13 this case.  And that's exceptional.  And we've laid out in

14 our briefing why that's exceptional.  And incentive award is

15 one of the issues in this case that we'll deal with, but I

16 told Mr. Charvat that I will fight for him.  And he's

17 entitled to an award that recognizes what he went through.

18 But let's put that aside.

19         The case that's before you now, I propose a $12 and

20 a half million settlement.  This is a vicarious liability

21 TCPA case.  So some of the objectors have said, oh, this is a

22 typical TCPA case.  It's not.  A typical TCPA case is a

23 debtor case where the debtor is -- debt collection calls,

24 where the company is calling directly.  This is vicarious

25 liability, where the telemarketer, Ms. Valenti and RMG,

1    basically in the boiler room made all these calls for the

2    cruise lines.

3            To get a real recovery for the consumers, we had to

4    go up the chain.  And to do that, you have to prove vicarious

5    liability.  Which creates a host of challenges in a case like

6    this.  And I just want to put that up front.

7            But you asked for an overview.  So where we're at

8    now at the end of this process, we have 274,856 valid claims.

9    The last time we were before you that number was 5,000 lower

10    than that.  And that's because we were going through the cure

11    process, your Honor.

12            THE COURT:  I'm sorry.  So you're at 274 --

13            MR. McCUE:  856.

14            THE COURT:  -- 856.  And those are claims, but some

15    of those might represent multiple calls --

16            MR. McCUE:  Correct.

17            THE COURT:  -- is that correct?

18            MR. McCUE:  Correct, your Honor.  So the average

19    claimant will get $22.00 in this case.  If you break it down

20    by call, it's about $8.00 a call.  There is a three-call cap

21    on the settlement.  So those are the rough numbers.

22            I submit to you that none of that would have been

23    possible without Mr. Charvat's work on this case.  And we are

24    proud about the settlement, pleased about the settlement.  Is

25    it a lot of money per consumer?  No.  But the point in

1    consumer class actions is to hold defendants accountable and

2    to enforce the law.  It's not about the latte, it's about

3    enforcing the TCPA.  And that's what we've done in this case.

4          As a result of Mr. Charvat's work, RMG is out of

5    business.  They closed up shop.  They're no longer running a

6    dialer and calling millions of people.  As a result of

7    Mr. Charvat's work, the cruise lines are now on notice that

8    they better be careful about who they're getting leads from.

9    Because attorneys and class representatives will hold them to

10   account.

11         There's been 30 objections to this case, your

12   Honor.  Given the volume of claims, that less than .01% of

13   total claims.  A lot of the objections, as we've detailed in

14   briefing, were filed *pro se* by consumers who were just

15   confused.  I reached out to a lot of those people to answer

16   the questions.  A lot of those people actually filed claims.

17         We have a handful of objectors represented by

18   counsel that are here today.  We'll deal with them down the

19   road at this hearing.

20         So that is a brief overview about the case.

21   Really, your Honor, you have a lot of briefing before you.

22   If you want to, I can go through stuff in great detail, but

23   really what this case is about, it's the factors for final

24   approval, is the settlement fair and reasonable.  I submit to

25   you it is.

10

1    A lot of people worked very hard on this case, and

2    I submit to you that once problems started to arise with the

3    administration -- and this was a very complicated

4    administration.  You were involved every step of the way

5    along with us trying to deal with these challenges.

6         The biggest challenge was the media attention to

7    this case absolutely went viral.  It was on ABC national

8    news, it was on hundreds of outlets throughout the country.

9    And it wasn't just extensive media coverage, it was

10   misleading media coverage that created the problem and

11   created this expectation for folks that they were going to

12   get $300, up to $900.  When all of the papers in this case,

13   all of the press releases in this case say *pro rata*, and that

14   the number you're going to get depends upon how many claims

15   are filed.  That got -- Fox News missed the memo on that.

16        We had 2.7 million people file claims.  A big issue

17   in this case has been costs of administration.  And on the

18   phone we have Phil Cooper from KCC, here live we have Rob

19   Dewitt, who is a vice president of KCC, to explain to you

20   what happened with costs of admin and why did they go from

21   800,000 to over three million.  The reason for that is

22   because of the explosion in the claims.

23        KCC had to commit extensive additional manpower to

24   this case.  They estimate that over 50 employees at KCC

25   worked on this case.  KCC spent over a million dollars in

11

1    out-of-pocket expenses on this case.  If you look at man

2    hours, they spent 7,000 man hours on this case.  When

3    originally anticipated, they anticipated 700 man hours.  They

4    anticipated 800,000 in admin.

5              THE COURT:  I'll stop you there for one moment,

6    because that brings up a question that I had.  Under the

7    settlement agreement, I believe there was a requirement for

8    an accounting to be provided by the settlement administrator

9    14 days prior to the final approval hearing.  Was that

10   provided?

11             MR. McCUE:  The accounting, I'm not aware of a

12   specific accounting.  I know KCC has submitted declarations,

13   the detailing of their work and their expenses.

14             THE COURT:  The ones that were submitted to the

15   Court.

16             MR. McCUE:  Correct, your Honor.

17             THE COURT:  So I'm looking at page 25 of the

18   settlement agreement, it's section 6.3.  It says:  "The

19   settlement administrator shall provide an accounting of all

20   such costs and expenses and all sums received from the cruise

21   defendants no later than 14 days prior to the final approval

22   hearing."

23             Was that a reference to the declarations that were

24   filed, or is that something else?

25             MR. McCUE:  Your Honor, I have to go back and look

1    at that in more detail, but I know that the cruise lines were

2    required to advance some of these expenses to KCC.  It might

3    be referring to that.

4            But the bigger picture, your Honor, if at any point

5    you want more documentation, KCC is prepared to submit to you

6    whatever you need.  So if we need to do an audit, some type

7    of invoice that shows the 7,000 man hours, they can do that.

8            THE COURT:  So I'll actually back up to the

9    sentence before that in the settlement agreement which

10   explains a little bit more what this is in reference to.

11           I think it says:  "The settlement administrator

12   will maintain detailed records of the amounts spent on the

13   administration of the settlement and will provide them to

14   class counsel and the cruise defendants' counsel monthly.

15   The settlement administrator shall provide an accounting of

16   all such costs and expenses and all sums received from the

17   cruise defendants no later than 14 days prior to the final

18   approval hearing."

19           So that is what I was noting in the settlement

20   agreement.

21           Did the settlement administrator provide the

22   detailed records, which perhaps were just invoices, to class

23   counsel and the cruise defendants' counsel monthly?

24           MR. DEWITT:  Your Honor, it probably makes sense

25   for me to speak on that.

13

1    THE COURT:  We're jumping around a little bit, so

2  go ahead.

3    MR. DEWITT:  Yes, of course.  I appreciate the

4  opportunity.

5    THE COURT:  And this is Mr. Dewitt.

6    MR. DEWITT:  Correct.  Yes.

7    So as Mr. McCue mentioned earlier, the major hiccup

8  in this case when it comes to administration was the initial

9  viral activity.  And, you know, there became a point in the

10  administration where everybody involved, both sides, asked us

11  to limit our costs as much as possible.  So the number that

12  we agreed to limit our costs to at the time was $3 million.

13    And honestly, at that point, whatever happens after

14  that, we keep track of it, but that's kind of the end of the

15  picture for us.  So that's the number.

16    And we keep our records, and continue to maintain

17  those records, and are happy to provide something to the

18  Court and the parties, and we have been in touch with the

19  parties on invoices and things of that nature.  But at that

20  point, that was the number we stopped at.  So I think that's

21  part of this issue.

22    THE COURT:  Is there an accounting that shows how

23  the costs and expenses were incurred up to the $3 million

24  amount?

25    MR. DEWITT:  That's certainly available.  Yes, your

1  Honor.

2  THE COURT:  So I think that is something I would

3  like, because it is a much higher number I think than what

4  was contemplated at the time the settlement was preliminarily

5  approved, and I obviously am fully aware that circumstances

6  did change, and so that doesn't necessarily indicate that

7  there's something amiss, but I do think given the substantial

8  increase from the time of preliminary approval to final

9  approval would make it prudent for me to have a little bit

10  more detail.  Because I know that's one of the things that's

11  been raised consistently by several objectors.  Frankly, it's

12  a little bit of a concern of mine.

13  It's also something I know that certainly our

14  appellate court here has taken a close look at in several

15  other cases where there have been issues on it raised with

16  respect to attorneys' fees and administration fees, so I want

17  to make sure I have a good idea of how that cost was

18  incurred.

19  So yes, I think I would like an accounting.  I'm

20  going to put that on the list of things that I'm going to be

21  asking for once we finish here.  And as I understand it,

22  Mr. Dewitt, that's available?

23  MR. DEWITT:  Yes.  Certainly we can pull everything

24  together for you.  A lot of it's available already.

25  A couple of points to your point:  Our work is

1    actually not done in this case yet, so we will continue to

2    add that to the accounting.  I think some of the cure

3    process, one of the deadlines was yesterday.  So that's part

4    of that.

5           Also in terms of the total costs here, we have been

6    the administrator of many very large TCPA settlements,

7    including Monitronics, Midland Capital, Portfolio Recovery

8    Associates.  And the administration fees in those cases were

9    all higher than we're asking for here, as a matter of context

10   for you.

11          THE COURT:  Thank you.

12          MR. DEWITT:  Thank you.

13          THE COURT:  On that note, since the idea of the

14   unexpected administrative costs and the viral nature of the

15   news coverage has come up, I'm going to again jump a little

16   bit ahead of what I had in my notes, Mr. McCue, and put you

17   on the spot a little bit with a question.

18          So one of the concerns that I had in reading

19   through all of the materials and keeping in mind that at the

20   end of the day the fundamental issue that I have to resolve

21   is the fairness of this settlement, I'm wondering if the fact

22   that the parties seem to have so under-estimated the number

23   of claims that would be submitted speaks to the fairness of

24   the settlement.  Because it seems to me one might take the

25   position that it illustrates either one of two scenarios.

1　Either the parties were right, and there is a substantial

2　number of fraudulent or improper claims that are still being

3　counted, or perhaps plaintiffs' counsel substantially

4　under-valued the case, and you should have actually demanded

5　much more in settlement because the defendants' exposure has

6　actually turned out potentially to be more than expected.

7　　　　　In either of those two scenarios, it seems that

8　somebody might make an argument that maybe there's a

9　fundamental fairness issue here.

10　　　　　MR. McCUE:  Sure.

11　　　　　THE COURT:  Why isn't that the case?

12　　　　　MR. McCUE:  Your Honor -- and of course those

13　arguments can be made.  Are they legitimate?  It really

14　depends on the context of the case and the facts of the case.

15　　　　　So what we had here was a dialer database, where

16　the telemarketer made millions and millions of calls, for the

17　cruise lines and not for the cruise lines.  We had specific

18　campaigns for Mr. Charvat that he had recorded it.  So we

19　knew that those were cruise calls.

20　　　　　So we had a situation where, as class counsel, I

21　had an obligation to try to allow for consumers to

22　participate in this process as fairly as possible.  That was

23　my No. 1 objective on advocating for the creation of a

24　portal.

25　　　　　No one could have anticipated, and if folks want to

1      criticize me, that's okay.  I mean, I am up for it, and I can

2      justify what we did and why we did it.

3           There has never been a case like this where the

4      media attention went viral, specifically driving people to

5      the portal, and misrepresenting the amount of the claim.  And

6      I suggest to you when people find out they can get $900,

7      that's going to motivate them to go to these portals.

8           So when we looked at the different cases that we've

9      done, the different cases we've administered, the best we can

10     do is try to anticipate what the claim response is.  That's

11     the best we can do.  No one has a crystal ball to see, you

12     know, is Fox News going to represent this properly.  Is it

13     going to go viral.  No one could have anticipated that.

14          So in hindsight, I don't know what we would have

15     done differently or how we could have done differently,

16     because it was out of our control in terms of how the media

17     presented this case to the public.

18          THE COURT:  But if we assume that all of the claims

19     that have been accepted are valid claims, then isn't that the

20     goal, to get notice as broad as possible?  I guess I'm a

21     little uncomfortable with the idea of being critical of the

22     viral news coverage, because it allowed counsel to reach more

23     class members.

24          MR. McCUE:  Yes.

25          THE COURT:  If the criticism is that it encouraged

1  fraud --

2           MR. McCUE:  Right.

3           THE COURT:  -- that's a different issue.  But if

4  the criticism is just that it allowed every single member of

5  the class to know they were a member of the class, isn't that

6  the goal?

7           MR. McCUE:  I agree, but it kind of goes hand in

8  hand.  I mean, I thought the notice, and that's of course an

9  element of the fairness.  I mean, how can you criticize the

10 notice.  It went everywhere.  But then the hard -- the down

11 side of that is the fraud.  And in that, again, I thought we

12 did absolutely the right thing.

13          And if this gets approved, the folks who are

14 getting a check are people that we know are valid claimants.

15 We had an obligation as class counsel, I had an obligation,

16 to weed out the fraud.  How you do that is what we wrestled

17 with before you for months and months.

18          So I think what we did was appropriate and fair.  I

19 thought we were always mindful of trying to treat everyone

20 fairly, almost I guess too fairly, because what happened was

21 so many people filed the claims, and then we had fraud, and

22 then we had to figure out fairly how to do that.  But I think

23 every step of the way we dealt with each challenge as they

24 came up in a thoughtful way, with your assistance, in a

25 collaborative way with the defendants to try to treat

19

1   everyone fairly.

2           And I'm not sure if I could do it all over again

3   what exactly I would have done differently.  Perhaps we

4   should have done a document verification process from the

5   very beginning.  But even if we did that, your Honor, then

6   this criticism for, oh, you're putting up too many burdens

7   for folks to file a claim.  When we decided to go with the

8   documentation verification, that was only after KCC told us

9   there is fraud here in the portal.  I was resistant at the

10  very beginning of the case to make it really hard for people

11  to file a claim, because I thought that was unfair.

12          So it's like every step you take there's an up side

13  and a down side, and the best I can do as class counsel is

14  try to navigate the class to an end result in a fair -- the

15  most fair process possible.  And I think we've done that.

16          So your Honor, back to kind of the overview of the

17  factors, and they're the Synfuel factors, was there good

18  notice in the case.  Absolutely.  Was the settlement at arm's

19  length.  This is a 2012 case.  As you can tell from some of

20  the briefing, even up to today in regards to Mr. Charvat's

21  incentive award, this was a very adversarial, contentious

22  process.  Not that we didn't get along and act

23  professionally, but this was not a collusive situation.  This

24  litigation was fought long and hard.  We mediated with a

25  mediator over a full day, and we were able to come to a final

1    agreement.

2             So notice, I submit notice was excellent in this

3    case.  Was it the best notice practicable, yes; was the

4    settlement arms length, yes.

5             Then we get into the Synfuel factors, what's the

6    opposition to the settlement.  We have 30 objections.  We've

7    dealt with them in the briefing.  A lot of them were based

8    upon consumers who misunderstood what type of documentation

9    they had to submit.  We have a few remaining objections about

10   admin costs and fees and incentive award that we can deal

11   with.  But in terms of substantively to the settlement, I'm

12   not hearing a whole lot of objections to the actual terms of

13   the settlement.

14            Opt outs.  The courts often look at opt outs.  In

15   this case there were about 280 opt outs.  In terms of the

16   fairness of this process, your Honor, I think that's an

17   important point, is that when we first came to you for

18   preliminary approval and we did the claim process, we had the

19   typical claims objection deadline and opt out.  That was

20   there.

21            What we did, and what I insisted that we do, is

22   that when we ran into challenges, for example, we sent out an

23   email after the media coverage exploded, and if the number of

24   claims were all valid, people were going to get $2.00.  And I

25   was worried about that, and I wanted to make sure class

1    members knew that; that if they wanted to participate, the

2    check was going to be very small, and give them another

3    opportunity to opt out.  And you approved that.  So we opened

4    up the opt out again.

5           So then when fraud was found in the portal claims,

6    and we went through a verification process, class members

7    were given a third opportunity to opt out.  I think that's

8    important to keep in mind in terms of the fairness, which is

9    what you're focusing on and what I'm focusing on, is that we

10   told consumers you could get as little as $2.00.  And they

11   stayed in the case.  When we said to consumers you have to

12   submit a phone bill to show you own the phone, they were

13   allowed to opt out.

14          So we have objector counsel here representing

15   clients, and they want $500 for each of their clients.  They

16   could have opted out.  They are all represented by competent

17   counsel.  They could have pursued their own claims on their

18   own, got a lot more than $500.  They chose to stay in this

19   case.

20          THE COURT:  If you had known at the time you went

21   to mediation the number of claims that would be submitted and

22   the number that would be treated as valid claims, do you

23   think you would have accepted $12.5 million as an upper limit

24   from the defendants?

25          MR. McCUE:  Yes, your Honor.

1    THE COURT:  Why would that have been justified?  I
2  appreciate, you know, maybe if you went back in time you
3  don't know if you would have done anything differently, but I
4  guess that's what I'm trying to think in terms of --
5    MR. McCUE:  Sure.
6    THE COURT:  -- what the real litigation risk was
7  here, what the real value of this case is, and the
8  compromise.
9    It seems to me that that number of anticipated
10  claims was something that must have been taken into account
11  on both sides in deciding what a reasonable compromise was,
12  and now we know that it turned out to be much different.
13    MR. McCUE:  Sure.  Sure.  So again, when we're
14  negotiating a deal, the best we can do is look at what is a
15  fair expectation of claim response.  So we start with
16  Mr. Charvat's campaign.  So that was roughly 400,000 people.
17  They got a postcard.  So we knew from the folks that are in
18  the Charvat telemarketing logs -- the logs were day to day to
19  day.  So we knew if Charvat was on June 1st, that's a log
20  that we could look to that we know that those folks got
21  cruise calls.  Those consumers got a postcard.  Got actual
22  notice.  The consumers who got indirect notice, media notice,
23  were people who were in the dialer database, but we didn't
24  know if they got a cruise call or not or didn't get a cruise
25  call.

1      THE COURT:  So is that really the crucial decision

2   here that has led to sort of everything that followed that

3   decision to include all the people from that dialer database,

4   even though, from what I understand, there was nothing in

5   discovery that indicated that you would be able to

6   independently establish which of them actually got calls?

7      MR. McCUE:  Sure.  So that is a perfect example of

8   the Catch 22.  So I know from the evidence that there's

9   complaints from consumers, other than Mr. Charvat.  I got a

10  cruise call on X date, I got FOIA records from the FTC that

11  have hundreds of complaints from consumers of getting

12  telemarketing calls from RMG relating to the cruise lines on

13  other dates.

14      I know as class counsel that if I just focus on

15  these three Charvat campaigns, all these other folks who got

16  these calls aren't allowed to participate.

17      The cruise lines want a general release.  We're

18  trying to provide that release.  I want people to participate

19  in a fair manner.  So do I say, oh, it's only 400,000 and

20  that's it, and nobody else can participate?  Is that fair?

21  Or what I chose, what my team chose to do is advocate for an

22  open process, where folks could file a claim and have to

23  attest under pains and penalties that they remember getting a

24  cruise call.

25      So there was some type of verification.  So it's an

24

1   example of no matter what you do, it can be criticized.  And

2   that's okay.  That's part of this process.  But when you

3   asked would I take twelve five if I knew this was the number,

4   then you need to get into the risk of the litigation.  Right?

5   Because if you don't certify or if a jury doesn't come back

6   for the plaintiff, there's zero.  So you have to look at the

7   risk.

8           And we fought this case for six years.  We believe

9   in this case.  We believe in Mr. Charvat.  There were three

10  defendants.  The evidence as to each of the defendants is

11  very different.  The vicarious liability challenges as to

12  each of the defendants are different.  You have to prove

13  agency.  Actual agency.  Apparent agency.  Ratification.

14  These are real legal burdens.

15          Then you have to deal with ascertainability.

16  Proving do these call records connect to the consumer.  The

17  cruise lines or RMG came up with arguments that, oh, maybe

18  sometimes we stopped the dialer.  Like even during a Charvat

19  campaign.  Oh, we stopped the dialer.  Maybe we put a hotel

20  prerecord in there.  Maybe.  So they had different arguments

21  there they were trying to develop evidentiary to challenge

22  ascertainability.

23          There was a battle of the experts over consent.

24  There is a whole -- so you line up all the different

25  arguments, and we were prepared to deal with every one.  This

1  case was fully briefed on class certification.  You had our

2  best shot, and you had their best shot.

3          But was there risk?  Absolutely there's risk.

4  There's class certification risk and there's trial risk.  So

5  as counsel I need to balance all those factors.  Is it better

6  to be super-aggressive and get zero, or is it better to try

7  to come to a reasonable settlement?  In this case we went to

8  a reasonable settlement.

9          THE COURT:  And is part of that analysis the idea

10  that, as you mentioned at the beginning of your presentation,

11  one of the real goals is to provide a negative incentive here

12  for this sort of behavior.  So it's an idea of what's a

13  sufficient amount to prevent similarly-situated parties from

14  engaging in this conduct, and sort of a general deterrence,

15  specific deterrence kind of thing so that these parties know

16  you can't make those kinds of calls, and while obviously

17  there is also a goal of compensating the people who received

18  the calls, there's an independent kind of goal of this sort

19  of action of deterring the conduct.

20          MR. McCUE:  That's a huge part of this process,

21  your Honor.  When you look at the TCPA, its legislative

22  purpose, it was to make consumers like Mr. Charvat into

23  private attorney generals.  You don't see the federal

24  government enforcing the statute.  You don't see it.  You see

25  private consumers enforcing the statute.

1    So regardless of the individual per pay out,

2    $22.00, you can look at that and say, well, that's too low,

3    or you can look at that and say, hey, good for Mr. Charvat

4    for fighting for six years to hold these people to account,

5    and RMG is out of business, and the cruise lines are going to

6    think really, really hard about who they hire next time.

7    That's a good result.  That's a good result for consumers,

8    it's a good result for public policy.

9    So your Honor, the admin expenses you've expressed

10   concern about, we're going to supplement the record on that.

11   Opposition to the settlement, I was discussing about how if

12   actual objections are .01% of total claims.  The opt outs,

13   given how many times people are allowed to opt out, I think

14   is a significant part of why this is a fair deal.

15   We have extensively briefed up attorneys' fees,

16   your Honor, and I'm happy to answer questions that you have

17   about my fees.  What I will say is that we shaved our fee by

18   over a million dollars to reflect the increase in admin in

19   this case.  Had nothing to do with anything else.  Our

20   initial fee request right after preliminary approval was in

21   accord with Pearson.  We amended our petition to again be in

22   accord with Pearson after the admin went to three million.

23   Our expenses are in line with this type of case, significant

24   investment in a case over five years.

25   If you have specific questions about fees, I'm

1    happy to answer that.

2           The other issue is Mr. Charvat's incentive award.

3    He's here today.  He's happy to answer any questions you have

4    about his incentive award.  That's all been briefed up.  I

5    will make it crystal clear that it's not Mr. Charvat who has

6    said I want 50 grand or that's it.  I am recommending that

7    for him because I feel he's entitled to it given what he went

8    through on this case, looking at other cases and what the

9    courts have approved in incentive awards.

10          In our briefing we lay out exactly what happened

11   and the defendants' attacks on him.  They accused him of

12   committing fraud, which was absolutely inappropriate and

13   without merit.  They accused his daughter of planting consent

14   evidence on the internet.  That's absolutely false.

15          RMG sued him for wiretap violations, putting

16   himself at risk.  The cruise lines filed a motion to dismiss

17   saying he acted unethically with unclean hands.  All those

18   efforts were rejected, but they've attacked his reputation at

19   every turn.

20          I represent Mr. Charvat in another case where the

21   first thing the defense attorney did is, oh, he's the guy who

22   plants consent evidence on the internet.  See Carnival Cruise

23   Lines.  That's an impact on someone's reputation.

24          THE COURT:  How many other times have you

25   represented Mr. Charvat?

1            MR. McCUE:  I represented Phil for probably 15

2       years.  I represented him in -- I don't know how many cases,

3       but 15, 20 cases.

4            MR. CHARVAT:  10 or 15.

5            MR. McCUE:  Phil tells me 10 or 15.

6            Another important issue with Mr. Charvat, your

7       Honor, is that key to this case was vicarious liability.  The

8       seminal order on vicarious liability under the TCPA was

9       issued by the Federal Communications Commission in 2013.

10      Mr. Charvat was the lead consumer representative on that

11      file.

12           So he's been fighting against illegal telemarketing

13      for a very long time.  There has been a pretty concerted

14      campaign to paint him as a serial professional plaintiff.

15      I'm not sure what that means.  He's a telemarketing activist.

16      He's proud of what he does.  He has been the reason why

17      appellate court decisions have issued favoring

18      interpretations of the TCPA in favor of consumers over and

19      over and over again.

20           He's been a class representative in a number of

21      cases that have resulted in significant moneys going back to

22      class members.  And as I pointed out in one of my briefs, in

23      one of our recent cases called Monitronics, he was offered an

24      offer of judgment for him to go away and drop the case of

25      $50,000.  And he said no because the offer did not offer

1    anything to the class.

2            So the case went on thankfully because of him, and

3    the case settled for $28 million in favor of consumers.  He's

4    not even going to get a $50,000 incentive award in that case.

5    But the reason consumers are going to recover is because he

6    stood up and fought back and did not accept a pickoff.

7            So there's been, oh, he's running a business, he's

8    doing this.  No, he's not.  He's doing exactly what Congress

9    told him to do, asked him to do.  He's fighting for

10   consumers.

11           THE COURT:  And I don't know under these

12   circumstances whether I should consider serial plaintiff as

13   an insult or a compliment.  I don't know that I really care

14   one way or the other.  But it does strike me as a bit odd to

15   suggest that the particular hardships of this case are a

16   basis to give him what I would consider to be a fairly

17   exceptional incentive award, given that frankly he seems like

18   somebody who must have known what he was getting into.

19           This isn't a situation where a complete novice

20   litigant gets involved in litigation for the first time and

21   then has to deal with all of this stuff.  There certainly

22   have been other cases where his -- where he's been identified

23   as a serial litigant and questions have been raised.  He

24   knows what's involved in depositions.  I can't imagine that

25   this was the first group of defendants that have gone into

30

```
1   his background and looked at his internet usage.

2          Why such a huge bump up in the incentive, given

3   that he's -- he is an exceptional plaintiff, he's somebody

4   who, if I accept what you're saying at face value, is more

5   interested in the principle behind it than the money anyway.

6          MR. McCUE:  Absolutely it is.  But was it fair for

7   him to be sued.  Right?  Was it fair --

8          THE COURT:  I mean, the defendant that sued him was

9   RMG.

10         MR. McCUE:  Your Honor, they were in a joint

11  defense agreement, right?  The cruise lines were the first

12  ones to come up with this theory.  On a motion to dismiss,

13  they tried to say because he tape recorded the calls he had

14  unclean hands.  And they won -- this is before Judge Zagel.

15  They asked him to dismiss the case.  He said no.

16         Then RMG turns around and files a third party

17  complaint against him.  Do you really think that Beth Valenti

18  came up with this idea?  I submit to you no.  They were

19  acting in concert.

20         THE COURT:  I'm not sure what her abilities would

21  be to come up with it on her own, because she's been absent

22  for most of the time that I have been involved in the case,

23  which is another reason why that particular angle of it,

24  perhaps just from my vantage point, seems a little odd.

25  Because since I have been in the case she's only been
```

1  marginally involved and has not participated in the
2  settlement process at all from what I've seen.
3              MR. McCUE:  Right.  Right.  Respectfully, why
4  should it matter if it's the defendants or if it's RMG.  He
5  still was sued, and they left it pending for over a year.
6  And it was frivolous.  They did it to leverage him, to try to
7  scare him to try to get him to go away.  That's what's
8  exceptional about this case.
9              They went out to California, deposed his daughter,
10  asked questions about her boyfriend.  They said his daughter
11  planted evidence on the internet.  They said he tried to mask
12  his IP address.  It was all total nonsense.  We had to go and
13  take depositions of these different shady characters in the
14  lead industry to figure out where these IP addresses came
15  from.  It ended up coming back saying, oh, this is fraud.
16  That's where the end of the road came down to, is that these
17  leads they have for Charvat were made up.  And we had to
18  fight for that.  We had to fight for his reputation.
19              So that's what is exceptional about this case.
20  Yes, he's a tough guy, he's been through this before, he
21  knows what's going to come back at him.  But never before,
22  never before have defendants gone after someone so personally
23  as in this case.
24              And I remind you what he said in his declaration.
25  He just wants to be treated fairly by you and acknowledged

1    for what he does.  The exact number, we defer to your good

2    discretion about what that number is.  But I ask that you

3    acknowledge what he went through.  And not the serial

4    plaintiff stuff, whatever, it's the fact that they sued him.

5            Is there any other questions that you have, your

6    Honor?

7            THE COURT:  I think that's all for now.  So I think

8    what I'd like to do is see if there are any of the defense

9    counsel who would like to add, particularly on the issue of

10   the overall fairness of the settlement, I'd like to put to

11   the side for a moment the issues with the incentive fee,

12   because I do have questions on that, but I think that's a

13   more extended discussion.  I have many --

14           MR. McCUE:  Mr. Charvat is happy to answer

15   questions personally if you would like, your Honor.

16           THE COURT:  So focusing on the overall -- all of

17   the factors in considering the fairness and adequacy of the

18   settlement, I'll hear from defense counsel if there is

19   anything you would like to add, and I think I indicated some

20   of my areas of concern in discussion with Mr. McCue.  So if

21   there is something you want to address there, feel free.

22           Ms. MacIvor?

23           MS. MacIVOR:  Yes, your Honor.  And if I'm getting

24   too detailed, feel free to let me know.

25           First I'd like to clarify a few things.  RMG, and

1    we set this forth in our brief, RMG never made calls for the

2    cruise lines.  Not one.  There is no agreement to do that,

3    there is no indication from every RMG deposition that the

4    plaintiffs took.  As a matter of fact, RMG said, every

5    witness said we made calls for RMG.

6        The background in that is that RMG used the

7    cruises, certificates and that type of thing, as a promotion

8    for their own business, to grow their business, which was a

9    travel club.

10       As a matter of fact, there is evidence in the

11   record that we cited in our memorandum brief that one of the

12   cruise lines contacted RMG and they were specifically told

13   before the complaint was filed and after the complaint was

14   filed that RMG was not making robo calls referring or

15   relating to the cruise lines.  So I would like to clarify

16   that.

17       And additionally, just one other clarification.

18   We're not necessarily, from the defense perspective, we're

19   not critical of the media coverage because that goes to

20   notice.  The issue is that it was the wrong information.

21   That's the problem.  It's not the fact that the media was

22   covering it, it's that they were telling people things that

23   weren't true.

24       Now, getting to the fairness factors, the case was

25   always a challenge for the plaintiffs factually for one of

1    the reasons that I've just mentioned.  There's no evidence
2    from any RMG employee, they refuted the fact from the very
3    beginning, and every witness, including Beth Valenti, there
4    is an affidavit where she said that the cruise lines were
5    unaware of what was going on.  There is her deposition
6    testimony, they took the deposition of numerous other people
7    within RMG.

8         There are proof issues that they also had that your
9    Honor has mentioned in court before, mentioned today.  Their
10   own expert admitted that there is no forensic way to
11   determine whether calls were made referencing the cruise
12   lines, cruises as a promotion.

13        Our expert contacted the person who worked with the
14   manufacturer of the auto dialing equipment, Asteria, and
15   Asteria, that person, Mr. Ringenback, also said that there
16   would be no way to forensically determine who made what
17   calls.

18        Now getting to the fairness factors, the first one
19   that the Court mentioned, the expected value.  We detailed
20   that extensively in our brief.  And while if everyone in the
21   class received the full $500, or even if willfulness were
22   found, there would be millions and millions and potentially
23   even more than that.

24        Synfuel takes into account discounts for defenses.
25   And in order to recover completely, this is what would have

1    to happen.  If the plaintiff could identify the telephone

2    numbers that corresponded to the numbers dialed in only three

3    campaigns, and as I mentioned before, there were serious

4    issues with that, the manufacturer of the database and the

5    person who created it said that that couldn't happen.  If

6    class members could demonstrate that they received a call

7    referencing the cruise lines, which for that reason would be

8    exceptionally difficult, if the plaintiff could prevail on

9    class certification and we raised a number of good defenses

10   to that that I will get to, if they defeated our motion to

11   strike their expert, it was the only -- that expert was the

12   sole basis for certifying the class.  And he, himself,

13   admitted that his own methodology was faulty at his

14   deposition.

15           And if the plaintiff survived summary judgment, and

16   it's not coincidental that this settled around the time that

17   we had prepared and were ready to file a motion for summary

18   judgment, now, the best case scenario was millions and

19   millions of dollars.  But as the Court is well-aware, we

20   cited a number of cases where this settlement falls generally

21   in line with cases that have held that for due process

22   concerns you can't award in a TCPA case millions and millions

23   of dollars or potentially even a billion; that the idea, as

24   the Court mentioned, the idea is to reward some moneys that

25   they were concerned and to take into account defenses.

36

1    Specifically Synfuel at 463 F.2d 653 and Wong at
2    773 F.3d 863 through 64 said the value of claims must
3    discounted based on the numerous difficulties.  And here
4    there were plenty.  There is no forensic possibility of
5    matching the sounds in this database or the recordings with
6    the numbers that were called.
7        There has also been a substantial amount of
8    difficulty finding people.  If we were to take everyone in
9    that database, you can't even match up some of the phone
10   numbers.
11       Consent would have been a huge issue to overcome.
12   There is also existing business relationships.  Now, the
13   issues with consent are that there is consent that RMG
14   obtained in a number of ways, which we fully briefed in class
15   certification, I'm sure the Court is aware of that, there is
16   numerous issues with preexisting -- with existing business
17   relationships.
18       As for summary judgment, this is a very big issue
19   for the plaintiff.  In order to demonstrate actual authority,
20   there is none.  There's no agreements, there's a lack of
21   evidence, most specifically over any control that the cruise
22   lines, all three of them, collectively or individually
23   exercised over RMG.  There is just none.
24       Ms. Valenti's testimony was:  I was in control, I
25   created the scripts that were used for the recordings, I

1   decided who would be called, when they would be called, what
2   would be said.

3            And as far as switching out, what Mr. McCue was
4   referring to, switching out the recordings, that's important.
5   Because you would have to assume for the plaintiffs to
6   prevail that the same recording was made all the time.  Even
7   Mr. Charvat's recordings that he included in his complaint
8   showed that the recordings were different.  That in and of
9   itself shows that they were switched out from time to time.

10           And there's plenty of evidence that we provided in
11  response to class certification and in our memorandum in
12  support of final approval that demonstrates that that did
13  happen.  Mr. Smith, there's an excerpt from his deposition in
14  our final approval brief where he said it happened all the
15  time.  There is no evidence to the contrary.

16           For apparent authority, the plaintiffs would have
17  to show that the entire class believe that RMG called them as
18  a cruise lines agent, and that that belief was traceable
19  somehow to some action made by the cruise lines that would
20  make them believe that.  There is no evidence of that.  There
21  is no evidence of communications directly with the cruise
22  lines and any of these class members.  That would be almost
23  impossible.

24           The other issue for a parent agency, like I said,
25  control also goes to that, which I've addressed.

1        THE COURT:  You're doing a good job of convincing

2    me that you shouldn't have settled at all.  You should have

3    just filed your summary judgment motion.

4        MS. MacIVOR:  Believe me, that's something my

5    clients raised.  And all three cruise lines were not happy

6    with this.  This is a case where unfortunately --

7        THE COURT:  Of course, I don't mean to actually

8    suggest that I have a view --

9        MS. MacIVOR:  I understand.

10        THE COURT:  -- on any of the summary judgment

11    issues.  It was meant more of a comment on the sort of very

12    detailed, and thorough, and seemingly very strongly-held

13    view.

14        MS. MacIVOR:  If I'm going into too much detail I

15    can reel it back.  So these are some of the factors -- I

16    won't go into class certification, I'd just like to give you

17    a couple things.

18        Let me go to a couple of the other Synfuel factors.

19    As for No. 2, the continued litigation, the expense of that,

20    there were -- at the time of settlement there were 566 docket

21    entries, 15 depositions in four states, 30 discovery

22    hearings, 26 status conferences before your Honor, 700,000

23    documents exchanged.  If it hadn't been settled, we estimate

24    a minimum of 15 additional depositions.  We would have asked

25    for class discovery on consent and on existing business

1    relationships.

2            As for the Synfuel --

3            THE COURT:  Let me stop there.  Would it have been

4    an issue for like each class member -- when you say class

5    discovery on consent, I'm having a hard time envisioning

6    that.

7            MS. MacIVOR:  We believe that that was an

8    individual inquiry, because there was substantial evidence

9    that there was a lot of consent, which we detailed.  And I

10   could give your Honor the specific references in the briefs,

11   I would be happy to tell your Honor that.  So we would have

12   to ask for discovery from each -- when we have information

13   that certain numbers -- we would have to go through, verify

14   the number, then we would ask for discovery relating to

15   existing business relationships and as to consent.  It would

16   be the only way we could prove it.  It would be very similar

17   to the way we did with Mr. Charvat and his daughter.  You

18   would have to -- that was an individual issue.

19           As for the Synfuel factor No. 3, the lack of

20   opposition to settlement, Mr. McCue touched on that briefly.

21   287 opt outs is only 0.10% of the class.  30 objections

22   represent only 0.01% of the class.

23           When you get to the fifth Synfuel factor, the

24   amount of discovery completed, time, I touched upon that

25   above.  The cruise lines added an additional benefit of over

1    969,000 by processing the supplemental claims.  RMG isn't

2    making calls, based on the cruise lines' request that they

3    stop doing so.  Demand actually.

4         So we believe that the settlement is fair.  It is

5    more expansive than what the litigation class would have

6    received otherwise.  There are people who would not be able

7    to prove up their calls if they made individual claims.  It

8    would be difficult for them to do it in a class because there

9    is no forensic evidence of how to do it.

10        And I would just like to add, just to clarify the

11   issue in case I don't get a chance later, as for the

12   incentive award, RMG was represented by counsel when RMG

13   sued, so it wasn't just Ms. Valenti.

14        Other than that, I don't have anything further

15   unless the Court has questions.

16        THE COURT:  I don't think so at this point.  You

17   addressed them.

18        MR. BECKER:  Very briefly, Judge.

19        THE COURT:  Mr. Becker.

20        MR. BECKER:  Good morning still, your Honor.

21   Jeffrey Becker on behalf of Carnival.

22        I'm not going to reiterate everything that

23   Ms. MacIvor and Mr. McCue just said.  This was a hard-fought

24   lawsuit.  The substantive merits of the underlying vicarious

25   liability and certification issues are well-documented in the

41

1    briefs.

2          I do want to address a few numbers that I think are

3    really important for your Honor to understand in context,

4    because you touched on it with Mr. McCue earlier, and I think

5    we need to understand the 2.6 million submissions that came

6    in after the news media came about, those aren't 2.6 million

7    individualized claims.  Those are people.  We don't know a

8    lot about those numbers.  They're very raw numbers.

9          So what we know about this is 2.6 million

10   submissions came in.  How many of them were from the same

11   person we're not sure.  We do know that when KCC did their

12   fraud analysis multiple submissions, more than 20 in many

13   cases, came from the same address or the same IP address,

14   which led them to believe that there was fraud in the system.

15         What we also know is that once we got to a later

16   stage in this litigation, once KCC was able to de-duplicate

17   things, those numbers drastically shrunk from the later

18   population.

19         So I want to make sure that when the Court looks at

20   this and says, gee, 2.6 million submissions came in, doesn't

21   that make you think that maybe you underestimated the value

22   of the case earlier on?  Absolutely not.  From the cruise

23   lines' perspectives, we came into this in a mediation when

24   certification had been briefed, when we were ready to file

25   summary judgment on vicarious liability.  And we sat down in

1    Florida, we all flew down there together, with a very

2    experienced mediator who drilled everybody on all of their

3    strengths and all of their weaknesses, and I think when the

4    number came out the other end after we had some time to

5    reflect on this, we came to a settlement we thought was fair.

6            Because the other thing about that 2.6 million

7    submissions that you mentioned, those were all from the

8    indirect class.  Right?  There were 50,000 direct

9    submissions.  These are the people that were in the three

10   Charvat campaigns.  The only campaigns that the plaintiff

11   actually sought to certify in their motion.  Which means the

12   2.6 million submissions that got reduced to approximately

13   400,000 supplemental submissions, they wouldn't have gotten

14   any relief on a trial on the merits.  They weren't part of

15   the certification in the litigation.

16           The cruise lines saw that there was certainty in

17   resolving this on a global basis; that the idea of allowing

18   the 2.6 million people to provide some information to show

19   they're connected with that phone number to forego the need

20   to prove that their call department with a cruise call,

21   cruise call, quote, versus a non-cruise call, put that to the

22   side and said everyone is welcome to participate.  You don't

23   have to prove this.

24           THE COURT:  So then the question that I have for

25   Mr. McCue, which was essentially why go with the broader

1    database even though you couldn't show that all of those

2    people in the database received a call, I think you're

3    addressing that in part by saying that from the defense

4    perspective it provided certainty that this issue could be

5    put to bed.

6              MR. BECKER:  We have 600 docket submissions, and we

7    haven't even gotten past certification yet.  Throughout the

8    settlement process we've had so much, that's absolutely

9    right, because even if at the end of the day this case went

10   past certification, pro or negative, even if it went past

11   summary judgment, pro or negative, or a trial on the merits,

12   there are still appeals that we had to deal with.  And the

13   idea that the cost of litigation and the uncertainty as to

14   where this would go -- because, again, only three campaigns

15   were being addressed in the case, it allowed us to globally

16   settle every call that RMG could have possibly made.

17             So when RMG made these calls, and we then said

18   we're going to settle this on a global basis, we have the

19   database, we can cross-reference it through the settlement

20   administrator, allow us to settle on a class-wide basis, they

21   allowed us to.  And we agreed to that.  And that made sense

22   for us.  And for them to be able to offer individuals -- who

23   would not have been part of any trial on the merits -- relief

24   of some sort without ever having to prove that they got a

25   call that mentioned a cruise, that makes sense to everybody.

44

1       And so we have these 2.6 million submissions.  We

2  don't know who they are.  How many are duplicative or not.

3  And then we open up the process to allow for supplemental

4  evidence to be provided by that population.  The response

5  rate was 14.75% or so, of 400 -- 397,000 submissions came in.

6  That's actually a higher response rate than the direct notice

7  response rate, where they didn't have to submit anything.

8  That was around 14.5%.  That's in our briefing.

9       So the idea is we see a population of individuals

10  who say, gee, I might get $900 for this?  I'm in.  Here's my

11  number.  Here's my information.

12       The fact that we had to go through a process to

13  verify those claims, because the administrator looked at them

14  and testified there is an issue here, makes sense.

15       And we came before you multiple times during this

16  process to talk about the process, and how we would do it,

17  and how we would see that it was fair.  We made it as easy as

18  possible for people to submit and show that they have claims.

19  And they did.

20       And so now that we have several hundred thousand

21  individuals who don't have to prove what kind of call they

22  got, right?  50,000 are from direct, about 250,000 of them

23  are indirect notice claimants.  They don't have to prove what

24  kind of call they got, what was said.  They provided us

25  documentation, and it provides us with a very vast class now,

1   where $22.00 approximately is going to be provided on average
2   to each of these claimants.

3          It was enough, your Honor, that if you read the
4   briefing closely, one of the objectors who originally started
5   out by mentioning the word vicarious liability a single time
6   in his objection, saying this would be easy, plaintiff made
7   it clear in their complaint how easy it is.  It's a testament
8   to a wonderful pleading by the plaintiff, but once the
9   objectors spoke with the defendants and started looking at
10   the evidence that wasn't yet in their record on vicarious
11   liability, that tune changed a bit.

12          And I believe some of the objectors today are here
13   to say we're no longer looking at the issue of the amount of
14   money per claimant as an issue that would stop certification.
15   They're now saying it's within the realm of fairness and
16   reasonableness.

17          So I just want to make sure that when we talk about
18   these big numbers they're in context.  We didn't know what
19   the 2.6 million population actually looks like.  What we do
20   know is hundreds of thousands of people participated when
21   given the opportunity to provide additional information.

22          So when the defendants look at this case and how
23   much work we put into the process, how much additional
24   funding we put into this process to make sure that the
25   settlement fund was there and reasonable for the claimants,

1   we think it's absolutely fair and reasonable, and we think
2   that after a mediation with the mediator that we went through
3   this with, the fact that two parties on opposite sides of
4   this were able to figure out a way to make this work as
5   fairly and reasonably as possible for everybody, including
6   claimants who would have received zero dollars at trial, I
7   submit to you that is a reason to proceed with final
8   certification.

9         THE COURT:  Is there any concern on the defense
10  side here about the fact that so much of the money that you
11  agreed to put into this, ostensibly primarily to compensate
12  people who received the calls, is going to claims
13  administration and plaintiffs' attorneys' fees?

14        MR. BECKER:  The claims administration process was
15  extensive.  And through our discussions with the claims
16  administrator, we asked them to reduce and cap their fees.  I
17  believe it would have been substantially higher than $3
18  million if everything that we had to go through was tagged on
19  to this.

20        So, you know, I can't fault KCC for what the media
21  said.  As Ms. MacIvor made a point, we don't fault broad
22  notice by the media.  We're glad to see it reached 88 million
23  people.  That's wonderful.  The problem is when 88 million
24  people receive information that let's them think you're going
25  to receive $900 -- I've got people in my firm saying, looks

47

1    like I'm getting a free cruise out of this.

2          It was not clear.  And when it led to that many

3    people submitting claims, and us having to work together with

4    plaintiffs' counsel, with the administrator, with all of our

5    clients and the cruise line counsel to find a way to address

6    that issue, the fact that KCC has capped their fees, I don't

7    think, when you look at the actual settlement payment coming

8    out of it, it's unreasonable.

9          And again, with plaintiffs' fees we're not taking

10   an issue on plaintiffs' fees, but when you look at the amount

11   of money left over after all is considered and it allows for

12   an aggregate payout on average of over $20.00 per claimant,

13   the fact that we made it into this realm of reasonableness,

14   when very early on we came to you asking for allow us to send

15   a notice saying it's going to be a few dollars, the fact that

16   we are where we are right now I think makes it substantially

17   reasonable to go forward with the case regardless of what

18   amount of money you award to plaintiffs' counsel or the

19   administrator.

20              THE COURT:  Okay.  Thank you.

21              MR. BECKER:  Thank you for your time, Judge.

22              THE COURT:  Okay.

23              MR. McCUE:  Briefly, your Honor?

24              THE COURT:  Mr. McCue wants to add something.  Go

25   ahead.

1    MR. McCUE:  10,000 foot view, your Honor.  I just
2    want to reemphasize a few things, is that when complications
3    came up in this admin, I think this is frankly a model
4    situation where we worked with the defendant and with you to
5    figure out what to do.
6         From the plaintiffs' side, we have voluntarily
7    agreed to shave our attorneys' fees over a million dollars.
8    From the defendants' side, we negotiated a process where a
9    lot of the backroom verification work would be done outside
10   of admin that added another million dollars in value to this
11   case.
12        From the class administrator's perspective, they've
13   agreed to cap their fees and will provide more documentation
14   about their fees.  But I do want to give a little more
15   elaboration about the class admin.  We have worked with KCC
16   on many cases, we've worked with all of the class action
17   administrators.  They do an excellent job.
18        THE COURT:  How often would you say that you
19   personally have worked with KCC?
20        MR. McCUE:  Probably ten other class actions.  But
21   I have worked with all of them --
22        THE COURT:  Would you say that that's more frequent
23   than how often you've worked with other class administrators?
24        MR. McCUE:  I would say that recently, because they
25   do exceptional work, and they are our administrator more

49

1    often than not, but we've worked with AB Data and Epic on

2    other cases as well.  We also always go through a competitive

3    bid process, which we did in this case as well.  So that is

4    all done at the front end.

5           THE COURT:  Because the concern might be if I were

6    an objecting class member that we've got a lead plaintiff,

7    plaintiffs' firm, and an administrator that perhaps work

8    together a lot, and they're the ones who, for the most part,

9    are not taking the cut in their fees as a result of the

10   changed circumstances.

11          And I appreciate that KCC has agreed to cap it at 3

12   million, and I appreciate the efforts that have been made to

13   try to manage the fees for attorneys and the administrator,

14   but I can imagine that from the outside, for a typical class

15   member, one might look and say it's the repeat players who

16   work together all the time who have structured this to make

17   sure that when things didn't go the way that was planned,

18   they still get their money, and our recovery is a whole lot

19   less.

20          MR. McCUE:  Sure, your Honor.  There is a dark side

21   interpretation of lots of things.  Is that the truth?

22   Absolutely not.  Our fee, we could come before you even under

23   this number and try to get a third of the gross settlement

24   fund.

25          If you look at Pearson, it would be towards the

1    upper threshold of Pearson, but it still would be compliant

2    with Pearson, it wouldn't be over 50%.  As class counsel I

3    was not comfortable with that.  I thought I had an obligation

4    to the class to get as much money, to do everything I could,

5    but also to recognize the fact that we worked for six years

6    in this case and spent over 4,000 hours of attorney time on

7    this file, almost a quarter million dollars in expenses.  So

8    we have agreed to take a significant cut on fees to try to

9    get this settlement approved.

10           From the class action administrator's perspective,

11   no matter who we had selected, we would have the same issues,

12   your Honor.  No one who we selected would have made a

13   difference.  Because they had 2.7 million claims filed, those

14   have to be processed and assessed.  And when you only think

15   that it's going to be, you know, a hundred thousand claims,

16   and you get 2.7 million, the numbers are going to go up.  No

17   matter who you hire.

18           And I do want to emphasize the chronology of what

19   happened here.  We hired them to do the notice, they did

20   that.  The press release, they did that.

21           And then things go sideways.  2.7 million claims

22   are filed.  Starting from that point, the bid is out the

23   window.  The estimates are out the window.  Because you have

24   to -- you can't just give up on the class and walk away.  You

25   have to administer what you have in front of you.

1    So they had to process 2.7 million claims, they had

2    to create new data infrastructure to do that, assign

3    additional people to do that.  They had to do a fraud

4    analysis to advise us in terms of are all these all

5    legitimate claims.  They helped us come up with a cure

6    process.  They participated in that.  They sent out multiple

7    new rounds of email notice.  They ran call centers responding

8    to that.  All of that was unanticipated.  All of that.

9    Then we get into the verification process.  We got

10   hundreds of thousands of submissions.  Some of these are

11   snail mail, email, portal.  All of that data needs to be

12   organized so that the cruise line attorneys and myself could

13   assess all that stuff.  It still had to be managed and

14   processed.

15   We extended the process a few times at your

16   direction.  Emails had to go out about that.  Calls came in

17   about that.  This is all new work.  And KCC will supplement

18   the record and back that up.

19   But I submit to your Honor that 7,000 hours of

20   time, over 50 people working on it, over a million dollars in

21   out-of-pocket expenses, it is a lot of money, your Honor,

22   there is no doubt about that, but it's not unreasonable or

23   unjustified.

24   The last thing that we're working on right now is

25   this cure process.  That's another example of how we tried to

1  be as fair as possible.  So even when we sent out a

2  verification email to consumers after all this process and

3  they responded with something, and they made a mistake, they

4  sent in the wrong phone bill that didn't match their number,

5  we then contacted them and gave them a two-week process.  A

6  two-week process to cure.  That's what just finished up as of

7  yesterday.

8        So I think when you look at what we did, why we did

9  it, we were measured and thoughtful throughout the whole

10 process.  Can objectors now come in and criticize what you

11 did?  Sure they can.  But does that take away from the fact

12 that this settlement is fair and reasonable?  No.  It's fair,

13 reasonable, and it should be finally approved.

14        THE COURT:  While you're up there, Mr. McCue, one

15 other question, which is:  Other than Mr. Charvat, is there

16 any other member of the class that's being treated

17 differently in any way of terms of what they're getting?  For

18 example, somebody who might have said I'm going to object and

19 then maybe reached a side agreement that --

20        MR. McCUE:  No, your Honor.

21        THE COURT:  -- resulted in withdrawing that?

22        MR. McCUE:  Absolutely not, your Honor.

23        Mr. Charvat is here, your Honor, if you have any

24 questions for him.

25        THE COURT:  Here's what I think I would like to do.

1    I think I'm going to hear from the objectors' counsel next,

2    and then give the parties' counsel an opportunity to respond

3    substantively if you'd like, if there is anything to respond

4    to on any points related to the overall approval of the

5    settlement, at which point after that I'm going to turn to

6    the specific issue of the incentive fee.  Which I know is

7    going to be raised by the objectors, and I know the parties

8    are not on the same page, and I know I have some specific

9    questions on.  But I think it would be helpful to hear from

10   the objectors before turning the focus on Mr. Charvat's

11   incentive fee.

12            Mr. Becker?

13            MR. BECKER:  Can I add one piece of factual

14   information I think it's important for your Honor to be aware

15   of, because we mentioned this final cure period?

16            THE COURT:  Yes.

17            MR. BECKER:  Do you want me to step up, or is this

18   okay?

19            THE COURT:  That's fine.  You can stay where you

20   are.

21            MR. BECKER:  Mr. McCue mentioned this final cure

22   period that's going on, as you may recall.  During this final

23   submission process we gave anyone that submitted

24   documentation that wasn't sufficient another opportunity to

25   cure.  And that went out to several thousand individuals.

1   They had 14 days to do so.  I believe the closure date was

2   either today or yesterday.  Yesterday.

3           So KCC is processing that right now.  I just want

4   the Court to be aware of it, because we do mention in our

5   briefs that based on the total approved claims thus far,

6   which was 274,851, you see the average number per claimant of

7   $22.00 and change that's been approved.  But there was at the

8   time approximately 30,000 or so additional individuals

9   getting a chance to cure one more time.  And so in our briefs

10  and in plaintiffs' briefs you may have seen numbers where it

11  said it could go down to this much if 100 percent of those

12  individuals cure.

13          We're able to say now, based on the numbers

14  yesterday from KCC, there have been a total of 2,567

15  additional approved claims.  And they don't expect that

16  number to go up by more than a thousand after they finalize

17  their review of everything that's outstanding.  So what we

18  expect to see is less than 3,600 additional approved claims.

19          Why is it important?  It's important because the

20  estimate we gave you, the range is much smaller now.  And the

21  floor actually won't go much below I think it's $21.80 or so,

22  whereas in the brief it said it could have gone as low as 19

23  if everyone had approved.  It's important for you to know

24  that that number is finalizing now and that actually that may

25  impact certain objectors' positions on things in a positive

55

1    way.

2              THE COURT:  Okay.  Thank you.

3              Before I hear from the objectors who are here,

4    Mr. McCue, I have another question for you about objectors

5    generally, which is that I went through the docket and made a

6    catalog of all of the objections that were filed, and many of

7    them were people who did express some either confusion or

8    displeasure, or both, with the process, filing objections

9    saying we can't get a hold of the claims administrator, we

10   can't find the phone number associated with our phone, we

11   can't find proof.

12             If I went through that list with you of the people

13   who filed objections, how many of them would you say have now

14   been resolved in the sense that the people who are saying the

15   process isn't working for me, they ended up coming out the

16   other end with a valid claim?

17             MR. McCUE:  Sure.  I don't have exact numbers for

18   you, but from my memory, probably 10 to 15 of those consumers

19   I specifically had email conversations with, answered their

20   questions and helped them file claims.  I wasn't comfortable,

21   though, like asking anyone to withdraw the objection, so the

22   objection is still on the docket.  And I can submit a

23   declaration, your Honor, if that would be helpful on

24   detailing who I spoke with and attaching the emails or

25   something like that.

1          THE COURT:  Would you also be able to confirm with

2   KCC whether or not they're included as a valid claim?

3          MR. McCUE:  Sure.

4          THE COURT:  So that may go onto my list of

5   something to get afterwards, because I think to the extent

6   some people actually had the wherewithal to reach out to the

7   Court in some way to say this process is flawed because I

8   couldn't do X, Y, and Z, to the extent that they end up being

9   able to do whatever they needed to do to have a valid claim,

10   that might give me some comfort that it's not a bigger

11   problem where people were excluded.

12          MR. McCUE:  Sure.  Just to clarify from my

13   perspective, do you want a declaration saying these objectors

14   have filed claims that have been accepted, is that what

15   you're interested in, or is it do you want to know from me

16   who I had communications with?

17          THE COURT:  No.  Just that the claims have been

18   accepted.  And I'm referring primarily to the people who have

19   filed objections, so it's of record, and I feel I need to

20   address them in some way --

21          MR. McCUE:  Yeah.

22          THE COURT:  -- whose objections were based on a

23   difficulty they were having in complying with the process.

24          MR. McCUE:  Okay.

25          THE COURT:  The substantive issues that people are

1    raising about the fairness of the settlement, wanting more

2    money, the incentive fee is too high, those are all things

3    that the parties have briefed, the objectors who are here

4    have weighed in on, and I am comfortable reaching conclusions

5    on those, or the people who actually are of record saying

6    that they had a difficulty with the process.  I think it

7    would be useful to know whether or not they actually made it

8    through the process at the end of the day.

9           MR. McCUE:  Happy to do that, your Honor.

10          THE COURT:  So it's yes or no.  I don't need to

11   know every conversation you had with them, or what was said

12   or anything.  I'll assume that if they're in the valid claim

13   pile that one way or the other they made it through.

14          MR. McCUE:  Okay.  Thank you, your Honor.

15          MR. BURKE:  Your Honor?

16          THE COURT:  Yes, Mr. Burke.

17          MR. BURKE:  Mr. Dewitt wants to say one more thing.

18          THE COURT:  Okay.  Mr. Dewitt, if you would like to

19   approach.

20          MR. DEWITT:  Yes.  Just really briefly, your Honor.

21          I re-read the declaration we have on file, and I

22   think we could have done a better job showing where costs

23   would actually be now as opposed to what the ask in that

24   document is, so we'll do a better job of sketching that out.

25          I also wanted to note that at every turn any time

1  anything was proposed to us by either side we made every

2  recommendation to minimize costs as much as we possibly

3  could, even as this administration has continued to take on

4  new dimensions we've proceeded working fully on that without

5  any concern about whether we'll be paid for it.  We think

6  it's important to continue the work on this matter.  Thank

7  you.

8           THE COURT:  Thank you.

9           Okay.  So I'm going to turn to the objectors.  I'm

10  going to ask the objectors to try to have your presentations

11  not go over a maximum of ten minutes, which is actually a

12  fairly lengthy period of time.

13           You're free to be as brief and succinct as you're

14  able to be and to fairly and accurately communicate your

15  concerns, but in the interest of time, I am going to have

16  somewhat of a time limit.  I always account for the fact that

17  if I ask you a bunch of questions I'm cutting into your time,

18  so we can go a little bit longer.

19           I'm going to start with -- looks like Mr. Warner.

20  And you're here on behalf of Julie Evancheck?

21           MR. WARNER:  Yes.  Thank you, your Honor.  Curtis

22  Warner on behalf of Julia Evancheck.  She filed an objection

23  here, docket No. 632, to the supplemental process of the

24  proof required, and she further asks this Court to consider

25  in the factors of Rule 23 whether this is a fair, adequate,

1   and reasonable settlement, this second layer of proof
2   required.

3         Just as some background about myself, your Honor, I
4   think when you first took the bench you certified a class
5   settlement in Florence Musad M.D. SC versus Better Doctor.  I
6   am primarily a plaintiff's counsel.  I have, however, one
7   other time represented objectors in a case successfully in
8   the Seventh Circuit, Redmond versus Radioshack.  That
9   settlement was overturned on the basis of the objectors who
10  do serve an important purpose to bring issues to the Court's
11  attention when you do have two parties that want to settle.

12        Ms. Evancheck's main objection here, and it's an
13  unprecedented second step, is for people to come forward with
14  evidence of that they are actually a called party or a
15  subscriber that is over eight years old.  In this case,
16  Ms. Evancheck, sometime between 2001 and 2003, opened up a
17  Verizon cell phone account and was a subscriber of that same
18  number at all times relevant to this claim.

19        She then switched in 2014, I believe her affidavit
20  says -- 2013.  She switched then over to AT&T Mobility on a
21  group plan.  She doesn't have any records that would show
22  that her name goes to that number.

23        The results of this second layer is what I'm
24  hearing, the numbers, is 89.82% of persons who made a claim
25  were disenfranchised.  And that's rounding up to the nearest

1    hundredth of a percent.

2          We've heard testimony here today that KCC had

3    discovered that there was fraud of duplicate addresses and

4    duplicate IP numbers.  The question is why weren't just those

5    persons sent an email or a letter for them to submit

6    information.  That's not answered here.  We haven't heard

7    anything about why just those people.

8          Instead there is an email -- there was actually

9    two.  And Ms. Evancheck has attached those to her motion.

10   They're page ID 23083 through 84, and 23090 through 91.

11         The notices don't specifically and clearly state

12   that the person is going to receive $2.00 and they have the

13   right to opt out.  It says there is two million claims with a

14   fund expected to be $12.5 million.  It's not exactly a clear

15   notice that they do have the right to opt out.  And it's --

16   the question is:  Why did it go to everybody?  Why do other

17   people have to submit further information?

18         The settlement originally did comply with Pearson

19   versus NBTY, as we bring up, where you just check under

20   penalty of perjury that I am sufficient.  But here now I've

21   listened for the first time that there was an effort to

22   identify these people who might be committing fraud to take

23   money away from class members.

24         But why is it that everybody has to send in more

25   information?  Which, in Ms. Evancheck's case, she doesn't

1    have it.  There's no phone books for cell phones.  She can't

2    find Mobility statements because -- Verizon, where her name

3    was actually on it, is long gone.  Why go through this whole

4    process?

5              Mr. McCue stood up here and told your Honor that

6    he's reached out to people.  Mr. Burke, who I used to work

7    with at the same plaintiff's class action firm, walked up to

8    me and didn't even recognize me, gotten a lot grayer since

9    he's probably saw me last, and said, are you speaking here

10   today.  Didn't even know that.

11             Nobody here talked to me from the plaintiffs or the

12   defendants about Ms. Evancheck's claim.

13             THE COURT:  Did she ultimately have her claim

14   accepted, or was she just unable to supplement and so she was

15   excluded?

16             MR. WARNER:  She can't supplement, so she objected.

17   I was contacted, and -- again, this is unprecedented.  What

18   it does is it disenfranchises.  As soon as you look at this,

19   you're like, well, this doesn't comport with Seventh Circuit

20   law and NBTY.  All you're supposed to do is sign, say under

21   the penalties of perjury, you know, this is me.  But if there

22   is a -- it just seems that this whole, as we point out in our

23   brief, this whole second layer is to disenfranchise people to

24   go that extra step.

25             THE COURT:  What would you have done differently if

1    you had been -- you're saying you're experienced --

2              MR. WARNER:  Sure.

3              THE COURT:  -- on the plaintiff's side --

4              MR. WARNER:  Yeah.

5              THE COURT:  -- and you had negotiated a settlement,

6    and then you realize that there is an indication that there

7    might be a material amount of fraud.  What would you have

8    come in front of me to ask for if not a second layer of

9    confirmation?

10             MR. WARNER:  Well, there is two parts to the

11   question, and I answer the first part, which is what would I

12   have done.  And that's at the beginning of the settlement.

13   You have to realize that these things can go viral.  This is

14   not the first one that has gone viral.  Facebook picks it up.

15   In fact, other claims administrator do use Facebook ads, and

16   Facebook posts, and Google banners in order to get there out.

17   We've used Garden City in the Zara (phonetic) case where

18   anybody who would seem to have an interest in shopping, in

19   clothing, or were near the store, would ask where can I buy

20   clothes.  Google ads or their Facebook feeds would then start

21   to become populated.  The special sauce that makes these

22   companies are what they are.  They can go about and find that

23   information, and then send them banner ads.  And then if it's

24   a settlement, news media do pick up on it.

25             The succinctness would have been is not to say that

1    it's going to be $300, or $900 or so.  Even as stated in the
2    papers, one of the original notices, is that it's going to be
3    $12 million on a *pro rata* share.  And then typically what you
4    do is you cite percentages:  If 2 million people submit
5    claims, this is how much you're going to do.

6         The second part that I would have done differently,
7    what I heard a lot about, is the allocation of costs.  I
8    think it was in Redmond versus Radioshack is where Judge
9    Posner in his opinion talked about that really the costs
10   don't benefit the class members.  The costs -- especially if
11   you have an exponential cost, it reduces the amount of money
12   that is for the class members.

13        Typically when I write settlement agreements to
14   present to the court, the terms are very clear based upon
15   case law.  The defendant pays for it whole-heartedly.  It's
16   separate above from the class.  The class members, they have
17   a settlement fund.  If it's a percentage, the attorneys take
18   a percentage off of that because it draws the interest of the
19   attorneys in with the members of the settlement class to
20   increase that settlement fund as large as possible.  And then
21   the class representative has their own separate and distinct
22   award that is separate from the class settlement fund.

23        So as far as the beginning of it, that is the
24   better structure of giving class notice and also structuring
25   a class action settlement that is here.

64

1    THE COURT:  And so you're standing here today and
2    you're representing a client who is not going to get even the
3    $28.00, is what you're saying?
4    MR. WARNER:  It appears that she's not.  No one has
5    reached out to me.  So she's going to be one of those persons
6    who's disenfranchised.  She can't produce what is there.
7    Other people probably looked at it and go, ah,
8    gosh, I don't have the time, two bucks, why should I bother,
9    why should I go through this.
10    So there may be other people out there that have
11    just been simply disenfranchised by the extra step that's
12    needed in going forward with this.
13    And so we just ask the Court to take a look at that
14    again to reevaluate whether or not it falls under being fair,
15    reasonable, and adequate to require an unprecedented second
16    verification process that would be contrary to what the first
17    one was, which was correct under NBTY.
18    Thank you, your Honor, if there are no further
19    questions.
20    And I also have other engagements, including
21    picking up my children from school, so I kind of need to
22    leave.  Thank you for your time.
23    THE COURT:  Thank you.
24    Mr. McDonald?  And you represent Mark Dunlap?
25    MR. McDONALD:  Yes, your Honor.

1    Your Honor, I first would like to say that I do

2    sympathize with the Court with the settlement and with some

3    of the questions regardless, settlement that's currently

4    before the Court.  You were presented, I think, with

5    something that perhaps at first blush would have looked like

6    a reasonable settlement when it was preliminarily approved.

7    But then there was evidence of fraud that the Court had

8    brought before her Honor, which I think required some hard

9    decisions to be made, but I don't see that there is any real

10    evidence that there was actual fraud that was being committed

11    by anybody.  I think the net effect was to simply, as the

12    other counsel said, to simply reduce the number of claims,

13    disenfranchise some folks, and take it from a measly two- or

14    three-dollar settlement which the Court would not have been

15    able to approve, I don't think, to something that seems to be

16    at the low end of the range of reasonableness.

17    Frankly the Court was reading my mind perhaps about

18    some of the lingering questions that there are between the

19    relationship with class counsel and KCC and Mr. Charvat.  I

20    think it came up in the hearing on Friday, that is a part of

21    some of my supplemental objection material, that I had

22    requested the ability to cross-examine Mr. Cooper and perhaps

23    Mr. Charvat, and I didn't know if the Court was going to

24    allow me to do that, or should I simply address the points

25    that I would be making in my questioning of them with the

1    Court?

2              THE COURT:  What is it that you would want to know

3    from them?  I don't know that I'm inclined to open it up for

4    questioning.  I'm not aware of any legal obligation to permit

5    objectors to examine anyone in connection with the hearing.

6    However, if there are specific questions, I may address them

7    for you.  That may be the better way to go about it.

8              What are your concerns, and go ahead and make your

9    arguments, and then I can make a determination of how to get

10   that information.

11             MR. McDONALD:  Okay.  Well, just kind of looking at

12   some of the outline of questions that I had for Mr. Cooper,

13   one of the questions I would like to have answered is why do

14   KCC quote a price of $1.5 million for looking at and

15   analyzing the supplemental claims material but the paralegals

16   from defense counsel were able to do it for I think $960,000.

17   That frankly was alarming to me that nonprofessionals, folks

18   who are not used to handling that type of a process, don't

19   have the infrastructure for it, would be able to do it for

20   more than one-third the amount.

21             The second thing I would like to know is there was

22   something that was said by Mr. Cooper concerning the

23   prolonged negotiations that there were between class counsel,

24   KCC, and I think that the defendants were involved in that

25   discussion as well regarding their decision to reduce their

1    fee request to simply $3 million.  I would like to know a

2    little bit more about what those negotiations are and what

3    was promised on each side.  What exactly was the *quid pro*

4    *quo?*

5              Frankly I would like to ask what was class

6    counsel's opening offer, and what did class counsel suggest

7    in the very beginning would be fair.  And to see what the

8    back and forth was and to see if perhaps there might have

9    been a threat made or a discussion had about class counsel's

10   ongoing relationship with KCC if they were not willing to

11   reduce their fee, and exactly how those discussions went.

12   Because frankly, this Court has to determine what KCC's fee

13   is.  That's up to the Court.

14             And I don't know what promises class counsel was

15   able to make as part of these prolonged negotiations, and nor

16   do I know what role defense counsel would have possibly had

17   in those discussions.  But I was very intrigued to read in

18   Mr. Cooper's declaration that that discussion was had.

19             I'd also like to know about discussions that there

20   might have been on the front end with any negotiations.

21             So far, from my extensive review of the record, I

22   still can't understand how KCC bills.  I don't understand the

23   basis for their charges.  I don't know if it's done on an

24   hourly basis.  I don't know if it's on a per task basis.

25             I think that at the hearing back in the springtime,

1    I think the Court inquired somewhat of Mr. Cooper regarding
2    that with regard to the supplemental notice and the fact that
3    it was going to cost $50,000.  And I think the Court said,
4    well, you draft up the notice, you have already got these
5    people's email address, and you hit the send button.
6           And that's my version very simplistically, not the
7    Court's words, and the response from Mr. Cooper was, well,
8    that's a pricing structure we're working on.  Well, that's
9    not an answer.  How much did it really cost them to do this,
10   and how in the world do they have 7,000 hours.  Class counsel
11   has 4,000 hours prosecuting the case and they have 7,000 man
12   hours in this case?  That just seems incredible to me.
13          So frankly, your Honor, that's some of the
14   questions that I would have for Mr. Cooper.  I don't know if
15   their rates are publicized.  I don't know if there is a rate
16   chart for them.
17          THE COURT:  On that point, on the point of the
18   detail, I am, as you heard, I'm going to be requiring
19   additional submission of detail on the fees and costs.
20          MR. McDONALD:  Will that be made available to
21   objectors publicly or is that something the Court is going to
22   review in camera?
23          THE COURT:  Well, I will see if counsel for either
24   the parties or KCC wants to raise a reason why this should
25   not be a filing, a supplemental filing.  Given that

1    Mr. Cooper's affidavits to this point are part of the public

2    record, I don't know if there is any reason why supporting

3    detail behind numbers that are already in his affidavit

4    should not be part of the public record.

5            I will let Mr. Cooper and KCC counsel mull that

6    over for a few minutes while I hear the rest of Mr. Dunlap's

7    points.  I'll circle back around to that.  But I think that's

8    a good point, and I will take the opportunity before the

9    hearing is over to inquire a little bit further into any

10   negotiations between counsel and KCC to make sure that there

11   isn't some sort of an arrangement that might have led to that

12   inflating the costs and expenses associated with

13   administration that are sort of going to reduce the amount of

14   funds that are available to go to class members.

15           MR. McDONALD:  Thank you, your Honor.

16           And there was a point that I was going to make.  I

17   think the point that just crossed my mind is --

18           THE COURT:  Well, I have a question for you.

19           MR. McDONALD:  Yes.

20           THE COURT:  I take it that your client is going

21   to -- has a valid claim that's been accepted.

22           MR. McDONALD:  Yes, your Honor.

23           THE COURT:  How much is your client going to get?

24           MR. McDONALD:  I'm not sure of that number.  I

25   would think he would be at the $24.00 range.

1          THE COURT:  One call?

2          MR. McDONALD:  No, three calls.  $8.00 a claim.  So

3     he would be in that range, I think.  That would be my

4     expectation for him.

5          THE COURT:  Okay.

6          MR. McDONALD:  Of course, that number could go up

7     slightly depending upon what the Court does with class

8     counsel's fee request and KCC's fee request, because after

9     all, those are reducing the class members' recovery.

10          There was also some work that Mr. Cooper apparently

11     did, your Honor, which I didn't understand.  It is reflected

12     in his declaration signed on 10/3/2018, docket No. 679-4,

13     that he was asked to review and analyze phone numbers by the

14     defendants to see which of the objecting class members were

15     in the direct notice class and which ones were in the

16     indirect notice class.

17          Frankly, that has nothing to do with settlement

18     administration in this case.  They're all class members.

19     Frankly, I wonder why Mr. Cooper was doing favors for the

20     defendants that was not part of the instructions from this

21     Court.  I'm not sure if that was a part of their negotiation,

22     their prolonged discussions, but I have a few questions for

23     them about why those activities were undertaken.  Because it

24     doesn't seem to be anything that would have to do with any

25     part of their work, it was just a failure to try to perhaps

1    reduce or influence objectors.

2         THE COURT:  And is your client, was he a direct

3    claimant or an indirect claimant?

4         MR. McDONALD:  Indirect.

5         THE COURT:  He's an indirect.  Okay.

6         MR. McDONALD:  Yes.  In fact, if he would have been

7    a direct notice claim then I might have had some other

8    possible objections to this process, because what it seems

9    like is that you really had two silos of claimants.  You had

10   the direct notice claimants that they had a lot of records

11   on, and then you had the indirect, who we simply had their

12   phone number.

13        And what I think you had was the defendants wanted

14   a broad release, and class counsel wanted a big fee, and so

15   they met in terms of giving them each exactly what they

16   wanted, and we had the innumerable problems that have

17   exploded as a result of those two interests meeting of the

18   settlement that we have.

19        THE COURT:  How did Mr. Dunlap hear about the

20   settlement so that he even knew to submit a claim?

21        MR. McDONALD:  I'm not sure where he heard about it

22   first.  He and I talked about it, and he had already I think

23   heard a little bit about it, so... But I'm really not sure

24   what the first place he heard of that was.

25        I'd also like to know from Mr. Cooper when he knew

1    that the costs of this administration were going to explode.

2    Because one of the fundamental problems that I have is that

3    it appears clear that when -- or that from his declaration he

4    was -- he obviously being -- he is the project manager for

5    KCC, they were only expecting 100,000 claims when this

6    process started.  They get 2.7 million.  And that's detailed

7    I think in the submission to the Court that says that they

8    knew that as of October of 2017.

9           So someone must have undertaken the mathematical

10   process of determining how much the claims administration

11   costs were going to go up.  The problem is nobody advised the

12   class and nobody advised the Court, at least in terms of what

13   I can see in the record, until much, much later in the

14   spring.  Why not?

15          As of the time that the objections were filed,

16   class members were still being told that there was only

17   $800,000 in administration costs.  Obviously KCC had to know

18   that that wasn't the case.  As of the date that my client

19   filed his objection at the end of October there were over 2

20   million claims filed.

21          THE COURT:  And why would that be relevant to

22   approval of the class action?  Because it's preliminarily

23   approved, there is a final approval of a settlement that's

24   already negotiated at the time of the preliminary approval,

25   is it just a matter of asking me to cut their costs?  But it

1    doesn't go to the overall settlement, it just goes to you

2    should reduce the amount of costs that they can recover here

3    because of shenanigans, for want of a better word.

4           MR. McDONALD:  That might be one way of putting it.

5    What I was really wondering about was not only the lack of

6    notice to the class and possible shenanigans, but what plans

7    did they put in place as soon as they knew that they were

8    exploding, or at the time that those costs were exploding,

9    and what was done to reduce those.

10          THE COURT:  Because I should -- other than reducing

11   what they can claim, what other remedy would there be for

12   that now after the fact?

13          MR. McDONALD:  There wouldn't be any other remedy,

14   but I think that it would be interesting for everyone to know

15   what their knowledge was and what was being done to reduce

16   those costs.  We know that they stopped the media coverage,

17   but were there other things being done to minimize the impact

18   at that time.

19          THE COURT:  Okay.

20          MR. McDONALD:  So that, I think, your Honor, covers

21   a lot of the topics that I would have had for Mr. Cooper.

22          And in terms of Mr. Charvat, we've got a problem

23   obviously with his incentive award, too.  I think there was a

24   little bit of question about Mr. Charvat's history, and one

25   of the interesting things that I note is that I don't think

1    that he started using these particular lawyers as his class

2    counsel until about 2011, but he's had this little cottage

3    industry and been fighting for the rights of consumers for

4    longer than that.

5            I know that he previously used some other lawyers,

6    and I wonder if this $50,000 incentive which Mr. Charvat's

7    lawyers are asking for, he's not asking for it, is a way of

8    perhaps keeping him as a repeat client for their firm and so

9    that he doesn't go out shopping for other lawyers.  Because

10   he did use prior lawyers in the past.

11           And as a final point for Mr. Charvat in his

12   experiences in this case that he lays at the hands of the

13   settling defendants, if they were bad actors in this case,

14   and if the defendants did something wrong, then they should

15   pay more money and that should go for the benefit of the

16   class members.

17           If they could show that, or if the plaintiffs could

18   show that the defendants were bad actors in front of a jury,

19   then they should have had to have paid more money and that

20   would have caused them to pay more money.  But as it is now,

21   class members would be getting less money because Mr. Charvat

22   wants to take it off the top for his pain, and so the class

23   members wind up getting less money because of the defendants'

24   bad actions.

25           I think that if their bad actions were a calculus

1  in this settlement, and it's already been taken into account,

2  and I don't think Mr. Charvat should be the one to receive

3  that windfall from their bad actions to the extent that it

4  could be proven.

5          Those are my points, your Honor.  Thank you.

6          THE COURT:  Okay.  Thank you.

7          I gave Mr. Dewitt and Mr. Cooper and Ms. Bryan a

8  minute to think about the issue of whether or not there is

9  any reason that their detailed accounting of the fees and

10  costs could not be part of the public record.

11          Perhaps what I'll do is actually start with

12  plaintiffs' counsel and defense counsel and see if you have a

13  view on whether that's something that should be filed as part

14  of the docket or submitted some other way.

15          MR. McCUE:  Your Honor, I've haven't had a chance

16  to confer with KCC, but from my perspective, that should be

17  filed under seal.  If objector counsel wants to review that,

18  I would be open to having them agree to a confidentiality

19  order.  But I would suspect that the level of detail you're

20  asking for is going to invoke proprietary information, trade

21  secret information that's going to be sensitive to their

22  business.

23          I want to get you that information for you to

24  assess, but I also am sensitive to competitors being able to

25  access that.  We need to think about that.

1           THE COURT:  But you would not have an objection to

2    objectors' counsel having access to it?

3           MR. McCUE:  Not if they agreed to attorneys' eyes

4    only and things like that.

5           THE COURT:  Okay.  I'll take that into

6    consideration.

7           Any of the defense counsel want to weigh in on that

8    particular issue?

9           MS. MacIVOR:  We would have no objection to it

10   being filed under seal, but we don't really take a position

11   on it.  But we would be fine with it under seal and the

12   objectors being able to see it.  If that's the way the Court

13   wants to go.  Otherwise we take no position.

14          THE COURT:  Do you have an objection to it being

15   part of the public record?

16          MS. MacIVOR:  We don't have a position on it at

17   all.

18          THE COURT:  I don't know who I should ask on behalf

19   of KCC.  Should I direct this to Ms. Bryan as counsel?

20          If she's still on the phone.  Did we lose

21   everybody?

22          Mr. Cooper, are you still on the phone?

23          MR. COOPER:  Yes.  I think maybe Rob -- this is

24   Phil Cooper from KCC.  Maybe Rob is the best to address that

25   question.

1     THE COURT:  Okay.  Very well then.  We'll give him

2     a chance to address it.

3     MR. DEWITT:  Sure.  Your Honor, we would sort of

4     take the same view of it as Mr. McCue, we would have no

5     problem presenting that information, and then barring some

6     comment from Ms. Bryan, if the objector wants to review it as

7     well.  We have nothing to hide.

8     THE COURT:  I guess the concern is whether there is

9     sort of something proprietary or trade secret about it that

10    would warrant keeping it out of the public domain and putting

11    some formal restriction on what the objectors can do with it.

12    MR. DEWITT:  Again, that would be something I would

13    refer to Ms. Bryan.  She dropped off, and...

14    THE COURT:  So maybe what I'll do is -- perhaps in

15    issuing an order I will allow KCC to ask to file it under

16    seal, to file it provisionally under seal, and indicate -- I

17    think it should be in the record if there is officially a

18    request from KCC to have it under seal due to a trade secret

19    or confidentiality reasons rather than in a situation like

20    this for me to just assume that it should be under seal and

21    take it out of the public domain.  But thank you.

22    MR. DEWITT:  Thank you.

23    THE COURT:  Mr. Hilton?

24    MR. HILTON:  Your Honor --

25    MS. MacIVOR:  Your Honor, before Mr. Hilton goes,

1  would it be possible to take a break after Mr. Hilton is

2  finished?  A quick one.

3              THE COURT:  That's fine.  I was thinking we might

4  do it afterwards.

5              MS. MacIVOR:  No, no.  I meant after he's finished.

6              THE COURT:  Oh, after he's finished.  I thought you

7  meant before.  That's fine.  No pressure now that everybody

8  knows you're standing between everybody and the break,

9  Mr. Hilton.

10             MR. HILTON:  Your Honor, and may it please the

11 Court, Jonathan Hilton for objectors Shelton and Johnson.  I

12 have two brief points of law that I would like to address

13 today, and then I would also like to say a couple of quick

14 things.

15             Mr. Becker had indicated that I might be moving to

16 withdraw my motion -- sorry, my objection, that it's related

17 specifically to the adequacy of the amount that each claimant

18 will receive.  So I'd like to address that at the back end if

19 I may.

20             THE COURT:  Okay.

21             MR. HILTON:  The first point of law that I'd like

22 to address, your Honor, is one that I do raise in docket --

23 it's docket 668 at page ID 23332.  And it has to do with the

24 Pearson presumption that we have heard a little bit about

25 today.

1          The Seventh Circuit case, Pearson, on my reading of

2    it holds that as a general presumption class counsel should

3    not be able to obtain more than one-third as its fee of

4    something called the net settlement amount.

5          THE COURT:  I'm going to actually -- sorry to

6    interrupt you.  I think we're going to try to get Ms. Bryan

7    on the line, and because I think that that may involve a

8    little bit of chatting on our end I'm going to ask you to

9    pause for just a moment while we do that.

10          MR. HILTON:  Yes, your Honor.

11       (Telephone call placed.)

12          THE COURT:  Hello.  This is Ms. Bryan?

13          MS. BRYAN:  Yes.  Sorry.  I got disconnected.

14          THE COURT:  That's fine.  This is Judge Wood.  I'm

15    glad we have you back on the line.

16          We are hearing from Mr. Hilton, who is counsel for

17    two of our objectors, and he was just getting started in his

18    presentation.

19          Mr. Hilton?

20          MS. BRYAN:  Thank you.

21          MR. HILTON:  Yes, your Honor.

22          So there has been a lot of talk about the Pearson

23    presumption.  So in my view, what the Pearson presumption is

24    is a line from a Seventh Circuit case by Judge Posner, and it

25    says very specifically that class counsel should not receive

1   as its fee more than "a third or at most one half" of the net

2   settlement amount.

3          So that's not the gross settlement amount.  That's

4   not 12.5 million.  Rather, that's the 12.5 million once

5   everything such as administration costs and so on has been

6   taken out.

7          Now, class counsel in this case in its amended fee

8   petition is asking for a third of the net settlement amount,

9   so much of the controversy that surrounds Pearson is moot

10  here today, except for one point that's worth probably about

11  $60,000 to the class.  So that point is specifically whether

12  the litigation expenses that class counsel is seeking to have

13  reimbursed, which are about $210,000 approximately, maybe a

14  little more, maybe a little less, but whether those

15  litigation expenses count towards that net settlement amount

16  or whether those should also, like administrative costs, be

17  deducted.

18         So you can imagine, your Honor, if that $210,000

19  were taken out of the computation of the net settlement

20  amount, then class counsel would lose its claim to one-third

21  of that amount as fees.

22         So if the Court is following me, what I'd like to

23  do is just talk very briefly about why I believe that those

24  litigation expenses are not part of the net settlement

25  amount.

1        THE COURT:  Okay.

2        MR. HILTON:  So one is that I believe that Pearson

3    and another case that's been mentioned today, Redmond versus

4    Radioshack, I believe that those cases, each individually and

5    also read together, state very clearly that the net

6    settlement amount constitutes:  One, the fee that class

7    counsel is seeking, the fee; plus two, what class members

8    received.

9        Nothing is said about litigation expenses.  The

10   Seventh Circuit doesn't address litigation expenses.  But

11   from a policy perspective, I think it makes sense to deduct

12   them just like administrative costs.  The class counsel

13   should be incentivized to keep litigation expenses, just like

14   administrative costs, relatively low, and also class counsel

15   is also receiving reimbursement already out of the common

16   fund for the expenses that it incurred.

17       So I believe it's a common sense suggestion.  And

18   again, the briefing on it is in doc 668 that I've submitted.

19   And the reason that I'm bringing it up today is primarily

20   that I haven't seen any filed response from class counsel on

21   that, and I want to be sure that if they have arguments that

22   those are before the Court so that all of the issues are

23   fairly disputed and properly preserved.

24       THE COURT:  Okay.

25       MR. HILTON:  The second issue of law that I would

1    like to address today is on the issue of the residual funds.

2    As your Honor knows, in the declaration of Phil Cooper, which

3    is doc 670 at page ID 23350, that continues on to 51, Phil

4    Cooper has asked that KCC rather than the named or proposed

5    *cy pres* recipient receive as a payment on the back end for

6    its administrative fees a share of the residual funds, what's

7    left over after the first round of claims have been made and

8    then have continued to a point that's called administrative

9    infeasibility.

10            Now, the settlement agreement at Section 8.4,

11   that's doc 569-1, page ID 22457, and continues on to 58, the

12   settlement agreement gives a definition for administrative

13   infeasibility.  And what it says, its very brief definition,

14   and perhaps calling it a definition is a little bit fast and

15   loose, but it does say in parentheses administratively

16   feasible, and then as a parentheses, and then it says i.e.,

17   meaning that is, comma, and it goes on to say each class

18   member would receive at least $5.00.

19            Now, KCC has also asked, this is in its declaration

20   at -- it's doc 679-2, page ID 23478, KCC has stated it will

21   use whatever definition of administrative infeasibility that

22   it is instructed to use.  And it has also said that it will

23   only -- that it will use that definition if:  "Provided the

24   settlement agreement calls for it."

25            So what I submit to the Court today is that the

1    current definition is that if a class member in a subsequent

2    distribution were to receive less than $5.00 in that

3    subsequent distribution, then whatever is left in the

4    residual funds is going to go to KCC.  I would like to

5    maximize the recovery for the class members.  And KCC in its

6    declaration frankly admits that it's possible that it might

7    be feasible to send payments to class members as low as

8    $2.50.

9         The parties have responded briefly in the record to

10   this point that I've made.  I believe it's in the cruise

11   defendants' omnibus brief in which they respond to all

12   objections, but what I haven't seen yet is any sort of a

13   modification of the settlement agreement or a promise from

14   the parties to use the best definition of administrative

15   infeasibility.

16        And to that point I would like to propose my own

17   definition.  It's actually a definition taken from a case in

18   the Third Circuit.  That case is In Re:  Baby Products

19   Antitrust Litigation, which is 708 F.3d 163.  And the

20   definition is found at pages 168 to 69.  That's a Third

21   Circuit decision from 2013.  And that decision defines

22   administrative infeasibility as the situation where:  "The

23   cost of distributing individually to all class members

24   exceeds the amount to be distributed."

25        Basically that means if there aren't sufficient

1   funds left in the common fund to pay to distribute any money

2   at all to class members, then that's the point of

3   administrative infeasibility.  And under the parties' current

4   proposal, that money would then go to KCC as a fee on the

5   back end.

6          So my hope is that this is something that can be

7   resolved fairly quickly among the parties, but I just bring

8   it up because it has not been resolved yet, and I would

9   object to not accepting a definition of administrative

10  infeasibility that results in the maximum recovery for the

11  class.

12         The third point that I'd like to make is just one

13  briefly about what I believe class counsel referred to as the

14  latte.  This is my argument made back in October, that when

15  the class stood to receive only about $4.00, in my opening

16  objection on behalf of objectors Shelton and Johnson and I

17  said, well, usually the market rate for one of these

18  settlements is about the price of a nice restaurant meal, not

19  just a pumpkin spice latte.  I said $4.00 wasn't enough.  And

20  in that objection I said something -- for the settlement to

21  be approved, essentially something needs to happen so the

22  class members get more.

23         What I have heard today is that class members are

24  standing to receive about $21.00 or so on average.  That

25  number could go up or down slightly.  Based on the case law

1  that I've presented in my original objection, and then also

2  Objector Dunlap's original objection that is represented by

3  Mr. McDonald, $20.00 per claimant does seem to me, at least

4  as far as comparing this settlement against other settlements

5  of comparable strength as to the per-claimant amount, $20.00

6  may well be fair and reasonable.

7       I do just have one question, though, that I would

8  like the parties to clarify, which is whether the three-call

9  cap, meaning a maximum of $24.00, eight times three, $8.00

10 per call, $24.00 if you have three calls, if that three-call

11 cap applies now that the settlement is *pro rata* or whether

12 that three-call cap only applied when we were talking about

13 class members receiving $300 or $900.

14      The reason that I'm bringing this up now is that in

15 the omnibus brief submitted by the cruise defendants against

16 all of the objections made by all objectors, my understanding

17 from that is that there are some claimants who under the *pro*

18 *rata* formula might be receiving as many as $500 because there

19 is no three-call cap.

20      If I've misread the brief in any way, my apologies,

21 and I hope that it can be clarified.  But just on behalf of

22 my clients, who have affidavits in to the Court that they

23 recall receiving more than three calls, who I believe the

24 call records will show, although I don't know for a fact, I

25 believe that they will be receiving -- that they received

1    more than three calls in the dialer database.  My clients
2    would stand to receive more money if we didn't use the
3    three-call cap now that it's a *pro rata* distribution.  And so
4    I would just push for that as being a more fair way to
5    distribute the funds.
6         The only thing that I believe is -- that is on the
7    docket from objectors' end that explains why the three-call
8    cap is unfair was actually an objection filed last October, I
9    believe by Attorney Amy Wilkins on behalf of Cathleen
10   Schilling -- or I might have the objector's name and the
11   counsel's name reversed.  But it just occurred today as I was
12   listening to Mr. McCue's presentation, and so that's why I
13   wanted to address it.
14        THE COURT:  I believe you're correct.  It's Amy
15   Wilkins on behalf of Cathleen Schilling.  I believe that was
16   one of the issues raised there.
17        MR. HILTON:  That would be it, your Honor.  And so
18   I would just ask the Court to consider that objection.  If
19   there is any ambiguity as to what *pro rata* means, I would
20   just ask that the Court choose the one that allows for those
21   who got more than three calls to recover a higher share.  And
22   I believe that that's the objection presented by Ms. Wilkins.
23        Then the very, very last point that I want to make,
24   hopefully the only time I ever bring this up today, is that I
25   did notice the objectors' fee petition for this morning.  I

1    believe that it has been fully briefed, unless either of the

2    parties would anticipate filing a surreply.  So I believe

3    that's all submitted.

4         The only question I have is whether the Court would

5    like to order me and the other objectors who participated in

6    that to submit their time sheets for review in camera.

7         THE COURT:  I don't think that's necessary at this

8    time.  Depending how I decide to resolve that issue, it may

9    be in the future.

10        MR. HILTON:  Thank you, your Honor.  That's all I

11   have.

12        THE COURT:  Thank you, Mr. Hilton.

13        Perhaps before I lose track of this point and

14   quickly before we take a break, my sense from Mr. Becker is

15   he wanted to address the issue of whether switching to a *pro*

16   *rata* distribution now means that some people are getting I

17   guess much bigger awards, or if there is still a three-call

18   cap in place that would limit everything.

19        Is this going to be a long response?

20        MR. BECKER:  No.  I can address that now, and then

21   we can take a break if you would like.  Obviously I want to

22   respond to the other objections.  But for that specific

23   purpose, no, there is a three-call cap still in place, it's

24   clearly in place throughout the settlement agreement and all

25   orders.  The reason individuals may receive -- claimants may

1    receive more than the 20 or so dollars for three calls would
2    be if they have more than one phone number associated with
3    their claim.  So if you have a cell phone and a residential
4    phone, both of those --
5            THE COURT:  Is there somebody who's getting $500?
6            MR. BECKER:  I believe there is an institution.
7    KCC or plaintiff could speak to that better than I could.
8            MR. McCUE:  University of Minnesota or something
9    like that where their HR put in claims for cell phones
10   assigned to staff.  That's kind of an anomaly, but that's one
11   example of how -- I think that's the top end of where they're
12   getting back over $500.
13           THE COURT:  And that's because of the number of
14   individual phone lines times three that they submitted claims
15   for?
16           MR. McCUE:  Associated with it.  So if you look at
17   the University of Minnesota, I hope that's the entity, I'm
18   not sure, if you look at that entity as the claimant, they
19   have an awful lot of phone numbers.  And then there is a
20   three-call cap on each number.  And that claimant then has
21   multiple claims.
22           MR. BECKER:  So claimants can have a variety of
23   different resolutions here.  If they have three phone lines,
24   one of which got one call, one of which got five calls, one
25   of which got two calls, there would be a one call, two call,

1    three call collection.  Right?  Because they're capped at

2    three for each phone line.  That's how it would work.

3            THE COURT:  Okay.  So with that, I guess everybody

4    will have a chance, or at least counsel for the parties will

5    have a chance to respond to the objectors.  I may have some

6    questions for Mr. Cooper based on some of the things that

7    were raised.

8            How much time do the parties need for a break?

9    I'll start by asking Ms. MacIvor.

10           MS. MacIVOR:  Five minutes?

11           THE COURT:  We'll do ten minutes.  We'll pick up

12   again at 12:40.  We're in recess.

13       (Short recess.)

14           THE COURT:  Okay.  So we just finished hearing from

15   the objectors who are here and who participated.  I will give

16   counsel for -- counsel of record for the parties a chance to

17   respond to the various objections that are raised.

18           Who would like to go first?  Mr. Becker?

19           MR. BECKER:  Thank you, your Honor, and good

20   afternoon.  Jeff Becker on behalf of Carnival Corporation

21   again.

22           I'll briefly address the arguments raised by the

23   three objectors that have come before you today, beginning

24   with Mr. Warner on behalf of Ms. Evancheck.

25           I think it's important to understand that

1    Mr. Warner is counsel of record who lives here in Chicago,

2    and did not participate in any proceeding throughout this

3    entire settlement process.  Had he done so, he would have

4    been before you during the multiple hearings we had where you

5    delved deeply into the supplemental proof process where we

6    discussed on the phone with KCC, with plaintiffs' counsel

7    present and with us present, the pros and cons of running a

8    supplemental check process on everybody in the indirect

9    notice class, or some threshold number above that.

10            It was determined after a long discussion and your

11    analysis we should do it starting with zero.  Everybody would

12    be checked.

13            This is not a process that's unheard of.  It

14    happened later in the case because of the exigent

15    circumstances we were facing.  However, oftentimes in class

16    action settlements individuals are required to provide some

17    form of evidence or proof of their appropriateness in the

18    class.

19            This was cited in our objection omnibus brief

20    docket entry 681 on page 23529.  We cite the settlement

21    administration section of the Manual of Complex Litigation

22    and case law where class claimants are asked to submit

23    information.

24            I also think it's important to point out this is

25    not something where you can simply look at it and say just

1    have the fraud-feasors do it, because it's not immediately

2    evident who is a fraud-feasor and who is not.  As the Court

3    recognized at one of our hearings, one might be a smarter

4    fraud-feasor than another.  So it made sense for us to

5    provide a uniform basis by which the entire population of

6    indirect claimants would provide information.  That process

7    worked.

8         To Mr. Warner's point, again, he misses the point

9    that the 2.6 million submissions that came in are not an

10   actual number one can rely upon.  It's a raw number that

11   doesn't tell you how many of those are the same person,

12   multiple claims or not.

13        THE COURT:  I actually think his point was that his

14   client was excluded.  And that demonstrates the lack of sort

15   of fairness that people like his client were excluded.

16        MR. BECKER:  Sure.  Well, to be clear, he tried

17   throwing out a big number of 88% of people that were

18   disenfranchised because they didn't respond.  Again, that's

19   based on looking at 400,000 compared to 2.6 million, when you

20   cannot do that.  You can't say there is 6.4 million people,

21   and only 400,000 responded, and the response rate is only

22   this, and therefore only 86% or more people are

23   disenfranchised.  That's my point on that.

24        As far as his client, let's be clear on this.

25   Mr. Warner contacted myself and counsel for Royal Caribbean

1    Norwegian and had conversations where he asked for payment of
2    money in order to settle his client's objection.  Which we
3    refused to do uniformly across the board for all objections.
4    Mr. Warner's client isn't in a different situation than many
5    claimants who contacted counsel for the plaintiff and KCC,
6    and I'll allow them to attest to this, and said, hey, I can't
7    find the document of my phone bill back in the day.  I've
8    switched phone lines.  I'll attest under penalty this was my
9    phone line, I'll provide you with whatever information I can,
10   but I can't find it, and I'm reaching out to you.  And
11   counsel for plaintiff asked those be submitted and accepted,
12   and they were.

13         So there are multiple people that are part of this
14   class today that didn't have the phone bill that are in the
15   same situation as Ms. Evancheck, who could have become part
16   of the class.  She also could have opted out, because we
17   opened that process up again, which she did not choose to do.
18   Instead he came before you to complain that the entire
19   process was no good.

20         This is a process that we took a lot of time
21   dealing with and addressing, and I think it is the most fair
22   and reasonable way to address the issues that are before the
23   Court and in front of the parties at that time.  It's a
24   process that, if it had been done at the beginning of the
25   case, would have similarly been acceptable.  But we did it

93

1    when we did it because KCC presented the issues it saw from

2    its analysis, doing this for decades and decades, of issues

3    that looked like fraud.  And they presented it to you, you

4    agreed, which is why we implemented the process.

5              That leads me to Mr. McDonald's objections on

6    behalf of Mr. Dunlap.  Mr. McDonald talks about how there's

7    no evidence of fraud.  I don't know that he can stand here

8    and say this.  I don't know that we could do much more than

9    rely upon an administrator who has done this extensively to

10   say this is not a normal procedure, and especially alongside

11   the misleading news media it makes sense for us to assess

12   this further and get us to where we are today.

13             As far as the questions he asked for Mr. Cooper,

14   I'm not going to address them, except for one, which is that

15   he wants to know why KCC looked up the phone numbers of

16   objectors to see whether they were in the direct or indirect

17   class.

18             I think that's a very good question to you, Judge,

19   and I think it's a very clear answer to you.  There is one

20   individual of all the objectors who is actually in the direct

21   notice class.  The rest are indirect.  And it's important for

22   us to know that, because these objectors who stand before you

23   complaining about the amount of money, and the supplemental

24   process, these are objectors who would get no money at trial.

25             We mentioned this earlier when I spoke about final

94

1    approval.  These objectors, including Ms. Evancheck, and
2    Mr. Dunlap, are not direct notice claimants.
3              THE COURT:  Is it appropriate for the direct and
4    indirect claimants to be part of the same class?  Why aren't
5    there are two class definitions, or subclasses, or something
6    like that, even for purposes of settlement?
7              MR. BECKER:  I think it's appropriate that they're
8    part of one class.  I don't think that the manner by which we
9    provided direct notice versus opening up to everybody --
10   because in any place there is going to be public notice
11   given.  The individuals part of the Charvat claims were given
12   direct notice because in looking at and assessing
13   consideration as to who is more likely to have gotten a call
14   that may or may not have mentioned the cruise lines,
15   Mr. Charvat had evidence of that, whereas the rest of the
16   world did not.
17             Again, if you think about what we're talking about
18   here, we're saying that we're allowing everybody to resolve
19   this case, even if they don't present evidence that they got
20   an actual cruise call, even if they're not part of
21   Mr. Charvat's campaigns, they do not have to prove to us the
22   call they got mentioned the cruise lines versus Branson,
23   Missouri or Las Vegas.  We're going to accept their sworn
24   statement when they sign off that they got a call that
25   mentioned a cruise.  And we're not going to require both a

1   phone bill and some proof that this was a cruise call versus

2   something that didn't mention cruises.

3          So I don't think it's wrong to treat everybody

4   similarly, because they got phone calls, the value of the

5   settlement should be the same among all of them.  What we're

6   really talking about is who got indirect notice and who did

7   not.  But to that point, if you think about the people that

8   got indirect notice, these are the individuals who did not

9   have to be part of a Charvat campaign, were not asked to

10  present any evidence of their association with a phone call

11  that actually received a cruise reference.

12         So when you look at Mr. Dunlap, for example, who

13  comes here and says this process is unfair, and we're not

14  getting enough money, the reality is they're getting more

15  money than they would get otherwise.

16         Ms. Evancheck, who said I have no proof that I had

17  a phone number associated with a number that was called,

18  would never be able to succeed on the merits of her claim.

19         THE COURT:  I want to understand why that's the

20  case.  Because under the class definition, if it went to

21  trial, so we have a certified class action that goes to

22  trial, then the class members, why would they necessarily not

23  be members of the class unless the class definition were

24  altered so that it's only people who were involved in these

25  three campaigns, or something else that ties it to how the

1    numbers were maintained rather than just getting a call.

2    Because the parties are using being in this database, or if

3    you had taken a different approach, being a member of these

4    three campaigns involving Mr. Charvat as a proxy for

5    determining who received calls under the class definition,

6    the whole direct notice/indirect notice thing is almost kind

7    of an artificial construct, I think, for us to manage the

8    settlement.

9              MR. BECKER:  Here's what we have to make sure we're

10   clear on.  There is a litigation class and a settlement

11   class.  The litigation class is the class the plaintiffs

12   presented in their certification briefing as to who would be

13   part of their class if this case went forward on the merits.

14   And that litigation class was limited to the three Charvat

15   claims.

16             THE COURT:  Was it?

17             MR. BECKER:  That's correct.

18             THE COURT:  I haven't looked at your class

19   certification briefing in quite some time.

20             Mr. McCue, what was your class definition proposed

21   in the briefing?

22             MR. McCUE:  It would be the same definition that

23   was in the class complaint, but it narrowed who would be in

24   the class to the consumers that are in three Charvat

25   campaigns.

1          THE COURT:  Ah-ha.  So whereas the settlement class

2   is not so limited.  It's just got a time frame and refers to

3   any subscribers.

4          MR. BECKER:  It's any individual who had a phone

5   call that was within the RMG database.  Right?  So the RMG

6   database is made up of dozens and dozens and dozens of

7   campaigns.  I don't know the exact number anymore, but it was

8   a lot of campaigns.  And plaintiff narrowed the scope of

9   their class definition from when they filed the lawsuit to

10  anyone RMG called to these three.  And that's their strategic

11  decision because they thought that they had a better chance

12  of being able to show those three campaigns received calls

13  that actually mentioned cruises.  Right?  Because Mr. Charvat

14  had recorded his calls.

15         When we broadened it for settlement purposes, we

16  went back to the original definition of the complaint very

17  early on of anyone RMG called which is evidenced by the phone

18  numbers in the dialer database.  Right?

19         So when you're looking at a much broader class

20  definition, we're now including individuals who were not part

21  of those three campaigns, who do not have necessarily proof

22  of their phone number, proof that they got a call that

23  mentioned a cruise line, so on and so forth.  But as we can

24  all agree now, those individuals received public notice, they

25  submitted a claim, they gave information that showed that

1    their phone number was associated with them.  Right?  Whether

2    it was a declaration, whether it was a phone bill, whatever

3    it might have been, they presented supplemental proof, they

4    were brought into the class, and now they're going to receive

5    relief without ever having to prove they got a

6    cruise-line-referenced call versus a call mentioning

7    something else.

8          So there is a substantial difference between what

9    the litigation class actually looked like, the three

10   campaigns, and the rest of these indirect notice claimants.

11         It happens to be an indirect notice claimant is

12   really someone who received public notice and submitted

13   information, and now they're able to stand before you and

14   receive money.  They're also objecting, however, saying it's

15   not enough, if this case went forward on the merits I would

16   have gotten more; but would they?  Would Ms. Evancheck even

17   be able to claim any money, present any proof at all, because

18   these attorneys here wouldn't have been representing her

19   after the class certification motion had gone forward.

20         THE COURT:  Why is that something that's even

21   appropriately considered by me at this point?  Because the

22   parties defined the settlement class, and within that class

23   why should I consider any indirect notice person sort of less

24   worthy of full consideration of their circumstances and

25   objections than a direct notice person?

99

1          MR. BECKER:  I think it's more so in your

2     assessment of fairness.  These people are complaining about

3     not getting as much as money as they would at trial, but

4     they're getting money.  They're receiving what counsels have

5     described now as at least within the realm of fairness as an

6     amount of money they're going to get they otherwise would not

7     get.

8          THE COURT:  Because of what I understand to be a

9     concession that the defense valued, because it allowed you to

10    have the broadest possible class so you have the broadest

11    possible release, as is pointed out by counsel, so there is

12    definitely value to the defendants there.  I'm not sure yet

13    what the incentive was for plaintiffs' counsel to agree to

14    the broadest possible release, but it just strikes me as

15    interesting that you are suggesting that certain people who

16    are within the class definition that the parties agreed upon

17    and presented to me should somehow be discounted in their

18    claim.

19          Because that's essentially what you're saying.

20    You're saying there are certain people who are indirect

21    notice people who, you know, I should be less worried about

22    their objections because they somehow have less of a claim to

23    the money in this fund than the people who would have been

24    within the litigation class definition.

25          MR. BECKER:  I don't want you to leave here today

1    thinking that's what I'm saying.  What I'm saying is when you

2    have people stepping before you complaining about the process

3    and how much money they're going to get, you need to remember

4    that many of those people are people that, within a trial on

5    the merits -- which is what we have to look at here.  When

6    you look at Synfuel, and you look at the risks, and the

7    costs, and the benefits, a number of people here are being

8    given the opportunity to participate in settlement and

9    receive a payout, a fair and reasonable payout that they may

10   not otherwise ever have been able to get.

11              THE COURT:  So then answer this question for me,

12   which is:  Why isn't that indicative of the fact that your

13   settlement class definition is too broad?  Because the

14   inclusion of the additional people in the class is reducing

15   the recovery for the people who would have been in the

16   litigation class.  And you're representing, I think, that

17   those are the only people who would have been able to receive

18   funds if this had gone to trial.  Their recovery is less

19   because of a settlement class definition that was agreed upon

20   by the parties.

21              Why isn't that a fairness issue?

22              MR. BECKER:  Two points that are very important to

23   understand.  We have never conceded that the litigation class

24   made up of the Charvat campaigns would have received any

25   money at trial.  Our position has always been, through our

1    expert testimony, and our challenges of the database itself,

2    and the plaintiffs' expert testimony, our position has always

3    been that there is no easy way to identify which individuals

4    received a call that mentioned a cruise and which ones did

5    not.

6         There is substantive evidence, there is deposition

7    testimony, there's evidence from the dialer database, that

8    the way the dialer database was preserved, you could only

9    tell what recording was played on the very last call of a

10   campaign.  And you have deposition testimony saying we, this

11   RMG entity, will make calls, and our primary focus is to sell

12   our vacation club, and sometimes we'll mention cruises as an

13   incentive, and sometimes we'll mention Vegas, and we'll

14   change that depending upon what seems to be selling on that

15   day.

16        So everybody in this case is relatively similar in

17   one respect.  We don't believe it's easy to tell who received

18   an actual call that mentioned cruises and who did not.  The

19   plaintiff had decided from a strategic standpoint throughout

20   the course of the litigation we're going to proceed on three

21   campaigns because it may be easier for us to prove that than

22   on every campaign.

23        But we didn't agree with that.  Our certification

24   briefing surely took issue with their ability to do that.  So

25   nobody in this case had a freebie, we're going to win, the

1    evidence is clear we got a cruise call, except maybe

2    Mr. Charvat, who recorded his call.  Outside of that, this

3    was very hard-fought on class certification and vicarious

4    liability.  We don't concede anybody can just walk in and say

5    I got a cruise call.  We believe everyone would have had to

6    do that on a relatively individualized basis.  So now we've

7    opened it up to a global resolution, which is important to

8    our clients, who have been through this process now, the

9    settlement process now for over a year, agreed to a

10   twelve-and-a-half-million-dollar payment, even though none of

11   our clients made a single phone call, and our clients firmly

12   believe there was no agency relationship, we're willing to do

13   this to provide certainty and closure to the case.

14           The plaintiffs understood that throughout the

15   mediation process and understood global resolution was

16   important to us.  Because we don't want to settle with three

17   campaigns and then have everybody else coming out later.  So

18   we opened it up to everybody --

19           THE COURT:  I understand your incentives very well,

20   Mr. Becker.  I'm sensitive to time, we've been going for

21   awhile, and I think I understand this point.  Were there

22   other --

23           MR. BECKER:  If you understand it, then I can move

24   on.  The last point I'll make with respect to Mr. Hilton's

25   objections, he mentions -- the only part that I want to

103

1    address is the infeasibility issue.  With respect to the

2    infeasibility issue, we do say in our documentation we would

3    support lowering the infeasibility from $5.00 to $2.50.  I

4    don't think it makes sense to lower the definition all the

5    way to even a penny or two cents to be paid out to claimants.

6    There needs to be some reasonable threshold there.  Other

7    than that, I don't take issue with Mr. Hilton's objections.

8             And thank you for your time and your patience in me

9    saying all these things, because it's been a long-fought and

10   long-litigated even settlement process, and we want the Court

11   to understand we truly believe the settlement fund that we're

12   trying to preserve here is giving a fair and reasonable

13   payment to any claimant, regardless of what they're able or

14   not able to prove.

15             MS. MacIVOR:  May I say one thing?  I'll be very

16   brief, I promise.

17             THE COURT:  Yes.

18             MS. MacIVOR:  Following up on what Mr. Becker was

19   talking about your Honor's questions, basically the objection

20   is the class settlement is unfair because the direct notice

21   claimants will get money -- I'm sorry.  Let me rephrase that.

22   The class settlement is unfair because the litigation class

23   would be better off if there was no settlement.  But the

24   problem is he would not be included in it.

25             So I've never really seen, in the years I have been

1    doing this, where an objector complains about getting money.

2    He wouldn't be included, his client wouldn't be included in

3    the litigation class.  So, I mean, the objection, to me at

4    least, doesn't even make sense.  So the fact of the matter is

5    the objection should just be summarily denied.

6           The other thing is they would never have been able

7    to prove on a class-wide basis the point -- and I just want

8    to reiterate that, there is no evidence, and their own expert

9    agreed that there would be no way to prove that.

10          So I don't know where these objections are coming

11   from other than the fact that they're not really terribly

12   familiar with the case.  And the people standing before you

13   who negotiated the settlement have fought this case for five

14   years, and who sat through all these depositions, extensive

15   analysis by experts on both sides.  We're familiar with it.

16   We knew what would come.  And a litigation class would have

17   been practically impossible, and that's what the objectors

18   don't understand.  And I can't fault them.  They weren't in

19   it for five years.  And they weren't in the nuts and bolts of

20   this litigation.  But we were.  And that's what came together

21   to settlement.

22          We've actually got a settlement that's more broad

23   and is giving people relief that they would never have been

24   able to get it.  Does it benefit us in a way that we get a

25   release?  Of course it does.  It also benefits the class.

105

1   Because they would not have been able to get anything but for

2   the fact that we agreed to it.  So it's mutually beneficial.

3          That's all I wanted to say.

4          THE COURT:  Okay.  Mr. McCue, can you start with --

5   I indicated I understand why the defense would be comfortable

6   negotiating a settlement class definition that's broader than

7   the litigation class definition.  That makes sense to me.

8   Why was plaintiffs' counsel on board with doing that?

9          MR. McCUE:  To be blunt, there would have been no

10  settlement.  They were not interested in negotiating a

11  limited release because they knew that if they only resolved

12  three campaigns they were subject to exposure on all kinds of

13  other calls.  So as a practical matter of trying to settle

14  the case, that was their condition of settlement.

15         THE COURT:  Did you negotiate more money as a

16  result of that?  Is that the tradeoff?

17         MR. McCUE:  Yes, your Honor.  The

18  twelve-and-a-half-million-dollar settlement is one of the

19  largest TCPA vicarious liability settlements ever.  So that's

20  what you look at in terms of what is the reality of trying to

21  settle this case.  What are you willing to give, what are you

22  willing to give up, what are your risks on going forward.  We

23  talked a lot about that today.

24         But what I wanted to do as class counsel is I

25  wanted to represent everybody and get everybody a chance.

1    And I don't see any distinction between direct notice and

2    indirect notice.  They're all class members.

3          The direct notice people who were in the Charvat

4    campaigns, we had an articulable basis to say they got cruise

5    calls.  Just like the indirect notice claimants.  We made

6    them say under pains and penalties, I remember getting these

7    calls.  So everybody was treated the same as long as there

8    was a factual evidentiary basis to say they got cruise calls.

9          So you asked a question about why aren't there two

10   different classes.  Because they're all the same.  They got

11   the sample exact prerecorded call, there was no consent, and

12   they provided some type of evidentiary support to get those

13   calls.  If you did that, you were part of the class, whether

14   you're direct or indirect.  The only difference between

15   direct and indirect is direct got postcard, indirect got

16   media notice.  So that's where I come down on that issue.

17         A couple quick questions.  Real quick comments.

18   Mr. Hilton raised a few concerns about Pearson, attorneys'

19   fees, and expenses, and what would you take off of net, how

20   you define net.  Sounds very academic.  Sounds like he's

21   planning his appeal already.  And we'll deal with that.  But

22   it doesn't matter.  We're asking for $3.150 million in

23   attorneys' fees.  And that's reasonable under any analysis.

24   If you take the net here or take the net there, no matter how

25   you crunch the math, it's a reasonable fee given the result,

1    and given the time and effort that we put into this case.

2            Mr. McDonald raised a few kind of conspiracy

3    concerns about KCC.  I will tell you flat out that when I

4    learned about the admin was in the late winter, early spring,

5    right before we notified you, your Honor, of what was going

6    on.  And Mr. Dewitt and I had a number of uncomfortable

7    conversations where I was upset about the expenses but

8    understanding of the circumstances.

9            There was no collusion.  There was no back dealing.

10   It's nonsense.  If anything, I was pushing KCC to recognize

11   that we need to cap costs.  We need to reduce costs if we're

12   going to get this deal approved.  And to KCC's credit, they

13   were willing to work with me and cap their costs.  So there

14   is a lot of work that they did after they agreed to cap costs

15   they are basically writing off.

16           So we can throw darts at KCC, but I can tell you

17   from working through this with them for a long time, they did

18   an awful lot of work on this case, and there was no deals, no

19   no agreement, nothing.  That's all nonsense.

20           THE COURT:  So in order to entice KCC to sort of

21   trim back some of its estimates and agree to take less than

22   they might otherwise have come in front of me claiming that

23   they were entitled to, was there any -- I think the word, the

24   term used was horse trading, perhaps, that went on.

25           MR. McCUE:  The answer is no, but if I did, I don't

108

1    think there is anything wrong with that, if I said to him,

2    look, Rob I'm never going to hire you guys again unless you

3    work with me on reduced costs for the class, I don't see

4    anything wrong with that.  But I knew from working with KCC

5    and Rob that when there are extenuating circumstances in

6    cases that they would work with us to cap costs to reduce

7    costs.

8            They repeatedly came up with ideas, your Honor,

9    about how to reduce costs.  I remember one exchange we had

10   with you where you were asking about postcard notice and

11   saying that's the best way to give notice, which it probably

12   is, but KCC said, your Honor, that's going to cost hundreds

13   of thousands of dollars.  And that's when we agreed to do an

14   email.  KCC probably could have made more money off sending

15   postcards.  But it's just an example of how -- that they were

16   working with us to do the best they could for the class.

17           The last comment, your Honor, I ask Mr. Charvat to

18   address the Court briefly.  He wanted to address the Court

19   specifically about kind of an insinuation about when did he

20   hire me and different things like that.

21           THE COURT:  Yes.  Mr. Charvat, please do.  And use

22   the microphone.

23           MR. CHARVAT:  Thank you, your Honor.  Good

24   afternoon.  This is unfamiliar turf for me.

25           There was an insinuation, which is unfortunately

1    typical in lots of cases, that for some reason I somehow

2    colluded with Mr. McCue based on the fee rewards that you may

3    get or may not get in a class action case.

4              I had an attorney for many years that I was very

5    happy with.  It was Jack Faren in Columbus, Ohio.  I did

6    nothing but private cases with him, not class action cases.

7    And unfortunately on December 24th, 2010, he had a near-fatal

8    stroke.  He survived, but not well enough to ever practice

9    law again.

10             So the only reason I switched lawyers was not

11   because of some enticement from Mr. McCue, but it was because

12   of practicality.  I had several cases going, and I had no

13   lawyer.

14             THE COURT:  Okay.  I do have one --

15             MR. CHARVAT:  I have one other comment if you don't

16   have specific questions.

17             THE COURT:  I will have some more questions for

18   you, but I'll let you go ahead and make your comment.

19             MR. CHARVAT:  I'm one of the early people that

20   pursued cases in general, along with many others that came

21   along.  We did private cases.  And private cases meaning we

22   sued for ourselves, not class action.

23             We expected initially that there would be some

24   change in the telemarket industry, but they were so small

25   compared to the revenues the telemarket industry realizes

1    that collectively all of our suits had no impact on the

2    industry.  I and my friends received ever more telemarketing

3    calls over the years.  And it's our collective belief and

4    experience that we made no impact whatsoever.  However, if

5    you can have some class action cases, as occurred in this

6    case, you can get a response from the defendants that they

7    take it seriously.  They change their behavior, may get out

8    of doing the illegal telemarketing altogether.  But in order

9    for all of that to happen, you have to have people who are

10   willing to take on class action cases.

11            I've described what went on in this case to some of

12   my friends who have asked me and have done private cases.

13   Well, should I get into a class action case?  And I described

14   easy cases to them, and I've described this case to them.

15   And so far, all of them have said I'm not going to wait for

16   that long to maybe get something when I could file on my own,

17   not worry about a class, and get some compensation for the

18   calls I received.

19            So I defer to your decision.  I don't envy you.

20   Solomon only had to cut the baby into two parts.  You have a

21   lot of portions here.  But you must also consider something

22   that isn't in the briefs, and that is you have to have an

23   adequate reward for people to take on these class action

24   cases.  Otherwise they'll just do a private case, and that

25   will ripple down into effectively no enforcement of the TCPA.

```
 1              Thank you.

 2              THE COURT:  So Mr. Charvat, are you a lawyer?

 3              MR. CHARVAT:  Am I --

 4              THE COURT:  Are you a lawyer?

 5              MR. CHARVAT:  Of?

 6              THE COURT:  Of any kind.  An attorney.  Did you go

 7    to law school, do you practice?

 8              MR. CHARVAT:  Oh, I didn't hear you.

 9              THE COURT:  I'm sorry.  I'll speak into the

10    microphone and try to speak more clearly.

11              I'm curious if you're a lawyer.  It seems that

12    you've invested a lot in learning about the TCPA and class

13    actions.

14              MR. CHARVAT:  No, I'm not a lawyer.  I'm a parent

15    who was aggrieved when my wife and I were trying to raise two

16    kids and the phone wouldn't stop ringing.  And I tried

17    everything.  I blew whistles in the phone, I hung up the

18    phone, I left the phone off the hook, I told people I'd never

19    buy anything from telemarketing, and nothing stopped it.

20              My mother-in-law clipped out an article, said, you

21    know -- this is way back -- there is a law you can actually

22    sue under this.  That's when I started doing this.

23              I decided, as I think it was Edmund Burke said, all

24    that's necessary for the triumph of evil is good men do

25    nothing.  And I took it on.  Because this was obnoxious.
```

1  Constant interruptions.

2          So later I did go to a paralegal school, that was

3  many years after I had already done this, in order to try and

4  learn a little bit more about the ins and outs.  Turns out I

5  knew about as much as what went on in paralegal school from

6  practical experience.

7          THE COURT:  And what do you do for a living?  Are

8  you still employed?

9          MR. CHARVAT:  For many, many years, for about four

10  decades I was a software person.  Started in IT.  Software

11  analysis.  In recent years I've got a retirement job, I'm a

12  school bus driver for Westerville City schools.

13          THE COURT:  I think this was raised in the

14  briefing, and I at one point did see the opinion that at

15  least one other judge had raised the question of if this

16  practice of calling is so vexing for you, why don't you put

17  yourself on the do-not-call list.  I think that judge might

18  have actually required you to put yourself on the do-not-call

19  list.

20          MR. CHARVAT:  That was in the case of my third suit

21  against the Columbus Dispatch.  I had sued them, won at the

22  Supreme Court of Ohio *pro se*.  They called again later; I

23  sued them a second time.  They settled out of court.  Sued a

24  third time.  In that third suit, it was started before my

25  attorney had his stroke, and I was pressed into a situation

1   of not having an attorney represent me.  There was a hearing

2   that was scheduled for attorney fees for the defendant after

3   I had dismissed the case without prejudice.

4          I believe if you would read the briefing you would

5   find if there were any offenses it was done by the other

6   side, not myself.  But in any case, to settle the case, since

7   I had no attorney, I agreed to a settlement.  And the

8   settlement was formalized in the form of an order that I

9   would put my numbers on the do-not-call list.

10          The Dispatch was very frustrated with the fact that

11   I had sued them three times, but they didn't ever complain

12   about the fact that they kept calling even after a suit.  So

13   they pressed hard, I had no attorney, and I decided to do

14   that.

15          In the past before that I had managed, as was

16   available under the law, to try and issue individual

17   do-not-call requests to companies.  It's ineffective.  For

18   the reasons I told you earlier.  So I settled that case and

19   several others, since I had no attorney, that were

20   outstanding in order to move on at that point in time.

21          THE COURT:  Okay.  And now there is a more

22   comprehensive way that you can make yourself do not call for,

23   you know, in general.  Are you a do-not-call person, or are

24   you -- I don't know if your settlement required you to

25   specifically just indicate that to -- was it the Columbus

1    Dispatch, or to get on the national --

2              MR. CHARVAT:  The requirement was I put my numbers
3    on the do-not-call list.

4              THE COURT:  On sort of the national do-not-call
5    registry.

6              MR. CHARVAT:  National do-not-call list.  Which
7    they are and have been.

8              THE COURT:  Has that effectively put an end to your
9    lawsuits?

10             MR. CHARVAT:  No.  And it does not put an end to
11   the tele-terrorism, as Senator Hollings called it.  In spite
12   of all my suits for 20-plus years, private and class, the
13   number of calls that I receive.  And also in spite of the
14   fact that I'm on the RRDNC, the really, really do not call
15   him list, that's a private list of people that sell it to
16   telemarketers of lists of numbers of TCPA plaintiffs, these
17   are the people you really don't want to call, I still get
18   more calls than I ever have.

19             It's an industry that's out of control.  And this
20   is the only effective means of having some attempt to bring
21   it under control.

22             THE COURT:  And Mr. Charvat, do you have any
23   financial relationship, or are you receiving any financial
24   incentive, directly or indirectly, from any of the attorneys
25   or law firms that are involved in this case?

115

1          MR. CHARVAT:  Not only not in this case, not in any

2     other case.  Anything other than is public record, the awards

3     I do or don't get from the class action cases.

4          THE COURT:  And I should probably, given that

5     you've submitted an affidavit which was a declaration and has

6     the effect of being under perjury, I'm going to do this a

7     little reversed, and did not put you under oath when I

8     started asking you questions, so instead what I'm going to do

9     is ask Colette to place you under oath now, and I'm going to

10    ask you whether the statements that you just made in court

11    are all true and accurate to the best of your knowledge.

12          So Colette, if you would do that.

13          (Mr. Charvat sworn.)

14          THE COURT:  So all the statements that you just

15    made when you stood up and volunteered statements, as well as

16    the statements in response to my questions, were they true

17    and correct to the best of your knowledge?

18          MR. CHARVAT:  Yes.

19          THE COURT:  Let me see if I have other questions.

20          Mr. Charvat, were you involved in consulting with

21    your counsel about how to handle the issues that came up with

22    class notice, and how the news reports had gone out, and

23    there were many more claims that were filed than expected?

24    Were you involved in discussions with your attorneys about

25    that issue?

mari4rok

1    MR. CHARVAT:  Yes.  He kept me abreast of it.  Not
2  to the level of the detail that has come out here, but when
3  problems arose, he would contact me, either email or phone,
4  and we would talk about we've got this overwhelming response,
5  and that they were going to come before you and try and
6  figure out what to do about it.
7    THE COURT:  Were you concerned by the large number
8  of claimants who initially responded when the press reports
9  went viral?
10    MR. CHARVAT:  Yeah.  It was obviously unexpected.
11  It certainly never occurred in any of my other class cases to
12  have that overwhelming response, but again, there was never
13  any national publicity that occurred like that.
14    THE COURT:  Were you satisfied with how those
15  issues were resolved?
16    MR. CHARVAT:  Yes.  Especially -- I mean, even at
17  the time he was keeping me abreast of what was going on, but
18  especially after hearing everything this morning from both
19  sides I'm even more impressed with the fact that it was
20  handled in a way that -- the best way that I think could
21  probably come out of it.
22    It's a very difficult situation.  You do have
23  people that don't have telephone records that may have gotten
24  calls, and you have people like myself who can prove the
25  calls, but those are very, very few and far between, the

1  number that can actually prove it to the extent that I could

2  with a recording.  And how to perfectly make things fair I

3  believe is impossible.  Because how do you make everything

4  and anything in life perfectly fair.  And these look like

5  reasonable approaches that were taken in order to find who

6  the appropriate class members were.  And I endorse them.  I

7  think it's a fair settlement.

8            THE COURT:  You've received incentive payments

9  before for being a class representative, is that correct?

10           MR. CHARVAT:  Yes.

11           THE COURT:  I take it you have not received a

12  $50,000 incentive payment previously?

13           MR. CHARVAT:  They have ranged in the past from 10

14  to $30,000.

15           THE COURT:  Mr. McCue has represented that your

16  experience in this case was unusual, and that's one of the

17  reasons why he's asking for a higher incentive fee.  Can you

18  describe for me in what ways your experience here was more

19  difficult or challenging than what your prior experiences

20  have been as a class representative?

21           MR. CHARVAT:  Certainly.  It's well-covered in the

22  briefing as well as the statements he made earlier.  The

23  primary things were that I've never had a counterclaim filed

24  in a class action suit.  And one that I personally believe

25  was frivolous.  As a result of it, I spent many, many hours

1    in the law library downtown Columbus at the courthouse where
2    you get free access to Westlaw, as well as many, many hours
3    on my own using things like Google search, researching all
4    the telemarketing cases that I could find -- not
5    telemarketing, I'm sorry -- all the call recording cases that
6    I could find to find if there's any precedent for such a
7    claim, where someone in a single party state consent for
8    recording was sued by someone in an all party consent state,
9    and I could find no appropriate case that was similar to this
10   one.  But it took many, many hours.

11              When we prepared that affidavit I originally -- the
12   original draft of it, I had 900 hours in there, is how much
13   time I spent on this case.  And Matt said (indicating
14   inaudibly).  I have no doubt that I spent that much time on
15   this case.  Because I had to always prepare for the fact that
16   that counterclaim may survive, and I may have to litigate it,
17   I may have to take it up on appeal.  So I dug in and did the
18   research on it.

19              Also the accusations against my daughter.  They
20   proved ultimately, at great expense to my attorney in time
21   and money, they proved to be baseless.  They were based on
22   records that were proved to be fraudulent.  Yet those claims
23   were never dropped by the defendants.  Even when they became
24   aware of things, there was never a withdrawal of anything.
25   There was never an admission that they were wrong.  I never

1    to this day and point in time received an apology for the

2    assertion of those things that my daughter had somehow

3    instigated this.  She did not.  I did not.  And the claims

4    were baseless.

5          As an example of what goes on in the telemarketing

6    industry, in another case that's pending right now, the first

7    thing out of the block, as Mr. McCue mentioned this morning,

8    was they apparently did some research, found out about this

9    case, and ginned up a similar accusation.  Fortunately in

10   that case it was so poorly done that within 48 hours from

11   public records we were able to prove that it was wrong.

12   Every bit of it.  It's the standard go-to defense that occurs

13   in the telemarketing industry these days.  From my experience

14   and vicarious experience of other people I deal with, you

15   file a claim, and the first thing is, you went to a website

16   and granted consent.  To my knowledge it's never been proven

17   to be true.  Proving you didn't go to a website is nearly

18   impossible.  But in this case we were able to, and in the

19   other case I referred to we were able to.

20         THE COURT:  Okay.  Was there anything you wanted to

21   add, Mr. Charvat?

22         MR. CHARVAT:  Just that I defer to your judgment on

23   the matter, I agree you have a very difficult set of

24   decisions to make, and I can tell that you're paying close

25   attention to every detail, and I appreciate it.  Thank you.

120

1          THE COURT:  Thank you.

2          MR. McCUE:  Anything else for me, your Honor?

3          THE COURT:  I don't believe so.

4          MR. McCUE:  Okay.  I'll pop back up if you think of

5     anything else.

6          THE COURT:  In fact, I may --

7          MR. BECKER:  Your Honor?

8          THE COURT:  Yes.

9          MR. BECKER:  If I may just clean up one thing from

10    when I was up there before.  I just want to point out that

11    there were approximately 350,000 direct claim notices that

12    had gone out.  There was not a single objection by a direct

13    claim recipient concerning how much money they were going to

14    receive comparing them to indirect notice claimants.

15          I think the insinuation started coming up during

16    the Dunlap objection, and we talked about it briefly, but I

17    want to make it clear only a single objection that I'm aware

18    of was made by a direct notice claimant, and that was

19    objector Johnson, and it was not on that basis.

20          THE COURT:  Okay.  And what conclusion would you

21    like me to draw from that fact?

22          MR. BECKER:  That the treatment of the class as a

23    whole in a uniform manner is fair and reasonable; that anyone

24    who wanted to participate in the settlement who was within

25    the database is able to receive a fair and reasonable payment

1    regardless of whether they were a direct recipient or

2    indirect recipient, whether they were part of the litigation

3    class or not.

4           THE COURT:  Mr. McCue, I do have another question

5    for you since I'm now much more focused on the difference

6    between the class definition that was being presented to me

7    in the class certification briefing where we didn't get to a

8    ruling as opposed to the definition that is in front of me

9    for settlement purposes.

10          Is there a difference -- and I suppose I could go

11   back and get the class certification brief and compare it to

12   the settlement approval brief and sort of crosscheck how the

13   different factors for class certification are addressed there

14   in terms of whether this is a class that would support a

15   finding of typicality and commonality and all of that, but

16   from your perspective is there a difference in terms of the

17   ability for counsel to support that the requirements for

18   class treatment, which are slightly different in the

19   settlement context but the general principles are the same,

20   based on your earlier definition versus this one -- let me

21   rephrase it a different way.

22          Do you believe that you could have supported class

23   certification using the definition for the settlement class

24   if that had been what you briefed way back when we still had

25   active contested litigation?

1        MR. McCUE:  I certainly could have, your Honor.

2    You've heard a lot of argument today about how the dialer

3    database contained a lot of non-cruise-line calls.  That was

4    their argument.  We were prepared to take the position that

5    that entire database was cruise calls.  Proving that is

6    different.  But certainly could I take a position that could

7    have been?  Absolutely.  For litigation purposes we made a

8    strategic decision to limit the class to certain campaigns.

9        Due process is one of the reasons.  There are

10   decisions out there now where some of these TCPA cases, the

11   Department of Justice versus Dish Network went all the way to

12   trial, and the judge ended up ordering about $2.00 a call

13   because the number of calls were so massive it created due

14   process concerns.  That's one issue.  Consent.  So we wanted

15   to limit how many different consent arguments they could

16   raise at trial.  By focusing on the Charvat campaigns we

17   simplified things for trial.  But that has nothing to do with

18   kind of standing to represent the class or could we do it

19   this way.

20       And I come back to the fact that everyone is the

21   same.  Everybody in the dialer database is the same.  If

22   they're a direct notice recipient, we know they're in the

23   Phil Charvat campaigns, we have a good faith basis to know

24   they got cruise calls.  If they're not, then they're able to

25   provide some type of evidence, pains of penalties or

123

 1   verification.  So then those people are all the same.  There

 2   is no reason to treat them differently.  They got the same

 3   call, they didn't consent, same exact situation.

 4           So I think it would be unfair to treat the indirect

 5   notice claimants in any other way.  Everyone is being treated

 6   the same, they're getting the same recovery, same *pro rata*

 7   recovery.

 8           I hope I'm answering your question, your Honor.

 9           THE COURT:  Yes, I think so.  The short answer is

10   yes, you feel that you could have defended this class

11   definition, which the class definition is not about -- in

12   theory it's focused on people who are in the dialer database

13   who received calls mentioning these specific defendants,

14   which is, again, we talk about direct notice and indirect

15   notice as a way of distinguishing between different types of

16   class members, but under the class definition, it's just one

17   class definition.

18           MR. McCUE:  Correct, your Honor.  If we had gone to

19   trial on that expanded definition, our argument would have

20   been every person in that dialer database got a cruise call

21   and here's why.  The only reason why we agreed to a smaller

22   class was litigation-specific strategy, how to make the case

23   easier to prove.  We still had numbers -- we had 400,000

24   calls.

25           THE COURT:  And you would have been able to if you

124

1    had to brief and support findings of commonality typicality,

2    the adequacy of the class representative based on the broader

3    class definition?

4              MR. McCUE:  Yes, your Honor.  And I could tick

5    through those if you would like.

6              THE COURT:  I don't know that that's needed because

7    I think it's sort of in the approval brief.

8              MR. McCUE:  Right.

9              THE COURT:  Okay.  I don't know that I have any

10   further questions.  I think what I would like to do is set a

11   timeline to get the couple of additional submissions that

12   I've asked for, which include the more detailed cost

13   breakdown at least up to the $33 million cap for KCC.

14             And Ms. Bryan, are you still there?

15             MS. BRYAN:  Yes.

16             THE COURT:  I think you may have mentioned the

17   point of the hearing where I indicated that I was going to

18   grant the sort of provisional leave to file under seal KCC's

19   more detailed breakdown.  It was suggested that the level of

20   detail might reveal trade secrets, or confidential

21   information, proprietary information that could be helpful to

22   your competitors, so I sort of indicated that if that is

23   KCC's position, that you can file it under seal.

24             I'll look at it, and what it means is if I think

25   that's not an appropriate approach I might ask for the

1   parties' input on that of why it should remain under seal.
2   But you will be granted the ability to file it under seal in
3   the first instance, and then I would like for Mr. McCue, sort
4   of the supplemental affidavit just indicating whether at
5   least the people who filed objections indicating that they
6   were having difficulties with the claim process ever actually
7   ended up submitting a valid claim.  I guess we had one person
8   here represented by counsel who had concerns about the
9   process who didn't make it through, and so I'd like to know
10  if the others, I think there might have been a couple dozen
11  that actually filed something on the docket, did or did not
12  make it through.  I suppose that begs the question of whether
13  it's because they didn't reach out to the parties as opposed
14  to for some other reason.
15          MR. McCUE:  To be clear, your Honor, I don't think
16  the objector tried to make some submission.  It's not that
17  they didn't make it through the process, something didn't
18  happen in the process.  The objector didn't file anything.
19          THE COURT:  Didn't submit anything to try to submit
20  anything through the claims process.
21          MR. McCUE:  Correct.
22          THE COURT:  Because there was a filing with the
23  court, and I guess that may be the case for some of the
24  people who are on the docket -- did you have a practice of
25  reaching out to *pro se* objectors who made filings on the

1    docket indicating that they were having difficulty with the
2    process?

3             MR. McCUE:  Yes, your Honor.  Not just on the
4    docket.  I had a lot of consumers reach out to me directly,
5    and my practice was to respond to every single one of them.
6    It was definitely my practice that if someone filed something
7    on the docket, on ECF, or made it known to me that there was
8    an objection, it was my practice to respond to each one of
9    those class members.  Some of them didn't respond, many of
10   them did.

11            THE COURT:  I suppose that perhaps raised the
12   question of why you didn't reach out to Mr. Warner when you
13   saw that he had filed an objection on behalf of
14   Ms. Evancheck.

15            MR. McCUE:  To clarify, I reached out to *pro se*
16   objectors who didn't have counsel thinking they needed help.
17   I didn't think of the same if someone had their own counsel.

18            THE COURT:  Why not?

19            MR. McCUE:  I thought if counsel had a question
20   they would call me.  It wasn't the same level of concern.
21   The ones I wanted to make sure I responded to was someone who
22   was confused, or someone thought, oh, I can't find my
23   historical phone bill; you don't have to submit a historical
24   phone bill.  Those are the folks I focused on.

25            THE COURT:  Is that because you had ethical

1    concerns as sort of class counsel if there was somebody who

2    was potentially in the class but had their own attorney, and

3    so you didn't want to reach out to them directly?

4         MR. McCUE:  To be honest, your Honor, it was more

5    just a practical concern that if someone has an attorney, I

6    would think that they're represented by that attorney, but if

7    someone is *pro se* and is confused, I felt an obligation as

8    class counsel to reach out to them and make sure they got

9    help.  And that's all I was trying to do.

10        THE COURT:  Okay.  So those are the two items that

11   I would like to receive.  I suppose the more difficult one

12   may be the KCC detail, though I imagine the information about

13   whether or not the people who filed the objections ended up

14   getting valid claims recognized is probably a task that KCC

15   needs to be involved in as well.  So perhaps I can find out

16   from Mr. Cooper or Mr. Dewitt how much time will be needed to

17   put together that information.

18        MR. DEWITT:  That would be a better question for

19   Mr. Cooper.

20        THE COURT:  Mr. Cooper?

21        MR. COOPER:  Yes, your Honor.  I think it will

22   probably only take us a couple of days to get that together.

23        THE COURT:  So today is the 30th.  Because I'm sure

24   it will take a little bit of time to kind of put it into a

25   format and have folks look at it, I'll give you until the end

1   of next week.  You can submit it sooner if you would like.

2   So until November 9th for those two submissions.

3           Once I receive that, I will take the matter under

4   advisement for ruling.  Given the number of issues, legal and

5   factual that have been raised, I'm anticipating I'll be

6   issuing a pretty detailed ruling with specific findings with

7   respect to the propriety of accepting the class settlement.

8           I don't think there is any other paper that I need

9   on this.  I've got a lot of paper.  So what I will do is set

10  a status date off in the future hoping that -- well, I

11  suppose if I approve the class settlement, then there will be

12  orders that are issued to set everything in motion and

13  finalize with funding the settlement, et cetera.

14          If the settlement is not approved, then we'll need

15  a status date to figure out what's going to happen next.  So

16  if I'm getting the information no later than the 9th, I'll

17  set our status -- I'm going to set the status hearing for

18  December 19th, at 9:30.  And once we know the outcome of the

19  ruling and have a better idea of what needs to be

20  accomplished, if anything, at that status, I may specifically

21  ask that everybody be here in person or I'll allow telephonic

22  appearances.  I just don't know at this point what we're

23  going to need to do.

24          Anything else before we adjourn for the afternoon?

25          MR. McCUE:  Nothing from the plaintiff.  Thank you,

1    your Honor.

2              MR. BECKER:  Thank you, Judge.

3              MS. MacIVOR:  Thank you.

4              MR. HILTON:  One very quick point for objectors.

5    May I approach?

6              THE COURT:  Yes, you may approach.

7              MR. HILTON:  Thank you, your Honor.

8              About I think roughly 20 minutes ago Mr. Becker

9    with the cruise defendants had represented what he believed

10   objector Johnson had argued regarding the direct versus

11   indirect notice.  Objector Johnson, whom I represent, and I

12   just felt it was appropriate for me to clarify on the record

13   what objector Johnson's objections are, he is the only

14   objector who was a direct notice claimant, so he's the only

15   postcard recipient.

16             Mr. Becker made the point objector Johnson didn't

17   say or make any objections about the fact that he was a

18   direct notice claimant and here are these other indirect

19   notice claimants who are being included in the settlement.  I

20   just wanted to direct your attention to one document that I

21   did file on his behalf that addresses this issue.  It's

22   docket 651, page ID 23227.  And the objection is not that

23   objector Johnson wishes the settlement to be disapproved

24   based on the fact that he had a postcard and all of these

25   other people didn't, instead, it was targeted towards how

1    objector Johnson views class counsel's performance in light

2    of the fact that there was this global release, but the

3    litigation would have proceeded with just a smaller 400,000

4    class.  And objector Johnson in that brief submits that class

5    counsel shouldn't receive any additional risk enhancement in

6    its class counsel fee award based on that, and that also

7    class counsel should be limited under Pearson to one-third of

8    the net settlement fund, which is a holding of that case, and

9    I submit it's not purely academic.

10            Thank you.

11            THE COURT:  Thank you.  Anything else from the

12   objector counsel?

13            Okay.  Good.  That's all I have for now.  Thank

14   you.  We are adjourned.

15       (End of proceedings.)

16            C E R T I F I C A T E

17

18       I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled case on

20   October 30, 2018.

21

22

23   /s/Colette M. Kuemmeth___
        Court Reporter
24

25