**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PHILIP CHARVAT, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 12-cv-05746 |
| v. | ) ) | |
| | ) | Judge Andrea R. Wood |
| ELIZABETH VALENTE, RESORT MARKETING GROUP, INC., CARNIVAL CORPORATION & PLC, ROYAL CARIBBEAN CRUISES, LTD., and NCL (BAHAMAS) LTD., | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Beginning in 2011, Philip Charvat received a series of prerecorded telemarketing calls

from Defendant Resort Marketing Group, Inc. and its principal Elizabeth Valente (together,

"RMG"), promoting travel products and services offered by Defendants Carnival Corporation &

PLC, Royal Caribbean Cruises, Ltd., and NCL (Bahamas) Ltd. (collectively, "Cruise

Defendants," and together with RMG, "Defendants"). Charvat had not consented to receive the

calls, and so he filed this lawsuit as a putative class action against Defendants for alleged

violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. After

extensive, often contentious, litigation, the parties reached a classwide settlement for which they

now seek final approval. (Dkt. No. 682.) In addition, Charvat seeks approval for his requested

incentive award (Dkt. No. 580), and his counsel have petitioned for an award of attorneys' fees

and costs (Dkt. No. 660). Three objectors have also moved for their own incentive awards (Dkt.

No. 693) and attorneys' fees for their counsel (Dkt. No. 691). For the reasons explained below,

the Court grants final approval of the class settlement, grants Charvat's petitions for attorneys'

and costs and for an incentive award (albeit the latter at a reduced amount than requested), and denies the objectors' motions for attorneys' fees and incentive awards.

## BACKGROUND

The TCPA prohibits the use of "any automatic telephone dialing system or an artificial or prerecorded voice" to call cellular and landline phones without prior express consent from the recipient of the calls or messages. 47 U.S.C. §§ 227(b)(1)(A), (B). The statute also establishes a private right of action—for each violation, a consumer may recover $500 in damages, with the damages amount increasing to up to $1,500 if a court finds that the defendant "willfully or knowingly violated" the TCPA. *Id*. § 227(b)(3).

In this case, Charvat alleges that, as part of an extended robocalling campaign, RMG, a travel agency, repeatedly called his phone with a prerecorded message informing him that he had been selected to receive a cruise with one of the Cruise Defendants. The Cruise Defendants maintain that RMG made those automated, prerecorded phone calls without informing them or obtaining authority to do so. Charvat filed his original class action complaint on July 23, 2012. That initial complaint was followed by the First Amended Complaint, the Second Amended Complaint, and finally, the Third Amended Complaint, which was filed April 1, 2016. After extensive fact and expert discovery, Charvat moved for class certification in May 2016. (Dkt. No. 492.) Briefing for the class certification motion spanned several months and generated over 3,000 pages of material. Then, while the class certification motion was pending in early 2017, the parties requested and were granted a stay of the proceedings to permit them to participate in a private settlement mediation. Although the mediation in March 2017 did not immediately result in a settlement, the parties continued to engage in settlement discussions and subsequently

informed the Court in April 2017 that they had reached an agreement-in-principle for a classwide settlement.

On June 7, 2017, Charvat moved for preliminary approval of the settlement. The Court granted preliminary approval on July 6, 2017, after an in-court hearing where the terms of the settlement and the parties' proposed plan for providing notice to class members was discussed at length. (Dkt. No. 576.) The settlement agreement requires that Defendants establish a common settlement fund of $12,500,000.[1] From that fund, Class Counsel seek payment of $3,150,000 in attorneys' fees, reimbursement of expenses in the amount of $207,548, and an incentive award for Charvat of $50,000. Additionally, the settlement agreement allocates $3,000,000 for costs incurred by the Settlement Administrator, KCC Class Action Services LLC ("KCC"), in connection with processing and analyzing claims. The settlement would permit a claimant to recover for up to three calls per telephone number, with a maximum value for each call set at $300. Although an individual claimant could potentially recover a maximum of $900 under the terms of the agreement, any actual recovery will be reduced pro rata because the number of submitted claims exceeds $12,500,000. The final average amount per claimant is therefore likely to be $22.17, with each call valued between $7.41 and $8.42.

Between the preliminary approval hearing and the final fairness hearing on October 30, 2018, the Court held several interim hearings to ensure that the distribution of class notice and general claim process were progressing appropriately and that the interests of class members were being addressed in a timely and fair manner. Of particular concern was the extensive publicity the settlement received through national and local news outlets, which misleadingly

---

[1]The settlement agreement establishes a settlement fund of between $7,000,000 and $12,500,000. Under the terms of the agreement, the actual amount of the settlement fund depends on the number of valid claims filed. As a result of the high number of approved claims, the settlement fund will max out at $12,500,000.

reported that each class member would receive $900. In actuality, the $900 figure represented the maximum amount a class member could receive, with the actual amount of each class member's recovery dependent on the number of valid claims submitted. The misleading press coverage resulted in a response rate from class members much greater than the parties had anticipated (and thus reduced the anticipated recovery per claim) and raised a risk of fraud in the claim process. To address these issues, the Court approved a plan for providing supplemental notice to class members explaining further the claim process and for verifying claims through a request for supplemental documentation. (Order Amending Publication Notice Plan, Dkt. No. 596; Order Authorizing Follow Up Documentation, Dkt. No. 620.)

Thirty-one separate objections were submitted to the Court in advance of the final approval hearing. The objections address several subjects: (1) the claim verification and supplemental documentation processes, (2) the settlement's limitation allowing recovery for no more than three violations, (3) the amount of the anticipated per-claim payment, (4) the total amount of the settlement fund, (5) Charvat's suitability as class representative, (6) Charvat's proposed incentive fee, and (7) Class Counsel's proposed attorneys' fees. Most of the objections, however, take issue with the supplemental documentation process, with the next most common issue being Charvat's proposed incentive fee. The Court will discuss the objections in greater detail below.

At the final approval hearing on October 30, 2018, the Court heard arguments from objectors as well as the parties, heard testimony from Charvat, and requested two supplemental post-hearing filings. (Dkt. No. 707.) Specifically, the Court requested that (1) KCC provide a detailed accounting of its fees, costs, and expenses incurred in administering the claims, and (2) Class Counsel file an affidavit attesting to whether objectors who claimed to have had difficulty

4

complying with claim submission or verification process were deemed to have submitted a valid

claim. Both supplements were filed with the Court in November 2018. (Dkts. No. 709, 711, 712.)

Having considered the extensive record before it, the Court now concludes that the proposed

classwide settlement satisfies the requirements of Federal Rule of Civil Procedure 23.

## DISCUSSION

### I.      Class Certification

The Court first considers whether the following class should be certified for settlement

only:

> All Persons in the United States who were the owner, subscriber or
> user of residential or cellular telephone numbers located in the RMG
> Defendants' dialer databases and who received pre-recorded
> telemarketing calls from the RMG Defendants, which referred to the
> trade names of any of the Cruise Defendants between July 23, 2009
> through March 8, 2014.

"Confronted with a request for settlement-only class certification, a district court need not

inquire whether the case, if tried, would present intractable management problems, for the

proposal is that there be no trial." *Smith v. Sprint Commc'ns Co., L.P.*, 387 F.3d 612, 614 (7th

Cir. 2004) (internal citations omitted). But settlement-only actions cannot evade the requirements

of Rule 23, as "[f]ailure to meet any one of the requirements of Rule 23 precludes certification of

a class." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993).

To grant class certification under Rule 23, the Court must be "satisfied, after a rigorous

analysis" that the Rule's requirements are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

350–51 (2011). Failure to meet a single one of these requirements precludes class certification.

*Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 513 (7th Cir. 2009). To be certified, a proposed

class must first satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that

joinder of all members is impracticable; (2) there are questions of law or fact common to the

class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). If Rule 23(a) is satisfied, the proposed class must then satisfy at least one of the three categories listed in Rule 23(b); in this particular instance, the category of cases "in which the common questions predominate and class treatment is superior." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).

###    A.    Rule 23(a) requirements

Class certification requires the party seeking certification to demonstrate, by a preponderance of the evidence, that the putative class satisfies all four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation. Numerosity is generally satisfied when there are at least forty members in the putative class. *See Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 491 (N.D. Ill. 2015); *Pruitt v. City of Chicago*, 472 F.3d 925, 926–27 (7th Cir. 2006). A plaintiff can show commonality by demonstrating the class members "have suffered the same injury." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Class members need not have identical claims: what matters is these claims "depend upon a common contention" of such a nature that determination of its "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Typicality is satisfied when the named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (internal citation omitted). Finally, the plaintiff must meet the adequacy of representation requirement by showing that (1) class counsel is qualified, experienced, and capable of conducting the litigation and (2)

the named plaintiff's interests are not antagonistic to other class members. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

First, there is no question the proposed class meets the numerosity requirement. Over 270,000 claims have been approved by the parties, and many more would may have been eligible for a payment. Second, commonality is satisfied by the shared nature of the injury common to all class members: receipt of at least one unwanted automated call or voicemail promoting the products of the Cruise Defendants. The claims of all class members depend on resolving common questions, such as whether the calls made by RMG used an "artificial or prerecorded voice" within the meaning of the TCPA and whether TCPA statutory damages would be available. Third, Charvat's claims are typical of class members, as he claims that Defendants violated the TCPA when RMG sent automated calls promoting the Cruise Defendants' products to thousands of phone numbers. Any minor factual variations (such as receipt of the calls on a landline instead of a cell phone) are immaterial to the key question of whether the TCPA claims arise from the same course of conduct and share a common legal theory.

Finally, Charvat is an adequate representative of the class. He claims Defendants made unwanted calls to his telephone number in violation of the TCPA, giving him standing to sue. Some objectors assert that Charvat's interests are not aligned with those of the settlement class because Charvat has been involved in many TCPA cases and seeks a high incentive award, while other class members are likely to receive significantly smaller amounts. Objector Fruchter asserts that Charvat is additionally unsuitable because he received the automated calls on a landline instead of a cell phone and would face potential defenses or counterclaims unique to him alone (such as a potential counterclaim for recording the robocalls). (Dkt. No. 604.)

7

The Court finds these arguments unpersuasive. Charvat's involvement in other cases does not mean he was injured any less when he received the unwanted phone calls at issue here. That he received similar or identical messages on a landline phone instead of a cell phone does not makes the calls any less of a TCPA violation. Moreover, Charvat's decision to record the phone calls benefited the settlement class by providing them with evidence of the extent and nature of the TCPA violations. Similarly, Charvat's frequent participation in TCPA cases does not make his injury any less real simply because he has suffered similar ones in earlier cases. Additionally, Charvat made his request for an incentive award after he had already participated in years of litigation, including seeking and responding to discovery requests and sitting for a deposition. While he is likely to receive a higher payout than other class members, this goes hand in hand with Charvat incurring a higher risk by agreeing to be the named plaintiff in the case. Given his efforts to advocate for the class—whether by participating in discovery or testifying at the final approval hearing—the Court does not find that Charvat has any conflicts of interest that would prevent him from representing the class adequately. Finally, Class Counsel is adequate in that they are experienced in class actions and, in particular, TCPA litigation.

Accordingly, the Court finds that the Rule 23(a) requirements have been met.

### B. Rule 23(b) requirements

Rule 23(b) provides the circumstances under which a class action may be maintained after satisfying the requirements of Rule 23(a). Charvat relies specifically on Rule 23(b)(3) for certification. A proposed class satisfies Rule 23(b)(3) if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This inquiry "tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Relevant factors include "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

The Rule 23(b)(3) requirements are satisfied here. The common questions speak to issues at the heart of each individual claim: whether the claimant is eligible for TCPA damages for a robocall and whether the call itself meets the definition of an automated, prerecorded call as defined by the TCPA. A single adjudication resolves all of these claims. Moreover, given the likelihood that damages would be limited to a few hundred dollars at most, it is unlikely class members would have much interest in controlling the prosecution of separate actions. Extensive litigation had not yet occurred with respect to the injuries suffered by the class members here when Charvat brought his lawsuit. And given the shared nature of the unwanted calls and voicemails, it is unlikely that managing a class action would prove to have any special difficulties: the claims are so similar in nature that a class action seems the most straightforward way of resolving them. In short, the common questions do represent a significant aspect of the case, they can be resolved on classwide basis, and they predominate over individual issues. The proposed class therefore satisfies Rule 23(b)(3).

## II.    Approval of Proposed Settlement

Having determined that certification of a settlement-only class is appropriate, the Court turns to the specifics of the settlement proposed here. This Court may approve a settlement binding class members only if it determines, after proper notice and a public hearing, that the

proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)-(2). In making

this determination, Rule 23(e)(2) requires the Court to consider whether (1) the class

representatives and class counsel have adequately represented the class, (2) the proposal was

negotiated at arm's length, (3) the proposal treats class members equitably relative to each other,

and (4) the relief provided by the settlement is adequate. Fed. R. Civ. P. 23(e). In addition, courts

in the Seventh Circuit consider the following five factors: (1) the strength of the plaintiffs' case

compared against the amount of the defendants' settlement offer; (2) the complexity, length, and

expense of continued litigation; (3) the amount of opposition to the settlement; (4) the opinion of

experienced counsel; and (5) the stage of the proceedings and the amount of discovery

completed. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006)

(internal citation omitted). In making their decisions, courts should "consider the facts in the

light most favorable to settlement." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (internal

quotation marks omitted). This does not mean a court should rubberstamp a settlement

agreement, however; instead, courts must remain vigilant for any evidence of collusion between

the defendants, the named plaintiff, and class counsel. *See Eubank v. Pella Corp.*, 753 F.3d 718,

720 (7th Cir. 2014).

### A.    Adequacy of Representation of the Class

The Court finds that Charvat has represented the class diligently as the named plaintiff:

he sat for a deposition, responded to discovery requests, and assisted Class Counsel throughout

the litigation. For their part, Class Counsel zealously represented the class throughout the action,

including through a lengthy and contentious discovery period that involved serving several sets

of discovery requests on Cruise Defendants, drafting seven motions to compel (and defending

against several others), and participating in no less than fifteen depositions. Class Counsel also

prepared for and attended mediation when it appeared to be a feasible route to a satisfactory settlement; and although the mediation itself did not conclude with a settlement, Class Counsel pursued negotiations afterward that led to the proposed settlement before the Court today. The Court finds that Class Counsel more than adequately represented class members.

### B.     Arm's Length Negotiations

The record reflects that the proposed settlement here was negotiated at arm's length after a lengthy period of litigation. Unlike many class action settlements in which settlement negotiations begin before discovery even takes place, this case was contested through an adversarial and contentious process. The parties attended a full day of mediation that, after initially failing to result in a settlement, finally jumpstarted negotiations between the parties. The settlement agreement contains no red flags that would lead the Court to think the settlement agreement resulted from anything other than good faith arm's length negotiations.

### C.     Equitable Treatment of Class Members

The proposed settlement allows each class member to recover for up to three illegal calls per telephone number. Since class members may have received more than three unwanted calls, some may contend that this represents an unfair outcome. Indeed, Objector Schilling complains that the settlement is unfair for precisely this reason. But capping the recovery is reasonable— without such a provision, a relatively small number of class members could swallow up a significant portion of the settlement fund, resulting in a smaller per-claimant payout for a relatively minor actual injury. A business or institution, for instance, that filed claims for calls made to employees' cell phones or landlines might claim entitlement to several thousand dollars of a limited settlement fund. Class Counsel's decision to cap recovery at three requests per claimant is a reasonable way of ensuring that every individual claimant has the best possible

11

payout. Moreover, the ability to opt out of the settlement allows class members who received more than three calls to pursue the possibility of a greater award in an individual suit. The Court thus finds that the proposal is equitable for class members.

**D.     Adequacy of Relief**

In considering whether the relief provided by the settlement is adequate, Rule 23(e)(2) instructs the Court to take into consideration the costs, risks, and delay of trial and appeal; the effectiveness of the proposed method of distributing relief; the terms of any proposed award of attorneys' fees; and any agreements made in connection with the proposed settlement. Fed. R. Civ. P. 23(e)(2). Since the factors articulated by the Seventh Circuit subsume most of these factors, the Court will consider the adequacy of the settlement's relief against the background of the factors. *See Snyder v. Ocwen Loan Servicing, LLC*, 14-cv-8461, 2019 WL 2103379, at *5 (N.D. Ill. May 14, 2019).

**1.     Strength of Case against the Settlement Offer**

The "strength of plaintiffs' case on the merits balanced against the amount offered in the settlement" is the most important factor for determining whether a proposed settlement is fair under Rule 23(e). *Synfuel*, 463 F.3d at 653. The Court must "estimate the likely outcome of a trial" in assessing whether a settlement adequately disposes of the case. *Eubank*, 753 F.3d at 727. As it currently stands, the settlement requires the Cruise Defendants to pay $12,500,000 into a common settlement fund. After deducting attorneys' fees, costs, administrative expenses, and an incentive award for Charvat, the 274,851 class members who submitted timely claims will receive their pro rata share of the settlement fund, which amounts to an average of $22.17 per claim.

As some objectors note, that recovery is significantly below the $500 recovery available under the statute for each call, or $1,500 per call for violations willfully or knowingly committed. 47 U.S.C. § 227(b)(3). But a settlement does not need to provide the class with the maximum possible damages in order to be reasonable. *See, e.g.*, *Douglas v. Western Union Co.*, 328 F.R.D. 204, 215 (N.D. Ill. 2018) (approving TCPA settlement providing $95.90 per claimant). Here, individual class members will receive compensation without suffering more than a few calls or having to endure the time, expense, and uncertainty of litigation. While the average consumer payout of $22.17 is not anywhere the statutory maximum, it is also not out of line with other approved TCPA class action settlements. *See, e.g., Kolinek*, 311 F.R.D. 493 (average award of $30 per claimant); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015) (average award of $39.66 each); *Rose v. Bank of Am. Corp.*, 12-cv-04009, 2014 WL 4273358 at *10 (N.D. Cal. Aug. 29, 2014) (discussing range of acceptable TCPA settlements and approving $20.00 to $40.00 per claimant). And given the extensive publicity received by the case and the surge in claimants that resulted, it is not surprising that the average payout is on lower end of approved TCPA class action settlements. Simply put, while certain objectors correctly note that the average recovery per claimant is well below the $500 statutory recovery available for each call (or $1,500 if the violations were willful or knowing), the inability to pay every injured plaintiff the absolute statutory maximum does not reflect a failure of the settlement itself. *See* 47 U.S.C. 227(b)(3).

Moreover, even if the amount of the recovery per class member is less than what one might typically expect in a TCPA case, the typical recovery in these cases is still only in the realm of a few dozen dollars. Regardless of class members' recoveries, the settlement still serves the purpose of punishing Cruise Defendants for their role in the controversy. That is, regardless

13

of what class members receive, *Defendants* are still paying the same substantial amount of $12,500,000. The settlement serves as a deterrent to potential future defendants who might think twice about violating the TCPA in an effort to boost business.

Additionally, the Court notes that absent a settlement, each of the parties would face very real litigation risk at trial. Charvat, for instance, may well have failed to prevail at trial, as his claims were predicated on the notion that the Cruise Defendants were vicariously liable for RMG's actions in sending the telemarketing calls. Should the Court or a jury have found that RMG was not acting as an agent for the Cruise Defendants, not a single member of the class would have received any payment. In sum, although the matter was not actually litigated, the Cruise Defendants had at least one colorable argument that could very well have foreclosed *any* recovery at all. On the other hand, the Cruise Defendants faced the risk of paying more at trial if Charvat and the class members prevailed. There is no reason to believe the parties failed to take these considerations into account when choosing to settle this case. Given the above, the Court concludes that this factor weighs in favor of approving the settlement.

### 2.      Complexity, Length, and Expense of Future Litigation

The Court must consider the likely complexity, length, and expense of continued litigation. *Synfuel*, 463 F.3d at 653. Here, while the parties exchanged a substantial amount of discovery, they had not yet proceeded to filing motions for summary judgment or preparing for trial.[2] Given the course of this litigation, it is reasonable to assume that summary judgment and pretrial issues would be hotly contested. As a result, any relief to class members would still be far down the road and may ultimately be entirely denied. Approving the proposed settlement

---

[2] While Charvat filed a motion for summary judgment as to a counterclaim raised by the Cruise Defendants (Dkt. No. 169), the parties shortly thereafter stipulated to the voluntary dismissal of the counterclaim and the motion was terminated. (Dkt. No. 193.)

agreement will end the case and cause benefits to flow in short order. In sum, the Court finds that the stage of proceedings supports approving the settlement.

### 3.  Amount of Opposition

"Significant opposition to a proposed settlement by interested parties should signal to a court that the settlement should not be approved." *Kolinek.* 311 F.R.D. at 495 (citing *Synfuel Techs.*, 463 F.3d at 653). Courts assess whether opposition levels are "low" by comparing the number of objectors and opt-outs to the number of individuals reached by the notice plan. *Kolinek*, 311 F.R.D. at 495. Opt-out and objection rates below 0.01% suggest that a settlement is reasonable. *In re Sw. Airlines Voucher Litig.*, 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (finding the fact that more than "99.9% of class members have neither opted out nor filed objections" to be "strong circumstantial evidence in favor of the settlements").

Here, as the settlement administrator, KCC initially received over 2.7 million claims, with 274,851 of those claims ultimately accepted as valid. A total of 287 class members opted out of the settlement and thirty-one objections were filed with the Court. That means only 0.001% of valid claimants chose either to opt out of the settlement or file an objection. Such a low percentage of opposition strongly suggests that the settlement is fair, reasonable, and adequate. While Objectors Johnson and Shelton contend that objections are underreported because the process was "difficult" and public perception led class members to think they could not object, the Court finds this to be unlikely. Thirty-one class members, including Johnson and Shelton, managed to file objections, including several individuals who did so *pro se*, which suggests that the process was readily accessible to class members. Moreover, the publicity the case received and the effort undertaken by Class Counsel to keep class members informed

15

through a regularly updated website meant that potential claimants had many avenues to become aware of their options with respect to participating in the case.

The Court also notes that the bulk of objector arguments focus on two issues: (1) the burden placed on class members in complying with the supplemental proof process, and (2) the failure of the settlement to award members the statutory maximum of $500 per call. The Court does not find that the burden placed on class members in complying with the supplemental proof process was terribly substantial. Claimants had to submit some form of documentation, such as a phone bill or copy of a phone directory page, to show ownership, use, or subscription to the phone number relating to the claim. Claimants were permitted to redact private account information and supporting documents only needed to be emailed or uploaded to a particular webpage. The supplemental proof process was a necessary procedure for safeguarding the integrity of the claim process: after the case received heavy publicity in the media, the parties adopted this procedure to vet the high volume of claims submitted and protect the settlement class from any potential fraud.

With respect to the payout rate, the Court appreciates that some class members may be unhappy about receiving approximately $22.17 per claim. Moreover, many claimants likely gained notice of their claims by reading the third-party media reports that suggested, rather misleadingly, that claimants would receive $900. But the surge of claimants that resulted from the press coverage was not a situation created by the parties. For most individuals, the experience of receiving the recorded calls or messages at issue lasted only seconds. No demands were made, no money exchanged hands, and not one objector has indicated how any of the calls could be considered distressing. Given the low harm experienced by class members, the Court finds objector concerns regarding the low payout rate to be unwarranted.

### 4. Opinion of Competent Counsel

The opinion of competent counsel is relevant in determining whether a class action settlement is fair, reasonable, and adequate. *Synfuel Techs.*, 463 F.3d at 653. Class Counsel here are experienced TCPA litigators who strongly support the settlement. This factor weighs in favor of the settlement.

### 5. Stage of Proceedings and Amount of Discovery Completed

Finally, courts should consider the stage of proceedings and the amount of discovery completed in order to determine "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Bd. Of Sch. Dirs. Of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980). Here, the parties engaged in a substantial amount of discovery over the course of multiple years. Simply put, the parties have completed enough discovery to place a reasoned value on their respective positions and litigation risk. This factor weighs in favor of settlement.

### 6. Absence of Collusion

In addition to the above factors, the Seventh Circuit has emphasized the importance of constant vigilance regarding collusion in class action settlements. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 637 (7th Cir. 2014) (noting the danger of collusion should district court judges fail to apply intense scrutiny to settlements). The danger is especially salient in class action suits, where "the class has limited ability to hold accountable either the named plaintiffs or class counsel." *Douglas*, 328 F.R.D. at 216. Courts must be on the lookout for deals that promote "the self-interest of both class counsel and defendant" but fail to provide adequate compensation for the class. *Eubank*, 753 F.3d at 720.

Here, the record provides no basis from which to conclude that the proposed settlement resulted from collusion between or among the parties. To the contrary, the parties have been embroiled in contentious litigation for several years. The parties quarreled over the extent of discovery and briefed several motions to compel during the discovery period, prepared for and attended an unsuccessful mediation, and presented oral argument at well over a dozen motion hearings. In sum, the Court finds that nothing on the record suggests the proposed settlement has been tainted by collusion.

### 7.    Objections to the Settlement

Thirty-one individuals have submitted objections arguing that the Court should either modify or not approve the proposed settlement. The Court has addressed some of the objectors' arguments above in analyzing the factors for approval of a proposed class settlement and will address those concerning the incentive award for Charvat and Class counsel's attorneys' fees and costs below. The Court focuses here on the remaining objections.

Three objectors take issue with the administrative costs for this case, which they contend are excessive and not fully documented. (Dkt. Nos. 671, 672.) These concerns, however, were addressed by the Court at the final approval hearing: the Court noted that costs had increased significantly, and while that was not necessarily an indicator that anything was amiss, it did not appear that KCC had fully documented the work associated with the additional administrative steps taken to effect notice and vet potential claimants. The Court requested that KCC provide a detailed accounting of all expenses. Since then, KCC has filed an additional affidavit and records documenting the particular work associated with each set of costs. (Cooper Dec., Dkt. No. 711; KCC Exhibits, Dkt. No. 712.) Exhibit B of KCC's Exhibits, for instance, documents everything from the cost of postage for the initial mailing to the website hosting fees to the cost of

18

processing claims. (Exh. B, KCC Exhibits, Dkt. No. 712.) Phil Cooper, the Senior Project

Manager at KCC, also submitted a declaration providing detailed information regarding the

specific tasks KCC undertook to respond to potential claimants following the misleading media

coverage of the notice efforts. (Cooper Dec., Dkt. No. 711.) The Court recognizes that the scope

of KCC's assignment as Settlement Administrator changed significantly with the increased

number of claimants and the additional vetting requirements imposed by the parties and the

Court. The parties and KCC represent that KCC chose to cap its expenses at $3,000,000 in

administering the settlement to preserve the settlement fund for class members. The Court finds

that KCC's response provides adequate assurance that the Settlement Administrator devised and

implemented an acceptable procedure for providing multiple rounds of notice to potential

claimants and weeding out potentially fraudulent claims.

Some objectors are nonetheless unhappy with the supplemental verification process

implemented by the parties to guard against fraud. Some, for instance, contend that they no

longer have phone bills and therefore could not provide evidence to support that their older

phone numbers were eligible for claims. Others contend they provided additional documentation

but received no response. While the Court understands that the process of acquiring records may

have required more effort from potential claimants than in a typical TCPA case, the

supplemental proof process was necessary to safeguard the settlement from the risk of fraud.

And courts have discretion to impose additional verification requirements on class members as

part of the proof process in a class action settlement. *Saltzman v. Pella Corp.*, 257 F.R.D. 471,

476 (N.D. Ill. 2009) (members asked to verify class membership by submitting photographs of

damage). The process implemented in this case ensured only legitimate claims would receive a

payout from the settlement fund, which in turn kept the per person payout from reducing further.

Moreover, the objections were filed before the supplemental proof process had concluded: objectors therefore had time to reach out to Class Counsel to work out an arrangement for providing evidence of a connection to a phone number. Indeed, Class Counsel have represented that they had contacted all objectors and, to the extent necessary, provided guidance regarding what supporting documentation would suffice, extended time for objectors to send in documents, and otherwise attempted to facilitate the supplemental proof process for class members. Moreover, the parties had extensive discussions both in and out of court about how to implement additional verification requirements without inflating the cost of implementing the settlement or discouraging potential claimants. Therefore, although the Court fully considers the concern raised by objectors, it finds that the supplemental proof process was fully warranted and implemented in the fairest possible manner.

Objectors Johnson and Shelton contend that Class Counsel prejudiced the class by negotiating a settlement based on a smaller class of 40,000 when the actual class had more than 2,000,000 potential members. But the Court disagrees that this result reflects poor performance by Class Counsel. All the parties were surprised that media outlets seized upon statutory provisions for relief while failing to pay attention to the terms of the actual settlement. Given that counsel on both sides have a long history working in class action litigation, the Court credits their assertions that it was reasonable to expect a smaller class size. To the extent individuals feel misled due to third-party representations not endorsed by either counsel, such frustrations do not speak to the question of whether the settlement itself is fair.

### III.     Charvat's Incentive Award

Charvat also seeks approval of an incentive award of $50,000 to reward him for his participation as the named plaintiff in the suit. "Incentive awards are justified when necessary to induce individuals to become named representatives." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001). Such an award compensates a named plaintiff for subjecting himself to various risks, including the burdens of discovery and potential responsibility for a defendant's costs or attorneys' fees should the suit fail. *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 875 (7th Cir. 2012). In deciding whether an incentive award is proper and, if so, in what amount, courts should consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

Here, the Court concludes that an incentive award to Charvat is appropriate. Charvat chose to bear the risk of being the named plaintiff and stayed involved throughout a lengthy discovery process. Charvat should be rewarded for his service to the class. That said, the Court finds the requested $50,000 to be excessive. Incentive awards for class action plaintiffs are usually modest in nature for good reason: the plaintiff's duties are not arduous in nature and the risk of incurring liability is small. *Espenscheid*, 688 F.3d at 877. An award of $50,000 would be a significant outlier for a named plaintiff in a TCPA consumer class action. In this District, courts routinely grant such plaintiffs incentive awards of only $5,000. *See Douglas*, 328 F.R.D. at 219; *Kolinek*, 311 F.R.D. at 503; *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d at 809.

However, unlike most named TCPA plaintiffs, Charvat's participation in the discovery process was extensive and included sitting for a seven-hour deposition. Charvat has endured several years of discovery, scrutiny, and inconvenience in pursuit of this case. Under these circumstances, the Court believes an incentive award of $25,000 is appropriate. *See Craftwood Lumber Co. v. Interline Brands, Inc.*, 11-cv-4462, 2015 WL 1399367, at *6 (N.D. Ill. Mar. 23, 2015) (awarding a $25,000 incentive fee for a plaintiff who assisted significantly during discovery, attended multiple mediations, and regularly communicated with counsel about strategy). This amount recognizes that Charvat's participation in this litigation was greater than that experienced by the typical TCPA plaintiff but does not

## IV. Attorneys' Fees and Costs

To determine whether a requested fee award is reasonable, courts "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988). The relevant ratio for assessing the reasonableness of attorneys' fees "is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman*, 768 F.3d at 630. *See also Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014). In the Seventh Circuit, there is a presumption that "attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Id.* at 782. This is a "common fund" case in which Defendants are paying a specific sum in exchange for a release of liability to all Plaintiffs; as such, in determining an appropriate attorneys' fee award, the Court should "award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d at 718.

Class Counsel here request an award of attorneys' fees in the amount of $3,150,000. After subtracting administrative costs and a $25,000 incentive award for Charvat as named plaintiff, that amounts to 33.99% of the net settlement fund. Class Counsel request the Court calculate this award by using a percentage-of-the-fund method—that is, determining what fee arrangement the parties would have otherwise bargained for at the outset of litigation based on a percentage of the plaintiffs' ultimate recovery. *See Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 957–58 (7th Cir. 2013). To determine the reasonableness of the requested award, the Court must determine what "the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time" should be. *In re Synthroid Mktg. Litig.*, 264 F.3d at 718.

In class action cases, attorneys' fees "should approximate the market rate that prevails between willing buyers and willing sellers of legal services." *Silverman*, 739 F.3d at 947. The goal in awarding a reasonable attorneys' fee award "is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). In calculating such an award, the Court "must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members." *Redman*, 768 F.3d at 629. Factors bearing on the market price for legal fees may include "the risk of nonpayment, the quality of the attorney's performance, the amount of work necessary to resolve the litigation, and the stakes of the case." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 833 (7th Cir. 2018). Since such an estimate is "inherently conjectural," the Seventh Circuit leaves to the discretion of district courts the decision whether to use the lodestar or percentage-of-fund approach to

calculate attorneys' fees in common-fund cases. *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994).

The Court agrees with Class Counsel that using the percentage-of-recovery method is preferable to the lodestar method in this instance. The "normal practice in consumer class actions" is to negotiate a fee arrangement based on a percentage of recovery. *In re Capital One*, 80 F. Supp. 3d at 795. *See also Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 501 (7th Cir. 2015) (noting a large class of lightly-injured plaintiffs would be unlikely "to monitor counsel and ensure that counsel are working efficiently on an hourly basis" as required by the lodestar model). Moreover, counsel's request for a 33.99% award comports with the attorneys' fees awards granted in similar cases. *See Taubenfeld v. Aon Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (fee awards in analogous class action settlements shed light on the market rate for legal services in similar cases); *see also Martin v. Dun & Bradstreet, Inc.*, 12-cv-215, 2014 WL 9913504, at *3 (N.D. Ill. Jan. 16, 2014) (one-third of value of settlement); *Craftwood Lumber Co.*, 2015 WL 1399367, at *4 (sliding scale contingency fee including thirty percent of the first ten million dollars of the settlement). A 33.99% market rate award in a complex case that involved a lengthy and contentious discovery period would by no means be an unreasonable outlier.

The Court next turns to the specific facts of the case to determine whether the factors bearing on the market price for legal fees justify the percentage-of-recovery fee arrangement proposed by Class Counsel. *See Camp Drug Store, Inc.*, 897 F.3d at 832–33. First, as to the quality of Class Counsel's work, the Court finds that Class Counsel have diligently worked to represent the class and produced work of a high quality, commensurate with their extensive class action experience. With respect to the amount of work necessary to resolve the litigation, Class Counsel have clearly spent a significant amount of time and effort litigating this matter since the

24

first complaint was filed in 2012. This is not a case in which parties engaged in "no real litigation" and moved immediately to settlement. *See id.* (finding a reduced attorneys' fee award warranted where counsel merely filed a complaint and negotiated a settlement). Two amended complaints were filed. Counsel fought extensively to secure written discovery (including briefing and arguing motions to compel that led to evidence assisting in the identification of potential claimants) and worked diligently to provide notice to potential claimants. And Class Counsel undoubtedly spent additional effort on a failed mediation before settlement negotiations eventually bore fruit. Finally, while the parties may have reasonably expected the case would settle before reaching trial or the summary judgment stage, that was by no means certain, and neither was the liability of the Cruise Defendants. Class Counsel faced a real risk of nonpayment.

Therefore, the Court finds that a 33.99% attorneys' fee award reflects the market rate and takes into account the risk of nonpayment. The requested fee is granted.

## V.      Objectors' Requests for Attorneys' Fees and an Incentive Award

Objectors Dunlap, Johnson, and Shelton ("DJS Objectors") filed two motions: one requesting an incentive fee of $500 each (Dkt. No. 693) and one requesting an award of attorneys' fees in the amount of $211,588 and expenses totaling $1,860.70. (Dkt. No. 691.) The DJS Objectors claim they played a material role in pressuring the Cruise Defendants to contribute an additional $969,600.00 to the common fund, modifying the notice procedure to allow an additional opt-out period after the parties moved to require supplemental documentation for potential claimants, and pushing Class Counsel to reduce their fee request. The Cruise Defendants and Charvat dispute that the objectors materially contributed to the proceedings or offered objections that held merit.

In a class action settlement, having a broad range of participants is desirable because of the potential risk of collusion over attorneys' fees and settlement terms. *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 288 (7th Cir. 2002). "Objectors who add value to a class settlement may be compensated for their efforts." *In re Sw. Airlines Voucher Litig.*, 898 F.3d 740, 744 (7th Cir. 2018). For an objector to recover fees, however, he must show his objection secured a benefit for the class that outweighs the fees he is seeking. *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687–88 (7th Cir. 2008); *see also Eubank*, 753 F.3d at 720 (noting that objectors may receive an award "if their objections persuade the judge to disapprove" a settlement and "as a consequence a settlement more favorable to the class is negotiated and approved"). Otherwise, he has rendered no actual benefit to the class. *Reynolds*, 288 F.3d at 288.

The two objector requests stem from the modification of the class notice process in 2018. As noted above, after news of the potential settlement gained widespread media attention, the number of claimants responding to the notice skyrocketed. To safeguard against potential fraud, the parties asked the Court to authorize requests for follow-up documentation from claimants. It is here where the DJS Objectors claim they made their mark. First, they assert that they "pressured" the Cruise Defendants into contributing more money to the common fund by serving discovery on the Cruise Defendants and complaining that the payout per claimant was too low. But the DJS Objectors overstate their influence. The Cruise Defendants never responded to the discovery requests issued by the DJS Objectors. It is difficult to see how issuing fruitless discovery requests had any impact on the Cruise Defendants' decision to contribute additional money to the common fund. Additionally, while it was accurate to note that a per-claimant payout rate of below $20 would be low for similar TCPA actions in the Northern District of Illinois, it is not clear how the DJS Objectors' stating of this point had a clear and material

26

impact on parties. The DJS Objectors claim that because the Cruise Defendants contributed additional money to the common fund, the DJS Objectors' position "has won out." But it is not evident to the Court that the statements made by the DJS Objectors influenced the Cruise Defendants' decision; it seems more likely that negotiations between the Cruise Defendants and Class Counsel, as well as the parties' collective decision to cap or reduce fees to preserve the potential Settlement Fund, pushed the Cruise Defendants to raise their contribution to the Settlement Fund.

The DJS Objectors also claim their suggestion that additional notice emails be sent and an opt-out deadline extended as a result of the Court's decision to authorize an additional documentation requirement constitutes a material benefit warranting compensation. The Court acknowledges that the DJS Objectors made a helpful suggestion, but this suggestion constituted only a few minutes of dialogue in a lengthy and detailed hearing. When viewed in light of the parties' successful effort to persuade the Settlement Administrator to cap the cost of collecting supplemental documentation after negotiating two previous email campaigns, the DJS Objectors' contribution was minimal. And finally, while the DJS Objectors may have made a valid point in contending that Class Counsel should reduce their fee request in light of the rising administrative costs, those concerns had already been raised and both parties had committed to assuming additional costs in relation to the documentation process. In sum, the Court cannot find that the DJS Objectors' comments or suggestions that made a material difference to the benefit of class members.

The Court is mindful that having a variety of voices, including dissenters, adds value to the process of reviewing a class action settlement. But an objector must contribute ***materially*** to the settlement class's recovery in order to justify receipt of an incentive award or attorneys' fees.

That is not what happened here. The Court therefore denies DJS Objectors' motions for attorneys' fees and costs and incentive awards.

## CONCLUSION

For the foregoing reasons, Charvat's motion for final approval of the class settlement is granted. Charvat's motion for attorneys' fees and costs is also granted in its entirety. Charvat's motion for an incentive award is granted in amount of $25,000. Objectors Dunlap, Johnson, and Shelton's motion for an incentive award is denied. Objectors Dunlap, Johnson, and Shelton's motion for attorneys' fees and costs is also denied.

ENTERED:

Dated:  October 28, 2019

_____

Andrea R. Wood
United States District Judge